IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and ABBOTT     )
CARDIOVASCULAR SYSTEMS, INC.,      )
                                   )
                                   )        Civil Action No. 07-259-SLR
            Plaintiffs,            )
                                   )
                                   )
        v.                         )
                                   )
JOHNSON AND JOHNSON, INC. and      )
CORDIS CORPORATION,                )
                                   )
            Defendants.            )
                                   )

**PLAINTIFFS' SUPPLEMENTAL MOTION FOR LEAVE TO FILE A
SUPPLEMENTAL COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15, Plaintiffs Abbott Laboratories and

Abbott Cardiovascular Systems, Inc. (collectively, "Abbott") respectfully move for leave to file a

supplemental complaint adding a new claim for declaratory judgment of invalidity and

noninfringement of United States Patent No. 7,300,662 (the "Falotico '662 patent"). The present

motion is a supplement to two motions to supplement filed by Abbott on May 29, 2007 and June

12, 2007. (*See* D.I. 10 and 15.) Abbott's proposed supplemental complaint and proposed order

are attached as Exhibit 1 and Attachment A, respectively.[1]  A redline against the original

complaint is attached as Exhibit 2.  While Abbott attempted to enter into a stipulation with J&J

to avoid burdening the Court with another motion to supplement, J&J refused to communicate

with Abbott regarding the Falotico '662 patent. (Ex. 3, Nov. 19, 2007 Hansen E-Mail.)

---

[1]  The supplemental complaint attached as Exhibit 1 includes all the changes proposed in
Abbott's May 29, 2007 and June 12, 2007 motions to supplement and new claim IV, which is the
declaratory judgment claim for the Falotico '662 patent.  The supplemental complaint also
includes minor revisions in order to reflect events that occurred after the filing of the original
complaint.

## DISCUSSION

In the original declaratory judgment complaint, filed on May 15, 2007, Abbott sought a declaratory judgment that U.S. Patent No. 7,217,286 (the "Wright '7286 patent") is invalid and not infringed by Abbott's XIENCE V drug-eluting stent system. (D.I. 1.) On May 29, 2007, Abbott moved for leave to file a supplemental complaint adding a claim for declaratory judgment of invalidity and noninfringement of U.S. Patent No. 7,223,286 (the "Wright '3286 patent"). (D.I. 10.) On June 12, 2007, Abbott filed a supplemental motion for leave to file a supplemental complaint adding a claim for declaratory judgment of invalidity and noninfringement of U.S. Patent No. 7,229,473 (the "Wright '473 patent"). (D.I. 15.) Abbott is now seeking leave to supplement its complaint with a newly issued patent from the Falotico patent family, namely the Falotico '662 patent which issued today, November 27, 2007.[2] (Ex. 4, Issue Notification.)

The subject matter claimed in the Falotico '662 patent is similar to the subject matter claimed in the Wright patent family. Specifically, the United States Patent and Trademark Office rejected certain claims of the Falotico '662 patent as unpatentable over claims 1 through 6 of United States Patent No. 6,808,536 ("the Wright '536 patent"). (Ex. 5, Feb. 22, 2007 Office Action.) The Wright '536, '7286, '3286 and '473 patents are all related through a series of continuations, and therefore the aforementioned patents all have the same disclosure and specification. Accordingly, the subject matter of the Falotico '662 patent is also similar to the subject matter of the Wright '7286, '3286 and '473 patents.

---

[2] This case is also related to Civil Action No. 06-613-SLR which involves a declaratory judgment that certain related Wright and Falotico patents are invalid and not infringed by the XIENCE V. Specifically, in that case, Abbott filed a complaint on September 29, 2006 seeking a declaratory judgment that U.S Patent Nos. 6,585,764, 6,808,536 and 6,776,796 are invalid and not infringed. (Civ. No. 06-613-SLR, D.I. 1.) Subsequently, as the Wright '7286 patent, the Wright '3286 patent, the Wright '473 patent, and the Falotico '662 patent issued, Abbott moved to supplement the complaint in Civil Action No. 06-613-SLR. (Id. at D.I. 43, 51 and 57 and D.I. filed on Nov. 27, 2007.) In the alternative, Abbott requested that the Court consolidate that case (Civ. No. 06-613-SLR) with this case (Civ. No. 07-259-SLR). (Id.)

2

As a matter of judicial economy and efficiency, the invalidity and noninfringement of the patents in the Wright and Falotico patent families should all be tried as part of the same case. As set forth more fully in Abbott's May 29 and June 12 motions, given the stage of the case, the lack of any prejudice to J&J, and Abbott's promptness in moving to supplement, Abbott respectfully requests that the Court grant Abbott's motions to supplement and allow Abbott to file the supplemental complaint attached as Exhibit 1. Further, Abbott requests that the supplemental complaint be deemed filed *nunc pro tunc* as of the filing of Abbott's motions to supplement as set forth in the proposed order.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC.

Date: November 27, 2007

3

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2007 I caused to be served by hand delivery the

foregoing document and electronically filed the same with the Clerk of the Court using CM/ECF

which will send notification of such filing(s) to the following:

> Steven J. Balick, Esquire
> John G. Day, Esquire
> Lauren E. Maguire, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> P.O. Box 1150
> Wilmington, DE 19899

I herby certify that on November 27, 2007, I caused to be sent by Federal Express the

foregoing document to the following non-registered participant:

> David T. Pritikin, Esquire
> William H. Baumgartner, Jr., Esquire
> Russell E. Cass, Esquire
> Laura L. Kolb, Esquire
> Sidley Austin LLP
> One South Dearborn
> Chicago, IL 60603

Anne Shea Gaza (#4093)
gaza@rlf.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | C. A. No. 07-259-SLR |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## RULE 7.1.1 CERTIFICATION

Pursuant to District of Delaware Local Rule 7.1.1., the undersigned counsel hereby certifies that counsel for plaintiffs consulted with counsel for defendants prior to filing Plaintiffs' Supplemental Motion for Leave to File A Supplemental Complaint (the "Motion") and were advised that defendants object the relief sought in the Motion.

*Frederick L. Cottrell, III /Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
920 N. King Street
Wilmington, DE 19899
(302) 651-7700
*Attorneys for Abbott Laboratories*
*and Abbott Cardiovascular Systems, Inc.*

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Donald J. Pochopien
Sandra A. Frantzen
Christopher J. Buchko
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Date: November 27, 2007

# ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | Civil Action No. 07-259-SLR |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTIONS FOR LEAVE
TO FILE A SUPPLEMENTAL COMPLAINT**

At Wilmington this _____ day of _____, 2007, having

considered: (1) Plaintiffs' Motion For Leave To File A Supplemental Complaint filed in

Civil Action No. 07-259-SLR (D.I. 10, "Plaintiffs' First Motion"); (2) Plaintiffs'

Supplemental Motion For Leave To File A Supplemental Complaint filed in Civil Action

No. 07-259-SLR (D.I. 15, "Plaintiffs' First Supplemental Motion"); (3) Plaintiffs' Second

Supplemental Motion For Leave To File A Supplemental Complaint filed in Civil Action

No. 07-259-SLR (D.I. filed on Nov. 27, 2007, "Plaintiffs' Second Supplemental

Motion"); and (4) Plaintiffs' Motion For Leave To File A Supplemental Complaint Or In

The Alternative To Consolidate Related Actions filed in Civil Action No. 06-613-SLR

(D.I. 43, "Plaintiffs' 06-613 Motion"),

IT IS HEREBY ORDERED that Plaintiffs' First Motion, and First and Second

Supplemental Motions are GRANTED. Within 10 days of entry of this Order, Plaintiffs

may file a Supplemental and Amended Complaint substantially in the form as Exhibit 1 filed in support of Plaintiffs' Second Supplemental Motion. Civil Action No. 07-259-SLR shall be deemed filed as of the filing of Plaintiffs' 06-613 Motion. With the exception of Claims III and IV, the Supplemental and Amended Complaint shall be deemed filed as of the filing of Plaintiffs' First Motion. Claim III shall be deemed filed as of the filing of Plaintiffs' First Supplemental Motion. Claim IV shall be deemed filed as of the filing of Plaintiffs' Second Supplemental Motion.

_____
Judge

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-259-SLR |
| v. | ) ) | |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT INVALIDITY AND NONINFRINGEMENT**

Plaintiffs Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively "Abbott") bring this Supplemental and Amended Complaint against Defendants Johnson and Johnson, Inc. and Cordis Corporation (collectively "J&J"). This is an action for declaratory judgment and injunctive relief that United States Patent No. 7,217,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '7286 patent"), United States Patent No. 7,223,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '3286 patent"), United States Patent No. 7,229,473 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '473 patent"), and United States Patent No. 7,300,662 entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease" ("the Falotico '662 patent") are invalid and not infringed by Abbott. The Wright '7286 patent,

the Wright '3286 patent, and the Wright '473 patent are attached as Exhibits A–C, respectively. The Issue Notification for the Falotico '662 patent and the Falotico '662 patent are attached as Exhibit D. Abbott alleges as follows:

## THE PARTIES

1.    Abbott Laboratories is a corporation organized under the laws of the State of Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.    Abbott Cardiovascular Systems, Inc. ("ACS"), formerly Advanced Cardiovascular Systems, Inc., is a corporation organized under the laws of the State of California and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.    On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.    On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

## JURISDICTION AND VENUE

5.    This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.    This Court has personal jurisdiction, general and specific, over J&J.

2

8.    On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.    On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.    On information and belief, J&J regularly transacts business within this judicial district.

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

13.    J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.    The coronary stent industry is highly litigious. J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.    On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc, et al.*, C.A. No. 97-550-SLR; *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 98-065-SLR).

16.    On three additional occasions within the last ten years, Cordis initiated patent infringement actions in this judicial district involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 98-197-SLR; *Cordis*

3

*Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR; and *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-027-SLR).

17.    In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS.    In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

18.    One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus.  ACS holds an exclusive patent license to use everolimus for drug eluting stents.  In clinical trials, everolimus has proven superior to other drugs.

19.    On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

**The Patents-in-Suit**

20.    United States Application No. 10/951,385 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '385 application ") was filed on September 28, 2004.

21.    The Wright '385 application is related to and claims priority to United States Patent Nos. 6,808,536 ("the Wright '536 patent") and 6,585,764 ("the Wright '764 patent").

22.    On information and belief, the subject matter claimed in the Wright '385 application  is not patentably distinct from the subject matter claimed in at least the Wright '536 patent, the Wright '764 patent, the Wright '7286 patent, and the Wright '473 patent.

23.    The Wright '385 application issued on May 29, 2007 as United States Patent No. 7,223,286.

4

24.    United States Application No. 11/467,035 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '035 application") was filed on August 24, 2006.

25.    The Wright '035 application is related to and claims priority to the Wright '536 patent, the Wright '764 patent, and the Wright '3286 patent.

26.    On information and belief, the subject matter claimed in the Wright '035 application is not patentably distinct from subject matter claimed in at least the Wright '764 patent, the Wright '536 patent, the Wright '3286 patent, and the Wright '473 patent.

27.    The Wright '035 application issued on May 15, 2007 as United States Patent No. 7,217,286.

28.    United States Application No. 11/466,983 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '983 application") was also filed on August 24, 2006.

29.    The Wright '983 application is related to and claims priority to the Wright '536 patent, the Wright '764 patent, and the Wright '3286 patent.

30.    On information and belief, the subject matter claimed in the Wright '983 application is not patentably distinct from the subject matter claimed in at least the Wright '536 patent, the Wright '764 patent, the Wright '3286 patent, and the Wright '7286 patent.

31.    The Wright '983 application issued on June 12, 2007 as United States Patent No. 7,229,473.

32.    United States Application No. 10/829,074 entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease" (the "Falotico '074 application") was filed on April 21, 2004.

33.    On February 22, 2007 the United States Patent and Trademark Office issued a Final Action Office which in part rejected claims 15-22 and 31-36 for obviousness-type double patenting as being unpatentable over claims 1-6 of the Wright '536 patent. The February 22, 2007 Final Office Action is attached as Exhibit E.

34.    On information and belief, the Falotico '662 patent issued on November 27, 2007 as United States Patent No. 7,300,662.

**J&J's Public Threats To Sue For Patent Infringement By XIENCE V**

35.    On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

36.    On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch. On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and United States Patent No. 6,776,796 ("the Falotico '796 patent").

37.    On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

38.    For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant," attached as Exhibit F ("the Prudential report"). In the Prudential report, parties are identified by their stock symbols: ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

39.    On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

40.    Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as . . . GDT's everolimus.  The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.

* * *

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI) business, including shared rights to GDT's promising everolimus-coated stent, Xience-V, to ABT.  Although JNJ's patents have never been litigated, JNJ believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent.  JNJ could pursue a preliminary injunction if ABT and BSX try to launch an everolimus-coated . . . stent.  . . .  According to JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

41.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Prudential analysts.

42.    On January 23, 2006, A.G. Edwards & Sons, Inc. published a report titled "Healthcare Industry Note:  The Game May Be Far From Over," attached as Exhibit G ("the AG Edwards report").

43.    On information and belief, the AG Edwards report relied on information provided in pertinent part by J&J.

44.    Among other things, the AG Edwards report stated:

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over.

* * *

We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent. We were only given two patent numbers (6776796 [the Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . . .

45.    On information and belief, the third patent referenced in J&J's threatening statements was the Wright '536 patent.

46.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to AG Edwards analysts.

47.    On January 13, 2006, Citigroup published a report titled "An INTERESTing New Offer," attached as Exhibit H ("the January 13, 2006 Citigroup report").

48.    On information and belief, the January 13, 2006 Citigroup report relied on information provided in pertinent part by J&J.

49.    Among other things, the January 13, 2006 Citigroup report stated:

The [Wright and Falotico] patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.

50.    Citigroup published an additional report on March 23, 2006 titled "Deconstructing Xience," attached as Exhibit I ("the March 23, 2006 Citigroup report"). In the March 23, 2006 Citigroup report, J&J is identified by its stock symbol JNJ.

8

51.    On information and belief, the March 23, 2006 Citigroup report relied on information provided in pertinent part by J&J.

52.    Among other things, the March 23, 2006 Citigroup report stated:

Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

53.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Citigroup analysts.

54.    On January 30, 2006, Lehman Brothers published a report titled "BSX: The Risks – Part I," attached as Exhibit J ("the Lehman Brothers report"). In the Lehman Brothers report, parties are identified by their stock symbols: ABT for Abbott; GDT for Guidant; and JNJ for J&J.

55.    On information and belief, the Lehman Brothers report relied on information provided in pertinent part by J&J.

56.    Among other things, the Lehman Brothers report stated:

There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JNJ/Wyeth DES patents covering the "limus" family of drugs.

57.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Lehman Brothers analysts.

58.    On March 14, 2006, Merrill Lynch published a report titled "More legal wrangling for J&J possible," attached as Exhibit K ("the Merrill Lynch report"). In the Merrill Lynch report, J&J is identified by its stock symbol JNJ.

9

59.    On information and belief, the Merrill Lynch report relied on information provided in pertinent part by J&J.

60.    Among other things, the Merrill Lynch report stated:

JNJ has two patents (Wright and Falotico) which appear to relate to the elution of characteristics of "olimus" compounds; JNJ's Cypher DES uses sirolimus, a member of the olimus family of drugs; other olimus drugs include Guidant's everolimus and Abbott/Medtronic's zotarolimus (ABT-578).  The European launch of Guidant's Xience DES, which the company has targeted for Q2:06, could trigger possible legal activity since we understand U.S. patent law prohibits domestic manufacture of a product for sale outside the U.S. if there's been infringement of intellectual property.

61.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Merrill Lynch analysts.

62.    On information and belief, J&J broadcast threatening statements to other news outlets regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

63.    On January 23, 2006, the International Herald Tribune published an article headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit L ("the International Herald article").

64.    On information and belief, the International Herald article relied on information provided in pertinent part by J&J.

65.    Among other things, the International Herald article stated:

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G. Edwards. Wald said he had been called by a Johnson & Johnson employee, whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

* * *

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design. At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

* * *

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said.

11

"J&J claims that two of its patents may be infringed if a company tries to launch a

drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

66.    On January 20, 2006, the Boston Globe published an article headlined "Suitors

take Guidant fight to The Street," attached as Exhibit M ("the Boston Globe article").

67.    On information and belief, the Boston Globe article relied on information

provided in pertinent part by J&J.

68.    Among other things, the Boston Globe article stated:

[J&J] has also raised the prospect that it could use patents and existing ties to Guidant to

derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for

Citigroup who is skeptical about Guidant's value to both companies.

69.    Also on January 20, 2006, Crain's Chicago Business published an article

headlined "Abbott stock falls on concerns over success of Guidant bid," attached as Exhibit N

("the Crain's article").

70.    On information and belief, the Crain's article relied on information provided in

pertinent part by J&J.

71.    Among other things, the Crain's article stated:

The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's

board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson,

a competing bidder for Guidant, claims its patents would be violated if Abbott markets its

own drug-eluting stents or those made by Guidant.

72.    On January 21, 2006, Reuters published an article headlined "Abbott, Boston

shares off on J&J patent threat," attached as Exhibit O ("the Reuters article").

12

73.    On information and belief, the Reuters article relied on information provided in pertinent part by J&J.

74.    Among other things, the Reuters article stated:

One analyst, who asked not to be named, said J&J management was making rounds on Wall Street trying to fan fears about the Boston Scientific bid.

The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products.

75.    On January 24, 2006, Medical Device Daily published an article headlined "J&J offer rumors persist as Guidant has more ICD issues," attached as Exhibit P ("the Medical Device Daily article").

76.    On information and belief, the Medical Device Daily article relied on information provided in pertinent part by J&J.

77.    Among other things, the Medical Device Daily article stated:

Fueling this speculation were rumors, some of which apparently were planted by J&J personnel as part of an organized campaign to undermine the Boston Scientific offer in the minds of analysts, that two of its patents may be infringed if an unnamed company tries to launch a drug-eluting stent coated with a derivative of rapamycin.

78.    On January 26, 2006, The Wall Street Journal published an article headlined "Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant," attached as Exhibit Q ("the Wall Street Journal article").

13

79.    On information and belief, the Wall Street Journal article relied on information provided in pertinent part by J&J.

80.    Among other things, the Wall Street Journal article stated that:

Another potential wrinkle arises in the intellectual-property rights surrounding stents - - an area that's been the subject of extensive litigation in the industry.  Citigroup analyst Matthew Dodds says J&J holds patents on methods of using "limus-type drugs on stents - - including the everolimus on Guidant's stent, as well as a drug on an Abbott stent.

81.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

82.    On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of patents in the Wright and/or Falotico families. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

83.    Abbott and others did become aware of J&J's threatening statements.

84.    For example, on January 20, 2006, Avram Goldstein of Bloomberg contacted Abbott regarding the Wright and Falotico patents in relation to the XIENCE V.

85.    On January 13, 2006, Bruce Nudell of Sanford C. Bernstein contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

86.    Also on January 13, 2006, The Shaw Group contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

87.    On January 20, 2006, Avram Goldstein of Bloomberg contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

88.    Again on January 20, 2006, Barnaby Feder of the New York Times contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

89.    On January 31, 2006, Steve Silva of Joele Frank contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

90.    On March 23, 2006, Jennifer B. Pearlman of Burgundy Asset Management contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

91.    On information and belief, in furtherance of its campaign to cast a cloud over the launch of the XIENCE V, J&J made threatening statements to Guidant.

92.    On January 12, 2006, J&J contacted Guidant and informed Guidant that if Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with the Wright and Falotico patent families.

93.    On January 13, 2006, J&J again contacted Guidant. J&J sent Guidant a document asserting that J&J's intellectual property portfolio included patents directed to everolimus when used on a stent, Abbott would not receive access to these patents in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using everolimus, including the XIENCE V, may infringe these patents.

94.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

95.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

15

96.    In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

97.    The XIENCE V was subsequently launched in Europe. On information and belief, J&J is aware that the XIENCE V has launched and is preparing to sue Abbott for infringement by the XIENCE V of patents in the Wright and/or Falotico families.

98.    Before Abbott filed the original complaint in this action on May 15, 2007, J&J never withdrew or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the patents in the Wright and/or Falotico families.

99.    On information and belief, by these statements J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

100.    On information and belief, by these statements J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

101.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the First Petition") with the United States Patent and Trademark Office in the matter of the Wright '385 application. On May 29, 2007 the Wright '385 application issued as the Wright '3286 patent. A copy of the First Petition is attached as Exhibit R.

16

102.    In the First Petition, J&J asserted that it could sue Abbott for infringement by the

XIENCE V immediately upon issuance of the Wright '385 application as a patent. Among other

things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories
>
> (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in
>
> Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in
>
> Guidant press releases, with the claims of the instant application. In my opinion,
>
> the XIENCE™ V product is unquestionably within the scope of at least claims
>
> 103 and 130 on file in this application.
>
> * * *
>
> It is therefore my opinion that Guidant is making a product in the United States to
>
> support the European launch that is unquestionably within the scope of at least
>
> claims 103 and 130 of the instant application, and that a patent containing these
>
> claims could immediately be asserted upon issue.

103.    On information and belief, J&J intended to create a substantial controversy

between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '3286

patent.

104.    On information and belief, J&J intended to create the apprehension in Abbott and

others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright

'3286 patent.

17

105.    J&J was preparing to sue Abbott for infringement by the XIENCE V upon the issuance of the Wright '3286 patent.

106.    On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Second Petition") with the United States Patent and Trademark Office in the matter of the Wright '035 application. On May 15, 2007, the Wright '035 application issued as the Wright '7286 patent. A copy of the Petition is attached as Exhibit S.

107.    In the Second Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '035 application as a patent. Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.
>
> * * *
>
> It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

18

108.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '7286 patent.

109.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '7286 patent.

110.    J&J was preparing to sue Abbott for infringement by the XIENCE V upon the issuance of the Wright '7286 patent.

111.    On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Third Petition") with the United States Patent and Trademark Office in the matter of the Wright '983 application. On June 12, 2007, the Wright '983 application issued as the Wright '473 patent. A copy of the Petition is attached as Exhibit T.

112.    In the Third Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '983 application as a patent. Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.

19

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

113.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '473 patent.

114.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '473 patent.

115.    J&J was preparing to sue Abbott for infringement by the XIENCE V of the Wright '473 patent.

116.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Fourth Petition") with the United States Patent and Trademark Office in the matter of Falotico '074 application.  On information and belief, on November 27, 2007, the Falotico '074 application issued as the Falotico '662 patent.  A copy of the Fourth Petition is attached as Exhibit U.

117.    In the Fourth Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Falotico '074 application as a patent.  Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

\* \* \*

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 15 to 30 on file in this application.

\* \* \*

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 15 to 30 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

118. On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Falotico '662 patent.

119. On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Falotico '662 patent.

120. J&J is preparing to sue Abbott for infringement by the XIENCE V upon issuance of the Falotico '662 patent.

21

**J&J Sued Abbott In An Attempt To Interfere With The XIENCE V Launch**

121.    On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York. Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant. The complaint seeks no less than $5.5 billion in damages. A copy of the complaint is attached as Exhibit V.

122.    Although the events cited in the complaint occurred over eight months prior to the filing of J&J's complaint, J&J timed the lawsuit, on information and belief, in anticipation of the then imminent launch of the XIENCE V. Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the then imminent launch of the XIENCE V.

**The XIENCE V Launch**

123.    Abbott manufactured and continues to manufacture, at its facilities in the United States, thousands of the XIENCE V.

124.    J&J created a substantial controversy between J&J and Abbott regarding the alleged infringement of the Wright '7286 patent, the Wright '3286 patent, the Wright '473 patent, and the Falotico '662 patent by the XIENCE V.

125.    Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Wright '7286 patent, the Wright '3286 patent, the Wright '473 patent, and the Falotico '662 patent by the XIENCE V.

## CLAIM I

### <u>INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,217,286</u>

126.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-125.

127.    The Wright '7286 patent issued on May 15, 2007.

128.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '7286 patent by the XIENCE V.

129.    J&J has asserted rights under the Wright '7286 patent against the XIENCE V.

130.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '7286 patent by the XIENCE V.

131.    On information and belief, the claims of the Wright '7286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

132.    The XIENCE V does not infringe any valid claim of the Wright '7286 patent.

133.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '7286 patent.

## CLAIM II

### <u>INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,223,286</u>

134.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-133.

135.    The Wright '3286 patent issued on May 29, 2007.

136.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '3286 patent by the XIENCE V.

23

137.    J&J has asserted rights under the Wright '3286 patent against the XIENCE V.

138.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '3286 patent by the XIENCE V.

139.    On information and belief, the claims of the Wright '3286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

140.    The XIENCE V does not infringe any valid claim of the Wright '3286 patent.

141.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '3286 patent.

## CLAIM III

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,229,473

142.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-141.

143.    The Wright '473 patent issued on June 12, 2007.

144.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '473 patent by the XIENCE V.

145.    J&J has asserted rights under the Wright '473 patent against the XIENCE V.

146.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '473 patent by the XIENCE V.

147.    On information and belief, the claims of the Wright '473 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

148.    The XIENCE V does not infringe any valid claim of the Wright '473 patent.

24

149.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '473 patent.

## CLAIM IV

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,300,662

150.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-149.

151.    On information and belief, the Falotico '662 patent issued on November 27, 2007.

152.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Falotico '662 patent by the XIENCE V.

153.    J&J has asserted rights under the Falotico '662 patent against the XIENCE V.

154.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Falotico '662 patent by the XIENCE V.

155.    On information and belief, the claims of the Falotico '662 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

156.    The XIENCE V does not infringe any valid claim of the Falotico '662 patent.

157.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Falotico '662 patent.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 7,217,286 is invalid;

(b)    each and every claim of U.S. Patent No. 7,223,286 is invalid;

(c)    each and every claim of U.S. Patent No. 7,229,473 is invalid;

25

(d)      each and every claim of U.S. Patent No. 7,300,662 is invalid;

(e)      Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,217,286;

(f)      Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,223,286;

(g)      Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,229,473;

(h)      Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,300,662;

(i)      Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S. Patent Nos. 7,217,286, 7,223,286, 7,229,473, and 7,300,662 against Plaintiffs, their suppliers, customers, distributors or users of their products;

(j)      Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by Plaintiffs in this action; and

(k)      Plaintiffs be granted such other and further relief as this Court deems just and proper.

26

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT
LABORATORIES and ABBOTT
CARDIOVASCULAR SYSTEMS, INC.

Date: November 27, 2007

27

_____

# EXHIBIT A



US007217286B2

(12) **United States Patent**
    Falotico et al.

(10) Patent No.: **US 7,217,286 B2**
(45) Date of Patent: ***May 15, 2007**

(54) **LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT**

(75) Inventors: **Robert Falotico**, Bell Mead, NJ (US); **Gerard H. Llanos**, Stewartsville, NJ (US)

(73) Assignee: **Cordis Corporation**, Miami Lakes, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/467,035**

(22) Filed: **Aug. 24, 2006**

(65) **Prior Publication Data**

US 2007/0021825 A1    Jan. 25, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/951,385, filed on Sep. 28, 2004, which is a continuation of application No. 10/408,328, filed on Apr. 7, 2003, now Pat. No. 6,808,536, which is a continuation of application No. 09/874,117, filed on Jun. 4, 2001, now Pat. No. 6,585,764, which is a continuation of application No. 09/061,568, filed on Apr. 16, 1998, now Pat. No. 6,273,913.

(60) Provisional application No. 60/044,692, filed on Apr. 18, 1997.

(51) Int. Cl.
    *A61F 2/06*        (2006.01)

(52) U.S. Cl. .................................... **623/1.42**

(58) Field of Classification Search ..... 623/1.45–1.48; 427/2.1–2.31
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 861,659 A | 7/1907 | Johnston | 464/147 |
| 3,051,677 A | 8/1962 | Rexford | 522/156 |
| 3,279,996 A | 10/1966 | Long et al. | 424/424 |
| 3,526,005 A | 9/1970 | Bokros | 623/11.11 |
| 3,599,641 A | 8/1971 | Sheridan | 604/256 |
| 3,657,744 A | 4/1972 | Ersek | 128/898 |
| 3,744,596 A | 7/1973 | Sander | 188/203 |
| 3,779,805 A | 12/1973 | Alsberg | 427/105 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE    3205942 A1    9/1983

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 07/819,314, filed Jan. 9, 1992, Morris.

(Continued)

*Primary Examiner*—Suzette Gherbi
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

Methods of preparing intravascular stents with a polymeric coating containing macrocyclic lactone (such as rapamycin or its analogs), stents and stent grafts with such coatings, and methods of treating a coronary artery with such devices. The macrocyclic lactone-based polymeric coating facilitates the performance of such devices in inhibiting restenosis

**5 Claims, 2 Drawing Sheets**



**US 7,217,286 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,992 A | 12/1975 | Sehgal et al. | 424/122 |
| 3,932,627 A | 1/1976 | Margraf | 514/56 |
| 3,948,254 A | 4/1976 | Zaffaroni | 128/833 |
| 3,952,334 A | 4/1976 | Bokros et al. | 623/11.11 |
| 3,968,800 A | 7/1976 | Vilasi | 606/198 |
| 4,069,307 A | 1/1978 | Higuchi et al. | 424/432 |
| 4,076,285 A | 2/1978 | Martinez | 285/332 |
| 4,292,965 A | 10/1981 | Nash et al. | 128/833 |
| 4,299,226 A | 11/1981 | Banka | 604/509 |
| 4,300,244 A | 11/1981 | Bokros | 623/1.13 |
| 4,312,920 A | 1/1982 | Pierce et al. | 428/425.5 |
| 4,321,711 A | 3/1982 | Mano | 623/1.43 |
| 4,323,071 A | 4/1982 | Simpson et al. | 606/194 |
| 4,390,599 A | 6/1983 | Broyles | 428/597 |
| 4,413,359 A | 11/1983 | Akiyama et al. | 623/23.72 |
| 4,423,183 A | 12/1983 | Close | 524/546 |
| 4,441,216 A | 4/1984 | Ionescu et al. | 623/2.19 |
| 4,503,569 A | 3/1985 | Dotter | 623/1.19 |
| 4,512,338 A | 4/1985 | Balko et al. | 606/108 |
| 4,550,447 A | 11/1985 | Seiler, Jr et al. | 623/1.32 |
| 4,553,545 A | 11/1985 | Maass et al. | 606/198 |
| 4,560,374 A | 12/1985 | Hammerslag | 604/509 |
| 4,562,596 A | 1/1986 | Kronberg | 623/1.32 |
| 4,565,740 A | 1/1986 | Golander et al. | 428/409 |
| 4,580,568 A | 4/1986 | Gianturco | 606/198 |
| 4,613,665 A | 9/1986 | Larm | 536/20 |
| 4,642,111 A | 2/1987 | Sakamoto et al. | 424/492 |
| 4,655,771 A | 4/1987 | Wallsten | 623/1.22 |
| 4,656,083 A | 4/1987 | Hoffman et al. | 442/123 |
| 4,676,241 A | 6/1987 | Webb et al. | 128/207.14 |
| 4,678,466 A | 7/1987 | Rosenwald | 424/427 |
| 4,687,482 A | 8/1987 | Hanson | 623/1.49 |
| 4,689,046 A | 8/1987 | Bokros | 623/2.31 |
| 4,731,054 A | 3/1988 | Billeter et al. | 604/93.01 |
| 4,733,665 A | 3/1988 | Palmaz | 606/108 |
| 4,733,665 A | 3/1988 | Palmaz | 606/108 |
| 4,739,762 A | 4/1988 | Palmaz | 623/1.11 |
| 4,740,207 A | 4/1988 | Kreamer | 623/1.15 |
| 4,749,585 A | 6/1988 | Greco et al. | 428/422 |
| 4,753,652 A | 6/1988 | Langer et al. | 623/1.42 |
| 4,760,849 A | 8/1988 | Kropf | 606/191 |
| 4,768,507 A | 9/1988 | Fischell et al. | 623/1.15 |
| 4,776,337 A | 10/1988 | Palmaz | 623/1.11 |
| 4,786,500 A | 11/1988 | Wong | 424/422 |
| 4,787,899 A | 11/1988 | Lazarus | 623/11.11 |
| 4,800,882 A | 1/1989 | Gianturco | 606/194 |
| 4,810,784 A | 3/1989 | Larm | 536/20 |
| 4,856,516 A | 8/1989 | Hillstead | 606/194 |
| 4,871,357 A | 10/1989 | Hsu et al. | 604/266 |
| 4,872,867 A | 10/1989 | Joh | 604/269 |
| 4,876,109 A | 10/1989 | Mayer et al. | 604/269 |
| 4,886,062 A | 12/1989 | Wiktor | 606/194 |
| 4,907,336 A | 3/1990 | Gianturco | 29/515 |
| 4,916,193 A | 4/1990 | Tang et al. | 525/413 |
| 4,954,126 A | 9/1990 | Wallsten | 600/36 |
| 4,969,458 A | 11/1990 | Wiktor | 623/1.11 |
| 4,990,131 A | 2/1991 | Dardik et al. | 600/36 |
| 4,990,155 A | 2/1991 | Wilkoff | 606/191 |
| 4,994,071 A | 2/1991 | MacGregor | 606/194 |
| 4,994,298 A | 2/1991 | Yasuda | 427/490 |
| 4,998,923 A | 3/1991 | Samson et al. | 606/194 |
| 5,015,253 A | 5/1991 | MacGregor | 623/1.15 |
| 5,019,090 A | 5/1991 | Pinchuk | 623/1.15 |
| 5,019,096 A | 5/1991 | Fox, Jr. et al. | 600/36 |
| 5,029,877 A | 7/1991 | Fedeli | 277/354 |
| 5,034,265 A | 7/1991 | Hoffman et al. | 442/124 |
| 5,035,706 A | 7/1991 | Gianturco et al. | 606/198 |
| 5,041,100 A | 8/1991 | Rowland et al. | 604/265 |
| 5,041,126 A | 8/1991 | Gianturco | 623/1.15 |
| 5,047,020 A | 9/1991 | Hsu | 604/266 |
| 5,049,132 A | 9/1991 | Shaffer et al. | 604/101.02 |
| 5,049,403 A | 9/1991 | Larm et al. | 427/2.1 |
| 5,053,048 A | 10/1991 | Pinchuk | 623/1.43 |
| 5,059,166 A | 10/1991 | Fischell et al. | 600/3 |
| 5,061,275 A | 10/1991 | Wallsten et al. | 623/1.22 |
| 5,061,750 A | 10/1991 | Feijen et al. | 525/54.1 |
| 5,064,435 A | 11/1991 | Porter | 623/23.7 |
| 5,092,877 A | 3/1992 | Pinchuk | 128/898 |
| 5,102,417 A | 4/1992 | Palmaz | 606/195 |
| 5,104,404 A | 4/1992 | Wolff | 623/11.16 |
| 5,116,365 A | 5/1992 | Hillstead | 623/1.15 |
| 5,122,154 A | 6/1992 | Rhodes | 623/1.13 |
| 5,131,908 A | 7/1992 | Dardik et al. | 600/36 |
| 5,133,732 A | 7/1992 | Wiktor | 623/1.22 |
| 5,134,192 A | 7/1992 | Feijen et al. | 525/54.1 |
| 5,135,536 A | 8/1992 | Hillstead | 606/195 |
| 5,163,952 A | 11/1992 | Froix | 623/1.18 |
| 5,163,958 A | 11/1992 | Pinchuk | 623/23.49 |
| 5,171,217 A | 12/1992 | March et al. | 604/507 |
| 5,171,262 A | 12/1992 | MacGregor | 623/1.15 |
| 5,176,660 A | 1/1993 | Truckai | 604/527 |
| 5,176,972 A | 1/1993 | Bloom et al. | 430/14 |
| 5,178,618 A | 1/1993 | Kandarpa | 606/28 |
| 5,180,366 A | 1/1993 | Woods | 604/96.01 |
| 5,182,317 A | 1/1993 | Winters et al. | 523/112 |
| 5,185,408 A | 2/1993 | Tang et al. | 525/415 |
| 5,192,307 A | 3/1993 | Wall | 623/1.2 |
| 5,195,984 A | 3/1993 | Schatz | 623/1.2 |
| 5,213,576 A | 5/1993 | Abiuso et al. | 604/103.01 |
| 5,213,898 A | 5/1993 | Larm et al. | 428/422 |
| 5,217,483 A | 6/1993 | Tower | 623/1.15 |
| 5,222,971 A | 6/1993 | Willard et al. | 606/198 |
| 5,226,913 A | 7/1993 | Pinchuk | 140/71 R |
| 5,234,456 A | 8/1993 | Silvestrini | 623/1.2 |
| 5,246,445 A | 9/1993 | Yachia et al. | 623/1.2 |
| 5,258,020 A | 11/1993 | Froix | 128/898 |
| 5,258,021 A | 11/1993 | Duran | 623/2.3 |
| 5,262,451 A | 11/1993 | Winters et al. | 523/112 |
| 5,266,073 A | 11/1993 | Wall | 623/1.2 |
| 5,272,012 A | 12/1993 | Opolski | 428/423.1 |
| 5,275,622 A | 1/1994 | Lazarus et al. | 623/11.11 |
| 5,282,823 A | 2/1994 | Schwartz et al. | 623/1.22 |
| 5,282,824 A | 2/1994 | Gianturco | 623/1.13 |
| 5,283,257 A | 2/1994 | Gregory et al. | 514/458 |
| 5,288,711 A | 2/1994 | Mitchell et al. | 424/122 |
| 5,290,305 A | 3/1994 | Inoue | 623/1.2 |
| 5,292,331 A | 3/1994 | Boneau | 623/11.16 |
| 5,292,802 A | 3/1994 | Rhee et al. | 525/54.1 |
| 5,304,121 A | 4/1994 | Sahatjian | 604/509 |
| 5,304,200 A | 4/1994 | Spaulding | 623/1.16 |
| 5,306,250 A | 4/1994 | March et al. | 604/104 |
| 5,308,862 A | 5/1994 | Ohlstein | 514/411 |
| 5,308,889 A | 5/1994 | Rhee et al. | 523/113 |
| 5,314,444 A | 5/1994 | Gianturco | 606/195 |
| 5,314,472 A | 5/1994 | Fontaine | 623/1.22 |
| 5,328,471 A | 7/1994 | Slepian | 604/101.03 |
| 5,334,301 A | 8/1994 | Heinke et al. | 204/267 |
| 5,336,518 A | 8/1994 | Narayanan et al. | 427/470 |
| 5,338,770 A | 8/1994 | Winters et al. | 523/112 |
| 5,342,348 A | 8/1994 | Kaplan | 604/891.1 |
| 5,342,387 A | 8/1994 | Summers | 606/198 |
| 5,342,621 A | 8/1994 | Eury | 606/198 |
| 5,354,308 A | 10/1994 | Simon et al. | 623/1.15 |
| 5,356,433 A | 10/1994 | Rowland et al. | 424/422 |
| 5,366,504 A | 11/1994 | Andersen et al. | 623/1.5 |
| 5,368,566 A | 11/1994 | Crocker | 604/101.02 |
| 5,370,683 A | 12/1994 | Fontaine | 623/1.22 |
| 5,370,691 A | 12/1994 | Samson | 623/1.22 |
| 5,375,612 A | 12/1994 | Cottenceau et al. | 128/899 |
| 5,376,112 A | 12/1994 | Duran | 623/1.26 |
| 5,378,475 A | 1/1995 | Smith et al. | 424/473 |
| 5,380,299 A | 1/1995 | Fearnot et al. | 604/265 |
| 5,382,261 A | 1/1995 | Palmaz | 606/158 |
| 5,383,853 A | 1/1995 | Jung et al. | 604/103.04 |

**US 7,217,286 B2**
Page 3

| | | | |
|---|---|---|---|
| 5,383,928 A | 1/1995 | Scott et al. | 623/1.12 |
| 5,387,235 A | 2/1995 | Chuter | 623/1.11 |
| 5,389,106 A | 2/1995 | Tower | 623/1.15 |
| 5,393,772 A | 2/1995 | Yue et al. | 514/410 |
| 5,395,390 A | 3/1995 | Simon et al. | 623/1.18 |
| 5,397,355 A | 3/1995 | Marin et al. | 623/1.2 |
| 5,399,352 A | 3/1995 | Hanson | 424/423 |
| 5,403,341 A | 4/1995 | Solar | 606/198 |
| 5,405,377 A | 4/1995 | Cragg | 623/1.2 |
| 5,409,696 A | 4/1995 | Narayanan et al. | 424/78.17 |
| 5,411,549 A | 5/1995 | Peters | 623/1.15 |
| 5,415,619 A | 5/1995 | Lee et al. | 600/36 |
| 5,417,969 A | 5/1995 | Hsu et al. | 424/78.27 |
| 5,419,760 A | 5/1995 | Narciso, Jr | 604/8 |
| D359,802 S | 6/1995 | Fontaine | D24/155 |
| 5,421,955 A | 6/1995 | Lau et al. | 216/48 |
| 5,423,885 A | 6/1995 | Williams | 623/1.17 |
| 5,429,618 A | 7/1995 | Keogh | 604/266 |
| 5,429,634 A | 7/1995 | Narciso, Jr | 604/890.1 |
| 5,439,446 A | 8/1995 | Barry | 604/103.01 |
| 5,441,515 A | 8/1995 | Khosravi et al. | 606/194 |
| 5,441,516 A | 8/1995 | Wang et al. | 606/198 |
| 5,441,947 A | 8/1995 | Dodge et al. | 514/179 |
| 5,443,458 A | 8/1995 | Evry | 604/891.1 |
| 5,443,477 A | 8/1995 | Marin et al. | 606/198 |
| 5,443,496 A | 8/1995 | Schwartz et al. | 623/1.16 |
| 5,443,498 A | 8/1995 | Fontaine | 623/1.17 |
| 5,443,500 A | 8/1995 | Sigwart | 623/1.17 |
| 5,447,724 A | 9/1995 | Helmus et al. | 424/426 |
| 5,449,372 A | 9/1995 | Schmaltz et al. | 606/198 |
| 5,449,373 A | 9/1995 | Pinchasik et al. | 606/198 |
| 5,449,382 A | 9/1995 | Dayton | 623/1.15 |
| 5,464,450 A | 11/1995 | Buscemi et al. | 632/1.2 |
| 5,464,540 A | 11/1995 | Friesen et al. | 210/640 |
| 5,464,650 A | 11/1995 | Berg et al. | 427/2.3 |
| 5,474,563 A | 12/1995 | Myler et al. | 606/108 |
| 5,486,357 A | 1/1996 | Narayanan | 424/78.17 |
| 5,496,365 A | 3/1996 | Sgro | 623/1.2 |
| 5,500,013 A | 3/1996 | Buscemi et al. | 623/1.22 |
| 5,510,077 A | 4/1996 | Dinh et al. | 264/485 |
| 5,512,055 A | 4/1996 | Domb et al. | 604/265 |
| 5,516,781 A | 5/1996 | Morris et al. | 514/291 |
| 5,519,042 A | 5/1996 | Morris et al. | 514/378 |
| 5,523,092 A | 6/1996 | Hanson et al. | 424/423 |
| 5,527,354 A | 6/1996 | Fontaine et al. | 623/1.17 |
| 5,545,208 A | 8/1996 | Wolff et al. | 623/1.22 |
| 5,551,954 A | 9/1996 | Buscemi et al. | 623/1.15 |
| 5,554,182 A | 9/1996 | Dinh et al. | 600/36 |
| 5,554,954 A | 9/1996 | Takahashi | 327/1546 |
| 5,556,413 A | 9/1996 | Lam | 623/1.2 |
| 5,562,922 A | 10/1996 | Lambert | 424/486 |
| 5,563,146 A | 10/1996 | Morris | 514/291 |
| 5,569,197 A | 10/1996 | Helmus | 604/102.02 |
| 5,569,295 A | 10/1996 | Lam | 606/198 |
| 5,569,462 A | 10/1996 | Martinson et al. | 424/423 |
| 5,569,463 A | 10/1996 | Helmus et al. | 424/426 |
| 5,571,089 A | 11/1996 | Crocker | 604/103.01 |
| 5,571,166 A | 11/1996 | Dinh et al. | 128/898 |
| 5,574,059 A | 11/1996 | Regunathan et al. | 514/397 |
| 5,575,818 A | 11/1996 | Pinchuk | 623/1.15 |
| 5,578,075 A | 11/1996 | Dayton | 623/1.15 |
| 5,580,873 A | 12/1996 | Bianco et al. | 514/263.36 |
| 5,580,874 A | 12/1996 | Bianco et al. | 514/263.36 |
| 5,591,140 A | 1/1997 | Narayanan et al. | 604/269 |
| 5,591,197 A | 1/1997 | Orth et al. | 623/1.16 |
| 5,591,224 A | 1/1997 | Schwartz et al. | 623/1.22 |
| 5,591,227 A | 1/1997 | Dinh et al. | 623/1.22 |
| 5,599,352 A | 2/1997 | Dinh et al. | 128/898 |
| 5,603,722 A | 2/1997 | Phan et al. | 623/1.18 |
| 5,604,283 A | 2/1997 | Wada et al. | 524/236 |
| 5,605,696 A | 2/1997 | Eury et al. | 424/423 |
| 5,607,463 A | 3/1997 | Schwartz et al. | 623/1.44 |
| 5,607,475 A | 3/1997 | Cahalan et al. | 424/423 |
| 5,609,629 A | 3/1997 | Fearnot et al. | 623/1.42 |
| 5,616,608 A | 4/1997 | Kinsella et al. | 514/449 |
| 5,620,984 A | 4/1997 | Bianco et al. | 514/263.36 |
| 5,621,102 A | 4/1997 | Bianco et al. | 544/267 |
| 5,622,975 A | 4/1997 | Singh et al. | 514/324 |
| 5,624,411 A | 4/1997 | Tuch | 604/265 |
| 5,628,785 A | 5/1997 | Schwartz et al. | 128/898 |
| 5,629,077 A | 5/1997 | Turnlund et al. | 623/1.15 |
| 5,629,315 A | 5/1997 | Bianco et al. | 514/263.36 |
| 5,632,763 A | 5/1997 | Glastra | 623/1.15 |
| 5,632,771 A | 5/1997 | Boatman et al. | 623/1.15 |
| 5,632,776 A | 5/1997 | Kurumatani et al. | 424/423 |
| 5,632,840 A | 5/1997 | Campbell | 156/196 |
| 5,635,201 A | 6/1997 | Fabo | 424/443 |
| 5,637,113 A | 6/1997 | Tartaglia et al. | 623/1.42 |
| 5,643,312 A | 7/1997 | Fischell et al. | 623/1.15 |
| 5,643,939 A | 7/1997 | Ohlstein | 514/411 |
| 5,646,160 A | 7/1997 | Morris et al. | 514/291 |
| 5,648,357 A | 7/1997 | Bianco et al. | 514/263.36 |
| 5,649,952 A | 7/1997 | Lam | 623/1.15 |
| 5,649,977 A | 7/1997 | Campbell | 623/1.15 |
| 5,651,174 A | 7/1997 | Schwartz et al. | 29/527.2 |
| 5,652,243 A | 7/1997 | Bianco et al. | 514/263.36 |
| 5,653,747 A | 8/1997 | Dereume | 623/1.54 |
| 5,653,992 A | 8/1997 | Bezwada et al. | 424/426 |
| 5,662,609 A | 9/1997 | Slepian | 604/101.03 |
| 5,665,591 A | 9/1997 | Sonenshein et al. | 435/375 |
| 5,665,728 A | 9/1997 | Morris et al. | 424/122 |
| 5,667,764 A | 9/1997 | Kopia et al. | 424/1.45 |
| 5,669,924 A | 9/1997 | Shaknovich | 623/1.11 |
| 5,670,506 A | 9/1997 | Leigh et al. | 514/141 |
| 5,672,638 A | 9/1997 | Verhoeven et al. | 523/112 |
| 5,674,242 A | 10/1997 | Phan et al. | 606/198 |
| 5,679,400 A | 10/1997 | Tuch | 427/2.14 |
| 5,679,659 A | 10/1997 | Verhoeven et al. | 514/56 |
| 5,684,061 A | 11/1997 | Ohnishi et al. | 523/114 |
| 5,691,311 A | 11/1997 | Maraganore et al. | 514/12 |
| 5,693,085 A | 12/1997 | Buirge et al. | 623/1.13 |
| 5,697,967 A | 12/1997 | Dinh et al. | 128/898 |
| 5,697,971 A | 12/1997 | Fischell et al. | 623/1.15 |
| 5,700,286 A | 12/1997 | Tartaglia et al. | 623/1.15 |
| 5,707,385 A | 1/1998 | Williams | 606/192 |
| 5,709,874 A | 1/1998 | Hanson et al. | 424/423 |
| 5,713,949 A | 2/1998 | Jayaraman | 623/1.12 |
| 5,716,981 A | 2/1998 | Hunter et al. | 514/449 |
| 5,725,549 A | 3/1998 | Lam | 623/1.15 |
| 5,725,567 A | 3/1998 | Wolff et al. | 623/1.42 |
| 5,728,150 A | 3/1998 | McDonald et al. | 623/1.15 |
| 5,728,420 A | 3/1998 | Keogh | 427/2.12 |
| 5,731,326 A | 3/1998 | Hart et al. | 514/323 |
| 5,733,327 A | 3/1998 | Igaki et al. | 623/1.5 |
| 5,733,920 A | 3/1998 | Mansuri et al. | 514/337 |
| 5,733,925 A | 3/1998 | Kunz et al. | 514/449 |
| 5,735,897 A | 4/1998 | Buirge | 623/1.15 |
| 5,739,138 A | 4/1998 | Bianco et al. | 514/263.36 |
| 5,755,734 A | 5/1998 | Richter et al. | 606/194 |
| 5,755,772 A | 5/1998 | Evans et al. | 623/1.15 |
| 5,759,205 A | 6/1998 | Valentini | 433/173 |
| 5,769,883 A | 6/1998 | Buscemi et al. | 623/1.42 |
| 5,776,184 A | 7/1998 | Tuch | 623/1.11 |
| 5,780,476 A | 7/1998 | Underiner et al. | 514/263.36 |
| 5,782,908 A | 7/1998 | Cahalan et al. | 623/1.15 |
| 5,788,979 A | 8/1998 | Alt et al. | 424/426 |
| 5,792,106 A | 8/1998 | Mische | 604/103.01 |
| 5,792,772 A | 8/1998 | Bianco et al. | 514/263.36 |
| 5,798,372 A | 8/1998 | Davies et al. | 514/356 |
| 5,799,384 A | 9/1998 | Schwartz et al. | 29/458 |
| 5,800,507 A | 9/1998 | Schwartz | 623/1.11 |
| 5,800,508 A | 9/1998 | Goicoechea et al. | 623/1.15 |
| 5,807,861 A | 9/1998 | Klein et al. | 514/263.35 |
| 5,811,447 A | 9/1998 | Kunz et al. | 514/411 |
| 5,820,917 A | 10/1998 | Tuch | 427/2.1 |
| 5,820,918 A | 10/1998 | Ronan et al. | 427/2.1 |

**US 7,217,286 B2**

Page 4

| | | | |
|---|---|---|---|
| 5,824,048 A | 10/1998 | Tuch | 128/898 |
| 5,824,049 A | 10/1998 | Ragheb et al. | 623/1.44 |
| 5,827,587 A | 10/1998 | Fukushi | 428/36.6 |
| 5,833,651 A | 11/1998 | Donovan et al. | 604/509 |
| 5,837,008 A | 11/1998 | Berg et al. | 128/898 |
| 5,837,313 A | 11/1998 | Ding et al. | 427/2.21 |
| 5,843,120 A | 12/1998 | Israel et al. | 623/1.15 |
| 5,843,166 A | 12/1998 | Lentz et al. | 623/1.13 |
| 5,843,172 A | 12/1998 | Yan | 623/1.42 |
| 5,849,034 A | 12/1998 | Schwartz | 606/36 |
| 5,851,217 A | 12/1998 | Wolff et al. | 606/191 |
| 5,851,231 A | 12/1998 | Wolff et al. | 623/1.42 |
| 5,858,990 A | 1/1999 | Walsh | 514/44 |
| 5,861,027 A | 1/1999 | Trapp | 623/1.15 |
| 5,865,814 A | 2/1999 | Tuch | 623/1.15 |
| 5,871,535 A | 2/1999 | Wolff et al. | 128/898 |
| 5,873,904 A | 2/1999 | Ragheb et al. | 623/1.13 |
| 5,876,433 A | 3/1999 | Lunn | 623/1.15 |
| 5,877,224 A | 3/1999 | Brocchini et al. | 514/772.2 |
| 5,879,697 A | 3/1999 | Ding et al. | 424/422 |
| 5,882,335 A | 3/1999 | Leone et al. | 604/103.02 |
| 5,891,108 A | 4/1999 | Leone et al. | 604/264 |
| 5,893,840 A | 4/1999 | Hull et al. | 604/103.02 |
| 5,897,911 A | 4/1999 | Loeffler | 427/2.25 |
| 5,900,246 A | 5/1999 | Lambert | 424/429 |
| 5,902,266 A | 5/1999 | Leone et al. | 604/509 |
| 5,916,910 A | 6/1999 | Lai | 514/423 |
| 5,922,393 A | 7/1999 | Jayaraman | 427/2.3 |
| 5,932,243 A | 8/1999 | Fricker et al. | 424/450 |
| 5,932,299 A | 8/1999 | Katoot | 427/508 |
| 5,932,580 A | 8/1999 | Levitzki et al. | 181/152 |
| 5,951,586 A | 9/1999 | Berg et al. | 606/198 |
| 5,957,971 A | 9/1999 | Schwartz | 623/1.15 |
| 5,968,091 A | 10/1999 | Pinchuk et al. | 623/1.16 |
| 5,972,027 A | 10/1999 | Johnson | 623/1.42 |
| 5,976,534 A | 11/1999 | Hart et al. | 424/145.1 |
| 5,977,163 A | 11/1999 | Li et al. | 514/449 |
| 5,980,553 A | 11/1999 | Gray et al. | 623/1.15 |
| 5,980,566 A | 11/1999 | Alt et al. | 623/23.7 |
| 5,980,972 A | 11/1999 | Ding | 427/2.24 |
| 5,981,568 A | 11/1999 | Kunz et al. | 514/411 |
| 5,985,307 A | 11/1999 | Hanson et al. | 424/423 |
| 5,997,468 A | 12/1999 | Wolff et al. | 606/36 |
| 6,004,346 A | 12/1999 | Wolff et al. | 623/23.71 |
| 6,015,432 A | 1/2000 | Rakos et al. | 623/1.13 |
| 6,039,721 A | 3/2000 | Johnson et al. | 604/508 |
| 6,059,813 A | 5/2000 | Vrba et al. | 606/198 |
| 6,071,305 A | 6/2000 | Brown et al. | 623/1.43 |
| 6,074,659 A | 6/2000 | Kunz et al. | 424/423 |
| 6,080,190 A | 6/2000 | Schwartz et al. | 623/1.22 |
| 6,096,070 A | 8/2000 | Ragheb et al. | 623/1.39 |
| 6,120,536 A | 9/2000 | Ding et al. | 623/1.43 |
| 6,120,847 A | 9/2000 | Yang et al. | 427/335 |
| 6,136,798 A | 10/2000 | Cody et al. | 514/141 |
| 6,140,127 A | 10/2000 | Sprague | 435/395 |
| 6,146,358 A | 11/2000 | Rowe | 604/103 |
| 6,153,252 A * | 11/2000 | Hossainy et al. | 427/2.3 |
| 6,159,488 A | 12/2000 | Nagier et al. | 424/423 |
| 6,171,232 B1 | 1/2001 | Papandreou et al. | 600/36 |
| 6,171,609 B1 | 1/2001 | Kunz | 424/422 |
| 6,177,272 B1 | 1/2001 | Nabel et al. | 435/320.1 |
| 6,179,817 B1 | 1/2001 | Zhong | 604/265 |
| 6,193,746 B1 | 2/2001 | Strecker | 623/1.13 |
| 6,214,901 B1 | 4/2001 | Chudzik et al. | 523/113 |
| 6,225,346 B1 | 5/2001 | Tang et al. | 514/523 |
| 6,240,616 B1 | 6/2001 | Yan | 29/527.2 |
| 6,245,537 B1 | 6/2001 | Williams et al. | 435/135 |
| 6,251,920 B1 | 6/2001 | Grainger et al. | 514/319 |
| 6,254,632 B1 | 7/2001 | Wu et al. | 623/1.15 |
| 6,254,634 B1 | 7/2001 | Anderson et al. | 623/1.42 |
| 6,258,121 B1 | 7/2001 | Yang et al. | 623/1.46 |
| 6,268,390 B1 | 7/2001 | Kunz | 514/411 |
| 6,273,913 B1 | 8/2001 | Wright et al. | 623/1.42 |
| 6,284,305 B1 | 9/2001 | Ding et al. | 427/2.28 |
| 6,287,320 B1 | 9/2001 | Slepian | 606/194 |
| 6,287,628 B1 | 9/2001 | Hossainy et al. | 427/2.3 |
| 6,299,604 B1 | 10/2001 | Ragheb et al. | 604/265 |
| 6,306,144 B1 | 10/2001 | Sydney et al. | 606/108 |
| 6,306,166 B1 | 10/2001 | Barry et al. | 623/1.46 |
| 6,306,176 B1 | 10/2001 | Whitbourne | 623/23.59 |
| 6,306,421 B1 | 10/2001 | Kunz et al. | 424/423 |
| 6,309,380 B1 | 10/2001 | Larson et al. | 604/502 |
| 6,309,660 B1 | 10/2001 | Hsu et al. | 424/425 |
| 6,313,264 B1 | 11/2001 | Caggiano et al. | 530/350 |
| 6,316,018 B1 | 11/2001 | Ding et al. | 424/423 |
| 6,335,029 B1 | 1/2002 | Kamath et al. | 424/423 |
| 6,358,556 B1 | 3/2002 | Ding et al. | 427/2.24 |
| 6,369,039 B1 | 4/2002 | Palasis et al. | 424/93.2 |
| 6,379,382 B1 | 4/2002 | Yang | 623/1.42 |
| 6,387,121 B1 | 5/2002 | Alt | 623/1.15 |
| 6,403,635 B1 | 6/2002 | Kinsella et al. | 514/449 |
| 6,407,067 B1 | 6/2002 | Schafer | 514/19 |
| 6,517,858 B1 | 2/2003 | Le Moel et al. | 424/424 |
| 6,517,889 B1 | 2/2003 | Jayaraman | 427/2.24 |
| 6,545,097 B2 | 4/2003 | Pinchuk et al. | 525/240 |
| 6,585,764 B2 | 7/2003 | Wright et al. | 623/1.42 |
| 6,620,194 B2 | 9/2003 | Ding et al. | 623/1.43 |
| 6,746,773 B2 | 6/2004 | Llanos et al. | 428/421 |
| 6,776,796 B2 | 8/2004 | Llanos et al. | 623/1.46 |
| 6,808,536 B2 | 10/2004 | Wright et al. | 623/1.42 |
| 2001/0007083 A1 | 7/2001 | Roorda | 623/1.15 |
| 2001/0029351 A1 | 10/2001 | Falotico et al. | 604/103.02 |
| 2001/0029660 A1 | 10/2001 | Johnson | 29/557 |
| 2001/0032014 A1 | 10/2001 | Yang et al. | 623/1.15 |
| 2001/0034363 A1 | 10/2001 | Li et al. | 514/449 |
| 2001/0037145 A1 | 11/2001 | Guruwaiya et al. | 623/1.15 |
| 2002/0010418 A1 | 1/2002 | Lary et al. | 604/101.04 |
| 2002/0032477 A1 | 3/2002 | Helmus et al. | 623/1.2 |
| 2002/0041899 A1 | 4/2002 | Chudzik et al. | 424/487 |
| 2002/0061326 A1 | 5/2002 | Li et al. | 424/424 |
| 2002/0068969 A1 | 6/2002 | Shanley et al. | 623/1.16 |
| 2002/0071902 A1 | 6/2002 | Ding et al. | 427/2.24 |
| 2002/0082680 A1 | 6/2002 | Shanley et al. | 623/1.16 |
| 2002/0082685 A1 | 6/2002 | Sirhan et al. | 623/1.42 |
| 2002/0091433 A1 | 7/2002 | Ding et al. | 623/1.2 |
| 2002/0095114 A1 | 7/2002 | Palasis | 604/96.01 |
| 2002/0099438 A1 | 7/2002 | Furst | 623/1.16 |
| 2002/0103526 A1 | 8/2002 | Steinke | 623/1.11 |
| 2002/0119178 A1 | 8/2002 | Levesque et al. | 424/423 |
| 2002/0123505 A1 | 9/2002 | Mollison et al. | 514/291 |
| 2002/0127327 A1 | 9/2002 | Schwartz et al. | 427/2.15 |
| 2002/0133222 A1 | 9/2002 | Das | 623/1.16 |
| 2002/0133224 A1 | 9/2002 | Bajgar et al. | 623/1.39 |
| 2002/0165608 A1 | 11/2002 | Llanos | 604/500 |
| 2002/0193475 A1 | 12/2002 | Hossainy et al. | 524/113 |
| 2003/0065377 A1 | 4/2003 | Davila et al. | 604/265 |
| 2003/0216699 A1 | 11/2003 | Falotico | 604/265 |
| 2004/0049265 A1 | 3/2004 | Ding et al. | 623/1.42 |
| 2004/0243097 A1 | 12/2004 | Falotico et al. | 604/500 |
| 2004/0260268 A1 | 12/2004 | Falotico et al. | 604/500 |
| 2005/0002986 A1 | 1/2005 | Falotico et al. | 424/426 |
| 2005/0004663 A1 | 1/2005 | Llanos et al. | 623/1.42 |
| 2005/0033261 A1 | 2/2005 | Falotico et al. | 604/500 |
| 2005/0106210 A1 | 5/2005 | Ding et al. | 623/1.15 |
| 2005/0187611 A1 | 8/2005 | Ding et al. | 623/1.15 |
| 2005/0208200 A1 | 9/2005 | Ding et al. | 427/2.25 |
| 2006/0088654 A1 | 4/2006 | Ding et al. | 427/2.21 |
| 2006/0089705 A1 | 4/2006 | Ding et al. | 623/1.15 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19723723 A1 | 12/1998 |
| EP | 0 145 166 A2 | 6/1985 |
| EP | 0 177 330 A2 | 4/1986 |
| EP | 0 183 372 A1 | 6/1986 |
| EP | 0 221 570 A2 | 5/1987 |

**US 7,217,286 B2**

Page 5

| | | |
|---|---|---|
| EP | 0 421 729 A2 | 4/1991 |
| EP | 0 540 290 A2 | 5/1993 |
| EP | 0 568 310 A1 | 11/1993 |
| EP | 0 604 022 A1 | 6/1994 |
| EP | 0 621 015 A1 | 10/1994 |
| EP | 0 623 354 A1 | 11/1994 |
| EP | 0 734 698 A2 | 3/1996 |
| EP | 0 712 615 A1 | 5/1996 |
| EP | 0 716 836 A1 | 6/1996 |
| EP | 0 734 721 A2 | 10/1996 |
| EP | 0 747 069 A2 | 12/1996 |
| EP | 0 761 251 A1 | 3/1997 |
| EP | 0 800 801 A1 | 10/1997 |
| EP | 0 540 290 B1 | 1/1998 |
| EP | 0 830 853 A1 | 3/1998 |
| EP | 0 815 803 A1 | 7/1998 |
| EP | 0 850 651 A2 | 7/1998 |
| EP | 0 938 878 A2 | 9/1999 |
| EP | 0 938 878 A3 | 9/1999 |
| EP | 0 950 386 A2 | 10/1999 |
| EP | 0 968 688 A1 | 1/2000 |
| EP | 0 633 032 B1 | 2/2001 |
| EP | 1 192 957 A2 | 4/2002 |
| EP | 1 588 726 A1 | 10/2005 |
| EP | 1 588 727 A1 | 10/2005 |
| FR | 566 807 A1 | 4/1992 |
| GB | 0 662 307 A2 | 12/1951 |
| GB | 1 205 743 A | 9/1970 |
| GB | 2 135 585 A | 9/1984 |
| SU | 660689 | 5/1979 |
| SU | 1457921 | 2/1989 |
| WO | 89/03232 A1 | 4/1989 |
| WO | 91/12779 A1 | 9/1991 |
| WO | 92/15286 A1 | 9/1992 |
| WO | 94/01056 A1 | 1/1994 |
| WO | 94/21308 A1 | 9/1994 |
| WO | 94/21309 A1 | 9/1994 |
| WO | 94/24961 A1 | 11/1994 |
| WO | 96/00272 A1 | 1/1996 |
| WO | 96/26689 A1 | 9/1996 |
| WO | 96/32907 A1 | 10/1996 |
| WO | 96/34580 A1 | 11/1996 |
| WO | 97/25000 A1 | 7/1997 |
| WO | 97/33534 A1 | 9/1997 |
| WO | 98/08463 A1 | 3/1998 |
| WO | 98/13344 A1 | 4/1998 |
| WO | 98/19628 A1 | 5/1998 |
| WO | 98/23228 A1 | 6/1998 |
| WO | 98/23244 A1 | 6/1998 |
| WO | 98/34689 A1 | 8/1998 |
| WO | 98/36784 A1 | 8/1998 |
| WO | 98/47447 A1 | 10/1998 |
| WO | 98/56312 A1 | 12/1998 |
| WO | 00/21584 A1 | 4/2000 |
| WO | 00/27445 A1 | 5/2000 |
| WO | 00/27455 A1 | 5/2000 |
| WO | 00/32255 A1 | 6/2000 |
| WO | 00/38754 A1 | 7/2000 |
| WO | 01/87342 A2 | 11/2001 |
| WO | 01/87372 A1 | 11/2001 |
| WO | 01/87373 A1 | 11/2001 |
| WO | 01/87376 A1 | 11/2001 |
| WO | 02/26139 A1 | 4/2002 |
| WO | 02/26271 A1 | 4/2002 |
| WO | 02/26280 A1 | 4/2002 |
| WO | 02/26281 A1 | 4/2002 |
| WO | 03/015664 A1 | 2/2003 |
| WO | 03/057218 A1 | 7/2003 |

OTHER PUBLICATIONS

U.S. Appl. No. 08/424,884, filed Apr. 19, 1995, Helmus et al.
U.S. Appl. No. 08/526,273, filed Sep. 11, 1995, Ding.

U.S. Appl. No. 08/730,542, filed Oct. 11, 1996, Helmus.
U.S. Appl. No. 09/575,480, filed May 19, 2000, Kopia.
U.S. Appl. No. 10/431,059, filed May 7, 2003, Falotico.
U.S. Appl. No. 10/829,074, filed Apr. 21, 2004, Falotico et al.
U.S. Appl. No. 10/833,200, filed Apr. 27, 2004, Falotico et al.
U.S. Appl. No. 10/852,517, filed May 24, 2004, Falotico et al.
Abraham, R. T., "Mammalian target of rapamycin: Immunosuppressive drugs offer new insight into cell growth regulation," *Progress in Inflammation Research*, 2000, Switzerland.
Alvarado, R. et al., "Evaluation of Polymer-coated Balloon-expandable Stents in Bile Ducts," *Radiology*, 1989, 170, 975-978.
Badimon, J. J. et al., "Inhibitory Effects of Rapamycin on Intimal Hyperplasia After PTCA," *JACC*, Mar. 1998.
Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement," *Circulation*, 82:III-541 (1990).
Berk, B. C. et al., "Pharmacologic Roles of Heparin and Glucocorticoids to Prevent Restenosis After Coronary Angioplasty," *JACC*, May 1991, 17(6), 111B-117B.
Bertram, P. G. et al., "The 14-3-3 proteins positively regulate rapamycin-sensitive signaling," *Current Biology*, 1998, 8, 1259-1267.
Biomaterials Science (B.D. Ratner, Ed.), Academic Press, New York, NY, pp. 228-238, 1996.
Campbell, G. R. et al., "Phenotypic Modulation of Smooth Muscle Cells in Primary Culture, Vascular Smooth Muscle Cells in Culture," *CRC Press*, 1987, 39-55.
Chang, M. W. et al., "Adenovirus-mediated Over-expression of the Cyclin/Cyclin-dependent Kinase inhibitor, p21 inhibits Vascular Smooth Muscle Cell Proliferation and Neointima Formation in the Rat Carotid Artery Model of Balloon Angioplasty," *J. Clin. Invest.*, 1995, 96, 2260-2268.
Chung, J. et al., "Rapamycin-FKBP specifically blocks growth-dependent activation of and signaling by the 70 kd S6 protein kinases," *Cell*, Jun. 26, 1992, 69(7), 1227-1236.
Clowes, A. W. et al., "Kinetics of cellular proliferation after arterial injury. IV. Heparin inhibits rat smooth muscle mitogenesis and migration," *Circ. Res.*, 1986, 58(6), 839-845.
Clowes, A. W. et al., Kinetics of Cellular Proliferation after Arterial Injury, *Laboratory Investigation*, 1985, 52(6), 611-616.
Clowes, A. W. et al., "Significance of quiescent smooth muscle migration in the injured rat carotid artery," *Circ Res.* 1985, 56(1), 139-145.
Clowes, A. W., "Suppression by heparin of smooth muscle cell proliferation in injured arteries," *Nature*, 1977, 265(5595), 625-626.
Colburn, M. D. et al., "Dose responsive suppression of myointimal hyperplasia by dexamethasone," *J. Vasc. Surg.*, 1992, 15, 510-518.
Currier, J. W. et al., "Colchicine Inhibits Restenosis After Iliac Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1989, 80(4), 11-66 (Abstract No. 0263).
Encyclopedia of Polymer Science and Engineering, vol. 7, Fluorocarbon Elastomers, p. 257-267, Mar. 1989.
Farb, A. et al., "Vascular smooth muscle cell cytotoxicity and sustained inhibition of neointimal formation by fibroblast growth factor 2-saporin fusion protein," *Circ. Res.*, 1997, 80, 542-550.
Ferns, G. A. A. et al., "Inhibition of Neointimal Smooth Muscle Accumulation After Angioplasty by an Antibody to PDGF," *Science*, 1991, 253, 1129-1132.
Fischman, D. L. et al., "A Randomized Comparison of Coronary-Stent Placement and Balloon Angioplasty in the Treatment of Coronary Artery Disease," *N. Eng. J. Med.*, 1994 Aug. 25, 331(8), 496-501.
Franklin, S. M. et al., "Pharmacologic prevention of restenosis after coronary angioplasty: review of the randomized clinical trials," *Coronary Artery Disease* Mar. 1993, 4(3), 232-242.
Fukuyama, J. et al., "Tranilast suppresses the vascular intimal hyperplasia after balloon injury in rabbits fed on a high-cholesterol diet," *Eur. J. Pharmacol.*, 1996, 318, 327-332.
Gregory, C. R. et al., "Rapamycin Inhibits Arterial Intimal Thickening Caused by Both Alloimmune and Mechanical Injury," *Transplantation*, Jun. 1993, 55(6), 1409-1418.

Gregory, C. R. et al, "Treatment with Rapamycin and Mycophenolic Acid Reduces Arterial Intimal Thickening Produced by Mechanical Injury and Allows Endothelial Replacement," *Transplantation*, Mar. 15, 1995, 59(5), 655-661.

Guyton, J. R. et al., "Inhibition of rat arterial smooth muscle cell proliferation by heparin. In vivo studies with anticoagulant and nonanticoagulant heparin," *Circ. Res.*, 1980, 46, 625-634.

Hansson, G. K. et al., "Interferon-γ Inhibits Arterial Stenosis After Injury," *Circ.*, 1991, 84, 1266-1272.

Hashemolhosseini, S. et al., "Rapamycin Inhibition of the G1 to S Transition Is Mediated by Effects on Cyclin D1 mRNA and Protein Stability," *J Biol Chem*, Jun. 5, 1998, 273, 14424-14429.

Jonasson, J. et al., "Cyclosporin A inhibits smooth muscle proliferation in the vascular response to injury," *Proc. Natl., Acad. Sci.*, 1988, 85, 2303-2306.

Kuhnt, M. et al., "Microbial Conversion of Rapamycin," *Enzyme and Microbial Technology*, 1997, 21, 405-412.

Lange, R. A. MD. et al., "Restenosis After Coronary Balloon Angioplasty," *Annu. Rev. Med.*, 1991, 42, 127-132.

Liu, M. W. et al., "Trapidil in Preventing Restenosis After Balloon Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1990, 81, 1089-1093.

Liu, M. W., MD et al., "Restenosis After Coronary Angioplasty Potential Biologic Determinants and Role of Intimal Hyperplasia," *Circulation*, 1989, 79, 1374-1387.

Lundergan, C. F. et al., "Peptide Inhibition of Myointimal Proliferation by Angiopeptin, a Somatostatin Analogue," *JACC*, May 1991, 17(6), 132B-136B.

Majesky, M. W. et al., "Heparin regulates smooth muscle S phase entry in the injured rat carotid artery," *Circ. Res.*, 1987, 61, 296-300.

Marx, S. O. et al., "Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells," *Circ. Res.*, 1995, 76, 412-417.

Nemecek, G. M. et al., "Terbinafine Inhibits the Mitogenic Response to Platelet-Derived Growth Factor in Vitro and Neointimal Proliferation in Vivo," *J. Pharmacol. Exp. Thera.*, 1989, 248, 1167-1174.

Okada, T. et al., "Localized Release of Perivascular Heparin Inhibits Intimal Proliferation after Endothelial Injury without Systemic Anticoagulation," *Neurosurgery*, 1989, 25, 892-898.

Poon, M. et al., "Rapamycin Inhibits Vascular Smooth Muscle Cell Migration," *J. Clin Invest.*, Nov. 1996, 98(10), 2277-2283.

Popma, J. J. et al., "Clinical trials of restenosis after coronary angioplasty," *Circulation*, Sep. 1991, 84(3), 1426-1436.

Powell, J. S. et al., "Inhibitors of Angiotensin-Converting Enzyme Prevent Myointimal Proliferation after Vascular Injury," *Science*, 1989, 245, 186-188.

Rensing, B. J. et al., "Coronary restenosis elimination with a sirolimus eluting stent, *European Heart Journal*, 2001, 22, 2125-2130

Rodeck, C. et al., "Methods for the Transcervical Collection of Fetal Cells During the First Trimester of Pregnancy," *Prenatal Diagnosis*, 1995, 15, 933-942.

Ruef, J. MD, et al., "Flavopiridol Inhibits Muscle Cell Proliferation In Vitro and Neointimal Formation In Vivo After Carotid Injury in the Rat," From the Division of Cardiology and Sealy Center for Molecular Cardiology, University of Texas Medical Branch, Galveston; Accepted Apr. 9, 1999; *Circulation* Aug. 10, 1999, pp. 659-665

Serruys, P. W. et al., "A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease," *N Engl J Med*, Aug. 25, 1994; 331(8), 489-495.

Serruys, P. W. et al., "Evaluation of ketanserin in the prevention of restenosis after percutaneous transluminal coronary angioplasty. A multicenter randomized double-blind placebo-controlled trial," *Circulation* Oct. 1993; 88(4 Pt 1), 1588-1601.

Serruys, P. W. et al., "Heparin-coated Palmaz-Schatz stents in human coronary arteries Early outcome of the Benestent-II Pilot Study," *Circulation*, Feb. 1, 1996; 93(3), 412-422.

Siekierka, J. J., "Probing T-Cell Signal Transduction Pathways with the Immunosupressive Drugs, FK-506 and Rapamycin," *Immunologic Research*, 1994, 13, 110-116.

Sigwart, et al., "Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," *N. Engl. J. Med.*, Mar. 19, 1987, 316, 701-706.

Simons, M. et al., "Antisense c-*myb* oligonucleotides inhibit intimal arterial smooth muscle cell accumulation in vivo," *Nature*, 1992, 359, 67-70.

Snow, A. D. et al., "Heparin modulates the composition of the extracellular matrix domain surrounding arterial smooth muscle cells," *Am. J. Pathol.*, 1990, 137, 313-330.

Sollott, S. J. et al., "Taxol Inhibits Neointimal Smooth Muscle Cell Accumulation after Angioplasty in the Rat," *J. Clin. Invest*, 1995, 95, 1869-1876.

van Der Giessen, et al , "Self-expandable Mesh Stents: an Experimental Study Comparing Polymer Coated and Uncoated Wallstent Stents in the Coronary Circulation of Pigs," *Circulation* 1990, 82(suppl. III):III-542.

van Der Giessen, W. J. et al, "Coronary stenting with polymer-coated and uncoated self-expanding endoprostheses in pigs," *Coron. Art. Disease* 1992; 3, 631-640.

Vasey, C. G. et al., "Clinical Cardiology: Stress Echo and Coronary Flow", *Circulation*, Oct. 1989, 80(4) Supplement II, II-66.

Verweire, E. et al., "Evaluation of Fluorinated Polymers As Coronary Stent Coating," *Journal of Materials Science. Materials in Medicine*, Apr. 2000.

Weinberger, J. et al., "Intracoronary irradiation: dose response for the prevention of restenosis in swine," *Int. J. Rad. Onc. Biol. Phys.*, 1996, 36, 767-775.

Preliminary Amendment in U.S. Appl. No. 07/258,189, May 22, 1989

Trial Transcript from Nov. 6, 2000 at 185-90 and 235-36 (Attorneys' opening remarks regarding '984 patent).

Trial Transcript from Nov. 7, 2000 at 274-301, 307-315, 320-28 and 332 (Cordis expert testimony regarding the Palmaz-Schatz stent); 370-379, 480-496 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 8, 2000 at 547-63, 657-63, 674-722, 782-85 (Cordis expert testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 9, 2000 at 819-23, 921 (Cordis expert testimony regarding the '984 patent); 926-941 (R. Croce testimony re Palmaz-Schatz stent); 1033-1053. (R. Schatz testimony)

Trial Transcript from Nov. 13, 2000 at 1086-1 134. (R. Schatz testimony); 1275-1305 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 14, 2000 at 1390-1404, 1448-1454, 1486-1500 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 15, 2000 at 1686-87, 1724-42, 1828-34, 1850-54, 1887-92 (AVE expert testimony regarding the '984 patent).

Trial Transcript from Nov. 16, 2000 at 2077-198 (AVE expert testimony regarding the alleged obviousness of the '984 patent).

Trial Transcript from Nov. 17, 2000 at 2331-34 (jury instructions as to the meaning of the limitations of the claims of the '984 patent).

Trial Transcript from Nov. 20, 2000 at 2441-48, 2499-2500, 2546-50, 2552-56 (Attorneys' closing arguments regarding the '984 patent).

Trial Transcript from Nov. 21, 2000 at 2592-94 (reading of jury verdict).

Trial Transcript from Dec. 18, 2000 at 2750-95 (Cordis expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Trial Transcript from Dec. 20, 2000 at 3421-88 )AVE expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Jury verdict, dated Nov. 21, 2000.

District Court decisions on post-trial motions (194 F. Supp. 2d 323).

Court of Appeal for the Federal Circuit decision (339 F3d 1352).

Trial Transcript from Mar. 4, 2005 at 133-135, 171-173 and 192-96 (Attorney's opening remarks regarding '984 validity).

Trial Transcript from Mar. 7, 2005 at 275-31 1 (Cordis expert testimony regarding the Palmaz-Schatz stent); 342-46, 353-59, 416-425 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art); 430-449, 452-58,

462-492 (R. Croce testimony regarding the Palmaz-Schatz stent); 500-507 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Mar. 8, 2005 at 609 (Cordis expert testimony regarding the '984 patent); 628-73, 724-740, 773, 801-839 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 9, 2005 at 936-49, 968-69 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 10, 2005 at 1427-74, 178-1509, 1514-23 (AVE expert testimony regarding the alleged obviousness of the '984 patent); 1566-93 (AVE expert testimony regarding Palmaz-Schatz stent); 1634-49 (R. Schatz testimony).

Trial Transcript from Mar. 11, 2005 at 1846-47, 1891-1900, 1919 (Attorneys' closing arguments regarding '984 obviousness).

Trial Transcript from Mar. 14, 2005 at 1964-67 (reading of jury verdict).

Jury verdict dated Mar. 14, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for Judgment As A Infringement Claim dated Apr. 19, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for a New Trial dated Apr. 19, 2005.

D.I. 1407, Cordis' Combined Answering Brief In Opposition to AVE's Motion for JMOL on Infringement of the Palmaz '762 and Schatz '984 Patents and Its Motion for a New Trial dated May 5, 2005.

D.I. 1414, Medtronic Vascular Inc.'s Combined Reply Brief In Support of Its Motion for Judgment as a Matter of Law on Cordis Corp.'s Patent Infringement Claims and Its Motion for a New Trial dated May 19, 2005.

Trial Transcript from Feb. 8, 2001 at 372-412, 449-469 (B. Tobor testimony regarding the prosecution of the '417, '984 and '332 patents); 510-13 (J. Milnamow testimony regarding the prosecution of the '332 patent); 558-604 (J. Palmaz testimony regarding the prosecution of the '417, '984 and '332 patents and the prior art).

Trial Transcript from Feb. 9, 2001 at 637-45, 662-672, 682-85 (J. Palmaz testimony regarding the prior art); 699-742 (R. Schatz testimony); 769-770, 790-95 (Cordis expert testimony regarding prior art).

D.I. 1067, Medtronic AVE, Inc.'s Post-Trial Brief Relating to the Unenforceability of the '762 and '984 Patents Due to Inequitable Conduct.

D.I. 1077, Cordis' Combined Answering Brief in Opposition to AVE's BSC's Post-Hearing Briefs on Alleged Inequitable Conduct Concerning the '762, '984 and '332 Patents.

D.I. 1089, Reply Brief In Support of Medtronic AVE, Inc.'s Contention that the '762 and '984 Patents are Unenforceable Due to Inequitable Conduct dated May 7, 2001.

C.A. No. 00-886-SLR, Answer and Counterclaims of Def. Medtronic AVE, Inc. To First Amended Complaint of Plaintiff Cordis Corp.

BSC's Opening Post-Trial Brief in Support of Its Defense That the Patents in Suit Are Unenforceable, dated Mar. 16, 2001.

Reply Brief in Support of BSC's Defense That the Patents in Suit Are Unenforceable, dated May 7, 2001.

Court's Decision on allegations of inequitable conduct (194 F. Supp. 2d 323) Mar. 28, 2002.

Trial Transcript from Nov. 21, 2000 at 155-57 and 180-84 (Attorneys' opening remarks regarding '332 patent).

Trial Transcript from Nov. 27, 2000 at 227-51, 260-300 (Cordis expert testimony regarding the Palmaz-Schatz stent); 343-60, 363-67, 424-33 (J. Palmaz testimony regarding the Palmaz-Schatz stent and the '332 patent).

Trial Transcript from Nov. 28, 2000 at 649-71.

Trial Transcript from Nov. 29, 2000 at 791-816, 859-870, 953-62 (Cordis expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Nov. 30, 2000 at 1018 (Cordis expert testimony regarding the '332 patent); 1062-80, 1 108-1 1 1 1 (R. Croce testimony regarding the Palmaz-Schatz stent); 1 169-70, 1205-17, 1236-45 (Cordis expert testimony regarding the '332 patent).

Trial Transcript from Dec. 1, 2000 at 1352-54 (Cordis expert testimony regarding the '332 patent); 1364-1442 (R. Schatz testi-

mony); 1493-1508, 1552-69 (BSC expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Dec. 4, 2000 at 1602-12, 1638-51, 1713-14, 1730-61, 1811-14, 1823-36 (BSC expert testimony regarding the alleged obviousness of the '332 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Dec. 6, 2000 at 2318-27, 2342-58 (BSC expert testimony regarding the '332 patent).

Trial Transcript from Dec. 7, 2000 at 2549-52 (Cordis expert testimony regarding the '332 patent); 2575-2579, 2591-92, 2630-31, 2649, 2669-71, 2684-85, 2688, 2708-10, 2725-27 (Attorney closing argument regarding '332 patent); 2742-46 Q'ury instructions as to the meaning of the limitations of the claims of the '332 patent).

Trial Transcript from Dec. 11, 2000 at 2817-22 (reading of jury verdict).

Jury verdict, dated Dec. 11, 2000.

D.I. 699, Motion by Defendant BSC and Scimed Life Systems, Inc. For Summary Judgment of Invalidity of U. S. Appl. No. 5,902,332 dated Apr. 4, 2000.

D.I. 896, Order Denying Motion for Summary Judgment of Invalidity and Unenforceability of Claims 1, 3, and 5 of the U.S Appl. No. 5,902,332 Denying {699-1} Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,902,332 dated Oct. 12, 2000.

Wright et al., Percutaneous Endovascular Stent: An Experimental Study (Abstract), RSNA Meeting (Nov. 28, 1984).

Hearing Transcript from Feb. 10, 1998 at 122-32, 146-80 (Attorneys' opening remarks regarding '417 patent); 180-312 (R. Schatz testimony) [Portions of This Transcript Have Been Removed as Confidential].

Hearing Transcript from Feb. 11, 1998 at 427-575, 577-651 (Cordis expert testimony regarding the '417 patent, the prior art and the Palmaz-Schatz stent).

Hearing Transcript from Feb. 13, 1998 at 1121-1261 (Guidant expert testimony regarding the alleged obviousness of the '417 patent, the prior art and the Palmaz-Schatz stent). [Portions of This Transcript Have Been Removed as Confidential].

Order by J. Robinson denying Cordis' Motion for a Preliminary Injuction Against ACS dated Jul. 17, 1998.

ACS, Inc.'s and Guidant Corp.'s Opening Brief in Support of Their Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102,417 dated Aug. 27, 1998.

Plaintiff's Answering Brief in Opposition to ACS' and BSC's Motion for Summary Judgment on Obviousness dated Sep. 24, 1998.

Order dated Mar. 31, 2000.

Schatz Deposition Testimony; May 15, 1996: 79-83, 89-92, 105-107 and 153-161.

Schatz Deposition Testimony; May 16, 1996: 555-564, 569-572.

Schatz Deposition Testimony; Jan. 8, 1998: 67-73, 108-110.

Schatz Deposition Testimony; Jul. 14, 1998: 69-77, 108-112, 119-123.

Schatz Deposition Testimony; Jul. 12, 1999: 88-91, 132-135, 144-149, 218-223, 231-242.

Schatz Deposition Testimony; Jul. 13, 1999: 251-334, 339-345, 374-416.

Schatz Deposition Testimony; Jul. 14, 1999: 454-550.

Schatz Deposition Testimony; Jul. 15, 1999: 560-614.

Schatz Deposition Testimony; Dec. 2, 1999: 906-91 1, 928-942, 945-963, 976-978, 1029-1034, 1038-1042.

Palmaz Deposition Testimony, Nov 5, 1991: 160-172.

Palmaz Deposition Testimony, Feb. 5, 1995: 710-727.

Palmaz Deposition Testimony, Jul. 16, 1998: 55-56, 81-82.

Palmaz Deposition Testimony, Jul. 28, 1999: 560-568, 570-579.

Palmaz Deposition Testimony, Jul. 29, 1999: 778-785.

Palmaz Deposition Testimony, Aug. 31, 1999: 1403-1452.

Palmaz Deposition Testimony, Sep. 2, 1999: 1953-1960.

Palmaz Deposition Testimony, Oct. 14, 1999: 2201-2209; 2275-2342; 2371-2411.

Palmaz Deposition Testimony, Oct. 15, 1999: 2424-2497; 2508-2589.

Palmaz Deposition Testimony, Oct. 16, 1999: 2853-2860.

Tobor Deposition Testimony, Jun 17, 1999: 837-958.

Tobor Deposition Testimony, Jun. 18, 1999: 1095-1184.

Tobor Deposition Testimony, Dec. 1, 1999: 1217-1371.

Tobor Deposition Testimony, Dec. 2, 1999: 1398-1414; 1444-1508; 1532-1548.

Tobor Deposition Testimony, Dec. 3, 1999: 1652-1653; 1662-1672; 1683-1694.

Kula Deposition Testimony, Apr. 20, 1999: 268-169.

Kula Deposition Testimony, Nov. 16, 1999: 660-675; 680-694; 7-8-755; 774-821.

Kula Deposition Testimony, Nov. 18, 1999: 176-223.

Expert Report of Dr. Rodney S. Badger on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Expert Report of Dr. Joseph Bonn on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Dr. Joseph Bonn dated Mar. 14, 2000.

Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Mar. 2000)

Second Supplemental Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Aug. 17, 2004).

Rebuttal Expert Report of John M. Collins, PH.D. (Feb. 2000).

Expert Report of David C. Cumberland, M.D. (Jan. 24, 2000).

Expert Report of John T. Goolkasian (Feb. 2000).

Deposition of Richard R. Heuser, M.D. (Sep. 7, 2004).

Deposition of Henry R. Piehler (Sep. 10, 2004).

Deposition of Ronald J. Solar (Mar. 22, 2000).

Deposition of Ronald J. Solar (Mar. 23, 2000).

Deposition of Ronald J. Solar (Apr. 12, 2000).

Expert Report of Dr. Arina Van Breda on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Anna Van Breda (Mar. 24, 2000)

Deposition of Arina Van Breda (Aug. 21, 2004)

Expert Report of John F. Witherspoon (Jan. 24, 2000).

Supplemental Expert Report of John F. Witherspoon (Oct. 27, 2000).

Deposition of John F. Witherspoon (Mar. 8, 2000).

Palmaz et al., Article: "Normal and Stenotic Renal Arteries: Experimental Balloon Expandable Intraluminal Stenting", Radiology, Sep. 1987. (AVE 84).

Julio C. Palmaz, Article: "Expandable vascular endoprosthesis." (AVE 132).

Duprat et al., Article: Flexible Balloon-Expandable Stent for Small Vessels Duprat et al. Radiology, vol. 162, pp. 276-278, 1987. (AVE 134).

Coons et. al., Article: "Large-Bore, Long Biliary Endoprosthesis (Biliary Stents) for Improved Drainage," Radiology, vol. 148, pp. 89-94, 1983. (AVE 143).

Honickman et al., Article: "Malpositioned Biliary Endoprosthesis, Technical Developments And Instrumentation," vol. 144, No. 2., 1982. (AVE 144).

Harries-Jones, et al., Article: "Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," AJR, vol. 138, pp. 771-772, 1982. (AVE 153).

Charnsangavej et al., Article "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (AVE 359).

Wallace, M. J. et al., Article "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 158, pp. 309-312, 1986. (AVE 364).

T. Yoshioka, et al., AIR Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs", vol. 151, pp. 673-676, 1988. (AVE 438)

Palmaz, J. C. et al., Article: "Expandable Intraluminal Vascular Graft: A Feasibility Study," Surgery, vol. 99, pp. 199-205, 1986. (AVE 461)

Lawrence et al., Article: "Percutaneous Endovascular Graft: Experimental Evaluation" Radiology, vol. 163, pp. 357-360, 1987. (AVE 671).

Palmaz et al., Article: Expandable Intraluminal Graft: A Preliminary Study, 1 Jan. 17-22, 1985, Radiology, vol. 156, pp. 73-77, 1985. (AVE 1224).

Fallone et al., "Elastic Characteristics of the Self-Expanding Metallic Stents," Investigative Radiology, vol. 23, pp. 370-376, 1988. (AVE 1953).

Palmaz Paper Entitled "Research Project Expandable Vascular Endoprosthesis" May 18, 1983.

Rousseau, et al., Publication: "Percutaneous Vascular Stent: Experimental Studies & Preliminary Clinical Results in Peripheral Arterial Diseases," in Inter. Angio, vol. 6, 153-161, 1987. (AVE 3301).

Rousseau , et al., Publication: "Self-Expanding Endovascular Prostesis: An Experimental Study," Radiology, vol. 164, pp. 709-714, 1987. (AVE 3303).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 58, pp. 309-312, 1986. (DBX 2938).

Palmaz et al., Article: "Expandable Intraluminal Graft: A Preliminary Study," Radiology, vol. 156, pp. 73-77, Nov. 17-22, 1985 (DBX 4595).

Program for the 12th Annual Course on Diagnostic Angiography and Interventional Radiology Mar. 23-26, 1987 sponsored by The Society of Cardiovascular and Interventional Radiology (DBX 6235).

Preliminary Motion for Judgment re: Wolff claims 1, 2-8, 10, 15 and 19 (DBX6759).

Palmaz Declaration (DBX 7069).

Letter from Gaterud to Dr. Palmaz dated Jul. 5, 1988 with attached document entitled: "Segmented, balloon-expandable stents." (DBX 7160).

Duprat et al., Article: "Flexible Balloon-Expandable Stent For Small Vessels," Radiology, vol. 168, pp. 276-278, 1987 (PX 82).

Drawing Sent to Bodie on Mar. 17, 1986 (PX 374).

Letter from Dr. Palmaz to R. Bowman enclosing a model of the flexible coronary graft dated Mar. 17, 1986 (PX 337).

Lab Notebook pages dated Jul. 30, 1987 from Rodney Wolff (COR 185596-597) (PX621A).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (API 72).

J. Palmaz: The Current Status of Vascular Prostheses, published by SCIR in the Twelfth Annual Course on Diagnostic Angiography And Interventional Radiology Mar. 23-26, 1987. (API 73)

Amendment in Response to Office Action of Oct. 18, 1998 in re: Application of Julio Palmaz SIN 174,246. (API 152).

Article: Wallace, et al., Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work In Progress, Radiology, vol. 158, pp. 309-312. (API 295).

Reply of Senior Party Schatz To Patentee Wolffs Opposition To The Belated Motion For Judgment Of Applicant Schatz With Regard To Wolff Claims 1, 2-8, 10, 1 1, 13-17, And 19 (COR 185640-455) (API 310).

Brief Of Senior Party Schatz At Final Hearing (API 313).

Letter from Ron Sickles to Ben Tobor dated Feb. 10, 1988 (Exhibit 42).

Letter from R.O. Sickles to Mike Tatlow dated May 12, 1988 (Exhibit 43).

Letter from R. O. Sickles to Richard Schatz dated Jun. 2, 1988 (Exhibit 44).

Letter from Richard Schatz to Raimund Erbel dated Jun. 3, 1988 (Exhibit 45).

Letter from Richard Schatz to Mike Schuler dated Aug. 29, 1991 (Exhibit 48).

Minutes of J&J Stent Project Review Meeting dated Jan. 21, 1988 (Exhibit 7).

Preliminary Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17, and 19. (Exhibit 67).

Declaration of Richard A. Schatz. (Exhibit 75).

Belated Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 1 1, 13-17 and 19. (Schatz-Exhibit 77).

Letter from Dr. Schatz to Mr. Tobor, dated Jun. 3, 1988. (Exhibit 122).

Letter from Dr. Schatz to Mr. Romano, dated Nov. 28, 1988 (Exhibit 131).

Letter from Mr. Sickles to Mr. Tobor, dated Feb. 10, 1988 (Exhibit 145).

Richard A. Schatz, Article titled: "A View of Vascular Stents" Circulation, vol. 79, No. 2, pp. 445-457, 1989. (Exhibit 194).

US 7,217,286 B2
Page 9

Senior Party Schatz's reply to Patentee Wolffs Opposition to the Preliminary Motion Of Applicant Schatz for judgment with regard to Wolff Claims 1, 2-8, 10, 1 1, and 13-17. (Exhibit 69).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications' Work In Progress," Radiology, vol. 158, pp. 309-312, 1986. (Exhibit 165).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminrary Assessment of Treatment with expandable Metallic Stents," Radioloby, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986l (Exhibit 167).

David D. Lawrence et al., Publication: Percutaneous Endoyascular Graft: Experimental Evaluation[1], Radiology, pp. 163, 357-360, 1987. (Exhibit 173).

Charles E. Putnam, M.D., Cover and article from "Investigative Radiology", vol. 23. No. 5, May 1988. (Exhibit 177).

Robert N. Berk, Cover and article from "American Journal of Roentology", pp. 673-676, 1988. (Exhibit 178).

Declaration of John S. Kula Under 37 CFR § 1. 672 (Kula-Exhibit 77).

Yoshioka et al., Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs" AJR, vol. 151, pp. 673-676, 1988 (PX 100).

Palmaz, et al., Article: Expandable Intraluminal Graft: A Preliminary Study Work in Progress[1], Radiology, vol. 156, No. 1, pp. 73-77, 1985. (PX 101).

Declaration of Richard Schatz Under 37 C.F.R. § 1.672. (PX 106).

Charnsangavej et al., Article: "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (PX 143).

Wallace, et al., Article: Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work in Progress[1], Radiology, vol. 158, pp. 309-312, 1986. (PX 144).

Ginn Kolata, News Article: NY Times, "Devices That Opens Clogged Arteries Gets a Falling Grade in a New Study", pp. 16-18, Jan. 3, 1991. (PX 186).

Duprat, et al., Article: "Flexible Balloon- Expanded Stent for Small Vessels Work in Progress[1]", Radiology, vol. 162, pp. 276-278, 1987 (PX 207).

Letter from Palmaz to Bowman dated Mar. 17, 1986. (PX 350)

Memo re: Minutes of Stent Project Review- San Antonia- Mar. 15, 1988 (PX 651).

Kuntz, et al., Article: Clinical Cardiology Frontiers: "Defining Coronary Restenosis, Newer Clinical and Angiographic Paradigms", Circulation, Sep 1993, vol. 88, No. 3, pp 1310-1323 (PX 854).

Belated Motion for Judgment with regard to Wolff Claims1, 2-8, 10, 11, 13-17, and 19 (PX 1410).

Drawing of Spiral Stent (sent to Bodic Mar. 17, 1986) (PX2933).

Wright et al, Article: "Percutaneous Endovascular Stents: An Experimental Evaluation," Radiology, vol. 156, pp. 69-72, 1985. (PX 3093).

Charnsangavej et al , Article: "A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation," Houston Medical Journal, vol. 3, pp. 41-51, Jun 1987. (PX 3207).

In re Application of Wiktor, Appln. No. 69,636, Response to Office Action dated Mar. 17, 1988. (PX3236).

Transmittal Letter of Response to First Office Action in '417 patent. (PX 3993).

Letter from B. Tobor to R. Schatz dated Jul 23, 1991. (PX 3996).

Mullins et al., Article: "Implication of balloon-expandable intravascular grafts by catherization in pulmonary arteries and systemic veins," Circulation, vol. 77, No. 1, pp. 188-189, 1988 (PX4049).

Schatz et al , Article: "Intravascular Stents for Angioplasty," Cardio, 1997. (PX 4050).

Schatz et al., Article: "New Technology in Angioplasty Balloon-Expandable Intravascular Stents, New Developments in Medicine," vol. 2, No. 2 pp. 59-75, 1987. (PX4051).

Richard A. Schatz, Article: "Introduction to Intravascular Stents," Cardiology Clinics, vol. 6, No. 3, pp. 357-372, 1988. (PX 4052).

Richard A. Schatz, Article: "A View of Vascular Stents," Circulation, vol. 79, No. 2, pp. 445-457, 1989. (PX4053).

Wang et al., Article: "An Update on Coronary Stents," Cardio, pp. 177-186, 1992. (PX 4054).

Richard A. Schatz, Article: "New Technology in Angioplasty: Balloon-Expandable Starts," Medicumundi, vol. 33, No. 3, pp. 1 12-1 26, 1988. (PX 4055).

Letter from Tobor to Schatz dated Sep. 29, 1988. (PX 1395).

Verified Statement of Facts by Unnamed Inventor R.A. Schatz document filed in U. S. Patent and Trademark Office on Sep. 8, 1989. (PX 3677).

Declaration of John S. Kula Under 37 CFR § 1.672 (Exhibit 329).

Letter to Mike Schular from R.A. Schatz dated Aug. 29, 1991. (Exhibit 402).

Articulated, Balloon-Expandable Stents, (DBX 7159).

J. Rosch et al., Experimental Intrahepatic Portacaval Anastomosis: Use of Expandable Gianturco Stents, Radiology, vol. 162, pp. 481-485, 1987.

J. Rosch et al., Modified Gianturco Expandable Wire Stents In Experimental and Clinical Use, Ann Radiol, vol. 31, No. 2, pp. 100-103, 1987.

J. Rosch et al., Gianturco Expandable Stents In the Treatment of Superior Vena Cava Syndrome Recurring After Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol 60, pp. 1243-1246, 1987.

I.E. Gordon, Structures or Why Things Don't Fall Down, Penguin Books, pp. 45-59, 132-148,210-244,377-383

Maass et al., Radiological Follow-up of Transluminally Inserted Vascular Endoprosthesis: An Experimental Study Using Expanding Spirals, Radiology, vol 152, pp. 659-663, 1984

Argument submitted re EP 861 15473 dated Jan. 20, 1995. (AVE 2478).

Verified Statement of Facts by Julio C. Palmaz dated Aug. 4, 1989 (PX 3662).

Papanicolaou et al., Insertion of a Biliary Endoprosthesis Using A Balloon Dilatation Catheter, Gastrointest Radiology, vol 10, pp. 394-396, 1986.

Palmaz et al., Atherosclerotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, vol. 168, pp. 723-726, 1986.

Palmaz, The Current Status of Vascular Prostheses; Rosch et al , Gianturco, Expandable Stents in Experimental and Clinical Use, SCIVR, pp. 1 18-124, 1987.

Rosch et al., Abstract: Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CIRSE, Porto Cervo, Sardinia, May 25-29, 1987.

Rosch et al., Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

Mirich et al., Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study, Radiology, vol. 170, pp. 1033-1037, 1989.

Dotter, Transluminally-placed Coilspring Endarterial Tube Grafts, Investigative Radiology, vol. 4, Sep.-Oct., pp. 329-332, 1969.

Palmaz et al., Abstract: Expandable Intraluminal Graft: A Preliminary Study, Radiology, vol. 153 (P), Nov. 1983: 70th Scientific Assembly and Annual Meeting.

Cragg et al, Nonsurgical Placement of Arterial Endoprostheses: A New Technique Using Nitinol Wire, Radiology, vol. 147, pp. 261-263, Apr. 1983.

J. Rosch et al., Gianturco Expandable Stents in Experimental and Clinical Use, Program: "Twelfth Annual Course on Diagnostic Angiography and Interventional Radiology" (Society of Cardiovascular and Interventional Radiology, Pittsburgh, PA), Mar. 23-26, 1987 (the second Monofilament Article).

Uchida et al., Modifications of Gianturco Expandable Wire Stents, AJR, vol. 150, pp. 1185-1187, 1988.

Palmaz, Balloon-Expandable Intravascular Stent, AJR, vol. 1510, pp. 1263-1269.

Cordis Corporation v. Advanced Cardiovascular Systems, Inc , Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCMED Life Systems, Inc., Plaintiffs Complaint, Oct 23, 1997 (Case No. 97-550-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Plaintiffs First Amended Complaint for Declaratory Relief of Patent Validity,

**US 7,217,286 B2**

Page 10

Unenforceability, Noninfringement, and for Antitrust Violations, Jan. 27, 1998 (Civil Action No. 97-700).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation,* Johnson & Johnson and Expandable-Grafts Partnership, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation,* Johnson & Johnson and Expandable-Grafts Partnership, Expandable-Graft Partnership's Answer, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation,* Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation,* Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership, Mar 31, 1998 (Civil Action No. 97-700-SLR).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. and Guidant Corporation,* Cordis Corporation's Motion for a Preliminary Injunction, Oct. 8, 1997 (Civil Action No. 97-550).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* Guidant Corporation Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIJVIED, Inc., Cordis's Motion for Preliminary Injunction Against Arterial Vascular Engineering, Inc., Dec. 29, 1997 (Case No. 97-550-SLR).

Deposition of R. Schatz, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Jan. 8, 1998 (Civil Action No. 97-550 SLR).

Deposition of Leo P. Bendel in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Jan. 22, 1998 (Civil Action No. 97-550 SLR).

Deposition of Julio Cesar Palmaz in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Dec. 29, 1997 (Civil Action No. 97-550 SLR).

Deposition of Richard A. Bowman in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Jan. 9, 1998 (Civil Action No. 97-550 SLR).

Deposition of Gary Schneiderman in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Jan. 16, 1998 (Civil Action No. 97-550 SLR).

Deposition of David Pearle, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.,* taken on Jul. 10, 1998 (Civil Action No. 97-550 SLR).

Preliminary Injunction hearing testimony taken on Feb. 9-13, 1998 (Civil Action No. 97-550 SLR).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., et al.,* (Civil Action No. 97-550 SLR) and *Cordis Corporation* v *Advanced Cardiovascular Systems, Inc. Et al.* (Civil Action No. 98-65-SLR), Opening Post Hearing Brief of Plaintiff Cordis Corporation in Support of Motion for Preliminary Injunction, Mar. 6, 1998 (Portions relevant to patent claim construction and patent validity issues).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc. et al,* Post-Hearing Reply Brief of Plaintiff Cordis Corporation in Support of Its Motion for Preliminary Injunction, Apr. 10, 1998 (Case No. 97-550 SLR) (Portions relevant to patent validity issues).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc. et al,* Plaintiffs Motion for a Preliminary Injunction Against Boston Scientific Corporation and SCLMED Life Systems, Inc. And Memorandum in Support, Apr. 13, 1998 (Case No. 97-550-SLR).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc., et al.,* Judge Robinson's Order Denying Plaintiffs Motion for a Preliminary Injunction, Jul. 17, 1998 (Civil Action No. 97-550 SLR).

*Cordis Corporation and Expandable Grafts Partnership* v *Advanced Cardiovascular Systems, Inc., et al.,* Defendant Boston Scientific Corporation and SCTMED Life Systems, Inc.'s Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102,417, filed Aug. 27, 1998 (Civil Action No. 97-550- SLR).

*Boston Scientific Limited, et al.* v. *Expandable Grafts Partnership,* Plaintiffs' Statement of Claim, Mar. 13, 1997 (UK Action No. 1493)

*Boston Scientific Limited, et al.* v. *Expandable Grafts Partnership,* Defendant's Amended Defense and Counterclaim, Aug 14, 1997 (UK Action No. 1493).

*Boston Scientific Limited, et al.* v. *Expandable Grafts Partnership,* Petition for Revocation, Mar. 13, 1997 (UK Action No. 1497).

*Boston Scientific Limited, et al.* v. *Expandable Grafts Partnership,* Particulars of Objections, Mar. 13, 1997 (UK Action No. 1497).

*Boston Scientific Limited, et al.* v. *Expandable Grafts Partnership and Boston Scientific Limited et al.,* v *Julio C. Palmaz,* Boston's Skeleton Argument (UK Action Nos. 1493, 1495, 1496, and 1497)

*Boston Scientific Limited, et al.* v. *Julio C. Palmaz and Expandable Grafts Partnership,* Skeleton Argument of Palmaz/EGP, Mar. 19, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

*Boston Scientific Limited, et al.* v. *Julio C. Palmaz and Expandable Grafts Partnership,* EGP's Final Submissions, Apr. 2, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497)

*Boston Scientific Limited, et al.* v. *Julio C. Palmaz and Expandable Grafts Partnership,* Judgment, Jun. 26, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Rosch, Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CJJR SE 1987 Presentation: see Witness Statement of Josef Rosch from U.K. Proceeding.

Statement of Claim by Boston Scientific et al. against Expandable Grafts Partnership et al., in *EPG et al,* v *Boston Scientific et al.* in Netherlands (Mar. 13, 1997).

Motion for Joinder of Actions, Change of Claim and Statement of Claim filed by Expandable Grafts Partnership et al. in *EPG et al.* v. *Boston Scientific et al.* In Netherlands (Apr. 22, 1997).

Opinion of K.J. Merman filed *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Aug. 29, 1997).

Expert report of Dr. Nigel Buller in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Aug. 28, 1997).

Expert report of Lee P. Bendel in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Aug. 28, 1997).

Memorandum of Oral Pleading in *EPG et al.* v *Boston Scientific et al.* in Netherlands (Sep. 12, 1997).

Plea Notes of P. A.M. in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Mar. 10, 1998).

Decision of Court of Appeals in *EPG et al* v *Boston Scientific et al.* in Netherlands (Apr. 23, 1998).

Translation of Nullity Action Against EPO 0 364 787 by Biotronik in Germany.

Translation of Nullity Action Against EPO 0 335 341 by Biotronik in Germany.

Translation of EPG Response to Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of EPG Response to Nullity Action EP 0 335 341 by Biotronik in Germany.

Nullity Suit Against EP-B1-0 335 341 Brought by Boston Scientific in Germany.

Translation of Opposition filed by Terumo Corp. Against Japan Patent No. 2680901.

Translation of Decision on Opposition Against Japan Patent No. 2680901.

Memorandum Order of the Court dated Sep. 7, 2000, concerning disputed claim construction

Translation of Judgment in Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of Judgment in Nullity Action Against EP 0 335 341 by Biotronik in Germany.

Trial transcript from Mar. 17, 2005 at 171-172, 191-192.

Trial transcript from Mar. 18, 2005 at 282-285, 325-327, 349-351.

Trial transcript from Mar. 21, 2005 at 721-726.

Trial transcript from Mar. 24, 2005 at 1387.

Trial transcript from Jul. 26, 2005.

BSC's Opening Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated Mar. 16, 2001.

## US 7,217,286 B2

Page 11

Cordis' Answering Brief in Opposition to BSC's Motion for JMOL or a New Trial on the Palmaz '762 Patent and the Schatz '332 Patents, dated Apr. 17, 2001.

BSC's Reply Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated May 11, 2001.

J. Rosch et al., Abstract, Expandable Gianturco-Type Wire Stents in Experimental Intrahepatic Portacaval Shunts, Program: "72nd Scientific Assembly and Annual Meeting of the Radiological Society of North America", Nov. 30-Dec. 5, 1986, Radiology, vol. 161, pp. 40-41, 1986.

*Cordis Corporation* v. *Boston Scientific*, Order Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation* v. *Boston Scientific*, Judgment in a Civil Case Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation* v. *Boston Scientific*, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation* v. *Boston Scientific*, Order Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc., Apr. 8, 1998 (Case No. 97-550-SLR).

*Boston Scientific Limited et al.* v. *Expandable Grafts Partnership and Boston Scientific Limited et al.* v. *Julio C. Palmaz*, Boston's Closing Submissions (UK Action Nos. 1493, 1495, 1496 and 1497).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Defendants' Answer, Nov. 12, 1997 (Case No. 97-550-SLR).

Statement of Rejoinder in the Action on the Merits, Also Including an Amendment of Defendant's Final Position in the Principal Action, as Well as the Provisional Statement of Rejoinder in the Action on the Counterclaim in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Feb. 10, 1998).

Statement of Answer in the Ancillary Appeal in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Mar. 10, 1998).

Appeal filed by Expandable Grafts Partnership et al. in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Nov. 12, 1997).

Title filed by Boston Scientific et al. in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Jan. 22, 1998).

Deposition of Richard Schatz, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.* taken on Jul. 14, 1998 (Civil Action No. 97-550-SLR).

Jury Verdict form from the *Cordis Corporation et al* v. *Boston Scientific Corporation, et al* liability trial, undated.

Trial testimony transcripts from the *Cordis Corporation et al.* v. *Boston Scientific Corporation et al* liability trial dated Nov. 21, Nov. 27-Dec. 1, Dec. 4-8 and Dec. 11, 2000.

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Stephen R. Hanson, Ph.D. (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Robson F Storey, Ph.D. (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Rebuttal Expert Report of Kinam Park, Ph.D. (Civil Action No. 03-283-SLR).

*Cordis Corporation* v. *Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) and *Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR) Combined Post-Hearing Brief In Support Of Cordis Corporation's Motion For Preliminary Injunction in C.A. No. 03-027-SLR, And In Opposition to Plaintiffs' Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

*Cordis Corporation* v. *Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) *Boston Scientific*

*SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR), Boston Scientific's Opening Post-Hearing Brief.

Wu et al., Silicone-covered self-expanding metallic stents for the palliation of malignant esophageal obstruction and esophagorespiratory fistulas: experience in 32 patients and a review of the literature, *Gastrointestinal Endoscopy*, 1994, pp. 22-33, vol. 40, No. 1, Portland Oregon.

Binmoeller, et al., Silicone-Covered Expandable Metallic Stents in the Esophagus: An Experimental Study, Endoscopy, 1992, pp. 416-420, vol. 24, Georg Thieme Verlag Stuttgart New York.

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Plaintiff's Reply Brief in Support of Their Motion for Preliminary Injunction.

Rhine, Polymers for Sustained Macromolecule Release: Procedures to Fabricate Reproducible Delivery Systems and Control Release Kinetics, *Journal of Pharmaceutical Sciences*, 1980, pp 265-270, vol. 69, No. 3.

Langer et al., Controlled Release of Macromolecules From Polymers, *Biomedical Polymers Polymeric Materials and Pharmaceuticals for Biomedical Use*, 1980, pp. 112-137, Academic Press, Inc., New York, NY.

Langer et al., Applications of Polymeric Delivery Systems for Macromolecules and Factors Controlling Release Kinetics.

Rhine et al., A Method to Achieve Zero-Order Release Kinetics From Polymer Matric Drug Delivery Systems, pp. 67-72.

Langer et al., Polymers for the Sustained Release of Macromolecules: Controlled and Magnetically Modulated Systems, *Better Therapy With Existing Drugs: New Uses and Delivery Systems*, 1981, pp. 179-216, Merck Sharp & Dohme International, Rahway, NJ.

Hsieh, et al., Zero-Order Controlled-Release Polymer Matrices for Micro-and-Macromolecules, *Journal of Pharmaceutical Sciences*, 1983 pp. 17-22, vol. 72, No. 1.

Brown et al., In Vivo and In Vitro Release of Macromolecules from Polymeric Drug Delivery Systems, *Journal of Pharmaceutical Sciences*, 1983, pp. 1181-1185, vol. 72, No. 10.

Langer, Implantable Controlled Release Systems, *Pharmac. Ther.*, 1983, pp. 35-51, vol. 21, printed in Great Britain.

Kost et al., Controlled Release of Bioactive Agents, *Trends In Biotechnology*, 1984, pp. 47-51, vol. 2, No. 2, Elsevier BV Amsterdam.

Bawa et al., An Explanation for the Controlled Release of Macromolecules from Polymers, *Journal of Controlled Release*, 1985, pp. 259-267, vol. 1 Elsevier Science BV Amsterdam.

Leong et al., Polymeric controlled drug delivery, 1987, pp. 199-233, vol. 1/3, Elsevier Science Publishers BV Amsterdam.

Langer, Polymeric Delivery Systems, *Targeting of Drugs 2 Optimization Strategies*, 1989, pp. 165-174, Plenum Press, New York and London.

Langer, Biomaterials in Controlled Drug Delivery; New Persectives from Biotechnological Advances; *Pharmaceutical Technology*, 1989, pp. 18, 23-24, 26, 28, 30

Langer, Controlled Release Systems, pp. 115-124.

Laurencin et al., Polymeric Controlled Release Systems: New Methods for Drug Delivery, *Clinics in Laboratory Medicine*, 1987, pp. 301-323, vol. 7, No. 2, WB Saunders Company, Philadelphia

Langer, Biopolymers in Controlled Release Systems, *Polymeric Biomaterials*, pp. 161-169.

Tsung-Pin Hsu et al., Polymers for the Controlled Release of Macromolecules: Effect of Molecular Weight of Ethylene-vinyl Acetate Copolymer, *Journal of Biomedical Materials Research*, 1985, pp. 445-460, vol. 19

Langer, Polymers and Drug Delivery Systems, *Long-Acting Contraceptive Delivery Systems*, 1983, pp. 23-32, Harper & Row, Philadelphia, PA.

Langer, New Drug Delivery Systems: What the Clinician Can Expect, *Drug Therapy*, 1983, pp. 217-231

**US 7,217,286 B2**

Page 12

Langer, et al., Chemical and Physical Structure of Polymers as Carriers for Controlled Release of Bioactive Agents: A Review, *Rev. Macromol. Chem. Phys.*, 1983, pp. 61-126.

Langer, Polymeric Delivery Systems for Controlled Drug Release, *Chem. Eng. Commun.* 1980, pp. 1-48-vol. 6, Gordon and Breach Science Publishers, Inc. USA.

Langer, et al., Biocompatibility of Polymeric Delivery Systems for Macromolecules, *Journal of Biomedical Materials Research*, 1981, pp. 267-277, vol. 15.

Langer, Controlled Release: A New Approach to Drug Delivery, *Technology Review*, 1981, pp. 26-34.

Langer, et al., Sustained Release of Macromolecules from Polymers, *Polymeric Delivery Systems*, pp. 175-176, Gordon and Breach Science Publishers, New York.

Langer, Polymers for the Sustained Release of Proteins and other Macromolecules, *Nature*, 1976, pp. 797, 263, 799-800, vol. 263, No. 5580.

Baker, et al., Controlled Release: Mechanisms and Rates (1974).

Hanson, et al., In Vivo Evaluation of Artificial Surfaces with a Nonhum Primate Model of Arterial Thrombosis,/ *Lab Clin. Med.*, Feb. 1980, pp. 289-304.

Baker, Controlled Release of Biologically Active Agents (1987) pp. 1-275.

*Cordis Corporation* v. *Boston Scientific Corporation* (CA. No. 03-27-SLR) and *Boston Scientific Scimed, Inc.*, v. *Cordis Corporation and Johnson & Johnson, Incorporated* (CA. No. 03-283-SLR) Hearing Transcripts for Jul. 21, 2003, Jul. 22, 2003, Jul. 23, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. No. 03-283-SLR), Boston Scientific's Post-Hearing Reply Brief and Exhibits Thereto, Sep. 12, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. 03-283-SLR), Memorandum Order, Nov. 21, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. No. 03-283-SLR), Deposition Transcript of Julio C. Palmaz.

Plea Notes in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Sep. 12, 1997).

Provisional Judgment *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Oct. 29, 1997).

Trial testimony transcripts from the *Cordis Corporation et al.* v. *Medtronic AVE Inc., et al.* liability trial dated Nov. 6-9, 13-17 and 20-21, 2000.

Jury verdict form from the *Cordis Corporation et al.* v. *Medtronic AVE, Inc. et al.* liability trial.

Hearing testimony trascript from the consolidated *Cordis Corporation et al.* v. *Medtronic AVE, Inc. et al.* and Boston Scientific Corporation et al. inequitable conduct hearing dated Feb. 7-9 and 12, 2001.

*Cordis Corporation* v. *Metronic Ave., Inc. et al*, OPINION, 97-550-SLR, dated Mar. 28, 2002.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Metronic AVE, Inc.* v. *Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc. etal.* (CA. No. 98-19-SLR), Expert Report of John T. Goolkasian, Esq.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic A VE, Inc.* v. *Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc. et al* (CA. 98-19-SLR), Expert Report to John F. Witherspoon.

\* cited by examiner

U.S. Patent        May 15, 2007        Sheet 1 of 2        US 7,217,286 B2

## FIG. 1



## FIG. 1a



## FIG. 2a



## FIG. 2b



U.S. Patent          May 15, 2007          Sheet 2 of 2          US 7,217,286 B2

## FIG. 3a



## FIG. 3b



## FIG. 4



US 7,217,286 B2

1

# LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of Ser. No. 10/951,385, filed Sep. 28, 2004, now pending, which in turn is a continuation of Ser. No. 10/408,328, filed Apr. 7, 2003, now issued as U.S. Pat. No. 6,808,536, which in turn is a continuation of application Ser. No. 09/874,117, filed Jun. 4, 2001, now issued as U.S. Pat. No. 6,585,764, which is a continuation of application Ser. No. 09/061,568, filed Apr. 16, 1998, now issued as U.S. Pat. No. 6,273,913, which in turn claims benefit of provisional application Ser. No. 60/044,692, filed Apr. 18, 1997. The disclosures of these prior applications are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

## BACKGROUND OF THE INVENTION

Re-narrowing (restenosis) of an artherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 10–50% of patients undergoing this procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the artherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages, leukocytes, or the smooth muscle cells (SMC) themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3–6 months results in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood flow.

Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both in vitro and in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known but may be due to any or all of the following: 1) reduced expression of the growth regulatory protooncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator; are 3) binding and dequestration of growth regulatory factors such as fibrovelent growth factor (FGF). Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon

2

vascular injury are angiopeptin (a somatostatin analog), calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal), colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides.

Additionally, a goat antibody to the SMC mitogen platelet derived growth factor (PDGF) has been shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000–600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transluminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG). PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000–300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified.

In the normal arterial will, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref) SMC in vessel wall exists in a *contractile* phenotype characterized by 80–90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state.

Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF),

etc. released from platelets (i.e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC. These cells undergo a phenotypic change from the contractile phenotype to a synthetic phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1–2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., In: Vascular Smooth Muscle Cells in Culture, Campbell, J. H. and Campbell, G. R., Eds, CRC Press, Boca Ratioh, 1987, pp. 39–55); Clowes, A. W. and Schwartz, S. M., Circ. Res. 56:139–145, 1985).

Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7–14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3–6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374–1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30–50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

### SUMMARY OF THE INVENTION

Novel Features and Applications to Stent Technology Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include reservoirs is a new approach which offers several important advantages over existing technologies.

Local Drug Delivery from a Stent to Inhibit Restenosis

In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatable material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

One advantage of this system is that the properties of the coating can be optimized for achieving superior biocompat-

ibility and adhesion properties, without the addition requirement of being able to load and release the drug. The size, shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be better understood in connection with the following figures in which FIGS. 1 and 1A are top views and section views of a stent containing reservoirs as described in the present invention;

FIGS. 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

FIGS. 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

FIG. 4 is a layout view of a device containing a reservoir as in FIG. 3.

### DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty. The calcium antagonists have also been unsuccessful in preventing restenosis, although they are still under study. Other agents currently under study include thromboxane inhibitors, prostacyclin mimetics, platelet membrane receptor blockers, thrombin inhibitors and angiotensin converting enzyme inhibitors. These agents must be given systemically, however, and attainment of a therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (Lang et al, 42 Ann. Rev. Med., 127–132 (1991); Popma et al., 84 Circulation, 1426–1436 (1991)).

Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis (Franklin, S. M. and Faxon, D. P., 4 Coronary Artery Disease, 2-32-242 (1993); Serruys, P. W. et al., 88 Circulation, (part 1) 1588–1601, (1993).

Conversely, stents have proven useful in preventing reducing the proliferation of restenosis. Stents, such as the stent 10 seen in layout in FIG. 4, balloon-expandable slotted metal tubes (usually but not limited to stainless steel), which when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall. This support is helpful in maintaining an open path for blood flow. In two randomized clinical trials, stents were shown to increase angiographic success after PTCA, increase the stenosed blood vessel lumen and to reduce the lesion recurrence at 6 months (Serruys et al, 331 New Eng Jour. Med, 495, (1994); Fischman et al, 331 New Eng Jour. Med, 496–501 (1994) Additionally, in a preliminary trial, heparin coated stents appear to possess the same benefit of reduction in stenosis diameter at follow-up as was observed with non-heparin coated stents. Additionally, heparin coating appears to have the added benefit of producing a reduction

US 7,217,286 B2

5

in sub-acute thrombosis after stent implantation (Serruys et al., 93 Circulation, 412–422, (1996). Thus, 1) sustained mechanical expansion of a stenosed coronary artery has been shown to provide some measure of restenosis prevention, and 2) coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs to local, injured tissue off the surface of the stent.

Numerous agents are being actively studied as antiproliferative agents for use in restenosis and have shown some activity in experimental animal models. These include: heparin and heparin fragments (Clowes and Karnovsky, 265 Nature, 25–626, (1977); Guyton, J. R. et al. 46 Circ. Res., 625–634, (1980); Clowes, A. W. and Clowes, M. M., 52 Lab. Invest., 611–616, (1985); Clowes, A. W. and Clowes, M. M., 58 Circ. Res., 839–845 (1986); Majesky et al., 61 Circ Res., 296–300, (1987); Snow et al., 137 Am. J. Pathol., 313–330 (1990); Okada, T. et al., 25 Neurosurgery, 92–898, (1989) colchicine (Currier, J. W. et al., 80 Circulation, 11–66, (1989), taxol (ref), agiotensin converting enzyme (ACE) inhibitors (Powell, J. S. et al., 245 Science, 186–188 (1989), angiopeptin (Lundergan, C. F. et al., 17 Am. J Cardiol. (Suppl. B); 132B-136B (1991), Cyclosporin A (Jonsson, L. et. al., 85 Proc. Nati, Acad. Sci., 2303 (1988), goat-anti-rabbit PDGF antibody (Ferns, G. A. A., et al., 253 Science, 1129–1132 (1991), terbinafine (Nemecek, G. M. et al., 248 J. Pharmacol. Exp. Thera., 1167–11747 (1989), trapidil (Liu, M. W. et al., 81 Circulation, 1089–1093 (1990), interferon-gamma (Hansson, G. K. and Holm, 84 J. Circulation, 1266–1272 (1991), steroids (Colburn, M. D. et al., 15 J. Vasc. Surg., 510–518 (1992), see also Berk, B. C. et al., 17 J. Am. Coll. Cardiol., 111B-117B (1991), ionizing radiation (ref), fusion toxins (ref) antisense oligonucleotides (ref), gene vectors (ref), and rapamycin (see below).

Of particular interest in rapamycin. Rapamycin is a macrolide antibiotic which blocks IL-2-mediated T-cell proliferation and possesses antiinflammatory activity. While the precise mechanism of rapamycin is still under active investigation, rapamycin has been shown to prevent the G.sub.1 to 5 phase progression of T-cells through the cell cycle by inhibiting specific cell cyclins and cyclin-dependent protein kinases (Siekierka, Immunol. Res. 13: 110–116, 1994). The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. (Circ Res 76:412–417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC in vitro while Poon et al. have shown the rat, porcine, and human SMC migratin can also be inhibited by rapamycin (J Clin Invest 98: 2277–2283, 1996). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55:1409–1418, 1993; Gallo et al., in press, (1997)). These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the dequale of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the restenosis process, an agent which prevents inflammation and the proliferation of

6

SMC combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

Experiments

Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression.

Delivery Methods: These can vary:

Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath.

Involving comixture with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.

or entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels, as will be explained further herein.

or including covalent binding of the drug to the stent via solution chemistry techniques (such as via the Carmeda process) or dry chemistry techniques (e.g. vapour deposition methods such as rf-plasma polymerization) and combinations thereof.

Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural uptake.

Extravascular delivery by the pericardial route.

Extravascular delivery by the advential application of sustained release formulations.

Uses:

for inhibition of cell proliferation to prevent neointimal proliferation and restenosis.

prevention of tumor expansion from stents.

preventingrowth of tissue into catheters and shunts inducing their failure.

1. Experimental Stent Delivery Method—Delivery from Polymer Matrix:

Solution of Rapamycin, prepared in a solvent miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001 weight % to 30 weight % of drug. Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters, e.g., polylactide, polycaprolacton-glycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocompatible polymers are also suitable candidates. Polymers such as polydimethylsiolxane; poly(ethylene-vingylacetate); acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.

Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the solvent allowed to evaporate to leave a film with entrapped rapamycin.

2. Experimental Stent Delivery Method—Delivery from Microporous Depots in Stent Through a Polymer Membrane Coating:

Stent, whose body has been modified to contain micropores or channels is dipped into a solution of Rapamycin, range 0.001 wt % to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. (The dipping solution can also be compressed to improve the loading efficiency.) After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A solution of polymer, chosen from any identified in the first experimental method, is applied to the

US 7,217,286 B2

7

stent as detailed above. This outer layer of polymer will act as diffusion-controller for release of drug.

3. Experimental Stent Delivery Method—Delivery Via Lysis of a Covalent Drug Tether:

Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides may be suitable for this.

4. Experimental Method—Pericardial Delivery:

A: Polymeric Sheet

Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolid-e) or non-degradable polymer, e.g., polydimethylsiloxane, and mixture cast as a thin sheet, thickness range 10 mu. to 1000 mu. The resulting sheet can be wrapped perivascularly on the target vessel. Preference would be for the absorbable polymer.

B: Conformal Coating:

Rapamycin is combined with a polymer that has a melting temperature just above 37° C., range 40°–45° C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies conformably to the vessel wall. Both non-degradable and absorbable biocompatable polymers are suitable.

As seen in the figures it is also possible to modify currently manufactured stents in order to adequately provide the drug dosages such as rapamycin. As seen in FIGS. 1a, 2a and 3a, any stent strut 10, 20, 30 can be modified to have a certain reservoir or channel 11, 21, 31. Each of these reservoirs can be open or closed as desired. These reservoirs can hold the drug to be delivered. FIG. 4 shows a stent 40 with a reservoir 45 created at the apex of a flexible strut. Of course, this reservoir 45 is intended to be useful to deliver rapamycin or any other drug at a specific point of flexibility of the stent. Accordingly, this concept can be useful for "second generation" type stents.

In any of the foregoing devices, however, it is useful to have the drug dosage applied with enough specificity and

8

enough concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the stent struts must be kept at a size of about 0.0005" to about 0.003". Then, it should be possible to adequately apply the drug dosage at the desired location and in the desired amount.

These and other concepts will are disclosed herein. It would be apparent to the reader that modifications are possible to the stent or the drug dosage applied. In any event, however, the any obvious modifications should be perceived to fall within the scope of the invention which is to be realized from the attached claims and their equivalents.

What is claimed:

1. A device comprising a metallic stent, a biocompatible, nonabsorbable polymeric carrier, and a therapeutic agent, wherein:

said polymeric carrier comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof, and

said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, and is present in an amount effective to inhibit neointimal proliferation.

2. The device according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin.

3. The device according to claim 1 that provides a controlled release of said therapeutic agent over a period of several weeks.

4. The device according to claim 2 that provides a controlled release of said therapeutic agent over a period of several weeks.

5. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a device according to any one of claims 1 to 4 in the lumen of said coronary artery.

*   *   *   *   *

# EXHIBIT B



US007223286B2

(12) **United States Patent**
Wright et al.

(10) Patent No.: **US 7,223,286 B2**
(45) Date of Patent: ***May 29, 2007**

(54) **LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT**

(75) Inventors: **Carol Wright**, Somerset, NJ (US); **Gerard H. Llanos**, Stewartsville, NJ (US); **Ronald Rakos**, Neshanic Station, NJ (US); **Kristin King**, Mahwah, NJ (US); **Robert Falotico**, Bell Mead, NJ (US)

(73) Assignee: **Cordis Corporation**, Miami Lakes, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 265 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/951,385**

(22) Filed: **Sep. 28, 2004**

(65) **Prior Publication Data**

US 2005/0085902 A1    Apr. 21, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/408,328, filed on Apr. 7, 2003, now Pat. No. 6,808,536, which is a continuation of application No. 09/874,117, filed on Jun. 4, 2001, now Pat. No. 6,585,764, which is a continuation of application No. 09/061,568, filed on Apr. 16, 1998, now Pat. No. 6,273,913.

(60) Provisional application No. 60/044,692, filed on Apr. 18, 1997.

(51) Int. Cl.
*A61F 2/06*    (2006.01)

(52) U.S. Cl. .................................................... 623/1.42

(58) Field of Classification Search ..... 623/1.42–1.48; 427/2.1–2.31
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 861,659 A | 7/1907 | Johnston | 464/147 |
| 3,051,677 A | 8/1962 | Rexford | 522/156 |
| 3,279,996 A | 10/1966 | Long et al. | 424/424 |
| 3,526,005 A | 9/1970 | Bokros | 623/11.11 |
| 3,599,641 A | 8/1971 | Sheridan | 604/256 |
| 3,657,744 A | 4/1972 | Ersek | 128/898 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE    3205942 A1    9/1983

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 07/819,314, filed Jan. 9, 1992, Morris

(Continued)

*Primary Examiner*—Suzette Gherbi
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

Methods of preparing intravascular stents with a polymeric coating containing macrocyclic lactone (such as rapamycin or its analogs), stents and stent graphs with such coatings, and methods of treating a coronary artery with such devices. The macrocyclic lactone-based polymeric coating facilitates the performance of such devices in inhibiting restenosis.

**77 Claims, 2 Drawing Sheets**



**US 7,223,286 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,744,596 A | 7/1973 | Sander | 188/203 |
| 3,779,805 A | 12/1973 | Alsberg | 427/105 |
| 3,929,992 A | 12/1975 | Sehgal et al. | 424/122 |
| 3,932,627 A | 1/1976 | Margraf | 514/56 |
| 3,948,254 A | 4/1976 | Zaffaroni | 128/833 |
| 3,952,334 A | 4/1976 | Bokros et al. | 623/11.11 |
| 3,968,800 A | 7/1976 | Vilasi | 606/198 |
| 4,069,307 A | 1/1978 | Higuchi et al. | 424/432 |
| 4,076,285 A | 2/1978 | Martinez | 285/332 |
| 4,292,965 A | 10/1981 | Nash et al. | 128/833 |
| 4,299,226 A | 11/1981 | Banka | 604/509 |
| 4,300,244 A | 11/1981 | Bokros | 623/1.13 |
| 4,312,920 A | 1/1982 | Pierce et al. | 428/425.5 |
| 4,321,711 A | 3/1982 | Mano | 623/1.43 |
| 4,323,071 A | 4/1982 | Simpson et al. | 606/194 |
| 4,390,599 A | 6/1983 | Broyles | 428/597 |
| 4,413,359 A | 11/1983 | Akiyama et al. | 623/23.72 |
| 4,423,183 A | 12/1983 | Close | 524/546 |
| 4,441,216 A | 4/1984 | Ionescu et al. | 623/2.19 |
| 4,503,569 A | 3/1985 | Dotter | 623/1.19 |
| 4,512,338 A | 4/1985 | Balko et al. | 606/108 |
| 4,550,447 A | 11/1985 | Seiler, Jr. et al. | 623/1.32 |
| 4,553,545 A | 11/1985 | Maass et al. | 606/198 |
| 4,560,374 A | 12/1985 | Hammerslag | 604/509 |
| 4,562,596 A | 1/1986 | Kornberg | 623/1.32 |
| 4,565,740 A | 1/1986 | Golander et al. | 428/409 |
| 4,580,568 A | 4/1986 | Gianturco | 606/198 |
| 4,613,665 A | 9/1986 | Larm | 536/20 |
| 4,642,111 A | 2/1987 | Sakamoto et al. | 424/492 |
| 4,655,771 A | 4/1987 | Wallsten | 623/1.22 |
| 4,656,083 A | 4/1987 | Hoffman et al. | 442/123 |
| 4,676,241 A | 6/1987 | Webb et al. | 128/207.14 |
| 4,678,466 A | 7/1987 | Rosenwald | 424/427 |
| 4,687,482 A | 8/1987 | Hanson | 623/1.49 |
| 4,689,046 A | 8/1987 | Bokros | 623/2.31 |
| 4,731,054 A | 3/1988 | Billeter et al. | 604/93.01 |
| 4,733,665 A | 3/1988 | Palmaz | 606/108 |
| 4,739,762 A | 4/1988 | Palmaz | 623/1.11 |
| 4,740,207 A | 4/1988 | Kreamer | 623/1.15 |
| 4,749,585 A | 6/1988 | Greco et al. | 428/422 |
| 4,753,652 A | 6/1988 | Langer et al. | 623/1.42 |
| 4,760,849 A | 8/1988 | Kropf | 606/191 |
| 4,768,507 A | 9/1988 | Fischell et al. | 623/1.11 |
| 4,776,337 A | 10/1988 | Palmaz | 623/1.11 |
| 4,786,500 A | 11/1988 | Wong | 424/422 |
| 4,787,899 A | 11/1988 | Lazarus | 623/1.11 |
| 4,800,882 A | 1/1989 | Gianturco | 606/194 |
| 4,810,784 A | 3/1989 | Larm | 536/20 |
| 4,856,516 A | 8/1989 | Hillstead | 606/194 |
| 4,871,357 A | 10/1989 | Hsu et al. | 604/266 |
| 4,872,867 A | 10/1989 | Joh | 604/269 |
| 4,876,109 A | 10/1989 | Mayer et al. | 604/269 |
| 4,886,062 A | 12/1989 | Wiktor | 606/194 |
| 4,907,336 A | 3/1990 | Gianturco | 29/557 |
| 4,916,193 A | 4/1990 | Tang et al. | 525/413 |
| 4,954,126 A | 9/1990 | Wallsten | 600/36 |
| 4,969,458 A | 11/1990 | Wiktor | 623/1.11 |
| 4,990,131 A | 2/1991 | Dardik et al. | 600/36 |
| 4,990,155 A | 2/1991 | Wilkoff | 606/191 |
| 4,994,071 A | 2/1991 | MacGregor | 606/194 |
| 4,994,298 A | 2/1991 | Yasuda | 427/490 |
| 4,998,923 A | 3/1991 | Samson et al. | 606/194 |
| 5,015,253 A | 5/1991 | MacGregor | 623/1.15 |
| 5,019,090 A | 5/1991 | Pinchuk | 623/1.15 |
| 5,019,096 A | 5/1991 | Fox, Jr et al. | 600/36 |
| 5,029,877 A | 7/1991 | Fedeli | 277/354 |
| 5,034,265 A | 7/1991 | Hoffman et al. | 442/126 |
| 5,035,706 A | 7/1991 | Gianturco et al. | 606/198 |
| 5,041,100 A | 8/1991 | Rowland et al. | 604/265 |
| 5,041,126 A | 8/1991 | Gianturco | 623/1.15 |
| 5,047,020 A | 9/1991 | Hsu | 604/266 |
| 5,049,132 A | 9/1991 | Shaffer et al. | 604/101.02 |
| 5,049,403 A | 9/1991 | Larm et al. | 427/2.1 |
| 5,053,048 A | 10/1991 | Pinchuk | 623/1.43 |
| 5,059,166 A | 10/1991 | Fischell et al. | 600/3 |
| 5,061,275 A | 10/1991 | Wallsten et al. | 623/1.22 |
| 5,061,750 A | 10/1991 | Feijen et al. | 525/54.1 |
| 5,064,435 A | 11/1991 | Porter | 623/23.7 |
| 5,092,877 A | 3/1992 | Pinchuk | 128/898 |
| 5,102,417 A | 4/1992 | Palmaz | 606/195 |
| 5,104,404 A | 4/1992 | Wolff | 623/1.16 |
| 5,116,365 A | 5/1992 | Hillstead | 623/1.15 |
| 5,122,154 A | 6/1992 | Rhodes | 623/1.13 |
| 5,131,908 A | 7/1992 | Dardik et al. | 600/36 |
| 5,133,732 A | 7/1992 | Wiktor | 623/1.22 |
| 5,134,192 A | 7/1992 | Feijen et al. | 525/54.1 |
| 5,135,536 A | 8/1992 | Hillstead | 606/195 |
| 5,163,952 A | 11/1992 | Froix | 623/1.18 |
| 5,163,958 A | 11/1992 | Pinchuk | 623/23.49 |
| 5,171,217 A | 12/1992 | March et al. | 604/507 |
| 5,171,262 A | 12/1992 | MacGregor | 623/1.15 |
| 5,176,660 A | 1/1993 | Truckai | 604/527 |
| 5,176,972 A | 1/1993 | Bloom et al. | 430/14 |
| 5,178,618 A | 1/1993 | Kandarpa | 606/28 |
| 5,180,366 A | 1/1993 | Woods | 604/96.01 |
| 5,182,317 A | 1/1993 | Winters et al. | 523/112 |
| 5,185,408 A | 2/1993 | Tang et al. | 525/415 |
| 5,192,307 A | 3/1993 | Wall | 623/1.2 |
| 5,195,984 A | 3/1993 | Schatz | 623/1.2 |
| 5,213,576 A | 5/1993 | Abiuso et al. | 604/103.01 |
| 5,213,898 A | 5/1993 | Larm et al. | 428/422 |
| 5,217,483 A | 6/1993 | Tower | 623/1.15 |
| 5,222,971 A | 6/1993 | Willard et al. | 606/198 |
| 5,226,913 A | 7/1993 | Pinchuk | 140/71 R |
| 5,234,456 A | 8/1993 | Silvestrini | 623/1.2 |
| 5,246,445 A | 9/1993 | Yachia et al. | 623/1.2 |
| 5,258,020 A | 11/1993 | Froix | 128/898 |
| 5,258,021 A | 11/1993 | Duran | 623/2.3 |
| 5,262,451 A | 11/1993 | Winters et al. | 523/112 |
| 5,266,073 A | 11/1993 | Wall | 623/1.2 |
| 5,272,012 A | 12/1993 | Opolski | 428/423.1 |
| 5,273,536 A | 1/1994 | Palmaz | 606/108 |
| 5,275,622 A | 1/1994 | Lazarus et al. | 623/1.11 |
| 5,282,823 A | 2/1994 | Schwartz et al. | 623/1.22 |
| 5,282,824 A | 2/1994 | Gianturco | 623/1.13 |
| 5,283,257 A | 2/1994 | Gregory et al. | 514/458 |
| 5,288,711 A | 2/1994 | Mitchell et al. | 424/122 |
| 5,290,305 A | 3/1994 | Inoue | 623/1.2 |
| 5,292,331 A | 3/1994 | Boneau | 623/1.16 |
| 5,292,802 A | 3/1994 | Rhee et al. | 525/54.1 |
| 5,304,121 A | 4/1994 | Sahatjian | 604/509 |
| 5,304,200 A | 4/1994 | Spaulding | 623/1.16 |
| 5,306,250 A | 4/1994 | March et al. | 604/104 |
| 5,308,862 A | 5/1994 | Ohlstein | 514/411 |
| 5,308,889 A | 5/1994 | Rhee et al. | 523/113 |
| 5,314,444 A | 5/1994 | Gianturco | 606/195 |
| 5,314,472 A | 5/1994 | Fontaine | 623/1.22 |
| 5,328,471 A | 7/1994 | Slepian | 604/101.03 |
| 5,334,301 A | 8/1994 | Heinke et al. | 204/267 |
| 5,336,518 A | 8/1994 | Narayanan et al. | 427/470 |
| 5,338,770 A | 8/1994 | Winters et al. | 523/112 |
| 5,342,348 A | 8/1994 | Kaplan | 604/891.1 |
| 5,342,387 A | 8/1994 | Summers | 606/198 |
| 5,342,621 A | 8/1994 | Eury | 606/198 |
| 5,354,257 A | 10/1994 | Roubin et al. | 600/7 |
| 5,354,308 A | 10/1994 | Simon et al. | 623/1.15 |
| 5,356,433 A | 10/1994 | Rowland et al. | 424/422 |
| 5,366,504 A | 11/1994 | Andersen et al. | 623/1.5 |
| 5,368,566 A | 11/1994 | Crocker | 604/101.02 |
| 5,370,683 A | 12/1994 | Fontaine | 623/1.22 |
| 5,370,691 A | 12/1994 | Samson | 623/1.22 |
| 5,375,612 A | 12/1994 | Cottenceau et al. | 128/899 |
| 5,376,112 A | 12/1994 | Duran | 623/1.26 |
| 5,378,475 A | 1/1995 | Smith et al. | 424/473 |

US 7,223,286 B2

Page 3

| | | |
|---|---|---|
| 5,380,299 A | 1/1995 | Fearnot et al. .............. 604/265 |
| 5,382,261 A | 1/1995 | Palmaz ........................ 606/158 |
| 5,383,853 A | 1/1995 | Jung et al. ............. 604/103.04 |
| 5,383,928 A | 1/1995 | Scott et al. .............. 623/1.12 |
| 5,387,235 A | 2/1995 | Chuter ....................... 623/1.11 |
| 5,389,106 A | 2/1995 | Tower ....................... 623/1.15 |
| 5,393,772 A | 2/1995 | Yue et al. ................... 514/410 |
| 5,395,390 A | 3/1995 | Simon et al. ............. 623/1.18 |
| 5,397,355 A | 3/1995 | Marin et al. .............. 623/1.2 |
| 5,399,352 A | 3/1995 | Hanson ..................... 424/423 |
| 5,403,341 A | 4/1995 | Solar ........................ 606/198 |
| 5,405,377 A | 4/1995 | Cragg ....................... 623/1.2 |
| 5,409,696 A | 4/1995 | Narayanan et al. ..... 424/78.17 |
| 5,411,549 A | 5/1995 | Peters ...................... 623/1.15 |
| 5,415,619 A | 5/1995 | Lee et al. ................... 600/36 |
| 5,417,969 A | 5/1995 | Hsu et al. ............. 424/78.27 |
| 5,419,760 A | 5/1995 | Narciso, Jr. ................ 604/8 |
| D359,802 S | 6/1995 | Fontaine ................. D24/155 |
| 5,421,955 A | 6/1995 | Lau et al ................ 216/48 |
| 5,423,885 A | 6/1995 | Williams ................. 623/1.17 |
| 5,429,618 A | 7/1995 | Keogh ..................... 604/266 |
| 5,429,634 A | 7/1995 | Narciso, Jr. ............ 604/890.1 |
| 5,439,446 A | 8/1995 | Barry .................. 604/103.01 |
| 5,441,515 A | 8/1995 | Khosravi et al. .......... 606/194 |
| 5,441,516 A | 8/1995 | Wang et al. .............. 606/198 |
| 5,441,947 A | 8/1995 | Dodge et al. ............ 514/179 |
| 5,443,458 A | 8/1995 | Evry ..................... 604/891.1 |
| 5,443,477 A | 8/1995 | Marin et al. .............. 606/198 |
| 5,443,496 A | 8/1995 | Schwartz et al. ........ 623/1.16 |
| 5,443,498 A | 8/1995 | Fontaine ................. 623/1.17 |
| 5,443,500 A | 8/1995 | Sigwart .................. 623/1.17 |
| 5,447,724 A | 9/1995 | Helmus et al. .......... 424/426 |
| 5,449,372 A | 9/1995 | Schmaltz et al. ......... 606/198 |
| 5,449,373 A | 9/1995 | Pinchasik et al. ......... 606/198 |
| 5,449,382 A | 9/1995 | Dayton .................. 623/1.15 |
| 5,464,450 A | 11/1995 | Buscemi et al. ......... 632/1.2 |
| 5,464,540 A | 11/1995 | Friesen et al. ......... 210/640 |
| 5,464,650 A | 11/1995 | Berg et al. .............. 427/2.3 |
| 5,474,563 A | 12/1995 | Myler et al. ............. 606/108 |
| 5,486,357 A | 1/1996 | Narayanan .......... 424/78.17 |
| 5,496,365 A | 3/1996 | Sgro .................... 623/1.2 |
| 5,500,013 A | 3/1996 | Buscemi et al. ......... 623/1.22 |
| 5,510,077 A | 4/1996 | Dinh et al. .............. 264/485 |
| 5,512,055 A | 4/1996 | Domb et al. .............. 604/265 |
| 5,516,781 A | 5/1996 | Morris et al ........... 514/291 |
| 5,519,042 A | 5/1996 | Morris et al. ........... 514/378 |
| 5,523,092 A | 6/1996 | Hanson et al ............ 424/423 |
| 5,527,354 A | 6/1996 | Fontaine et al. .......... 623/1.17 |
| 5,545,208 A | 8/1996 | Wolff et al. ............. 623/1.22 |
| 5,551,954 A | 9/1996 | Buscemi et al. ......... 623/1.15 |
| 5,554,182 A | 9/1996 | Dinh et al. ............... 600/36 |
| 5,554,954 A | 9/1996 | Takahashi ............... 327/546 |
| 5,556,413 A | 9/1996 | Lam .................... 623/1.2 |
| 5,562,922 A | 10/1996 | Lambert ................. 424/486 |
| 5,563,146 A | 10/1996 | Morris .................. 514/291 |
| 5,569,197 A | 10/1996 | Helmus ............. 604/102.02 |
| 5,569,295 A | 10/1996 | Lam ...................... 606/198 |
| 5,569,462 A | 10/1996 | Martinson et al. ......... 424/423 |
| 5,569,463 A | 10/1996 | Helmus et al. ......... 424/426 |
| 5,571,089 A | 11/1996 | Crocker | |
| 5,571,166 A | 11/1996 | Dinh et al. .............. 128/898 |
| 5,574,059 A | 11/1996 | Regunathan et al. ..... 514/397 |
| 5,575,818 A | 11/1996 | Pinchuk ................ 623/1.15 |
| 5,578,075 A | 11/1996 | Dayton ................. 623/1.15 |
| 5,580,873 A | 12/1996 | Bianco et al ....... 514/263.36 |
| 5,580,874 A | 12/1996 | Bianco et al ...... 514/263.36 |
| 5,591,140 A | 1/1997 | Narayanan et al ...... 604/269 |
| 5,591,197 A | 1/1997 | Orth et al. | |
| 5,591,224 A | 1/1997 | Schwartz et al ........ 623/1.22 |
| 5,591,227 A | 1/1997 | Dinh et al ............... 623/1.22 |
| 5,599,352 A | 2/1997 | Dinh et al. .............. 128/898 |
| 5,603,722 A | 2/1997 | Phan et al. ............. 623/1.18 |
| 5,604,283 A | 2/1997 | Wada et al. ............. 524/236 |

| | | |
|---|---|---|
| 5,605,696 A | 2/1997 | Eury et al. ............... 424/423 |
| 5,607,463 A | 3/1997 | Schwartz et al. ........ 623/1.44 |
| 5,607,475 A | 3/1997 | Cahalan et al. .......... 424/423 |
| 5,609,629 A | 3/1997 | Fearnot et al. .......... 623/1.42 |
| 5,616,608 A | 4/1997 | Kinsella et al ........... 514/449 |
| 5,620,984 A | 4/1997 | Bianco et al. ...... 514/263.36 |
| 5,621,102 A | 4/1997 | Bianco et al. ........... 544/267 |
| 5,622,975 A | 4/1997 | Singh et al. .............. 514/324 |
| 5,624,411 A | 4/1997 | Tuch ...................... 604/265 |
| 5,628,785 A | 5/1997 | Schwartz et al. ........ 128/898 |
| 5,629,077 A | 5/1997 | Turnlund et al. ......... 623/1.15 |
| 5,629,315 A | 5/1997 | Bianco et al .... 514/263.36 |
| 5,632,763 A | 5/1997 | Glastra .................. 623/1.15 |
| 5,632,771 A | 5/1997 | Boatman et al. .......... 623/1.15 |
| 5,632,776 A | 5/1997 | Kurumatani et al. ...... 424/423 |
| 5,632,840 A | 5/1997 | Campbell ............... 156/196 |
| 5,635,201 A | 6/1997 | Fabo .................... 424/443 |
| 5,637,113 A | 6/1997 | Tartaglia et al .......... 623/1.42 |
| 5,643,312 A | 7/1997 | Fischell et al ........... 623/1.15 |
| 5,643,939 A | 7/1997 | Ohlstein ................. 514/411 |
| 5,646,160 A | 7/1997 | Morris et al ............. 514/291 |
| 5,648,357 A | 7/1997 | Bianco et al ...... 514/263.36 |
| 5,649,952 A | 7/1997 | Lam .................... 623/1.15 |
| 5,649,977 A | 7/1997 | Campbell .............. 623/1.15 |
| 5,651,174 A | 7/1997 | Schwartz et al ......... 29/527.2 |
| 5,652,243 A | 7/1997 | Bianco et al. ...... 514/263.36 |
| 5,653,747 A | 8/1997 | Dereume ................. 623/1.54 |
| 5,653,992 A | 8/1997 | Bezwada et al. ......... 424/426 |
| 5,662,609 A | 9/1997 | Slepian ............ 604/101.03 |
| 5,665,591 A * | 9/1997 | Sonenshein et al. ....... 435/375 |
| 5,665,728 A | 9/1997 | Morris et al ............. 424/122 |
| 5,667,764 A | 9/1997 | Kopia et al. ............. 424/1.45 |
| 5,669,924 A | 9/1997 | Shaknovich ............ 623/1.11 |
| 5,670,506 A | 9/1997 | Leigh et al. ............. 514/141 |
| 5,672,638 A | 9/1997 | Verhoeven et al ...... 523/112 |
| 5,674,242 A | 10/1997 | Phan et al. ............. 606/198 |
| 5,679,400 A | 10/1997 | Tuch ..................... 427/2.14 |
| 5,679,659 A | 10/1997 | Verhoeven et al ....... 514/56 |
| 5,684,061 A | 11/1997 | Ohnishi et al ........... 523/114 |
| 5,691,311 A | 11/1997 | Maraganore et al. ...... 514/12 |
| 5,693,085 A | 12/1997 | Buirge et al. ........... 623/1.13 |
| 5,697,967 A | 12/1997 | Dinh et al . ............. 128/898 |
| 5,697,971 A | 12/1997 | Fischell et al. .......... 623/1.15 |
| 5,700,286 A | 12/1997 | Tartaglia et al .......... 623/1.15 |
| 5,707,385 A | 1/1998 | Williams ................. 606/192 |
| 5,709,874 A | 1/1998 | Hanson et al. ........... 424/423 |
| 5,713,949 A | 2/1998 | Jayaraman ............. 623/1.12 |
| 5,716,981 A | 2/1998 | Hunter et al ............ 514/449 |
| 5,725,549 A | 3/1998 | Lam ..................... 623/1.15 |
| 5,725,567 A | 3/1998 | Wolff et al .............. 623/1.42 |
| 5,728,150 A | 3/1998 | McDonald et al. ........ 623/1.15 |
| 5,728,420 A | 3/1998 | Keogh ................... 427/2.12 |
| 5,731,326 A | 3/1998 | Hart et al. ............... 514/323 |
| 5,733,327 A | 3/1998 | Igaki et al. .............. 623/1.5 |
| 5,733,920 A | 3/1998 | Mansuri et al ........... 514/337 |
| 5,733,925 A | 3/1998 | Kunz et al ............... 514/449 |
| 5,735,897 A | 4/1998 | Buirge ................... 623/1.15 |
| 5,739,138 A | 4/1998 | Bianco et al. ...... 514/263.36 |
| 5,755,734 A | 5/1998 | Richter et al. ........... 606/194 |
| 5,755,772 A | 5/1998 | Evans et al ............. 128/898 |
| 5,759,205 A | 6/1998 | Valentini ................ 433/173 |
| 5,769,883 A | 6/1998 | Buscemi et al .......... 623/1.42 |
| 5,776,184 A | 7/1998 | Tuch .................... 623/1.11 |
| 5,780,476 A | 7/1998 | Underiner et al .... 514/263.36 |
| 5,782,908 A | 7/1998 | Cahalan et al .......... 623/1.13 |
| 5,788,979 A | 8/1998 | Alt et al ............... 424/426 |
| 5,792,106 A | 8/1998 | Mische .............. 604/103.01 |
| 5,792,772 A | 8/1998 | Bianco et al. ...... 514/263.36 |
| 5,798,372 A | 8/1998 | Davies et al ............ 514/356 |
| 5,799,384 A | 9/1998 | Schwartz et al .......... 29/458 |
| 5,800,507 A | 9/1998 | Schwartz ............... 623/1.11 |
| 5,800,508 A | 9/1998 | Goicoechea et al. ...... 623/1.15 |
| 5,807,861 A | 9/1998 | Klein et al ........ 514/263.35 |

US 7,223,286 B2

Page 4

| | | |
|---|---|---|
| 5,811,447 A | 9/1998 | Kunz et al ............... 514/411 |
| 5,820,917 A | 10/1998 | Tuch ....................... 427/2.1 |
| 5,820,918 A | 10/1998 | Ronan et al ............... 427/2.1 |
| 5,824,048 A | 10/1998 | Tuch ....................... 128/898 |
| 5,824,049 A | 10/1998 | Ragheb et al ............. 623/1.44 |
| 5,827,587 A | 10/1998 | Fukushi ................... 428/36.6 |
| 5,833,651 A | 11/1998 | Donovan et al .......... 604/509 |
| 5,837,008 A | 11/1998 | Berg et al ................ 427/2.21 |
| 5,837,313 A | 11/1998 | Ding et al ................ 427/2.21 |
| 5,843,120 A | 12/1998 | Israel et al |
| 5,843,166 A | 12/1998 | Lentz et al. |
| 5,843,172 A | 12/1998 | Yan ....................... 623/1.42 |
| 5,849,034 A | 12/1998 | Schwartz ................. 606/36 |
| 5,851,217 A | 12/1998 | Wolff et al .............. 606/191 |
| 5,851,231 A | 12/1998 | Wolff et al .............. 623/1.42 |
| 5,858,990 A | 1/1999 | Walsh .................... 514/44 |
| 5,861,027 A | 1/1999 | Trapp ..................... 623/1.15 |
| 5,865,814 A | 2/1999 | Tuch ...................... 623/1.15 |
| 5,871,535 A | 2/1999 | Wolff et al .............. 128/898 |
| 5,873,904 A | 2/1999 | Ragheb et al ............ 623/1 13 |
| 5,876,433 A | 3/1999 | Lunn ...................... 623/1.15 |
| 5,877,224 A | 3/1999 | Brocchini et al. ....... 514/772.2 |
| 5,879,697 A | 3/1999 | Ding et al. .............. 424/422 |
| 5,882,335 A | 3/1999 | Leone et al. ............ 604/103.02 |
| 5,891,108 A | 4/1999 | Leone et al. |
| 5,893,840 A | 4/1999 | Hull et al. .............. 604/103.02 |
| 5,897,911 A | 4/1999 | Loeffler .................. 427/2.25 |
| 5,900,246 A | 5/1999 | Lambert .................. 424/429 |
| 5,902,266 A | 5/1999 | Leone et al. ............ 604/509 |
| 5,916,910 A | 6/1999 | Lai ........................ 514/423 |
| 5,922,393 A | 7/1999 | Jayaraman ............... 427/2.3 |
| 5,932,243 A | 8/1999 | Fricker et al |
| 5,932,299 A | 8/1999 | Katoot .................... 427/508 |
| 5,932,580 A | 8/1999 | Levitzki et al. .......... 181/152 |
| 5,951,586 A | 9/1999 | Berg et al. ............... 606/198 |
| 5,957,971 A | 9/1999 | Schwartz ................. 623/1.15 |
| 5,968,091 A | 10/1999 | Pinchuk et al. .......... 623/1 16 |
| 5,972,027 A | 10/1999 | Johnson |
| 5,976,534 A | 11/1999 | Hart et al. ............... 424/145.1 |
| 5,977,163 A | 11/1999 | Li et al. .................. 514/449 |
| 5,980,553 A | 11/1999 | Gray et al. ............... 623/1.15 |
| 5,980,566 A | 11/1999 | Alt et al. ................. 623/23.7 |
| 5,980,972 A | 11/1999 | Ding ...................... 427/2.24 |
| 5,981,568 A | 11/1999 | Kunz et al ............... 514/411 |
| 5,985,307 A | 11/1999 | Hanson et al ............ 424/423 |
| 5,997,468 A | 12/1999 | Wolff et al. ............. 606/36 |
| 6,004,346 A | 12/1999 | Wolff et al. ............. 623/23 71 |
| 6,015,432 A | 1/2000 | Rakos et al. ............. 623/1.13 |
| 6,039,721 A | 3/2000 | Johnson et al. .......... 604/508 |
| 6,059,813 A | 5/2000 | Vrba et al. ............... 606/198 |
| 6,071,305 A | 6/2000 | Brown et al. ............ 623/1.43 |
| 6,074,659 A | 6/2000 | Kunz et al. .............. 424/423 |
| 6,080,190 A | 6/2000 | Schwartz ................. 623/1 22 |
| 6,096,070 A | 8/2000 | Ragheb et al ............ 623/1 39 |
| 6,120,536 A | 9/2000 | Ding et al. ............... 623/1.43 |
| 6,120,847 A | 9/2000 | Yang et al |
| 6,136,798 A | 10/2000 | Cody et al. .............. 514/141 |
| 6,140,127 A | 10/2000 | Sprague .................. 435/395 |
| 6,146,358 A | 11/2000 | Rowe ..................... 604/103 |
| 6,153,252 A | 11/2000 | Hossainy et al. ......... 427/2.3 |
| 6,159,488 A | 12/2000 | Nagler et al. ............ 424/423 |
| 6,171,232 B1 | 1/2001 | Papandreou et al ...... 600/36 |
| 6,171,609 B1 | 1/2001 | Kunz ...................... 424/422 |
| 6,177,272 B1 | 1/2001 | Nabel et al. ............. 435/320.1 |
| 6,179,817 B1 | 1/2001 | Zhong .................... 604/265 |
| 6,193,746 B1 | 2/2001 | Strecker .................. 623/1 13 |
| 6,214,901 B1 | 4/2001 | Chudzik et al. .......... 523/113 |
| 6,225,346 B1 | 5/2001 | Tang et al. ............... 514/523 |
| 6,240,616 B1 | 6/2001 | Yan ....................... 29/527.2 |
| 6,245,537 B1 | 6/2001 | Williams et al .......... 435/135 |
| 6,251,920 B1 | 6/2001 | Grainger et al. ......... 514/319 |
| 6,254,632 B1 | 7/2001 | Wu et al .................. 623/1.15 |
| 6,254,634 B1 | 7/2001 | Anderson et al ......... 623/1.42 |

| | | |
|---|---|---|
| 6,258,121 B1 | 7/2001 | Yang et al. .............. 623/1.46 |
| 6,268,390 B1 | 7/2001 | Kunz ...................... 514/411 |
| 6,273,913 B1 | 8/2001 | Wright et al ............. 623/1.42 |
| 6,284,305 B1 | 9/2001 | Ding et al ................ 427/2.28 |
| 6,287,320 B1 | 9/2001 | Slepian ................... 606/194 |
| 6,287,628 B1 | 9/2001 | Hossainy et al. ........ 427/2.3 |
| 6,299,604 B1 | 10/2001 | Ragheb et al. ........... 604/265 |
| 6,306,144 B1 | 10/2001 | Sydney et al ............ 606/108 |
| 6,306,166 B1 | 10/2001 | Barry et al ............... 623/1.46 |
| 6,306,176 B1 | 10/2001 | Whitbourne ............. 623/23.59 |
| 6,306,421 B1 | 10/2001 | Kunz et al ............... 424/423 |
| 6,309,380 B1 | 10/2001 | Larson et al. ............ 604/502 |
| 6,309,660 B1 | 10/2001 | Hsu et al .................. 424/425 |
| 6,313,264 B1 | 11/2001 | Caggiano et al .......... 530/350 |
| 6,316,018 B1 | 11/2001 | Ding et al ................ 424/423 |
| 6,335,029 B1 | 1/2002 | Kamath et al. ........... 424/423 |
| 6,358,556 B1 | 3/2002 | Ding et al. ............... 427/2.24 |
| 6,369,039 B1 | 4/2002 | Palasis et al. ............ 424/93.2 |
| 6,379,382 B1 | 4/2002 | Yang ...................... 623/1.42 |
| 6,387,121 B1 | 5/2002 | Alt ........................ 623/1.15 |
| 6,403,635 B1 | 6/2002 | Kinsella et al ........... 514/449 |
| 6,407,067 B1 | 6/2002 | Schafer .................. 514/19 |
| 6,517,858 B1 | 2/2003 | Haberbosch et al. ..... 424/424 |
| 6,517,889 B1 | 2/2003 | Jayaraman ............... 427/2.24 |
| 6,545,097 B2 | 4/2003 | Pinchuk et al. .......... 525/240 |
| 6,585,764 B2 | 7/2003 | Wright et al. ............ 623/1 42 |
| 6,620,194 B2 | 9/2003 | Ding et al ................ 623/1.43 |
| 6,746,773 B2 | 6/2004 | Llanos et al. ............ 428/421 |
| 6,776,796 B2 | 8/2004 | Llanos et al. ............ 623/1.46 |
| 6,808,536 B2 | 10/2004 | Wright et al. ............ 623/1.42 |
| 2001/0007083 A1 | 7/2001 | Roorda .................... 623/1.15 |
| 2001/0029351 A1 | 10/2001 | Falotico et al. .......... 604/103.02 |
| 2001/0029660 A1 | 10/2001 | Johnson .................. 29/557 |
| 2001/0032014 A1 | 10/2001 | Yang et al. ............... 623/1.15 |
| 2001/0034363 A1 | 10/2001 | Li et al. .................. 514/449 |
| 2001/0037145 A1 | 11/2001 | Guruwaiya et al ....... 623/1.15 |
| 2002/0010418 A1 | 1/2002 | Lary et al. ............... 604/101.04 |
| 2002/0032477 A1 | 3/2002 | Helmus et al. ........... 623/1.2 |
| 2002/0041899 A1 | 4/2002 | Chudzik et al. .......... 424/487 |
| 2002/0061326 A1 | 5/2002 | Li et al. .................. 424/424 |
| 2002/0068969 A1 | 6/2002 | Shanley et al. ........... 623/1 16 |
| 2002/0071902 A1 | 6/2002 | Ding et al ................ 427/2 24 |
| 2002/0082680 A1 | 6/2002 | Shanley et al. ........... 623/1.16 |
| 2002/0082685 A1 | 6/2002 | Sirhan et al .............. 623/1.42 |
| 2002/0091433 A1 | 7/2002 | Ding et al. ............... 623/1.2 |
| 2002/0095114 A1 | 7/2002 | Palasis ................... 604/96.01 |
| 2002/0099438 A1 | 7/2002 | Furst ...................... 623/1.16 |
| 2002/0103526 A1 | 8/2002 | Steinke .................. 623/1.11 |
| 2002/0119178 A1 | 8/2002 | Levesque et al. ......... 424/423 |
| 2002/0123505 A1 | 9/2002 | Molliston et al ......... 514/291 |
| 2002/0127327 A1 | 9/2002 | Schwartz et al .......... 427/2.15 |
| 2002/0133222 A1 | 9/2002 | Das ........................ 623/1.16 |
| 2002/0133224 A1 | 9/2002 | Bajgar et al ............. 623/1.39 |
| 2002/0165608 A1 | 11/2002 | Llanos ................... 604/500 |
| 2002/0193475 A1 | 12/2002 | Hossainy et al .......... 524/113 |
| 2003/0065377 A1 | 4/2003 | Davila et al .............. 604/265 |
| 2003/0216699 A1 | 11/2003 | Falotico ................. 604/265 |
| 2004/0049265 A1 | 3/2004 | Ding et al ................ 623/1.42 |
| 2004/0243097 A1 | 12/2004 | Falotico et al ........... 604/500 |
| 2004/0260268 A1 | 12/2004 | Falotico et al .......... 604/500 |
| 2005/0002986 A1 | 1/2005 | Falotico et al ........... 424/426 |
| 2005/0004663 A1 | 1/2005 | Llanos et al. ............ 623/1.46 |
| 2005/0033261 A1 | 2/2005 | Falotico et al. .......... 604/500 |
| 2005/0106210 A1 | 5/2005 | Ding et al ................ 424/423 |
| 2005/0187611 A1 | 8/2005 | Ding et al ................ 623/1 15 |
| 2005/0208280 A1 | 9/2005 | Ding et al ................ 427/2 25 |
| 2006/0088654 A1 | 4/2006 | Ding et al ................ 427/2.21 |
| 2006/0089705 A1 | 4/2006 | Ding et al ................ 623/1.15 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19723723 A1 | 12/1998 |
| EP | 0 145 166 A2 | 6/1985 |

**US 7,223,286 B2**

Page 5

| | | |
|---|---|---|
| EP | 0 177 330 A2 | 4/1986 |
| EP | 0 183 372 A1 | 6/1986 |
| EP | 0 221 570 A2 | 5/1987 |
| EP | 0 421 729 A2 | 4/1991 |
| EP | 0 540 290 A2 | 5/1993 |
| EP | 0 568 310 A1 | 11/1993 |
| EP | 0 604 022 A1 | 6/1994 |
| EP | 0 621 015 A1 | 10/1994 |
| EP | 0 623 354 A1 | 11/1994 |
| EP | 0 734 698 A2 | 3/1996 |
| EP | 0 712 615 A1 | 5/1996 |
| EP | 0 716 836 A1 | 6/1996 |
| EP | 0 734 721 A2 | 10/1996 |
| EP | 0 747 069 A2 | 12/1996 |
| EP | 0 761 251 A1 | 3/1997 |
| EP | 0 800 801 A1 | 10/1997 |
| EP | 0 540 290 B1 | 1/1998 |
| EP | 0 830 853 A1 | 3/1998 |
| EP | 0 815 803 A1 | 7/1998 |
| EP | 0 850 651 A2 | 7/1998 |
| EP | 0 938 878 A2 | 9/1999 |
| EP | 0 938 878 A3 | 9/1999 |
| EP | 0 950 386 A2 | 10/1999 |
| EP | 0 968 688 A1 | 1/2000 |
| EP | 0 633 032 B1 | 2/2001 |
| EP | 1 192 957 A2 | 4/2002 |
| EP | 1 588 726 A1 | 10/2005 |
| EP | 1 588 727 A1 | 10/2005 |
| FR | 566 807 A1 | 4/1992 |
| GB | 0 662 307 A2 | 12/1951 |
| GB | 1 205 743 A | 9/1970 |
| GB | 2 135 585 A | 9/1984 |
| SU | 660689 | 5/1979 |
| SU | 1457921 | 2/1989 |
| WO | 89/03232 A1 | 4/1989 |
| WO | 91/12779 A1 | 9/1991 |
| WO | 92/15286 A1 | 9/1992 |
| WO | 94/01056 A1 | 1/1994 |
| WO | 94/21308 A1 | 9/1994 |
| WO | 94/21309 A1 | 9/1994 |
| WO | 94/24961 A1 | 11/1994 |
| WO | 96/00272 A1 | 1/1996 |
| WO | 96/26689 A1 | 9/1996 |
| WO | 96/32907 A1 | 10/1996 |
| WO | 96/34580 A1 | 11/1996 |
| WO | 97/25000 A1 | 7/1997 |
| WO | 97/33534 A1 | 9/1997 |
| WO | 98/08463 A1 | 3/1998 |
| WO | 98/13344 A1 | 4/1998 |
| WO | 98/19628 A1 | 5/1998 |
| WO | 98/23228 A1 | 6/1998 |
| WO | 98/23244 A1 | 6/1998 |
| WO | 98/34669 A1 | 8/1998 |
| WO | 98/36784 A1 | 8/1998 |
| WO | 98/47447 A1 | 10/1998 |
| WO | 98/56312 A1 | 12/1998 |
| WO | 00/21584 A1 | 4/2000 |
| WO | 00/27445 A1 | 5/2000 |
| WO | 00/27455 A1 | 5/2000 |
| WO | 00/32255 A1 | 6/2000 |
| WO | 00/38754 A1 | 7/2000 |
| WO | 01/87342 A2 | 11/2001 |
| WO | 01/87372 A1 | 11/2001 |
| WO | 01/87373 A1 | 11/2001 |
| WO | 01/87376 A1 | 11/2001 |
| WO | 02/26139 A1 | 4/2002 |
| WO | 02/26271 A1 | 4/2002 |
| WO | 02/26280 A1 | 4/2002 |
| WO | 02/26281 A1 | 4/2002 |
| WO | 03/015664 A1 | 2/2003 |
| WO | 03/057218 A1 | 7/2003 |

OTHER PUBLICATIONS

U.S. Appl. No. 08/424,884, filed Apr. 19, 1995, Helmus et al.

U.S. Appl. No. 08/526,273, filed Sep. 11, 1995, Ding.

U.S. Appl. No. 08/730,542, filed Oct. 11, 1996, Helmus.

U.S. Appl. No. 09/575,480, filed May 19, 2000, Kopia.

U.S. Appl. No. 10/431,059, filed May 7, 2003, Falotico.

Abraham, R. T., "Mammalian target of rapamycin: Immunosuppressive drugs offer new insight into cell growth regulation," *Progress In Inflammation Research*, 2000, Switzerland.

Alvarado, R. et al., "Evaluation of Polymer-coated Balloon-expandable Stents in Bile Ducts," *Radiology*, 1989, 170, 975-978.

Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement," *Circulation*, 82:III-541 (1990).

Berk, B. C. et al., "Pharmacologic Roles of Heparin and Glucocorticoids to Prevent Restenosis After Coronary Angioplasty," *JACC*, May 1991, 17(6), 111B-117B.

Bertram, P. G. et al., "The 14-3-3 proteins positively regulate rapamycin-sensitive signaling," *Current Biology*, 1998, 8, 1259-1267.

*Biomaterials Science* (B.D. Ratner, Ed.), Academic Press, New York, NY, pp. 228-238, 1996.

Campbell, G. R. et al., "Phenotypic Modulation of Smooth Muscle Cells in Primary Culture, Vascular Smooth Muscle Cells in Culture," *CRC Press*, 1987, 39-55.

Chang, M. W. et al., "Adenovirus-mediated Over-expression of the Cyclin/Cyclin-dependent Kinase inhibitor, p21 inhibits Vascular Smooth Muscle Cell Proliferation and Neointima Formation in the Rat Carotid Artery Model of Balloon Angioplasty," *J. Clin. Invest.*, 1995, 96, 2260-2268.

Chung, J. et al., "Rapamycin-FKBP specifically blocks growth-dependent activation of and signaling by the 70 kd S6 protein kinases," *Cell*, Jun. 26, 1992, 69(7), 1227-1236.

Clowes, A. W. et al., "Kinetics of cellular proliferation after arterial injury. IV. Heparin inhibits rat smooth muscle mitogenesis and migration," *Circ. Res.*, 1986, 58(6), 839-845.

Clowes, A. W. et al., Kinetics of Cellular Proliferation after Arterial Injury, *Laboratory Investigation*, 1985, 52(6), 611-616.

Clowes, A. W. et al., "Significance of quiescent smooth muscle migration in the injured rat carotid artery," *Circ Res.* 1985, 56(1), 139-145.

Clowes, A. W., "Suppression by heparin of smooth muscle cell proliferation in injured arteries," *Nature*, 1977, 265(5595), 625-626.

Colburn, M. D. et al., "Dose responsive suppression of myointimal hyperplasia by dexamethasone," *J. Vasc. Surg.*, 1992, 15, 510-518.

Currier, J. W. et al., "Colchicine Inhibits Restenosis After Iliac Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1989, 80(4), 11-66 (Abstract No. 0263).

*Encyclopedia of Polymer Science and Engineering*, vol. 7, Fluorocarbon Elastomers, p. 257-267, Mar. 1989.

Farb, A. et al., "Vascular smooth muscle cell cytotoxicity and sustained inhibition of neointimal formation by fibroblast growth factor 2-saporin fusion protein," *Circ. Res.*, 1997, 80, 542-550.

Ferns, G. A. A. et al., "Inhibition of Neointimal Smooth Muscle Accumulation After Angioplasty by an Antibody to PDGF," *Science*, 1991, 253, 1129-1132.

Fischman, D. L. et al., "A Randomized Comparison of Coronary-Stent Placement and Balloon Angioplasty in the Treatment of Coronary Artery Disease," *N. Eng. J. Med.*, Aug. 25, 1994, 331(8), 496-501.

Franklin, S. M. et al., "Pharmacologic prevention of restenosis after coronary angioplasty: review of the randomized clinical trials," *Coronary Artery Disease* Mar. 1993, 4(3), 232-242.

Fukuyama, J. et al., "Tranilast suppresses the vascular intimal hyperplasia after balloon injury in rabbits fed on a high-cholesterol diet," *Eur. J. Pharmacol.*, 1996, 318, 327-332.

Gregory, C. R. et al., "Rapamycin Inhibits Arterial Intimal Thickening Caused by Both Alloimmune and Mechanical Injury," *Transplantation*, Jun. 1993, 55(6), 1409-1418.

Gregory, C. R. et al, "Treatment with Repamycin and Mycophenolic Acid Reduces Arterial Intimal Thickening Produced by Mechanical Injury and Allows Endothelial Replacement," *Transplantation*, Mar. 15, 1995, 59(5), 655-661.

Guyton, J. R. et al., "Inhibition of rat arterial smooth muscle cell proliferation by heparin. In vivo studies with anticoagulant and nonanticoagulant heparin," *Circ. Res*, 1980, 46, 625-634

Hansson, G. K. et al., "Interferon-γ Inhibits Arterial Stenosis After Injury," *Circ.*, 1991, 84, 1266-1272.

Hashemolhosseini, S. et al., "Rapamycin Inhibition of the G1 to S Transition Is Mediated by Effects on Cyclin D1 mRNA and Protein Stability," *J Biol Chem*, Jun. 5, 1998, 273, 14424-14429

Jonasson, J. et al., "Cyclosporin A inhibits smooth muscle proliferation in the vascular response to injury," *Proc. Natl., Acad. Sci.*, 1988, 85, 2303-2306

Lange, R. A. MD et al., "Restenosis After Coronary Balloon Angioplasty," *Annu. Rev. Med.*, 1991, 42, 127-132.

Liu, M W. et al., "Trapidil in Preventing Restenosis After Balloon Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1990, 81, 1089-1093.

Liu, M. W., MD et al., "Restenosis After Coronary Angioplasty Potential Biologic Determinants and Role of Intimal Hyperplasia," *Circulation*, 1989, 79, 1374-1387

Lundergan, C. F. et al., "Peptide inhibition of Myointimal Proliferation by Angiopeptin, a Somatostatin Analogue," *JACC*, May 1991, 17(6), 132B-136B.

Majesky, M. W. et al., "Heparin regulates smooth muscle S phase entry in the injured rat carotid artery," *Circ. Res*, 1987, 61, 296-300

Marx, S. O. et al., "Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells," *Circ. Res*, 1995, 76, 412-417

Nemecek, G. M et al., "Terbinafine Inhibits the Mitogenic Response to Platelet-Derived Growth Factor in Vitro and Neointimal Proliferation in Vivo," *J. Pharmacol. Exp. Thera*, 1989, 248, 1167-1174.

Okada, T. et al., "Localized Release of Perivascular Heparin Inhibits Intimal Proliferation after Endothelial Injury without Systemic Anticoagulation," *Neurosurgery*, 1989, 25, 892-898

Poon, M. et al., "Rapamycin Inhibits Vascular Smooth Muscle Cell Migration," *J. Clin Invest*, Nov. 1996, 98(10), 2277-2283.

Popma, J. J. et al., "Clinical trials of restenosis after coronary angioplasty," *Circulation*, Sep. 1991, 84(3), 1426-1436

Powell, J. S. et al., "Inhibitors of Angiotensin-Converting Enzyme Prevent Myointimal Proliferation After Vascular Injury," *Science*, 1989, 245, 186-188.

Rensing, B. J. et al., Coronary restenosis elimination with a sirolimus eluting stent, *European Heart Journal*, 2001, 22, 2125-2130

Rodeck, C. et al., "Methods for the Transcervical Collection of Fetal Cells During the First Trimester of Pregnancy," *Prenatal Diagnosis*, 1995, 15, 933-942

Ruef, J. MD, et al , "Flavopiridol Inhibits Muscle Cell Proliferation In Vitro and Neointimal Formation In Vivo After Carotid Injury in the Rat," From the Division of Cardiology and Sealy for Molecular Cardiology, University of Texas Medical Branch, Galveston; Accepted Apr. 9, 1999; *Circulation* Aug. 10, 1999, pp. 659-665

Serruys, P. W. et al., "A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease," *N Engl J Med*, Aug. 25, 1994; 331(8), 489-495

Serruys, P. W. et al., "Evaluation of ketanserin in the prevention of restenosis after percutaneous transluminal coronary angioplasty. A multicenter randomized double-blind placebo-controlled trial," *Circulation*. Oct. 1993; 88(4 Pt 1), 1588-1601

Serruys, P. W. et al., "Heparin-coated Palmaz-Schatz stents in human coronary arteries. Early outcome of the Benestent-II Pilot Study," *Circulation*, Feb. 1, 1996; 93(3), 412-422

Siekierka, J. J., "Probing T-Cell Signal Transduction Pathways with the Immunosupressive Drugs, FK-506 and Rapamycin," *Immunologic Research*, 1994, 13, 110-116

Sigwart, et al , "Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," *N. Engl. J. Med.*, Mar 19, 1987, 316, 701-706.

Simons, M et al., "Antisense *c-myb* oligonucleotides inhibit intimal arterial smooth muscle cell accumulation in vivo," *Nature*, 1992, 359, 67-70.

Snow, A. D. et al., "Heparin modulates the composition of the extracellular matrix domain surrounding arterial smooth muscle cells," *Am. J. Pathol.*, 1990, 137, 313-330.

Sollott, S. J. et al., "Taxol Inhibits Neointimal Smooth Muscle Cell Accumulation after Angioplasty in the Rat," *J. Clin. Invest*, 1995, 95, 1869-1876.

van Der Giessen, et al , "Self-expandable Mesh Stents: An Experimental Study Comparing Polymer Coated and Uncoated Wallstent Stents in the Coronary Circulation of Pigs," *Circulation* 1990, 82(suppl. III):III-542.

van Der Giessen, W. J. et al., "Coronary stenting with polymercoated and uncoated self-expanding endoprosthesis in pigs," Coron. Art. Disease 1992; 3, 631-640.

Vasey, C. G. et al , "Clinical Cardiology: Stress Echo and Coronary Flow", , *Circulation*, Oct 1989, 80(4) Supplement II, II-66.

Verweire, E. et al , "Evaluation of Fluorinated Polymers As Coronary Stent Coating," *Journal of Materials Science: Materials in Medicine*, Apr. 2000.

Weinberger, J. et al., "Intracoronary irradiation: dose response for the prevention of restenosis in swine," *Int. J. Rad. Onc. Biol. Phys.*, 1996, 36, 767-775.

Preliminary Amendment in U.S. Appl. No. 07/258,189, May 22, 1989.

Trial Transcript from Nov. 6, 2000 at 185-90 and 235-36 (Attorneys' opening remarks regarding '984 patent).

Trial Transcript from Nov. 7, 2000 at 274-301, 307-315, 320-28 and 332 (Cordis expert testimony regarding the Palmaz-Schatz stent); 370-379, 480-496 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 8, 2000 at 547-63, 657-63, 674-722, 782-85 (Cordis expert testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 9, 2000 at 819-23, 921 (Cordis expert testimony regarding the '984 patent); 926-941. (R. Croce testimony re Palmaz-Schatz stent); 1033-1053. (R. Schatz testimony).

Trial Transcript from Nov. 13, 2000 at 1086-1 134. (R Schatz testimony); 1275-1305 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 14, 2000 at 1390-1404, 1448-1454, 1486-1500 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 15, 2000 at 1686-87, 1724-42, 1828-34, 1850-54, 1887-92 (AVE expert testimony regarding the '984 patent).

Trial Transcript from Nov. 16, 2000 at 2077-198 (AVE expert testimony regarding the alleged obviousness of the '984 patent)

Trial Transcript from Nov. 17, 2000 at 2331-34 (jury instructions as to the meaning of the limitations of the claims of the '984 patent)

Trial Transcript from Nov 20, 2000 at 2441-48, 2499-2500, 2546-50, 2552-56 (Attorneys' closing arguments regarding the '984 patent).

Trial Transcript from Nov. 21, 2000 at 2592-94 (reading of jury verdict).

Trial Transcript from Dec. 18, 2000 at 2750-95 (Cordis expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Trial Transcript from Dec. 20, 2000 at 3421-88 (AVE expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Jury verdict, dated Nov 21, 2000

District Court decisions on post-trial motions (194 F. Supp. 2d 323)

Court of Appeal for the Federal Circuit decision (339 F.3d 1352).

Trial Transcript from Mar. 4, 2005 at 133-135, 171-173 and 192-96 (Attorney's opening remarks regarding '984 validity).

Trial Transcript from Mar. 7, 2005 at 275-31 1 (Cordis expert testimony regarding the Palmaz-Schatz stent); 342-46, 353-59, 416-425 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art); 430-449, 452-58, 462-492 (R. Croce testimony regarding the Palmaz-Schatz stent); 500-507 (Cordis expert testimony regarding the '984 patent).

**US 7,223,286 B2**

Page 7

Trial Transcript from Mar. 8, 2005 at 609 (Cordis expert testimony regarding the '984 patent); 628-73, 724-740, 773, 801-839 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 9, 2005 at 936-49, 968-69 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 10, 2005 at 1427-74, 178-1509, 1514-23 (AVE expert testimony regarding the alleged obviousness of the '984 patent); 1566-93 (AVE expert testimony regarding Palmaz-Schatz stent); 1634-49 (R. Schatz testimony).

Trial Transcript from Mar. 11, 2005 at 1846-47, 1891-1900, 1919 (Attorneys' closing arguments regarding '984 obviousness).

Trial Transcript from Mar. 14, 2005 at 1964-67 (reading of jury verdict).

Jury verdict dated Mar. 14, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for Judgement As A Infringement Claim dated Apr. 19, 2005

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for a New Trial dated Apr. 9, 2005.

D.I. 1407, Cordis' Combined Answering Brief In Opposition to AVE's Motion for JMOL on Infringement of the Palmaz '762 and Schatz '984 Patents and Its Motion for a New Trial dated May 5, 2005.

D.I. 1414, Medtronic Vascular Inc.'s Combined Reply Brief In Support of Its Motion for Judgement as a Matter of Law on Cordis Corp.'s Patent Infringement Claims and Its Motion for a New Trial dated May 19, 2005.

Trial Transcript from Feb. 8, 2001 at 372-412, 449-469 (B. Tobor testimony regarding the prosecution of the '417, '984 and '332 patents); 510-13 (J. Milannow testimony regarding the prosecution of the '332 patent); 558-604 (J. Palmaz testimony regarding the prosecution of the '417, '984 and '332 patents and the prior art).

Trial Transcript from Feb. 9, 2001 at 637-45, 662-672, 682-85 (J. Palmaz testimony regarding the prior art); 699-742 (R. Schatz testimony); 769-770, 790-95 (Cordis expert testimony regarding prior art).

D.I. 1067, Medtronic AVE, Inc.'s Post-Trial Brief Relating to the Unenforceability of the '762 and '984 Patents Due to Inequitable Conduct.

D.I. 1077, Cordis' Combined Answering Brief in Opposition to AVE's BSC's Post-Hearing Briefs on Alleged Inequitable Conduct Concerning the '762, '984 and '332 Patents.

D.I. 1089, Reply Brief In Support of Medtronic AVE, Inc.'s Contention that the '762 and '984 Patents are Unenforceable Due to Inequitable Conduct dated May 7, 2001.

C.A. No. 00-886-SLR, Answer and Counterclaims of Def. Medtronic AVE, Inc. To First Amended Complaint of Plaintiff Cordis Corp.

BSC's Opening Post-Trial Brief in Support of Its Defense That the Patents in Suit Are Unenforceable, dated Mar. 16, 2001.

Reply Brief in Support of BSC's Defense That the Patents in Suit Are Unenforceable, dated May 7, 2001.

Court's Decision on allegations of inequitable conduct (194 F. Supp. 2d 323) Mar. 28, 2002.

Trial Transcript from Nov. 21, 2000 at 155-57 and 180-84 (Attorneys' opening remarks regarding '332 patent).

Trial Transcript from Nov. 27, 2000 at 227-51, 260-300 (Cordis expert testimony regarding the Palmaz-Schatz stent); 343-60, 363-67, 424-33 (J. Palmaz testimony regarding the Palmaz-Schatz stent and the '332 patent).

Trial Transcript from Nov. 28, 2000 at 649-71.

Trial Transcript from Nov. 29, 2000 at 791-816, 859-870, 953-62 (Cordis expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Nov. 30, 2000 at 1018 (Cordis expert testimony regarding the '332 patent); 1062-80, 1 108-1 1 1 1 (R. Croce testimony regarding the Palmaz-Schatz stent); 1 169-70, 1205-17, 1236-45 (Cordis expert testimony regarding the '332 patent).

Trial Transcript from Dec. 1, 2000 at 1352-54 (Cordis expert testimony regarding the '332 patent); 1364-1442 (R. Schatz testimony); 1493-1508, 1552-69 (BSC expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Dec. 4, 2000 at 1602-12, 1638-51, 1713-14, 1730-61, 1811-14, 1823-36 (BSC expert testimony regarding the alleged obviousness of the '332 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Dec. 6, 2000 at 2318-27, 2342-58 (BSC expert testimony regarding the '332 patent).

Trial Transcript from Dec. 7, 2000 at 2549-52 (Cordis expert testimony regarding the '332 patent); 2575-2579, 2591-92, 2630-31, 2649, 2669-71, 2684-85, 2688, 2708-10, 2725-27 (Attorney closing argument regarding '332 patent); 2742-46 Q'ury instructions as to the meaning of the limitations of the claims of the '332 patent).

Trial Transcript from Dec. 11, 2000 at 2817-22 (reading of jury verdict).

Jury verdict, dated Dec. 11, 2000.

D.I. 699, Motion by Defendant BSC and Scimed Life Systems, Inc. For Summary Judgment of Invalidity of U.S. Appl. No. 5,902,332 dated Apr. 4, 2000

D.I. 896, Order Denying Motion for Summary Judgment of Invalidity and Unenforceability of Claims 1, 2, and 5 of the U.S. Appl. No. 5,902,332 Denying {699-1} Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,902,332 dated Oct. 12, 2000.

Wright et al., Percutaneous Endovascular Stent: An Experimental Study (Abstract), RSNA Meeting (Nov. 28, 1984).

Hearing Transcript from Feb. 10, 1998 at 122-32, 146-80 (Attorneys' opening remarks regarding '417 patent); 180-312 (R. Schatz testimony) [Portions of This Transcript Have Been Removed as Confidential].

Hearing Transcript from Feb. 11, 1998 at 427-575, 577-651 (Cordis expert testimony regarding the '417 patent, the prior art and the Palmaz-Schatz stent).

Hearing Transcript from Feb. 13, 1998 at 1121-1261 (Guidant expert testimony regarding the alleged obviousness of the '417 patent, the prior art and the Palmaz-Schatz stent). [Portions of This Transcript Have Been Removed as Confidential].

Order by J. Robinson denying Cordis' Motion for a Preliminary Injunction Against ACS dated Jul. 17, 1998.

ACS, Inc.'s and Guidant Corp.'s Opening Brief in Support of Their Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102, 417 dated Aug. 27, 1998.

Plaintiffs's Answering Brief in Opposition to ACS' and BSC's Motion for Summary Judgment on Obviousness dated Sep. 24, 1998.

Order dated Mar. 31, 2000.

Schatz Deposition Testimony; May 15, 1996: 79-83, 89-92, 105-107 and 153-161.

Schatz Deposition Testimony; May 16, 1996: 555-564, 569-572.

Schatz Deposition Testimony; Jan. 8, 1998: 67-73, 108-110.

Schatz Deposition Testimony; Jul. 14, 1998: 69-77, 108-112, 119-123.

Schatz Deposition Testimony; Jul. 12, 1999: 88-91, 132-135, 144-149, 218-223, 231-242.

Schatz Deposition Testimony; Jul. 13, 1999: 251-334, 339-345, 374-416.

Schatz Deposition Testimony; Jul. 14, 1999: 454-550

Schatz Deposition Testimony; Jul. 15, 1999: 560-614

Schatz Deposition Testimony; Dec. 2, 1999: 906-91 1, 928-942, 945-963, 976-978, 1029-1034, 1038-1042.

Palmaz Deposition Testimony, Nov. 5, 1991: 160-172.

Palmaz Deposition Testimony, Feb. 5, 1995: 710-727.

Palmaz Deposition Testimony, Jul. 16, 1998: 55-56; 81-82

Palmaz Deposition Testimony, Jul. 28, 1999: 560-568, 570-579.

Palmaz Deposition Testimony, Jul. 29, 1999: 778-785.

Palmaz Deposition Testimony, Aug. 31, 1999: 1403-1452.

Palmaz Deposition Testimony, Sep. 2, 1999: 1953-1960

Palmaz Deposition Testimony, Oct. 14, 1999: 2201-2209; 2275-2342; 2371-2411.

Palmaz Deposition Testimony, Oct. 15, 1999: 2424-2497; 2508-2589.

Palmaz Deposition Testimony, Oct. 16, 1999: 2853-2860.

Tobor Deposition Testimony, Jun. 17, 1999: 837-958.

Tobor Deposition Testimony, Jun. 18, 1999: 1095-1184.

Tobor Deposition Testimony, Dec. 1, 1999: 1217-1371.

**US 7,223,286 B2**

Page 8

Tobor Deposition Testimony, Dec. 2, 1999: 1398-1414; 1444-1508; 1532-1548.

Tobor Deposition Testimony, Dec. 3, 1999: 1652-1653; 1662-1672; 1683-1694.

Kula Deposition Testimony, Apr. 20, 1999: 268-169.

Kula Deposition Testimony, Nov. 16, 1999: 660-675; 680-694; 7-8-755; 774-821.

Kula Deposition Testimony, Nov. 18, 1999; 176-223.

Expert Report of Dr. Rodney S. Badger on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Expert Report of Dr. Joseph Bonn on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Dr. Joseph Bonn dated Mar. 14, 2000.

Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Mar. 2000).

Second Supplemental Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Aug. 17, 2004).

Rebuttal Expert Report of John M. Collins, PH.D. (Feb. 2000).

Expert Report of David C. Cumberland, M.D. (Jan. 24, 2000).

Expert Report of John T. Goolkasian (Feb. 2000).

Deposition of Richard R. Heuser, M.D. (Sep. 7, 2004).

Deposition of Henry R. Piehler (Sep. 10, 2004).

Deposition of Ronald J. Solar (Mar. 22, 2000).

Deposition of Ronald J. Solar (Mar. 23, 2000).

Deposition of Ronald J. Solar (Apr. 12, 2000).

Expert Report of Dr Arina Van Breda on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Anna Van Breda (Mar. 24, 2000).

Deposition of Arina Van Breda (Aug. 21, 2004).

Expert Report of John F. Witherspoon (Jan. 24, 2000).

Supplemental Expert Report of John F. Witherspoon (Oct. 27, 2000).

Deposition of John F. Witherspoon (Mar. 8, 2000).

Palmaz et al., Article: "Normal and Stenotic Renal Arteries: Experimental Balloon Expandable Intraluminal Stentintg", Radiology, Sep. 1987. (AVE 84).

Julio C. Palmaz, Article: "Expandable vascular endoprosthesis." (AVE 132).

Duprat et. al., Article: Flexible Balloon-Expandable Stent for Small Vessels Duprat et. al. Radiology, vol. 162, pp. 276-278, 1987 (AVE 134).

Coons et. al., Article: "Large-Bore, Long Biliary Endoprosthesis (Billiary Stents) for Improved Drainage," Radiology, vol. 148, pp 89-94, 1983. (AVE 143).

Honickman et al., Article: "Malpositioned Biliary Endoprosthesis, Technical Developments And Instrumentation," vol. 144, No. 2, 1982. (AVE 144).

Harries-Jones, et al., Article: "Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," AJR, vol. 138, pp. 771-772, 1982 (AVE 153).

Charnsangavej et al., Article "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (AVE 359).

Wallace, M. J. et al., Article "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 158, pp. 309-312, 1986. (AVE 364)

T. Yoshioka, et al., AIR Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs", vol. 151, pp 673-676, 1988 (AVE 438).

Palmaz, J. C. et al., Article: "Expandable Intraluminal Vascular Graft: A Feasibility Study," Surgery, vol. 99, pp. 199-205, 1986. (AVE 461).

Lawrence et al., Article: "Percutaneous Endovascular Graft: Experimental Evaluation." Radiology, vol. 163, pp. 357-360, 1987. (AVE 671).

Palmaz et al., Article: Expandable Intraluminal Graft: A Preliminary Study, Nov. 17-22, 1985, Radiology, vol. 156, pp. 73-77, 1985. (AVE 1224).

Fallone et al., "Elastic Characteristics of the Self-Expanding Metallic Stents," Investigative Radiology, vol. 23, pp. 370-376, 1988. (AVE 1953).

Palmaz Paper Entitled "Research Project Expandable Vascular Endoprosthesis" May 18, 1983.

Rousseau , et al., Publication: "Percutaneous Vascular Stent: Experimental Studies & Preliminary Clinical Results in Peripheral Arterial Diseases," in Inter. Angio, vol. 6, 153-161, 1987. (AVE 3301).

Rousseau , et al., Publication: "Self-Expanding Endovascular Prostesis: An Experimental Study," Radiology, vol. 164, pp. 709-714, 1987. (AVE 3303).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 58, pp. 309-312, 1986. (DBX 2938).

Palmaz, et al., Article: "Expandable Intraluminal Graft: A Preliminary Study," Radiology, vol. 156, pp. 73-77, Nov. 17-22, 1985 (DBX 4595).

Program for the 12th Annual Course on Diagnostic Angiography and Interventional Radiology Mar. 23-26, 1987 sponsored by The Society of Cardiovascular and Interventional Radiology (DBX 6235).

Preliminary Motion for Judgment re: Wolff claims 1, 2-8, 10, 15 and 19 (DBX6759).

Palmaz Declaration (DBX 7069).

Letter from Gaterud to Dr. Palmaz dated Jul. 5, 1988 with attached document entitled: "Segmented, balloon-expandable stents " (DBX 7160).

Duprat et al., Article: "Flexible Balloon-Expandable Stent For Small Vessels," Radiology, vol. 168, pp. 276-278, 1987 (PX 82). Drawing Sent to Bodic on Mar. 17, 1986 (PX 374).

Letter from Dr. Palmaz to R. Bowman enclosing a model of the flexible coronary graft dated Mar. 17, 1986 (PX 337).

Lab Notebook pages dated Jul. 30, 1987 from Rodney Wolff (COR 185596-597) (PX621A).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminnary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (API 72).

J. Palmaz: The Current Status of Vascular Prosthesis, published by SCIR in the Twelfth Annual Course on Diagnostic Angiography And Interventional Radiology Mar. 23-26, 1987. (API 73).

Amendment in Response to Office Action of Oct. 18, 1998 in re: Application of Julio Palmaz U.S. Appl. No. 174,246. (API 152).

Article: Wallace, et al., "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work In Progress, Radiology, vol. 158, pp. 309-312. (API 295).

Reply of Senior Party Schatz To Patentee Wolffs Opposition To The Belated Motion For Judgment Of Applicant Schatz With Regard To Wolff Claims 1, 2-8, 1 1, 13-17, And 19 (COR 186450-455) (API 310).

Brief Of Senior Party Schatz At Final Hearing (API 313).

Copy of Letter from Ron Sickles to Ben Tobor dated Feb. 10, 1988 (Exhibit 42).

Copy of Letter from R.O. Sickles to Mike Tatlow dated May 12, 1988 (Exhibit 43)

Copy of Letter from R. 0. Sickles to Richard Schatz dated Jun 2, 1988 (Exhibit 44).

Copy of Letter from Richard Schatz to Raimund Erbel dated Jun 3, 1988 (Exhibit 45)

Copy of Letter from Richard Schatz to Mike Schuler dated Aug. 29, 1991 (Exhibit 48)

Minutes of J&J Stent Project Review Meeting datd Jan. 21, 1988 (Exhibit 7).

Preliminary Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17, and 19. (Exhibit 67).

Declaration of Richard A Schatz. (Exhibit 75).

Belated Motion For Judgement with Regard to Wolff Claims 1, 2-8, 10, 1 1, 13-17 and 19. (Schatz—Exhibit 77)

Letter from Dr. Schatz to Mr. Tobor, dated Jun. 3, 1988. (Exhibit 122).

Letter from Dr. Schatz to Mr. Romano, dated Nov 28, 1988 (Exhibit 131).

Letter from Mr Sickles to Mr Tobor, dated Feb 10, 1988 (Exhibit 145).

Richard A. Schatz, Article title: "A View of Vascular Stents" Circulation, vol. 79, No. 2, pp. 445-457, 1989. (Exibit 194)

US 7,223,286 B2

Page 9

Senior Party Schatz's reply to Patentee Wolffs Opposition to the Preliminary Motion Of Application Schatz for judgment with regard to Wolff Claims 1, 2-8, 10, 1 1 , and 13-17. (Exhibit 69).

Wallace, et al., Article: " Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications' Work In Progress," Radiology, vol. 158, pp. 309-312, 1986. (Exhibit 165)

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminnary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 19861 (Exhibit 167)

David D. Lawrence et al., Publication: Percutaneous Endovascular Graft: Experimental Evaluation[1], Radiology, pp. 163, 357-360, 1987. (Exhibit 173).

Charles E. Putnam, M.D., Cover and article from "Investigative Radiology", vol 23, No 5, May 1988. (Exhibit 177).

Robert N. Berk, Cover and article from "American Journal of Roentology", pp. 673-676, 1988 (Exhibit 178).

Declaration of John S Kula Under 37 CFR § 1 .672. ( Kula—Exhibit 77).

Yoshioka et al., Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs" AJR, vol. 151, pp. 673-676, 1988. (PX 100).

Palmaz, et al., Article: Expandable Intraluminal Graft: A Preliminary Study Work in Progress[1], Radiology, vol. 156, No. 1, pp. 73-77, 1985. (PX 101).

Declaration of Richard Schatz Under 37 C.F.R.§ 1 672 (PX 106)

Charnsangavej et al., Article: "Stenosis of the Vena Cave: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol 161, pp. 295-298, 1986 (PX 143)

Wallace, et al., Article: Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work in Progress[1], Radiology, vol. 158, pp 309-312, 1986 (PX 144).

Gina Kolata, News Article: NY Times, "Devices That Opens Clogged Arteries Gets a Falling Grade in a New Study", pp. 16-18, Jan 3, 1991 (PX 186).

Duprat, et al., Article: "Flexible Balloon-Expanded Stent for Small Vessels Work in Progress[1]", Radiology, vol. 162, pp. 276-278, 1987. (PX 207).

Letter from Palmaz to Bowman dated Mar 17, 1986. (PX 350).

Memo re: Minutes of Stent Project Review- San Antonia- Mar. 15, 1988 (PX 651).

Kuntz, et al., Article: Clinical Cardiology Frontiers: "Defining Coronary Restenosis, Newer Clinical and Angiographic Paradigms", Circulation, Sep 1993, vol 88, No. 3, pp. 1310-1323 (PX 854).

Belated Motion for Judgment with regard to Wolff Claims1, 2-8, 10, 11, 13-17, and 19. (PX 1410).

Drawing of Spiral Stent (sent to Bodic Mar. 17, 1986). (PX2933).

Wright et al., Article: "Percutaneous Endovascular Stents: An Experimental Evaluation," Radiology, vol. 156, pp. 69-72, 1985. (PX 3093).

Charnsangavej et al , Article: "A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation," Houston Medical Journal, vol. 3, pp 41-51, Jun. 1987. (PX 3207).

In re Application of Wiktor, U.S. Appl. No. 679,636, Response to Office Action dated Mar. 17, 1988. (PX3236).

Transmittal Letter of Response to First Office Action in '417 patent. (PX 3993).

Letter from B. Tobor to R. Schatz dated Jul 23, 1991. (PX 3996).

Mullins et al , Article: "Implantation of balloon-expandable intravascular grafts by catherization in pulmonary arteries and systemic veins," Circulation, vol 77, No 1, pp 188-189, 1988. (PX4049).

Schatz et al , Article: "Intravascular Stents for Angioplasty," Cardio, 1997. (PX 4050).

Schatz et al., Article: "New Technology in Angioplasty Balloon-Expandable Intravascular Stents, New Developments in Medicine," vol. 2, No. 2, pp. 59-75, 1987 (PX4051).

Richard A- Schatz, Article: "Introduction to Intravascular Stents," Cardiology Clinics, vol 6, No 3, pp 357-372, 1988 (PX 4052).

Richard A. Schatz, Article: "A View of Vascular Stents," Circulation, vol. 79, No. 2, pp. 445-457, 1989. (PX4053).

Wang et al., Article: "An Update on Coronary Stents," Cardio, pp. 177-186, 1992. (PX 4054).

Richard A. Schatz, Article: "New Technology in Angioplasty: Balloon-Expandable Starts," Medicamundi, vol. 33, No. 3, pp. 1 121-1 16, 1988. (PX 4055).

Letter from Tobor to Schatz dated Sep. 29, 1988. (PX 1395).

Verified Statement of Facts by Innamed Inventor R.A. Schatz document filed in U.S. Patent and Tradement Office on Sep. 8, 1989. (PX 3677).

Declaration of John S. Kula Under 37 CFR § 1.672 (Exhibit 329)

Letter to Mike Schular from R.A Schatz dated Aug. 29, 1991. (Exhibit 402).

Articulated, Balloon—Expandable Stents, (DBX 7159).

J. Rosch et al , Experimental Intrahepatic Portacaval Anastomosis: Use of Expandable Gianturco Stents, Radiology, vol 162, pp. 481-485, 1987.

J. Rosch et al , Modified Gianturco Expandable Wire Stents In Experimental and Clinical Use, Ann Radiol, vol. 31, No. 2, pp. 100-103, 1987.

J. Rosch et al , Gianturco Expandable Stents In the Treatment of Superior Vena Cava Syndrome Recurring After Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

I.E. Gordon, Structures or Why Things Don't Fall Down, Penguin Books, pp. 45-59,132-148,210-244,377-383.

Maass et al , Radiological Follow-up of Transluminally Inserted Vascular Endoprostheses: An Experimental Study Using Expanding Spirals, Radiology, vol. 152, pp. 659-663, 1984

Argument submitted re EP 861 15473 dated Jan. 20, 1995. (AVE 2478).

Verified Statement of Facts by Julio C. Palmaz dated Aug. 4, 1989. (PX 3662).

Papanicolaou et al , Insertion of a Biliary Endoprosthesis Using A Balloon Dilatation Catheter, Gastrointest Radiology, vol 10, pp. 394-396, 1985.

Palmaz et al , Atherosclerotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, vol. 168, pp. 723-726, 1986.

Palmaz, The Current Status of Vascular Prostheses; Rosch et al , Gianturco, Expandable Stents in Experimental and Clinical Use, SCIVR, pp 1 18-124, 1987.

Rosch et al , Abstract: Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CIRSE, Porto Cervo, Sardinia, May 25-29, 1987.

Rosch et al., Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

Mirich et al , Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study, Radiology, vol. 170, pp. 1033-1037, 1989.

Dotter, Transluminally-placed Coilspring Endarterial Tube Grafts, Investigative Radiology, vol 4, Sep.-Oct., pp 329-332, 1969.

Palmaz et al., Abstract: Expandable Intraluminal Graft: A Preliminary Study, Radiology, vol. 153 (P), Nov. 1983: 70th Scientific Assembly and Annual Meeting.

Cragg et al, Nonsurgical Placement of Arterial Endoprosthesis: A New Technique Using Nitinol Wire, Radiology, vol. 147, pp. 261-263, Apr. 1983.

J. Rosch et al., Gianturco Expandable Stents in Experimental and Clinical Use, Program: "Twelfth Annual Course on Diagnostic Angiography and Interventional Radiology" (Society of Cardiovascular and Interventional Radiology, Pittsburgh, PA), Mar 23-26, 1987 (the second Monofilament Article).

Uchida t al , Modifications of Gianturco Expandable Wire Stents, AJR, vol. 150, pp. 1185-1187, 1988.

Palmaz, Balloon-Expandable Intravascular Stent, AJR, vol. 1510, pp. 1263-1269.

Cordis Corporation v. Advanced Cardiovascular Systems, Inc , Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCMED Life Systems, Inc., Plaintiffs Complaint, Oct. 23, 1997 (Case No. 97-550-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Plaintiffs First Amended Complaint for Declaratory Relief of Patent Validity,

**US 7,223,286 B2**

Page 10

Unenforceability, Noninfringement, and for Antitrust Violations, Jan. 27, 1998 (Civil Action No. 97-700).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Expandable-Graft Partnership's Answer, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc. and Guidant Corporation, Cordis Corporation's Motion for a Preliminary Injunction, Oct. 8, 1997 (Civil Action No. 97-550.)

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCJJVIED, Inc., Cordis 's Motion for Preliminary Injunction Against Arterial Vascular Engineering, Inc., Dec. 29, 1997 (Case No. 97-550-SLR).

Deposition of R. Schatz, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 8, 1998 (Civil Action No. 97-550 SLR).

Deposition of Lee P. Bendel in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 22, 1998 (Civil Action No. 97-550 SLR).

Deposition of Julio Cesar Palmaz in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Dec. 29, 1997 (Civil Action No. 97-550 SLR).

Deposition of Richard A. Bowman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 9, 1998 (Civil Action No. 97-550 SLR).

Deposition of Gary Schneiderman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 16, 1998 (Civil Action No. 97-550 SLR).

Deposition of David Pearle, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jul. 10, 1998 (Civil Action No. 97-550 SLR).

Preliminary Injunction hearing testimony taken on Feb. 9-13, 1998 (Civil Action No. 97-550 SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., et al., (Civil Action No. 97-550 SLR) and Cordis Corporation v. Advanced Cardiovascular Systems, Inc. Et al. (Civil Action No. 98-65-SLR), Opening Post Hearing Brief of Plaintiff Cordis Corporation in Support of Motion for Preliminary Injunction, Mar. 6, 1998 (Portions relevant to patent claim construction and patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Post-Hearing Reply Brief of Plaintiff Cordis Corporation in Support of Its Motion for Preliminary Injunction, Apr. 10, 1998 (Case No. 97-550 SLR) (Portions relevant to patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Plaintiff's Motion for a Preliminary Injunction Against Boston Scientific Corporation and SCLMED Life Systems, Inc. And Memorandum in Support, Apr. 13, 1998 (Case No 97-550-SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., et al., Judge Robinson's Order Denying Plaintiffs Motion for a Preliminary Injunction, Jul. 17, 1998 (Civil Action No. 97-550 SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., et al., Defendant Boston Scientific Corporation and SCTMED Life Systems, Inc 's Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102,417, Aug. 27, 1998 (Civil Action No. 97-550-SLR).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Plaintiffs' Statement of Claim, Mar. 13, 1997 (UK Action No. 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Defendant's Amended Defense and Counterclaim, Aug. 14, 1997 (UK Action No. 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Petition for Revocation, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Particulars of Objections, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al., v. Julio C. Palmaz, Boston's Skeleton Argument (UK Action Nos. 1493, 1495, 1496, and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Skeleton Argument of Palmaz/EGP, Mar. 19, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, EGP's Final Submissions, Apr. 2, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Judgment, Jun. 26, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Rosch, Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CJJR-SE 1987 Presentation: see Witness Statement of Josef Rosch from U.K. Proceeding.

Statement of Claim by Boston Scientific et al against Expandable Grafts Partnership et al., in EPG et al, v. Boston Scientific et al. in Netherlands (Mar. 13, 1997).

Motion for Joinder of Actions, Change of Claim and Statement of Claim filed by Expandable Grafts Partnership et al in EPG et al v Boston Scientific et al. In Netherlands (Apr. 22, 1997).

Opinion of K.J. Merman filed in EPG et al v. Boston Scientific et al. in Netherlands (Aug. 29, 1997).

Expert report of Dr. Nigel Buller in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Expert report of Lee P. Bendel in EPG et al v Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Memorandum of Oral Pleading in EPG et al v Boston Scientific et al. in Netherlands (Sep. 12, 1997).

Plea Notes of P. A.M. in EPG et al v. Boston Scientific et al in Netherlands (Mar. 10, 1998).

Decision of Court of Appeals in EPG et al. v. Boston Scientific et al. in Netherlands (Apr. 23, 1998).

Translation of Nullity Action Against EPO 0 364 787 by Biotronik in Germany.

Translation of Nullity Action Against EPO 0 335 341 by Biotronik in Germany.

Translation of EPG Response to Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of EPG Response to Nullity Action EP 0 335 341 by Biotronik in Germany.

Nullity Suit Against EP-B1-0 335 341 Brought by Boston Scientific in Germany.

Translation of Opposition filed by Terumo Corp. Against Japan Patent No. 2680901.

Translation of Decision on Opposition Against Japan Patent No 2680901.

Memorandum Order of the Court dated Sep. 7, 2000, concerning disputed claim construction.

Translation of Judgment in Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of Judgment in Nullity Action Against EP 0 335 341 by Biotronik in Germany.

Trial transcript from Mar. 17, 2005 at 171-172, 191-192.

Trial transcript from Mar. 18, 2005 at 282-285, 325-327, 349-351.

Trial transcript from Mar. 21, 2005 at 721-726

Trial transcript from Mar. 24, 2005 at 1387.

Trial transcript from Jul 26, 2005

BSC's Opening Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated Mar. 16, 2001.

**US 7,223,286 B2**

Page 11

Cordis' Answering Brief in Opposition to BSC's Motion for JMOL or a New Trial on the Palmaz '762 Patent and the Schatz '332 Patents, dated Apr. 17, 2001.

BSC's Reply Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated May 11, 2001.

J. Rosch et al., Abstract, Expandable Gianturco-Type Wire Stents in Experimental Intrahepatic Portacaval Shunts, Program: "72nd Scientific Assembly and Annual Meeting of the Radiological Society of North America", Nov. 30-Dec. 5, 1986m Radiology, vol. 161, pp. 40-41, 1986.

Cordis Corporation v. Boston Scientific, Order Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Judgment in a Civil Case Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems. Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc*, Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc, Apr. 8, 1998 (Case No. 97-550-SLR).

*Boston Scientific Limited et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al. v. Julio C. Palmaz*, Boston's Closing Submissions (UK Action Nos 1493, 1495, 1496 and 1497).

*Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc*, Defendants' Answer, Nov. 12, 1997 (Case No. 97-550-SLR).

Statement of Rejoinder in the Action on the Merits, Also Including an Amendment of Defendant's Final Position in the Principal Action, as Well as the Provisional Statement of Rejoinder in the Action on the Counterclaim in *EPG et al. v. Boston Scientific et al.* in Netherlands (Feb. 10, 1998).

Statement of Answer in the Ancillary Appeal in *EPG et al. v. Boston Scientific et al.* in Netherlands (Mar. 10, 1998)

Appeal filed by Expandable Grafts Partnership et al. in *EPG et al. v. Boston Scientific et al.* in Netherlands (Nov. 12, 1997).

Title filed by Boston Scientific et al. in *EPG et al. v. Boston Scientific et al.* in Netherlands (Jan. 22, 1998)

Deposition of Richard Schatz, M.D., in *Cordis Corporation v. Advanced Cardiovascular Systems, Inc* taken on Jul. 14, 1998 (Civil Action No. 97-550-SLR).

Jury Verdict form from the *Cordis Corporation et al v. Boston Scientific Corporation, et al* liability trial, undated.

Trial testimony transcripts from the *Cordis Corporation et al. v. Boston Scientific Corporation et al.* liability trial dated Nov. 21, Nov. 27-Dec. 1, Dec. 4-8 and Dec. 11, 2000.

*Boston Scientic SCIMED, Inc and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Stephen R. Hanson, Ph.D. (Civil Action No. 03-328-SLR).

*Boston Scientific SCIMED. Inc and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Robson F Storey, Ph.D. (Civil Action No 03-283-SLR).

*Boston Scientific SCIMED, Inc and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc*, Rebuttal Expert Report of Kinam Park, Ph.D. (Civil Action No. 03-283-SLR)

*Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) and *Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No 03-283-SLR) Combined Post-Hearing Brief In Support Of Cordis Corporation's Motion For Preliminary Injunction in C.A. No. 03-027-SLR, And In Opposition to Plaintiffs' Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

*Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc* (C.A. No. 03-027-SLR) *Boston Scientific SCIMED. Inc., and Boston Scientific Corporation v. Cordis Cor-*

*poration and Johnson and Johnson, Inc* (C.A. No. 03-283-SLR), Boston Scientific's Opening Post-Hearing Brief

*Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) *Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR), Combined Post-Hearing Answering Brief In Support of Cordis Corporation's Motion For Preliminary Injunction In C.A. No. 03-027-SLR, And In Opposition To Plaintiffs Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

Wu et al., Silicone-covered self-expanding metallic stents for the palliation of malignant esophageal obstruction and esophagorespiratory fistulas: experience in 32 patients adn a review of the literature, *Gastrointestinal Endoscopy*, 1994, pp. 22-33, vol. 40, No. 1, Portland Oregon.

Binmoeller, et al., Silicone-Covered Expandable Metallic Stents in the Esophagus: An Experimental Study, Endoscopy, 1992, pp. 416-420, vol. 24, Georg Thieme Verlag Stuttgart New York

*Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc.*, Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc*, Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

Rhine, Polymers for Sustained Macromolecule Release: Procedures to Fabricate Reproducible Delivery Systems and Control Release Kinetics, *Journal of Pharmaceutical Sciences*, 1980, pp. 265-270, vol. 69, No. 3.

Langer et al., Controlled Release of Macromolecules From Polymers, *Biomedical Polymers Polymeric Materials and Pharmaceuticals for Biomedical Use*, 1980, pp. 112-137, Academic Press, Inc., New York, NY.

Langer et al., Applications of Polymeric Delivery Systems for Macromolecules and Factors Controlling Release Kinetics.

Rhine et al., A Method to Achieve Zero-Order Release Kinetics From Polymer Matrix Drug Delivery Systems, pp. 67-72.

Langer et al., Polymers for the Sustained Release of Macromolecules: Controlled and Magnetically Modulated Systems, *Better Therapy With Existing Drugs: New Uses and Delivery Systems*, 1981, pp. 179-216, Merck Sharp & Dohme International, Rahway, NJ.

Hsieh, et al., Zero-Order Controlled-Release Polymer Matrices for Micro-and-Macromolecules, *Journal of Pharmaceutical Sciences*, 1983 pp. 17-22, vol. 72, No. 1.

Brown et al., In Vivo and In Vitro Release of Macromolecules from Polymeric Drug Delivery Systems, *Journal of Pharmaceutical Sciences*, 1983, pp. 1181-1185, vol. 72, No. 10.

Langer, Implantable Controlled Release Systems, *Pharmac. Ther.*, 1983, pp. 35-51, vol. 21, printed in Great Britain

Kost et al., Controlled Release of Bioactive Agents, *Trends in Biotechnology*, 1984, pp. 47-51, vol. 2, No. 2, Elsevier BV Amsterdam

Bawa et al., An Explanation for the Controlled Release of Macromolecules from Polymers, *Journal of Controlled Release*, 1985, pp. 259-267, vol. 1 Elsevier Science BV Amsterdam

Leong et al., Polymeric controlled drug delivery, 1987, pp. 199-233, vol. 1/3, Elsevier Science Publishers BV Amsterdam

Langer, Polymeric Delivery Systems, *Targeting of Drugs 2 Optimization Strategies*, 1989, pp. 165-174. Plenum Press, New York and London

Langer, Biomaterials in Controlled Drug Delivery: New Perspective from Biotechnological Advances; *Pharmaceutical Technology*, 1989, pp. 18, 23-24, 26, 28, 30

Langer, Controlled Release Systems, pp. 115-124

Laurencin et al., Polymeric Controlled Release Systems: New Methods for Drug Delivery, *Clinics in Laboratory Medicine*, 1987, pp. 301-323, vol. 7, No. 2, WB Saunders Company, Philadelphia

Langer, Biopolymers in Controlled Release Systems, *Polymeric Biomaterials*, pp. 161-169.

Tsong-Pin Hsu et al., Polymers for the Controlled Release of Macromolecules: Effect of Molecular Weight of Ethylene-vinyl Acetate Copolymer, *Journal of Biomedical Materials Research*, 1985, pp. 445-460, vol. 19.

Langer, Polymers and Drug Delivery Systems, *Long-Acting Contraceptive Delivery Systems*, 1983, pp. 23-32, Harper & Row, Philadelphia, PA.

Langer, New Drug Delivery Systems: What the Clinician Can Expect, *Drug Therapy*, 1983, pp. 217-231.

Langer, et al., Chemical and Physical Structure of Polymers as Carriers for Controlled Release of Bioactive Agents: A Review, *Rev. Macromol. Chem. Phys.*, 1983, pp. 61-126.

Langer, Polymeric Delivery Systems for Controlled Drug Release, *Chem. Eng. Commun* 1980, pp. 1-48-vol. 6, Gordon and Breach Science Publishers, Inc. USA.

Langer, et al., Biocompatibility of Polymer Delivery Systems for Macromolecules, *Journal of Biomedical Materials Research*, 1981, pp. 267-277, vol. 15.

Langer, Controlled Release: A New Approach to Drug Delivery, *Technology Review*, 1981, pp. 26-34.

Langer, et al., Sustained Release of Macromolecules from Polymers, *Polymeric Delivery Systems*, PGS. 175-176, Gordon adn Breach Science Publishers, New York

Langer, Polymers for the Sustained Release of Proteins and other Macromolecules, *Nature*, 1976, pp. 797, 263, 799-800, vol. 263, No. 5580.

Baker, et al., Controlled Release: Mechanisms and Rates (1974).

Hanson, et al., In Vivo Evaluation of Artificial Surfaces with a Nonhum Primate Model of Arterial Thrombosis,/ *Lab Clin Med.*, Feb. 1980, pp. 289-304.

Baker, Controlled Release of Biologically Active Agents (1987) pp. 1-275.

*Cordis Corporation v. Boston Scientific Corporation* (CA. No. 03-27-SLR) and *Boston Scientific Scimed, Inc., v. Cordis Corporation and Johnson & Johnson, Incorporated* (CA. No. 03-283-SLR) Hearing Transcripts for Jul. 21, 2003, Jul. 22, 2003, Jul. 23, 2003.

*Cordis Corporation v. Boston Scientific Corporation et al* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al. v. Cordis Corporation et al.* (CA. No. 03-283-SLR), Boston Scientific's Post-Hearing Reply Brief and Exhibits Thereto, Sep. 12, 2003.

*Cordis Corporation v. Boston Scientific Corporation et al* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al. v. Cordis Corporation et al.* (CA. 03-283-SLR), Memorandum Order, Nov. 21, 2003.

*Cordis Corporation v. Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al v. Cordis Corporation et al* (CA. No. 03-283-SLR), Deposition Transcript of Julio C. Palmaz

*Arterial Vascular Engineering, Inc v. Cordis Corporation, Johnson & Johnson and Expandable Grafts Partnership*, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Plea Notes in *EPG et al. v. Boston Scientific et al.* in Netherlands (Sep. 12, 1997).

Provisional Judgment *EPG et al. v. Boston Scientific et al.* in Netherlands (Oct. 29, 1997).

Trial testimony transcripts from the Cordis Corporation et al. v. Medtronic AVE Inc., et al. liability trial dated Nov. 6-9, 13-17 and 20-21, 2000.

Jury verdict form from the Cordis Corporation et al. v. Medtronic AVE, Inc. et al. liability trial.

Hearing testimony transcript from the consolidated Cordis Corporation et al. v. Medtronic AVE, Inc. et al. and Boston Scientific Corporation et al. inequitable conduct hearing dated Feb. 7-9 and 12, 2001.

Cordis Corporation v Medtronic Ave., Inc. et al, OPINION, 97-550-SLR, dated Mar. 28, 2002.

*Cordis Corporation v. Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic Ave, Inc. v. Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation v. Athicon, Inc. etal.* (CA. No. 98-19-SLR), Expert Report of John T. Goolkasian, Esq.

*Cordis Corporation v. Advanced Cardiovascular Systems. Inc. et al.* (CA. No. 97-550-SLR), *Medtronic A VE, Inc v Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation v Athicon, Inc. et al* (CA. 98-19-SLR), Expert Report of John F Witherspoon.

"Microbial Conversion of Rapamycin," Kuhnt et al., Enzyme and Microbial Technology, vol. 21, pp. 405-412, 1997

"Inhibitory Effects of Rapamycin on Intimal Hyperplasia After PTCA," Badimon et al., JACC, Mar. 1998

\* cited by examiner

U.S. Patent        May 29, 2007        Sheet 1 of 2        US 7,223,286 B2

# FIG. 1



# FIG. 1a



# FIG. 2a



# FIG. 2b



# FIG. 3a



# FIG. 3b



# FIG. 4



US 7,223,286 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of Ser. No. 10/408,328, filed Apr. 7, 2003, now issued as U.S. Pat. No. 6,808,536, which in turn is a continuation of application Ser. No. 09/874,117, filed Jun. 4, 2001, now issued as U.S. Pat. No. 6,585,764, which is a continuation of application Ser. No. 09/061,568, filed Apr. 16, 1998, now issued as U.S. Pat. No. 6,273,913, which in turn claims benefit of provisional application Ser. No. 60/044,692, filed Apr. 18, 1997.

### FIELD OF THE INVENTION

Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

### BACKGROUND OF THE INVENTION

Re-narrowing (restenosis) of an artherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 10–50% of patients undergoing this procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the artherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages, leukocytes, or the smooth muscle cells (SMC) themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3–6 months results in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood flow.

Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both in vitro and in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known but may be due to any or all of the following: 1) reduced expression of the growth regulatory protooncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator; are 3) binding and sequestration of growth regulatory factors such as fibrovalent growth factor (FGF).

Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon vascular injury are angiopeptin (a somatostatin analog), calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal),

colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides.

Additionally, a goat antibody to the SMC mitogen platelet derived growth factor (PDGF) has been shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000–600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transluminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG).

PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000–300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified.

In the normal arterial will, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref). SMC in vessel wall exists in a 'contractile' phenotype characterized by 80–90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state.

Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), etc. released from platelets (i.e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC.

3

These cells undergo a phenotypic change from the contractile phenotype to a 'synthetic' phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1–2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., In: *Vascular Smooth Muscle Cells in Culture*, Campbell, J. H. and Campbell, G. R., Eds, CRC Press, Boca Ration, 1987, pp. 39–55); Clowes, A. W. and Schwartz, S. M., Circ. Res. 56:139–145, 1985).

Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7–14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3–6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374–1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30–50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

## SUMMARY OF THE INVENTION

Novel Features and Applications to Stent Technology

Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include reservoirs is a new approach which offers several important advantages over existing technologies

Local Drug Delivery from a Stent to Inhibit Restenosis

In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatable material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

One advantage of this system is that the properties of the coating can be optimized for achieving superior biocompatibility and adhesion properties, without the addition requirement of being able to load and release the drug. The size,

4

shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

## DESCRIPTION OF THE DRAWINGS

The invention will be better understood in connection with the following figures in which FIGS. 1 and 1A are top views and section views of a stent containing reservoirs as described in the present invention;

FIGS. 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

FIGS. 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

FIG. 4 is a layout view of a device containing a reservoir as in FIG. 3.

## DETAILED DESCRIPTION OF THE INVENTION

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty. The calcium antagonists have also been unsuccessful in preventing restenosis, although they are still under study. Other agents currently under study include thromboxane inhibitors, prostacyclin mimetics, platelet membrane receptor blockers, thrombin inhibitors and angiotensin converting enzyme inhibitors. These agents must be given systemically, however, and attainment of a therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (Lang et al., 42 Ann. Rev. Med., 127–132 (1991); Popma et al, 84 *Circulation*, 1426–1436 (1991)).

Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis (Franklin, S. M. and Faxon, D. P., 4 Coronary Artery Disease, 232–242 (1993); Serruys, P. W. et al., 88 *Circulation*, (part 1) 1588–1601, (1993).

Conversely, stents have proven useful in preventing reducing the proliferation of restenosis. Stents, such as the stent 10 seen in layout in FIG. 4, balloon-expandable slotted metal tubes (usually but not limited to stainless steel), which when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall. This support is helpful in maintaining an open path for blood flow. In two randomized clinical trials, stents were shown to increase angiographic success after PTCA, increase the stenosed blood vessel lumen and to reduce the lesion recurrence at 6 months (Serruys et al., 331 New Eng Jour. Med, 495, (1994); Fischman et al., 331 New Eng Jour Med, 496–501 (1994). Additionally, in a preliminary trial, heparin coated stents appear to possess the same benefit of reduction in stenosis diameter at follow-up as was observed with non-heparin coated stents. Additionally, heparin coating appears to have the added benefit of producing a reduction in sub-acute thrombosis after stent implantation (Serruys et al., 93 Circulation, 412–422, (1996). Thus, 1) sustained

US 7,223,286 B2

5

mechanical expansion of a stenosed coronary artery has been shown to provide some measure of restenosis prevention, and 2) coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs to local, injured tissue off the surface of the stent.

Numerous agents are being actively studied as antiproliferative agents for use in restenosis and have shown some activity in experimental animal models. These include: heparin and heparin fragments (Clowes and Karnovsky, 265 *Nature*, 25–626, (1977); Guyton, J. R. et al. 46 Circ. Res., 625–634, (1980); Clowes, A. W. and Clowes, M. M., 52 Lab. Invest., 611–616, (1985); Clowes, A. W. and Clowes, M. M., 58 Circ. Res., 839–845 (1986); Majesky et al., 61 Circ Res., 296–300, (1987); Snow et al., 137 Am. J. Pathol., 313–330 (1990); Okada, T. et al., 25 *Neurosurgery*, 92–898, (1989) colchicine (Currier, J. W. et al., 80 *Circulation*, 11–66, (1989), taxol (ref), agiotensin converting enzyme (ACE) inhibitors (Powell, J. S. et al., 245 Science, 186–188 (1989), angiopeptin (Lundergan, C. F. et al., 17 Am. J. Cardiol. (Suppl. B); 132B–136B (1991), Cyclosporin A (Jonasson, L. et. al., 85 Proc. Natl. Acad. Sci., 2303 (1988), goat-anti-rabbit PDGF antibody (Ferns, G. A. A., et al., 253 *Science*, 1129–1132 (1991), terbinafine (Nemecek, G. M. et al., 248 J. Pharmacol. Exp. Thera., 1167–1747 (1989), trapidil (Liu, M. W. et al., 81 *Circulation*, 1089–1093 (1990), interferon-gamma (Hansson, G. K. and Holm, 84 *J. Circulation*, 1266–1272 (1991), steroids (Colburn, M. D. et al., 15 J. Vasc. Surg., 510–518 (1992), see also Berk, B. C. et al., 17 J. Am. Coll. Cardiol., 111B–117B (1991), ionizing radiation (ref), fusion toxins (ref) antisense oligonucleotides (ref), gene vectors (ref), and rapamycin (see below).

Of particular interest is rapamycin. Rapamycin is a macrolide antibiotic which blocks IL-2-mediated T-cell proliferation and possesses antiinflammatory activity. While the precise mechanism of rapamycin is still under active investigation, rapamycin has been shown to prevent the $G_1$ to S phase progression of T-cells through the cell cycle by inhibiting specific cell cyclins and cyclin-dependent protein kinases (Siekierka, Immunol. Res. 13: 110–116, 1994). The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. (Circ Res 76:412–417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC in vitro while Poon et al. have shown the rat, porcine, and human SMC migratin can also be inhibited by rapamycin (J Clin Invest 98: 2277–2283, 1996). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55:1409–1418, 1993; Gallo et al., in press, (1997)) These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the dequale of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the restenosis process, an agent which prevents inflammation and the proliferation of SMC combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

6

Experiments
   Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression.
   Delivery Methods:
   These can vary:
   Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath.
   Involving comixture with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.
   or entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels, as will be explained further herein.
   or including covalent binding of the drug to the stent via solution chemistry techniques (such as via the Carmeda process) or dry chemistry techniques (e.g. vapour deposition methods such as rf-plasma polymerization) and combinations thereof.
   Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural uptake
   Extravascular delivery by the pericardial route
   Extravascular delivery by the advential application of sustained release formulations.
   Uses: for inhibition of cell proliferation to prevent neointimal proliferation and restenosis.
      prevention of tumor expansion from stents
      prevent ingrowth of tissue into catheters and shunts inducing their failure.
   1. Experimental Stent Delivery Method—Delivery from Polymer Matrix:
   Solution of Rapamycin, prepared in a solvent miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001 weight % to 30 weight % of drug. Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters, e.g., polylactide, polycaprolactonglycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocompatible polymers are also suitable candidates. Polymers such as polydimethylsiolxane; poly(ethylene-vingylacetate); acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.
   Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the solvent allowed to evaporate to leave a film with entrapped rapamycin.

2. Experimental Stent Delivery Method—Delivery from Microporous Depots in Stent Through a Polymer Membrane Coating:
   Stent, whose body has been modified to contain micropores or channels is dipped into a solution of Rapamycin, range 0.001 wt % to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. (The dipping solution can also be compressed to improve the loading efficiency.) After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A solution of polymer, chosen from any identified in the first experimental method, is applied to the stent as detailed above. This outer layer of polymer will act as diffusion-controller for release of drug.

7

3. Experimental Stent Delivery Method—Delivery via Lysis of a Covalent Drug Tether

Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides may be suitable for this.

4. Experimental Method—Pericardial Delivery

A: Polymeric Sheet Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolide) or non-degradable polymer, e.g., polydimethylsiloxane, and mixture cast as a thin sheet, thickness range 10μ to 1000μ. The resulting sheet can be wrapped perivascularly on the target vessel. Preference would be for the absorbable polymer.

B: Conformal Coating: Rapamycin is combined with a polymer that has a melting temperature just above 37° C., range 40°–45° C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies conformably to the vessel wall. Both non-degradable and absorbable biocompatible polymers are suitable.

As seen in the figures it is also possible to modify currently manufactured stents in order to adequately provide the drug dosages such as rapamycin. As seen in FIGS. 1a, 2a and 3a, any stent strut 10, 20, 30 can be modified to have a certain reservoir or channel 11, 21, 31. Each of these reservoirs can be open or closed as desired. These reservoirs can hold the drug to be delivered. FIG. 4 shows a stent 40 with a reservoir 45 created at the apex of a flexible strut. Of course, this reservoir 45 is intended to be useful to deliver rapamycin or any other drug at a specific point of flexibility of the stent. Accordingly, this concept can be useful for "second generation" type stents.

In any of the foregoing devices, however, it is useful to have the drug dosage applied with enough specificity and enough concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the stent struts must be kept at a size of about 0.0005" to about 0.003". Then, it should be possible to adequately apply the drug dosage at the desired location and in the desired amount.

These and other concepts will are disclosed herein. It would be apparent to the reader that modifications are possible to the stent or the drug dosage applied. In any event, however, the any obvious modifications should be perceived to fall within the scope of the invention which is to be realized from the attached claims and their equivalents.

What is claimed is:

1. A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture and said drug is rapamycin or a macrocyclic lactone analog thereof.

2. A stent according to claim 1 comprising a generally thin walled cylinder containing a plurality of generally solid struts to which said coating is applied.

3. A stent according to claim 2 further comprising a channel formed in at least one of said struts.

4. A stent according to claim 3, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

5. A stent according to claim 1 wherein the coating is dip-coated onto the stent.

6. A stent according to claim 1 wherein the coating is spray-coated onto the stent.

8

7. A stent according to claim 1 wherein said rapamycin or macrocyclic lactone analog thereof is contained in the coating at a weight percentage of about 30%.

8. A stent according to claim 1 wherein the coating comprises a degradable polymer.

9. A stent according to claim 1 wherein the coating comprises a nonabsorbable polymer.

10. A stent according to claim 1 wherein the coating comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly (hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

11. A stent according to claim 10 wherein the coating comprises a lactone-based polyester.

12. A stent according to claim 10 wherein the coating comprises a lactone-based copolyester.

13. A stent according to claim 10 wherein the coating comprises a polyanhydride.

14. A stent according to claim 10 wherein the coating comprises a polyaminoacid.

15. A stent according to claim 10 wherein the coating comprises a polysaccharide.

16. A stent according to claim 10 wherein the coating comprises a polyphosphazene.

17. A stent according to claim 10 wherein the coating comprises a poly(ether-ester) copolymer.

18. A stent according to claim 10 wherein the coating comprises a polydimethylsiloxane.

19. A stent according to claim 10 wherein the coating comprises a poly(ethylene)vinylacetate.

20. A stent according to claim 10 wherein the coating comprises a poly(hydroxy)ethylmethylmethacrylate.

21. A stent according to claim 10 wherein the coating comprises an acrylate based polymer.

22. A stent according to claim 10 wherein the coating comprises an acrylate based copolymer.

23. A stent according to claim 10 wherein the coating comprises a polyvinyl pyrrolidone.

24. A stent according to claim 10 wherein the coating comprises a cellulose ester.

25. A stent according to claim 10 wherein the coating comprises a fluorinated polymer.

26. A stent according to claim 10 wherein the fluorinated polymer is polytetrafluoroethylene.

27. A stent according to any one of claims 1 to 26 wherein said drug is a macrocyclic lactone analog of rapamycin.

28. A stent according to any one of claims 1 to 26 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

29. A stent according to claim 28 wherein said drug is a macrocyclic lactone analog of rapamycin.

30. A stent according to any one of claims 1 to 26 that releases said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days.

31. A stent according to claim 30 wherein said drug is a macrocyclic lactone analog of rapamycin.

32. A stent according to any one of claims 1 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.

33. A stent according to claim 32 wherein said drug is a macrocyclic lactone analog of rapamycin.

9

34. A stent according to claim 33 that releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days.

35. A stent according to claim 34 wherein the coating comprises a fluorinated polymer.

36. A stent according to claim 35 wherein the coating further comprises an acrylate based polymer or copolymer.

37. A stent according to claim 33 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

38. A stent according to claim 37 wherein the coating comprises a fluorinated polymer.

39. A stent according to claim 38 wherein the coating further comprises an acrylate based polymer or copolymer.

40. A device comprising a metallic stent, a biocompatible polymeric carrier and a drug, wherein said drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation.

41. A device according to claim 40 wherein said polymeric carrier and drug are mixed together.

42. A device according to claim 40 wherein said polymeric carrier is bound to the drug.

43. A device according to claim 40 wherein the drug is entrapped on the surface of the stent by said polymeric carrier.

44. A device according to claim 40 wherein said stent comprises a generally thin walled cylinder containing a plurality of generally solid struts to which said polymeric carrier and drug are applied.

45. A device according to claim 44 further comprising a channel formed in at least one of said struts.

46. A device according to claim 45, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

47. A device according to claim 40 wherein the polymeric carrier and drug are dip-coated onto the stent.

48. A device according to claim 40 wherein the polymeric carrier and drug are spray-coated onto the stent.

49. A device according to claim 40 wherein the weight ratio of drug to polymeric carrier is about 3:7.

50. A device according to claim 40 wherein the polymeric carrier comprises a degradable polymer.

51. A device according to claim 40 wherein the polymeric carrier comprises a nonabsorbable polymer.

52. A device according to claim 40 wherein the polymeric carrier comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly (hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

53. A device according to claim 52 wherein the polymeric carrier comprises a lactone-based polyester.

10

54. A device according to claim 52 wherein the polymeric carrier comprises a lactone-based copolyester.

55. A device according to claim 52 wherein the polymeric carrier comprises a polyanhydride.

56. A device according to claim 52 wherein the polymeric carrier comprises a polyaminoacid.

57. A device according to claim 52 wherein the polymeric carrier comprises a polysaccharide.

58. A device according to claim 52 wherein the polymeric carrier comprises a polyphosphazene.

59. A device according to claim 52 wherein the polymeric carrier comprises a poly(ether-ester) copolymer.

60. A device according to claim 52 wherein the polymeric carrier comprises a polydimethylsiloxane.

61. A device according to claim 52 wherein the polymeric carrier comprises a poly(ethylene)vinylacetate.

62. A device according to claim 52 wherein the polymeric carrier comprises a poly(hydroxy)ethylmethylmethacrylate.

63. A device according to claim 52 wherein the polymeric carrier comprises an acrylate based polymer.

64. A device according to claim 52 wherein the polymeric carrier comprises an acrylate based copolymer.

65. A device according to claim 52 wherein the polymeric carrier comprises a polyvinyl pyrrolidone.

66. A device according to claim 52 wherein the polymeric carrier comprises a cellulose ester.

67. A device according to claim 52 wherein the polymeric carrier comprises a fluorinated polymer.

68. A device according to claim 67 wherein the fluorinated polymer is polytetrafluoroethylene.

69. A device according to any one of claims 40 to 68 wherein said drug is a macrocyclic lactone analog of rapamycin.

70. A device according to any one of claims 40 to 68 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

71. A device according to claim 70 wherein said drug is a macrocyclic lactone analog of rapamycin.

72. A device according to claim 71 wherein the polymeric carrier comprises a fluorinated polymer.

73. A device according to claim 72 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

74. A device according to any one of claims 40 to 68 that releases said drug over a period of at least 14 days.

75. A device according to claim 74 wherein said drug is a macrocyclic lactone analog of rapamycin.

76. A device according to claim 75 wherein the polymeric carrier comprises a fluorinated polymer.

77. A device according to claim 76 wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

* * * * *

EXHIBIT C



US007229473B2

(12) **United States Patent**
　　Falotico et al.

(10) Patent No.: **US 7,229,473 B2**
(45) Date of Patent: ***Jun. 12, 2007**

(54) **LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT**

(75) Inventors: **Robert Falotico**, Bell Mead, NJ (US); **Gerard H. Llanos**, Stewartsville, NJ (US)

(73) Assignee: **Cordis Corporation**, Miami Lakes, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/466,983**

(22) Filed: **Aug. 24, 2006**

(65) **Prior Publication Data**
US 2006/0282160 A1　Dec. 14, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/951,385, filed on Sep. 28, 2004, which is a continuation of application No. 10/408,328, filed on Apr. 7, 2003, now Pat. No. 6,808,536, which is a continuation of application No. 09/874,117, filed on Jun. 4, 2001, now Pat. No. 6,585,764, which is a continuation of application No. 09/061,586, filed on Apr. 16, 1998, now Pat. No. 6,273,913.

(60) Provisional application No. 60/044,692, filed on Apr. 18, 1997.

(51) Int. Cl.
*A61F 2/06*　　(2006.01)

(52) U.S. Cl. .................................... **623/1.42**
(58) Field of Classification Search ...... 623/1.42–1.48
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 861,659 A | 7/1907 | Johnson | 464/147 |
| 3,051,677 A | 8/1962 | Rexford | 522/156 |
| 3,279,996 A | 10/1966 | Long et al. | 424/424 |
| 3,526,005 A | 9/1970 | Bokros | 623/11.11 |
| 3,599,641 A | 8/1971 | Sheridan | 604/256 |
| 3,657,744 A | 4/1972 | Ersek | 128/898 |
| 3,744,596 A | 7/1973 | Sander | 188/203 |
| 3,779,805 A | 12/1973 | Alsberg | 427/105 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE　　　3205942 A1　　9/1983

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 07/819,314, filed Jan. 9, 1992, Morris.

(Continued)

*Primary Examiner*—Suzette Gherbi
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

Methods of preparing intravascular stents with a polymeric coating containing macrocyclic lactone (such as rapamycin or its analogs), stents and stent graphs with such coatings, and methods of treating a coronary artery with such devices. The macrocyclic lactone-based polymeric coating facilitates the performance of such devices in inhibiting restenosis.

**5 Claims, 2 Drawing Sheets**



**US 7,229,473 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,929,992 A | 12/1975 | Sehgal et al. ............... 424/122 |
| 3,932,627 A | 1/1976 | Margraf ........................ 514/56 |
| 3,948,254 A | 4/1976 | Zaffaroni ....................... 128/833 |
| 3,952,334 A | 4/1976 | Bokros et al. ............... 623/11.11 |
| 3,968,800 A | 7/1976 | Vilasi .......................... 606/198 |
| 4,069,307 A | 1/1978 | Higuchi et al. ............... 424/432 |
| 4,076,285 A | 2/1978 | Martinez ...................... 285/332 |
| 4,292,965 A | 10/1981 | Nash et al. ................... 128/833 |
| 4,299,226 A | 11/1981 | Banka .......................... 604/509 |
| 4,300,244 A | 11/1981 | Bokros ......................... 623/1.13 |
| 4,312,920 A | 1/1982 | Pierce et al. ............... 428/425.5 |
| 4,321,711 A | 3/1982 | Mano .......................... 623/1.43 |
| 4,323,071 A | 4/1982 | Simpson et al. .............. 606/194 |
| 4,390,599 A | 6/1983 | Broyles ........................ 428/597 |
| 4,413,359 A | 11/1983 | Akiyama et al. ........... 623/23.72 |
| 4,423,183 A | 12/1983 | Close .......................... 524/546 |
| 4,441,216 A | 4/1984 | Ionescu et al. .............. 623/2.19 |
| 4,503,569 A | 3/1985 | Dotter ......................... 623/1.19 |
| 4,512,338 A | 4/1985 | Balko et al. ................. 606/108 |
| 4,550,447 A | 11/1985 | Seiler, Jr et al. ........... 623/1.32 |
| 4,553,545 A | 11/1985 | Maass et al. ................. 606/198 |
| 4,560,374 A | 12/1985 | Hammerslag ............... 604/509 |
| 4,562,596 A | 1/1986 | Kornberg ..................... 623/1.32 |
| 4,565,740 A | 1/1986 | Golander et al. ............ 428/409 |
| 4,580,568 A | 4/1986 | Gianturco ..................... 606/198 |
| 4,613,665 A | 9/1986 | Larm .......................... 536/20 |
| 4,642,111 A | 2/1987 | Sakamoto et al. ........... 424/492 |
| 4,655,771 A | 4/1987 | Wallsten ...................... 623/1.22 |
| 4,656,083 A | 4/1987 | Hoffman et al. ............ 442/123 |
| 4,676,241 A | 6/1987 | Webb et al. ............... 128/207.14 |
| 4,678,466 A | 7/1987 | Rosenwald ................... 424/427 |
| 4,687,482 A | 8/1987 | Hanson ........................ 623/1.49 |
| 4,689,046 A | 8/1987 | Bokros ........................ 623/2.31 |
| 4,731,054 A | 3/1988 | Billeter et al. ............. 604/93.01 |
| 4,733,665 A | 3/1988 | Palmaz ........................ 606/108 |
| 4,739,762 A | 4/1988 | Palmaz ........................ 623/1.11 |
| 4,740,207 A | 4/1988 | Kreamer ..................... 623/1.15 |
| 4,749,585 A | 6/1988 | Greco et al. ................ 428/422 |
| 4,753,652 A | 6/1988 | Langer et al. ............... 623/1.42 |
| 4,760,849 A | 8/1988 | Kropf .......................... 606/191 |
| 4,768,507 A | 9/1988 | Fischell et al. .............. 623/1.11 |
| 4,776,337 A | 10/1988 | Palmaz ........................ 623/1.11 |
| 4,786,500 A | 11/1988 | Wong .......................... 424/422 |
| 4,787,899 A | 11/1988 | Lazarus ........................ 623/1.11 |
| 4,800,882 A | 1/1989 | Gianturco ..................... 606/194 |
| 4,810,784 A | 3/1989 | Larm .......................... 536/20 |
| 4,856,516 A | 8/1989 | Hillstead ...................... 606/194 |
| 4,871,357 A | 10/1989 | Hsu et al. .................... 604/266 |
| 4,872,867 A | 10/1989 | Joh ............................. 604/269 |
| 4,876,109 A | 10/1989 | Mayer et al. ................ 604/269 |
| 4,886,062 A | 12/1989 | Wiktor ........................ 606/194 |
| 4,907,336 A | 3/1990 | Gianturco ...................... 29/515 |
| 4,916,193 A | 4/1990 | Tang et al. .................. 525/413 |
| 4,954,126 A | 9/1990 | Wallsten ...................... 600/36 |
| 4,969,458 A | 11/1990 | Wiktor ........................ 623/1.11 |
| 4,990,131 A | 2/1991 | Dardik et al. ................ 600/36 |
| 4,990,155 A | 2/1991 | Wilkoff ....................... 606/191 |
| 4,994,071 A | 2/1991 | MacGregor .................. 606/194 |
| 4,994,298 A | 2/1991 | Yasuda ........................ 427/490 |
| 4,998,923 A | 3/1991 | Samson et al. .............. 606/194 |
| 5,015,253 A | 5/1991 | MacGregor .................. 623/1.15 |
| 5,019,090 A | 5/1991 | Pinchuk ....................... 623/1.15 |
| 5,019,096 A | 5/1991 | Fox, Jr et al. ............... 600/36 |
| 5,029,877 A | 7/1991 | Fedeli ......................... 277/354 |
| 5,034,265 A | 7/1991 | Hoffman et al. ............ 442/126 |
| 5,035,706 A | 7/1991 | Gianturco et al. ........... 606/198 |
| 5,041,100 A | 8/1991 | Rowland et al. ............. 604/265 |
| 5,041,126 A | 8/1991 | Gianturco .................... 623/1.15 |
| 5,047,020 A | 9/1991 | Hsu ............................. 604/266 |
| 5,049,132 A | 9/1991 | Shaffer et al. ............ 604/101.02 |
| 5,049,403 A | 9/1991 | Larm et al. .................. 427/2.1 |
| 5,053,048 A | 10/1991 | Pinchuk ....................... 623/1.43 |
| 5,059,166 A | 10/1991 | Fischell et al. ............... 600/3 |
| 5,061,275 A | 10/1991 | Wallsten et al. ............. 623/1.22 |
| 5,061,750 A | 10/1991 | Feijen et al. ............... 525/54.1 |
| 5,064,435 A | 11/1991 | Porter ......................... 623/23.7 |
| 5,092,877 A | 3/1992 | Pinchuk ....................... 128/898 |
| 5,102,417 A | 4/1992 | Palmaz ........................ 606/195 |
| 5,104,404 A | 4/1992 | Wolff .......................... 623/1.16 |
| 5,116,365 A | 5/1992 | Hillstead ..................... 623/1.15 |
| 5,122,154 A | 6/1992 | Rhodes ........................ 623/1.13 |
| 5,131,908 A | 7/1992 | Dardik et al. ................ 600/36 |
| 5,133,732 A | 7/1992 | Wiktor ........................ 623/1.22 |
| 5,134,192 A | 7/1992 | Feijen et al. ............... 525/54.1 |
| 5,135,536 A | 8/1992 | Hillstead ...................... 606/195 |
| 5,163,952 A | 11/1992 | Froix .......................... 623/1.18 |
| 5,163,958 A | 11/1992 | Pinchuk ..................... 623/23.49 |
| 5,171,217 A | 12/1992 | March et al. ................ 604/507 |
| 5,171,262 A | 12/1992 | MacGregor .................. 623/1.15 |
| 5,176,660 A | 1/1993 | Truckai ....................... 604/527 |
| 5,176,972 A | 1/1993 | Bloom et al. ................. 430/14 |
| 5,178,618 A | 1/1993 | Kandarpa ..................... 606/28 |
| 5,180,366 A | 1/1993 | Woods ...................... 604/96.01 |
| 5,182,317 A | 1/1993 | Winters et al. .............. 523/112 |
| 5,185,408 A | 2/1993 | Tang et al. .................. 525/415 |
| 5,192,307 A | 3/1993 | Wall ........................... 623/1.2 |
| 5,195,984 A | 3/1993 | Schalz ......................... 623/1.2 |
| 5,213,576 A | 5/1993 | Abiuso et al. ............ 604/103.01 |
| 5,213,898 A | 5/1993 | Larm et al. .................. 428/422 |
| 5,217,483 A | 6/1993 | Tower ......................... 623/1.15 |
| 5,222,971 A | 6/1993 | Willard et al. ............... 606/198 |
| 5,226,913 A | 7/1993 | Pinchuk .................... 140/71 R |
| 5,234,456 A | 8/1993 | Silvestrini ................... 623/1.2 |
| 5,246,445 A | 9/1993 | Yachia et al. ................ 623/1.2 |
| 5,258,020 A | 11/1993 | Froix .......................... 128/898 |
| 5,258,021 A | 11/1993 | Duran ......................... 623/2.3 |
| 5,262,451 A | 11/1993 | Winters et al. .............. 523/112 |
| 5,266,073 A | 11/1993 | Wall ........................... 623/1.2 |
| 5,272,012 A | 12/1993 | Opolski .................... 428/423.1 |
| 5,733,665 A | 1/1994 | Palmaz ........................ 606/108 |
| 5,275,622 A | 1/1994 | Lazarus et al. .............. 623/1.11 |
| 5,282,823 A | 2/1994 | Schwartz et al. ............ 623/1.22 |
| 5,282,824 A | 2/1994 | Gianturco .................... 623/1.13 |
| 5,283,257 A | 2/1994 | Gregory et al. ............. 514/458 |
| 5,288,711 A | 2/1994 | Mitchell et al. ............. 424/122 |
| 5,290,305 A | 3/1994 | Inoue ......................... 623/1.2 |
| 5,292,331 A | 3/1994 | Boneau ..................... 623/1.15 |
| 5,292,802 A | 3/1994 | Rhee et al. ................. 525/54.1 |
| 5,304,121 A | 4/1994 | Sahatjian ..................... 604/509 |
| 5,304,200 A | 4/1994 | Spaulding .................... 623/1.16 |
| 5,306,250 A | 4/1994 | March et al. ................ 604/104 |
| 5,308,862 A | 5/1994 | Ohlstein ....................... 514/411 |
| 5,308,889 A | 5/1994 | Rhee et al. .................. 523/113 |
| 5,314,444 A | 5/1994 | Gianturco .................... 606/195 |
| 5,314,472 A | 5/1994 | Fontaine ...................... 623/1.22 |
| 5,328,471 A | 7/1994 | Slepian .................... 604/101.03 |
| 5,334,301 A | 8/1994 | Heinke et al. ............... 204/267 |
| 5,336,518 A | 8/1994 | Narayanan et al. .......... 427/470 |
| 5,338,770 A | 8/1994 | Winters et al. .............. 523/112 |
| 5,342,348 A | 8/1994 | Kaplan ..................... 604/891.1 |
| 5,342,387 A | 8/1994 | Summers ..................... 606/198 |
| 5,342,621 A | 8/1994 | Eury .......................... 606/198 |
| 5,354,257 A | 10/1994 | Roubin et al. ................ 600/7 |
| 5,354,308 A | 10/1994 | Simon et al. ................ 623/1.15 |
| 5,356,433 A | 10/1994 | Rowland et al. ............. 424/422 |
| 5,366,504 A | 11/1994 | Andersen et al. ............ 623/1.5 |
| 5,368,566 A | 11/1994 | Crocker .................... 604/101.02 |
| 5,370,683 A | 12/1994 | Fontaine ...................... 623/1.22 |
| 5,370,691 A | 12/1994 | Samson ....................... 623/1.22 |
| 5,375,612 A | 12/1994 | Cottenceau et al. ......... 128/899 |
| 5,376,112 A | 12/1994 | Duran ......................... 623/1.26 |
| 5,378,475 A | 1/1995 | Smith et al. ................. 424/473 |
| 5,380,299 A | 1/1995 | Fearnot et al. .............. 604/265 |
| 5,382,261 A | 1/1995 | Palmaz ........................ 606/158 |

**US 7,229,473 B2**

Page 3

| | | |
|---|---|---|
| 5,383,853 A | 1/1995 | Jung et al. ............ 604/103 04 |
| 5,383,928 A | 1/1995 | Scott et al. ............ 623/1.12 |
| 5,387,235 A | 2/1995 | Chuter ............ 623/1.11 |
| 5,389,106 A | 2/1995 | Tower ............ 623/1.15 |
| 5,393,772 A | 2/1995 | Yue et al. ............ 514/410 |
| 5,395,390 A | 3/1995 | Simon et al. ............ 623/1.18 |
| 5,397,355 A | 3/1995 | Marin et al. ............ 623/1.2 |
| 5,399,352 A | 3/1995 | Hanson ............ 424/423 |
| 5,403,341 A | 4/1995 | Solar ............ 606/198 |
| 5,405,377 A | 4/1995 | Cragg ............ 623/1.2 |
| 5,409,696 A | 4/1995 | Narayanan et al. ...... 424/78.17 |
| 5,411,549 A | 5/1995 | Peters ............ 623/1.15 |
| 5,415,619 A | 5/1995 | Lee et al ............ 600/36 |
| 5,417,969 A | 5/1995 | Hsu et al. ............ 424/78 27 |
| 5,419,760 A | 5/1995 | Narcisco, Jr. ............, 604/8 |
| D359,802 S | 6/1995 | Fontaine ............ D24/155 |
| 5,421,955 A | 6/1995 | Lau et al. ............ 216/48 |
| 5,423,885 A | 6/1995 | Williams ............ 623/1.17 |
| 5,429,618 A | 7/1995 | Keogh ............ 604/266 |
| 5,429,634 A | 7/1995 | Narciso, Jr. ............ 604/890.1 |
| 5,439,446 A | 8/1995 | Barry ............ 604/103.01 |
| 5,441,515 A | 8/1995 | Khosravi et al. ............ 606/194 |
| 5,441,516 A | 8/1995 | Wang et al. ............ 606/198 |
| 5,441,947 A | 8/1995 | Dodge et al. ............ 514/179 |
| 5,443,458 A | 8/1995 | Evry ............ 604/891.1 |
| 5,443,477 A | 8/1995 | Marin et al. ............ 606/198 |
| 5,443,496 A | 8/1995 | Schwartz et al. ............ 623/1.16 |
| 5,443,498 A | 8/1995 | Fontaine ............ 623/1.17 |
| 5,443,500 A | 8/1995 | Sigwart ............ 623/1.17 |
| 5,447,724 A | 9/1995 | Helmus et al. ............ 424/426 |
| 5,449,372 A | 9/1995 | Schmaltz et al. ............ 606/198 |
| 5,449,373 A | 9/1995 | Pinchasik et al. ............ 606/198 |
| 5,449,382 A | 9/1995 | Dayton ............ 623/1.15 |
| 5,464,450 A | 11/1995 | Buscemi et al. ............ 632/1.2 |
| 5,464,540 A | 11/1995 | Friesen et al. ............ 210/640 |
| 5,464,650 A | 11/1995 | Berg et al ............ 427/2.3 |
| 5,474,563 A | 12/1995 | Myler et al. ............ 606/108 |
| 5,486,357 A | 1/1996 | Narayanan ............ 424/78.17 |
| 5,496,365 A | 3/1996 | Sgro ............ 623/1.2 |
| 5,500,013 A | 3/1996 | Buscemi et al. ............ 623/1.22 |
| 5,510,077 A | 4/1996 | Dinh et al. ............ 264/485 |
| 5,512,055 A | 4/1996 | Domb et al. ............ 604/265 |
| 5,516,781 A | 5/1996 | Morris et al. ............ 514/291 |
| 5,519,042 A | 5/1996 | Morris et al. ............ 514/378 |
| 5,523,092 A | 6/1996 | Hanson et al ............ 424/423 |
| 5,527,354 A | 6/1996 | Fontaine et al ............ 623/1.17 |
| 5,545,208 A | 8/1996 | Wolff et al ............ 623/1.22 |
| 5,551,954 A | 9/1996 | Buscemi et al ............ 623/1.15 |
| 5,554,182 A | 9/1996 | Dinh et al ............ 600/36 |
| 5,554,954 A | 9/1996 | Takahashi ............ 327/546 |
| 5,556,413 A | 9/1996 | Lam ............ 623/1.2 |
| 5,562,922 A | 10/1996 | Lambert ............ 424/486 |
| 5,563,146 A | 10/1996 | Morris ............ 514/291 |
| 5,569,197 A | 10/1996 | Helmus ............ 604/102.02 |
| 5,569,295 A | 10/1996 | Lam ............ 606/198 |
| 5,569,462 A | 10/1996 | Martinson et al ............ 424/423 |
| 5,569,463 A | 10/1996 | Helmus et al ............ 424/426 |
| 5,571,089 A | 11/1996 | Crocker ............ 604/103.01 |
| 5,571,166 A | 11/1996 | Dinh et al ............ 128/898 |
| 5,574,059 A | 11/1996 | Regunathan et al ............ 514/397 |
| 5,575,818 A | 11/1996 | Pinchuk ............ 623/1.15 |
| 5,578,075 A | 11/1996 | Dayton ............ 623/1.15 |
| 5,580,873 A | 12/1996 | Bianco et al ............ 514/263.36 |
| 5,580,874 A | 12/1996 | Bianco et al. ............ 514/263.36 |
| 5,591,140 A | 1/1997 | Narayanan et al ............ 604/269 |
| 5,591,197 A | 1/1997 | Orth et al ............ 623/1.16 |
| 5,591,224 A | 1/1997 | Schwartz et al ............ 623/1.22 |
| 5,591,227 A | 1/1997 | Dinh et al ............ 623/1.22 |
| 5,599,352 A | 2/1997 | Dinh et al ............ 128/898 |
| 5,603,722 A | 2/1997 | Phan et al. ............ 623/1.18 |
| 5,604,283 A | 2/1997 | Wada et al ............ 524/236 |
| 5,605,696 A | 2/1997 | Eury et al ............ 424/423 |
| 5,607,463 A | 3/1997 | Schwartz et al ............ 623/1.44 |
| 5,607,475 A | 3/1997 | Cahalan et al ............ 424/423 |
| 5,609,629 A | 3/1997 | Fearnot et al ............ 623/1.42 |
| 5,616,608 A | 4/1997 | Kinsella et al ............ 514/449 |
| 5,620,984 A | 4/1997 | Bianco et al ............ 514/263.36 |
| 5,621,102 A | 4/1997 | Bianco et al ............ 544/267 |
| 5,622,975 A | 4/1997 | Singh et al. ............ 514/324 |
| 5,624,411 A | 4/1997 | Tuch ............ 604/265 |
| 5,628,785 A | 5/1997 | Schwartz et al ............ 128/898 |
| 5,629,077 A | 5/1997 | Turnlund et al ............ 623/1.15 |
| 5,629,315 A | 5/1997 | Bianco et al ............ 514/263.36 |
| 5,632,763 A | 5/1997 | Glastra ............ 623/1.15 |
| 5,632,771 A | 5/1997 | Boatman et al ............ 623/1.15 |
| 5,632,776 A | 5/1997 | Kurumatani et al ............ 424/423 |
| 5,632,840 A | 5/1997 | Campbell ............ 156/196 |
| 5,635,201 A | 6/1997 | Fabo ............ 424/443 |
| 5,637,113 A | 6/1997 | Tartaglia et al ............ 623/1.42 |
| 5,643,312 A | 7/1997 | Fischell et al. ............ 623/1.15 |
| 5,643,939 A | 7/1997 | Ohlstein ............ 514/411 |
| 5,646,160 A | 7/1997 | Morris et al. ............ 514/291 |
| 5,648,357 A | 7/1997 | Bianco et al. ............ 514/263 36 |
| 5,649,952 A | 7/1997 | Lam ............ 623/1.15 |
| 5,649,977 A | 7/1997 | Campbell ............ 623/1.15 |
| 5,651,174 A | 7/1997 | Schwartz et al ............ 29/527.2 |
| 5,652,243 A | 7/1997 | Bianco et al. ............ 514/263.36 |
| 5,653,747 A | 8/1997 | Dereume ............ 623/1.54 |
| 5,653,992 A | 8/1997 | Bezwada et al. ............ 424/426 |
| 5,662,609 A | 9/1997 | Slepian ............ 604/101.03 |
| 5,665,591 A | 9/1997 | Sonenshein et al ............ 435/375 |
| 5,665,728 A | 9/1997 | Morris et al ............ 424/122 |
| 5,667,764 A | 9/1997 | Kopia et al. ............ 424/1.45 |
| 5,669,924 A | 9/1997 | Shaknovich ............ 623/1.11 |
| 5,670,506 A | 9/1997 | Leigh et al. ............ 514/141 |
| 5,672,638 A | 9/1997 | Verhoeven et al ............ 523/112 |
| 5,674,242 A | 10/1997 | Phan et al ............ 606/198 |
| 5,679,400 A | 10/1997 | Tuch ............ 427/2.14 |
| 5,679,659 A | 10/1997 | Verhoeven et al ............ 514/56 |
| 5,684,061 A | 11/1997 | Ohnishi et al ............ 523/114 |
| 5,691,311 A | 11/1997 | Maranganore et al ............ 514/12 |
| 5,693,085 A | 12/1997 | Buirge et al ............ 623/1.13 |
| 5,697,967 A | 12/1997 | Dinh et al ............ 128/898 |
| 5,697,971 A | 12/1997 | Fischell et al. ............ 623/1.15 |
| 5,700,286 A | 12/1997 | Tartaglia et al. ............ 623/1.15 |
| 5,707,385 A | 1/1998 | Williams ............ 606/192 |
| 5,709,874 A | 1/1998 | Hanson et al ............ 424/423 |
| 5,713,949 A | 2/1998 | Jayaraman ............ 623/1.12 |
| 5,716,981 A | 2/1998 | Hunter et al ............ 514/449 |
| 5,725,549 A | 3/1998 | Lam ............ 623/1.15 |
| 5,725,567 A | 3/1998 | Wolff et al ............ 623/1.42 |
| 5,728,150 A | 3/1998 | McDonald et al. ............ 623/1.15 |
| 5,728,420 A | 3/1998 | Keogh ............ 427/2.12 |
| 5,731,326 A | 3/1998 | Hart et al. ............ 514/323 |
| 5,733,327 A | 3/1998 | Igaki et al. ............ 623/1.5 |
| 5,733,920 A | 3/1998 | Mansuri et al ............ 514/337 |
| 5,733,925 A | 3/1998 | Kunz et al ............ 514/449 |
| 5,735,897 A | 4/1998 | Buirge ............ 623/1.15 |
| 5,739,138 A | 4/1998 | Bianco et al ............ 514/263.36 |
| 5,755,734 A | 5/1998 | Richter et al ............ 606/194 |
| 5,755,772 A | 5/1998 | Evans et al. ............ 128/898 |
| 5,759,205 A | 6/1998 | Valentini ............ 433/173 |
| 5,769,883 A | 6/1998 | Buscemi et al. ............ 623/1.42 |
| 5,776,184 A | 7/1998 | Tuch ............ 623/1.11 |
| 5,780,476 A | 7/1998 | Underiner et al ............ 514/263.36 |
| 5,782,908 A | 7/1998 | Cahalan et al ............ 623/1.13 |
| 5,788,979 A | 8/1998 | Alt et al. ............ 424/426 |
| 5,792,106 A | 8/1998 | Mische ............ 604/103.01 |
| 5,792,772 A | 8/1998 | Bianco et al ............ 514/263.36 |
| 5,798,372 A | 8/1998 | Davies et al ............ 514/356 |
| 5,799,384 A | 9/1998 | Schwartz et al ............ 29/458 |
| 5,800,507 A | 9/1998 | Schwartz ............ 623/1.11 |
| 5,800,508 A | 9/1998 | Goicoechea et al ............ 623/1.15 |
| 5,807,861 A | 9/1998 | Klein et al. ............ 514/263.35 |
| 5,811,447 A | 9/1998 | Kunz et al ............ 514/411 |
| 5,820,917 A | 10/1998 | Tuch ............ 427/2.1 |

**US 7,229,473 B2**

Page 4

| | | |
|---|---|---|
| 5,820,918 A | 10/1998 | Ronan et al. .................... 427/2.1 |
| 5,824,048 A | 10/1998 | Tuch ................................ 128/898 |
| 5,824,049 A | 10/1998 | Ragheb et al. ............... 623/1.44 |
| 5,827,587 A | 10/1998 | Fukushi ......................... 428/36.6 |
| 5,833,651 A | 11/1998 | Donovan et al. ............. 604/509 |
| 5,837,008 A | 11/1998 | Berg et al. ..................... 128/898 |
| 5,837,313 A | 11/1998 | Ding et al. .................... 427/2.21 |
| 5,843,120 A | 12/1998 | Israel et al. .................. 623/1.15 |
| 5,843,166 A | 12/1998 | Lentz et al. .................. 623/1.13 |
| 5,843,172 A | 12/1998 | Yan .............................. 623/1.42 |
| 5,849,034 A | 12/1998 | Schwartz ......................... 606/36 |
| 5,851,217 A | 12/1998 | Wolff et al. ..................... 606/191 |
| 5,851,231 A | 12/1998 | Wolff et al. ................... 623/1.42 |
| 5,858,990 A | 1/1999 | Walsh .............................. 514/44 |
| 5,861,027 A | 1/1999 | Trapp .......................... 623/1.15 |
| 5,865,814 A | 2/1999 | Tuch ............................ 623/1.15 |
| 5,871,535 A | 2/1999 | Wolff et al. ................... 128/898 |
| 5,873,904 A | 2/1999 | Ragheb et al. ............... 623/1.13 |
| 5,876,433 A | 3/1999 | Lunn ............................ 623/1.15 |
| 5,877,224 A | 3/1999 | Brocchini et al. ....... 514/772.2 |
| 5,879,697 A | 3/1999 | Ding et al. .................... 424/422 |
| 5,882,335 A | 3/1999 | Leone et al .............. 604/103.02 |
| 5,891,108 A | 4/1999 | Leone et al. ................. 604/264 |
| 5,893,840 A | 4/1999 | Hull et al. .............. 604/103.02 |
| 5,897,911 A | 4/1999 | Loeffler ...................... 427/2.25 |
| 5,900,246 A | 5/1999 | Lambert ...................... 424/429 |
| 5,902,266 A | 5/1999 | Leone et al. ................. 604/509 |
| 5,916,910 A | 6/1999 | Lai .............................. 514/423 |
| 5,922,393 A | 7/1999 | Jayaraman .................... 427/2.3 |
| 5,932,243 A | 8/1999 | Fricker et al .............. 424/450 |
| 5,932,299 A | 8/1999 | Katoot ......................... 427/508 |
| 5,932,580 A | 8/1999 | Levitzki et al. .......... 181/152 |
| 5,951,586 A | 9/1999 | Berg et al. ................... 606/198 |
| 5,957,971 A | 9/1999 | Schwartz .................... 623/1.15 |
| 5,968,091 A | 10/1999 | Pinchuk et al. ............ 623/1.16 |
| 5,972,027 A | 10/1999 | Johnson ....................... 623/1.42 |
| 5,976,534 A | 11/1999 | Hart et al. ................ 424/145.1 |
| 5,977,163 A | 11/1999 | Li et al. ...................... 514/449 |
| 5,980,553 A | 11/1999 | Gray et al. .................. 623/1.15 |
| 5,980,566 A | 11/1999 | Alt et al. ..................... 623/23.7 |
| 5,980,972 A | 11/1999 | Ding ........................... 427/2.24 |
| 5,981,568 A | 11/1999 | Kunz et al. .................. 514/411 |
| 5,985,307 A | 11/1999 | Hanson et al. .............. 424/423 |
| 5,997,468 A | 12/1999 | Wolff et al. .................... 606/36 |
| 6,004,346 A | 12/1999 | Wolff et al. ............... 623/23.71 |
| 6,015,432 A | 1/2000 | Rakos et al. ................ 623/1.13 |
| 6,039,721 A | 3/2000 | Johnson et al ............. 604/508 |
| 6,059,813 A | 5/2000 | Vrba et al. ................... 606/198 |
| 6,071,305 A | 6/2000 | Brown et al .............. 623/1.43 |
| 6,074,659 A | 6/2000 | Kunz et al .................. 424/423 |
| 6,080,190 A | 6/2000 | Schwartz .................... 623/1.22 |
| 6,096,070 A | 8/2000 | Ragheb et al .............. 623/1.39 |
| 6,120,536 A | 9/2000 | Ding et al. .................. 623/1.43 |
| 6,120,847 A | 9/2000 | Yang et al. ................... 427/335 |
| 6,136,798 A | 10/2000 | Cody et al. .................. 514/141 |
| 6,140,127 A | 10/2000 | Sprague ...................... 435/395 |
| 6,146,358 A | 11/2000 | Rowe ........................... 604/103 |
| 6,153,252 A | 11/2000 | Hossainy et al ........... 427/2.3 |
| 6,159,488 A | 12/2000 | Nagler et al ............... 424/423 |
| 6,171,232 B1 | 1/2001 | Papandreou et al ....... 600/36 |
| 6,171,609 B1 | 1/2001 | Kunz ........................... 424/422 |
| 6,177,272 B1 | 1/2001 | Nabel et al ............... 435/320.1 |
| 6,179,817 B1 | 1/2001 | Zhong ......................... 604/265 |
| 6,193,746 B1 | 2/2001 | Strecker ..................... 623/1.13 |
| 6,214,901 B1 | 4/2001 | Chudzik et al ........... 623/1.13 |
| 6,225,346 B1 | 5/2001 | Tang et al. .................. 514/623 |
| 6,240,616 B1 | 6/2001 | Yan .............................. 29/527.2 |
| 6,245,537 B1 | 6/2001 | Williams et al. ........... 435/135 |
| 6,251,920 B1 | 6/2001 | Grainger et al ........... 514/319 |
| 6,254,632 B1 | 7/2001 | Wu et al. ..................... 623/1.15 |
| 6,254,634 B1 | 7/2001 | Anderson et al. .......... 623/1.42 |
| 6,258,121 B1 | 7/2001 | Yang et al ................. 623/1.46 |
| 6,268,390 B1 | 7/2001 | Kunz .......................... 514/411 |

| | | |
|---|---|---|
| 6,273,913 B1 | 8/2001 | Wright et al. ............... 623/1.42 |
| 6,284,305 B1 | 9/2001 | Ding et al. .................. 427/2.28 |
| 6,287,320 B1 | 9/2001 | Slepian ...................... 606/194 |
| 6,287,628 B1 | 9/2001 | Hossainy et al ........... 427/2.3 |
| 6,299,604 B1 | 10/2001 | Ragheb et al .............. 604/265 |
| 6,306,144 B1 | 10/2001 | Sydney et al. .............. 606/108 |
| 6,306,166 B1 | 10/2001 | Barry et al. ................. 623/1.46 |
| 6,306,176 B1 | 10/2001 | Whitbourne ............ 623/23.59 |
| 6,306,421 B1 | 10/2001 | Kunz et al ................. 424/423 |
| 6,309,380 B1 | 10/2001 | Larson et al. .............. 604/502 |
| 6,309,660 B1 | 10/2001 | Hsu et al. .................... 424/425 |
| 6,313,264 B1 | 11/2001 | Caggiano et al. ....... 530/350 |
| 6,316,018 B1 | 11/2001 | Ding et al .................. 424/423 |
| 6,335,029 B1 | 1/2002 | Kamath et al .............. 424/423 |
| 6,358,556 B1 | 3/2002 | Ding et al .................. 427/2.24 |
| 6,369,039 B1 | 4/2002 | Palasis et al ............. 424/93.2 |
| 6,379,382 B1 | 4/2002 | Yang .......................... 623/1.42 |
| 6,387,121 B1 | 5/2002 | Alt ............................. 623/1.15 |
| 6,403,635 B1 | 6/2002 | Kinsella et al ............ 514/449 |
| 6,407,067 B1 | 6/2002 | Schäfer ......................... 514/19 |
| 6,517,858 B1 | 2/2003 | Le Moel et al. ............ 424/424 |
| 6,517,889 B1 | 2/2003 | Jayaraman .................. 427/2.24 |
| 6,545,097 B2 | 4/2003 | Pinchuk et al .............. 525/240 |
| 6,585,764 B2 | 7/2003 | Wright et al ............... 623/1.42 |
| 6,620,194 B2 | 9/2003 | Ding et al .................. 623/1.43 |
| 6,746,773 B2 | 6/2004 | Llanos et al. .............. 428/421 |
| 6,776,796 B2 | 8/2004 | Falotico et al. ........... 623/1.46 |
| 6,808,536 B2 | 10/2004 | Wright et al. .............. 623/1.42 |
| 2001/0007083 A1 | 7/2001 | Roorda ....................... 623/1.15 |
| 2001/0029351 A1 | 10/2001 | Falotico et al. ....... 604/103.02 |
| 2001/0029660 A1 | 10/2001 | Johnson ......................... 29/557 |
| 2001/0032014 A1 | 10/2001 | Yang et al. ................. 623/1.15 |
| 2001/0034363 A1 | 10/2001 | Li et al. ...................... 514/449 |
| 2001/0037145 A1 | 11/2001 | Gunawaiya et al ....... 623/1.15 |
| 2002/0010448 A1 | 1/2002 | Lury et al. ............ 604/101.04 |
| 2002/0032477 A1 | 3/2002 | Helmus et al. ............. 623/1.2 |
| 2002/0041899 A1 | 4/2002 | Chudzik et al ........... 424/487 |
| 2002/0061326 A1 | 5/2002 | Li et al. ...................... 424/424 |
| 2002/0068969 A1 | 6/2002 | Shanley et al. ........... 623/1.16 |
| 2002/0071902 A1 | 6/2002 | Ding et al. .................. 427/2.24 |
| 2002/0082680 A1 | 6/2002 | Shanley et al. ........... 623/1.16 |
| 2002/0082685 A1 | 6/2002 | Sirhan et al. ............... 623/1.42 |
| 2002/0091433 A1 | 7/2002 | Ding et al ................... 623/1.2 |
| 2002/0095114 A1 | 7/2002 | Palasis ..................... 604/96.01 |
| 2002/0099438 A1 | 7/2002 | Furst ........................... 623/1.16 |
| 2002/0103526 A1 | 8/2002 | Steinke ....................... 623/1.11 |
| 2002/0119178 A1 | 8/2002 | Levesque et al. .......... 424/423 |
| 2002/0123505 A1 | 9/2002 | Mollison et al ........... 514/291 |
| 2002/0127327 A1 | 9/2002 | Schwartz et al ......... 427/2.15 |
| 2002/0133222 A1 | 9/2002 | Das ............................. 623/1.16 |
| 2002/0133224 A1 | 9/2002 | Bajgar et al .............. 623/1.39 |
| 2002/0165608 A1 | 11/2002 | Llanos ....................... 604/500 |
| 2002/0193475 A1 | 12/2002 | Hossainy et al. .......... 524/113 |
| 2003/0065377 A1 | 4/2003 | Davila et al ............... 604/265 |
| 2003/0216699 A1 | 11/2003 | Falotico ..................... 604/265 |
| 2004/0049265 A1 | 3/2004 | Ding et al ................. 623/1.42 |
| 2004/0243097 A1 | 12/2004 | Falotico et al ............ 604/500 |
| 2004/0260268 A1 | 12/2004 | Falotico et al ............ 604/500 |
| 2005/0002986 A1 | 1/2005 | Falotico et al ............ 424/426 |
| 2005/0004663 A1 | 1/2005 | Llanos et al .............. 623/1.46 |
| 2005/0033261 A1 | 2/2005 | Falotico et al ............ 604/500 |
| 2005/0106210 A1 | 5/2005 | Ding et al .................. 424/423 |
| 2005/0187611 A1 | 8/2005 | Ding et al .................. 623/1.15 |
| 2005/0208200 A1 | 9/2005 | Ding et al .................. 427/2.25 |
| 2006/0088654 A1 | 4/2006 | Ding et al .................. 427/2.21 |
| 2006/0089705 A1 | 4/2006 | Ding et al .................. 623/1.15 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19723723 A1 | 12/1998 |
| EP | 0 145 166 A2 | 6/1985 |
| EP | 0 177 330 A2 | 4/1986 |
| EP | 0 183 372 A1 | 6/1986 |

US 7,229,473 B2

Page 5

| EP | 0 221 570 A2 | 5/1987 |
| EP | 0 421 729 A2 | 4/1991 |
| EP | 0 540 290 A2 | 5/1993 |
| EP | 0 568 310 A1 | 11/1993 |
| EP | 0 604 022 A1 | 6/1994 |
| EP | 0 621 015 A1 | 10/1994 |
| EP | 0 623 354 A1 | 11/1994 |
| EP | 0 712 615 A1 | 5/1996 |
| EP | 0 716 836 A1 | 6/1996 |
| EP | 0 734 721 A2 | 10/1996 |
| EP | 0 747 069 A2 | 12/1996 |
| EP | 0 761 251 A1 | 3/1997 |
| EP | 0 800 801 A1 | 10/1997 |
| EP | 0 540 290 B1 | 1/1998 |
| EP | 0 830 853 A1 | 3/1998 |
| EP | 0 815 803 A1 | 7/1998 |
| EP | 0 850 651 A2 | 7/1998 |
| EP | 0 938 878 A2 | 9/1999 |
| EP | 0 938 878 A3 | 9/1999 |
| EP | 0 950 386 A2 | 10/1999 |
| EP | 0 968 688 A1 | 1/2000 |
| EP | 0 633 032 B1 | 2/2001 |
| EP | 1 192 957 A2 | 4/2002 |
| EP | 1 588 726 A1 | 10/2005 |
| EP | 1 588 727 A1 | 10/2005 |
| FR | 566 807 A1 | 4/1992 |
| GB | 0 662 307 A2 | 12/1951 |
| GB | 1 205 743 A | 9/1970 |
| GB | 2 135 585 A | 9/1984 |
| JP | 0 734 698 A2 | 3/1996 |
| SU | 660689 | 5/1979 |
| SU | 1457921 | 2/1989 |
| WO | 89/03232 A1 | 4/1989 |
| WO | 91/12779 A1 | 9/1991 |
| WO | 92/15286 A1 | 9/1992 |
| WO | 94/01056 A1 | 1/1994 |
| WO | 94/21308 A1 | 9/1994 |
| WO | 94/21309 A1 | 9/1994 |
| WO | 94/24961 A1 | 11/1994 |
| WO | 96/00272 A1 | 1/1996 |
| WO | 96/26689 A1 | 9/1996 |
| WO | 96/32907 A1 | 10/1996 |
| WO | 96/34580 A1 | 11/1996 |
| WO | 97/25000 A1 | 7/1997 |
| WO | 97/33534 A1 | 9/1997 |
| WO | 98/08463 A1 | 3/1998 |
| WO | 98/13344 A1 | 4/1998 |
| WO | 98/19628 A1 | 5/1998 |
| WO | 98/23228 A1 | 6/1998 |
| WO | 98/23244 A1 | 6/1998 |
| WO | 98/34669 A1 | 8/1998 |
| WO | 98/36784 A1 | 8/1998 |
| WO | 98/47447 A1 | 10/1998 |
| WO | 98/56312 A1 | 12/1998 |
| WO | 00/21584 A1 | 4/2000 |
| WO | 00/27445 A1 | 5/2000 |
| WO | 00/27455 A1 | 5/2000 |
| WO | 00/32255 A1 | 6/2000 |
| WO | 00/38754 A1 | 7/2000 |
| WO | 01/87342 A2 | 11/2001 |
| WO | 01/87372 A1 | 11/2001 |
| WO | 01/87373 A1 | 11/2001 |
| WO | 01/87376 A1 | 11/2001 |
| WO | 02/26139 A1 | 4/2002 |
| WO | 02/26271 A1 | 4/2002 |
| WO | 02/26280 A1 | 4/2002 |
| WO | 02/26281 A1 | 4/2002 |
| WO | 03/015664 A1 | 2/2003 |
| WO | 03/057218 A1 | 7/2003 |

## OTHER PUBLICATIONS

U.S. Appl. No. 08/424,884, filed Apr. 19, 1995, Helmus et al.

U.S. Appl. No. 08/526,273, filed Sep. 11, 1995, Ding.

U.S. Appl. No. 08/730,542, filed Oct. 11, 1996, Helmus.

U.S. Appl. No. 09/575,480, filed May 19, 2000, Kopia.

U.S. Appl. No. 10/431,059, filed May 7, 2003, Falotico.

U.S. Appl. No. 10/829,074, filed Apr. 21, 2004, Falotico et al.

U.S. Appl. No. 10/833,200, filed Apr. 27, 2004, Falotico et al.

U.S. Appl. No. 10/852,517, filed May 24, 2004, Falotico et al.

Abraham, R. T., "Mammalian target of rapamycin: Immunosuppressive drugs offer new insight into cell growth regualtion," *Progress in Inflammation Research*, 2000, Switzerland.

Alvarado, R. et al., "Evaluation of Polymer-coated Balloon-expandable Stents in Bile Ducts," *Radiology*, 1989, 170, 975-978.

Badimon, J. J. et al., "Inhibitory Effects of Rapamycin on Intimal Hyperplasia After PTCA," *JACC*, Mar. 1998.

Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement," *Circulation*, 82:III-541 (1990).

Berk, B. C. et al., "Pharmacologic Roles of Heparin and Glucocorticoids to Prevent Restenosis After Coronary Angioplasty," *JACC*, May 1991, 17(6), 111B-117B.

Bertram, P. G. et al., "The 14-3-3 proteins positively regulate rapamycin-dependent signaling," *Current Biology*, 1998, 8, 1259-1267.

Biomaterials Science (B.D. Ratner, Ed.), Academic Press, New York, NY, pp. 228-238, 1996.

Campbell, G. R. et al., "Phenotypic Modulation of Smooth Muscle Cells in Primary Culture, Vascular Smooth Muscle Cells in Culture," *CRC Press*, 1987, 39-55.

Chang, M. W. et al., "Adenovirus-mediated Over-expression of the Cyclin/Cyclin-dependent Kinase inhibitor, p. 21 inhibits Vascular Smooth Muscle Cell Proliferation and Neointima Formation in the Rat Carotid Artery Model of Balloon Angioplasty," *J. Clin. Invest.*, 1995, 96, 2260-2268.

Chung, J. et al., "Rapamycin-FKBP specifically blocks growth-dependent activation of and signaling by the 70 kd S6 protein kinases," *Cell*, Jun. 26, 1992, 69(7), 1227-1236.

Clowes, A. W. et al., "Kinetics of cellular proliferation after arterial injury. IV. Heparin inhibits rat smooth muscle mitogenesis and migration," *Circ. Res.*, 1986, 58(6), 839-845.

Clowes, A. W. et al., Kinetics of Cellular Proliferation after Arterial Injury, *Laboratory Investigation*, 1985, 52(6), 611-616.

Clowes, A. W. et al., "Significance of quiescent smooth muscle migration in the injured rat carotid artery," *Circ Res.* 1985, 56(1), 139-145.

Clowes, A. W., "Suppression by heparin of smooth muscle cell proliferation in injured arteries," *Nature*, 1977, 265(5595), 625-626.

Colburn, M. D. et al., "Dose responsive suppression of myointimal hyperplasia by dexamethasone," *J.Vasc. Surg.*, 1992, 15, 510-518.

Currier, J. W. et al., "Colchicine Inhibits Restenosis After Iliac Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1989, 80(4), 11-66 (Abstract No. 0263).

Encyclopedia of Polymer Science and Engineering, vol. 7, Fluorocarbon Elastomers, p. 257-267, Mar. 1989.

Farb, A. et al., "Vascular smooth muscle cell cytotoxicity and sustained inhibition of neointimal formation by fibroblast growth factor 2-saporin fusion protein," *Circ. Res.*, 1997, 80, 542-550.

Ferns, G. A. A. et al., "Inhibition of Neointimal Smooth Muscle Accumulation After Angioplasty by an Antibody to PDGF," *Science*, 1991, 253, 1129-1132.

Fischman, D. L. et al., "A Randomized Comparison of Coronary-Stent Placement and Balloon Angioplasty in the Treatment of Coronary Artery Disease," *N. Eng. J. Med.*, Aug. 25, 1994, 331(8), 496-501.

Franklin, S. M. et al., "Pharmacologic prevention of restenosis after coronary angioplasty: review of the randomized clinical trials," *Coronary Artery Disease* Mar. 1993, 4(3), 232-242.

Fukuyama, J. et al., "Tranilast suppresses the vascular intimal hyperplasia after balloon injury in rabbits fed on a high-cholesterol diet," *Eur. J. Pharmacol.*, 1996, 318, 327-332.

Gregory, C. R. et al., "Rapamycin Inhibits Arterial Intimal Thickening Caused by Both Alloimmune and Mechanical Injury," *Transplantation*, Jun. 1993, 55(6), 1409-1418.

Gregory, C. R. et al., "Treatment with Rapamycin and Mycophenolic Acid Reduces Arterial Intimal Thickening Produced by Mechanical Injury and Allows Endothelial Replacement," *Transplantation*, Mar. 15, 1995, 59(5), 655-661.

Guyton, J. R. et al., "Inhibition of rat arterial smooth muscle cell proliferation by heparin. In vivo studies with anticoagulant and nonanticoagulant heparin," *Circ. Res.*, 1980, 46, 625-634.

Hansson, G. K. et al., "Interferon-γ Inhibits Arterial Stenosis After Injury," *Circ.*, 1991, 84, 1266-1272.

Hashemolhosseini, S. et al., "Rapamycin Inhibition of the G1 to S Transition Is Mediated by Effects on Cyclin D1 mRNA and Protein Stability," *J Biol Chem*, Jun. 5, 1998, 273, 14424-14429.

Jonasson, J. et al., "Cyclosporin A inhibits smooth muscle proliferation in the vascular response to injury," *Proc. Natl., Acad. Sci.*, 1988, 85, 2303-2306.

Kuhnt, M. et al., "Microbial Conversion of Rapamycin," *Enzyme and Microbial Technology*, 1997, 21, 405-412.

Lange, R. A. MD et al., "Restenosis After Coronary Balloon Angioplasty," *Annu. Rev. Med.*, 1991, 42, 127-132.

Liu, M. W. et al., "Trapidil in Preventing Restenosis After Balloon Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1990, 81, 1089-1093.

Liu, M. W., MD et al., "Restenosis After Coronary Angioplasty Potential Biologic Determinants and Role of Intimal Hyperplasia," *Circulation*, 1989, 79, 1374-1387.

Lundergan, C. F. et al., "Peptide inhibition of Myointimal Proliferation by Angiopeptin, a Somatostatin Analogue," *JACC*, May 1991, 17(6), 132B-136B.

Majesky, M. W. et al., "Heparin regulates smooth muscle S phase entry in the injured rat carotoid artery," *Circ. Res.*, 1987, 61, 296-300.

Marx, S. O. et al., "Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells," *Circ. Res.*, 1995, 76, 412-417.

Nemecek, G. M. et al., "Terbinafine Inhibits the Mitogenic Response to Platelet—Derived Growth Factor in Vitro and Neointimal Proliferation in Vivo," *J. Pharmacol. Exp. Thera.*, 1989, 248, 1167-1174.

Okada, T. et al., "Localized Release of Perivascular Heparin Inhibits Intimal Proliferation after Endothelial Injury without Systemic Anticoagulation," *Neurosurgery*, 1989, 25, 892-898.

Poon, M. et al., "Rapamycin Inhibits Vascular Smooth Muscle Cell Migration," *J. Clin Invest.*, Nov. 1996, 98(10), 2277-2283.

Popma, J. J. et al., "Clinical trials of restenosis after coronary angioplasty," *Circulation*, Sep. 1991, 84(3), 1426-1436.

Powell, J. S. et al., "Inhibitors of Angiotensin-Converting Enzyme Prevent Myointimal Proliferation After Vascular Injury," *Science*, 1989, 245, 186-188.

Rensing, B. J. et al., "Coronary restenosis elimination with a sirolimus eluting stent, *European Heart Journal*, 2001, 22, 2125-2130.

Rodeck, C. et al., "Methods for the Transcervical Collection of Fetal Cells During the First Trimester of Pregnancy," *Prenatal Diagnosis*, 1995, 15, 933-942.

Ruef, J. MD, et al., "Flavopiridol Inhibits Muscle Cell Proliferation In Vitro and Neointimal Formation In Vitro After Carotid Injury in the Rat," From the Division of Cardiology and Sealy Center for Molecular Cardiology, University of Texas Medical Branch, Galveston; Accepted Apr. 9, 1999; *Circulation* Aug. 10, 1999, pp. 659-665.

Serruys, P. W. et al., "A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease," *N Engl J Med*, Aug. 25, 1994; 331(8), 489-495.

Serruys, P. W. et al., "Evaluation of ketanserin in the prevention of restenosis after percutaneous transluminal coronary angioplasty," *Circulation*. Oct. 1993; 88(4 Pt 1), 1588-1601.

Serruys, P. W. et al., "Heparin-coated Palmaz-Schatz stents in human coronary arteries. Early outcome of the Benestent-II Pilot Study," *Circulation*, Feb. 1, 1996; 93(3), 412-422.

Siekierka, J. J., "Probing T-Cell Signal Transduction Pathways with the Immunosupressive Drugs, FK-506 and Rapamycin," *Immunologic Research*, 1994, 13, 110-116.

Sigwart, et al., "Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," *N. Engl. J. Med.*, Mar. 19, 1987, 316, 701-706.

Simons, M. et al., "Antisense c-*myb* oligonucleotides inhibit intimal arterial smooth muscel cell accumulation in vivo," *Nature*, 1992, 359, 67-70.

Snow, A. D. et al., "Heparin modulates the composition of the extracellular matrix domain surrounding arterial smooth muscle cells," *Am. J. Pathol.*, 1990, 137, 313-330.

Sollott, S. J. et al., "Taxol Inhibits Neoitimal Smooth Muscle Cell Accumulation after Angioplasty in the Rat," *J. Clin. Invest.*, 1995, 95, 1869-1876.

van Der Giessen, et al., "Self-expandable Mesh Stents: an Experimental Study Comparing Polymer Coated and Uncoated Wallstent Stents in the Coronary Circulation of Pigs," *Circulation* 1990, 82(suppl. III):III-542.

van Der Giessen, W. J. et al., "Coronary stenting with polymer-coated and uncoated self-expanding endoprostheses in pigs," Coron Art. Disease 1992; 3, 631-640.

Vasey, C. G. et al., "Clinical Cardiology: Stress Echo and Coronary Flow", , *Circulation*, Oct. 1989, 80(4) Supplement II, II-66

Verweire, E. et al., "Evaluation of Fluorinated Polymers As Coronary Stent Coating," *Journal of Materials Science: Materials in Medicine*, Apr. 2000.

Weinberger, J. et al., "Intracoronary irradiation: dose response for the prevention of restenosis in swine," *Int. J. Rad. Onc Biol. Phys.*, 1996, 36, 767-775.

Preliminary Amendment in U.S. Appl. No. 07/258,189, May 22, 1989.

Trial Transcript from Nov. 6, 2000 at 185-90 and 235-36 (Attorneys' opening remarks regarding '984 patent).

Trial Transcript from Nov. 7, 2000 at 274-301, 307-315, 320-28 and 332 (Cordis expert testimony regarding the Palmaz-Schatz stent); 370-379, 480-496 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 8, 2000 at 547-63, 657-63, 674-722, 782-85 (Cordis expert testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 9, 2000 at 819-23, 921 (Cordis expert testimony regarding the '984 patent); 926-941 . (R. Croce testimony re Palmaz-Schatz stent); 1033-1053. (R. Schatz testimony).

Trial Transcript from Nov. 13, 2000 at 1089-1 134. (R. Schatz testimony); 1275-1305 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 14, 2000 at 1390-1404, 1448-1454, 1486-1500 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 15, 2000 at 1686-87, 1724-42, 1828-34, 1850-54, 1887-92 (AVE expert testimony regarding the '984 patent).

Trial Transcript from Nov. 16, 2000 at 2077-198 (AVE expert testimony regarding the alleged obviousness of the '984 patent).

Trial Transcript from Nov. 17, 2000 at 2331-34 ( jury instructions as to the meaning of the limitations of the claims of the '984 patent)

Trial Transcript from Nov. 20, 2000 at 2441-48, 2499-2500, 2546-50, 2552-56 (Attorneys' closing arguments regarding the '984 patent).

Trial Transcript from Nov. 21, 2000 at 2592-94 (reading of jury verdict).

Trial Transcript from Dec. 18, 2000 at 2750-95 (Cordis expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Trial Transcript from Dec. 20, 2000 at 3421-88 (AVE expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Jury verdict, dated Nov. 21, 2000.

District Court decisions on post-trial motions (194 F. Supp. 2d 323)

Court of Appeal for the Federal Circuit decision (339 F.3d 1352)

US 7,229,473 B2
Page 7

Trial Transcript from Mar. 4, 2005 at 133-135, 171-173 and 192-96 (Attorney's opening remarks regarding '984 validity).

Trial Transcript from Mar. 7, 2005 at 275-31.1 (Cordis expert testimony regarding the Palmaz-Schatz stent); 342-46, 353-59, 416-425 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art); 430-449, 452-58, 462-492 (R. Croce testimony regarding the Palmaz-Schatz stent); 500-507 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Mar. 8, 2005 at 609 (Cordis expert testimony regarding the '984 patent); 628-73, 724-740, 773, 801-839 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 9, 2005 at 936-49, 968-69 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 10, 2005 at 1427-74, 178-1509, 1514-23 (AVE expert testimony regarding the alleged obviousness of the '984 patent); 1566-93 (AVE expert testimony regarding Palmaz-Schatz stent); 1634-49 (R. Schatz testimony).

Trial Transcript from Mar. 11, 2005 at 1846-47, 1891-1900, 1919 (Attorneys' closing arguments regarding '984 obviousness).

Trial Transcript from Mar. 14, 2005 at 1964-67 (reading of jury verdict).

Jury verdict dated Mar. 14, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for Judgment As a Infringement Claim dated Apr. 19, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for a New Trial dated Apr. 19, 2005.

D.I. 1407, Cordis' Combined Answering Brief In Opposition to AVE's Motion for JMOL on Infringement of the Palmaz '762 and Schatz '984 Patents and Its Motion for a New Trial dated May 5, 2005.

D.I. 1414, Medtronic Vascular Inc.'s Combined Reply Brief In Support of Its Motion for Judgment as a Matter of Law on Cordis Corp.'s Patent Infringement Claims and Its Motion for a New Trial dated May 19, 2005.

Trial Transcript from Feb. 8, 2001 at 372-412, 449-469 (B. Tobor testimony regarding the prosecution of the '417, '984 and '332 patents); 510-13 (J. Milnamow testimony regarding the prosecution of the '332 patent); 558-604 (J. Palmaz testimony regarding the prosecution of the '417, '984 and '332 patents and the prior art).

Trial Transcript from Feb. 9, 2001 at 637-45, 662-672, 682-85 (J. Palmaz testimony regarding the prior art); 699-742 (R. Schatz testimony); 769-770, 790-95 (Cordis expert testimony regarding prior art).

D.I 1067, Medtronic AVE, Inc.'s Post-Trial Brief Relating to the Unenforceability of the '762 and '984 Patents Due to Inequitable Conduct.

D.I. 1077, Cordis' Combined Answering Brief in Opposition to AVE's BSC's Post-Hearing Briefs on Alleged Inequitable Conduct Concerning the '762, '984 and '332 Patents

D.I. 1089, Reply Brief In Support of Medtronic AVE, Inc.'s Contention that the '762 and '984 Patents are Unenforceable Due to Inequitable Conduct dated May 7, 2001

C.A. No. 00-886-SLR, Answer and Counterclaims of Def. Medtronic AVE, Inc. To First Amended Complaint of Plaintiff Cordis Corp.

BSC's Opening Post-Trial Brief in Support of Its Defense That the Patents in Suit Are Unenforceable, dated Mar. 16, 2001.

Reply Brief in Support of BSC's Defense That the Patents in Suit Are Unenforceable, dated May 7, 2001.

Court's Decision on allegations of inequitable conduct (194 F. Supp 2d 323) Mar. 28, 2002.

Trial Transcript from Nov. 21, 2000 at 155-57 and 180-84 (Attorneys' opening remarks regarding '332 patent).

Trial Transcript from Nov. 27, 2000 at 227-51, 260-300 (Cordis expert testimony regarding the Palmaz-Schatz stent); 343-60, 363-67, 424-33 (J. Palmaz testimony regarding the Palmaz-Schatz stent and the '332 patent).

Trial Transcript from Nov. 28, 2000 at 649-71.

Trial Transcript from Nov. 29, 2000 at 791-816, 859-870, 953-62 (Cordis expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Nov. 30, 2000 at 1018 (Cordis expert testimony regarding the '332 patent); 1062-80, 1 108-1 1 1 1 (R. Croce testimony regarding the Palmaz-Schatz stent); 1 169-70, 1205-17, 1236-45 (Cordis expert testimony regarding the '332 patent).

Trial Transcript from Dec. 1, 2000 at 1352-54 (Cordis expert testimony regarding the '332 patent); 1364-1442 (R. Schatz testimony); 1493-1508, 1552-69 (BSC expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Dec. 4, 2000 at 1602-12, 1638-51, 1713-14, 1730-61, 1811-14, 1823-36 (BSC expert testimony regarding the alleged obviousness of the '332 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Dec. 6, 2000 at 2318-27, 2342-58 (BSC expert testimony regarding the '332 patent).

Trial Transcript from Dec. 7, 2000 at 2549-52 (Cordis expert testimony regarding the '332 patent); 2575-2579, 2591-92, 2630-31, 2649, 2669-71, 2684-85, 2688, 2708-10, 2725-27 (Attorney closing argument regarding '332 patent); 2742-46 Q'ury instructions as to the meaning of the limitations of the claims of the '332 patent)

Trial Transcript from Dec. 11, 2000 at 2817-22 (reading of jury verdict).

Jury verdict, dated Dec. 11, 2000.

D.I. 699, Motion by Defendant BSC and Scimed Life Systems, Inc. For Summary Judgment of Invalidity of U.S. Patent No. 5,902,332 dated Apr. 4, 2000

D.I. 896, Order Denying Motion for Summary Judgment of Invalidity and Unenforceability of Claims 1, 3, and 5 of the U.S. Patent No. 5,902,332 Denying [699-1] Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,902,332 dated Oct. 12, 2000.

Wright et al., Percutaneous Endovascular Stent: An Experimental Study (Abstract), RSNA Meeting (Nov. 28, 1984).

Hearing Transcript from Feb. 10, 1998 at 122-32, 146-80 (Attorneys' opening remarks regarding '417 patent); 180-312 (R. Schatz testimony) [Portions of This Transcript Have Been Removed as Confidential].

Hearing Transcript from Feb. 11, 1998 at 427-575, 577-651 (Cordis expert testimony regarding the '417 patent, the prior art and the Palmaz-Schatz stent).

Hearing Transcript from Feb. 13, 1998 at 1121-1261 (Guidant expert testimony regarding the alleged obviousness of the '417 patent, the prior art and the Palmaz-Schatz stent). [Portions of This Transcript Have Been Removed as Confidential].

Order by J. Robinson denying Cordis' Motion for a Preliminary Injunction Against ACS dated Jul. 17, 1998

ACS, Inc.'s and Guidant Corp.'s Opening Brief in Support of Their Motion for Summary Judgment on Invalidity of U.S. Patent No. 5,102,417 dated Aug. 27, 1998

Plaintiffs' Answering Brief in Opposition to ACS' and BSC's Motion for Summary Judgment on Obviousness dated Sep. 24, 1998

Order dated Mar. 31, 2000.

Schatz Deposition Testimony; May 15, 1996: 79-83, 89-92, 105-107 and 153-161.

Schatz Deposition Testimony; May 16, 1996: 555-564, 569-572

Schatz Deposition Testimony; Jan 8, 1998: 61-73, 108-110.

Schatz Deposition Testimony; July 14, 1998: 69-77, 108-112, 119-123.

Schatz Deposition Testimony; Jul. 12, 1999: 88-91, 132-135, 144-149, 218-223, 231-242.

Schatz Deposition Testimony; Jul. 13, 1999: 251-334, 339-345, 374-416.

Schatz Deposition Testimony; Jul. 14, 1999: 454-550.

Schatz Deposition Testimony; Jul. 15, 1999: 560-614.

Schatz Deposition Testimony; Dec. 2, 1999: 906-91 1, 928-942, 945-963, 976-978, 1029-1034, 1038-1042.

Palmaz Deposition Testimony, Nov. 5, 1991: 160-172.

Palmaz Deposition Testimony, Feb. 5, 1995: 710-727.

Palmaz Deposition Testimony, Jul. 16, 1998: 55-56; 81-82.

Palmaz Deposition Testimony, Jul. 28, 1999: 560-568, 570-579.

Palmaz Deposition Testimony, Jul. 29, 1999: 778-785.

Palmaz Deposition Testimony, Aug. 31, 1999: 1403-1452.

Palmaz Deposition Testimony, Sep. 2, 1999: 1953-1960.

Palmaz Deposition Testimony, Oct. 14, 1999; 2201-2209; 2275-2342; 2371-2411.

Palmaz Deposition Testimony, Oct. 15, 1999: 2424-2497; 2508-2589.

Palmaz Deposition Testimony, Oct. 16, 1999; 2853-2860.

Tobor Deposition Testimony, Jun. 17, 1999: 837-958.

Tobor Deposition Testimony, Jun. 18, 1999: 1095-1184.

Tobor Deposition Testimony, Dec. 1, 1999: 1217-1371.

Tobor Deposition Testimony, Dec. 2, 1999: 1398-1414; 1444-1508; 1532-1548.

Tobor Deposition Testimony, Dec. 3, 1999: 1652-1653; 1662-1672; 1683-1694.

Kula Deposition Testimony, Apr. 20, 1999: 268-169.

Kula Deposition Testimony, Nov. 16, 1999: 660-675; 680-694; 7-8-755; 774-821.

Kula Deposition Testimony, Nov. 18, 1999; 176-223.

Expert Report of Dr. Rodney S. Badger on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Expert Report of Dr. Joseph Bonn on Behalf of Medtronic AVE, Inc (Jan. 31, 2000).

Deposition of Dr. Joseph Bonn dated Mar. 14, 2000.

Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Mar 2000).

Second Supplement Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Aug. 17, 2004).

Rebuttal Expert Report of John M. Collins, PH.D. (Feb. 2000).

Expert Report of David C. Cumberland, M.D. (Jan. 24, 2000).

Expert Report of John T. Goolkasian (Feb. 2000).

Deposition of Richard R. Heuser, M.D. (Sep. 7, 2004).

Deposition of Henry R. Piehler (Sep. 10, 2004).

Deposition of Ronald J. Solar (Mar. 22, 2000).

Deposition of Ronald J. Solar (Mar. 23, 2000).

Deposition of Ronald J. Solar (Apr. 12, 2000).

Expert Report of Dr. Arina Van Breda on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Anna Van Breda (Mar. 24, 2000).

Deposition of Arina Van Breda (Aug. 21, 2004).

Expert Report of John F. Witherspoon (Jan. 24, 2000).

Supplemental Expert Report of John F Witherspoon (Oct. 27, 2000).

Deposition of John F. Witherspoon (Mar. 8, 2000).

Palmaz et al., Article: "Normal and Stenotic Renal Arteries: Experimental Balloon Expandable Intraluminal Stenting", Radiology, Sep. 1987 (AVE 84).

Julio C. Palmaz, Article: "Expandable vascular endoprosthesis." (AVE 132).

Duprat et. al., Article: Flexible Balloon-Expandable Stent for Small Vessels Duprat et. al. Radiology, vol. 162, pp. 276-278, 1987 (AVE 134).

Coons et. al., Article: "Large-Bore, Long Biliary Endoprosthesis (Biliary Stents) for Improved Drainage," Radiology, vol. 148, pp. 89-94, 1983. (AVE 143).

Honickman et al., Article: "Malpositioned Biliary Endoprostesis, Technical Developments And Instrumentation," vol 144, No. 2, 1982 (AVE 144).

Harries-Jones, et al., Article: "Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," AJR, vol 138, pp. 771-772, 1982 (AVE 153).

Charnsangavej et al., Article "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol 161, pp 295-298, 1986. (AVE 359).

Wallace, M. J. et al., Article "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 158, pp. 309-312, 1986 (AVE 364)

T. Yoshioka, et al., AIR Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs", vol. 151, pp. 673-676, 1988 (AVE 438).

Palmaz, J. C. et al., Article: "Expandable Intraluminal Vascular Graft: A Feasibility Study," Surgery, vol 99, pp. 199-205, 1986. (AVE 461).

Lawrence et al., Article: "Percutaneous Endovascular Graft: Experimental Evaluation." Radiology, vol. 163, pp. 357-360, 1987. (AVE 671).

Palmaz et al., Article: Expandable Intraluminal Graft: A Preliminary Study, Nov. 17-22, 1985, Radiology, vol. 156, pp. 73-77, 1985. (AVE 1224).

Fallone et al., "Elastic Characteristics of the Self-Expanding Metallic Stents," Investigative Radiology, vol. 23, pp. 370-376, 1988. (AVE 1953).

Palmaz Paper Entitled "Research Project Expandable Vascular Endoprosthesis" May 18, 1983.

Rousseau , et al., Publication: "Percutaneous Vascular Stent: Experimental Studies & Preliminary Clinical Results in Peripheral Arterial Diseases," in Inter. Angio, vol. 6, 153-161, 1987. (AVE 3301)

Rousseau , et al., Publication: "Self-Expanding Endovascular Prostesis; An Experimental Study," Radiology, vol. 164, pp. 709-714, 1987. (AVE 3303).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 58, pp. 309-312, 1986. (DBX 2938).

Palmaz et al., Article: "Expandable Intraluminal Graft: A Preliminary Study," Radiology, vol. 156, pp. 73-77, Nov 17-22, 1985 (DBX 4595).

Program for the 12th Annual Course on Diagnostic Angiography and Interventional Radiology Mar. 23-26, 1987 sponsored by the Society of Cardiovascular and Interventional Radiology (DBX 6235).

Preliminary Motion for Judgment re: Wolff claims 1, 2-8, 10, 15 and 19 (DBX6759).

Palmaz Declaration (DBX 7069).

Letter from Gaterud to Dr. R. Palmaz dated Jul. 5, 1988 with attached document entitled: "Segmented, balloon-expandable stents." (DBX 7160).

Duprat et al., Article: "Flexible Balloon-Expandable Stent For Small Vessels," Radiology, vol. 168, pp. 276-278, 1987 (PX 82).

Drawing Stent to Bodic on Mar. 17, 1986 (PX 374).

Letter from Dr. Palmaz to R. Bowman enclosing a model of the flexible coronary graft dated Mar. 17, 1986 (PX 337).

Lab Notebook pages dated Jul. 30, 1987 from Rodney Wolff (Cor 185596-597) (PX621A).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (API 72).

J. Palmaz: The Current Status of Vascular Prostheses, published by SCIR in the Twelfth Annual Course on Diagnostic Angiography And Interventional Radiology Mar. 23-26, 1987. (API 73).

Amendment in Response to Office Action of Oct. 18, 1998 in re: Application of Julio Palmaz S/N 174,246. (API 152).

Article: Wallace, et al., Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work In Progress, Radiology, vol. 158, pp 309-312 (API 295).

Reply of Senior Party Schatz To Patentee Wolff's Opposition To The Belated Motion For Judgment Of Applicant Schatz With Regard To Wolff Claims 1, 2-8, 10, 1 1, 13-17, and 19 (COR 186450-455) (API 310).

Brief Of Senior Party Schatz At Final Hearing (API 313)

Letter from Ron Sickles to Ben Tobor dated Feb. 10, 1988 (Exhibit 42).

Letter from R.O. Sickles to Mike Tatlow dated May 12, 1988 (Exhibit 43).

Letter from R. O. Sickles to Richard Schatz dated Jun. 2, 1988 (Exhibit 44).

Letter from Richard Schatz to Raimund Erbel dated Jun. 3, 1988 (Exhibit 45).

Letter from Richard Schatz to Mike Schuler dated Aug. 29, 1991 (Exhibit 48).

Minutes of J&J Stent Project Review Meeting dated Jan. 21, 1988 (Exhibit 7)

Preliminary Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17, and 19. (Exhibit 67)

Declaration of Richard A. Schatz. (Exhibit 75).

Belated Motion for Judgement with Regard to Wolff Claims 1, 2-8, 10, 1 1, 13-17 and 19. (Schatz—Exhibit 77).

Letter from Dr. Schatz to Mr. Tobor, dated Jun. 3, 1988 (Exhibit 122)

**US 7,229,473 B2**

Page 9

Letter from Dr. Schatz to Mr. Romano, dated Nov. 28, 1988. (Exhibit 131).

Letter from Mr. Sickles to Mr. Tobor, dated Feb. 10, 1988 (Exhibit 145).

Richard A. Schatz, Article titled: "A View of Vascular Stents" Circulation, vol. 79, No 2, pp. 445-457, 1989. (Exhibit 194)

Senior Party Schatz's reply to Patentee Wolffs Opposition to the Preliminary Motion Of Applicant Schatz for judgment with regard to Wolff Claims 1, 2-8, 10, 1 1, and 13-17. (Exhibit 69).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications' Work In Progress," Radiology, vol. 158, pp. 309-312, 1986. (Exhibit 165)

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminary Assessment of Treatment with expandable Metallic Stents," Radioloby, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986l (Exhibit 167)

David D. Lawrence et al., Publication: Percutaneous Endovascular Graft: Experimental Evaluation¹, Radiology pp. 163, 357-360, 1987. (Exhibit 173).

Charles E. Putnam, M.D., Cover and article from "Investigative Radiology", vol. 23. No. 5, May 1988. (Exhibit 177)

Robert N. Berk, Cover and article from "American Journal of Roentology", pp. 673-676, 1988. (Exhibit 178).

Declaration of John S. Kula Under 37 C.F.R. § 1 .672. ( Kula—Exhibit 77)

Yoshioka et al., Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs" AJR, vol. 151, pp. 673-676, 1988 (PX 100).

Palmaz, et al., Article: Expandable Intraluminal Graft: A Preliminary Study Work in Progress¹, Radiology, vol. 156, No. 1, pp 73-77, 1985. (PX 101).

Declaration of Richard Schatz Under 37 C.F.R. § 1.672. (PX 106).

Charnsangavej et al., Article: "Stenosis of the Vena Cave: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol 161, pp. 295-298, 1986. (PX 143).

Wallace, et al ., Article: Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work in Progress¹, Radiology, vol. 158, pp 309-312, 1986 (PX 144).

Ginn Kolata, News Article: NY Times, "Devices That Opens Clogged Arteries Gets a Falling Grade in a New Study", pp. 16-18, Jan 3, 1991. (PX 186).

Duprat, et al., Article: "Flexible Balloon—Expanded Stent for Small Vessels Work in Progress¹", Radiology, vol 62, pp. 276-278, 1987 (PX 207).

Letter from Palmaz to Bowman dated Mar. 17, 1986. (PX 350).

Memo re: Minutes of Stent Project Review—San Antonio—Mar. 15, 1988. (PX 651)

Kuntz, et al., Article: Clinical Cardiology Frontiers: "Defining Coronary Restenosis, Newer Clinical and Angiographic Paradigms", Circulation, Sep 1993, vol. 88, No. 3, pp. 1310-1323. (PX 854)

Belated Motion for Judgment with regard to Wolff Claims1, 2-8, 10, 11, 13-17, and 19. (PX 1410).

Drawing of Sprial Stent (sent to Bodie Mar. 17, 1986) (PX2933).

Wright et al ., Article: "Percutaneous Endovascular Stents: An Experimental Evaluation," Radiology, vol. 156, pp. 69-72, 1985. (PX 3093).

Charnsangavej et al., Article: "A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation," Houston Medical Journal, vol. 3, pp. 41-51, Jun 1987 (PX 3207).

In re Application of Wiktor, Appln. No. 69,636, Response to Office Action dated Mar. 17, 1988. (PX3236).

Transmittal Letter of Response to First Office Action in '417 patent. (PX 3993).

Letter from B. Tobor to R. Schatz dated Jul. 23, 1991 (PX 3996).

Mullins et al., Article: "Implantation of balloon—expandable intravascular grafts by catherization in pulmonary arteries and systemic veins," Circulation, vol 77, No. 1, pp. 188-189, 1988 (PX4049).

Schatz et al ., Article: "Intravascular Stents for Angioplasty," Cardio, 1997 (PX 4050).

Schatz et al., Article: "New Technology in Angioplasty Balloon—Expandable Intravascular Stents, New Developments in Medicine," vol. 2, No 2 pp. 59-75, 1987. (PX4051).

Richard A. Schatz, Article: "Introduction to Intravascular Stents," Cardiology Clinics, vol. 6, No. 3, pp 357-372, 1988. (PX 4052).

Richard A. Schatz, Article: "A View of Vascular Stents," Circulation, vol. 79, No. 2, pp. 445-457, 1989. (PX4053).

Wang et al., Article: "An Update on Coronary Stents," Cardio, pp. 177-186, 1992. (PX 4054).

Richard A. Schatz, Article: "New Technology in Angioplasty: Balloon-Expandable Stunts," Medicamundi, vol. 33, No. 3, pp. 1 12-1 16, 1988 (PX 4055).

Letter from Tobor to Schatz dated Sep. 29, 1988. (PXl395).

Verified Statement of Facts by Unnamed Inventor R.A. Schatz document filed in U.S. Patent and Trademark Office on Sep. 8, 1989. (PX 3677).

Declaration of John S. Kula Under 37 CFR § 1.672 (Exhibit 329).

Letter to Mike Schular from R.A. Schatz dated Aug. 29, 1991. (Exhibit 402).

Articulated, Balloon—Expandable Stents, (DBX 7159).

J. Rosch et al., Experimental Intrahepatic Portacaval Anastomosis: Use of Expandable Gianturco Stents, Radiology, vol. 162, pp. 481-485, 1987.

J. Rosch et al., Modified Gianturco Expandable Wire Stents In Experimental and Clinical Use, Ann Radiol, vol. 31, No 2, pp. 100-103, 1987.

J. Rosch et al., Gianturco Expandable Stents In the Treatment of Superior Vena Cava Syndrome Recurring After Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp 1243-1246, 1987.

I.E. Gordon, Structures or Why Things Don't Fall Down, Penguin Books, pp. 45-59, 132-148, 210-244,377-383.

Maass et al., Radiological Follow-up of Transluminally Inserted Vascular Endoprostheses: An Experimental Study Using Expanding Spirals, Radiology, vol 152, pp. 659-663, 1984.

Argument submitted re EP 861 15473 dated Jan 20, 1995 (AVE 2478).

Verified Statement of Facts by Julio C. Palmaz dated Aug. 4, 1989. (PX 3662)

Papanicolaou et al., Insertion of a Biliary Endoprosthesis Using A Balloon Dilatation Catheter, Gastrointest Radiology, vol. 10, pp. 394-396, 1985.

Palmaz et al., Atherosclerotic Rabbit Aortas; Expandable Intraluminal Grafting, Radiology, vol. 168, pp. 723-726, 1986.

Palmaz, The Current Status of Vascular Prostheses; Rosch et al., Gianturco, Expandable Stents in Experimental and Clinical Use, SCIVR, pp. 1. 18-124, 1987.

Rosch et al., Abstract: Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CIRSE, Porto Cervo, Sardinia, May 25-29, 1987.

Rosch et al., Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

Mirich et al., Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study, Radiology, vol. 170, pp. 1033-1037, 1989.

Dotter, Transluminally-placed Coilspring Endarterial Tube Grafts, Investigative Radiology, vol. 4, Sep.-Oct., pp 329-332, 1969.

Palmaz et al., Abstract: Expandable Intraluminal Graft: A Preliminary Study, Radiology, vol. 153 (P), Nov. 1983: 70th Scientific Assembly and Annual Meeting.

Cragg et al, Nonsurgical Placement of Arterial Endoprostheses: A New Technique Using Nitinol Wire, Radiology, vol 147, pp. 261-263, Apr. 1983.

J. Rosch et al ., Gianturco Expandable Stents in Experimental and Clinical Use, Program: "Twelfth Annual Course on Diagnostic Angiography and Interventional Radiology" (Society of Cardiovascular and Interventional Radiology, Pittsburgh, PA), Mar 23-26, 1987 (the second Monofilament Article).

Uchida et al., Modifications of Gianturco Expandable Wire Stents, AIR, vol. 150, pp. 1185-1187, 1988.

Palmaz, Balloon-Expandable Intravascular Stent, AJR, vol 1510, pp. 1263-1269.

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCMED Life Systems, Inc., Plaintiffs Complaint, Oct. 23, 1997 (Case No. 97-550-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Plaintiffs First Amended Complaint for Declaratory Relief of Patent Validity, Unenforceability, Noninfingement, and for Antitrust Violations, Jan. 27, 1998 (Civil Action No. 97-700).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Expandable-Graft Partnership's Answer, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc. and Guidant Corporation, Cordis Corporation's Motion for a Preliminary Injunction, Oct. 8, 1997 (Civil Action No. 97-550).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIJVIED, Inc., Cordis 's Motion for Preliminary Injunction Against Arterial Vascular Engineering, Inc., Dec. 29, 1997 (Case No. 97-550-SLR).

Deposition of R. Schatz, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc, taken on Jan. 8, 1998 (Civil Action No. 97-550 SLR).

Deposition of Lee P. Bendel in Cordis Corporation v. Advanced Cardiovascular Systems, Inc, taken on Jan. 22, 1998 (Civil Action No. 97-550 SLR).

Deposition of Julio Cesar Palmaz in Cordis Corporation v. Advanced Cardiovascular Systems, Inc, taken on Dec. 29, 1997 (Civil Action No. 97-550 SLR).

Deposition of Richard A. Bowman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 9, 1998 (Civil Action No. 97-550 SLR).

Deposition of Gary Schneiderman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 16, 1998 (Civil Action No. 97-550 SLR).

Deposition of David Pearle, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc, taken on Jul. 10, 1998 (Civil Action No. 97-550 SLR).

Preliminary Injuction hearing testimony taken on Feb. 9-13, 1998 (Civil Action No. 97-550 SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., et al., (Civil Action No. 97-550 SLR) and Cordis Corporation v. Advanced Cardiovascular Systems, Inc. Et al. (Civil Action No. 98-65-SLR), Opening Post Hearing Brief of Plaintiff Cordis Corporation in Support of Motion for Preliminary Injuction, Mar. 6, 1998 (Portions relevant to patent claim construction and patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Post-Hearing Reply Brief of Plaintiff Cordis Corporation in Support of Its Motion for Preliminary Injuction, Apr. 10, 1998 (Case No. 97-550 SLR) (Portions relevant to patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Plaintiffs Motion for a Preliminary Injuction Against Boston Scientific Corporation and SCLMED Life Systems, Inc. And Memorandum in Support, Apr. 13, 1998 (Case No. 97-550-SLR)

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Judge Robinson's Order Denying Plaintiffs Motion for a Preliminary Injunction, Jul. 17, 1998 (Civil Action No. 97-550 SLR)

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., et al., Defendant Boston Scientific Corporation and SCTMED Life Systems, Inc.'s Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,102,417, Aug. 27, 1998 (Civil Action No. 97-550-SLR).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Plaintiffs' Statement of Claim, Mar. 13, 1997 (UK Action No 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Defendant's Amended Defense and Counterclaim, Aug. 14, 1997 (UK Action No. 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Petition for Revocation, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Particulars of Objections, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al., v. Julio C. Palmaz, Boston's Skeleton Argument (UK Action Nos. 1493, 1495, 1496, and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Skeleton Argument of Palmaz/EGP, Mar. 19, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, EGP's Final Submissions, Apr. 2, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Judgment, Jun 26, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Rosch, Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CJJR SE 1987 Presentation: see Witness Statement of Josef Rosch from U.K. Proceeding.

Statement of Claim By Boston Scientific et al. against Expandable Grafts Partnership et al., in EPG et al., v. Boston Scientific et al. in Netherlands (Mar. 13, 1997).

Motion for Joinder of Actions, Change of Claim and Statement of Claim filed by Expandable Grafts Partnership et al. in EPG et al. v. Boston Scientific et al. in Netherlands (Apr. 22, 1997)

Opinion of K.J. Merman filed in EPG et al v. Boston Scientific et al. in Netherlands (Aug. 29, 1997).

Expert report of Dr. Nigel Buller in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Expert report of Lee P. Bendel in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Memorandum of Oral Pleading in EPG et al. v. Boston Scientific et al. in Netherlands (Sep. 12, 1997).

Plea Notes of P. A.M. in EPG et al. v. Boston Scientific et al. in Netherlands (Mar. 10, 1998).

Decision of Court of Appeals in EPG et al. v. Boston Scientific et al. in Netherlands (Apr. 23, 1998).

Translation of Nullity Action Against EPO 0 364 787 by Biotronik in Germany.

Translation of Nullity Action Against EPO 0 335 341 by Biotronik in Germany.

Translation of EPG Response to Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of EPG Response to Nullity Action EP 0 335 341 by Biotronik in Germany.

Nullity Suit Against EP-B1-0 335 341 Brought by Boston Scientific in Germany.

Translation of Opposition filed by Terumo Corp. Against Japan Patent No. 2680901.

Translation of Decision on Opposition Against Japan Patent No. 2680901.

Memorandum Order of the Court dated Sep. 7, 2000, concerning disputed claim constuction.

Translation of Judgment in Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translaion of Judgment in Nullity Action Against EP 0 335 341 by Biotronik in Germany.

Trial transcript from Mar. 17, 2005 at 171-172, 191-192.

Trial transcript from Mar. 18, 2005 at 282-285, 325-327, 349-351.

Trial transcript from Mar. 21, 2005 at 721-726.

Trial transcript from Mar. 24, 2005 at 1387.

Trial transcript from Jul. 26, 2005.

BSC's Opening Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated Mar. 16, 2001.

Cordis' Answering Brief in Opposition to BSC's Motion for JMOL or a New Trial on the Palmaz '762 Patent and the Schatz '332 Patents, dated Apr. 17, 2001.

BSC's Reply Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated May 11, 2001.

J. Rosch et al., Abstract, Expandable Gianturco-Type Wire Stents in Experimental Intrahepatic Portacaval Shunts, Program: "72nd Scientific Assembly and Annual Meeting of the Radiological Society of North America", Nov. 30-Dec. 5, 1986, Radiology, vol. 161, pp. 40-41, 1986.

Cordis Corporation v. Boston Scientific, Order Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Judgment in a Civil Case Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Order Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Order Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation. Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc., Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc., Apr. 8, 1998 (Case No. 97-550-SLR).

Boston Scientific Limited et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al. v. Julio C. Palmaz, Boston's Closing Submissions (UK Action Nos. 1493, 1495, 1496 and 1497).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc., Defendants' Answer, Nov. 12, 1997 (Case No. 97-550-SLR).

Statement of Rejoinder in the Action on the Merits, Also Including an Amendment of Defendant's Final Position in the Principal Action, as Well as the Provisional Statement of Rejoinder in the Action on the Counterclaim in EPG et al. v. Boston Scientific et al. in Netherlands (Feb. 10, 1998).

Statement of Answer in the Ancillary Appeal in EPG et al. v. Boston Scientific et al. in Netherlands (Mar. 10, 1998).

Appeal filed by Expandable Grafts Partnership et al. in EPG et al. v. Boston Scientific et al. in Netherlands (Nov. 12, 1997).

Title filed by Boston Scientific et al. in EPG et al. v. Boston Scientific et al. in Netherlands (Jan. 22, 1998).

Deposition of Richard Schatz, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc. taken on Jul. 14, 1998 (Civil Action No. 97-550-SLR).

Jury Verdict form from the Cordis Corporation et al v. Boston Scientific Corporation, et al liability trial, undated.

Trial testimony transcripts from the Cordis Corporation et al. v. Boston Scientific Corporation et al. liability trial dated Nov. 21, Nov. 27-Dec. 1, Dec. 4-8 and Dec. 11, 2000.

Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Opening Expert Report of Stephen R. Hanson, Ph.D. (Civil Action No. 03-283-SLR).

Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Opening Expert Report of Robson F. Storey, Ph.D. (Civil Action No. 03-283-SLR).

Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Rebuttal Expert Report of Kinam Park, Ph.D. (Civil Action No. 03-283-SLR).

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) and Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc. (C.A. No. 03-283-SLR), Combined Post-Hearing Brief In Support Of Cordis Corporation's Motion For Preliminary Injunction in C.A. No. 03-027-SLR, And In Opposition to Plaintiffs' Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc. (C.A. No. 03-283-SLR), Boston Scientific's Opening Post-Hearing Brief.

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc. (C.A. No. 03-283-SLR), Combined Post-Hearing Answering Brief In Support of Cordis Corporation's Motion For Preliminary Injunction In C.A. No. 03-027-SLR, And In Opposition To Plaintiffs Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

Wu et al., Silicone-covered self-expanding metallic stents for the palliation of malignant esophageal obstruction and esophagorespiratory fistulas: experience in 32 patients and a review of the literature, Gastrointestinal Endoscopy, 1994, pp. 22-33, vol. 40, No. 1, Portland Oregon.

Binmoeller, et al., Silicone-Covered Expandable Metallic Stents in the Esophagus: An Experimental Study, Endoscopy, 1992, pp. 416-420, vol. 24, Georg Thieme Verlag Stuttgart New York.

Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Plaintiff's Reply Brief in Support of Their Motion for Preliminary Injunction.

Rhine, Polymers for Sustained Macromolecule Release: Procedures to Fabricate Reproducible Delivery Systems and Control Release Kinetics, Journal of Pharmaceutical Sciences, 1980, pp. 265-270, vol. 69, No. 3.

Langer et al., Controlled Release of Macromolecules from Polymers, Biomedical Polymers Polymeric Materials and Pharmaceuticals for Biomedical Use, 1980, pp. 112-137, Academic Press, Inc., New York, NY.

Langer et al., Applications of Polymeric Delivery Systems for Macromolecules and Factors Controlling Release Kinetics.

Rhine et al., A Method to Achieve Zero-Order Release Kinetics From Polymer Matric Drug Delivery Systems, pp. 67-72.

Langer et al., Polymers for the Sustained Release of Macromolecules: Controlled and Magnetically Modulated Systems, Better Therapy With Existing Drugs: New Uses and Delivery Systems; 1981, pp. 179-216, Merck Sharp & Dohme International, Rahway, NJ.

Hsieh, et al., Zero-Order Controlled-Release Polymer Matrices for Micro-and-Macromolecules, Journal of Pharmaceutical Sciences, 1983 pp. 17-22, vol. 72, No. 1.

Brown et al., In Vivo and In Vitro Release of Macromolecules from Polymeric Drug Delivery Systems, Journal of Pharmaceutical Sciences, 1983, pp. 1181-1185, vol. 72, No. 10.

Langer, Implantable Controlled Release Systems, Pharmac. Ther., 1983, pp. 35-51, vol. 21, printed in Great Britain.

Kost et al., Controlled Release of Bioactive Agents, Trends in Biotechnology, 1984, pp. 47-51, vol. 2, No. 2, Elsevier BV Amsterdam.

Bawa et al., An Explanation for the Controlled Release of Macromolecules from Polymers, Journal of Controlled Release, 1985, pp. 259-267, vol. 1 Elsevier Science BV Amersterdam.

Leong et al., Polymeric controlled drug delivery, 1987, pp. 199-233, vol. 1/3, Elsevier Science Publishers BV Amsterdam.

Langer, Polymeric Delivery Systems, *Targeting of Drugs 2 Optimization Strategies*, 1989, pp. 165-174, Plenum Press, New York and London.

Langer, Biomaterials in Controlled Drug Delivery; New Perspectives from Biotechnological Advances; *Pharmaceutical Technology*, 1989, pp. 18, 23-24, 26, 28, 30.

Langer, Controlled Release Systems, pp. 115-124.

Laurencin et al., Polymeric Controlled Release Systems: New Methods for Drug Delivery, *Clinics in Laboratory Medicine*, 1987, pp. 301-323, vol. 7, No. 2, WB Saunders Company, Philadelphia.

Langer, Biopolymers in Controlled Release Systems, *Polymeric Biomaterials*, pp. 161-169.

Tsong-Pin Hsu et al., Polymers for the Controlled Release of Macromolecules: Effect of Molecular Weight of Ethylene-vinyl Acetate Copolymer, *Journal of Biomedical Materials Research*, 1985, pp. 445-460, vol. 19.

Langer, Polymers and Drug Delivery Systems, *Long-Acting Contraceptive Delivery Systems*, 1983, pp. 23-32, Harper & Row, Philadelphia, PA.

Langer, New Drug Delivery Systems: What the Clinician Can Expect, *Drug Therapy*, 1983, pp. 217-231.

Langer, et al., Chemical and Physical Structure of Polymers as Carriers for Controlled Release of Bioactive Agents: A Review, *Rev. Macromol. Chem. Phys.*, 1983, pp. 61-126.

Langer, Polymeric Delivery Systems for Controlled Drug Release, *Chem. Eng. Commun.* 1980, pp. 1-48-vol. 6, Gordon and Breach Science Publishers, Inc. USA.

Langer, et al., Biocompatibility of Polymeric Delivery Systems for Macromolecules, *Journal of Biomedical Materials Research*, 1981, pp. 267-277, vol. 15.

Langer, Controlled Release: A New Approach to Drug Delivery, *Technology Review*, 1981, pp. 26-34.

Langer, et al., Sustained Release of Macromolecules from Polymers, *Polymeric Delivery Systems*, pp. 175-176, Gordon and Breach Science Publishers, New York.

Langer, Polymers for the Sustained Release of Proteins and other Macromolecules, *Nature*, 1976, pp. 797, 263, 799-800, vol. 263, No. 5580.

Baker, et al., Controlled Release: Mechanisms and Rates (1974).

Hanson, et al., In Vivo Evaluation of Artificial Surfaces with a Nonhum Primate Model of Arterial Thrombosis/ *Lab Clin Med.*, Feb. 1980, pp. 289-304.

Baker, Controlled Release of Biologically Active Agents (1987) pp. 1-275.

*Cordis Corporation* v. *Boston Scientific Corporation* (CA. No. 03-27-SLR) and *Boston Scientific Scimed, Inc.*, v. *Cordis Corporation and Johnson & Johnson, Incorporated* (CA. No. 03-283-SLR) Hearing Transcripts for Jul. 21, 2003, Jul. 22, 2003, Jul. 23, 2003.

*Cordis Corporation* v *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. No. 03-283-SLR), Boston Scientific's Post-Hearing Reply Brief and Exhibits Thereto, Sep. 12, 2003.

*Cordis Corporation* v *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. 03-283-SLR), Memorandum Order, Nov. 21, 2003.

*Cordis Corporation* v *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. No. 03-283-SLR), Deposition Transcript of Julio C. Palmaz.

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable Grafts Partnership*, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Plea Notes in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Sep. 12, 1997).

Provisional Judgment *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Oct. 29, 1997).

Trial testimony transcripts from the *Cordis Corporation et al.* v. *Medtronic Inc.*, *et al.* liability trial dated Nov. 6-9, 13-17 and 20-21, 2000.

Jury verdict form from the *Cordis Corporation et al.* v. *Medtronic AVE, Inc. et al.* liability trial.

Hearing testimony transript from the consolidated *Cordis Corporation et al.* v. *Medtronic AVE, Inc. et al.* and *Boston Scientific Corporation et al.* inequitable conduct hearing dated Feb. 7-9 and 12, 2001.

*Cordis Corporation* v. *Metronic Ave., Inc.*, *et al*, OPINION, 97-550-SLR, dated Mar. 28, 2002.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic AVE, Inc.* v. *Cordis Corporation et al.* (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc. etal* (CA. No. 98-19-SLR), Expert Report of John T. Goolkasian, Esq.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic A VE, Inc.* v. *Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc. et al* (CA. No. 98-19-SLR), Expert Report of John F. Witherspoon.

# *FIG. 1*



# *FIG. 1a*



# *FIG. 2a*



# *FIG. 2b*



## FIG. 3a



## FIG. 3b



## FIG. 4



US 7,229,473 B2

1

**LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of Ser. No. 10/951,385, filed Sep. 28, 2004, now pending, which is a continuation of Ser. No. 10/408,328, filed Apr. 7, 2003, now issued as U.S. Pat. No. 6,808,536, which is a continuation of application Ser. No. 09/874,117, filed Jun. 4, 2001, now issued as U.S. Pat. No. 6,585,764, which is a continuation of application Ser. No. 09/061,568, filed Apr. 16, 1998, now issued as U.S. Pat. No. 6,273,913, which in turn claims benefit of provisional application Ser. No. 60/044,692, filed Apr. 18, 1997. The disclosures of these prior applications are incorporated herein by reference in their entirety.

FIELD OF THE INVENTION

Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

BACKGROUND OF THE INVENTION

Re-narrowing (restenosis) of an artherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 10–50% of patients undergoing this procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the artherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages, leukocytes, or the smooth muscle cells (SMC) themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3–6 months results in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood flow.

Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both in vitro and in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known but may be due to any or all of the following: 1) reduced expression of the growth regulatory protooncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator; are 3) binding and desequestration of growth regulatory factors such as fibroveblast growth factor (FGF).

Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon vascular injury are angiopeptin (a somatostatin analog),

2

calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal), colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides.

Additionally, a goat antibody to the SMC mitogen platelet derived growth factor (PDGF) has been shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000–600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transluminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG). PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000–300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified.

In the normal arterial will, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref). SMC in vessel wall exists in a contractile phenotype characterized by 80–90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state.

Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), etc. released from platelets (i.e., PDGF) adhering to the

3

damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC. These cells undergo a phenotypic change from the contractile phenotype to a synthetic phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1–2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., In: Vascular Smooth Muscle Cells in Culture, Campbell, J. H. and Campbell, G. R, Eds, CRC Press, Boca. Ratioh, 1987, pp. 39–55); Clowes, A. W. and Schwartz, S. M., Circ. Res. 56:139–145, 1985).

Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7–14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3–6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374–1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30–50% of patients undergoing PTCA will experience reocclusion, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

## SUMMARY OF THE INVENTION

Novel Features and Applications to Stent Technology Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include reservoirs is a new approach which offers several important advantages over existing technologies.

Local Drug Delivery from a Stent to Inhibit Restenosis

In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere strongly to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatable material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

One advantage of this system is that the properties of the coating can be optimized for achieving superior biocompatibility and adhesion properties, without the addition require-

4

ment of being able to load and release the drug. The size, shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be better understood in connection with the following figures in which

FIGS. 1 and 1A are top views and section views of a stent containing reservoirs as described in the present invention;

FIGS. 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

FIGS. 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

FIG. 4 is a layout view of a device containing a reservoir as in FIG. 3.

## DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty. The calcium antagonists have also been unsuccessful in preventing restenosis, although they are still under study. Other agents currently under study include thromboxane inhibitors, prostacyclin mimetics, platelet membrane receptor blockers, thrombin inhibitors and angiotensin converting enzyme inhibitors. These agents must be given systemically, however, and attainment of a therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (Lang et al., 42 Ann. Rev. Med., 127–132 (1991); Popma et al., 84 Circulation, 1426–1436 (1991)).

Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis (Franklin, S. M. and Faxon, D. P., 4 Coronary Artery Disease, 2-32-242 (1993); Serruys, P. W. et al., 88 Circulation, (part 1) 1588–1601, (1993).

Conversely, stents have proven useful in preventing reducing the proliferation of restenosis. Stents, such as the stent 10 seen in layout in FIG. 4, balloon-expandable slotted metal tubes (usually but not limited to stainless steel), which when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall. This support is helpful in maintaining an open path for blood flow. In two randomized clinical trials, stents were shown to increase angiographic success after PTCA, increase the stenosed blood vessel lumen and to reduce the lesion recurrence at 6 months (Serruys et al., 331 New Eng. Jour. Med, 495, (1994); Fischman et al., 331 New Eng. Jour. Med, 496–501 (1994). Additionally, in a preliminary trial, heparin coated stents appear to possess the same benefit of reduction in stenosis diameter at follow-up as was observed with non-heparin coated stents. Additionally, heparin coating appears to have the added benefit of producing a reduction in sub-acute thrombosis after stent implantation (Serruys et

| 5 | 6 |

al., 93 Circulation, 412–422, (1996). Thus, 1) sustained mechanical expansion of a stenosed coronary artery has been shown to provide some measure of restenosis prevention, and 2) coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs to local, injured tissue off the surface of the stent.

Numerous agents are being actively studied as antiproliferative agents for use in restenosis and have shown some activity in experimental animal models. These include: heparin and heparin fragments (Clowes and Karnovsky, 265 Nature, 25–626, (1977); Guyton, J. R. et al. 46 Circ. Res., 625–634, (1980); Clowes, A. W and Clowes, M. M., 52 Lab. Invest., 611–616, (1985); Clowes, A. W and Clowes, M. M., 58 Circ. Res., 839–845 (1986); Majesky et al., 61 Circ Res., 296–300, (1987); Snow et al., 137 Am. J. Pathol., 313–330 (1990); Okada, T. et al., 25 Neurosurgery, 92–898, (1989) colchicine (Currier, J. W. et al., 80 Circulation, 11–66, (1989), taxol (ref), agiotensin converting enzyme (ACE) inhibitors (Powell, J. S. et al., 245 Science, 186–188 (1989), angiopeptin (Lundergan, C. F. et al., 17 Am. J. Cardiol. (Suppi. B); 132B–136B (1991), Cyclosporin A (Jonasson, L. et. al., 85 Proc. Nati, Acad. Sci., 2303 (1988), goat-anti-rabbit PDGF antibody (Ferns, G. A. A., et al., 253 Science, 1129–1132 (1991), terbinafine (Nemecek, G. M. et al., 248 J. Pharmacol. Exp. Thera., 1167–11747 (1989), trapidil (Liu, M. W. et al., 81 Circulation, 1089-1093 (1990), interferon-gamma (Hansson, G. K. and Holm, 84 J. Circulation, 1266–1272 (1991), steroids (Colburn, M. D. et al., 15 J. Vasc. Surg., 510–518 (1992), see also Berk, B. C. et al., 17 J. Am. Coll. Cardiol., 111B–117B (1991), ionizing radiation (ref), fusion toxins (ref) antisense oligonucleotides (ref), gene vectors (ref), and rapamycin (see below).

Of particular interest in rapamycin. Rapamycin is a macrolide antibiotic which blocks IL-2-mediated T-cell proliferation and possesses antiinflammatory activity. While the precise mechanism of rapamycin is still under active investigation, rapamycin has been shown to prevent the $G_1$ sub. 1 to 5 phase progression of T-cells through the cell cycle by inhibiting specific cell cyclins and cyclin-dependent protein kinases (Siekierka, Immunol. Res. 13: 110–116, 1994). The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. (Circ Res 76:412–417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC in vitro while Poon et al. have shown the rat, porcine, and human SMC migration can also be inhibited by rapamycin (J Clin Invest 98: 2277–2283, 1996). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55:1409–1418, 1993; Gallo et al., in press, (1997)). These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the dequale of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the restenosis process, an agent which prevents inflammation and the proliferation of

SMC combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

Experiments

Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression.

Delivery Methods: These can vary:
Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath.
Involving comixture with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.
or entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels, as will be explained further herein
or including covalent binding of the drug to the stent via solution chemistry techniques (such as via the Carmeda process) or dry chemistry techniques (e.g. vapour deposition methods such as rf-plasma polymerization) and combinations thereof.
Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural uptake.
Extravascular delivery by the pericardial route.
Extravascular delivery by the advential application of sustained release formulations.

Uses:
for inhibition of cell proliferation to prevent neointimal proliferation and restenosis.
prevention of tumor expansion from stents.
prevent ingrowth of tissue into catheters and shunts inducing their failure.

1. Experimental Stent Delivery Method—Delivery from Polymer Matrix:

Solution of Rapamycin, prepared in a solvent miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001 weight % to 30 weight % of drug. Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters, e.g., polylactide, polycaprolactonglycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocompatible polymers are also suitable candidates. Polymers such as polydimethylsiolxane; poly(ethylene-vingylacetate); acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.

Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the solvent allowed to evaporate to leave a film with entrapped rapamycin.

2. Experimental Stent Delivery Method—Delivery from Microporous Depots in Stent Through a Polymer Membrane Coating:

Stent, whose body has been modified to contain micropores or channels is dipped into a solution of Rapamycin, range 0.001 wt % to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. (The dipping solution can also be compressed to improve the loading efficiency.) After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A solution of polymer, chosen from any

US 7,229,473 B2

7

identified in the first experimental method, is applied to the stent as detailed above. This outer layer of polymer will act as diffusion-controller for release of drug.

3. Experimental Stent Delivery Method—Delivery via Lysis of a Covalent Drug Tether:

Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides may be suitable for this.

4. Experimental Method—Pericardial Delivery:

A: Polymeric Sheet

Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolid-e) or non-degradable polymer, e.g., poly-dimethylsiloxane, and mixture cast as a thin sheet, thickness range 10 mu. to 1000 mu. The resulting sheet can be wrapped perivascularly on the target vessel. Preference would be for the absorbable polymer.

B: Conformal Coating:

Rapamycin is combined with a polymer that has a melting temperature just above 37°, range 40°–45° C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies conformally to the vessel wall. Both non-degradable and absorbable biocompatible polymers are suitable.

As seen in the figures it is also possible to modify currently manufactured stents in order to adequately provide the drug dosages such as rapamycin As seen in FIGS. 1a, 2a and 3a, any stent strut 10, 20, 30 can be modified to have a certain reservoir or channel 11, 21, 31. Each of these reservoirs can be open or closed as desired. These reservoirs can hold the drug to be delivered. FIG. 4 shows a stent 40 with a reservoir 45 created at the apex of a flexible strut. Of course, this reservoir 45 is intended to be useful to deliver rapamycin or any other drug at a specific point of flexibility of the stent. Accordingly, this concept can be useful for "second generation" type stents.

In any of the foregoing devices, however, it is useful to have the drug dosage applied with enough specificity and

8

enough concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the stent struts must be kept at a size of about 0.0005" to about 0.003". Then, it should be possible to adequately apply the drug dosage at the desired location and in the desired amount.

These and other concepts will are disclosed herein. It would be apparent to the reader that modifications are possible to the stent or the drug dosage applied. In any event, however, the any obvious modifications should be perceived to fall within the scope of the invention which is to be realized from the attached claims and their equivalents.

What is claimed:

1. A metallic stent having a coating applied thereto, wherein:

said coating comprises a mixture of a biocompatible polymeric carrier and a therapeutic agent;

said polymeric carrier comprises at least one nonabsorbable polymer;

said therapeutic agent is rapamycin, or a macrocyclic lactone analog thereof, present in an amount effective to inhibit neointimal proliferation; and

said stent provides a controlled release of said therapeutic agent over a period of several weeks.

2. The metallic stent according to claim 1 wherein said therapeutic agent is a macrocyclic lactone analog of rapamycin.

3. The metallic stent according to claim 1 wherein said biocompatible polymeric carrier comprises a fluorinated polymer.

4. The metallic according to claim 3 wherein said biocompatible polymeric carrier further comprises an acrylate-based polymer or copolymer.

5. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting a metallic stent according to any one of claims 1 to 4 in the lumen of said coronary artery.

*    *    *    *    *

# EXHIBIT D

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/829,074 | 11/27/2007 | 7300662 | CRDS-0062 | 5950 |

45511          7590          11/07/2007
WOODCOCK WASHBURN LLP
CIRA CENTRE, 12TH FLOOR
2929 ARCH STREET
PHILADELPHIA, PA 19104-2891

## ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 503 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Robert Falotico, Belle Mead, NJ;
Gregory A. Kopia, Hillsborough, NJ;
Gerard H. Llanos, Stewartsville, NJ;

# United States Patent No. 7,300,662

# EXHIBIT E



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/829,074 | 04/21/2004 | Robert Falotico | CRD0931CIP | 5950 |

| 45511        7590        02/22/2007 |
|---|
| WOODCOCK WASHBURN LLP |
| CIRA CENTRE, 12TH FLOOR |
| 2929 ARCH STREET |
| PHILADELPHIA, PA 19104-2891 |

| EXAMINER |
|---|
| KENNEDY, SHARON E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1615 | |

| SHORTENED STATUTORY PERIOD OF RESPONSE | MAIL DATE | DELIVERY MODE |
|---|---|---|
| 3 MONTHS | 02/22/2007 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

If NO period for reply is specified above, the maximum statutory period will apply and will expire 6 MONTHS from the mailing date of this communication.

PTOL-90A (Rev. 10/06)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/829,074 | FALOTICO ET AL. |
| | Examiner | Art Unit |
| | Sharon E. Kennedy | 1615 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>08 January 2007</u>.
2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) <u>15-36</u> is/are pending in the application.
   4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) <u>15-36</u> is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All  b) ☐ Some * c) ☐ None of:
     1. ☐ Certified copies of the priority documents have been received.
     2. ☐ Certified copies of the priority documents have been received in Application No. _____.
     3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
   * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail. Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

Application/Control Number: 10/829,074

Art Unit: 1615

# DETAILED ACTION

## *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.  A nonstatutory obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

Claims 15-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 3-5, 7, 8, 13, 14, 16, 18, 19 of copending Application No. 10/431,059 with reference to view of Boston Scientific, "Measuring DES Efficacy," www.taxus-stent.com/usa/efficacy.html, pages 1-3, copyright 2006, hereinafter "Boston Scientific·2006". The claims of the '059 application recite a method of preventing lesion restenosis by using an implantable medical device having the compound rapamycin and the medical device. Applicant's claims are directed to a method of inhibiting neointimal proliferation resulting from transluminal coronary angioplasty comprising, e.g., using a stent having FKBP12,

rapamycin, etc, and the device. Applicant's claims further recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded much patentable weight since it is not an accurate measure of efficacy, and in view that the prior applied for claim already recites the rapamycin antiproliferative, the claims are provisionally rejected.

Applicant should take note that in this rejection, and in the following rejections, the Boston Scientific reference has a publication date of probably 2006, after the filing date of this application. However, this reference is being used to discuss the inherent scientific aspects of claiming an in stent late loss, and is not being used as prior art. It is being used as evidence to show that a characteristic not disclosed in the reference in inherent.

This is a _provisional_ obviousness-type double patenting rejection.

Claims 15-22, 31-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claim 10 of copending Application No. 10/742,346 with reference to view of Boston Scientific-2006. The '346 application claim 10 recites an implantable medical device comprising the antiproliferative rapamycin. Applicant's claims are directed to a stent comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded much patentable weight since it is not an accurate measure of efficacy, and in view that the prior applied

Application/Control Number: 10/829,074
Art Unit: 1615

for claim already recites the rapamycin antiproliferative, the claims are provisionally

rejected.

This is a <u>provisional</u> obviousness-type double patenting rejection.

Claims 15-36 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 1-9 of copending

Application No. 10/761,032 with reference to view of Boston Scientific-2006. The claims

of the '032 application recite an implantable medical device and method comprising the

rapamycin. Applicant's claims are directed to a stent comprising, e.g., rapamycin and

recite a specific in-stent late loss. Boston Scientific explains that this terminology

indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in

view that the in stent late loss limitation is not accorded much patentable weight since it

is not an accurate measure of efficacy, and in view that the prior applied for claims

already recite the rapamycin antiproliferative, the claims are provisionally rejected.

This is a <u>provisional</u> obviousness-type double patenting rejection.

Claims 15-36 are provisionally rejected on the ground of nonstatutory

obviousness-type double patenting as being unpatentable over claims 1-23 of

copending Application No. 10/796,397 with reference to view of Boston Scientific-2006.

The claims of the '397 application recite an implantable medical device and method of

use comprising rapamycin. Applicant's claims are directed to a stent and method of use

comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston Scientific

explains that this terminology indicates, roughly at best, the efficacy of the drug in the

medical device. Accordingly, in view that the in stent late loss limitation is not accorded

much patentable weight since it is not an accurate measure of efficacy, and in view that

the prior applied for claim already recites rapamycin, the claims are provisionally

rejected.

This is a provisional obviousness-type double patenting rejection.

Claims 15-36 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-12 of U.S. Patent No. 6,776,796

in view of Boston Scientific-2006. The claims of the '796 patent are directed to a stent

and method including the therapeutic agent rapamycin. Applicant's claims 13-22 are

directed to a stent comprising, e.g., rapamycin and recite a specific in-stent late loss.

Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of

the drug in the medical device. Accordingly, in view that the in stent late loss limitation

is not accorded much patentable weight since it is not an accurate measure of efficacy,

and in view that the prior patent claims already recite rapamycin, the claims are

rejected.

Claims 15-22, 31-36 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 6,808,536 in

view of Boston Scientific-2006. The claims of the '536 patent are directed to a stent

including the therapeutic agent rapamycin. Applicant's claims 13-22 are directed to a

stent comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston

Scientific explains that this terminology indicates, roughly at best, the efficacy of the

drug in the medical device. Accordingly, in view that the in stent late loss limitation is

not accorded much patentable weight since it is not an accurate measure of efficacy,

Application/Control Number: 10/829,074

Art Unit: 1615

and in view that the prior patent claims already recite rapamycin, the claims are

rejected.

## Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 15-30 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention. The claims require a specific in-stent late loss

efficacy, as claimed in the independent claims. Boston Scientific-2006, is cited to show

the inherent indefiniteness of this limitation. In-stent late loss, as shown in the article,

does not provide any useful information as to the efficacy of a stent delivery device.

See especially the second diagram in the reference, describing "CASE A" and "CASE

B". As shown, in-stent late loss has little meaning when describing the functionality of a

device as compared to in-segment late loss. Applicant may argue that this is irrelevant,

since the in-stent loss can be measured and quantified regardless of its usefulness as a

data point. However, the examiner takes the position that this characteristic places a

potential infringer in an untenable position since the data holds no real value. Although

applicant claims a specific numerical range, less than about 0.5 mm, the metes and

bounds of this range are indefinite because the standard for measuring the data is

unclear. See MPEP 2173.05(c), reproduced below for applicant's convenience.

### 2173.05(c)    Numerical Ranges and Amounts Limitations

Generally, the recitation of specific numerical ranges in a claim does not raise an issue of whether a claim is definite.

#### I. NARROW AND BROADER RANGES IN THE SAME CLAIM

Use of a narrow numerical range that falls within a broader range in the same claim may render the claim indefinite when the boundaries of the claim are not discernible. Description of examples and preferences is properly set forth in the specification rather than in a single claim. A narrower range or preferred embodiment may also be set forth in another independent claim or in a dependent claim. If stated in a single claim, examples and preferences lead to confusion over the intended scope of the claim. In those instances where it is not clear whether the claimed narrower range is a limitation, a rejection under 35 U.S.C. 112, second paragraph should be made. The Examiner should analyze whether the metes and bounds of the claim are clearly set forth. Examples of claim language which have been held to be indefinite are (A) "a temperature of between 45 and 78 degrees Celsius, preferably between 50 and 60 degrees Celsius"; and (B) "a predetermined quantity, for example, the maximum capacity."

While a single claim that includes both a broad and a narrower range may be indefinite, it is not improper under 35 U.S.C. 112, second paragraph, to present a dependent claim that sets forth a narrower range for an element than the range set forth in the claim from which it depends. For example, if claim 1 reads "A circuit ... wherein the resistance is 70-150 ohms." and claim 2 reads "The circuit of claim 1 wherein the resistance is 70-100 ohms.", then claim 2 should not be rejected as indefinite.

The claims are also indefinite in view of the language "rapamycin or a macrocyclic triene analog thereof". Applicant published specification paragraph [0040] states that "rapamycin used in this context includes rapamycin and all analogs, derivatives and congeners." There is also a broadening phrase set in the last line of applicant's published paragraph [0047]. It is unclear how these phrases affect the scope of the claims, accordingly, the claims are indefinite.

Application/Control Number: 10/829,074

Art Unit: 1615

## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 15-36 are rejected under 35 U.S.C. 103(a) as being unpatentable over Mitchell et al., US 5,288,711 in view of Kamath et al., US 6,335,029..

This application is a continuation in part of applicant's prior application, US Serial No. 09/575,480. The claims of that application are under appeal. The file history of that application is incorporated herein.

The claims of the present application differ from the '480 application by reciting an in-stent late loss and requiring that the drug be rapamycin or a macrocyclic triene analog thereof. Taxol (Paclitaxel) is not a macrocyclic triene.

Application/Control Number: 10/829,074
Art Unit: 1615

Kamath, applied in the parent application, discloses the claimed invention except Kamath applies taxol instead of rapamycin as the drug delivered. In the '480 application, the examiner relied on applicant's disclosure on page 8, lines 25-27, which places taxol, vincristine and rapamycin in a Markush type grouping, which is an admission that the compounds have equivalent functionalities in stents. The present specification does not include this Markush grouping.

The examiner does not find this to be convincing evidence that applicant does not consider these drugs to be equivalents for the proposed use. The primary reference, Mitchell '711, has a publication date of 1994, and is cited to exemplify that the use of rapamycin in stents to prevent smooth muscle cell hyperplasia after balloon angioplasty has been well known for some time. However, Mitchell does not explicitly disclose the polymeric coatings claimed, merely stating (column 4, lines 5-7) that a "vascular stent can be impregnated with ... rapamycin." The secondary reference, Kamath, exemplifies that incorporating antiproliferative drugs in polymeric coatings on stents is rudimentary. Accordingly, it would have been obvious to a person of ordinary skill in the art at the time the invention was made to have use rapamycin in any stent having a polymeric coating, such as the Kamath stent, so that the rapamycin would be delivered to the intraluminal area of interest.

Regarding applicant's limitation directed to in-stent late loss, this numerical characteristic only vaguely, at best, defines the effectiveness of the stent. In view of the deficiencies in the definiteness of this embodiment (as explained in previous rejections), the in-stent late loss is considered to be within the scope of the ordinary artisan. In-

Application/Control Number: 10/829,074

Art Unit: 1615

stent late loss findings are dependent upon the amount of drug incorporated into the stent, the release rate of the drug, the polymeric binding of the drug, the degree to which the blood vessel was initially blocked or partially blocked, the degree to which the artery was widened by the angioplasty, the health and age of the patient, and numerous other factors. All of these parameters are within the skill of the surgeon to control. Accordingly, the specifically claimed in-stent late loss is obvious to one of ordinary skill in the art.

Applicant has submitted new claims 31-36 directed to the drug dosage of rapamycin/analog. The examiner takes the position that this is merely a recitation of a "prescription-type" claim and does not set forth anything unusual or unexpected. Citing a particular range or dosage is merely akin to providing a dosage amount of any drug for a patient in the absence of a showing of criticality. It is simply up to the surgeon or doctor to determine what dosage a patient needs and how long the drug should be administered. If a patient is in need of pain medication, it is a simple matter to decide how much medicine should be provided and how long the patient should take the medicine. Every person who has ever suffered a migraine headache readily understands this concept. Similarly, it is well known that drug eluting stents are designed according to patient need. These are concepts which are merely observed and learned by a surgeon during the ordinary course of patient examination.

Specifically with regard to Mitchell '711, this concept is explained therein. As set forth in column 7, lines 26+, Mitchell states, "The dosage requirements vary with the particular compositions employed, the route of administration, the severity of the

symptoms presented and the particular subject being treated." There is nothing unusual about discovering a particular drug dosage in the absence of a showing of criticality.

### Response to Arguments

Applicant's arguments filed January 18, 2007 have been fully considered but they are not persuasive. Regarding the rejection under 35 U.S.C. 112, applicant presents several articles comparing the reliability of observations between in-stent late loss and in-segment late loss in predicting target lesion revascularization (TLR). The examiner's relied on reference and applicant's submitted references discuss different types of drug eluting stents. At a minimum, these references collectively show that these types of measurements are not universal, they must be carefully analyzed for each type of drug eluting stent, and are not a predictor of stent efficacy across the board. Accordingly, the examiner takes the position that these articles collectively affirm the examiner's rejection under 35 U.S.C. 112 in view that the outcome for predicting the TLR using in-stent LL or in-segment LL differed.

Further, the examiner takes the position that the Mauri '321 does not purport to prove the efficacy measuring in-stent versus in-segment LL. The thrust of the article is set forth in the "Conclusion" section of the Abstract. The point is to promote the use of transformation to improve the accuracy of predicting low binary restenosis rates. This has nothing to do with advocating one measuring data-collection technique over the other, but is relevant to the manner in which the data are "crunched" (log, square root, log normal, log-logistic, power), which is a statistical examination performed to provide

Application/Control Number: 10/829,074

Art Unit: 1615

useful information. A careful reading of the article will show that while in-stent LL was more effective in one single aspect, that pointed out by applicant, it was not statistically relevant in other stents.

Applicant has submitted new claims 31-36 which sets forth an amount of rapamycin/analog. These limitations, in combination with the description of late loss, yield useful information sufficient to place a potential infringer on notice. Accordingly, these claims are not rejected under 35 U.S.C. 112.


### Conclusion

Applicant did not address the obvious double patenting rejections in the previous response of January 8, 2007. Applicant must either argue the rejections or file the appropriate terminal disclaimers in response to this office action.

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. The patent to Kaplan, US 5,342,348, contains a statement similar to the Kamath patent, stating in column 2, lines 15-20 that it is well known for a drug delivery device to operate for weeks or months.


Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL.** See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

Application/Control Number: 10/829,074                    Page 13
Art Unit: 1615

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

## Contact Information

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Sharon E. Kennedy whose telephone number is 571/272-4948. The examiner can normally be reached on Monday-Thursday.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Michael Woodward, can be reached on 571/272-8373.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Sharon E. Kennedy
Primary Examiner
Art Unit 1615

# EXHIBIT F

January 20, 2006                                    **Prudential Equity Group, LLC**

Healthcare
**Medical Devices**

### *JNJ: TAKES OFF THE GLOVES IN ITS FIGHT WITH BOSTON SCIENTIFIC FOR GUIDANT*

**Johnson & Johnson**                                           JNJ | $61.48 | NYSE

*Larry Biegelsen • 212.778.5825 • lawrence_biegelsen@prusec.com*   Current: **Underweight**
*Steve Beuchaw • 212.778.1515 • steve_beuchaw@prusec.com*          Risk: **Low**
                                                                   Target: **$59.00**
                                                                   Industry: **Favorable**

**All important disclosures and Regulation AC disclosure can be found at the end of this report, starting at page 6, under the section entitled Important Disclosures and Regulation AC Disclosure, respectively.**

**Includes Option Expenses**

|         | FY    | REV         | EPS     | P/E   | 1Q     | 2Q     | 3Q     | 4Q     |
|---------|-------|-------------|---------|-------|--------|--------|--------|--------|
| Actual  | 12/04 | $47,348.0E  | $2.99E  | 20.6X | $0.80A | $0.79A | $0.75A | $0.64A |
| Current | 12/05 | $51,214.0E  | $3.37E  | 18.2X | $0.94A | $0.90A | $0.85A | $0.69E |
| Current | 12/06 | $53,758.0E  | $3.61E  | 17.0X | $1.01E | $0.95E | $0.89E | $0.76E |

**Without Option Expenses**

|         | FY    | REV         | EPS     | P/E   | 1Q     | 2Q     | 3Q     | 4Q     |
|---------|-------|-------------|---------|-------|--------|--------|--------|--------|
| Actual  | 12/04 | $47,348.0E  | $3.10A  | 19.8X | $0.83A | $0.82A | $0.78A | $0.67A |
| Current | 12/05 | $51,214.0E  | $3.49E  | 17.6X | $0.97A | $0.93A | $0.87A | $0.72E |
| Current | 12/06 | $53,758.0E  | $3.74E  | 16.4X | $1.04E | $0.98E | $0.93E | $0.79E |

| Avg. Volume: 8,700,000 | Div/Yield: 1.32/2.15% | EPS Growth: NA |
|---|---|---|
| Market Cap: $191,808 m | 52w Range: 70.00-59.80 | P/E / Growth: NM |
| Shares: 3,119.84 m | | |

## HIGHLIGHTS

- As the 1/25 deadline to make a counter-offer for GDT approaches, JNJ is communicating to the Street that BSX's $80/share offer for GDT is fraught with uncertainty which leads us to believe that JNJ is still very interested in acquiring GDT and that JNJ will likely increase its offer at least one more time.
- We believe JNJ will have to raise its offer to about $78/share from $71/share in order to gain the GDT board's approval.
- Although a JNJ offer of $78/share would be 3% below BSX's, there is precedent for a board to accept a lower offer. In 5/05, Verizon acquired MCI for $8.44B or 13% less than what Qwest offered because Verizon was seen as a more stable company.
- JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as ABT's zotarolimus and GDT's everolimus. The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.
- Our analysis indicates that an offer of $78/share for GDT would be slightly more dilutive for JNJ compared to its current $71/share offer but still accretive on a cash basis in '08. In addition, our analysis indicates that JNJ could offer $90/share for GDT before an acquisition of STJ is more attractive.

          Prudential Equity Group, LLC • One New York Plaza • 15th Floor • New York, NY 10292

January 20, 2006

Healthcare
**Medical Devices**

## DISCUSSION

As the January 25th deadline for JNJ to make a counter-offer for Guidant (GDT-$75.89; Neutral Weight Rated) approaches, JNJ is communicating to the Street that Boston Scientific's (BSX-$23.36; Neutral Weight Rated) $80/share offer for GDT is fraught with uncertainty. This leads us to believe that JNJ is still very much interested in acquiring GDT and that JNJ will likely increase its offer for GDT at least one more time. We believe JNJ will have to increase its offer to at least $78/share from its previous offer of $71/share if it hopes to gain the GDT board's approval. Although a JNJ offer of $78/share would be 3% below BSX's, there is precedent for a board and shareholders to accept a lower offer. In May 2005, Verizon acquired MCI for $8.44 billion or 13% less than what Qwest offered because VZ was seen as a more stable company. During the bidding process, Q forced VZ to raise its offer for MCI from $20.35/share to $26/share. Although the situation with VZ and Q is not a perfect analogy, we could envision a similar scenario playing out with GDT given the lower risk associated with the JNJ offer and the greater liquidity of JNJ shares compared to BSX shares once a deal is completed. Interestingly, BSX's stock price is moving closer to the lower end of the collar ($22.62). If BSX's stock price falls to $22.00, its offer for GDT would become $79/share (see Figure 1 below).

**Figure 1: Impact of Collar on BSX's Offer For GDT if BSX's Share Price Reaches $22.00**

```
BSX Current Price:                      $23.36
Collar Max:                             $28.86
Collar Min:                             $22.62

Proposed Cash Component of BSX Offer:   $42.00
Proposed Stock Component of BSX Offer:  $38.00
Proposed Total BSX Offer for GDT:       $80.00

Assumed BSX Stock Price:                $22.00
Collared Exchange Ratio:                1.68

Resulting Stock Component of BSX Offer: $36.96
Resulting Total Value of BSX Offer:     $78.96

Lost Value Per GDT Share:               -$1.04

GDT Fully Diluted Shares (mm):          335
Market Value Impact ($mm):              -$349
```
Source: Company reports, Prudential Equity Group, LLC estimates, Reuters.

JNJ's acquisition of GDT has already received regulatory clearance in the U.S. and E.U. In order to receive approval from the FTC, JNJ was forced to license out rapid exchange (RX) stent technology as well as certain JNJ patents which cover the use of rapamycin derivatives such as Novartis's (NVS: $54.98; Overweight rated by Prudential Equity Group's Senior Pharmaceutical Analyst, Tim Anderson) everolimus and Abbott Labs' (ABT-$40.60; Neutral Weight Rated) zotarolimus on a stent because the FTC wanted to ensure that ABT would be a viable competitor in the drug-eluting stent (DES) market. ABT is currently developing a DES using its proprietary drug, zotarolimus which is also used on Medtronic's (MDT-$58.99; Overweight Rated) Endeavor DES. The clinical results for Endeavor have

January 20, 2006

Healthcare
**Medical Devices**

been mixed thus far and data with ABT's DES, ZoMaxx, have not been presented yet so it's unclear how competitive ZoMaxx will be. Under the JNJ-GDT deal, ABT would be able to potentially develop a second DES using everolimus. Although ABT does not currently have the rights to use the drug everolimus on a stent from NVS, the drug's originator, it is our understanding that acquiring the rights would not be a major obstacle if ABT wanted to develop an everolimus-coated stent.

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI) business, including shared rights to GDT's promising everolimus-coated stent, Xience-V, to ABT. Although JNJ's patents have never been litigated, JNJ believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent. JNJ could pursue a preliminary injunction if ABT and BSX try to launch an everolimus-coated or zotarolimus-coated stent. The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board and the FTC pause for approving a BSX-GDT merger. According to JNJ, the key patents are the Falotico (6,776,796) and Wright (6,5857,64) patents.

Our analysis indicates that an offer of $78/share for GDT would be slightly more dilutive for JNJ on a cash and GAAP basis compared to its current $71/share offer but still accretive on a cash basis in 2008 (see merger models at the end of this note). In our model, we assume that JNJ raises the cash portion of its offer by $6/share. In addition, our analysis indicates that JNJ could offer $90/share for GDT before an acquisition of St. Jude is more attractive financially for JNJ (also shown at the end of this note).

**VALUATION AND RISKS**

Our price target of $59 is the average of our price targets for J&J with and without GDT. For JNJ alone, we apply a target multiple of 13.0x our 2008 EPS of $4.38 to arrive at a target price of $57. We use a multiple of 13x, a 7% discount to the average multiple of the large cap U.S. pharmaceutical group, which is appropriate in our view because of JNJ's slowing pharmaceutical growth (the source of 50% of JNJ's profits). We use 2008 EPS because that is the first year in which the GDT acquisition is expected to be accretive. For JNJ with GDT, we apply a target multiple of 14x our combined JNJ-GDT EPS estimate of $4.40 to arrive at a target price of $62. We use a multiple of 14x because this represents a 15% discount to our coverage universe which we believe is appropriate given the combined entity's below average growth prospects. Again, we use 2008 EPS because that is the first year in which the GDT acquisition would be accretive.

The average of the two scenarios yields a target price of $59.

Key risks to the achievement of our price target are: 1) less price erosion in the U.S. EPO market than we model; 2) branded and generic competition in the European EPO market takes less share of the market than we model; 3) Cypher captures greater market share from Taxus than what we model; 4) key pharmaceutical pipeline products such as paliperidone ER exceed our expectations; 6) JNJ acquires GDT; 7) JNJ's operating expenses grow more slowly than what we model; and 8) JNJ acquires additional late stage pharmaceutical products.

**BUSINESS**

*Johnson & Johnson (JNJ), is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets.*

January 20, 2006

Healthcare
**Medical Devices**

## CHARTS/MODELS

### Guidant Impact on JNJ Cash EPS, GAAP EPS and Growth - $71 per Share (57% cash/43% stock)

*In Millions, Except Per Share Data*

| Revenue Impact of GDT (9MM) | 2005 E | 2006 E | 2007 E | 2008 E | 2009 E | 2010 E | CAGR '05-'08 | CAGR '06-'10 | CAGR '07-'10 |
|---|---|---|---|---|---|---|---|---|---|
| JNJ Sales (ex-GDT) | $51,185 | $53,818 | $57,263 | $60,996 | $63,778 | $68,761 | 6.0% | 6.1% | 6.3% |
| Total Incremental Sales (Guidant) | $3,549 | $3,899 | $4,478 | $5,235 | $5,942 | $6,500 | 13.8% | 12.9% | 13.2% |
| Total JNJ-GDT Pro Forma Sales | $54,735 | $57,718 | $61,742 | $66,231 | $69,720 | $75,280 | 6.6% | 6.6% | 6.9% |
| *Pro-Forma Y-Y %* | | *5.5%* | *7.0%* | *7.3%* | *5.3%* | *8.0%* | | | |
| *JNJ Growth Ex-GDT* | *8.1%* | *5.1%* | *6.4%* | *6.5%* | *4.6%* | *7.9%* | | | |
| *Sales Growth Impact of GDT* | | *0.3%* | *0.6%* | *0.8%* | *0.7%* | *0.1%* | | | |
| | | | | | | | | | |
| **Profit Impact** | | | | | | | | | |
| Total Incremental Operating Profit | | 832 | 1,264 | 1,591 | 1,860 | 2,132 | | | |
| Merger Synergies | | 0 | 0 | 0 | 0 | 0 | | | |
| GDT Other Expenses | | 12 | 23 | 41 | 53 | 53 | | | |
| Profit w/Synergies and GDT Other Expenses | | 820 | 1,231 | 1,551 | 1,807 | 2,078 | | | |
| After Tax GDT Income | | 523 | 936 | 1,178 | 1,373 | 1,580 | | | |
| Impact on JNJ Interest Income - After Tax | | -378 | -358 | -328 | -293 | -249 | | | |
| Net Impact on JNJ Net Profit | | 245 | 577 | 850 | 1,081 | 1,331 | | | |
| | 2005 E | 2006 E | 2007 E | 2008 E | 2009 E | 2010 E | CAGR '05-'08 | CAGR '06-'10 | CAGR '07-'10 |
| Pre GDT JNJ EPS | 3.48 | 3.74 | 4.09 | 4.38 | 4.52 | 4.98 | 7.9% | 7.4% | 6.6% |
| JNJ Cash EPS with GDT | | 3.62 | 4.08 | 4.42 | 4.63 | 5.15 | 8.2% | 8.1% | 8.2% |
| GDT Impact on Cash EPS | | -0.11 | -0.02 | 0.05 | 0.11 | 0.17 | | | |
| Amort of Intang. Per Share (Non-Cash) | | (0.16) | (0.18) | (0.16) | (0.16) | (0.16) | | | |
| JNJ GAAP EPS with GDT | | 3.46 | 3.90 | 4.26 | 4.47 | 4.99 | | | |
| GDT Impact on JNJ GAAP EPS | | (0.27) | (0.19) | (0.12) | (0.05) | 0.00 | | | |
| | | | | | | | | | |
| **Growth Impact of GDT** | | | | | | | | | |
| Pre GDT JNJ EPS Y-Y | | 7.1% | 9.4% | 7.1% | 3.3% | 10.2% | | | |
| JNJ EPS ex-Amort of GDT Intangibles | | 3.9% | 12.1% | 8.9% | 4.7% | 11.1% | | | |
| Impact of GDT ex-Amort. of Intangibles | | -3.2% | 2.7% | 1.8% | 1.4% | 1.0% | | | |
| JNJ GAAP EPS Y-Y with GDT Intangibles | | -0.8% | 12.6% | 9.3% | 4.9% | 11.5% | | | |
| GDT Impact on GAAP EPS Growth | | -7.9% | 3.3% | 2.2% | 1.6% | 1.4% | | | |

*A Actuals*
*E Prudential Equity Group Estimates*
Source: Prudential Equity Group, LLC, and Company Reports
Assumes JNJ shares are worth $62.00

January 20, 2006

Healthcare
**Medical Devices**

### Guidant Impact on JNJ Cash EPS, GAAP EPS and Growth - $78 per Share (61% cash/39% stock)
*In Millions, Except Per Share Data*

| Revenue Impact of GDT ($MM) | 2005 E | 2006 E | 2007 E | 2008 E | 2009 E | 2010 E | '05-'08 | CAGR '05-'10 | '07-'10 |
|---|---|---|---|---|---|---|---|---|---|
| JNJ Sales (ex-GDT) | $51,186 | $53,619 | $57,283 | $60,698 | $63,776 | $66,781 | 6.0% | 6.1% | 6.3% |
| Total Incremental Sales (Guidant) | $3,549 | $3,699 | $4,479 | $5,235 | $5,942 | $6,500 | 13.8% | 12.9% | 13.2% |
| Total JNJ-GDT Pro Forma Sales | $54,735 | $57,718 | $61,742 | $66,231 | $69,720 | $75,290 | 6.6% | 6.6% | 6.8% |
| *Pro-Forma Y-Y %* | | *5.5%* | *7.0%* | *7.3%* | *5.3%* | *8.0%* | | | |
| *JNJ Growth Ex-GDT* | *6.1%* | *5.1%* | *6.4%* | *6.5%* | *4.6%* | *7.9%* | | | |
| *Sales Growth Impact of GDT* | | *0.3%* | *0.6%* | *0.8%* | *0.7%* | *0.1%* | | | |

**Profit Impact**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Incremental Operating Profit | | 832 | 1,264 | 1,591 | 1,860 | 2,132 | | | |
| Merger Synergies | | 0 | 0 | 0 | 0 | 0 | | | |
| GDT Other Expenses | | 12 | 23 | 41 | 53 | 53 | | | |
| Profit w/Synergies and GDT Other Expenses | | 820 | 1,231 | 1,551 | 1,807 | 2,079 | | | |
| After Tax GDT Income | | 623 | 936 | 1,178 | 1,373 | 1,580 | | | |
| Impact on JNJ Interest Income - After Tax | | -458 | -439 | -409 | -373 | -329 | | | |
| Net Impact on JNJ Net Profit | | 165 | 497 | 769 | 1,000 | 1,251 | | | |

| | 2005 E | 2006 E | 2007 E | 2008 E | 2009 E | 2010 E | '05-'08 | CAGR '05-'10 | '07-'10 |
|---|---|---|---|---|---|---|---|---|---|
| Pre GDT JNJ EPS | 3.49 | 3.74 | 4.09 | 4.38 | 4.52 | 4.96 | 7.8% | 7.4% | 6.6% |
| JNJ Cash EPS with GDT | | 3.60 | 4.04 | 4.40 | 4.61 | 5.12 | 8.0% | 8.0% | 8.3% |
| GDT Impact on Cash EPS | | -0.14 | -0.06 | 0.02 | 0.09 | 0.14 | | | |
| Amort of Intang. Per Share (Non-Cash) | | (0.16) | (0.16) | (0.16) | (0.16) | (0.16) | | | |
| JNJ GAAP EPS with GDT | | $3.44 | $3.87 | $4.23 | $4.44 | $4.96 | | | |
| GDT Impact on JNJ GAAP EPS | | (0.30) | (0.21) | (0.14) | (0.08) | (0.02) | | | |

**Growth Impact of GDT**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Pre GDT JNJ EPS Y-Y | | 7.1% | 9.4% | 7.1% | 3.3% | 10.2% | | | |
| JNJ EPS ex-Amort of GDT Intangibles | | 3.2% | 12.2% | 9.0% | 4.8% | 11.2% | | | |
| Impact of GDT ex-Amort. of Intangibles | | -3.9% | 2.8% | 1.9% | 1.5% | 1.0% | | | |
| JNJ GAAP EPS Y-Y with GDT Intangibles | | -1.5% | 12.7% | 9.3% | 4.9% | 11.6% | | | |
| GDT Impact on GAAP EPS Growth | | -8.6% | 3.3% | 2.2% | 1.7% | 1.4% | | | |

*A Actuals*
*E Prudential Equity Group Estimates*
Source: Prudential Equity Group, LLC, and Company Reports
Assumes JNJ shares are worth $82.00

January 20, 2006

Healthcare
**Medical Devices**

*To view charts associated with those stocks mentioned in this report, please visit http://cm1.prusec.com.*

## REGULATION AC DISCLOSURE

Larry Biegelsen is principally responsible for the analysis of any security or issuer included in this report and certifies that the views expressed accurately reflect such research analyst's personal views about subject securities or issuers and certifies that no part of his or her compensation was, is, or will be directly or indirectly related to the specific recommendation or views contained in the research report.

## IMPORTANT DISCLOSURES

Prudential Financial or its affiliates beneficially owns 1% or more of any class of common equity securities of St. Jude Medical.

When we assign an **Overweight** rating, we mean that we expect that the stock's total return will exceed the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

When we assign a **Neutral** Weight rating, we mean that we expect that the stock's total return will be in line with the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

When we assign an **Underweight** rating, we mean that we expect that the stock's total return will be below the average total return of all of the stocks covered by the analyst (or analyst team). Our investment time frame is 12-18 months except as otherwise specified by the analyst in the report.

ANALYST UNIVERSE COVERAGE:
Larry Biegelsen: Abbott Laboratories, Boston Scientific, Edwards Lifesciences, Johnson & Johnson, St. Jude Medical, Medtronic, Inc., Guidant Corp.
Tim Anderson, M.D.: Schering-Plough, Eli Lilly, Forest Laboratories, Merck & Co., Bristol-Myers Squibb, Wyeth, Pfizer, Inc., GlaxoSmithKline plc, AstraZeneca, Novartis AG, Roche Holding AG, Sanofi-Aventis Group.

Rating Distribution

| 01/19/06 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 30% | 0% | 29% | 0% |
| Neutral Weight(Hold)* | 48% | 0% | 53% | 0% |
| Underweight(Sell)* | 22% | 0% | 17% | 0% |

Excludes Closed End Funds

| 12/30/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 30% | 0% | 31% | 0% |
| Neutral Weight(Hold)* | 47% | 0% | 52% | 0% |
| Underweight(Sell)* | 23% | 0% | 17% | 0% |

Excludes Closed End Funds

| 09/30/05 | | Firm's | | Sector's |
|---|---|---|---|---|

6

January 20, 2006

Healthcare
**Medical Devices**

| | Firm | Investment Banking Clients | Sector | Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 29% | 0% |
| Neutral Weight(Hold)* | 44% | 0% | 49% | 0% |
| Underweight(Sell)* | 24% | 0% | 22% | 0% |

Excludes Closed End Funds

| 06/30/05 | Firm | Firm's Investment Banking Clients | Sector | Sector's Investment Banking Clients |
|---|---|---|---|---|
| Overweight(Buy)* | 32% | 0% | 31% | 0% |
| Neutral Weight(Hold)* | 45% | 0% | 51% | 0% |
| Underweight(Sell)* | 22% | 0% | 19% | 0% |

Excludes Closed End Funds

\* In accordance with applicable rules and regulations, we note above parenthetically that our stock ratings of "Overweight," "Neutral Weight," and "Underweight" most closely correspond with the more traditional ratings of "Buy," "Hold," and "Sell," respectively; however, please note that their meanings are not the same. (See the definitions above.) We believe that an investor's decision to buy or sell a security should always take into account, among other things, that the investor's particular investment objectives and experience, risk tolerance, and financial circumstances. Rather than being based on an expected deviation from a given benchmark (as buy, hold and sell recommendations often are), our stock ratings are determined on a relative basis (see the foregoing definitions).

Prior to September 8, 2003 our rating definitions were Buy, Hold, Sell. They are defined as follows:

When we assign a **Buy** rating, we mean that we believe that a stock of average or below-average risk offers the potential for total return of 15% or more over the next 12 to 18 months. For higher-risk stocks, we may require a higher potential return to assign a Buy rating. When we reiterate a Buy rating, we are stating our belief that our price target is achievable over the next 12 to 18 months.

When we assign a **Sell** rating, we mean that we believe that a stock of average or above-average risk has the potential to decline 15% or more over the next 12 to 18 months. For lower-risk stocks, a lower potential decline may be sufficient to warrant a Sell rating. When we reiterate a Sell rating, we are stating our belief that our price target is achievable over the next 12 to 18 months.

A **Hold** rating signifies our belief that a stock does not present sufficient upside or downside potential to warrant a Buy or Sell rating, either because we view the stock as fairly valued or because we believe that there is too much uncertainty with regard to key variables for us to rate the stock a Buy or Sell.

When we assign an industry rating of Favorable, we mean that generally industry fundamentals/stock prospects are improving.

When we assign an industry rating of Neutral, we mean that generally industry fundamentals/stock prospects are stable.

When we assign an industry rating of Unfavorable, we mean that generally industry fundamentals/stock prospects are deteriorating.

January 20, 2006

Healthcare
**Medical Devices**

Ratings History: JNJ

| Rating Changes | | | | | Target Price Changes | | | |
|---|---|---|---|---|---|---|---|---|
| Date | From | To | Analyst | | Date | From | To | Analyst |
| 12/08/05 | -- | UNDR | Biegelsen | | 12/08/05 | -- | 59.00 | Biegelsen |
| 03/31/05 | OVER | -- | Faulkner | | 03/31/05 | 74.00 | -- | Faulkner |
| 08/20/04 | -- | OVER | Faulkner | | 12/16/04 | 61.00 | 74.00 | Faulkner |
| | | | | | 08/20/04 | -- | 61.00 | Faulkner |

## *Additional Information*

Price Target – Methods/Risks

The methods used to determine the price target generally are based on future earning estimates, product performance expectations, cash flow methodology, historical and/or relative valuation multiples.  The risks associated with achieving the price target generally include customer spending, industry competition and overall market conditions.

Additional risk factors as they pertain to the analyst's specific investment thesis can be found within the report.

Price History: JNJ

January 20, 2006

Healthcare
**Medical Devices**



Source: Factset and Prudential Equity Group, LLC estimates.

January 20, 2006

Healthcare
**Medical Devices**

When recommending the purchase or sale of a security, Prudential Equity Group, LLC is subject to a conflict of interest because should such advice be followed, and result in a transaction being executed through the firm, Prudential Equity Group, LLC may earn brokerage compensation on the transaction. In addition, any order placed with Prudential Equity Group, LLC may be executed on either an agency basis resulting in a commission payment to Prudential Equity Group, LLC or on a principal basis, versus Prudential Equity Group, LLC's proprietary account, resulting in a mark-up or mark-down by Prudential Equity Group, LLC.

Any OTC-traded securities or non-U.S. companies mentioned in this report may not be cleared for sale in all jurisdictions.
**Securities products and services are offered through Prudential Equity Group, LLC, a Prudential Financial company.**

© **Prudential Equity Group, LLC, 2006, all rights reserved. One New York Plaza, New York, NY 10292**

Information contained herein is based on data obtained from recognized statistical services, issuer reports or communications, or other sources, believed to be reliable. Any statements nonfactual in nature constitute only current opinions, which are subject to change.

There are risks inherent in international investments, which may make such investments unsuitable for certain clients. These include, for example, economic, political, currency exchange rate fluctuations, and limited availability of information on international securities. Prudential Equity Group LLC, and its affiliates, make no representation that the companies which issue securities that are the subject of their research reports are in compliance with certain informational reporting requirements imposed by the Securities Exchange Act of 1934. Sales of securities covered by this report may be made only in those jurisdictions where the security is qualified for sale. The contents of this publication have been approved for distribution by Bache Financial Limited, which is authorised and regulated by The Financial Services Authority. We recommend that you obtain the advice of your Registered Representative regarding this or other investments.

If you did not receive this research report directly from Prudential Equity Group, LLC ("PEG") or Bache Financial Ltd ("BFL"), your access to, and receipt of, this report does not by itself operate to establish a client-broker relationship between you and PEG or BFL, as the case may be. Accordingly, please direct any questions you may have regarding this report to the registered representative employed by the securities firm at which your account is held who is assigned to service your account, and not to PEG or any PEG analyst whose name appears above. Please note that PEG or BFL, as the case may be, bears no responsibility for any recommendation(s) or advice that such securities firm or its registered representatives may provide to you, regardless of whether any such recommendation or advice is based in whole or in part on this report.

Additional information on the securities discussed herein is available upon request. The applicable disclosures can be obtained by writing to: Prudential Equity Group, LLC, 1 New York Plaza – 17th floor, New York, New York, 10292 Attn: Equity Research.

Prudential Equity Group, LLC and Prudential Financial, Inc. of the United States are not affiliated with Prudential plc of the United Kingdom.

# EXHIBIT G

G



# HEALTHCARE INDUSTRY NOTE

## The Game May Be Far from Over

**Disclosure Information:  Please see pages 5 - 12 of this report for important disclosure information.**

**Jan David Wald, PhD** (617) 854-1968
**John Boylan,** *Associate Analyst* (314) 955-2395
**Charlie Wang,** *Associate Analyst* (617) 854-1979



HEALTH CARE

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over. Both companies seem intent on winning the battle for GDT, even to the extent of being 'nice' to sell side analysts. Our takeaway message from these conversations has been that both sides believe there is information to share that can bolster the argument for its being a better suitor for GDT.

JNJ, for example, reminded us that the analysis that BSX presented as to its valuation included price objectives that did not assume the deal had taken place. That is certainly true of our $42 price objective, which is built on our beliefs about the dynamics of the drug eluting stent market and BSX's potential pipeline of products (moving to the right in time and leaving some unsuccessful projects behind to be sure, assuming its deal with GDT goes through). Suffice it to say, we were glad that BSX did not just use our Price Objective, but averaged it with others.

We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent. We were only given two patent numbers (6776796 and 6585764), and, sure enough, both have to do with using any '-limus' on a stent. We have not vetted these patents, but they did seem quite broad in their language. When we spoke to BSX management about them, we were told neither GDT nor Abbott (ABT) seemed to be concerned about them, and that their broad language may make them non-defensible. As we said, we have not vetted them yet.

**Here Are Our Initial Thoughts for Potential EPS, Assuming Things Go Through as BSX Has Planned**
As for our conversation with BSX, we were surprised, somewhat, by the conservative assumptions it was making on stent market share (it was trying to keep to Street assumptions) and especially on GDT high voltage market share (we had been presuming, as has the Street, a faster ramp to normalcy). BSX is assuming that GDT only will have 26% share exiting '07, 25% in mid-'07 and 24% in 4Q06. Because of this we are assuming the company earns $0.90 in '06, $1.35 in '07, $1.80 in '08 and $2.35 in '09 on a pro forma basis, assuming the BSX/GDT merger goes through as planned. We believe the company's internal estimates are lower than these. We discuss how we derived these estimates in more detail later on in this piece

**We also would like to remind investors that this analysis and all subsequent analysis on this piece are based on the assumption that BSX does indeed merge with GDT at the $80 price recently submitted by BSX.** JNJ has yet to respond to this new bid by BSX and it may do so. As a result, investors should view this analysis as speculation based on what we know at this time. **Since this is speculation, we are maintaining our price objective and estimates at this time as we have no assurances that BSX will end up with GDT.** It is still a pretty dynamic atmosphere out there in our view.

**Additional Synergies with BSX/GDT? Perhaps.**
BSX also told us that there were more potential synergies than it had initially expected. It has said that it expected $400 million in synergies, $200 million from the GDT side and $200 million from its side, mainly from reducing corporate overhead and only having to have 1.2x the international

infrastructure that it currently has. It has also determined that there are between $50 million and $100 million of manufacturing savings that can be realized as well (especially in inspection, scrap and waste). We are not surprised by this. Our experience at GDT was that manufacturing efficiency, while taken seriously, was not taken as seriously as it has been at BSX.

As far as the arrangements with ABT is concerned (ABT, if BSX ends up with GDT, would purchase GDT's vascular business and share rights to GDT's drug eluting stent program. It also would own a portion of BSX, approximately 4%), it appears that ABT was the only true candidate for the rapid exchange technology or the larger deal that BSX is proposing. This would imply that the FTC is probably agreeable to the plan being offered, so it is more of a matter of time than worrying about the structure of the planned acquisition. We do believe that a definitive offer will likely have to be in place prior to the deal being closed. We also think that it will be late 2008/early 2009 before we see a combination product in the market.

Interesting times these.

### Our Numbers Analysis, at Least on a Theoretical Basis

Now that it is BSX' turn at bat in the battle for GDT (JNJ may be heard from before Wednesday), we thought we would take a look at what BSX's value might be after any such merger. However, **investors should keep in mind once again that this exercise is theoretical,** as GDT has yet to recommend BSX's bid and we have not heard back from JNJ who, again, could come back with a new bid itself. BSX did give some level of guidance of what it might expect to see in terms of EPS after a potential merger when it bid $72 per share for GDT. At that time, BSX stated we could expect EPS to be in a rage of $1.50 to $1.66 in 2007 and $1.98 to $2.18 in 2008.

A lot has changed since that time, however due to BSX's $80 bid for GDT. While we think BSX wisely sold some equity to Abbott (ABT) in its latest bid, which resulted in less debt being accumulated, there still should be some additional incremental debt it has taken on (around $200 million) and potential EPS dilution from those new shares being sold to ABT.

### Back to the Pre-Taxus Days in Terms of Expense Control?

However, in our subsequent discussions with the company, it indicated a willingness to return to "pre-

Express/Taxus" spending disciplines, assuming that it succeeds in its efforts to acquire GDT. Remember before the Express stent (the bare metal platform that BSX developed internally before the DES era), BSX was suffering from an extended period of market share losses (down to 8% of the market by our reckoning) and lackluster top line growth.

We think that cost control at this point is important. During past analyst meetings BSX indicated that it wanted to keep its after tax margins below 30% as it believed that it had a number of projects it could invest in both internally and externally (and it mentioned at the time, we think correctly, that investors would not reward it for a relatively high after tax margin). Our question is how deeply will BSX reign in costs assuming that its operations are already relatively efficient, as evidenced by operating margins often in excess of 30%? After speaking with the company on Friday, it is apparent that it does intend to slow down expenditures, because, as the management put it, now that we would have GDT's pipeline and R&D efforts, we may be able to slow down or stop expenditures related to longer-term projects. We should all remember that BSX has been spending approximately $600 million or more on milestone payments and new technology projects in addition to its in-house R&D expenditures. With a new focus, having acquired GDT, these projects will be reviewed and some of them most likely terminated.

### We May See Dilution Until FY10, in This Scenario

Regardless of the synergies the company finds in these R&D programs, BSX's EPS should be diluted until FY10, at least according to our analysis and our assumptions so far. We are assuming that in the DES market that BSX retains its entire market share that we assumed it would get before the merger (approximately 30%) and we layered on top of that a portion of what we assumed would be GDT's market share. **This analysis and all subsequent analysis in this piece, again, is predicated on BSX succeeding in obtaining GDT, which we think is not a sure thing** as we have not definitively heard from JNJ as of yet.

Going into more detail, we originally assumed that GDT would also achieve approximately 30% of the DES market by the end of the decade. Taking that figure we assumed that BSX and ABT would split 40% of that market share each, with the remainder going to JNJ, due to continuity of JNJ's operations and marketing teams (sorry, MDT). The company has told us that it is assuming that two-thirds of the market share will be incrementally derived, and

one-third from cannibalization. The numbers work out to be almost equivalent. We are going to stick with our analysis. It's easier on the eyes.

We further assumed that BSX would have most of its integration issues behind it by late FY08 to early FY09 with its operating margins starting to return to normalcy (30%+). The company is actually more conservative and assumes that it will not reach that goal until close to FY10. We are also assuming that GDT's CRM group slowly returns to close to a 30% market share range in high voltage in the United States by the end of the decade. However, due to GDT related debt, integration costs and additional shares that BSX has offered, it emerges from earnings dilution around FY10 in our model. Preliminarily, we assume that BSX's pro-forma earnings may approximate $0.90 for FY06, $1.35 for FY07, $1.80 for FY08 and $2.35 for FY09. Once again, this is predicated on the assumption that BSX acquires GDT, and all of this analysis may change quickly if JNJ comes in with a competing bid.

**Here's Our Initial Take on a Theoretical Valuation, But the Game Might Not Be Over Yet.**
Keeping those assumptions and qualifiers in mind, recently our peer group average for BSX (MDT, EW, STJ) was trading at a one year forward multiple of 25.6x. The question we believe worth asking, is what should be the discount to that multiple? Using that average with no discount leads us to a valuation of $35 per share, utilizing our preliminary FY07 estimate. We decided to use FY07 as opposed to the one year forward (FY06) as FY07 would be the first full fiscal year with GDT under its belt as well as the first year it may begin to move toward normalcy. However, we do believe that BSX should receive some discount due to the potentially higher short-term financial risk the company might face. The problem is that we cannot think of any recent acquisitions of this size and scope among equals that is dilutive over the course of a couple years in this or any other industry. Therefore any number we pick as a discount rate would be somewhat arbitrary.

Since we were unsure on what discount to that multiple should be, we decided to create a table of discount values to determine a valuation range and then make an more educated estimate on what a potential valuation might be using our recent comp group EPS multiple of 25.6x as a base.

|          | Discount Rates | | | |
|----------|--------|--------|--------|--------|
| EPS Ests | 10%    | 20%    | 30%    | 40%    |
| $1.15    | $26.50 | $23.55 | $20.61 | $17.66 |
| $1.25    | $28.80 | $25.60 | $22.40 | $19.20 |
| $1.35    | $31.10 | $27.65 | $24.19 | $20.74 |
| $1.45    | $33.41 | $29.70 | $25.98 | $22.27 |
| $1.55    | $35.71 | $31.74 | $27.78 | $23.81 |

Source: A.G. Edward theoretical estimates.

Using the middle portion of this table as a proxy for potential outcomes, we see a range of potential values of $30 to $22 per share. This fits in within our preliminary pro-forma discounted cash flow analysis of approximately $28 per share. In that analysis, we used all of the EPS assumptions listed above as well as weighted average cost of capital of 12.0%, an implied market risk for the shares of 10.5% (our large cap universe range is 7.5% to 11.0%) and a long-term growth rate of 12%.

However, we would also like to stress that this is a preliminary analysis. We expect to see and hear more from BSX, GDT and possibly JNJ in the coming days. Our intention is to give investors an idea of what might be, given events could change very quickly. Importantly, we are sticking with our price objective for BSX of $42 per share and our current estimates as we do not believe this saga is near completion at this time.

**Boston Scientific (BSX – $23.34 – Buy/Aggressive) Valuation**
We use a three-stage discounted cash flow model, which leads us to a price objective of $42 per share. Our weighted average cost of capital was 11.3%. Our market risk premium is 9%. We assumed a free cash flow growth rate of 11.75% for 10 years after our detailed cash flow model ends in 2010 and assume a growth rate of 4% thereafter. On a P/E basis, BSX's one-year forward P/E five-year average is 28.8x with a range of 70.7x to 12.0x. Based upon our FY06 estimate of $1.82 and our price objective of $42, we have a target P/E value of 23.0x, a discount to its five-year average, but appropriate in our opinion as we think BSX has a good long-term pipeline.

**BSX Risks To Valuation**
Risk to achieving our price objective include unanticipated market share losses in the drug-eluting stent market (e.g., new competitive products being more successful than we anticipate, product recalls, etc.), new products not being successfully brought to market or not experiencing sales levels as highs as we anticipate, regulatory risk (e.g., reimbursement and regulatory approval), ongoing

litigation risk and the highly competitive markets in which the company competes.

### Guidant (GDT – $76.00 – Hold/Speculative) Valuation
We use a three stage discounted cash flow model for our valuation. Our discount rate on our future cash flows, which is the weighted average cost of capital, we are using is 12.1%. This and other assumptions lead us to believe GDT is at fair value. Based upon our FY06 estimate of $1.70 per share, GDT is now trading at a P/E multiple of 44.8x.

### GDT Risks To Valuation
The ongoing issues and uncertainties we have seen in the stent business are the major risks for Guidant. Others include acquisition risks, slower than expected uptake of CHF devices, new technology not only from direct competitors, but also from other sectors as well such as Pharma, regulatory risk, reimbursement risk and litigation risk.

### Johnson & Johnson (JNJ – $61.19 – Hold/Conservative) Valuation
We utilize a three-stage discounted cash flow analysis for our valuation methodology. Our weighted average cost of capital assumption at the time of analysis was 10.4%, we assumed a free cash flow growth rate of 9.0% for 10 years after our detailed forecasts embedded in our model end in FY10, and 4.0% thereafter. These and other assumptions lead us to believe that the shares are at a level that represents what we would consider fair value. On a P/E basis, JNJ's two-year forward P/E five-year average is 20.0x with a range of 27.7x to 15.2x. Based upon our FY06 estimate of $3.80, JNJ is currently trading at a P/E (at a recent price of $61.19 per share) of 16.1x. We believe that a multiple at the lower end of the range is justified due to competition in the drug-eluting stent marketplace, and potential and existing generic competition in some product lines in pharma.

### JNJ Risks To Valuation
Johnson & Johnson may see greater competition than expected in the drug-eluting stents market in the United States, and new drug-eluting stent products from competitors in Europe. The Pharma pipeline may be weaker than expected, and there may be increased competition from generic manufacturers.

### Abbott Labs (ABT – $40.51 – Buy/Aggressive) Valuation
We utilize a three-stage discounted cash flow analysis for our valuation methodology. Our weighted average cost of capital assumption is 11.5% and our risk premium assumption is 9%. Our out year operating cash flow growth assumption is 11.0% for ten years (2011-2020)-right in the middle of the largest of our large-cap group. These and other assumptions lead us to our price objective of $46 per share. On a P/E basis, using our $2.70 FY06 EPS estimate, and our $46 price objective the multiple is 17.0x. This compares to a five-year historical two-year forward P/E average of 18.3x, with a range of 13.4x to 25.2x. We feel that our implied target multiple, which is close to its historical average, is justified due to uncertainty concerning generic competition, but offset by good potential we see in Medical Products. Therefore, being close to the middle seems like a good place to be.

### ABT Risks To Valuation
Risks to achieving our price objective include the fact that Abbott's pharmacological pipeline may not be as robust as we have assumed, sales of its key products (such as Humira) may not be as strong as we anticipate and it participates in highly competitive and regulated markets.

### Analyst Certification Statement
The views expressed in this research report accurately reflect my personal views about the subject company/companies and securities. I receive no compensation that is directly or indirectly related to the specific recommendations or views contained within this report.

*All prices from intraday on 1/230/6.*

# BOSTON SCIENTIFIC

 EDWARDS.

**January 21, 2006**
**Buy/Aggressive**
**BSX/NYSE/$23.59**                                    **Price Objective: $42.00**



Pricing sources: Factset and IDSI

— Daily Closing Prices
△ Price Objective Changes
▣ Rating/Suitability Changes
◆ Analyst Coverage Changes

## PRICE OBJECTIVE (PO) CHANGES *

| Date | Closing Price | PO | Date | Closing Price | PO | Date | Closing Price | PO |
|------|--------------|-----|------|--------------|-----|------|--------------|-----|
|  |  | 25.00 | 09/16/2003 | 33.25 | 37.50 | 06/02/2004 | 44.70 | 52.00 |
| 05/21/2003 | 25.04 | 30.00 | 12/30/2003 | 36.54 | 42.00 | 08/24/2005 | 26.38 | 42.00 |
| 06/11/2003 | 29.88 | 32.50 | 02/24/2004 | 41.27 | 49.00 |  |  |  |

* NA: Positive rating removed; no price objective supplied.

## RATING/SUITABILITY CHANGES

| Date | Closing Price | Rating/Suitability | Date | Closing Price | Rating/Suitability |
|------|--------------|-------------------|------|--------------|-------------------|
|  |  | Strong Buy/Aggressive |  |  |  |

## ANALYST COVERAGE CHANGES

| Analyst | From | To | Analyst | From | To |
|---------|------|-----|---------|------|-----|
| Jan D. Wald | 01/18/2001 |  |  |  |  |

# BOSTON SCIENTIFIC



**January 21, 2006**
**Buy/Aggressive**
**BSX/NYSE/$23.59**                                             **Price Objective: $42.00**

|  | | | Past 12 months | |
| Rating | Master List Companies | Current Rating Distribution | Investment Banking Clients | % of Investment Banking Clients * |
|---|---|---|---|---|
| Buy | 257 | 36% | 48 | 19% |
| Hold/Neutral | 440 | 62% | 28 | 6% |
| Sell | 12 | 2% | 0 | 0% |

\* Percentage of Investment Banking Clients on Master List by rating.

**OUR 3-TIER RATING SYSTEM (12-18 month time horizon)**

**Buy:** A total return is anticipated in excess of the market's long-term historic rate (approximately 10%). Total return expectations should be higher for stocks which possess greater risk

**Hold:** Hold the shares, with neither a materially positive total return nor a materially negative total return is anticipated.

**Sell:** Stock should be sold, as a materially negative total return is anticipated.

**RISK SUITABILITY (Relates to fundamental risk, including earnings predictability, balance sheet strength and price volatility)**

**Conservative:** Fundamental risk approximates or is less than the market.

**Aggressive:** Fundamental risk is higher than the market.

**Speculative:** Fundamental risk is significantly higher than the market.

The suitability ratings assigned by A.G. Edwards industry analysts to individual securities should be reviewed by investors and their financial consultants to determine whether a particular security is suitable for their portfolio, with full consideration given to existing portfolio holdings.

**COMPANY SPECIFIC DISCLOSURES:**
Analyst or household member owns a long common equity position.
AGE and/or officer(s) own a long position in the issuer's equity securities.

The views expressed in this research report accurately reflect my personal views about the subject company and its securities.

AGE's research analysts receive no compensation in connection with the firm's investment banking business. The analyst certifies that he/she receives no compensation that is directly or indirectly related to the specific recommendations or views contained within this report. Analysts may be eligible for annual bonus compensation based on the overall profitability of the firm, which takes into account revenues derived from all of the firm's business activities, including its investment banking business.

Price objectives and recommendations contained in this report are based on a time horizon of 12-18 months, but there is no guarantee the objective will be achieved within the specified time horizon. Price objectives are determined by a subjective review of fundamental and/or quantitative characteristics of the issuer and the security that is the subject of this report. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, peer group comparisons, sum of the parts and enterprise values. All securities are subject to market, interest rate and general economic risks. Specific information is provided in the text of our most recent research report.

# GUIDANT CORP



January 21, 2006
## Hold/Speculative
GDT/NYSE/$75.95



Pricing sources: Factset and IDSI

- —— Daily Closing Prices
- △ Price Objective Changes
- ■ Rating/Suitability Changes
- ◆ Analyst Coverage Changes

## PRICE OBJECTIVE (PO) CHANGES *

| Date | Closing Price | PO | Date | Closing Price | PO | Date | Closing Price | PO |
|------|---------------|-----|------|---------------|-----|------|---------------|-----|
| | | NA | 11/20/2003 | 55.35 | 62.00 | 09/30/2004 | 66.04 | 73.00 |
| 06/27/2003 | 44.51 | 50.00 | 01/13/2004 | 64.28 | 76.00 | 12/17/2004 | 71.62 | NA |
| 07/17/2003 | 49.96 | 57.00 | 05/26/2004 | 54.34 | 63.00 | | | |

* NA: Positive rating removed; no price objective supplied.

## RATING/SUITABILITY CHANGES

| Date | Closing Price | Rating/Suitability | Date | Closing Price | Rating/Suitability |
|------|---------------|--------------------|------|---------------|--------------------|
| | | Hold/Speculative | 12/17/2004 | 71.62 | Hold/Speculative |
| 06/27/2003 | 44.51 | Buy/Speculative | | | |

## ANALYST COVERAGE CHANGES

| Analyst | From | To | Analyst | From | To |
|---------|------|-----|---------|------|-----|
| Jan D. Wald | 01/08/2001 | | | | |

# GUIDANT CORP

 **EDWARDS.**

## January 21, 2006
## Hold/Speculative
## GDT/NYSE/$75.95

|  |  |  | Past 12 months | |
| --- | --- | --- | --- | --- |
| Rating | Master List Companies | Current Rating Distribution | Investment Banking Clients | % of Investment Banking Clients * |
| Buy | 257 | 36% | 48 | 19% |
| Hold/Neutral | 440 | 62% | 28 | 6% |
| Sell | 12 | 2% | 0 | 0% |

\* Percentage of Investment Banking Clients on Master List by rating.

**OUR 3-TIER RATING SYSTEM (12-18 month time horizon)**

**Buy:** A total return is anticipated in excess of the market's long-term historic rate (approximately 10%). Total return expectations should be higher for stocks which possess greater risk.

**Hold:** Hold the shares, with neither a materially positive total return nor a materially negative total return is anticipated.

**Sell:** Stock should be sold, as a materially negative total return is anticipated.

**RISK SUITABILITY** (Relates to fundamental risk, including earnings predictability, balance sheet strength and price volatility)

**Conservative:** Fundamental risk approximates or is less than the market.

**Aggressive:** Fundamental risk is higher than the market.

**Speculative:** Fundamental risk is significantly higher than the market.

The suitability ratings assigned by A.G. Edwards industry analysts to individual securities should be reviewed by investors and their financial consultants to determine whether a particular security is suitable for their portfolio, with full consideration given to existing portfolio holdings.

**COMPANY SPECIFIC DISCLOSURES:**
Analyst or household member owns a long common equity position.

The views expressed in this research report accurately reflect my personal views about the subject company and its securities.

AGE's research analysts receive no compensation in connection with the firm's investment banking business. The analyst certifies that he/she receives no compensation that is directly or indirectly related to the specific recommendations or views contained within this report. Analysts may be eligible for annual bonus compensation based on the overall profitability of the firm, which takes into account revenues derived from all of the firm's business activities, including its investment banking business.

Price objectives and recommendations contained in this report are based on a time horizon of 12-18 months, but there is no guarantee the objective will be achieved within the specified time horizon. Price objectives are determined by a subjective review of fundamental and/or quantitative characteristics of the issuer and the security that is the subject of this report. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, peer group comparisons, sum of the parts and enterprise values. All securities are subject to market, interest rate and general economic risks. Specific information is provided in the text of our most recent research report.

# JOHNSON & JOHNSON

 EDWARDS

January 21, 2006
## Hold/Conservative
JNJ/NYSE/$60.80



Price

Date

Pricing sources: Factset and IDSI

— Daily Closing Prices
△ Price Objective Changes
▣ Rating/Suitability Changes
◆ Analyst Coverage Changes

**PRICE OBJECTIVE (PO) CHANGES ***

| Date | Closing Price | PO | Date | Closing Price | PO | Date | Closing Price | PO |
|---|---|---|---|---|---|---|---|---|
| | | NA | 04/03/2003 | 57.46 | NA | 07/16/2003 | 52.60 | NA |
| 02/14/2003 | 51.75 | 58.00 | 06/06/2003 | 52.75 | 59.00 | | | |

* NA: Positive rating removed; no price objective supplied.

**RATING/SUITABILITY CHANGES**

| Date | Closing Price | Rating/Suitability | Date | Closing Price | Rating/Suitability |
|---|---|---|---|---|---|
| | | Hold/Conservative | 06/06/2003 | 52.75 | Buy/Conservative |
| 02/14/2003 | 51.75 | Buy/Conservative | 07/16/2003 | 52.60 | Hold/Conservative |
| 04/03/2003 | 57.46 | Hold/Conservative | | | |

**ANALYST COVERAGE CHANGES**

| Analyst | From | To | Analyst | From | To |
|---|---|---|---|---|---|
| Jan D. Wald | 08/17/2001 | | | | |

# JOHNSON & JOHNSON

 **EDWARDS**

**January 21, 2006**
## Hold/Conservative
**JNJ/NYSE/$60.80**

| Rating | Master List Companies | Current Rating Distribution | Past 12 months Investment Banking Clients | % of Investment Banking Clients * |
|---|---|---|---|---|
| Buy | 257 | 36% | 48 | 19% |
| Hold/Neutral | 440 | 62% | 28 | 6% |
| Sell | 12 | 2% | 0 | 0% |

\* Percentage of Investment Banking Clients on Master List by rating.

**OUR 3-TIER RATING SYSTEM (12-18 month time horizon)**

**Buy:** A total return is anticipated in excess of the market's long-term historic rate (approximately 10%). Total return expectations should be higher for stocks which possess greater risk

**Hold:** Hold the shares, with neither a materially positive total return nor a materially negative total return is anticipated.

**Sell:** Stock should be sold, as a materially negative total return is anticipated.

**RISK SUITABILITY** (Relates to fundamental risk, including earnings predictability, balance sheet strength and price volatility)

**Conservative:** Fundamental risk approximates or is less than the market.

**Aggressive:** Fundamental risk is higher than the market.

**Speculative:** Fundamental risk is significantly higher than the market.

The suitability ratings assigned by A.G. Edwards industry analysts to individual securities should be reviewed by investors and their financial consultants to determine whether a particular security is suitable for their portfolio, with full consideration given to existing portfolio holdings.

**COMPANY SPECIFIC DISCLOSURES:**
Analyst or household member owns a long common equity position.
AGE or an affiliate received compensation from the subject company for products or services other than investment banking services during the past 12 months, and analyst or person with ability to influence substance of this report is aware of same.
The subject company is or was a client of AGE during the past 12 months for non-investment banking securities-related services and analyst is aware of same.
AGE and/or officer(s) own a long position in the issuer's equity securities.

The views expressed in this research report accurately reflect my personal views about the subject company and its securities.

AGE's research analysts receive no compensation in connection with the firm's investment banking business. The analyst certifies that he/she receives no compensation that is directly or indirectly related to the specific recommendations or views contained within this report. Analysts may be eligible for annual bonus compensation based on the overall profitability of the firm, which takes into account revenues derived from all of the firm's business activities, including its investment banking business.

Price objectives and recommendations contained in this report are based on a time horizon of 12-18 months, but there is no guarantee the objective will be achieved within the specified time horizon. Price objectives are determined by a subjective review of fundamental and/or quantitative characteristics of the issuer and the security that is the subject of this report. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, peer group comparisons, sum of the parts and enterprise values. All securities are subject to market, interest rate and general economic risks. Specific information is provided in the text of our most recent research report.

# ABBOT LABORATORIES

 EDWARDS.

**January 21, 2006**
**Buy/Aggressive**
**ABT/NYSE/$40.35**                    **Price Objective: $46.00**



Pricing sources: Factset and IDSI

——— Daily Closing Prices
△ Price Objective Changes
■ Rating/Suitability Changes
◆ Analyst Coverage Changes

### PRICE OBJECTIVE (PO) CHANGES *

| Date | Closing Price | PO | Date | Closing Price | PO | Date | Closing Price | PO |
|------|--------------|-----|------|--------------|-----|------|--------------|-----|
| | | 46.00 | 01/18/2005 | 46.04 | 52.00 | | | |
| 05/30/2003 | 44.55 | 49.00 | 12/16/2005 | 40.17 | 46.00 | | | |

* NA: Positive rating removed; no price objective supplied.

### RATING/SUITABILITY CHANGES

| Date | Closing Price | Rating/Suitability | Date | Closing Price | Rating/Suitability |
|------|--------------|-------------------|------|--------------|-------------------|
| | | Buy/Aggressive | | | |

### ANALYST COVERAGE CHANGES

| Analyst | From | To | Analyst | From | To |
|---------|------|-----|---------|------|-----|
| Jan D. Wald | 08/17/2001 | | | | |

# ABBOT LABORATORIES



## January 21, 2006
## Buy/Aggressive
**ABT/NYSE/$40.35**                                             **Price Objective: $46.00**

|  |  |  | Past 12 months | |
| Rating | Master List Companies | Current Rating Distribution | Investment Banking Clients | % of Investment Banking Clients * |
|---|---|---|---|---|
| Buy | 257 | 36% | 48 | 19% |
| Hold/Neutral | 440 | 62% | 28 | 6% |
| Sell | 12 | 2% | 0 | 0% |

\* Percentage of Investment Banking Clients on Master List by rating.

**OUR 3-TIER RATING SYSTEM (12-18 month time horizon)**

**Buy:** A total return is anticipated in excess of the market's long-term historic rate (approximately 10%). Total return expectations should be higher for stocks which possess greater risk.

**Hold:** Hold the shares, with neither a materially positive total return nor a materially negative total return is anticipated.

**Sell:** Stock should be sold, as a materially negative total return is anticipated.

**RISK SUITABILITY (Relates to fundamental risk, including earnings predictability, balance sheet strength and price volatility)**

**Conservative:** Fundamental risk approximates or is less than the market.

**Aggressive:** Fundamental risk is higher than the market.

**Speculative:** Fundamental risk is significantly higher than the market

The suitability ratings assigned by A.G. Edwards industry analysts to individual securities should be reviewed by investors and their financial consultants to determine whether a particular security is suitable for their portfolio, with full consideration given to existing portfolio holdings.

**COMPANY SPECIFIC DISCLOSURES:**
Not applicable.

The views expressed in this research report accurately reflect my personal views about the subject company and its securities.

AGE's research analysts receive no compensation in connection with the firm's investment banking business. The analyst certifies that he/she receives no compensation that is directly or indirectly related to the specific recommendations or views contained within this report. Analysts may be eligible for annual bonus compensation based on the overall profitability of the firm, which takes into account revenues derived from all of the firm's business activities, including its investment banking business.

Price objectives and recommendations contained in this report are based on a time horizon of 12-18 months, but there is no guarantee the objective will be achieved within the specified time horizon. Price objectives are determined by a subjective review of fundamental and/or quantitative characteristics of the issuer and the security that is the subject of this report. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, peer group comparisons, sum of the parts and enterprise values. All securities are subject to market, interest rate and general economic risks. Specific information is provided in the text of our most recent research report.

**Additional information available upon request.** With the exception of information about A.G. Edwards & Sons, Inc., the material contained herein has been prepared from sources and data we believe to be reliable but we make no guarantee as to its accuracy or completeness. This material is published solely for informational purposes and is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or investment product. This material is not to be construed as providing investment services in any jurisdiction where such offers or solicitation would be illegal. Opinions and estimates are as of a certain date and subject to change without notice. You should be aware that investments can fluctuate in price, value and/or income, and you may get back less than you invested. Past performance is not necessarily a guide to future performance. Investments or investment services mentioned may not be suitable for you and if you have any doubts you should seek advice from your financial consultant. Where the purchase or sale of an investment requires a change from one currency to another, fluctuations in the exchange rate may have an adverse effect on the value, price or income of the investment. Certain investments may be mentioned that are not readily realizable. This means that it may be difficult to sell or realize the investment or obtain reliable information regarding its value. The levels and basis of taxation can change.

This document has been approved by A.G. Edwards & Sons (U.K.) Limited, authorized and regulated by the Financial Services Authority.

© 2006 A.G. Edwards & Sons, Inc.    • Member SIPC.                    www.agedwards.com

# EXHIBIT H



**Multi-Company Note**

# Medical Supplies & Technology

### An INTERESTing New Offer

| January 13, 2006 | SUMMARY |
|---|---|
| | ➤ BSX's new bid appears more focused on anti-trust issues than a higher price, which is likely to be based on intellectual property as much as timing. We don't think BSX's new offer is enough to get GDT to switch sides. |
| Matthew J Dodds | ➤ A BSX/GDT deal may not have the freedom of passage through the FTC that is widely anticipated, as JNJ holds some key intellectual property needed to make ABT a "competitive" DES player. |
| Efrem Kamen | ➤ JNJ owns the IP around the use of the drug sirolimus (rapamycin) and its analogues on a stent - this includes both ABT-578 and everolimus. |
| | ➤ When the FTC initially approved JNJ/GDT in October, JNJ agreed to license rapid exchange and other stent rights to ABT. We suspect that the other stent rights included the IP surrounding the use of rapamycin analogues on a stent. |
| | ➤ Without this IP, the FTC could have concern over ABT's ability to make ZoMaxx or Xience V a viable competitor. |

United States

SUMMARY VALUATION AND RECOMMENDATION DATA

| Company (Ticker) | Price | Expected Returns | | | Rating | Div.(E) | Target | LTGR | Earnings Per Share | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Price | Div. | Total | | | | | Current Yr | Next Yr |
| Abbott Laboratories- | $41.34 | (8.1%) | 2.6% | (5.5%) | Curr | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| (ABT) | | | | | Prev | 3M | $1.07 | $38.00 | 7% | $2.48E | $2.50E |
| Boston Scientific- | $25.05 | 7.8% | 0.0% | 7.8% | Curr | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| (BSX) | | | | | Prev | 2H | $0.00 | $27.00 | 7% | $1.83E | $1.80E |
| Guidant Corporation- | $70.40 | (31.9%) | 0.6% | (31.3%) | Curr | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| (GDT) | | | | | Prev | 3H | $0.40 | $48.00 | 15% | $1.82E | $1.49E |
| Johnson & Johnson- | $62.21 | 28.6% | 2.1% | 30.7% | Curr | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |
| (JNJ) | | | | | Prev | 1L | $1.29 | $80.00 | 11% | $3.50E | $3.86E |

**OPINION**

**BSX's new offer shows GDT's Board is as concerned with anti-trust as price...**

After the close yesterday, Boston came back with another offer for Guidant. While this was widely anticipated, it is a bit quicker than we thought and the structure puts more of a focus on anti-trust concerns than a pricing premium. Specifically, the Boston offer of $73 is only $1 higher than the last offer and is still equally split between stock and cash. We felt Boston would go to $76 with its follow up bid on the chance that JNJ was "maxed" at $68. In addition to the $1 increase in price, Boston has altered its agreement on two fronts to address two apparent concerns of Guidant's Board: 1) the ability to get through the FTC, and 2) the ability to close the deal in a timely manner. To address these concerns, Boston has now

Citigroup Research is a division of Citigroup Global Markets Inc. (the "Firm"), which does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Non-US research analysts who have prepared this report, and who may be associated persons of the member or member organization, are not registered/qualified as research analysts with the NYSE and/or NASD, but instead have satisfied the registration/qualification requirements or other research-related standards of a non-US jurisdiction.
Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroupgeo.com (for institutional clients) or can call (866) 836-9542 to request a copy of this research.

**Citigroup Global Markets**

citigroup⌂

offered to divest all overlapping assets if necessary and will pay $0.012 in cash per day (or $4MM per day) for every day the closing slips after April 1. The second component is quite novel, and we aren't sure if this has ever been done before in a major acquisition/merger. While it may sound lucrative since the cash register rings daily, it's really quite small ($120MM a month) in relation to the $25B deal size.

...And could be related to JNJ's IP around using limus compounds on a stent...

The interesting new features of Boston's offer implies that Guidant's Board is more concerned with anti-trust issues than the investment community has realized. Our recent work in the area suggests there may be one major issue that has been overlooked to date – JNJ's IP position on using sirolimus (rapamycin) and its analogues on a stent. JNJ licensed rapamycin from Wyeth but also has its own patents that cover the use of rapamycin and rapamycin analogues on a stent. These patents include the '796 patent filed in May 2001 and the '536 patent filed in April 2003. The patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation. While we have not done specific research on the strength of the patents, the claims appear to somewhat broadly cover the use of rapamycin on a stent to treat restenosis.

What makes this issue interesting is that JNJ is likely to have offered a license to these patents along with rapid-exchange to Abbott since ABT-578 (the drug Abbott uses for ZoMaxx) is a rapamycin analogue. If this is correct, it means that the FTC required this access to ensure that Abbott would not face litigation from JNJ when it eventually enters the US market.

...Which would remain an issue with Boston's new offer...

In the Boston deal for Guidant, neither Boston nor Abbott would garner access to the limus patents so another competitive stent entrant may not technically be "created" with this deal. (It could be argued that Guidant didn't have access to these patents before the JNJ offer, but if the FTC determined it was an issue in its JNJ/GDT review, its on the map.) Hence, while the Boston/Abbott deal looks quite a bit more comprehensive than the JNJ/Abbott deal, the importance of the limus patent rights appear to have been underestimated.

...Along with some other potential snags....

While Boston is now saying it will divest all required assets – which would presumably include dropping the "shared" rights to everolimus – this would require another "agreement" with Abbott since the current one does not include this scenario. It was also noted by the *Wall Street Journal* that Boston's last trip to the FTC was ugly as its acquisition of Cardiovascular Imaging Systems included an agreement with Hewlett Packard that the FTC felt was not honored. Finally, Boston has said little about EU anti-trust clearance, which may not be on fast-track status given that Boston and Guidant have more overlap and the EU authorities raised several product issues between JNJ and Guidant that the FTC did not raise.

...So the bottom line on the new offer is: we just don't think it's enough.

Last night, Guidant's Board noted that it will look at and respond to the new offer by Boston Scientific. Even with the new components of the Boston offer, we don't think Guidant's Board will get comfortable enough with the aforementioned anti-trust issues and the extra $1. Boston is demanding that Guidant's Board respond by 4 p.m. EST today (which is ironically Friday the 13th). If Guidant doesn't take the offer (80%), Boston could still go higher on price since Guidant's Board appeared comfortable to go with Boston earlier this week when the spread was $8. If Guidant does take Boston's new offer (20%), its hard to

2



say what JNJ will do, especially given the fact that we have been incorrect on JNJ's last three moves relating to Guidant.

**QUARTERLY ESTIMATES PER SHARE DATA**

| Ticker | Period | Current Year Current | Current Year Previous | Next Year Current | Next Year Previous | Next Year + 1 Current | Next Year + 1 Previous |
|---|---|---|---|---|---|---|---|
| ABT | 1Q | $0.58A | $0.58A | $0.58E | $0.58E | NA | NA |
| (FYE Dec) | 2Q | $0.58A | $0.58A | $0.62E | $0.62E | NA | NA |
| | 3Q | $0.58A | $0.58A | $0.60E | $0.60E | NA | NA |
| | 4Q | $0.74E | $0.74E | $0.70E | $0.70E | NA | NA |
| | Year | $2.48E | $2.48E | $2.50E | $2.50E | $2.62E | $2.62E |
| BSX | 1Q | $0.51A | $0.51A | $0.47E | $0.47E | NA | NA |
| (FYE Dec) | 2Q | $0.48A | $0.48A | $0.45E | $0.45E | NA | NA |
| | 3Q | $0.42A | $0.42A | $0.42E | $0.42E | NA | NA |
| | 4Q | $0.42E | $0.42E | $0.46E | $0.46E | NA | NA |
| | Year | $1.83E | $1.83E | $1.80E | $1.80E | $1.99E | $1.99E |
| GDT | 1Q | $0.65A | $0.65A | NA | NA | NA | NA |
| (FYE Dec) | 2Q | $0.63A | $0.63A | NA | NA | NA | NA |
| | 3Q | $0.28A | $0.28A | NA | NA | NA | NA |
| | 4Q | $0.26E | $0.26E | NA | NA | NA | NA |
| | Year | $1.82E | $1.82E | $1.49E | $1.49E | $2.42E | $2.42E |
| JNJ | 1Q | $0.97A | $0.97A | $1.04E | $1.04E | NA | NA |
| (FYE Dec) | 2Q | $0.93A | $0.93A | $1.01E | $1.01E | NA | NA |
| | 3Q | $0.87A | $0.87A | $0.97E | $0.97E | NA | NA |
| | 4Q | $0.74E | $0.74E | $0.83E | $0.83E | NA | NA |
| | Year | $3.50E | $3.50E | $3.86E | $3.86E | $4.22E | $4.22E |

**VALUATION AND RISKS – COMPANIES DISCUSSED**
**Johnson & Johnson (JNJ –$62.21; 1L)**

*Valuation*
We arrive at our $80 target price for Johnson & Johnson based on an average of three different valuations: 1) a 21x multiple off our forward 12 months (F12M) EPS forecast; 2) a TEV/2005E EBITDA target multiple of 14x; and 3) a 10-year DCF analysis.

A 21x P/E multiple represents a weighted average multiple using a sum-of-the-parts analysis on JNJ's three major divisions: Pharmaceuticals (58% of operating profit), MD&D (31%), and Consumer (11%). For Pharmaceuticals, our target multiple of 20x represents a modest premium to the large-cap pharmaceutical group average of 17x, but is in line to slightly above the better-positioned franchises of Eli Lilly (21x), and Novartis (18x). Our comp group also includes companies such as Bristol Myers. The range of this comp group is from 15x–19x.

For MD&D, our target multiple of 25x represents a 10% premium to our F12M forecast for the CMTI as JNJ's business should grow 16% in 2005E, well north of the group average. The group in comprised of 17 large-cap med tech companies and includes companies such as

citigroup

Medtronic, Abbott Laboratories, and Alcon. The trading range for the comp group is 15x–33x forward 12-month EPS.

For Consumer, we are forecasting a 21x multiple, which is in line with the average F12M P/E multiple the Citigroup Home & Personal Care Products Team is forecasting for the four closest comparable companies. The range of the comps group is 18x-21x and includes companies such as Avon Products, Procter & Gamble, and Colgate-Palmolive.

For our TEV/2005E EBITDA calculation, we use the 2004 share count and net debt, and the 2005E EBITDA to calculate the current multiple of 14x. Our TEV/EBITDA premium is based on the same factors as our Price/F12M EPS target, and we arrive at a TEV/EBITDA target price of $78. The range of our TEV/EBITDA for the comp groups ranges from 10x to 32x 2005 EBITDA.

Johnson & Johnson Valuation Ratios

| | Current | CMTI | Hor. Sup. Peers | Pharma Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|---|
| LT EPS Growth | 10% | 15% | 13% | 9% | 7% | | | |
| Price/F12M EPS | 17x | 23x | 18x | 17x | 18x | 21x | $78.96 | 26% |
| TEV/2004 EBITDA | 11x | 17x | 12x | | | 14x | $78.08 | 25% |
| Implied DCF Value | -- | | | | | | $84.15 | 35% |
| Derived DCF Value | | | | | | | | |
| Dividend Yield | | | | | | | | 2% |
| Expected Total Return | | | | | | | | |

*Source: Citigroup Investment Research estimates*

Our DCF valuation of $84 per share is based on ten years of projected free cash flow with a 1% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.58; and our weighted average cost of capital is 6.4%.

*Risks*

We rate Johnson & Johnson Low Risk based on three factors: 1) Johnson & Johnson's broad business mix in three large, defensive markets – pharmaceuticals, medical products, and consumer products – makes Johnson & Johnson the most diversified large-cap company in the health care space; 2) Johnson & Johnson is a major player in all three of its targeted markets, including the No. 1 position in the $224 billion medical products market; and 3) Johnson & Johnson has a sizable cash hoard – over $7 billion in net cash – and free cash flow generation currently running at roughly $1.5 billion/quarter.

Risks to our thesis include: 1) unexpected generic competition for Levaquin, Risperdal, Aciphex, Topamax, or Procrit before 2008; 2) the inability to gain further share in the US drug eluting stent market in 2005 and 2006; 3) overly aggressive growth expectations for Natrecor, Remicade, or Topamax; 4) issues related to the Guidant merger.

Given the recent heightened scrutiny over drug-safety, there also exists the risk that any of Johnson & Johnson major pharmaceuticals could face slowing sales because of new or increased safety concerns.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange based on favorable yoy comparisons of the U.S. dollar versus the Euro and Yen declining in 2005; and 3) a strengthening US economy could lead to a negative sector rotation, as the med-tech industry is non-cyclical in nature.

citigroup

If the impact on the company from any of these factors proves to be greater/less than we anticipate, it may prevent the stock from achieving our target price or could cause our target price to be materially outperformed.

### Guidant (GDT –$70.40; 3H)

*Valuation*

Our $48 target on GDT is still based on fundamental valuation and not on the newly proposed deal terms by either JNJ or BSX. Our target is based on an average of a 22x P/E multiple off of our forward 12-month EPS estimate of $1.46 (Q4:05 – Q3:06), a 16x TEV/2005 EBITDA multiple, and a DCF valuation.

Our P/E multiple is based on GDT trading at 22x forward 12-month earnings, which is based on a multiple that is in line to slightly below our Citigroup Med Tech Index (CMTI) of 17 large-cap companies, which also averages 22x.. Our index includes companies such as Medtronic, Baxter, and Alcon. Our in-line target is based on Guidant performance over the next 12-months falling right in the average range of the group. The P/E multiples in the group range from as low as 15x forward earnings to as high as 33x forward earnings.

Our TEV/EBITDA multiple of 16x 2005 EBITDA is also roughly in line with the CMTI average of 17x. This is based on the same reasons as the in-line P/E multiple. The group TEV/EBITDA multiples in the CMTI range from 10x to 32x.

**Guidant Estimated Valuation Ratios If JNJ or BSX Deal Breaks**

|  | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 34x | 22x | 26x | 18x | 22x | $45.04 | -36% |
| TEV/EBITDA | 17x | 17x | 20x |  | 16x | $50.84 | -28% |
| Implied DCF Value | – |  |  |  |  | $47.81 | -32% |
| Derived Price Target |  |  |  |  |  | $47.90 | -32% |
| Dividend Yield |  |  |  |  |  |  | 1% |
| Expected Total Return |  |  |  |  |  |  | -32% |

*Source: Citigroup Investment Research*

Our DCF valuation of $48 per share is based on ten years of projected free cash flow with a 2% terminal growth rate. For an equity risk premium we used 3.8%; our adjusted beta is 0.79; and our weighted average cost of capital is 7.2%.

*Risks*

We rate Guidant High Risk primarily based on four factors: 1) Risk of failure of the company's DES programs; 2) Liability surrounding EVT; 3) Additional fallout from the ICD recall; and 4) A formal SEC investigation.

Upside investment risks to our Sell rating and target price include: 1) the completion of the proposed acquisition by either Johnson & Johnson or Boston Scientific, or 2) a stronger-than-anticipated return in the ICD market.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from foreign exchange if favorable yoy comparisons of the US dollar versus



the Euro and Yen subside; and 3) a strengthening US economy could lead to a negative sector rotation, as the med tech industry is non-cyclical in nature.

On the contrary, shares of Guidant could fall below our target price should the company's ICD market share losses continue or should legal problems relating to the recent DOJ subpoena or the SEC investigation arise. These situations would likely cause the deal to break for a second time, which could also cause Guidant to fall below our target.

---

### Boston Scientific (BSX– $25.05; 2H)

*Valuation*

Our price target on Boston Scientific remains $27. Our $27 target price is based off an average of three different valuations: 1) a 15x multiple off our forward 12 months (F12M ending 3Q:06) EPS forecast of $1.75; 2) a TEV/EBITDA target multiple of 10x; and 3) a 10-year DCF analysis.

A 15x P/E multiple represents a 30%-35% discount our CMTI F12M group multiple of 22x and is based on a forecast of minimal EPS growth from 2005-08 and the heightened risk that TAXUS share could fall below our Street low expectations. The CMTI is comprised of 17 large-cap medical devices companies, including companies such as Johnson & Johnson, Medtronic, and Alcon. The range of the CMTI F12M P/E multiples is from 15x to 33x.

Our TEV/EBITDA target multiple of 10x is also based on Boston trading at a 30%-35% discount to the current CMTI multiple of 17x. The comp group has changed ever so slightly since our last published note, pushing our multiple target for BSX to round down from 11x to 10x. This said, the difference in value is minimal. The TEV/EBITDA range for the CMTI is from 10x to 32x current enterprise value to projected 2005 EBITDA.

**Boston Scientific Valuation Ratios**

|  | Current | CMTI | Cardio Peers | S&P 500 | Multiple Target | Target Price | Total Return |
|---|---|---|---|---|---|---|---|
| Price/F12M EPS | 14x | 23x | 31x | 19x | 15x | $26.12 | 4% |
| TEV/EBITDA | 10x | 17x | 23x |  | 10x | $28.62 | 14% |
| Implied DCF Value | -- |  |  |  |  | $26.31 | 5% |
| Derived Price Target |  |  |  |  |  | $27.00 | 8% |
| Dividend Yield |  |  |  |  |  |  | 0% |
| Expected Total Return |  |  |  |  |  |  | 8% |

*Source: Citigroup Investment Research*

Our DCF valuation of $27 per share is based on 10 years of projected free cash flow with a 1% terminal growth rate. For an equity risk premium we used 3.9%, our adjusted beta is 1.51 and our WACC is 8.9%.

*Risks*

We rate BSX shares High Risk. Investment risks particular to Boston Scientific include:

➤ **Reliance on a single product line.** The expected performance of the TAXUS stent in 2005 means that 40% of sales and 50% of EPS will come from a single product line. No other large-cap med tech company has this level of sales and EPS concentrated in one product line and recent data has led to questions about the safety profile of this stent.

citigroup J

➤ **Patent risk surrounding the TAXUS stent.** Boston remains in litigation with JNJ over key stent patents in the US. Boston recently lost initial jury decisions on two JNJ patents (Palmaz and Gray), but won decisions on two of its own patents (Ding and Yang). These cases are unlikely to be resolved anytime soon, but could ultimately result in a large damage award or injunctive relief.

➤ **Competitive ASP pressure in the DES market in excess of our forecast.** We expect US DES ASPs to decline by 5% annually through 2008. Primary DES competitor JNJ is larger and better capitalized and has already been using price to win back DES market share in the US.

We would also highlight that BSX has recently announced its intentions to bid for Guidant. A culmination of this deal could adversely provide new risk to our BSX rating in either direction, as it could cause BSX share to fall due to possible dilution or could cause share to increase in value based on improved long-term prospects for BSX.

Our High Risk rating is primarily based on the company's significant reliance on a single product line combined with the outstanding legal issues noted above.

Investment risks relating to the medical supplies and technology ("med tech") industry include: 1) modest pricing pressure across most major product lines; 2) a reduction in sales and EPS benefit from FX as favorable Y/Y comparisons of the US dollar vs. the Euro and Yen subside in Q4; and 3) negative sector rotation if the US economy remains strong, as the med tech industry is non-cyclical in nature.

The above factors highlight some of the risks associated with investing in Boston Scientific's shares (for a more detailed list, please see the company's most recent 10-K filing). If any of the above-mentioned risk factors has a more negative impact on the company than we anticipate, the stock will likely have difficulty achieving our target price. Conversely, if any of these risk factors has less of an impact on the company's fundamentals, the stock could materially outperform our price target.



## ANALYST CERTIFICATION

APPENDIX A-1

I, Matthew J. Dodds, research analyst and the author of this report, hereby certify that all of the views expressed in this research report accurately reflect my personal views about any one all of the subject issuer(s) or securities. I also certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation(s) or view(s) in this report.

## IMPORTANT DISCLOSURES

### Boston Scientific (BSX)
Ratings and Target Price History - Fundamental Research
Analyst: Matthew Dodds (covered since May 19 2004)



### Guidant Corporation (GDT)
Ratings and Target Price History - Fundamental Research
Analyst: Matthew Dodds (covered since May 19 2004)





## Johnson & Johnson (JNJ)
### Ratings and Target Price History – Fundamental Research
Analyst: Matthew Dodds (covered since November 12 2004)



| # | • Date | Rating | Target Price | Closing Price |
|---|--------|--------|--------------|---------------|
| 1: | 11 Nov 04 | 1L | *71.00 | 60.59 |
| 2: | 7 Dec 04 | 1L | *72.00 | 60.41 |
| 3: | 18 Apr 05 | 1L | *75.00 | 69.04 |
| 4: | 20 Apr 05 | 1L | *80.00 | 68.10 |

*Indicates change.

— Covered
---- Not covered

Customers of the Firm in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at http://www.smithbarney.com (for retail clients) or http://www.citigroup.com (for Institutional clients) or can call (866) 836-9542 to request a copy of this research.

A director of Citigroup Inc. serves as a director of Johnson & Johnson.

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Johnson & Johnson. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. and/or its affiliates has a significant financial interest in relation to Guidant Corporation. (For an explanation of the determination of significant financial interest, please refer to the policy for managing conflicts of interest which can be found at www.citigroupgeo.com .)

Citigroup Global Markets Inc. or its affiliates beneficially owns 1% or more of any class of common equity securities of Guidant Corporation. This position reflects information available as of the prior business day.

Citigroup Global Markets Inc. or an affiliate received compensation for products and services other than investment banking services from Boston Scientific, Guidant Corporation and Johnson & Johnson in the past 12 months.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Citigroup Global Markets Inc. currently has, or had within the past 12 months, the following company(ies) as clients, and the services provided were non-investment-banking, non-securities-related: Boston Scientific, Guidant Corporation and Johnson & Johnson.

Analysts' compensation is determined based upon activities and services intended to benefit the investor clients of Citigroup Global Markets Inc. and its affiliates ("the Firm"). Like all Firm employees, analysts receive compensation that is impacted by overall firm profitability, which includes revenues from, among other business units, the Private Client Division, Institutional Equities, and Investment Banking.

The Firm is a market maker in the publicly traded equity securities of Boston Scientific, Guidant Corporation and Johnson & Johnson.

### Citigroup Investment Research Ratings Distribution
Data current as of 31 December 2005

| | Buy | Hold | Sell |
|---|-----|------|------|
| Citigroup Investment Research Global Fundamental Coverage (2784) | 42% | 41% | 17% |
| % of companies in each rating category that are investment banking clients | 47% | 48% | 37% |
| Medical Supplies & Technology – North America (9) | 44% | 33% | 22% |
| % of companies in each rating category that are investment banking clients | 50% | 33% | 50% |

Guide to Fundamental Research Investment Ratings:
Citigroup Investment Research's stock recommendations include a risk rating and an investment rating.
Risk ratings, which take into account both price volatility and fundamental criteria, are: Low (L), Medium (M), High (H), and Speculative (S).
Investment ratings are a function of Citigroup Investment Research's expectation of total return (forecast price appreciation and dividend yield within the next 12 months) and risk rating.
For securities in developed markets (US, UK, Europe, Japan, and Australia/New Zealand), investment ratings are: Buy (1) (expected total return of 10% or more for Low-Risk stocks, 15% or more for Medium-Risk stocks, 20% or more for High-Risk stocks, and 35% or more for Speculative stocks); Hold (2) (0%-10% for Low-Risk stocks, 0%-15% for Medium-Risk stocks, 0%-20% for High-Risk stocks, and 0%-35% for Speculative stocks); and Sell (3) (negative total return).
Investment ratings are determined by the ranges described above at the time of initiation of coverage, a change in investment and/or risk rating, or a change in target price (subject to limited management discretion). At other times, the expected total returns may fall outside of these ranges because of market price movements and/or other short-term volatility or trading patterns. Such interim deviations from


citigroup

specified ranges will be permitted but will become subject to review by Research Management. Your decision to buy or sell a security should be based upon your personal investment objectives and should be made only after evaluating the stock's expected performance and risk.

Between September 9, 2002, and September 12, 2003, Citigroup Investment Research's stock ratings were based upon expected performance over the following 12 to 18 months relative to the analyst's industry coverage universe at such time. An Outperform (1) rating indicated that we expected the stock to outperform the analyst's industry coverage universe over the coming 12-18 months. An In-line (2) rating indicated that we expected the stock to perform approximately in line with the analyst's coverage universe. An Underperform (3) rating indicated that we expected the stock to underperform the analyst's coverage universe. In emerging markets, the same ratings classifications were used, but the stocks were rated based upon expected performance relative to the primary market index in the region or country. Our complementary Risk rating system — Low (L), Medium (M), High (H), and Speculative (S) — took into account predictability of financial results and stock price volatility. Risk ratings for Asia Pacific were determined by a quantitative screen which classified stocks into the same four risk categories. In the major markets, our Industry rating system — Overweight, Marketweight, and Underweight — took into account each analyst's evaluation of their industry coverage as compared to the primary market index in their region over the following 12 to 18 months.

## OTHER DISCLOSURES

Within the past 5 years, Citigroup Global Markets Inc. or its affiliates has acted as manager or co manager of a public offering of fixed income securities of Boston Scientific and Johnson & Johnson.

Citigroup Global Markets Inc. or its affiliates beneficially owns 2% or more of any class of common equity securities of Guidant Corporation.

Citigroup Global Markets Inc. or its affiliates holds a long position in any class of common equity securities of Guidant Corporation.

For securities recommended in the Product in which the Firm is not a market maker, the Firm is a liquidity provider in the issuers' financial instruments and may act as principal in connection with such transactions. The Firm is a regular issuer of traded financial instruments linked to securities that may have been recommended in the Product. The Firm regularly trades in the securities of the subject company(ies) discussed in the Product. The Firm may engage in securities transactions in a manner inconsistent with the Product and, with respect to securities covered by the Product, will buy or sell from customers on a principal basis.

Securities recommended, offered, or sold by the Firm: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources that the Firm believes to be reliable, we do not guarantee its accuracy and it may be incomplete and condensed. Note, however, that the Firm has taken all reasonable steps to determine the accuracy and completeness of the disclosures made in the Important Disclosures section of the Product. In producing Product, members of the Firm's research department may have received assistance from the subject company(ies) referred to in the Product. Any such assistance may have included access to sites owned, leased or otherwise operated or controlled by the issuers and meetings with management, employees or other parties associated with the subject company(ies). Firm policy prohibits research analysts from sending draft research to subject companies. However, it should be presumed that the author of the Product has had discussions with the subject company to ensure factual accuracy prior to publication. All opinions, projections and estimates constitute the judgment of the author as of the date of the Product and are subject to change without notice. Prices and availability of financial instruments also are subject to change without notice. Although Citigroup Investment Research does not set a predetermined frequency for publication, if the Product is a fundamental research report, it is the intention of Citigroup Investment Research to provide research coverage of the/those issuer(s) mentioned therein, including in response to news affecting this issuer, subject to applicable quiet periods and capacity constraints. The Product is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Any decision to purchase securities mentioned in the Product must take into account existing public information on such security or any registered prospectus.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. Foreign companies are generally not subject to uniform audit and reporting standards, practices and requirements comparable to those in the U.S. Securities of some foreign companies may be less liquid and their prices more volatile than securities of comparable U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rates conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received the Product from the Firm may be prohibited in certain states or other jurisdictions from purchasing securities mentioned in the Product from the Firm. Please ask your Financial Consultant for additional details. Citigroup Global Markets Inc. takes responsibility for the Product in the United States. Any orders by non-US investors resulting from the information contained in the Product may be placed only through Citigroup Global Markets Inc.

The Citigroup legal entity that takes responsibility for the production of the Product is the legal entity which the first named author is employed by. The Product is made available in Australia to wholesale clients through Citigroup Global Markets Australia Pty Ltd. (ABN 64 003 114 832 and AFSL No. 240992) and to retail clients through Citigroup Wealth Advisors Pty Ltd. (ABN 19 009 145 555 and AFSL No. 240813), Participants of the ASX Group and regulated by the Australian Securities & Investments Commission. Citigroup Centre, 2 Park Street, Sydney, NSW 2000. If the Product is being made available in certain provinces of Canada by Citigroup Global Markets (Canada) Inc. ("CGM Canada"), CGM Canada has approved the Product. Citigroup Place, 123 Front Street West, Suite 1100, Toronto, Ontario M5J 2M3. The Product may not be distributed to private clients in Germany. The Product is distributed in Germany by Citigroup Global Markets Deutschland AG & Co. KGaA, which is regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin). Frankfurt am Main, Reuterweg 16, 60323 Frankfurt am Main.  If the Product is made available in Hong Kong by, or on behalf of, Citigroup Global Markets Asia Ltd., it is attributable to Citigroup Global Markets Asia Ltd., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. Citigroup Global Markets Asia Ltd. is regulated by Hong Kong Securities and Futures Commission. If the Product is made available in Hong Kong by The Citigroup Private Bank to its clients, it is attributable to Citibank N.A., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong.  The Citigroup Private Bank and Citibank N.A. is regulated by the Hong Kong Monetary Authority.  The Product is made

citigroup

available in India by Citigroup Global Markets India Private Limited, which is regulated by Securities and Exchange Board of India. Bakhtawar, Nariman Point, Mumbai 400-021. If the Product was prepared by Citigroup Investment Research and distributed in Japan by Nikko Citigroup Ltd., it is being so distributed under license. Nikko Citigroup Limited is regulated by Financial Services Agency, Securities and Exchange Surveillance Commission, Japan Securities Dealers Association, Tokyo Stock Exchange and Osaka Securities Exchange. Akasaka Park Building, 2-20, Akasaka 5-chome, Minato-ku, Tokyo 107-6122. The Product is made available in Korea by Citigroup Global Markets Korea Securities Ltd., which is regulated by Financial Supervisory Commission and the Financial Supervisory Service. Hungkuk Life Insurance Building, 226 Shinmunno 1-GA, Jongno-Gu, Seoul, 110-061. The Product is made available in Malaysia by Citigroup Global Markets Malaysia Sdn Bhd, which is regulated by Malaysia Securities Commission. Menara Citibank, 165 Jalan Ampang, Kuala Lumpur, 50450. The Product is made available in Mexico by Acciones y Valores Banamex, S.A. De C. V., Casa de Bolsa, which is regulated by Comision Nacional Bancaria y de Valores. Reforma 398, Col. Juarez, 06600 Mexico, D.F. In New Zealand the Product is made available through Citigroup Global Markets New Zealand Ltd., a Participant of the New Zealand Exchange Limited and regulated by the New Zealand Securities Commission. Level 19, Mobile on the Park, 157 Lambton Quay, Wellington. The Product is made available in Poland by Dom Maklerski Banku Handlowego SA an indirect subsidiary of Citigroup.Inc., which is regulated by Komisja Papierów Wartosciowych i Gield. Bank Handlowy w Warszawie S.A. ul. Senatorska 16, 00-923 Warszawa. The Product is made available in the Russian Federation through ZAO Citibank, which is licensed to carry out banking activities in the Russian Federation in accordance with the general banking license issued by the Central Bank of the Russian Federation and brokerage activities in accordance with the license issued by the Federal Service for Financial Markets. Neither the Product nor any information contained in the Product shall be considered as advertising the securities mentioned in this report within the territory of the Russian Federation or outside the Russian Federation. The Product does not constitute an appraisal within the meaning of the Federal Law of the Russian Federation of 29 July 1998 No. 135-FZ (as amended) On Appraisal Activities in the Russian Federation. 8-10 Gashoka Street, 125047 Moscow. The Product is made available in Singapore through Citigroup Global Markets Singapore Pte. Ltd., a Capital Markets Services Licence holder, and regulated by Monetary Authority of Singapore. 1 Temasek Avenue, #39-02 Millenia Tower, Singapore 039192. Citigroup Global Markets (Pty) Ltd. is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at 145 West Street, Sandton, 2196, Saxonwold. Citigroup Global Markets (Pty) Ltd. is regulated by JSE Securities Exchange South Africa, South African Reserve Bank and the Financial Services Board. The investments and services contained herein are not available to private customers in South Africa. The Product is made available in Taiwan through Citigroup Global Markets Inc. (Taipei Branch), which is regulated by Securities & Futures Bureau. No portion of the report may be reproduced or quoted in Taiwan by the press or any other person. No. 8 Manhattan Building, Hsin Yi Road, Section 5, Taipei 100, Taiwan. The Product is made available in United Kingdom by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. This material may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA and further details as to where this may be the case are available upon request in respect of this material. Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB. The Product is made available in United States by Citigroup Global Markets Inc, which is regulated by NASD, NYSE and the US Securities and Exchange Commission. 388 Greenwich Street, New York, NY 10013. Unless specified to the contrary, within EU Member States, the Product is made available by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. Many European regulators require that a firm must establish, implement and make available a policy for managing conflicts of interest arising as a result of publication or distribution of investment research. The policy applicable to Citigroup Investment Research's Products can be found at www.citigroupgeo.com. Compensation of equity research analysts is determined by equity research management and Citigroup's senior management and is not linked to specific transactions or recommendations. The Product may have been distributed simultaneously, in multiple formats, to the Firm's worldwide institutional and retail customers. The Product is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal. Subject to the nature and contents of the Product, the investments described therein are subject to fluctuations in price and/or value and investors may get back less than originally invested. Certain high-volatility investments can be subject to sudden and large falls in value that could equal or exceed the amount invested. Certain investments contained in the Product may have tax implications for private customers whereby levels and basis of taxation may be subject to change. If in doubt, investors should seek advice from a tax adviser. Advice in the Product has been prepared without taking account of the objectives, financial situation or needs of any particular investor. Accordingly, investors should, before acting on the advice, consider the appropriateness of the advice, having regard to their objectives, financial situation and needs.

© 2006 Citigroup Global Markets Inc. Citigroup Investment Research is a division and service mark of Citigroup Global Markets Inc. and its affiliates and is used and registered throughout the world. Citigroup and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world. Nikko is a registered trademark of Nikko Cordial Corporation. All rights reserved. Any unauthorized use, duplication, redistribution or disclosure is prohibited by law and will result in prosecution. The Firm accepts no liability whatsoever for the actions of third parties. The Product may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the Product refers to website material of the Firm, the Firm has not reviewed the linked site. Equally, except to the extent to which the Product refers to website material of the Firm, the Firm takes no responsibility for, and makes no representations or warranties whatsoever as to, the data and information contained therein. Such address or hyperlink (including addresses or hyperlinks to website material of the Firm) is provided solely for your convenience and information and the content of the linked site does not in anyway form part of this document. Accessing such website or following such link through the Product or the website of the Firm shall be at your own risk and the Firm shall have no liability arising out of, or in connection with, any such referenced website.

ADDITIONAL INFORMATION IS AVAILABLE UPON REQUEST

11

# EXHIBIT I



See page 6 for Analyst Certification and Important Disclosures
**Multi-Company Note**

# Medical Supplies & Technology

### Deconstructing Xience

**March 23, 2006**

**Matthew J Dodds**
+1-212-816-6928
matthew.dodds@citigroup.com

SUMMARY

➤ Our work on the intellectual property (IP) challenges facing GDT's Xience stent suggests: 1) the BSX/GDT deal may not close on time and 2) ABT's purchase price for GDT's Vascular business looks excessive.

➤ We uncoupled the key components of Guidant's Xience drug-eluting stent and found potential IP issues on each piece.

➤ GDT's Vision stent appears to have a difficult roadblock against a stent patent held by Evysio that was recently licensed by MDT. This patent was recently found valid and novel by the EPO and has recently been asserted in the US.

➤ Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

➤ GDT's polymer is also likely to face issues as several patents in this arena were issued before GDT even developed this polymer.

**United States**

SUMMARY VALUATION AND RECOMMENDATION DATA

| Company (Ticker) | Price | Expected Returns | | | Rating | | Div.(E) | Target | LTGR | Earnings Per Share | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Price | Div. | Total | | | | | | Current Yr | Next Yr |
| Abbott Laboratories- | $44.10 | (13.8%) | 2.4% | (11.4%) | Curr | 3M | $1.07 | $38.00 | 7% | $2.52E | $2.65E |
| (ABT) | | | | | Prev | 3M | $1.07 | $38.00 | 7% | $2.52E | $2.65E |
| Boston Scientific- | $23.47 | (2.0%) | 0.0% | (2.0%) | Curr | 2S | $0.00 | $23.00 | 7% | $1.56E | $1.61E |
| (BSX) | | | | | Prev | 2S | $0.00 | $23.00 | 7% | $1.56E | $1.61E |
| Conor Medsystems- | $28.73 | 18.3% | 0.0% | 18.3% | Curr | 1S | $0.00 | $34.00 | NA | ($0.92)E | $0.33E |
| (CONR) | | | | | Prev | 1S | $0.00 | $34.00 | NA | ($0.92)E | $0.33E |
| Guidant Corporation- | $78.76 | (46.7%) | 0.5% | (46.2%) | Curr | 3S | $0.40 | $42.00 | 15% | $1.81E | $1.30E |
| (GDT) | | | | | Prev | 3S | $0.40 | $42.00 | 15% | $1.81E | $1.30E |
| Johnson & Johnson- | $61.00 | 31.1% | 2.1% | 33.3% | Curr | 1L | $1.29 | $80.00 | 11% | $3.49E | $3.84E |
| (JNJ) | | | | | Prev | 1L | $1.29 | $80.00 | 11% | $3.49E | $3.84E |
| Medtronic (MDT) | $53.83 | 26.3% | 0.6% | 27.0% | Curr | 1L | $0.34 | $68.00 | 17% | $2.22E | $2.54E |
| | | | | | Prev | 1L | $0.34 | $68.00 | 17% | $2.22E | $2.54E |

**OPINION**

**Deconstructing Xience....We know more about the IP than the efficacy**

We have spent the past few weeks reviewing the intellectual propery (IP) position of Guidant's highly-touted Xience drug-eluting stent. Our work included discussions with several companies in the drug-eluting stent space and a review by a patent expert. This work suggests the Xience stent faces several hurdles on the intellectual property front

Citigroup Research is a division of Citigroup Global Markets Inc. (the "Firm"), which does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Non-US research analysts who have prepared this report, and who may be associated persons of the member or member organization, are not registered/qualified as research analysts with the NYSE and/or NASD, but instead have satisfied the registration/qualification requirements or other research-related standards of a non-US jurisdiction.



citigroup J

that essentially cover the system through all of its primary components. While not a complete review, our analysis strongly suggests Abbott is paying a very hefty price given the IP risk and it is likely the FTC review of this IP landscape makes an early April close of the Boston/Guidant merger appear unlikely.

**The stent (Vision)**

Guidant's Vision stent is made of cobalt-chromium and is viewed as one of the premier bare metal stents along with Medtronic's Driver. The Vision has faced little patent opposition to date with the exception of a recent (February 10) negative decision on one patent by privately-held Medinol in the Southern district of New York. This trial is still proceeding as Guidant has challenged the patent's validity.

In Guidant's recent 10-K, another lawsuit was noted that could end up being an even bigger hurdle to Vision, especially in Europe. The case – filed in the Northern District of California on 2/16 – claims infringement by several of Guidant's balloon catheters and the Vision stent. The plaintiff in the case is Medtronic and privately-held Evysio Medical Devices, based in Vancouver.

The most interesting component of this lawsuit is the patent being asserted against the Vision – 6'858'037. This patent is owned by Evysio, but was recently licensed exclusively by Medtronic. This patent has already shown its strength in one European court and our patent work suggests the US claims are very similar.

In France, Evysio filed suit against Guidant's Vision stent soon after it was launched in 2003 seeking a preliminary injunction. At the core of this case was Evysio's patent EPO888093, which corresponds to US patent '037. On December 17, 2004, Evysio's request for a permanent injunction was not granted, but our review of the decision shows the Paris Court's decision heavily favored Evysio. While an injunction was not granted, most of Guidant's claims to dismiss the case (i.e., scope of the patent, priority date, novelty) were dismissed. In addition, the court determined that the "action on the merits seems to be serious" and Guidant was forced to post an 800,000 EUR bond pending a final decision on the case.

Since Guidant challenged the validity of the '093 patent, the case was stayed pending an Opposition Proceeding at the European Patent Office (EPO). Earlier this month, the EPO upheld the '093 patent and now the case in France can proceed. While this trial isn't likely to start until later in the year, the initial findings of the Paris court and the EPO decision put high odds on the Vision being found to infringe on the '093 patent.

Given that France is just one country in the European market (albeit the largest one) and the case may not have a final appellate decision for a couple of years, this case doesn't seem too troubling at first blush. Digging a bit deeper, we believe this case is a foreboding sign for Vision on two fronts.

First, with the favorable EPO decision and Medtronic's deep pockets, we expect Evysio and Medtronic to go after the Vision stent in several countries, including Ireland, where it is manufactured. If Vision is found to infringe in Ireland, it could lead to a lack of supply for this product in Europe.

In the US, we have compared the European '093 patent with the '037 US version and then templated the claims against the design of the Vision stent.

Claim 1 of the '037 patent is directed to:

An unexpanded stent comprising:

citigroup

➤ a tubular wall having a series of undulating circumferential portions, each circumferential portion comprising alternating peaks and valleys;

➤ the tubular wall also having a plurality of longitudinal portions connecting said series of undulating circumferential portions to form a porous, cylindrical surface;

➤ a longitudinal portion connecting a peak in a first circumferential portion with a valley in a second circumferential portion adjacent to the first circumferential portion; and

➤ each longitudinal portion having a flexure member, said flexure member, in two dimensions, being non-sinusoidal and arcuate, each flexure member being connected to an adjacent circumferential portion with a straight strut portion which is disposed parallel to a longitudinal axis of the stent.

The Guidant Multi-link stent is reproduced below:



Based upon our legal expert's comparison of the claim language of claim 1 to the picture of the Guidant Multi-link stent, the claim language appears to literally read on the Guidant Multi-link stent. The novelty of claim 1 appears to reside in the "flexure member" which is described as "non-sinusoidal and arcuate." In the Guidant Multi-link is the U-shaped member appears to correspond to the "flexure member" of the '037 patent. We have also looked at the file history of the '037 patent, and it appears that the language describing the "flexure member" was amended during prosecution of the patent.

The French decision describes claim 1 of the '093 patent, and the language of the U.S. and EPO patents are different, but claim 1 of the EPO patent also appears to be directed to the "flexure member." The EPO patent has also been amended to include a limitation directed to "laser cutting."

If we assume the '037 patent is valid (based on the favorable EPO review), the burden of proof will fall on Guidant to build a case of non-infringement. Our patent expert believes this will have to be based on prior art, which is a difficult hurdle, and suggests a 60-70% chance of success for the plaintiff.

**The drug (everolimus)**

Guidant obtained exclusive rights to using the drug everolimus on a stent from Novartis back in 2002. Unfortunately, obtaining rights to use the drug on a stent and holding the IP to use the drug on a stent are two entirely different things.

Over the past couple of months, potential blocking IP on using a derivative of Rapamycin, the drug JNJ uses on its Cypher stent, has surfaced. This IP originally showed up as part of JNJ's agreement with Abbott in order to receive FTC approval for the acquisition of Guidant While JNJ originally offered Abbott what was believed to be the key to a deal – access to rapid exchange delivery system patents – Abbott apparently lobbied the FDA for two other patent portfolios owned by JNJ. These patents, broadly known as Falotico (6'776'796) and Wright (6'585'764) – were apparently deemed to be vital to the use of a limus "analogue" on a stent and both everolimus and zotarolimus (the drug used in ZoMaxx) fall under this definition of an analogue. JNJ ended up being required to license both patents to Abbott for



its ZoMaxx stent program in order to satisfy the FTC, but the deal ended up dying along with JNJ's acquisition of Guidant once Boston Scientific entered the picture.

What is interesting about this change is that Abbott is now acquiring Guidant's Xience platform alongside its ZoMaxx platform yet neither product will have access to the '796 or '764 patents. Hence, both products could be found to infringe these patents. This puts the FTC in an interesting spot as the agency was compelled to make sure Abbott received access to these patents in its approval of the JNJ/Guidant combination and will now have to be comfortable that Abbott will still be considered a viable player without access.

Of the two patents, the '796 appears to be particularly damaging as it was filed in 2001 and now has over 27 follow on patents pending with the PTO.

**The polymer**

Guidant finally unveiled the composition of the polymer on the Xience stent during a presentation at the ACC last week. While the name of the polymer was not provided, we did see background information on the composition -- acrylic and flourinated polymers. We looked into the IP around this polymer composition and found a handful of patents granted to JNJ's polymer supplier Surmodix and a patent on flourinated polymers by Medtronic (Nolting, 6'488'701) that was filed all the way back in 1998 and issued in December 2002. We also believe JNJ's Ethicon division may have some patents around both acrylic and flourinated polymers.

It should also be noted that Guidant is likely to have trouble moving from its current durable polymer to a bioaborbable one. As we noted in our March 14 note (*ACC 2006: DES Behind the Scenes*) concerns about late thrombosis with durable polymers appears to be driving the industry toward bioerodable polymers where Conor currently holds the lead.

While we do not believe Guidant has any version of Xience with a bioerodable polymer in the works, any work in this area could be subject to IP from its jilted partner Biosensors. Biosensors has a patent – 6'939'376 – that was just issued in September 2005 that covers immuno-suppressive drugs, including everolimus, on a stent with a biodegradable polymer. While we believe Guidant may technically have rights to this patent since its partnership with Biosensors has not been officially severed, it does appear well on its way since Biosensors Occam subsidiary sued Guidant in California on January 20 under the allegation that Guidant breached its contractual obligations.

**What can happen from here**

Near term, there are two events to look out for relating to these patents. First, we believe JNJ's '796 and '764 patents will need to be strongly considered by the FTC, which is likely to make Boston's plan to close the Guidant deal by April 3 unrealistic. Second, we would not be surprised to see Medtronic and Evysio file suit in Ireland shortly, which could put the EU launch of the Xience at risk.

Longer-term, the IP issues looming could be a major problem for Abbott given the amount of money that it is paying for Xience and the Street's bullish stance on Abbott's interventional cardiology prospects post the Guidant deal. Based on our analysis, Abbott would have been better off sticking with JNJ and not helping Boston win the bidding war since it would have had broader IP access and paid a much lower price. For Abbott to take this risk, we can only assume the company's expectation for either the efficacy or approval timing of its ZoMaxx platform is less optimistic than the Street's projections.

citigroup⌐

For Medtronic, the licensing of the Evysio patents could prove a key chip to barter for access to rapid exchange and/or the Lau patents.

### QUARTERLY ESTIMATES PER SHARE DATA

| Ticker | Period | Current Year | | Next Year | | Next Year + 1 | |
|---|---|---|---|---|---|---|---|
| | | Current | Previous | Current | Previous | Current | Previous |
| ABT | 1Q | $0.60E | $0.60E | NA | NA | NA | NA |
| (FYE Dec) | 2Q | $0.61E | $0.61E | NA | NA | NA | NA |
| | 3Q | $0.61E | $0.61E | NA | NA | NA | NA |
| | 4Q | $0.70E | $0.70E | NA | NA | NA | NA |
| | Year | $2.52E | $2.52E | $2.65E | $2.65E | $2.76E | $2.76E |
| BSX | 1Q | $0.42E | $0.42E | NA | NA | NA | NA |
| (FYE Dec) | 2Q | $0.41E | $0.41E | NA | NA | NA | NA |
| | 3Q | $0.37E | $0.37E | NA | NA | NA | NA |
| | 4Q | $0.36E | $0.36E | NA | NA | NA | NA |
| | Year | $1.56E | $1.56E | $1.61E | $1.61E | $1.60E | $1.60E |
| CONR | 1Q | ($0.35)E | ($0.35)E | NA | NA | NA | NA |
| (FYE Dec) | 2Q | ($0.21)E | ($0.21)E | NA | NA | NA | NA |
| | 3Q | ($0.20)E | ($0.20)E | NA | NA | NA | NA |
| | 4Q | ($0.16)E | ($0.16)E | NA | NA | NA | NA |
| | Year | ($0.92)E | ($0.92)E | $0.33E | $0.33E | $2.15E | $2.15E |
| GDT | 1Q | $0.65A | $0.65A | $0.30E | $0.30E | NA | NA |
| (FYE Dec) | 2Q | $0.63A | $0.63A | $0.38E | $0.38E | NA | NA |
| | 3Q | $0.28A | $0.28A | $0.33E | $0.33E | NA | NA |
| | 4Q | $0.25A | $0.25A | $0.29E | $0.29E | NA | NA |
| | Year | $1.81E | $1.81E | $1.30E | $1.30E | $1.93E | $1.93E |
| JNJ | 1Q | $0.97A | $0.97A | $1.04E | $1.04E | NA | NA |
| (FYE Dec) | 2Q | $0.93A | $0.93A | $1.03E | $1.03E | NA | NA |
| | 3Q | $0.87A | $0.87A | $1.00E | $1.00E | NA | NA |
| | 4Q | $0.73A | $0.73A | $0.77E | $0.77E | NA | NA |
| | Year | $3.49E | $3.49E | $3.84E | $3.84E | $4.21E | $4.21E |
| MDT | 1Q | $0.50A | $0.50A | NA | NA | NA | NA |
| (FYE Apr) | 2Q | $0.54A | $0.54A | NA | NA | NA | NA |
| | 3Q | $0.55E | $0.55E | NA | NA | NA | NA |
| | 4Q | $0.63E | $0.63E | NA | NA | NA | NA |
| | Year | $2.22E | $2.22E | $2.54E | $2.54E | $2.94E | $2.94E |



## ANALYST CERTIFICATION                                    APPENDIX A-1

I, Matthew Dodds, research analyst and the author of this report, hereby certify that all of the views expressed in this research report accurately reflect my personal views about any and all of the subject issuer(s) or securities. I also certify that no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation(s) or view(s) in this report.

## IMPORTANT DISCLOSURES

Analysts' compensation is determined based upon activities and services intended to benefit the investor clients of Citigroup Global Markets Inc. and its affiliates ("the Firm"). Like all Firm employees, analysts receive compensation that is impacted by overall firm profitability, which includes revenues from, among other business units, the Private Client Division, Institutional Equities, and Investment Banking.

**Citigroup Investment Research Ratings Distribution**
*Data current as of 31 December 2005*

|  | Buy | Hold | Sell |
|---|---|---|---|
| Citigroup Investment Research Global Fundamental Coverage (2784) | 42% | 41% | 17% |
| % of companies in each rating category that are investment banking clients | 47% | 46% | 37% |

**Guide to Fundamental Research Investment Ratings:**
Citigroup Investment Research's stock recommendations include a risk rating and an investment rating.
Risk ratings, which take into account both price volatility and fundamental criteria, are: Low (L), Medium (M), High (H), and Speculative (S).
Investment ratings are a function of Citigroup Investment Research's expectation of total return (forecast price appreciation and dividend yield within the next 12 months) and risk rating.
For securities in developed markets (US, UK, Europe, Japan, and Australia/New Zealand), investment ratings are: Buy (1) (expected total return of 10% or more for Low-Risk stocks, 15% or more for Medium-Risk stocks, 20% or more for High-Risk stocks, and 35% or more for Speculative stocks); Hold (2) (0%-10% for Low-Risk stocks, 0%-15% for Medium-Risk stocks, 0%-20% for High-Risk stocks, and 0%-35% for Speculative stocks); and Sell (3) (negative total return).
For securities in emerging markets (Asia Pacific, Emerging Europe/Middle East/Africa, and Latin America), investment ratings are: Buy (1) (expected total return of 15% or more for Low-Risk stocks, 20% or more for Medium-Risk stocks, 30% or more for High-Risk stocks, and 40% or more for Speculative stocks); Hold (2) (5%-15% for Low-Risk stocks, 10%-20% for Medium-Risk stocks, 15%-30% for High-Risk stocks, and 20%-40% for Speculative stocks); and Sell (3) (5% or less for Low-Risk stocks, 10% or less for Medium-Risk stocks, 15% or less for High-Risk stocks, and 20% or less for Speculative stocks).
Investment ratings are determined by the ranges described above at the time of initiation of coverage, a change in investment and/or risk rating, or a change in target price (subject to limited management discretion). At other times, the expected total returns may fall outside of these ranges because of market price movements and/or other short-term volatility or trading patterns. Such interim deviations from specified ranges will be permitted but will become subject to review by Research Management. Your decision to buy or sell a security should be based upon your personal investment objectives and should be made only after evaluating the stock's expected performance and risk.

## OTHER DISCLOSURES

For securities recommended in the Product in which the Firm is not a market maker, the Firm is a liquidity provider in the issuers' financial instruments and may act as principal in connection with such transactions. The Firm is a regular issuer of traded financial instruments linked to securities that may have been recommended in the Product. The Firm regularly trades in the securities of the subject company(ies) discussed in the Product. The Firm may engage in securities transactions in a manner inconsistent with the Product and, with respect to securities covered by the Product, will buy or sell from customers on a principal basis.

Securities recommended, offered, or sold by the Firm: (i) are not insured by the Federal Deposit Insurance Corporation; (ii) are not deposits or other obligations of any insured depository institution (including Citibank); and (iii) are subject to investment risks, including the possible loss of the principal amount invested. Although information has been obtained from and is based upon sources that the Firm believes to be reliable, we do not guarantee its accuracy and it may be incomplete and condensed. Note, however, that the Firm has taken all reasonable steps to determine the accuracy and completeness of the disclosures made in the Important Disclosures section of the Product. In producing Products, members of the Firm's research department may have received assistance from the subject company(ies) referred to in the Product. Any such assistance may have included access to sites owned, leased or otherwise operated or controlled by the issuers and meetings with management, employees or other parties associated with the subject company(ies). Firm policy prohibits research analysts from sending draft research to subject companies. However, it should be presumed that the author of the Product has had discussions with the subject company to ensure factual accuracy prior to publication. All opinions, projections and estimates constitute the judgment of the author as of the date of the Product and are subject to change without notice. Prices and availability of financial instruments also are subject to change without notice. Although Citigroup Investment Research does not set a predetermined frequency for publication, if the Product is a fundamental research report, it is the intention of Citigroup Investment Research to provide research coverage of the/those issuer(s) mentioned therein, including in response to news affecting this issuer, subject to applicable quiet periods and capacity constraints. The Product is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of a security. Any decision to purchase securities mentioned in the Product must take into account existing public information on such security or any registered prospectus.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. Foreign companies are generally not subject to uniform audit and reporting standards, practices and requirements comparable to those in the U.S. Securities of some foreign companies may be less liquid and their prices more volatile than securities of comparable U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rates conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received the Product from the Firm may be prohibited in certain states or other jurisdictions from

6

**citigroup**

purchasing securities mentioned in the Product from the Firm. Please ask your Financial Consultant for additional details. Citigroup Global Markets Inc. takes responsibility for the Product in the United States. Any orders by non-US investors resulting from the information contained in the Product may be placed only through Citigroup Global Markets Inc.

The Citigroup legal entity that takes responsibility for the production of the Product is the legal entity which the first named author is employed by. The Product is made available in Australia to wholesale clients through Citigroup Global Markets Australia Pty Ltd. (ABN 64 003 114 832 and AFSL No. 240992) and to retail clients through Citigroup Wealth Advisors Pty Ltd. (ABN 19 009 145 555 and AFSL No. 240813), Participants of the ASX Group and regulated by the Australian Securities & Investments Commission. Citigroup Centre, 2 Park Street, Sydney, NSW 2000. If the Product is being made available in certain provinces of Canada by Citigroup Global Markets (Canada) Inc. ("CGM Canada"), CGM Canada has approved the Product. Citigroup Place, 123 Front Street West, Suite 1100, Toronto, Ontario M5J 2M3. The Product may not be distributed to private clients in Germany. The Product is distributed in Germany by Citigroup Global Markets Deutschland AG & Co. KGaA, which is regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin). Frankfurt am Main, Reuterweg 16, 60323 Frankfurt am Main. If the Product is made available in Hong Kong by, or on behalf of, Citigroup Global Markets Asia Ltd., it is attributable to Citigroup Global Markets Asia Ltd., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. Citigroup Global Markets Asia Ltd. is regulated by Hong Kong Securities and Futures Commission. If the Product is made available in Hong Kong by The Citigroup Private Bank to its clients, it is attributable to Citibank N.A., Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong. The Citigroup Private Bank and Citibank N.A. is regulated by the Hong Kong Monetary Authority. The Product is made available in India by Citigroup Global Markets India Private Limited, which is regulated by Securities and Exchange Board of India. Bakhtawar, Nariman Point, Mumbai 400-021. If the Product was prepared by Citigroup Investment Research and distributed in Japan by Nikko Citigroup Ltd., it is being so distributed under license. Nikko Citigroup Limited is regulated by Financial Services Agency, Securities and Exchange Surveillance Commission, Japan Securities Dealers Association, Tokyo Stock Exchange and Osaka Securities Exchange. Akasaka Park Building, 2-20, Akasaka 5-chome, Minato-ku, Tokyo 107-6122. The Product is made available in Korea by Citigroup Global Markets Korea Securities Ltd., which is regulated by Financial Supervisory Commission and the Financial Supervisory Service. Hungkuk Life Insurance Building, 226 Shinmunno 1-GA, Jongno-Gu, Seoul, 110-061. The Product is made available in Malaysia by Citigroup Global Markets Malaysia Sdn Bhd, which is regulated by Malaysia Securities Commission. Menara Citibank, 165 Jalan Ampang, Kuala Lumpur, 50450. The Product is made available in Mexico by Acciones y Valores Banamex, S.A. De C. V., Casa de Bolsa, which is regulated by Comision Nacional Bancaria y de Valores. Reforma 398, Col. Juarez, 06600 Mexico, D.F. In New Zealand the Product is made available through Citigroup Global Markets New Zealand Ltd., a Participant of the New Zealand Exchange Limited and regulated by the New Zealand Securities Commission. Level 19, Mobile on the Park, 157 lambton Quay, Wellington. The Product is made available in Poland by Dom Maklerski Banku Handlowego SA an indirect subsidiary of Citigroup Inc., which is regulated by Komisja Papierów Wartosciowych i Gield. Bank Handlowy w Warszawie S.A. ul. Senatorska 16, 00-923 Warszawa. The Product is made available in the Russian Federation through ZAO Citibank, which is licensed to carry out banking activities in the Russian Federation in accordance with the general banking license issued by the Central Bank of the Russian Federation and brokerage activities in accordance with the license issued by the Federal Service for Financial Markets. Neither the Product nor any information contained in the Product shall be considered as advertising the securities mentioned in this report within the territory of the Russian Federation or outside the Russian Federation. The Product does not constitute an appraisal within the meaning of the Federal Law of the Russian Federation of 29 July 1998 No. 135-FZ (as amended) On Appraisal Activities in the Russian Federation. 8-10 Gasheka Street, 125047 Moscow. The Product is made available in Singapore through Citigroup Global Markets Singapore Pte. Ltd., a Capital Markets Services Licence holder, and regulated by Monetary Authority of Singapore. 1 Temasek Avenue, #39-02 Millenia Tower, Singapore 039192. Citigroup Global Markets (Pty) Ltd. is incorporated in the Republic of South Africa (company registration number 2000/025866/07) and its registered office is at 145 West Street, Sandton, 2196, Saxonwold. Citigroup Global Markets (Pty) Ltd. is regulated by JSE Securities Exchange South Africa, South African Reserve Bank and the Financial Services Board. The investments and services contained herein are not available to private customers in South Africa. The Product is made available in Taiwan through Citigroup Global Markets Inc. (Taipei Branch), which is regulated by Securities & Futures Bureau. No portion of the report may be reproduced or quoted in Taiwan by the press or any other person. No. 8 Manhattan Building, Hsin Yi Road, Section 5, Taipei 100, Taiwan. The Product is made available in Thailand through Citicorp Securities (Thailand) Ltd., which is regulated by the Securities and Exchange Commission of Thailand. 18/F, 22/F and 29/F, 82 North Sathorn Road, Silom, Bangrak, Bangkok 10500, Thailand. The Product is made available in United Kingdom by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. This material may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA and further details as to where this may be the case are available upon request in respect of this material. Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB. The Product is made available in United States by Citigroup Global Markets Inc, which is regulated by NASD, NYSE and the US Securities and Exchange Commission. 388 Greenwich Street, New York, NY 10013. Unless specified to the contrary, within EU Member States, the Product is made available by Citigroup Global Markets Limited, which is regulated by Financial Services Authority. Many European regulators require that a firm must establish, implement and make available a policy for managing conflicts of interest arising as a result of publication or distribution of investment research. The policy applicable to Citigroup Investment Research's Products can be found at www.citigroupgeo.com. Compensation of equity research analysts is determined by equity research management and Citigroup's senior management and is not linked to specific transactions or recommendations. The Product may have been distributed simultaneously, in multiple formats, to the Firm's worldwide institutional and retail customers. The Product is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal. Subject to the nature and contents of the Product, the investments described therein are subject to fluctuations in price and/or value and investors may get back less than originally invested. Certain high-volatility investments can be subject to sudden and large falls in value that could equal or exceed the amount invested. Certain investments contained in the Product may have tax implications for private customers whereby levels and basis of taxation may be subject to change. If in doubt, investors should seek advice from a tax adviser. Advice in the Product has been prepared without taking account of the objectives, financial situation or needs of any particular investor. Accordingly, investors should, before acting on the advice, consider the appropriateness of the advice, having regard to their objectives, financial situation and needs.

© 2006 Citigroup Global Markets Inc. Citigroup Investment Research is a division and service mark of Citigroup Global Markets Inc. and its affiliates and is used and registered throughout the world. Citigroup and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world. Nikko is a registered trademark of Nikko Cordial Corporation. All rights reserved. Any unauthorized use, duplication, redistribution or disclosure is prohibited by law and will result in prosecution. The Firm accepts no liability whatsoever for the actions of third parties. The Product may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the Product refers to website material of the Firm, the Firm has not reviewed the linked site.

# citigroup

Equally, except to the extent to which the Product refers to website material of the Firm, the Firm takes no responsibility for, and makes no representations or warranties whatsoever as to, the data and information contained therein. Such address or hyperlink (including addresses or hyperlinks to website material of the Firm) is provided solely for your convenience and information and the content of the linked site does not in anyway form part of this document. Accessing such website or following such link through the Product or the website of the Firm shall be at your own risk and the Firm shall have no liability arising out of, or in connection with, any such referenced website.

ADDITIONAL INFORMATION IS AVAILABLE UPON REQUEST

8

# EXHIBIT J

# LEHMAN BROTHERS
EQUITY RESEARCH

January 30, 2006

United States of America
Healthcare
Medical Supplies & Devices

## Boston Scientific (BSX - $ 23.15) 1-Overweight

Company Update

Bob Hopkins
1.212.526.4919
bhopkins@lehman.com

BSX: The Risks – Part 1

**Investment Conclusion**

☐ Over the course of this week we will be writing a series of notes highlighting four key risks facing BSX: Intellectual property or patent risk, legal and legal liability risk, regulatory risk and integration risk. Each individual note will explore a different risk with today's note focusing on intellectual property risk.

**Summary**

☐ The purpose of these notes is to provide investors with more information to assess the risk profile of BSX as BSX's valuation and pending acquisition of GDT have created significant interest in the stock.

**EPS ($)**  (FY Dec)

| | 2004 | 2005 | | | 2006 | | | % Change | |
|---|---|---|---|---|---|---|---|---|---|
| | Actual | Old | New | St. Est. | Old | New | St. Est. | 2005 | 2006 |
| 1Q | 0.23A | 0.51A | 0.51A | 0.51A | 0.46E | 0.46E | 0.47E | 122% | -10% |
| 2Q | 0.44A | 0.48A | 0.48A | 0.48A | 0.27E | 0.27E | 0.47E | 9% | -44% |
| 3Q | 0.47A | 0.42A | 0.42A | 0.42A | 0.26E | 0.26E | 0.45E | -11% | -38% |
| 4Q | 0.49A | 0.42E | 0.42E | 0.42E | 0.29E | 0.29E | 0.46E | -14% | -31% |
| Year | 1.63A | 1.83E | 1.83E | 1.83E | 1.29E | 1.29E | 1.85E | 12% | -30% |
| P/E | 14.2 | | 12.7 | | | 17.9 | | | |

**Market Data**

| | |
|---|---|
| Market Cap (Mil.) | 20160 |
| Shares Outstanding (Mil.) | 840.00 |
| Float (%) | 574 |
| Dividend Yield | N/A |
| Convertible | No |
| 52 Week Range | 35.26 - 22.80 |

**Financial Summary**

| | |
|---|---|
| Revenue FY05 (Mil.) | 6315.0 |
| Five-Year EPS CAGR | 16.0 |
| Return on Equity | 30.00 |
| Current BVPS | 4.64 |
| Debt To Capital (%) | 30.62 |

**Stock Overview**



**Stock Rating**

New: 1-Overweight
Old: 1-Overweight

**Target Price**

New: $ 31.00
Old: $ 31.00

**Sector View:** 1-Positive

• Over the course of this week we will be writing a series of notes highlighting four key risks facing BSX: intellectual property or patent risk, legal and legal liability risk, regulatory risk and integration risk. Each individual note will explore a different risk with today's note focusing on intellectual property risk. On the legal risk front however, it is worth noting that over the weekend the New York Times reported that the US attorney's office in Minneapolis issued a subpoena for records disclosed in a Texas lawsuit that suggest the Government is undertaking a broad investigation of GDT including the potential for Medicare fraud. This is not surprising as we already knew the Government was interested, but the potential ramifications are meaningful and must be explored as we will later this week. The purpose of these notes is to provide investors with more information to assess the risk profile of BSX as BSX's valuation and pending acquisition of GDT have created significant interest in the stock.

• Intellectual Property Risk: As is typical in medical device land, BSX is involved in a number of litigations. Given that BSX is about to become a more highly leveraged company and that some of the current patent cases involve BSX's most important pipeline products,

Lehman Brothers does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.

Customers of Lehman Brothers in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.lehmanlive.com or can call 1-800-2LEHMAN to request a copy of this research.

Investors should consider this report as only a single factor in making their investment decision.

**PLEASE SEE ANALYST(S) CERTIFICATION(S) ON PAGE 5 AND IMPORTANT DISCLOSURES BEGINNING ON PAGE 6**

LEHMAN BROTHERS
EQUITY RESEARCH

the stakes are higher than normal. To bottom line it, we believe BSX's IP risk is manageable despite our view that BSX is more likely than not to come up on the short-end on a number of key upcoming decisions including Ding. We should hear a key decision on the Ding patent sometime in the next few months. Most of the key patent cases that BSX faces today involve JNJ and include the Palmaz-Schatz litigation, the Ding litigation, the Grey litigation, the Jang litigation, the Grainger litigation and a number of others. There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JNJ/Wyeth DES patents covering the "limus" family of drugs. BSX has not reserved any meaningful amount of money for currently pending IP litigation. The upcoming ruling on Ding from Judge Robinson of Delaware is the most important as a BSX victory would not only increase the probabilities that Liberte could launch without a problem, but it might also have a positive impact on the amount that BSX ultimately pays JNJ on the Palmaz litigation. If the Ding decision goes against BSX, investors would assume Liberte may never come to market, which would be a negative for investor sentiment towards BSX but it would not change our current BSX EPS estimates by more than a few pennies as we feel the market share loss relative to our current model would be less than 5 points. Liberte is a potential source of upside, but most seem to have modeled it conservatively.

- Importantly, it is our opinion that BSX faces little potential liquidity risk from these litigations as most of these law suits involve future products that have yet to truly launch in the US, which suggests little potential for damages. The Palmaz litigation could involve $500mm-$1bln in damages to JNJ, but that is something that investors have been aware of for a long time and we believe is manageable. The Ding ruling is critical because if BSX losses, BSX may not be able to launch its next generation DES (Liberte) in the US. Because BSX will now potentially have access to GDT's Xience stent however, the risk to BSX from not having Liberte is somewhat mitigated in our view especially considering that JNJ's pipeline remains an unknown and that JNJ Palmaz patents expired last year. We believe Judge Robinson will most likely overturn the Jury decision on Ding and hand JNJ a victory for reasons that we explain in the note, and while this will create considerable noise in the market place, our 2007 BSX EPS number of $1.47 would decline by less than $0.05. Liberte is scheduled to come to market late Q3 or early Q4 of this year and Xience is due out Q3:07. See the attached note for full details on all litigations.

### BSX Litigation: An Overview
In the following sections, we outline the majority of outstanding patent cases between JNJ and BSX on bare metal and drug-eluting stent technology, discussing those decisions that have gone in favor of BSX and JNJ and those yet to be decided. In addition, we attempt to quantify the potential damages BSX may owe JNJ, which could total as much as $900 mm ($550 mm or so for Express and Liberte and $350 mm for infringement by the NIR stent) in retro- and prospective royalties, by our calculations. However, if BSX is victorious on Ding, we believe it would swing the leverage back to BSX and any damages would likely be minimized if the two parties decide to trade IP rights (and money) in exchange for a settlement. If BSX loses on Ding, BSX's access to the Xience stent via the GDT merger would prevent any real market share damage in our view and while the economics to BSX from Xience sales are much less than from any TAXUS sales, we have taken this into account in our models.

### IP Summary – What you Need To Know

Essentially all DES manufacturers have been found in violation of JNJ's Palmaz-Schatz patent and BSX is no exception. While this patent has expired, we are waiting for the damages phase to hear how much BSX will owe JNJ for sales of its Express stents before the expiration. We estimate between $500mm and $1bln would be owed. BSX's Liberte stent has also been found to be in violation of JNJ's Gray patent, but JNJ's Cypher stent has been found to violate BSX's Ding patent and if that ruling sticks, BSX would have a great deal of leverage over JNJ, which could limit the amount BSX has to pay JNJ on Palmaz and limit JNJ's ability to shut down Liberte. A horse trade would be likely in that situation. BSX's Ding patent describes the use of a topcoat in a DES polymer and a jury ruled late last year that JNJ's Cypher DES system violates this key patent. Cypher is the only DES system JNJ sells. In addition to planning an appeal on Ding, JNJ is asking the Judge overseeing the case to overturn the Jury verdict and throw out the decision. If the Judge overturns the Jury verdict BSX's Liberte stent would be at risk because BSX's leverage over the Gray ruling would go away. JNJ has also been found to violate the Jang patent, but BSX's right to Jang seems in doubt. The damages phase on Palmaz seems to be on hold until the Ding decision.

Outside of Ding, Jang, Gray and Palmaz, BSX is also suing JNJ in the US on the Grainger patent, which describes the use of systemic drugs delivered on a stent. The case was originally scheduled to be heard in October (by Judge Robinson), but has since been rescheduled for March of 2006. JNJ has also made some recent assertions that GDT's everolimus may infringe JNJ IP covering the use of limus compounds (JNJ uses the parent compound, Sirolimus) in DES platforms, however none of those patents have been litigated and, to our knowledge, no suits have been filed as of yet. Also worth mentioning, BSX has been victorious in Europe on IP, effectively forcing JNJ to shift manufacturing out of the Netherlands, but this transition appears to have occurred seamlessly and therefore we doubt it provides BSX any significant leverage. Also worth mentioning, BSX has agreed to pay Medinol $750 mm in damages relating to the NIR stent – the settlement provides an end to most of the litigation risk, though there are still outstanding cases by both parties that were not included in the settlement.

In summary, BSX has won the initial rounds of litigation against JNJ on two important US patents – Ding and Jang, which cover polymer coatings for DES and bare metal stent architecture, respectively. JNJ has been victorious on the Palmaz-Schatz and Gray patents, which describe bare metal stent architecture – Express2 violates Palmaz, while Liberte violates both. Importantly, Palmaz-Schatz expired in November of 2005, but the Gray patent will be enforceable until 2016. The court has yet to decide on infringement for Liberte DES because it has yet to be launched in the US, but given that Liberte DES is, in effect, the Liberte stent, we believe there is a high probability Liberte DES (as well as Barracuda, which has the same stent architecture) will infringe Gray.

2

LEHMAN BROTHERS
EQUITY RESEARCH

With respect to timing, the key events we are waiting for are: 1) Judge Robinsons' decision on motions to overturn jury rulings on Ding and Jang as well as BSX motions to overturn Palmaz and Gray, with Ding being the key and JNJ having a reasonable chance of prevailing, in our opinion. No dates have been set, but final briefs were filed in October of 2005 and a ruling could come at any point; 2) JNJ is awaiting reinstatement of a $342 mm damages ruling for BSX's infringement with the NIR stent; 3) following the motions to overturn, all these cases will enter damages phases, with monetary awards to be decided and 4) all these decisions will be appealed, and importantly, BSX has not reserved for any of the potential damages for each of these cases.

**BSX Wins: The Ding and Jang Patents**
On July 2ND 2005, a jury handed down a surprising victory to BSX by ruling that JNJ's Cypher drug-eluting stent, among others, infringes BSX's Ding and Jang patents; the jury also ruled that the patents were valid. Ding describes a polymer with a top coat while Jang covers specific stent geometry. Please see Figures 1 and 2 below for specific patent details and wording.

**Figure 1: BSX Patent Wins**

| Key Patents Under Litigation | | | | | | |
|---|---|---|---|---|---|---|
| Patent Assignee | Patent No. | Date of Filing | Date of Issue | Inventor | Title | Abstract |
| BSX | 6,120,536 | 6/13/1996 | 9/19/2000 | Ding | Medical devices with long-term non-thrombogenic coatings | A coating and method for implantable open lattice metallic stent prostheses are disclosed. The coating includes a relatively thin layer of biostable elastomeric material containing an amount of biologically active material, particularly heparin, dispersed in the coating in combination with a non-thrombogenic surface. In one embodiment, the surface is provided with sites of high electronegativity species by coating with fluorosilicone which aid in controlling elution, particularly the initial release rate, and reduced thrombogenic activity. Other non-thrombogenic outer layers for heparin such as covalently bound polyethylene glycol (PEG) are also disclosed. |
| BSX | 5,922,021 | 4/25/1997 | 7/13/1999 | Jang | Intravascular stent | A stent in a non-expanded state has a first expansion strut pair consisting of a first expansion strut positioned adjacent to a second expansion strut and a joining strut which couples the first and second expansion struts at a distal end of the first expansion strut pair. A plurality of the first expansion strut pair form a first expansion column. A second expansion strut pair consists of a first expansion strut positioned adjacent to a second expansion strut and a joining strut couples the first and second expansion struts at a proximal end of the second expansion strut pair. A plurality of the second expansion strut pair form a second expansion column. A first connecting strut includes a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section. The first connecting strut proximal section is coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section is coupled to the proximal end of the second expansion strut pair of the second expansion column. A plurality of the first connecting struts form a first connecting strut column that couples the first expansion column to the second expansion column. A length of the first connecting strut proximal section is equal to a length of the first connecting strut distal section, and a length of the first connecting strut intermediate section is greater than the length of the first connecting strut proximal and distal sections. |

Source: US Patent Office

**Figure 2: Key Ding Patent Claims**

| Key Ding Patent Claims Under Litigation (BSX Patent No. 6,120,536) | |
|---|---|
| Claim No. | Description |
| 1 | A medical device having at least a portion which is implantable into the body of a patient, wherein at least a part of the device portion is metallic and at least part of the metallic device portion is covered with a coating for release of at least one biologically active material, wherein said coating comprises an undercoat comprising a hydrophobic elastomeric material incorporating an amount of biologically active material therein for timed release therefrom, and wherein said coating further comprises a topcoat which at least partially covers the undercoat, said topcoat comprising a biostable, non-thrombogenic material which provides long term non-thrombogenicity to the device portion during and after release of the biologically active material, and wherein said topcoat is substantially free of an elutable material. |
| 6 | The device of claim 1 wherein the medical device is an expandable stent. |
| 8 | The device of claim 6 wherein the stent comprises a tubular body having open ends and an open lattice sidewall structure and wherein the coating conforms to said sidewall structure in a manner that preserves said open lattice. |

Source: U.S. Patent Office web site

**JNJ's Prospects for Appeal on Ding**
Following the jury's decision on Ding, JNJ filed a motion with Judge Robinson to vacate the ruling based both on the narrow definition of important terms in claim 1 (see Figure 2 above), particularly the meaning of elastomeric, as well as the existence of prior art. Though the jury found that Ding was valid and JNJ did infringe, we continue to believe JNJ has several valid arguments that could serve the basis for a strong appeal and while there has been precedent for a Judge to overrule a decision from the bench, the likelihood of this occurring seems low. Specifically, in our review of the patent and the comments/rulings by Judge Robinson prior to the decision, we believe JNJ will again

3

LEHMAN BROTHERS
EQUITY RESEARCH

argue in its appeal that it does not infringe Ding, citing, among other things, the very specific definition of elastomeric coatings. In the Markman hearings (claims construction), an "elastomeric" material was defined by Judge Robinson as "a material able to stretch or expand without breaking, and to return to its original dimensions." JNJ has previously described Cypher as having an elastomeric coating, however during the trial, the company presented evidence which Judge Robinson cited in her decision that the coating does indeed crack when the stent is expanded — Judge Robinson, in her decision, specifically stated uncertainty as to whether, by the letter of the law, such a narrow definition would be inclusive of JNJ's stent. Despite the jury's ruling, JNJ may continue to use this argument in its appeal. With respect to prior art, several patents describing polymers on stents do exist (Fox, Domb, Myler), however with BSX having now received two affirmations of validity (from the patent office and Friday's jury decision), the probability the patent is found to be invalid would seem low.

### Other Litigation: BSX's Grainger Patent

Finally, March of 2006, JNJ and BSX will go back to trial once again to litigate the next IP case over BSX's Grainger patent (6,251,290), which describes the systemic (oral administration) and site-specific (on a stent) usage of therapeutic compounds (tamoxifen derivatives) to treat cardiovascular disease. No updates have been given and timing of a trial is unclear, other than to say Judge Robinson will likely rule on the outstanding cases (Ding, Gray, Palmaz, etc) prior to rendering a decision on Grainger.

### JNJ's Wins: Palmaz-Schatz and Gray and the NIR stent

On June 21st, 2005 a U.S. jury in the federal court of Delaware found that BSX's Express2 and Liberte bare metal stents and Taxus drug-eluting stent infringe JNJ's Palmaz-Schatz patent (expired in November 2005) and that Liberte also infringes JNJ's Gray patent (expires in 2016). The finding of infringement on the Palmaz-Schatz patent is not unexpected and the damages phase of the trial will be set after Judge Robinson rules on motions to overturn the jury decisions on Ding, Jang, Palmaz and Gray. The ruling on the Gray patent gives JNJ some meaningful leverage as it could allow JNJ to seek an injunction on BSX's Liberte DES platform or at least seek a royalty on Liberte DES sales when that device is approved around mid-2006, although BSX would be free to revert to the GDT Xience V stent.

In addition, on March 24, 2005 JNJ was victorious in a multi-year battle against BSX involving the NIR stent. JNJ originally won in 2000, but the court set aside the decision in 2002 and sent it back to trial which finally decided in JNJ's favor in March. JNJ is seeking reinstatement of the original $324 mm damages awarded (plus interest). This decision could come any day.

### Damages on Palmaz and Ding: What could BSX Have to Pay?

Assuming BSX loses on Ding and has little to no leverage in settlement/cross-licensing negotiations, we calculate that BSX could owe JNJ approximately $900 mm, comprised of $342 mm (plus interest) on NIR, and $550 mm for Express and Liberte. The latter could be reduced (perhaps to $200-300 mm) if BSX launches Xience in 2007 and continues selling Express2 (and not Liberte) which violates only the expired Palmaz patent, not Gray. Figure 3 below lays out the calculation damages. Our calculation involves applying a 15% royalty rate (an amount equivalent to that paid by GDT to JNJ in a similar ruling) to both Taxus and Express 2/Liberte sales from launch. On Taxus damages, JNJ could apply the royalty to only the bare metal portion of the stent as Gray and Palmaz only cover bare metal stent architecture. Of note, JNJ could seek treble damages award for willful infringement on Palmaz and Gray, which could bring the award well north of $1 billion, but the hurdle for such an outcome is high, in our opinion.

**Figure 3: BSX Potential Payments to JNJ**

| BSX Payment to JNJ Cumulative BMS + DES Sales | 2002A | 2003A | 2004A | 2005A | 2006E | 2007E | 2008E | Total |
|---|---|---|---|---|---|---|---|---|
| **US Revenues ($MM)** | | | | | | | | |
| Express/Liberte BMS | $90 | $209 | $60 | $27 | $16 | $15 | $15 | $432 |
| TAXUS/Liberte DES | 0 | 0 | 1,571 | 1,762 | 1,660 | 1,933 | 1,125 | 8,051 |
| Total | $90 | $209 | $1,632 | $1,789 | $1,676 | $1,948 | $1,140 | $8,483 |
| **ASPs ($)** | | | | | | | | |
| Express/Liberte BMS | $1,050 | $915 | $910 | $910 | $850 | $850 | $850 | $931 |
| TAXUS/Liberte DES | $0 | $0 | $2,580 | $2,450 | $2,260 | $2,050 | $1,900 | $2,238 |
| **Unit Sales** | | | | | | | | |
| Express/Liberte BMS | 85,519 | 227,869 | 66,264 | 29,670 | 18,824 | 17,647 | 17,647 | 463,440 |
| TAXUS/Liberte DES | 0 | 0 | 609,070 | 719,184 | 734,513 | 942,927 | 592,105 | 3,597,799 |
| Total | 85,519 | 227,869 | 675,334 | 748,854 | 753,337 | 960,574 | 609,752 | 4,061,238 |
| **Adjusted Revenues ($MM)** | | | | | | | | |
| Express/Liberte BMS | $90 | $209 | $60 | $27 | $16 | $15 | $15 | $432 |
| TAXUS/Liberte DES | 0 | 0 | 554 | 654 | 624 | 801 | 503 | 3,138 |
| Total | $90 | $209 | $615 | $681 | $640 | $816 | $518 | $3,569 |
| Royalty Assumption | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| Royalties on Express | $14 | $32 | $95 | $106 | $0 | $0 | $0 | $247.0 |
| Royalties on Liberte | $0 | $0 | $0 | $0 | $99 | $126 | $80 | $305.9 |
| **Total Royalties Due ($MM)** | $13.9 | $32.3 | $95.2 | $105.6 | $99.2 | $126.5 | $80.3 | $552.9 |

*Source: Company data; Lehman estimates*

4

# LEHMAN BROTHERS
**EQUITY RESEARCH**

**Analyst Certification:**

I, Bob Hopkins, hereby certify (1) that the views expressed in this research Company Note accurately reflect my personal views about any or all of the subject securities or issuers referred to in this Company Note and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this Company Note.

**Other Team Members:**

| | | |
|---|---|---|
| Blackman, Mathew | 1.212.526.9955 | mblackma@lehman.com |
| Guha, Amrita | 1.212.526.5144 | aguha@lehman.com |

**Company Description:**

Boston Scientific is a global medical technology company focused on less invasive medicine, specifically interventional cardiology, radiology, neurology, and urology products.

# LEHMAN BROTHERS
### EQUITY RESEARCH

**Important Disclosures:**

**Boston Scientific (BSX)**
**Rating and Price Target Chart:**

$ 23.15 (26-Jan-2006)

**1-Overweight / 1-Positive**

**BOSTON SCIENTIFIC**

As of 24-Jan-2006
Currency = USD



— Closing Price          ▲ Price Target
● Recommendation Change  ✖ Drop Coverage

Source: FactSet

Currency=$

| Date | Closing Price | Rating | Price Target |
|------|---------------|--------|--------------|
| 09-Mar-05 | 29.75 | | 37.00 |
| 15-Nov-04 | 34.60 | | 43.00 |
| 06-Aug-04 | 33.21 | | 49.00 |
| 28-May-04 | 44.30 | | 54.00 |
| 24-Feb-04 | 41.27 | | 49.00 |

| Date | Closing Price | Rating | Price Target |
|------|---------------|--------|--------------|
| 12-Jan-04 | 36.40 | | 41.00 |
| 16-Sep-03 | 33.25 | | 37.00 |
| 12-Jun-03 | 30.43 | | 32.50 |

FOR EXPLANATIONS OF RATINGS REFER TO THE STOCK RATING KEYS LOCATED ON THE PAGE FOLLOWING THE LAST PRICE CHART.

One of the analysts on the coverage team (or a member of his or her household) owns shares of the common stock of Boston Scientific.
Lehman Brothers Inc and/or an affiliate trade regularly in the shares of Boston Scientific.

**Valuation Methodology:** Our $31 price target is derived from a 18.5x multiple off our 2006 cash EPS estimate of $1.68.

**Risks Which May Impede the Achievement of the Price Target:** Exposure to emerging drug-eluting stent market. Exposure to interventional cardiology market. Competition from other drug-eluting stent players. Acquisition integration. Risk from pending litigation.

**Other Material Conflicts:** One of the analysts on the coverage team (or a member of his or her household) owns common stock and options in the common stock of Boston Scientific.

6

# LEHMAN BROTHERS
### EQUITY RESEARCH

**Important Disclosures Continued:**
**Guidant Corp (GDT)**
**Rating and Price Target Chart:**

$ 75.26 (26-Jan-2006)

2-Equal weight / 1-Positive

GUIDANT CORP

As of 25-Jan-2006
Currency = USD



---- Closing Price          ▲ Price Target
● Recommendation Change ✖ Drop Coverage

Source: FactSet

| Currency=$ | | | |
|---|---|---|---|
| Date | Closing Price | Rating | Price Target |
| 29-Dec-05 | 64.85 | | 68.00 |
| 10-Nov-05 | 57.75 | | 68.00 |
| 08-Nov-05 | 56.53 | | 70.00 |
| 03-Nov-05 | 57.97 | | 76.00 |
| 21-Dec-04 | 71.70 | 2-Equal weight | |
| 21-Dec-04 | 71.70 | | 80.00 |
| 01-Oct-04 | 66.76 | | |

| Date | Closing Price | Rating | Price Target |
|---|---|---|---|
| 28-May-04 | 54.34 | | 65.00 |
| 12-Jan-04 | 64.96 | | 78.00 |
| 20-Nov-03 | 55.35 | | 62.00 |
| 17-Jul-03 | 49.96 | | 57.00 |
| 02-Apr-03 | 36.48 | | 43.00 |
| 31-Jan-03 | 33.62 | | 38.00 |

FOR EXPLANATIONS OF RATINGS REFER TO THE STOCK RATING KEYS LOCATED ON THE PAGE FOLLOWING THE LAST PRICE CHART.

Lehman Brothers Inc. and/or its affiliates beneficially owns 1% or more of any class of common equity securities of Guidant Corp as of the end of last month.
Lehman Brothers Inc and/or an affiliate trade regularly in the shares of Guidant Corp.

**Risks Which May Impede the Achievement of the Price Target:** Exposure to emerging drug-eluting stent market. Exposure to cardiac rhythm management market.

# LEHMAN BROTHERS
**EQUITY RESEARCH**

**Important Disclosures Continued:**

**Johnson & Johnson (JNJ)**          $ 58.64 (26-Jan-2006)          1-Overweight / 1-Positive

**Rating and Price Target Chart:**

JOHNSON & JOHNSON

As of 25-Jan-2006
Currency = USD



— Closing Price          ▲ Price Target
● Recommendation Change  ✕ Drop Coverage

*Source: FactSet*

Currency=$

| Date | Closing Price | Rating | Price Target | Date | Closing Price | Rating | Price Target |
|------|---------------|--------|--------------|------|---------------|--------|--------------|
| 17-Nov-05 | 63.34 | | 76.00 | 07-Mar-05 | 68.44 | | 76.00 |

FOR EXPLANATIONS OF RATINGS REFER TO THE STOCK RATING KEYS LOCATED ON THE PAGE FOLLOWING THE LAST PRICE CHART.

Lehman Brothers Inc and/or an affiliate trade regularly in the shares of Johnson & Johnson.

**Risks Which May Impede the Achievement of the Price Target:** Risks to the JNJ story include possible rotation back into large-cap pharma, delays and/or failure in the late-stage pharma pipeline, regulatory and integration risks associated with the GDT acquisition, and a marked slowdown in the consumer business, which has been growing well above historical rates for the past two years.

# LEHMAN BROTHERS
EQUITY RESEARCH

**Important Disclosures Continued:**
The analysts responsible for preparing this report have received compensation based upon various factors including the firm's total revenues, a portion of which is generated by investment banking activities

| Company Name | Ticker | Price (26-Jan-2006) | Stock / Sector Rating |
|---|---|---|---|
| Boston Scientific | BSX | $ 23.15 | 1-Overweight / 1-Positive |

| Related Stocks | Ticker | Price (26-Jan-2006) | Stock / Sector Rating |
|---|---|---|---|
| Guidant Corp | GDT | $ 75.26 | 2-Equal weight / 1-Positive |
| Johnson & Johnson | JNJ | $ 58.64 | 1-Overweight / 1-Positive |

**Sector Coverage Universe**
Below is the list of companies that constitute the sector coverage universe against which the primary stock, Boston Scientific, is rated:

Alcon, Inc (ACL)
Bausch & Lomb (BOL)
Boston Scientific (BSX)
DJ Orthopedics (DJO)
Guidant Corp (GDT)
Medtronic Inc (MDT)
Nuvasive Inc (NUVA)
Stryker Corp (SYK)
Thoratec Corp (THOR)
Zimmer Holdings (ZMH)

Angiotech Pharmaceuticals (ANPI)
Biomet, Inc (BMET)
Conor Medsystems (CONR)
Greatbatch Inc. (GB)
Johnson & Johnson (JNJ)
Novoste Corp (NOVTD)
St. Jude Medical (STJ)
Syneron Medical (ELOS)
Wright Medical Group (WMGI)

**Guide to Lehman Brothers Equity Research Rating System:**
Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector (the "sector coverage universe"). To see a list of the companies that comprise a particular sector coverage universe, please go to www.lehman.com/disclosures

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

**Stock Rating**
**1-Overweight** - The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**2-Equal weight** - The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12- month investment horizon.
**3-Underweight** - The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**RS-Rating Suspended** - The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company.

**Sector View**
**1-Positive** - sector coverage universe fundamentals/valuations are improving.
**2-Neutral** - sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating.
**3-Negative** - sector coverage universe fundamentals/valuations are deteriorating.

**Distribution of Ratings:**
Lehman Brothers Equity Research has 1836 companies under coverage.
42% have been assigned a 1-Overweight rating which, for purposes of mandatory regulatory disclosures, is classified as Buy rating, 36% of companies with this rating are investment banking clients of the Firm.
41% have been assigned a 2-Equal weight rating which, for purposes of mandatory regulatory disclosures, is classified as Hold rating, 6% of companies with this rating are investment banking clients of the Firm.
17% have been assigned a 3-Underweight rating which, for purposes of mandatory regulatory disclosures, is classified as Sell rating, 75% of companies with this rating are investment banking clients of the Firm.

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), authorized and regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Inc., Singapore Branch ("LBIS"). Where this material is distributed by LBIS, please note that it is intended for general circulation only and the recommendations contained herein does not take into account the specific investment objectives, financial situation or particular needs of any particular person. An investor should consult his Lehman Brothers' representative regarding the suitability of the product and take into account his specific investment objectives, financial situation or particular needs before he makes a commitment to purchase the investment product. This material is distributed in Korea by Lehman Brothers International (Europe) Seoul Branch.

9

# LEHMAN BROTHERS
EQUITY RESEARCH

This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. With the exception of disclosures relating to Lehman Brothers, this research report is based on current public information that Lehman Brothers considers reliable, but we make no representation that it is accurate or complete, and it should not be relied on as such. In the case of any disclosure to the effect that Lehman Brothers Inc. or its affiliates beneficially own 1% or more of any class of common equity securities of the subject company, the computation of beneficial ownership of securities is based upon the methodology used to compute ownership under Section 13(d) of the United States' Securities Exchange Act of 1934. In the case of any disclosure to the effect that Lehman Brothers Inc. and/or its affiliates hold a short position of at least 1% of the outstanding share capital of a particular company, such disclosure relates solely to the ordinary share capital of the company. Accordingly, while such calculation represents Lehman Brothers' holdings net of any long position in the ordinary share capital of the company, such calculation excludes any rights or obligations that Lehman Brothers may otherwise have, or which may accrue in the future, with respect to such ordinary share capital. Similarly such calculation does not include any shares held or owned by Lehman Brothers where such shares are held under a wider agreement or arrangement (be it with a client or a counterparty) concerning the shares of such company (e.g. prime broking and/or stock lending activity). Any such disclosure represents the position of Lehman Brothers as of the last business day of the calendar month preceding the date of this report.
This material is provided with the understanding that Lehman Brothers is not acting in a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers representative. The value of and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. © 2005 Lehman Brothers. All rights reserved. Additional information is available on request. Please contact a Lehman Brothers entity in your home jurisdiction.

Lehman Brothers policy for managing conflicts of interest in connection with investment research is available at www.lehman.com/researchconflictspolicy. Ratings, earnings per share forecasts and price targets contained in the Firm's equity research reports covering U.S. companies are available at www.lehman.com/disclosures.

Complete disclosure information on companies covered by Lehman Brothers Equity Research is available at www.lehman.com/disclosures.

# EXHIBIT K

Link to full report including important disclosures*
http://rsch1.ml.com/9093/24013/ds/2768242_.PDF

New JNJ stent manufacturing now coming on line
The first manufacturing line for Johnson & Johnson's
(JNJ;A-1-7;$59.29) Cypher drug eluting stent (DES) is scheduled
to come on line this month with one line per month to be added
over the next 3 months.  With the new Cypher capacity, JNJ
expects to realize share gains over the next few quarters.  Of
the ~1,600 U.S. interventional cardiology labs, JNJ estimates it
has a presence in ~800 of which 500 get preferential allocation
of Cypher.  In those 500 targeted accounts, JNJ pegs its DES
market share at upwards of 60%.

JNJ-GDT co-promotion agreement could remain in place
The pending sale of Guidant's (GDT;RSTR;$77.55) Vascular
Intervention franchise to Abbott (ABT;B-1-7;$45.16) in
conjunction with Boston Scientific's (BSX;B-2-9; $22.95) pending
purchase of Guidant does not void the existing JNJ-GDT
co-promotion agreement for Cypher.  JNJ has indicated that it
will review the arrangement post closing of the deal, which could
result in a cessation of the arrangement or a continuation
pending the approval of Guidant's Xience DES in the U.S. (late
2007/ early 2008).

New DES products expected in 2007 from JNJ
In early '07, JNJ expects to launch the Cypher Select in Europe
with an enhanced delivery system to be followed with Cypher in
2.25mm and 4.00mm diameters.  Next up in the U.S. is the Cypher
Nxt, which is Cypher on GDT's Vision delivery system.  Further
back in the queue is: 1) Project Python, a new stent/delivery
system (U.S.) , 2) Cypher Neo, a cobalt chrome DES based on a new
stent design/delivery system (WW) and 3) Firefox, a cobalt chrome
DES based on a new stent/delivery system which is characterized
as a "workhorse" stent that will also be targeted at small
vessels.  And as part of the JNJ-GDT cross-licensing agreement,
JNJ has rights to GDT's bioabsorbable DES (enrollment in the
ABSORB trial evaluating GDT's bioabsorbable stent is underway).

More legal wrangling from JNJ possible
JNJ has two patents (Wright and Falotico), which appear to relate
to the elution characteristics of "olimus" compounds; JNJ's
Cypher DES uses sirolimus, a member of the olimus family of
drugs; other olimus drugs include Guidant's everolimus and
Abbott/Medtronic's zotarolimus (ABT-578).  The European launch of
Guidant's Xience DES, which the company has targeted for Q2:06,
could trigger possible legal activity since we understand U.S.
patent law prohibits domestic manufacture of a product for sale
outside the U.S. if there's been infringement of intellectual
property.

To reply to Katherine Martinelli directly, Click here
mailto:katherine_martinelli@ml.com or call +1 617 350 5862

* Read the research report, available through the link above, for
complete information including important disclosures and analyst
certification(s). Reports can be saved to your local drive in
.pdf format. Merrill Lynch URLs are active for six months from
the date that such report is published. There may be more recent
information available. Please visit one of the electronic venues
that carry Merrill Lynch research or contact your Merrill Lynch
representative for further information.

# EXHIBIT L

## INTERNATIONAL
# Herald Tribune

## J&J works to discredit rival offer for Guidant

**By Avram Goldstein Bloomberg News**
MONDAY, JANUARY 23, 2005

WASHINGTON Johnson & Johnson, facing a deadline on Tuesday for raising its bid to acquire the cardiac device maker Guidant, is trying to sow doubts among investors about Boston Scientific's rival offer, according to analysts.

Johnson & Johnson, the world's biggest maker of medical devices, and its advisers told securities analysts last week that Boston Scientific would borrow too much for the deal, according to analysts at Prudential Equity Group and A.G. Edwards.

J&J also said Boston Scientific had been making unrealistic financial projections to justify its $27 billion offer to buy Guidant, almost $3 billion more than Johnson & Johnson's.

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with Prudential in New York, said in a note to clients sent on Friday. The campaign, he said, suggests "that J&J is still very interested in acquiring Guidant and that J&J will likely increase its offer at least one more time."

The Guidant transaction would be the biggest purchase of a medical device company. Guidant, the second-largest maker of implantable defibrillators and pacemakers, behind Medtronic, is developing a cardiac stent that would pose a competitive threat to rival products of J&J and Boston Scientific, the world's biggest maker of heart stents, tiny metal sleeves used to clear artery blockages.

A spokesman for J&J, Jeffrey Leebaw, and for Guidant, Steven Tragash, declined to comment.

J&J shares fell $1.37, or 2.2 percent, to close last week at $60.80 in New York Stock Exchange composite trading. Guidant dropped 17 cents, to $75.95. Boston Scientific declined 36 cents, or 1.5 percent, to close at $23.59.

Guidant said Tuesday that Boston Scientific's offer of about $27 billion, or $80 a share, of which $42 would be in cash and $38 in stock, was "superior" to J&J's bid of $24.2 billion, or $71 a share, consisting of $40.52 in cash and the rest in J&J shares.

Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G. Edwards. Wald said he had been called by a Johnson & Johnson employee, whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

Drug coatings on stents are designed to keep tissue growth from clogging blood vessels again.

Abbott agreed to contribute $6.4 billion to the Boston Scientific bid and acquire Guidant's vascular business including the new cardiac stent.

Abbott shares lost $1.19, or 2.9 percent, on Friday to close the week at $40.35.

Patent infringement lawsuits over stent drug coatings have "no bearing on our proposed acquisition of Guidant," a spokesman for Boston Scientific, Paul Donovan, said. "Unfortunately, threats of legal action are commonplace in our industry."

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design. At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

Abbott, Guidant and Medtronic are all developing competing products coated with drugs similar to the one that Johnson & Johnson's stent uses.

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said. "J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" Abbott's zotarolimus and Guidant's everolimus, he wrote.

After the Guidant board declared Boston Scientific's bid superior, Johnson & Johnson issued a statement calling the proposal a "highly dilutive and leveraged transaction based on extremely aggressive business projections."

The statement said the Boston Scientific bid "will not provide $80 per share in value to Guidant shareholders."

Boston Scientific initially bid $25 billion on Jan. 8, a month after declaring its intention to make an offer.

**ADVERTISER LINKS**

**Pacemaker Recall List**
List of over 40 Guidant pacemakers that have been recalled
www.schmidtandclark.com/Guidant

**Guidant Recall Attorneys**
Free Nationwide Review Talk to an attorney. Toll-free 1 800 223-3784
www.pulaskilawfirm.com

**Guidant Lawsuit**
News on the Guidant recall of heart defibrillator and pacemaker devices
guidant.martinandjones.com

**St. Jude Symmetry Device**
Problem w/artery clogging after a bypass graft? Call for free consult
www.capretz.com

**IHT**    Copyright © 2006 The International Herald Tribune | www.iht.com

# EXHIBIT M



*SUITORS TAKE GUIDANT FIGHT TO THE STREET The Boston Globe January 20, 2006 Friday*

Copyright 2006 Globe Newspaper Company
**The Boston Globe**

**January** 20, 2006 Friday
THIRD EDITION

**SECTION:** BUSINESS; Pg. C1

**LENGTH:** 721 words

**HEADLINE: SUITORS** TAKE GUIDANT FIGHT TO THE STREET

**BYLINE:** BY STEPHEN HEUSER, GLOBE STAFF

**BODY:**

With the clock ticking down for Johnson & Johnson to answer Boston Scientific's $27 billion bid for Guidant Corp., the two rivals are trying to torpedo each other's bids with Wall Street analysts and major stockholders.

Three days ago Guidant declared Boston Scientific's new offer superior, giving the Natick device maker the upper hand for the first time in a six-week bidding war. Under terms of Guidant's existing deal with Johnson & Johnson, the company has until Tuesday to boost its offer or lose Guidant.

As the day approaches, Johnson & Johnson has been raising questions about the solidity of Boston Scientific stock and the likelihood the much smaller company can actually close the deal, said two analysts who have been contacted by the firm.

Boston Scientific, to support its bid, released a set of slides on Wednesday showing a crisp month-by-month march to a completed merger and outlining plans to exceed Wall Street's earnings estimates.

"It's behind closed doors right now," said Thomas Gunderson, a medical device analyst for Piper Jaffray, of the bidding war for Guidant. "It's like watch ing a tennis match, but the ball has to pass through this 20-foot blind spot before the audience gets to see how the ball comes out the other side, if it comes out at all."

Gunderson said he had not been contacted by Johnson & Johnson, but had a conversation with Boston Scientific earlier this week.

After more than a month of back-and-forth public statements, filings, and conference calls, the intense lobbying by both companies this week underscores their delicate positions in the bidding war over Guidant.

When Guidant's board of directors picked Boston Scientific's offer on Tuesday, Johnson & Johnson found itself out in the cold for the first time since it signed a deal to buy Guidant more than a year ago, and now must decide whether to re-enter the contest.

"I suspect that they're trying to determine what a winning bid is, and secondarily do they want to go that

high," said Robert Faulkner, an analyst for JMP Securities.

With a reputation for fiscal caution, Johnson & Johnson could be hesitant to make any bid over $76 a share, the price it offered for Guidant in December 2004, before Guidant suffered a series of product recalls that pushed its value down.

A key concern for Boston Scientific, on the other hand, is the price of its own stock. Its $80 bid comprises $42 in cash and $38 in Boston Scientific stock, but because of a "collar" provision in the offer, the value of that bid will drop sharply if Boston Scientific stock slides below $22.62 a share. Even if it gets close to that number, many investors' models will begin assigning a lower value to the bid, and Johnson & Johnson could woo Guidant back with a lower bid.

Boston Scientific stock dropped by more than $1 on Tuesday when it made its $80-per-share offer, but has been largely steady since then at just under $24 a share. It closed at $23.95 last night, up 1 cent on the day.

Johnson & Johnson launched its first salvo on Tuesday night, after Guidant gave the nod to Boston Scientific. In an unusually terse statement, the New Jersey healthcare giant attacked the fundamental value of the Boston-Guidant deal, calling it "based on extremely aggressive business projections."

Since then, the company has raised similar questions in phone conversations with analysts who value medical device companies. It has also raised the prospect that it could use patents and existing ties to Guidant to derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for Citigroup who is skeptical about Guidant's value to both companies.

Johnson & Johnson is "strongly suggesting" that it could tie up the deal past Boston's estimated completion date of March 31, he said, and questioned the business estimates it is based on.

"They're talking about the excessiveness of the Boston Scientific deal, how they don't believe the numbers can work," he said.

Contacted for this story, Johnson & Johnson would not discuss details of its conversations with investors.

A Boston Scientific spokesman said the deal at this point would come down to the numbers.

"We're at $80, and J&J is at $71," he said. "Guidant has declared us superior, and we're working very hard to close this deal as soon as possible."

Stephen Heuser can be reached at sheuser@globe.com.

**GRAPHIC:** PHOTO

**LOAD-DATE:** January 20, 2006

# EXHIBIT N

**CHICAGOBUSINESS**
—POWERED BY CRAIN'S—

Print Story | Close Window     Printed from ChicagoBusiness.com

# Abbott stock falls on concerns over success of Guidant bid

By Paul Merrion
Jan. 20, 2006

(Crain's) — Abbott Laboratories stock took a tumble today after a research analyst raised the possibility that Abbott and another company, Boston Scientific Corp., may not win the bidding for Guidant Corp.

The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson, a competing bidder for Guidant, claims its patents would be violated if Abbott markets its own drug-eluting stents or those made by Guidant. That could give Guidant's board pause in approving Boston Scientific's bid, Mr. Biegelsen wrote.

Abbott's shares closed down $1.19, or 2.9%, to $40.35 on Friday, capping two weeks of declines that wiped out a 3.7% gain Jan. 9, when investors bid up Abbott's stock on enthusiasm for the potential deal.

Since the bid was announced, Abbott has raised its offer to $4.1 billion and agreed to loan $900 million to Boston Scientific, which would acquire the rest of Guidant. Abbott also is agreeing to buy $1.4 billion worth of Boston Scientific's stock to help that company outbid Johnson & Johnson in the takeover battle for Guidant.

Abbott was not available for comment.

"We believe this issue (J&J's patent claim) has no bearing on our proposed acquisition of Guidant," says a spokesman for Boston Scientific. "Unfortunately, threats of legal action are commonplace in our industry."

Abbott CEO Miles D. White is trying to diversify his product line so it isn't so reliant on drug sales. Abbott sees the Guidant deal as a rare opportunity to quickly become a big player in the market for stents, tiny cylinders used to prop open clogged arteries to the heart and brain. Abbott is developing its own products but would gain those already sold by Indianapolis-based Guidant, in addition to research and a salesforce.

But there are risks involved in getting into a business in which Abbott will play catch-up.

"They're increasing the price and increasing their exposure" to risk, says Ignatius Smetek, president and chief investment officer of Abbott shareholder Arcataur Capital Management LLC in Milwaukee.

For instance, North Chicago-based Abbott would acquire a drug-coated heart stent Guidant is developing. Drug-coated stents are supposed to be effective at keeping arteries from reclogging after heart procedures, and the market for these products may reach $8 billion by 2011, Boston Scientific estimates.

But Abbott, which hopes to have a drug-coated stent on the market by 2008, would enter several years behind New Jersey-based Johnson & Johnson and Massachusetts's Boston Scientific, which already have products on

the market. Medtronic Inc. also is developing a drug-coated stent.

"It will be difficult to significantly penetrate that market," says Mark Morasch, a vascular surgeon and assistant professor at Northwestern University's Feinberg School of Medicine.

# EXHIBIT O

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



factiva

(c) 2006 Reuters Limited



Reuters News

January 20, 2006 Friday  8:35 PM GMT

LENGTH: 411 words

HEADLINE: UPDATE 2-Abbott, Boston shares off on J&J patent threat

DATELINE: January 21, 2006

BODY:

(Adds J&J shares)

CHICAGO, Jan 20 (Reuters) – Shares of Abbott Laboratories Inc. and Boston Scientific Corp. fell on Friday on concerns that Johnson & Johnson <J&J.N> could have patents that might put Boston Scientific's bid for heart device maker Guidant Corp. at risk.

In a research note on Friday, Prudential analyst Larry Biegelsen said J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a derivative of rapamycin. The drug compound is used to enhance the performance of the stents, or tiny wiremesh tubes.

J&J's Cypher stent is coated with such a compound. So are the experimental stents under development by Abbott and Guidant.

Boston Scientific and Johnson & Johnson are locked in a bidding war over control of Guidant, a maker of heart devices to treat irregular heartbeats and clogged heart arteries.

Guidant's board has said Boston Scientific's offer of $80 per share in cash and stock is superior to a $73 bid by J&J.

Boston Scientific's shares edged down 36 cents, or 1.5 percent, to close at $23.59, while Abbott slid $1.19, or 2.86 percent, at $40.35 amid a broadly weaker market. Shares of J&J also fell $1.37, or 2.2 percent, to $60.80.

"The potential for J&J to prevent Abbott Laboratories and Boston Scientific from marketing (Guidant's Xience-V stent) could give the Guidant board pause," Biegelsen wrote.

"We believe this issue has no bearing on our proposed acquisition of Guidant. Unfortunately, threats of legal action are commonplace in our industry," said Paul Donovan, a spokesman for Boston Scientific.

UPDATE 2-Abbott, Boston shares off on J&J patent threat Reuters News

Abbott spokesman Jonathon Hamilton said the company was undeterred by the report. "We are confident we have freedom to operate," Hamilton said of Abbott's stent. "With respect to Guidant's product, it would be inappropriate for us to comment," he said.

J&J representatives declined to comment.

Many analysts expressed skepticism, saying the concerns over intellectual property were overblown.

One analyst, who asked not to be named, said J&J management was making rounds on Wall Street, trying to fan fears about the Boston Scientific bid.

The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products. (Additional reporting by Lewis Krauskopf in New York)

NOTES: HEALTH-ABBOTT (UPDATE 2)|LANGEN|ABN|E|RBN|U|M|D|RNP|DNP;
PUBLISHER: Reuters Ltd.

LOAD-DATE: January 21, 2006

# EXHIBIT P

Copyright 2006 Gale Group, Inc.
All Rights Reserved
ASAP
Copyright 2006 Thomson Healthcare, Inc.
Medical Device Week

January 24, 2006

ACC-NO: 142590071

LENGTH: 1006 words

HEADLINE: J&J offer rumors persist as Guidant has more ICD issues.

BODY:

J&J offer rumors persist as Guidant has more ICD issues

By HOLLAND JOHNSON

Medical Device Daily Associate Managing Editor

As the bidding war for Guidant (Indianapolis) continued to play itself out as the week began, several new factors were added to an already much-too-complex equation.

Guidant, which already has reported a slew of problems with its pacemakers last year, on Monday reported a new problem with some of its older devices. Additionally, rumors began to fly that Johnson & Johnson (J&J; New Brunswick, New Jersey), the original suitor in the escalating bid to acquire Guidant, was poised to make a higher offer for the company.

Guidant said it had identified a second batch of older-model pacemakers that are at risk of malfunction due to a problem with a sealing component. The company recommended physicians reassess their patients due to the discovery of additional devices with the potential defect.

Guidant, which said there have been 145 incidents of malfunction to date related to the seal problem, estimated 16,000 of the affected devices remain implanted in patients worldwide.

This new leak disclosure adds to a previous physician notification made this past July (Medical Device Daily, July 19, 2005).

At the time of the first notification, the company said that as of July 11 it had identified 69 devices that may have exhibited this failure, from about 78,000 devices distributed with this component, with about 28,000 devices still implanted worldwide.

It said that no failures were reported for the first 44 months of device use but that "the likelihood of occurrence increases with implant time." Of the 28,000 devices identified and implanted worldwide, 18,000 of them remain in service in the U.S., with an average implantage of 69 months.

As of Jan. 9, a total of five reported incidents out of the second identified patient population of 54,000 represented a

Page 2

J&J offer rumors persist as Guidant has more ICD issues. Medical Dev

rate of occurrence of 0.009%. Guidant said it has confirmed hermetic seal degradation in two of the five reports. It is estimated that 19,300 devices in this second population remain implanted worldwide.

At the time devices in the second population were assembled, the company said hermetic sealing components susceptible to gradual degradation were mistakenly mixed with a much larger group of non-susceptible components.

The devices in this latest notification were manufactured between Oct. 19, 1998, and Dec. 5, 2000.

Guidant's warranty supplement program, subject to certain conditions, provides a no-cost replacement device and up to $2,500 in unreimbursed medical expenses. The program is available through June 30 and is applicable to both patient populations.

Apparently neither this latest news, nor the documents un-sealed in a Texas court last week that showed that Guidant executives had debated whether to tell doctors about possible heart device malfunctions six months before the problems were publicly disclosed, has deterred J&J from making a possible new increased offer for the embattled, but apparently Teflon-coated company.

Rumors began circulating on Monday that J&J would raise its offer, possibly during its quarterly earnings report today, to somewhere in the neighborhood of $77 to $78 a share - still significantly below rival suitor Boston Scientific's (Natick, Massachusetts) most recent $80 a share bid - but higher than its own initial December 2004 $76-a-share offer.

Fueling this speculation were rumors, some of which apparently were planted by J&J personnel as part of an organized campaign to undermine the Boston Scientific offer in the minds of analysts, that two of its patents may be infringed if an unnamed company tries to launch a drug-eluting stent coated with a derivative of rapamycin.

J&J's Cypher stent is coated with that compound, as are the experimental stents under development by Guidant and its potential partner in the bidding war for Guidant, Abbott Laboratories (Abbott Park, Illinois). Abbott agreed to contribute $6.4 billion to the Boston Scientific bid and acquire Guidant's vascular business including the new cardiac stent.

Larry Biegelsen, an analyst with Prudential (New York), wrote in a research report that "this potential for J&J to prevent Abbott Laboratories and Boston Scientific from marketing [Guidant's] Xience-V DES, could give Guidant's board pause approving a Boston Scientific-Guidant merger."

While Biegelsen said a $78-a-share offer was likely, he noted that J&J, with much larger pockets than Boston Scientific, could go as high as $90 a share for Guidant "before an acquisition of St. Jude Medical [St. Paul, Minnesota; another significant player in the cardiac rhythm management space] is more attractive."

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan Wald, an analyst with A.G. Edwards (Boston), in a telephone interview with Bloomberg. Wald said he was called by a J&J employee he declined to name.

As part of its recent campaign, J&J also has argued that Boston Scientific's bid was breaking its bank and that its assumptions concerning Guidant's cardiac rhythm management were too aggressive.

While Guidant's board remained silent, Guidant's suitors disputed the rumors floating around Wall Street.

"We believe this issue has no bearing on our proposed acquisition of Guidant. Unfortunately, threats of legal action are commonplace in our industry," Paul Donovan, a spokesman for Boston Scientific, said in a statement.

Abbott spokesman Jonathon Hamilton said the company was undeterred by the report. "We are confident we have freedom to operate," Hamilton said of Abbott's stent. "With respect to Guidant's product, it would be inappropriate for us to comment."

J&J offer rumors persist as Guidant has more ICD issues. Medical Dev

Guidant said last week that Boston Scientific's offer of $80 a share -- $42 in cash and $38 in stock -- is "superior" to J&J's current bid of $24.2 billion, or $71 a share, consisting of $40.52 in cash plus 0.493 of a J&J share for each Guidant share held (MDD, Jan. 18, 2006). J&J had until today to make a counteroffer.

SOURCE-Medical Device Daily

LOAD-DATE: March 1, 2006

# EXHIBIT Q

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



**factiva**

(Copyright (c) 2006, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

January 26, 2006 Thursday

SECTION: Pg. A1

LENGTH: 1960 words

HEADLINE: Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant

BYLINE: By Thomas M. Burton, Sylvia Pagan Westphal and Dennis K. Berman

BODY:

Boston Scientific Corp., exploiting a monumental case of buyer's remorse by rival Johnson & Johnson, sealed a $27 billion agreement to buy Guidant Corp. in an acquisition that creates a company set on dominating the field of cardiac devices.

The contest between Boston Scientific and J&J gave Wall Street something it hadn't seen in a while -- a large-scale bidding war that ended up putting an extra $6 billion in Guidant investors' pockets.

The deal represents the biggest gamble in the history of Boston Scientific. The Natick, Mass., company has clawed its way into the big time in the health-care business with savvy acquisitions, hardball business tactics and a penchant for navigating threatening regulatory and legal shoals.

The combined company, with revenue of about $9 billion, will have the No. 1 position in the U.S. in selling coronary stents, the tiny arterial implants that now dominate interventional cardiology. It also will have the No. 2 position in selling implantable defibrillators. These increasingly popular products rein in lethally fast heartbeats and have supplanted pacemakers as the main growth area in cardiac electrical therapy. Both products have rich profit margins and stand to benefit from an aging, overweight U.S. population.

Still, to finance the purchase, Boston Scientific will wind up with $11 billion in debt, a burden that has already prompted rating agencies to put it on watch for a possible downgrade. It faces new competitors bringing stents to the market at a time when growth in the overall market has slowed.

Guidant, too, has been losing defibrillator share after recalls because of product malfunctions and ensuing federal investigations and patient lawsuits. Some analysts also see possible difficulties in gaining quick antitrust clearance for the deal.

Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant

To help with antitrust clearance, Boston Scientific enlisted help from Abbott Laboratories, another big player in medical devices. Abbott will buy Guidant's stent business and other assets for $4.1 billion, while Boston Scientific will retain shared rights to Guidant stent technology. Abbott will also purchase $1 billion of Boston Scientific stock and lend Boston Scientific $900 million.

Although confident that they can smoothly absorb Guidant and create a powerful health-care company, Boston Scientific executives have been so intensely focused on the bidding competition that celebrating a victorious outcome was nearly forgotten. As Chief Executive Officer James Tobin has put it in various conversations in the past several days, "We're kind of like the dog that caught the bus. Now what are we going to do with the bus?"

J&J sealed a deal to acquire Indianapolis-based Guidant last year. But it provided an opening for Boston Scientific to snatch away its prize when Guidant ran into its recall problems and J&J decided to trim its purchase price to $63 a share from the previously agreed $76. Boston Scientific intervened with its initial offer of $72 a share on Dec. 5.

The bidding war culminated last week, when Guidant's board said Boston Scientific's $80-a-share offer was preferable to a previous $71-a-share offer from J&J. That gave J&J five days to sweeten its $24 billion bid.

During those five days, tension mounted at Boston Scientific, where executives were forced into a waiting game to see what J&J would -- or would not -- do. Mr. Tobin would cut the tension by joking, "It's just a bunch of zeroes. You can't get tight just because it's billions."

They went to bed Tuesday night believing it was very possible that they were going to be aced out once again. No one slept much, especially Chairman Peter Nicholas, who had been traveling across multiple time zones during the bidding war and dealing with resultant jet lag.

Until Boston Scientific's last offer, they had been on the outside looking in, trying to decipher Guidant's true concerns. Each time Guidant chose a lower J&J bid over a higher Boston Scientific one, the Boston executives grew more frustrated as they sought to decipher "incomplete, cryptic information," as one Boston Scientific executive describes it. This was "a major frustration, and it raised the temperature in the room."

Even after Guidant last week declared Boston Scientific's $27.2 billion offer "superior," J&J still had its five-day option. Rumors spread through the executive suites at both Boston Scientific and Guidant: First, that J&J wasn't coming back at all, then, that it was, but at $76 a share, then $78, then $77.50, and finally, a whopping $81 a share, with participation of a third party. According to this rumor, Medtronic Inc. would buy all or part of the Guidant stent business under a J&J deal. Medtronic officials say this didn't happen.

Boston Scientific executives had a meticulous response prepared for each eventuality. "What we weren't prepared for was silence," says one executive on the Boston Scientific side. Boston Scientific executives thought they would hear Tuesday afternoon at 4 p.m., then at 5. Then they were sure they would get definitive documents to sign at 12:02 a.m. yesterday. That didn't happen, and they feared the worst.

At 6:27 a.m. yesterday, an email arrived from Boston Scientific's lawyers, Shearman & Sterling. Boston Scientific had won.

In 4 p.m. New York Stock Exchange composite trading yesterday, Guidant shares fell $1.59, or 2.1%, to $75.19. Boston Scientific shares were down 46 cents, or 1.9%, at $23.54. J&J shares were down 86 cents, or 1.5%, at $58.50.

Boston Scientific was formed in 1979 by John Abele, an inventor who believed in the promise of less-invasive surgery, and Mr. Nicholas, a former Eli Lilly & Co. executive. The purpose of the start-up: buying Medi-Tech Inc., Mr. Abele's employer.

The two scraped together $300,000 and persuaded some Boston bankers to lend them $500,000 more to purchase

Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant

Medi-Tech, a maker of catheters, cell-sampling tools and depilatories. In the early days, Boston Scientific grew by using its expertise in catheters to make the tools "larger or shorter, fatter or smaller," depending on how they were to be used, says venture capitalist Thomas Brooks, who joined the company in 1986 when it was still privately held and had fewer than 100 employees.

With a fresh infusion of cash from its 1992 initial public offering, Boston Scientific went on an acquisition binge. The most important purchase was SciMed Life Systems Inc., a successful manufacturer of angioplasty balloons and catheters. Boston Scientific bought it in 1995 for about $850 million in stock.

While that figure pales next to the $27 billion price Boston Scientific will pay for Guidant, the two transactions share one crucial similarity: their ability to catapult Boston Scientific into the top tier of a chosen market. SciMed instantly turned Boston Scientific into one of the leading manufacturers of angioplasty balloons and other products in interventional cardiology. As the likely No. 1 in the market for cardiac devices, Boston Scientific will go head-to-head with current market leader Medtronic.

Driven by Mr. Nicholas, Boston Scientific has bought more than 25 companies in the past 10 years, growing to about 16,000 employees and annual revenue of more than $6 billion. With Guidant, it will acquire 12,000 employees and about $3.6 billion in annual revenue.

The bid for Guidant is being bankrolled, in essence, by Boston Scientific's success in coronary stents. In 2004, Boston Scientific orchestrated one of the most successful product launches in the history of the medical-device industry when it got Food and Drug Administration approval for its Taxus Express drug-coated stent. The drug coating reduces the chance that a buildup of cells around the stent -- called "restenosis" -- will reclog the artery. At the time, J&J was the only company with a drug-coated stent in the U.S.

Boston Scientific made a bold prediction: Taxus would garner 70% of the market in 70 days.

It did better than that, snatching away the lead from J&J and attaining 70% market share within 17 days, according to a company spokesperson. The company posted a 62% revenue increase for 2004, despite a recall of about 99,000 Taxus stents that summer due to malfunctions that caused several injuries and deaths.

The company saw its prospects sour in 2005 as U.S. market share for the stent started to erode -- down to about 54% now -- amid safety concerns about Taxus and a resurgence in popularity for J&J's Cypher. Since their peak in 2004, shares of Boston Scientific are down more than 40%.

Boston Scientific officials believe that Guidant, while damaged by the recall, pending litigation and lost share, will rebound within perhaps a year. The $10 billion business of making defibrillators is growing at a rate of 20% a year. In addition, Guidant's program to produce a stent coated with a drug called everolimus is considered a potentially important one. Guidant's stent is considered easily maneuverable by cardiologists who use it.

Guidant will expose its acquirer to risks of unknown dimension stemming from the company's defibrillator recalls and alleged hiding of problems. Guidant faces a federal investigation by the U.S. Attorney's office in Minneapolis, among other pressures.

Boston Scientific itself fell under a lengthy Justice Department criminal investigation for allegedly shipping stents it knew to be defective. The matter ended last summer in a civil complaint and settlement reached with the U.S. Attorney in Boston. Despite testing that revealed failures at "unacceptably high rates," management at the company decided to continue shipping the stents, the complaint said. In the settlement, Boston Scientific paid $74 million and made no admission of guilt.

Boston Scientific will confront a few hurdles as it subsumes Guidant's products and operations. Among the issues: The deal will give Boston Scientific two drug-coated stents -- its own, which uses the drug paclitaxel, and the

Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant

forthcoming everolimus stent.

Some analysts worry that Boston Scientific's proposed arrangement with Abbott Laboratories may not be enough to ward off antitrust concerns. In that case, Boston Scientific may have to distance itself further from the Guidant stent technology, perhaps by selling it entirely.

Complete divestment of Guidant's drug-coated stent technology is "an extremely low likelihood," says Paul Donovan, a spokesman for Boston Scientific. He adds that the company expects the FTC to clear the deal by March 31, with the technology-sharing arrangement.

Another potential wrinkle arises in the intellectual-property rights surrounding stents -- an area that's been the subject of extensive litigation in the industry. Citigroup analyst Matthew Dodds says J&J holds patents on methods of using "limus"-type drugs on stents -- including the everolimus on Guidant's stent, as well as a drug on an Abbott stent.

Now that J&J has lost the battle for Guidant, it isn't likely to license the technology to either Guidant or Abbott, and that could slow down the deal, Mr. Dodds says. "If these patents block a limus, you don't really have" a drug-coated stent program, he says. That would leave only J&J, Boston Scientific and, to a lesser extent, Medtronic, as potential players in the market, a situation that could trouble antitrust reviewers. Mr. Dodds predicts that J&J is "going to make this a big issue with the FTC. . . . They are not incentivized to let them close the deal quickly."

But Boston Scientific's Mr. Donovan says: "We do not consider this to be an issue."

----

Charles Forelle contributed to this article.

----

Online Today: WSJ.com subscribers can track Guidant's share price, and see how the company stacks up against Boston Scientific, at WSJ.com/OnlineToday.

Boston Scientific Faces Pivotal Test After Victory In Fight for Guidant



**Vital Signs**

Guidant's stock price:

$80

Source: WSJ Market Data Group

NOTES:
PUBLISHER: Dow Jones & Company, Inc.

LOAD-DATE: January 26, 2006

EXHIBIT R

**DOCKET NO.:** CRDS-0005(JJI-51-CON2)    **PATENT**
**Application No.:** 10/951,385

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    Confirmation No.: **7537**
**Carol Wright, et al.**

Application No.: **10/951,385**          Group Art Unit: **3731**

Filing Date: **September 28, 2004**      Examiner: **Not yet assigned**

For:    **Local Delivery of Rapamycin for Treatment of Proliferative Sequelae**
        **Associated with PTCA Procedures, Including Delivery Using a Modified Stent**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### DECLARATION BY ATTORNEY IN SUPPORT OF PETITION TO MAKE SPECIAL BECAUSE OF ACTUAL INFRINGEMENT (MPEP § 708.02)

I, S. Maurice Valla, Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia PA, 19103, Registration No. 43,966, Telephone No. 215-564-3100, am the attorney of record for Applicants and make the following declarations.

1.    The instant application is directed to drug-eluting stents. Claims 64 to 140 are presently pending. Claims 64 and 103 are the only independent claims. Claim 103 is directed to a device comprising a metallic stent, a biocompatible polymeric carrier and a drug. The drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation. Claim 130, which depends from claim 103, specifies that the drug is a macrocyclic lactone analog of rapamycin.

**DOCKET NO.:** CRDS-0005(JJI-51-CON2)                **PATENT**
**Application No.:** 10/951,385

2.      Attached as exhibits hereto are press releases issued by Guidant Corporation ("Guidant") describing its activities relating to drug eluting stents. In a release dated January 30, 2006 (Exhibit 1), Guidant announced that it has received Conformité Européene (CE) Mark Approval for its XIENCE™ V Everolimus Eluting Coronary Stent System. In the same press release, Guidant states that it "is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE™ V beginning in the second quarter of 2006."

3.      In a release dated October 19, 2005 (Exhibit 2), Guidant announced that inspection of its manufacturing facilities in Temecula, California had been successfully concluded as part of its submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. Guidant reported that its European Notified Body found no nonconformities and would recommend certification for Guidant's manufacturing facility for XIENCE™ V.

4.      Since Guidant's approved manufacturing facility for XIENCE™ V  is in Temecula, California, I conclude that the "ramping up manufacturing and building inventory to . . . support the European launch of XIENCE™ V" to which Guidant's January 30, 2006, release refers is being performed in the United States. Thus, on the basis of these public statements by Guidant, I conclude that Guidant is "making" XIENCE™ V and building inventory in the United States to support launch of the product in Europe.

5.      Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

6.      I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V

**DOCKET NO.:** CRDS-0005(JJI-51-CON2)                    **PATENT**
**Application No.:** 10/951,385

product is unquestionably within the scope of at least claims 103 and 130 on file in this application.

7.      In a release dated September 21, 2005 (Exhibit 5), Guidant states that XIENCE™ V is being utilized in SPIRIT II and SPIRIT III clinical trials to evaluate the safety and efficacy of the product for the treatment of coronary artery disease. XIENCE™ V is described as "an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium MULTI-LINK VISION® Coronary Stent System platform." In an earlier release, dated April 5, 2004 (Exhibit 6), Guidant stated that it "holds a worldwide exclusive license . . . to use everolimus, a novel proliferation-signal inhibitor with potent anti-proliferative and immunosuppressant properties, in drug eluting stents." The April 5, 2004, release also states that "Guidant has both durable and bioabsorbable polymer drug  carriers in development" and that "[t]he company's clinical trials utilizing durable polymer technology are identified by the SPIRIT designation in the study name." In the same press release, the MULTI-LINK VISION® Coronary Stent System is referred to as a "market-leading metallic stent." On the basis of these statements made by Guidant, I conclude that the XIENCE™ V product comprises a metallic stent coated with everolimus and a durable polymer carrier.

8.      Everolimus is a macrocyclic lactone analog of rapamycin, bearing a stable 2-hydroxyethyl chain substitution at position 40 on the rapamycin structure (Exhibits 7, 8). In a press release dated March 15, 2006 (Exhibit 9), Guidant stated "everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation." Similarly, in a release dated November 15, 2005 (Exhibit 10), Guidant stated that "[t]he one year data from SPIRIT FIRST continued to demonstrate a preservation of the treatment effect of the XIENCE V Everolimus Eluting Coronary Stent System, with a highly statistically significant reduction of cell proliferation compared to the uncoated control." On the basis of the known structure of everolimus and Guidant's statements, I conclude that the XIENCE™ V product contains a macrocyclic lactone analog of rapamycin in an amount effective to inhibit neointimal proliferation.

**DOCKET NO.:** CRDS-0005(JJI-51-CON2)                    **PATENT**
**Application No.:** 10/951,385

9.      It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims 103 and 130 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

10.     I have a knowledge of the pertinent prior art by virtue of the prosecution histories of the parents of the instant application and other patents owned by the assignee of the instant application. All such material art is provided to the Examiner as

     ☒      having been filed
     ☒      being filed

in a respective Information Disclosure Statement.

10.     I declare further that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Date: August 7, 2006

S. Maurice Valla
Registration No. 43,966

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

© 2005 WW

Guidant News Release — January 30, 2006        **EXHIBIT 1**        Page 1 of 2





### ABOUT US

**Corporate Overview**
  Locations
  Global Compliance
  Guidant Foundation

**Careers**

**Newsroom**

**Historical Investor Resources**

# Guidant Receives European Approval for Drug Eluting Coronary Stent

### Company Achieves CE Mark Approval Ahead of Schedule; XIENCE V Launch Slated for Second Quarter

Indianapolis, Ind. and Brussels — January 30, 2006 — Guidant Corporation (NYSE: GDT) today announced that the company has received Conformité Européene (CE) Mark approval for the XIENCE™ V Everolimus Eluting Coronary Stent System. This regulatory certification allows Guidant to begin marketing the drug eluting stent in the 25 countries of the European Union. In addition, the CE Mark Approval is used to support market registrations in other regulated countries including those within Asia, Latin America and Eastern Europe.

"This early approval represents a significant milestone in Guidant's drug eluting stent program and demonstrates our ongoing commitment to advancing the field of cardiovascular therapy through innovative solutions," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "The development of XIENCE V represents years of hard work and dedication by our employees and by trial investigators. We look forward to bringing this next-generation therapy to physicians and patients."

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation.

"Completion of the CE Mark approval process for XIENCE V follows on the heels of impressive clinical results from the SPIRIT FIRST trial, which demonstrated the benefits of an everolimus drug eluting stent," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who served as the study's principal investigator. "With this approval, physicians in Europe will have an excellent treatment option for patients requiring a drug eluting stent."

Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the  European launch of XIENCE V beginning in the second quarter of 2006.

In November, Guidant announced completion of enrollment in only four months of SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-eluting coronary stent system for the treatment of coronary artery disease.

Guidant's 1,380-patient SPIRIT III global clinical trial is evaluating the XIENCE V Stent System in the United States and Japan.  The randomized U.S. cohort, which will support U.S. Premarket Approval submission, has enrolled more than 70 percent of the required patients and is expected to complete enrollment later this quarter.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life

today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE V. The statements are based on assumptions about many important factors, including satisfactory enrollment and completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

<< Back

© 2006, Guidant Corporation. All rights reserved.  |  Terms and Conditions  |  Website Privacy Policy

This website contains content relating to Vascular and Endovascular therapies that is now owned and managed by Abbott Laboratories, and content relating to Cardiac Rhythm Management and Cardiac Surgery that is now owned and managed by Boston Scientific. Neither party is responsible for the content that is owned and managed by the other.

## EXHIBIT 2





# Guidant Provides Update

**Indianapolis, Ind. — October 19, 2005 ---** Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today responded to statements by Johnson & Johnson on its pending acquisition of the Company and provided an update on its two major businesses.

## Transaction Update

In response to Johnson & Johnson's comments yesterday, Ronald W. Dollens, president and CEO of Guidant Corporation, stated, "While neither company depends on this transaction for its continued future success, Guidant believes that the strategic rationale for combining the two companies is as strong today as when we entered into the Merger Agreement." Guidant anticipates that the pending transaction will receive FTC clearance in October. The Company does not expect to make any specific comments on the pending transaction until after FTC approval.

## Business Performance

"Guidant's third quarter results will reflect the temporary unavailability of the CONTAK RENEWAL 3 and 4 family of heart failure devices during the full month of July and part of August, partially offset by sequential growth of U.S. coronary stent revenue, and continuing sales growth of our emerging businesses," Dollens reported. "At the end of the quarter, data suggest our implantable defibrillator implant rate exceeded 80 percent of the pre-product notification level and is over 100 percent of the rate one year ago."

Dollens continued, "As previously announced, Guidant is launching several recently approved cardiac rhythm management systems during the fourth quarter, including the revolutionary Latitude Patient Management system. Physicians are expressing enthusiasm for the new wireless capability to monitor patients, improve their compliance, and monitor device status independent of patient effort." Dollens further observed, "Our drug eluting stent development program continues to make important progress toward European launch during the first half of next year. We are expanding manufacturing capacity, increasing productivity, and recently received FDA approval to expand clinical trial enrollment."

"While recent events and the publicity surrounding them will impact our short-term results, we believe that the fundamentals of our business and the markets that we serve remain strong and our outlook is positive," Dollens noted. "Our track record of success over the years has been driven in large part by the dedication of our people to the needs of patients and physicians who use our products. We continue to be committed to providing the highest quality products for patients who critically need them and we are confident that the value of the Company remains strong."

## Cardiac Rhythm Management Products Update

Consistent with an anticipated new product cycle, several significant new products were approved (cleared) by FDA during the third quarter. They include:

- VITALITY HE implantable defibrillator; Guidant's first high-energy product to offer the advanced functionality of the VITALITY family.

- CONTAK RENEWAL 3 RF cardiac resynchronization-defibrillator; this is Guidant's first wireless and wandless CRT-D and is designed to enhance the speed and convenience of patient care.

- ZOOM LATITUDE programmer; this next generation programmer is designed to interface with devices that include remote monitoring capability.

- LATITUDE Communicator and secure data storage system; these elements represent the final components of the Latitude Patient Management system.

Actions taken by the Company during the quarter reflect Guidant's commitment to provide more timely information to physicians and patients about our devices. Our products continue to demonstrate high performance and reliability, and tens of thousands of people are alive today and hundreds of thousands feel better as a result of Guidant's technologies. Guidant will continue to focus on meeting and exceeding the expectations of physicians, patients and the FDA.

## Drug Eluting Stent Progress

Guidant announced today that its drug eluting stent development program continues to demonstrate progress and the Company has enrolled more than 500 patients in the SPIRIT II and III clinical trials since June. SPIRIT III is a large-scale pivotal clinical trial evaluating XIENCE™ V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium rapid-exchange MULTI-LINK VISION® RX Coronary Stent System platform. Guidant plans to use the results of the SPIRIT III trial to obtain FDA approval for XIENCE V for the treatment of coronary artery disease. Results of the SPIRIT II study will provide additional clinical data to support the launch of XIENCE V in Europe and several countries outside the United States.

Earlier in the quarter, Guidant announced attainment of an enrollment milestone in the Company's exclusive license agreement with Novartis Pharma AG. Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies.

In addition, the Company plans to present one-year follow up data from SPIRIT I at the American Heart Association meeting in November 2005. SPIRIT I is a prospective, randomized, single-blind pilot study evaluating XIENCE V versus an uncoated MULTI-LINK VISION Coronary Stent System control in de novo (previously untreated) lesions.

During the quarter, the Company also announced that it successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the Company's submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant's manufacturing facility.

## Guidant Corporation

Guidant Corporation pioneers lifesaving technology, giving an opportunity for a better life today to millions of cardiac and vascular patients worldwide. The Company, driven by a strong entrepreneurial culture of more than 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information, visit www.guidant.com.

This release includes forward-looking statements that are based on assumptions about many important factors, including market trends and competition, particularly in connection with expanded indications and reimbursement for cardiac rhythm management products; satisfactory clinical and regulatory progress; progress with respect to the merger, including satisfaction of conditions to closing, including antitrust approvals; economic conditions, including exchange rates; litigation developments; and the factors listed on exhibit 99 to Guidant's most recent 10-Q. As such, they involve risks that could cause actual results to differ materially. The company does not undertake to update its forward-looking statements.

 << Back

Abbott Completes Acquisition of Guidant Vascular Business

## EXHIBIT 3



Print This Page | Back to Web Page

## Press Release

### Abbott Completes Acquisition of Guidant Vascular Business

**Combination of Abbott's and Guidant's Vascular Organizations Creates Leading Vascular Devices Business**
Abbott Park, Illinois, April 21, 2006 — Abbott today announced it has completed the acquisition of Guidant's vascular business, which, combined with Abbott's current vascular business, creates one of the leading global vascular devices companies. This acquisition was made in connection with Boston Scientific's acquisition of Guidant Corporation.

"The acquisition of Guidant's vascular business builds on our broad-based business strategy to develop leading positions in attractive health care markets – shaping Abbott for greater balance and strengthening our business mix and breadth of pipeline opportunities," said Miles D. White, chairman and chief executive officer, Abbott.

"The combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as a state-of-the-art R&D organization, which is developing innovative technologies and devices such as the XIENCE™ V and ZoMaxx™ drug-eluting stents," White said. "Our newly expanded vascular organization has the tools and the talent to transform the way physicians treat vascular disease, impacting the lives of millions of patients around the world."

**Broad Vascular Devices Product Portfolio**
For the past several years, Abbott has built a competitive vascular business through acquisitions, licensing agreements, and internal scientific and commercial development. With the addition of Guidant's vascular business, Abbott offers physicians, catheterization labs and clinics a complete line of products and technologies for interventional procedures including: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. In addition, the combined business has a broad portfolio of intellectual property, including rapid exchange technology and stent designs, enabling the company to operate effectively in the competitive vascular devices market.

**Innovative Research and Development Programs**
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for treating vascular disease. With Guidant, Abbott now has two drug-eluting stents in development: ZoMaxx, a state-of-the-art stent coated with a proprietary immunosuppressant drug, zotarolimus, designed specifically to combat vessel re-narrowing; and XIENCE V, an everolimus-eluting stent on the MULTI-LINK VISION® cobalt chromium stent platform, which recently received approval in Europe. The combined organization also is leading the industry with a number of next-generation research programs including a stent that elutes two drugs targeted at difficult-to-treat patients such as diabetics, and a bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

**Guidant Vascular Sales and Employees**
The transaction provides Abbott with Guidant's vascular intervention and endovascular solutions business units, which had combined sales of more than $1 billion in 2005. These business units add nearly 6,000 employees worldwide to Abbott in three primary locations: Santa Clara, California; Temecula, California; and Clonmel, Ireland. The addition of Guidant's California-based employees boosts Abbott's presence in the state – currently the headquarters of Abbott's diabetes care and vascular businesses – from more than 3,000 to more than 7,000 employees.

**Financial Details**
Abbott paid $4.1 billion in cash for Guidant's vascular business. In addition, Abbott will pay Boston Scientific milestone payments of $250 million at U.S. Food and Drug Administration approval of Guidant's drug-eluting stent, and an additional payment of $250 million upon a similar approval in Japan. Abbott also provided Boston Scientific with a five-year, $900 million interest-bearing loan. In addition, Abbott has purchased approximately 64 million shares of Boston Scientific stock for $1.4 billion, which represents less than 5 percent of the company.

Abbott expects that the Guidant transaction will be accretive to earnings per share in 2007 and beyond. Further information, including financial details, will be provided on the conference call scheduled for 8 a.m. Central time today (9 a.m. Eastern), as previously announced. A live webcast of the conference call will be accessible through Abbott's Investor Relations Web site at www.abbottinvestor.com. An archived edition of the call will be available after 11 a.m. Central time. Abbott also furnished an 8-K today regarding the Guidant transaction.

**About Abbott**
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company now employs 65,000

Abbott Completes Acquisition of Guidant Vascular Business

people and markets its products in more than 130 countries.

---

**Private Securities Litigation Reform Act of 1995 —**
**A Caution Concerning Forward-Looking Statements**
Some statements in this news release may be forward-looking statements for the purposes of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in the "Risk Factors" section and Exhibit 99.1 of our Securities and Exchange Commission Form 10-K for the period ended December 31, 2005, and are incorporated by reference. We undertake no obligation to release publicly any revisions to forward-looking statements as the result of subsequent events or developments.

---

Contact:

Media:
Melissa Brotz            (847) 935-3456
Jonathon Hamilton        (847) 935-8646

Financial Community:
John Thomas              (847) 938-2655
Tina Ventura             (847) 935-9390

⊞ top of page

Home | Select a Country | Site Map | Contact Us | Privacy Policy | Terms of Use

Copyright © 2006 Abbott Laboratories. Abbott Park, Illinois, U.S.A.

Unless otherwise specified, all product names appearing in this Internet site are trademarks owned by or licensed to Abbott Laboratories, its subsidiaries or affiliates. No use of any Abbott trademark, trade name, or trade dress in this site may be made without the prior written authorization of Abbott Laboratories, except to identify the product or services of the company.

Abbott                                                                                     Page 1 of 3

# EXHIBIT 4



Print This Page | Back to Web Page

## Abbott Vascular Business Fact Sheet

The combined Abbott and Guidant vascular business offers physicians, catheterization labs and clinics a complete line of products to treat patients with cardiac, vascular and biliary disease. Products and technologies for interventional procedures include: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. Bolstered by the acquisition of Guidant's vascular business in April 2006, Abbott began building its vascular presence with the 1999 acquisition of Perclose, a pioneer in vessel closure technologies. Over the next few years, Abbott strategically assembled a comprehensive vascular devices business through a series of acquisitions, licensing agreements and internal development.

### Abbott's Vascular Business -- At a Glance

Worldwide headquarters: San Francisco Bay Area

Web address: www.abbottvascular.com

Primary businesses: Coronary, Endovascular and Vessel Closure Devices

Employees: 8,000 (including nearly 6,000 from Guidant)

Facilities: More than 10 commercial, R&D and manufacturing facilities worldwide

### Product Portfolio

Abbott offers comprehensive product lines throughout the world in three key areas of focus: coronary, endovascular and vessel closure devices. Key product lines and products include:

#### Coronary Products:

With Abbott's long history in health care and the advanced medical devices developed by Abbott Vascular and Guidant, the company is uniquely positioned to bring physicians and their patients innovative products for the treatment of coronary artery disease.

**Drug-eluting Coronary Stents:** The Xience V stent, approved for sale in Europe, is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus.

**Bare Metal Coronary Stents:** Comprehensive line of bare metal stents designed for a variety of vessel sizes and clinical situations ( *Multi-Link Vision* family). The *TriMaxx* bare metal stent is available outside the United States.

**Guide Wires:** Full lines of coronary guide wires to assist the interventional cardiologist in accessing treatment area (*HI-Torque* and *Asahi PTCA*).

**Catheters:** A variety of balloon dilatation catheters and specialty catheters designed to restore blood flow to stenosed arteries (*Tornus* specialty catheter; *Mercury* balloons and *Jography* catheters; *Voyager, CrossSail, PowerSail* and *HighSail*).

#### Endovascular Products:

Abbott delivers an advanced portfolio of endovascular and biliary products to assist clinicians in a broad range of diagnostic and interventional procedures outside the coronary area (including carotid arteries, renal arteries and bile ducts).

**Carotid Stents and Embolic Protection Devices:** For the treatment of carotid artery disease, *RX Acculink* is an open-cell, self-expanding nitinol stent available on a rapid exchange delivery system. It is used in conjunction with *RX Accunet* embolic protection device, a polyurethane filter with a nitinol basket. *Xact* is a closed-cell, self-expanding stent used in conjunction with *Emboshield Embolic Protection System*, which features *Barewire*, a proprietary technology allowing for excellent stent placement.

**Biliary stent systems:** Broad lines of self-expanding and balloon expanding stents for a variety of applications ( *RX Herculink*, *Omnilink* and *Jostent* balloon-expandable stent systems; and the *Absolute*, *Dynalink*, *Xceed* and *Xpert* self-expanding stent systems).

**Peripheral Catheters and Guide wires:** Full product lines of catheters and guide wires for various vessels and obstructions (*Agiltrac*, *Vietrac*, *Fox PTA*, and *Joceth* catheters; *Hi-Torque* guide wires).

## Vessel Closure Products:

A pioneer in vessel closure technologies, Abbott offers products designed to facilitate faster, safer and more secure closure of the vascular access site following catheterizations.

**Clip-based closure:** The *StarClose Vascular Closure System* delivers a tiny circumferential flexible clip onto the surface of the femoral artery, mechanically closing the access site in the femoral artery securely in a matter of seconds following diagnostic catheterization procedures.

**Suture-mediated closure:** Minimally invasive vessel closure devices that utilize sutures and automate the surgical closure of femoral artery puncture sites following diagnostic or interventional procedures (*Perclose ProGlide*, *Perclose AT* and *Closer S*).

## Leading Vascular R&D Program

In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for vascular disease.

### Drug-eluting stents

Abbott has two drug-eluting stents in development: *Xience V* and *ZoMaxx*.

▸ The *Xience V* stent is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus. *Xience V* recently received regulatory approval in Europe and is expected to be launched in the third quarter of 2006. The product is also currently an investigational device in the United States and Japan.

▸ The *ZoMaxx* stent elutes zotarolimus, a proprietary immunosuppressant drug, and utilizes the *TriMaxx* stent platform, formed from a unique tri-layer composite that allows for thin struts while maintaining optimal visibility via X-ray. *ZoMaxx* is currently in clinical trials in both the United States and internationally, with an expected European launch in 2006.

The company also has a number of next-generation drug-eluting stent programs in development, including:

▸ A second-generation stent that elutes two drugs (zotarolimus and dexamethasone) intended for difficult-to-treat patients, such as diabetics, where restenosis rates are high.

▸ A bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

### Carotid stent clinical trials:

Abbott is a leader in studying carotid stenting as a minimally invasive alternative to surgery for patients with carotid artery disease, a leading cause of stroke. The company is sponsoring/ participating in three clinical trials designed to investigate the benefits of carotid stenting in patients who are at risk of stroke from carotid artery disease.

- ACT I is the first company-sponsored clinical trial to compare carotid artery stenting to carotid artery surgery in asymptomatic patients who normally would be referred for surgery. ACT I utilizes Abbott's *Xact* stent and *Emboshield* embolic protection device.
- CAPTURE 2 is a 10,000-patient post-approval study of high-risk patients using the *RX Acculink* stent and *RX Accunet* embolic protection device.
- Abbott is also participating in the CREST study comparing carotid artery stenting to carotid surgery in normal-risk, symptomatic and asymptomatic patients who normally would be referred for surgery. CREST is sponsored by the National Institute of Neurological Disorders and Stroke (NINDS), and the National Institutes of Health (NIH). CREST utilizes the *RX Acculink* stent and *RX Accunet* embolic protection device.

---

* Trademarks are shown in italics in the text of this fact sheet.

**EXHIBIT 5**



Print this page

# Guidant Enrolls 300 Patients in Drug Eluting Stent Pivotal Trials and Completes Manufacturing Audit

## Successful Inspection Brings Company One Step Closer to European Approval; Drug Eluting Stent Milestone Results in Payment to Novartis in Third Quarter

Indianapolis, Ind. — September 21, 2005 — Guidant Corporation (NYSE: GDT) today announced that the company has enrolled more than 300 patients in its SPIRIT II and SPIRIT III clinical trials, meeting a milestone in the company's exclusive license agreement with Novartis Pharma AG.

The company also announced that it has successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the company's submission for approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant.

"We are pleased with our recent progress with the XIENCE V Everolimus Eluting Coronary Stent System," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant Corporation. "Enrollment in SPIRIT II and SPIRIT III is progressing well, and successful completion of the audit brings us one step closer to approval to market the XIENCE V Coronary Stent System in Europe."

SPIRIT II and SPIRIT III are large-scale pivotal clinical trials evaluating the safety and efficacy of Guidant's drug eluting stent system for the treatment of coronary artery disease. These prospective, randomized, single-blind trials compare XIENCE V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium MULTI-LINK VISION® Coronary Stent System platform, versus the TAXUS® Express 2™ Paclitaxel Eluting Coronary Stent System.

Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies. Under the terms of the agreement with Novartis, the milestone achievement will trigger a $60 million IPR&D charge in the third quarter of 2005, of which $40 million will be paid to Novartis in the third quarter. An additional $20 million will be paid by December 31, 2006.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company, driven by a strong entrepreneurial culture of 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

<< Back

# EXHIBIT 6



Print this page

# Guidant Announces Enrollment of First Patient in FUTURE III Clinical Trial in Europe

## Everolimus Eluting Stent Trial Will Provide Additional Safety and Performance Data

**Indianapolis, Ind. and Santa Clara, Calif. — April 5, 2004** — Guidant Corporation (NYSE: GDT) today announced that the first patient has been enrolled in FUTURE III, an 800-patient clinical trial that will provide additional safety and performance data to support market launch of Guidant's investigational CHAMPION™ Everolimus Eluting Coronary Stent System outside the United States.

"The initiation of FUTURE III is a significant milestone for Guidant's drug eluting stent program and will provide a deeper understanding of the benefits of everolimus eluting stents for the treatment of coronary artery disease," said Dana G. Mead, Jr., president, Guidant Vascular Intervention. "The start of this new trial demonstrates our confidence in the clinical performance of the CHAMPION Stent System and in our drug eluting stent operational capabilities. We expect that the data from FUTURE III will build upon the excellent results from the FUTURE I and FUTURE II clinical trials, which we anticipate will serve as the clinical basis for regulatory approval in Europe."

FUTURE III is a randomized clinical trial comparing the CHAMPION Everolimus Eluting Coronary Stent System to Guidant's MULTI-LINK ZETA® Coronary Stent System at approximately 90 sites in Europe, the Middle East, Asia, Australia, Canada and New Zealand. The primary endpoint of the trial is in-segment late loss (a measurement of the re-narrowing of the vessel caused by tissue re-growth in the area of the artery in which the stent was placed) at four, six and 12 months following stent implantation.

The trial is designed to show superiority of the CHAMPION Everolimus Eluting Coronary Stent System, which approximately 600 patients will receive, over the MULTI-LINK ZETA Coronary Stent System, which approximately 200 patients will receive. The company expects to present 30-day MACE (major adverse cardiac event) data from the first 120 patients enrolled in FUTURE III before the end of 2004.

Dr. Ulrich Gerckens performed the first implant at the Herzzentrum Siegburg in Germany. Prof. Eberhard Grube, also of the Herzzentrum Siegburg, is the principal investigator of FUTURE III. "The CHAMPION Stent System is a very competitive drug eluting stent system. I look forward to presenting the results from FUTURE III. The study will provide significant data on the use of the bioabsorbable polymer," said Prof. Grube.

Guidant plans to file the third and final module of its submission for Conformité Européenne (CE) Mark approval during the second quarter. The company expects to launch the CHAMPION Everolimus Eluting Coronary Stent System in Europe in the first quarter of 2005, pending regulatory approvals.

## Guidant's Drug Eluting Stent Program

Guidant has been a global innovator in stent technology since 1995, when its first coronary stent for the treatment of heart disease was launched internationally. Since then, the company has consistently been the market leader in metallic stent sales worldwide. Guidant's drug eluting stent program leverages this market-leading position as well as the company's excellent customer relationships built through its world-class sales force. The company's vascular intervention business is focused on developing broad capabilities in drug eluting stents, including product design, clinical science, polymer science and product commercialization. Guidant holds a worldwide exclusive license from Novartis Pharma AG to use everolimus, a novel proliferation-signal inhibitor with potent anti-proliferative and immunosuppressant properties, in drug eluting stents. Guidant has both durable and bioabsorbable polymer drug carriers in development, providing product design flexibility and potentially offering unique clinical benefits.

Guidant gained immediate entry into the U.S. drug eluting stent market in February through an agreement with Cordis

Corporation, a Johnson & Johnson company. Under the terms of the agreement, Guidant co-promotes Cordis' CYPHER™ Sirolimus-eluting Coronary Stent in the United States. Like everolimus, sirolimus has been shown to prevent cellular proliferation and reduce restenosis.

Guidant's first everolimus eluting stent, the CHAMPION Everolimus Eluting Coronary Stent System, utilizes a bioabsorbable polymer on a stainless steel stent platform with Guidant's MULTI-LINK VISION® Delivery System. Guidant's second everolimus eluting stent, the cobalt chromium MULTI-LINK VISION-based stent system currently being evaluated in the SPIRIT FIRST trial, utilizes a durable polymer.

Guidant's clinical trials employing bioabsorbable polymer technology utilize the FUTURE designation in the study name. The company's clinical trials utilizing durable polymer technology are identified by the SPIRIT designation in the study name.

## The FUTURE Clinical Trials

FUTURE I and FUTURE II evaluated safety and performance of an everolimus eluting stent with a bioabsorbable polymer drug carrier and stainless steel stent platform. Results from the FUTURE I and II clinical trials demonstrated safety and efficacy. There was a profound effect in preventing in-stent restenosis (binary angiographic restenosis), with no restenosis at six-month follow-up among patients receiving an everolimus eluting stent (0/46) and an 87 percent reduction of in-stent late loss compared to a metallic stent control.

FUTURE III is an 800-patient clinical trial currently enrolling patients that will provide additional safety and performance data to support market launch of the CHAMPION Everolimus Eluting Stent System outside the United States. Another planned trial, FUTURE IV, is a 975-patient U.S. pivotal trial for the CHAMPION Everolimus Eluting Stent System.

## The SPIRIT Clinical Trials

The initial trial in the SPIRIT series, SPIRIT FIRST, enrolled a total of 60 patients at multiple sites in The Netherlands, Denmark and Germany. The primary endpoint of the study is in-stent late loss at six months. Data from the trial will support filings for both a pivotal trial to obtain approval to market the product in the United States and a larger European study to support market launch outside the United States.

Guidant Corporation is a world leader in the treatment of cardiac and vascular disease. The company pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. Driven by a strong entrepreneurial culture of 12,000 employees, Guidant develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

 << Back

1: Clin Pharmacokinet. 2004;43(2):83-95.                    **EXHIBIT 7**

Clinical pharmacokinetics of everolimus.

Kirchner GI, Meier-Wiedenbach I, Manns MP.

Department of Gastroenterology, Hepatology and Endocrinology, Zentrum Innere
Medizin, Medizinische Hochschule Hannover, Hannover, Germany.
Kirchner.Gabriele@MH-Hannover.de

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl
chain substitution at position 40 on the sirolimus (rapamycin) structure.
Everolimus, which has greater polarity than sirolimus, was developed in an
attempt to improve the pharmacokinetic characteristics of sirolimus,
particularly to increase its oral bioavailability. Everolimus has a mechanism of
action similar to that of sirolimus. It blocks growth-driven transduction
signals in the T-cell response to alloantigen and thus acts at a later stage
than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and
ciclosporin show synergism in immunosuppression both in vitro and in vivo and
therefore the drugs are intended to be given in combination after solid organ
transplantation. The synergistic effect allows a dosage reduction that decreases
adverse effects. For the quantification of the pharmacokinetics of everolimus,
nine different assays using high performance liquid chromatography coupled to an
electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have
been developed. Oral everolimus is absorbed rapidly, and reaches peak
concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and
steady-state peak and trough concentrations, and area under the
concentration-time curve (AUC), are proportional to dosage. In adults,
everolimus pharmacokinetic characteristics do not differ according to age,
weight or sex, but bodyweight-adjusted dosages are necessary in children. The
interindividual pharmacokinetic variability of everolimus can be explained by
different activities of the drug efflux pump P-glycoprotein and of metabolism by
cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system
for everolimus biotransformation leads to drug-drug interactions with other
drugs metabolised by this cytochrome system. In patients with hepatic
impairment, the apparent clearance of everolimus is significantly lower than in
healthy volunteers, and therefore the dosage of everolimus should be reduced by
half in these patients. The advantage of everolimus seems to be its lower
nephrotoxicity in comparison with the standard immunosuppressants ciclosporin
and tacrolimus. Observed adverse effects with everolimus include
hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections,
thrombocytopenia and leucocytopenia. Because of the variable oral
bioavailability and narrow therapeutic index of everolimus, blood concentration
monitoring seems to be important. The excellent correlation between steady-state
trough concentration and AUC makes the former a simple and reliable index for
monitoring everolimus exposure. The target trough concentration of everolimus
should range between 3 and 15 microg/L in combination therapy with ciclosporin
(trough concentration 100-300 microg/L) and prednisone.

Publication Types:
    Review

PMID: 14748618 [PubMed - indexed for MEDLINE]

**EXHIBIT 9**





# Guidant Completes Enrollment in Randomized U.S. Portion of Drug Eluting Stent Pivotal Trial

## Large-Scale Trial Evaluating Safety and Efficacy of Next-Generation XIENCE™ V Coronary Stent System

**Indianapolis, Ind. and Santa Clara, Calif. — March 15, 2006 —** Guidant Corporation (NYSE: GDT) today announced that the company has completed enrollment of 1,002 patients in the randomized U.S. portion of its SPIRIT III drug eluting stent pivotal clinical trial. The randomized U.S. cohort will support Guidant's Premarket Approval submission to the U.S. Food and Drug Administration (FDA) for the company's XIENCE™ V Everolimus Eluting Coronary Stent System for the treatment of coronary artery disease.

SPIRIT III is an International clinical trial consisting of a 1,002-patient prospective, randomized, single-blind U.S. cohort evaluating the safety and efficacy of the XIENCE V Everolimus Eluting Coronary Stent System compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease, and four non-randomized trial arms. The trial is being conducted in the U.S. and Japan. XIENCE V, which utilizes Guidant's proven MULTI-LINK VISION® cobalt chromium stent platform, received CE Mark approval in January and will be launched in Europe in the second quarter of 2006.

"The completion of enrollment in the randomized U.S. portion of the SPIRIT III trial is a significant milestone for Guidant and demonstrates the commitment of our employees and trial investigators to advancing the science of drug eluting stents," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "We are very pleased with the progress this represents for this next-generation drug eluting stent in the U.S."

Gregg Stone, M.D., Professor of Medicine and Director of Cardiovascular Research & Education of Columbia University Medical Center in New York, and Campbell Rogers, M.D., Director of Cardiac Catheterization at Brigham and Women's Hospital, are co-principal investigators of the study. Dr. Shigeru Saito, Director of Cardiology and Catheterization Laboratories, Shonan Kamakura Hospital, is the principal investigator for the Japan arm of the trial.

"Based on the positive results of SPIRIT FIRST, Guidant's -olimus based XIENCE V Everolimus Eluting Coronary Stent System appears to hold great promise as a next-generation therapy for treating coronary artery disease," said Dr. Rogers. "We look forward to analyzing these data and sharing results of the trial early next year. We also look forward to continuing to examine how the XIENCE stent performs in diverse patient and lesion subsets in upcoming clinical studies."

"We are excited that the SPIRIT III clinical trial has completed enrollment so smoothly and rapidly," said Dr. Stone. "The potential of this highly deliverable XIENCE V Stent System represents a welcome option for physicians caring for patients with coronary artery disease."

In November, Guidant announced that SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V outside the U.S., had completed enrollment in only four months. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease.

## About XIENCE V

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation. Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the

European launch of XIENCE V beginning in the second quarter of 2006.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE™ V. The statements are based on assumptions about many important factors, including completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

<< Back

# EXHIBIT S

**DOCKET NO.:** CRDS-0067                                           **PATENT**
**Application No.:** Not yet assigned

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                          Confirmation No.:
**Carol Wright, et al.**

Application No.: **not yet assigned**          Group Art Unit:

Filing Date: **August 15, 2006**               Examiner: **Not yet assigned**

For:   **Local Delivery of Rapamycin for Treatment of Proliferative Sequelae
        Associated with PTCA Procedures, Including Delivery Using a Modified Stent**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### DECLARATION BY ATTORNEY IN SUPPORT OF PETITION TO MAKE SPECIAL
### BECAUSE OF ACTUAL INFRINGEMENT (MPEP § 708.02)

I, S. Maurice Valla, Woodcock Washburn LLP, One Liberty Place, 46th Floor,
Philadelphia PA, 19103, Registration No. 43,966, Telephone No. 215-564-3100, am the attorney
of record for Applicants and make the following declarations.

1.      The instant application is directed to drug-eluting stents. Claims 1 to 5 are presently
pending. Claim 1, the only independent claim, is directed to device comprising a metallic stent
having a nonabsorbable polymeric carrier, and a therapeutic agent. The polymeric carrier
comprises an acrylate-based polymer or copolymer, a fluorinated polymer, or a mixture thereof.
The therapeutic agent is rapamycin or a macrocyclic lactone analog thereof and is present in an

**DOCKET NO.:** CRDS-0067                                    **PATENT**
**Application No.:** Not yet assigned

amount effective to inhibit neointimal proliferation. Claim 2 recites that the therapeutic agent is a macrocyclic lactone analog of rapamycin, and claims 3 and 4 recite that the device provides a controlled release of the therapeutic agent over a period of several weeks. Claim 5 is directed to a method for inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty that comprises implanting a device according to any one of claims 1 to 4 in the lumen of said coronary artery.

2.      Attached as exhibits hereto are several press releases issued by Guidant Corporation ("Guidant") describing its activities relating to drug eluting stents. In a release dated January 30, 2006 (Exhibit 1), Guidant announced that it has received Conformité Européene (CE) Mark Approval for its XIENCE™ V Everolimus Eluting Coronary Stent System. In the same press release, Guidant states that it "is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE™ V beginning in the second quarter of 2006."

3.      In a release dated October 19, 2005 (Exhibit 2), Guidant announced that inspection of its manufacturing facilities in Temecula, California had been successfully concluded as part of its submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. Guidant reported that its European Notified Body found no nonconformities and would recommend certification for Guidant's manufacturing facility for XIENCE™ V.

4.      Since Guidant's approved manufacturing facility for XIENCE™ V  is in Temecula, California, I conclude that the "ramping up manufacturing and building inventory to . . . support the European launch of XIENCE™ V" to which Guidant's January 30, 2006, release refers is being performed in the United States. Thus, on the basis of these public statements by Guidant, I

**DOCKET NO.:** CRDS-0067                                          **PATENT**
**Application No.:** Not yet assigned

conclude that Guidant is "making" XIENCE™ V and building inventory in the United States to support launch of the product in Europe.

5.      Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

6.      I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.

7.      Abbott's Fact Sheet attached hereto as Exhibit 4 further states that the XIENCE™ V product elutes everolimus from a MULTI-LINK VISION metallic stent. Everolimus is a macrocyclic lactone analog of rapamycin, bearing a stable 2-hydroxyethyl chain substitution at position 40 on the rapamycin structure (Exhibits 5, 6). In a press release dated March 15, 2006 (Exhibit 7), Guidant stated "everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation." Similarly, in a release dated November 15, 2005 (Exhibit 8), Guidant stated that "[t]he one year data from SPIRIT FIRST continued to demonstrate a preservation of the treatment effect of the XIENCE V Everolimus Eluting Coronary Stent System, with a highly statistically significant reduction of cell proliferation compared to the uncoated control." On the basis of the known structure of everolimus and Guidant's statements, I conclude that the XIENCE™ V product is a device that comprises a metallic stent and a macrocyclic lactone analog of rapamycin in an amount effective to inhibit neointimal proliferation.

**DOCKET NO.:** CRDS-0067                                    **PATENT**
**Application No.:** Not yet assigned

8.      An article published in EuroIntervention in 2005 (Exhibit 9) confirms the XIENCE™ V product comprises a nonerodible (*i.e.*, nonabsorbable) polymeric carrier that includes a blend of acrylic and fluoro polymers (*Id.*).  The article further states that the stent is designed to release approximately 70% of the drug within 30 days after implantation.  On the basis of this information, I conclude that the XIENCE™ V product comprises a nonerodible polymeric carrier comprising both a fluropolymer and an acrylate-based polymer, and that it provides a controlled release of the therapeutic agent over a period of several weeks, as recited in claims 1 to 4 of the instant application.

9.      The EuroIntervention article cited above (Exhibit 9) further confirms that the XIENCE™ V product is intended for use in a method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty (*see Id.*), as recited in claim 5 of the instant application.

10.     It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

11.     I have a knowledge of the pertinent prior art by virtue of the prosecution histories of the parents of the instant application and other patents owned by the assignee of the instant application.  All such material art is provided to the Examiner as

☐      having been filed
☒      being filed

in a respective Information Disclosure Statement.

**DOCKET NO.:** CRDS-0067                                    **PATENT**
**Application No.:** Not yet assigned

12.    I declare further that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.


DATE: August 24, 2006

/S. Maurice Valla/
S. Maurice Valla
Registration No. 43,966


Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA  19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

© 2005 WW

# EXHIBIT 1

**EXHIBIT 1**





# Guidant Receives European Approval for Drug Eluting Coronary Stent

## Company Achieves CE Mark Approval Ahead of Schedule; XIENCE V Launch Slated for Second Quarter

Indianapolis, Ind. and Brussels — January 30, 2006 — Guidant Corporation (NYSE: GDT) today announced that the company has received Conformité Européene (CE) Mark approval for the XIENCE™ V Everolimus Eluting Coronary Stent System. This regulatory certification allows Guidant to begin marketing the drug eluting stent in the 25 countries of the European Union. In addition, the CE Mark Approval is used to support market registrations in other regulated countries including those within Asia, Latin America and Eastern Europe.

"This early approval represents a significant milestone in Guidant's drug eluting stent program and demonstrates our ongoing commitment to advancing the field of cardiovascular therapy through innovative solutions," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "The development of XIENCE V represents years of hard work and dedication by our employees and by trial investigators. We look forward to bringing this next-generation therapy to physicians and patients."

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation.

"Completion of the CE Mark approval process for XIENCE V follows on the heels of impressive clinical results from the SPIRIT FIRST trial, which demonstrated the benefits of an everolimus drug eluting stent," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who served as the study's principal investigator. "With this approval, physicians in Europe will have an excellent treatment option for patients requiring a drug eluting stent."

Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE V beginning in the second quarter of 2006.

In November, Guidant announced completion of enrollment in only four months of SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-eluting coronary stent system for the treatment of coronary artery disease.

Guidant's 1,380-patient SPIRIT III global clinical trial is evaluating the XIENCE V Stent System in the United States and Japan. The randomized U.S. cohort, which will support U.S. Premarket Approval submission, has enrolled more than 70 percent of the required patients and is expected to complete enrollment later this quarter.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE V. The statements are based on assumptions about many important factors, including satisfactory enrollment and completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

[ << Back ]

[ Print this page ]    [ Close window ]

# EXHIBIT 2

**EXHIBIT 2**                                       Page 1 of 2



Print this page

# Guidant Provides Update

Indianapolis, Ind. — October 19, 2005 — Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today responded to statements by Johnson & Johnson on its pending acquisition of the Company and provided an update on its two major businesses.

## Transaction Update

In response to Johnson & Johnson's comments yesterday, Ronald W. Dollens, president and CEO of Guidant Corporation, stated, "While neither company depends on this transaction for its continued future success, Guidant believes that the strategic rationale for combining the two companies is as strong today as when we entered into the Merger Agreement." Guidant anticipates that the pending transaction will receive FTC clearance in October. The Company does not expect to make any specific comments on the pending transaction until after FTC approval.

## Business Performance

"Guidant's third quarter results will reflect the temporary unavailability of the CONTAK RENEWAL 3 and 4 family of heart failure devices during the full month of July and part of August, partially offset by sequential growth of U.S. coronary stent revenue, and continuing sales growth of our emerging businesses," Dollens reported. "At the end of the quarter, data suggest our implantable defibrillator implant rate exceeded 80 percent of the pre-product notification level and is over 100 percent of the rate one year ago."

Dollens continued, "As previously announced, Guidant is launching several recently approved cardiac rhythm management systems during the fourth quarter, including the revolutionary Latitude Patient Management system. Physicians are expressing enthusiasm for the new wireless capability to monitor patients, improve their compliance, and monitor device status independent of patient effort." Dollens further observed, "Our drug eluting stent development program continues to make important progress toward European launch during the first half of next year. We are expanding manufacturing capacity, increasing productivity, and recently received FDA approval to expand clinical trial enrollment."

"While recent events and the publicity surrounding them will impact our short-term results, we believe that the fundamentals of our business and the markets that we serve remain strong and our outlook is positive," Dollens noted. "Our track record of success over the years has been driven in large part by the dedication of our people to the needs of patients and physicians who use our products. We continue to be committed to providing the highest quality products for patients who critically need them and we are confident that the value of the Company remains strong."

## Cardiac Rhythm Management Products Update

Consistent with an anticipated new product cycle, several significant new products were approved (cleared) by FDA during the third quarter. They include:

- VITALITY HE implantable defibrillator; Guidant's first high-energy product to offer the advanced functionality of the VITALITY family.

- CONTAK RENEWAL 3 RF cardiac resynchronization-defibrillator; this is Guidant's first wireless and wandless CRT-D and is designed to enhance the speed and convenience of patient care.

- ZOOM LATITUDE programmer; this next generation programmer is designed to interface with devices that include remote monitoring capability.

- LATITUDE Communicator and secure data storage system; these elements represent the final components of the Latitude Patient Management system.

Actions taken by the Company during the quarter reflect Guidant's commitment to provide more timely information to physicians and patients about our devices. Our products continue to demonstrate high performance and reliability, and tens of thousands of people are alive today and hundreds of thousands feel better as a result of Guidant's technologies. Guidant will continue to focus on meeting and exceeding the expectations of physicians, patients and the FDA.

## Drug Eluting Stent Progress

Guidant announced today that its drug eluting stent development program continues to demonstrate progress and the Company has enrolled more than 500 patients in the SPIRIT II and III clinical trials since June. SPIRIT III is a large-scale pivotal clinical trial evaluating XIENCE™ V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium rapid-exchange MULTI-LINK VISION® RX Coronary Stent System platform. Guidant plans to use the results of the SPIRIT III trial to obtain FDA approval for XIENCE V for the treatment of coronary artery disease. Results of the SPIRIT II study will provide additional clinical data to support the launch of XIENCE V in Europe and several countries outside the United States.

Earlier in the quarter, Guidant announced attainment of an enrollment milestone in the Company's exclusive license agreement with Novartis Pharma AG. Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies.

In addition, the Company plans to present one-year follow up data from SPIRIT I at the American Heart Association meeting in November 2005. SPIRIT I is a prospective, randomized, single-blind pilot study evaluating XIENCE V versus an uncoated MULTI-LINK VISION Coronary Stent System control in de novo (previously untreated) lesions.

During the quarter, the Company also announced that it successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the Company's submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant's manufacturing facility.

## Guidant Corporation

Guidant Corporation pioneers lifesaving technology, giving an opportunity for a better life today to millions of cardiac and vascular patients worldwide. The Company, driven by a strong entrepreneurial culture of more than 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information, visit www.guidant.com.

This release includes forward-looking statements that are based on assumptions about many important factors, including market trends and competition, particularly in connection with expanded indications and reimbursement for cardiac rhythm management products; satisfactory clinical and regulatory progress; progress with respect to the merger, including satisfaction of conditions to closing, including antitrust approvals; economic conditions, including exchange rates; litigation developments; and the factors listed on exhibit 99 to Guidant's most recent 10-Q. As such, they involve risks that could cause actual results to differ materially. The company does not undertake to update its forward-looking statements.



# EXHIBIT 3

Abbott Laboratories Press Releases (1098)        **EXHIBIT 3**        · Page 1 of 3

### ABBOTT COMPLETES ACQUISITION OF GUIDANT VASCULAR BUSINESS

*—COMBINATION OF ABBOTT'S AND GUIDANT'S VASCULAR ORGANIZATIONS CREATES LEADING VASCULAR DEVICES BUSINESS —*

Abbott Park, Illinois, April 21, 2006 — Abbott today announced it has completed the acquisition of Guidant's vascular business, which, combined with Abbott's current vascular business, creates one of the leading global vascular devices companies. This acquisition was made in connection with Boston Scientific's acquisition of Guidant Corporation.

"The acquisition of Guidant's vascular business builds on our broad-based business strategy to develop leading positions in attractive health care markets – shaping Abbott for greater balance and strengthening our business mix and breadth of pipeline opportunities," said Miles D. White, chairman and chief executive officer, Abbott.

"The combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as a state-of-the-art R&D organization, which is developing innovative technologies and devices such as the XIENCE™ V and ZoMaxx™ drug-eluting stents," White said. "Our newly expanded vascular organization has the tools and the talent to transform the way physicians treat vascular disease, impacting the lives of millions of patients around the world."

**Broad Vascular Devices Product Portfolio**
For the past several years, Abbott has built a competitive vascular business through acquisitions, licensing agreements, and internal scientific and commercial development. With the addition of Guidant's vascular business, Abbott offers physicians, catheterization labs and clinics a complete line of products and technologies for interventional procedures including: a comprehensive line of coronary and endovascular guide wires; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. In addition, the combined business has a broad portfolio of intellectual property, including rapid exchange technology and stent designs, enabling the company to operate effectively in the competitive vascular devices market.

**Innovative Research and Development Programs**
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for treating vascular disease. With Guidant, Abbott now has two drug-eluting stents in development: ZoMaxx, a state-of-the-art stent coated with a proprietary immunosuppressant drug, zotarolimus, designed specifically to combat vessel re-narrowing; and XIENCE V, an everolimus-eluting stent on the MULTI-LINK VISION® cobalt chromium stent platform, which recently received approval in Europe. The combined organization also is leading the industry with a number of next-generation research programs including a stent that elutes two drugs targeted at difficult-to-treat patients such as diabetics, and a bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

**Guidant Vascular Sales and Employees**
The transaction provides Abbott with Guidant's vascular intervention and endovascular solutions business units, which had combined sales of more than $1 billion in 2005. These business units add nearly 6,000 employees worldwide to Abbott in three primary locations: Santa Clara, California; Temecula, California; and Clonmel, Ireland. The addition of Guidant's California-based employees boosts Abbott's presence in the state – currently the headquarters

of Abbott's diabetes care and vascular businesses – from more than 3,000 to more than 7,000 employees.

**Financial Details**
Abbott paid $4.1 billion in cash for Guidant's vascular business. In addition, Abbott will pay Boston Scientific milestone payments of $250 million at U.S. Food and Drug Administration approval of Guidant's drug-eluting stent, and an additional payment of $250 million upon a similar approval in Japan. Abbott also provided Boston Scientific with a five-year, $900 million interest-bearing loan. In addition, Abbott has purchased approximately 64 million shares of Boston Scientific stock for $1.4 billion, which represents less than 5 percent of the company.

Abbott expects that the Guidant transaction will be accretive to earnings per share in 2007 and beyond. Further information, including financial details, will be provided on the conference call scheduled for 8 a.m. Central time today (9 a.m. Eastern), as previously announced. A live webcast of the conference call will be accessible through Abbott's Investor Relations Web site at www.abbottinvestor.com. An archived edition of the call will be available after 11 a.m. Central time. Abbott also furnished an 8-K today regarding the Guidant transaction.

**About Abbott**
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company now employs 65,000 people and markets its products in more than 130 countries.

---

**Private Securities Litigation Reform Act of 1995 —**
**A Caution Concerning Forward-Looking Statements**
Some statements in this news release may be forward-looking statements for the purposes of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in the "Risk Factors" section and Exhibit 99.1 of our Securities and Exchange Commission Form 10-K for the period ended December 31, 2005, and are incorporated by reference. We undertake no obligation to release publicly any revisions to forward-looking statements as the result of subsequent events or developments.

---

Contact:

Media
Melissa Brotz        (847) 935-3456
Jonathon Hamilton     (847) 935-8646

Financial Community
John Thomas          (847) 938-2655
Tina Ventura         (847) 935-9390

---

Back to Top

Abbott Laboratories Press Releases (1098)

] Privacy Policy | Terms of Use |
Copyright © 1996, 2006 Abbott Laboratories. Abbott Park, Illinois, U.S.A.

# EXHIBIT 4



EXHIBIT 4

# Abbott's Vascular Business
# Fact Sheet

*The combined Abbott and Guidant vascular business offers physicians, catheterization labs and clinics a complete line of products to treat patients with cardiac, vascular and biliary disease. Products and technologies for interventional procedures include: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. Bolstered by the acquisition of Guidant's vascular business in April 2006, Abbott began building its vascular presence with the 1999 acquisition of Perclose, a pioneer in vessel closure technologies. Over the next few years, Abbott strategically assembled a comprehensive vascular devices business through a series of acquisitions, licensing agreements and internal development.*

### Abbott's Vascular Business – At a Glance

| | |
|---|---|
| Worldwide headquarters: | San Francisco Bay Area |
| Web address: | www.abbottvascular.com |
| Primary businesses: | Coronary, Endovascular and Vessel Closure Devices |
| Employees: | 8,000 (including nearly 6,000 from Guidant) |
| Facilities: | More than 10 commercial, R&D and manufacturing facilities worldwide |

### Product Portfolio
Abbott offers comprehensive product lines throughout the world in three key areas of focus: coronary, endovascular and vessel closure devices. Key product lines and products include:

### Coronary Products:
With Abbott's long history in health care and the advanced medical devices developed by Abbott Vascular and Guidant, the company is uniquely positioned to bring physicians and their patients innovative products for the treatment of coronary artery disease.

<u>Drug-eluting Coronary Stents:</u> The *Xience V* stent, approved for sale in Europe, is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus.

<u>Bare Metal Coronary Stents:</u> Comprehensive line of bare metal stents designed for a variety of vessel sizes and clinical situations (*Multi-Link Vision* family). The *TriMaxx* bare metal stent is available outside the United States.

<u>Guide Wires:</u> Full lines of coronary guide wires to assist the interventional cardiologist in accessing treatment area (*Hi-Torque* and *Asahi PTCA*).

<u>Catheters:</u> A variety of balloon dilatation catheters and specialty catheters designed to restore blood flow to stenosed arteries (*Tornus* specialty catheter; *Mercury* balloons and *Jography* catheters; *Voyager, CrossSail, PowerSail* and *HighSail*).



**Endovascular Products:**
Abbott delivers an advanced portfolio of endovascular and biliary products to assist clinicians in a broad range of diagnostic and interventional procedures outside the coronary area (including carotid arteries, renal arteries and bile ducts).

Carotid Stents and Embolic Protection Devices: For the treatment of carotid artery disease, *RX Acculink* is an open-cell, self-expanding nitinol stent available on a rapid exchange delivery system. It is used in conjunction with *RX Accunet* embolic protection device, a polyurethane filter with a nitinol basket. *Xact* is a closed-cell, self-expanding stent used in conjunction with *Emboshield Embolic Protection System*, which features *Barewire*, a proprietary technology allowing for excellent stent placement.

Biliary stent systems: Broad lines of self-expanding and balloon expanding stents for a variety of applications (*RX Herculink*, *Omnilink* and *Jostent* balloon-expandable stent systems; and the *Absolute*, *Dynalink*, *Xceed* and *Xpert* self-expanding stent systems).

Peripheral Catheters and Guide wires: Full product lines of catheters and guide wires for various vessels and obstructions (*Agiltrac*, *Viatrac*, *Fox PTA*, and *Jocath* catheters; *Hi-Torque* guide wires).

**Vessel Closure Products:**
A pioneer in vessel closure technologies, Abbott offers products designed to facilitate faster, safer and more secure closure of the vascular access site following catheterizations.

Clip-based closure: The *StarClose Vascular Closure System* delivers a tiny circumferential flexible clip onto the surface of the femoral artery, mechanically closing the access site in the femoral artery securely in a matter of seconds following diagnostic catheterization procedures.

Suture-mediated closure: Minimally invasive vessel closure devices that utilize sutures and automate the surgical closure of femoral artery puncture sites following diagnostic or interventional procedures (*Perclose ProGlide*, *Perclose AT* and *Closer S*).

Leading Vascular R&D Program
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for vascular disease.

**Drug-eluting stents**
Abbott has two drug-eluting stents in development: *Xience V* and *ZoMaxx*.

- The *Xience V* stent is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus. *Xience V* recently received regulatory approval in Europe and is expected to be launched in the third quarter of 2006. The product is also currently an investigational device in the United States and Japan.

- The *ZoMaxx* stent elutes zotarolimus, a proprietary immunosuppressant drug, and utilizes the *TriMaxx* stent platform, formed from a unique tri-layer composite that allows for thin struts while maintaining optimal visibility via X-ray. *ZoMaxx* is currently in clinical trials in both the United States and internationally, with an expected European launch in 2006.

Abbott
A Promise for Life

The company also has a number of next-generation drug-eluting stent programs in development, including:

- A second-generation stent that elutes two drugs (zotarolimus and dexamethasone) intended for difficult-to-treat patients, such as diabetics, where restenosis rates are high.
- A bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

### Carotid stent clinical trials:

Abbott is a leader in studying carotid stenting as a minimally invasive alternative to surgery for patients with carotid artery disease, a leading cause of stroke. The company is sponsoring/participating in three clinical trials designed to investigate the benefits of carotid stenting in patients who are at risk of stroke from carotid artery disease.

- ACT I is the first company-sponsored clinical trial to compare carotid artery stenting to carotid artery surgery in asymptomatic patients who normally would be referred for surgery. ACT I utilizes Abbott's *Xact* stent and *Emboshield* embolic protection device.
- CAPTURE 2 is a 10,000-patient post-approval study of high-risk patients using the *RX Acculink* stent and *RX Accunet* embolic protection device.
- Abbott is also participating in the CREST study comparing carotid artery stenting to carotid surgery in normal-risk, symptomatic and asymptomatic patients who normally would be referred for surgery. CREST is sponsored by the National Institute of Neurological Disorders and Stroke (NINDS), and the National Institutes of Health (NIH). CREST utilizes the *RX Acculink* stent and *RX Accunet* embolic protection device.

###

---

\* Trademarks are shown in italics in the text of this fact sheet.



# EXHIBIT 5

## EXHIBIT 5

1: Clin Pharmacokinet. 2004;43(2):83-95.

Clinical pharmacokinetics of everolimus.

Kirchner GI, Meier-Wiedenbach I, Manns MP.

Department of Gastroenterology, Hepatology and Endocrinology, Zentrum Innere
Medizin, Medizinische Hochschule Hannover, Hannover, Germany.
Kirchner.Gabriele@MH-Hannover.de

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl
chain substitution at position 40 on the sirolimus (rapamycin) structure.
Everolimus, which has greater polarity than sirolimus, was developed in an
attempt to improve the pharmacokinetic characteristics of sirolimus,
particularly to increase its oral bioavailability. Everolimus has a mechanism of
action similar to that of sirolimus. It blocks growth-driven transduction
signals in the T-cell response to alloantigen and thus acts at a later stage
than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and
ciclosporin show synergism in immunosuppression both in vitro and in vivo and
therefore the drugs are intended to be given in combination after solid organ
transplantation. The synergistic effect allows a dosage reduction that decreases
adverse effects. For the quantification of the pharmacokinetics of everolimus,
nine different assays using high performance liquid chromatography coupled to an
electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have
been developed. Oral everolimus is absorbed rapidly, and reaches peak
concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and
steady-state peak and trough concentrations, and area under the
concentration-time curve (AUC), are proportional to dosage. In adults,
everolimus pharmacokinetic characteristics do not differ according to age,
weight or sex, but bodyweight-adjusted dosages are necessary in children. The
interindividual pharmacokinetic variability of everolimus can be explained by
different activities of the drug efflux pump P-glycoprotein and of metabolism by
cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system
for everolimus biotransformation leads to drug-drug interactions with other
drugs metabolised by this cytochrome system. In patients with hepatic
impairment, the apparent clearance of everolimus is significantly lower than in
healthy volunteers, and therefore the dosage of everolimus should be reduced by
half in these patients. The advantage of everolimus seems to be its lower
nephrotoxicity in comparison with the standard immunosuppressants ciclosporin
and tacrolimus. Observed adverse effects with everolimus include
hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections,
thrombocytopenia and leucocytopenia. Because of the variable oral
bioavailability and narrow therapeutic index of everolimus, blood concentration
monitoring seems to be important. The excellent correlation between steady-state
trough concentration and AUC makes the former a simple and reliable index for
monitoring everolimus exposure. The target trough concentration of everolimus
should range between 3 and 15 microg/L in combination therapy with ciclosporin
(trough concentration 100-300 microg/L) and prednisone.

Publication Types:
    Review

PMID: 14748618 [PubMed - indexed for MEDLINE]

# EXHIBIT 6

EXHIBIT 6



# Everolimus – A Sirolimus Analog

## Sirolimus® (Rapamycin)

FKBP Binding domain

## Everolimus®

| | Sirolimus® (Rapamycin) | Everolimus® |
|---|---|---|
| Formula | $C_{51}H_{79}NO_{13}$; MW: 914.2 | $C_{53}H_{83}NO_{14}$; MW: 958.25 |
| Original Indications | Acute Rejection – Kidney, Liver | Acute & Chronic Rejection – Heart, Kidney, Lung |
| Approvals | OUS & US | OUS; US approvable |

# EXHIBIT 7

**EXHIBIT 7**





# Guidant Completes Enrollment in Randomized U.S. Portion of Drug Eluting Stent Pivotal Trial

## Large-Scale Trial Evaluating Safety and Efficacy of Next-Generation XIENCE™ V Coronary Stent System

Indianapolis, Ind. and Santa Clara, Calif. — March 15, 2006 — Guidant Corporation (NYSE: GDT) today announced that the company has completed enrollment of 1,002 patients in the randomized U.S. portion of its SPIRIT III drug eluting stent pivotal clinical trial. The randomized U.S. cohort will support Guidant's Premarket Approval submission to the U.S. Food and Drug Administration (FDA) for the company's XIENCE™ V Everolimus Eluting Coronary Stent System for the treatment of coronary artery disease.

SPIRIT III is an international clinical trial consisting of a 1,002-patient prospective, randomized, single-blind U.S. cohort evaluating the safety and efficacy of the XIENCE V Everolimus Eluting Coronary Stent System compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease, and four non-randomized trial arms. The trial is being conducted in the U.S. and Japan. XIENCE V, which utilizes Guidant's proven MULTI-LINK VISION® cobalt chromium stent platform, received CE Mark approval in January and will be launched in Europe in the second quarter of 2006.

"The completion of enrollment in the randomized U.S. portion of the SPIRIT III trial is a significant milestone for Guidant and demonstrates the commitment of our employees and trial investigators to advancing the science of drug eluting stents," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "We are very pleased with the progress this represents for this next-generation drug eluting stent in the U.S."

Gregg Stone, M.D., Professor of Medicine and Director of Cardiovascular Research & Education of Columbia University Medical Center in New York, and Campbell Rogers, M.D., Director of Cardiac Catheterization at Brigham and Women's Hospital, are co-principal investigators of the study. Dr. Shigeru Saito, Director of Cardiology and Catheterization Laboratories, Shonan Kamakura Hospital, is the principal investigator for the Japan arm of the trial.

"Based on the positive results of SPIRIT FIRST, Guidant's -olimus based XIENCE V Everolimus Eluting Coronary Stent System appears to hold great promise as a next-generation therapy for treating coronary artery disease," said Dr. Rogers. "We look forward to analyzing these data and sharing results of the trial early next year. We also look forward to continuing to examine how the XIENCE stent performs in diverse patient and lesion subsets in upcoming clinical studies."

"We are excited that the SPIRIT III clinical trial has completed enrollment so smoothly and rapidly," said Dr. Stone. "The potential of this highly deliverable XIENCE V Stent System represents a welcome option for physicians caring for patients with coronary artery disease."

In November, Guidant announced that SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V outside the U.S., had completed enrollment in only four months. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease.

## About XIENCE V

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation. Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the

European launch of XIENCE V beginning in the second quarter of 2006.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE™ V. The statements are based on assumptions about many important factors, including completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

<< Back

# EXHIBIT 8

**EXHIBIT 8**



Print this page

# Guidant Reports Excellent 12-Month Results from SPIRIT FIRST Everolimus Eluting Coronary Stent Clinical Trial

## Results Demonstrate Sustained Benefit of the XIENCE V Everolimus Eluting Coronary Stent System

Indianapolis, Ind., and Dallas, Texas — November 15, 2005 — Guidant Corporation (NYSE: GDT) today announced 12-month adjudicated results from the company's SPIRIT FIRST clinical trial. SPIRIT FIRST is a prospective, randomized, single-blind trial evaluating Guidant's rapid-exchange XIENCE™ V Everolimus Eluting Coronary Stent System versus an uncoated MULTI-LINK VISION® Coronary Stent System control in de novo (previously untreated) lesions.

"The trial's impressive results demonstrate the sustained efficacy of the XIENCE V Everolimus Eluting Coronary Stent System," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who serves as the study's principal investigator. "The benefit of an everolimus drug eluting stent, with only one device-related MACE event and no thrombotic events, combined with the highly deliverable rapid-exchange VISION stent and stent delivery system, holds great promise for the treatment of patients with cardiovascular disease."

The one-year data from SPIRIT FIRST continued to demonstrate a preservation of the treatment effect of the XIENCE V Everolimus Eluting Coronary Stent System, with a highly statistically significant reduction of cell proliferation compared to the uncoated control. At one year, the XIENCE V arm demonstrated an angiographic in-stent late loss of 0.23 mm and an in-segment late loss of 0.13 mm, which were 72 percent and 78 percent less, respectively, than the values of the uncoated control (0.81 mm and 0.59 mm). The percent volume obstruction as determined by intravascular ultrasound at one year was 10.7 percent, which was 60 percent less than the control value (26.9 percent).

There were no acute or late stent thromboses reported through the one-year follow-up period. The rate of major adverse cardiac events (MACE) was 15.4 percent (4/26) at one year, compared with 21.4 percent (6/28) for the control. Three of the four MACE events in the treatment arm were not directly related to the XIENCE V stent, resulting in a device-related MACE rate of 3.8 percent, compared with 21.4 percent for the control. Results were presented today at the American Heart Association Scientific Sessions in Dallas by Prof. Jan J. Piek, M.D. of the Academic Medical Center, Department of Cardiology, University of Amsterdam.

"Everolimus has clearly proven its effectiveness in reducing tissue proliferation in the coronary vessels following stent implantation. We are excited about combining this unique drug with the proven MULTI-LINK VISION, our most advanced coronary stent system, which is available on the rapid-exchange platform physicians prefer," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "We look forward to additional data on this exciting product coming from both SPIRIT II and SPIRIT III. SPIRIT II completed enrollment of 300 patients ahead of schedule last week, and enrollment is proceeding nicely in SPIRIT III as well, with more than 400 patients enrolled to date."

SPIRIT II and SPIRIT III are large-scale pivotal clinical trials evaluating the safety and efficacy of Guidant's drug eluting stent system for the treatment of coronary artery disease. These prospective, randomized, single-blind trials compare XIENCE V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium MULTI-LINK VISION Coronary Stent System platform, versus the TAXUS® Express 2™ Paclitaxel Eluting Coronary Stent System.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

<<Back

# EXHIBIT 9



**EXHIBIT 9**

# A randomized comparison of a durable polymer Everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial

Patrick W. Serruys, MD, PhD[1]; Andrew T. L. Ong, MBBS, FRACP[1]; Jan J. Piek, MD, PhD[2]; Franz-Josef Neumann, MD[3]; Willem J. van der Giessen, MD, PhD[1]; Marcus Wiemer, MD[4]; Andreas Zeiher, MD[5]; Eberhard Grube, MD[6]; Jürgen Haase, MD, PhD[7]; Leif Thuesen, MD[8]; Christian Hamm, MD[9]; Patricia C. Otto-Terlouw, MSc[10]

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herzzentrum, Bad Krozingen, Germany. 4. Herzzentrum, Bad Oeynhausen, Germany. 5. Uni. Klinikum Frankfurt, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik Bad Nauheim, Germany. 10. Cardialysis B.V., Rotterdam, The Netherlands.

· Conflict of interest: All authors declare no conflict of interest.



## Abstract

*Background:* Everolimus is a sirolimus analogue with similar efficacy in animal models, and has been previously successfully tested in humans using an erodable polymer.

*Methods:* This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus eluting from a durable polymer on a cobalt chromium stent in patients with *de novo* native coronary artery lesions. Sixty patients were allocated to stent implantation with an everolimus-eluting stent (n=28) or an identical bare stent (n=32). Patients had either stable, unstable angina or silent ischaemia. Suitable lesions treated were single *de novo* native coronary lesions with 50-99% stenosis and could be covered by a 18 mm stent. The primary endpoint was in-stent late loss at 180 days, analysed on a per treatment basis. The major secondary endpoint was percent in-stent volume obstruction (%VO) as measured by intravascular ultrasound (IVUS) at 180 days. The clinical secondary endpoint was major adverse cardiac events (MACE) at 180 days.

*Results:* At 6 months, (matched pairs angiographic analysis), the in-stent late loss, percentage diameter stenosis and percentage of patients with binary restenosis were 0.10 mm, 16% and 0% respectively, in the everolimus arm (n=23), as compared with 0.87 mm, 39% and 25.9%, respectively in the bare stent arm (n=27, p<0.001 for late loss and diameter stenosis, p = 0.01 for restenosis). Significantly less neointimal hyperplasia was observed in the everolimus group compared to the bare stent group (10 ± 13 mm³ vs 38 ± 19 mm³, p<0.001) and similarly, less volume obstruction (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). A major adverse cardiac event occurred in 2 patients in the everolimus arm versus 6 in the bare stent arm. *Conclusion:* Everolimus eluted from a durable polymer on a cobalt chromium stent effectively suppresses neointimal growth at 6 months compared to an identical bare stent.

Corresponding to: Professor P.W. S. Serruys, MD, PhD, FESC, FACC Thoraxcenter, Bd-406, Erasmus Medical Center, Dr. Molewaterplein 40, 3015 GD Rotterdam, The Netherlands, Telephone: +31-10-463.5260, Fax: +31-10-436.9154, E-mail: p.w.j.c.serruys@erasmusmc.nl

Funding sources: This study was sponsored by Guidant Corporation.





## Introduction

Recent studies that have evaluated the local application of anti-proliferative drugs (sirolimus and paclitaxel) for the prevention of restenosis via a stent delivery system have shown that these therapies successfully inhibit the development of neointimal hyperplasia[1,2].

Everolimus is an effective anti-proliferative agent[3]. On a molecular level, everolimus forms a complex with the cytoplasmic protein FKBP12. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of protein synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of mammalian Target Of Rapamycin (mTOR), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with its function. Disabling mTOR explains the cell cycle arrest at the late G1 stage caused by everolimus and sirolimus.

The feasibility of using everolimus on a drug eluting stent was determined by the FUTURE I trial[4]. This trial utilized an S-stent and bioabsorbable polymer system (both Biosensors International, Singapore) and confirmed the safety of the everolimus-eluting stent at 6 and 12 months. At 6 months, a 7.7% Major Adverse Cardiac Event (MACE) rate was observed with no thrombosis and no late incomplete apposition. The efficacy was demonstrated by significant reduction of in-stent tissue proliferation at 6 months: both angiographic in-stent late loss and IVUS% neointimal volume were reduced by 87%. No angiographic in-stent binary restenosis was observed in the everolimus-eluting stent arm. The 12 month FUTURE I results showed sustained safety and efficacy with no new MACE events, no aneurysms, no late stent malapposition, and no thrombosis observed between 6 and 12 months. Minimal Lumen Area and Luminal Volume Index were maintained up to 12 months and no in-stent binary restenosis was observed up to 12 months.

The SPIRIT First clinical trial represents the first clinical evaluation of the Guidant XIENCE™ V Everolimus Eluting Coronary Stent System (XIENCE™ V Everolimus Eluting CSS), to investigate the potential benefits of the local application of everolimus in a durable polymer in combination with a thin strut cobalt chromium stent.

## Methods

### Patient selection

This randomized single-blind trial was performed at 9 medical centers and enrolled patients from December 2003 to April 2004. It was approved by the ethics committee at each participating institution, and all patients gave written informed consent.

Patients were eligible for the study if they were aged above 18 years and had received a diagnosis of stable or unstable angina or silent ischaemia. Additional eligibility criteria were the presence of a single primary de novo coronary lesion that was 3.0 mm in diameter as assessed by on-line QCA, that could be covered by an 18 mm stent, a stenosis of between 50-99% of the luminal diameter, and a Thrombolysis In Myocardial Infarction (TIMI) flow grade of 1 or more. Patients were not eligible for enrollment if they had an evolving myocardial infarction, stenosis of an unprotected left main coronary artery, an ostial location, located within 2 mm of a bifurcation, a lesion with moderate to heavy calcification, an angiographically visible thrombus within the target lesion, a left ventricular ejection fraction of less than 30%, were awaiting a heart transplant, or had a known hypersensitivity or contraindication to aspirin, heparin, clopidogrel, cobalt, chromium, nickel, tungsten, everolimus, acrylic and fluoro polymers or contrast sensitivity that could not be adequately pre-medicated.

## The Everolimus-eluting stent

The Guidant XIENCE™ V Everolimus Eluting CSS is comprised of the Guidant MULTI-LINK VISION® Stent and delivery system, and a drug eluting coating. The Guidant MULTI-LINK VISION® Stent is a balloon expandable stent, which consists of serpentine rings connected by links fabricated from a single piece of medical grade L-605 cobalt chromium alloy.

Everolimus is blended in a nonerodable polymer (this drug layer was coated over another nonerodable polymer primer layer). This coating includes of acrylic and fluoro polymers, both approved for use in blood contacting applications. This layer of everolimus-polymer matrix with a thickness of 5-6 microns is applied to the surface of the stent and is loaded with 100 micrograms of everolimus per square centimeter of stent surface area with no top coat polymer layer. The stent is designed to release approximately 70% of the drug within 30 days after implantation.

Everolimus (Certican®, Novartis Corporation) has been evaluated in clinical trials in the US and Europe for use as an immunosuppressant following cardiac and renal transplantation[3]. Everolimus has received market approval in the European Union.

## Study procedure

Following the confirmation of angiographic inclusion and exclusion criteria and prior to the procedure, patients were allocated through a telephone randomization service and assigned in a 1:1 ratio to either an everolimus eluting stent or bare metal stent. A single stent 3.0 mm in diameter, 18 mm long was used in the study.

Lesions were treated using standard interventional techniques with mandatory pre-dilatation and stent implantation at a pressure not exceeding the rated burst pressure. Due to packaging differences, physicians were not blinded to the device. Post-dilatation was allowed with a balloon shorter than the implanted stent. In the event of a dissection occurring at the edge of the implanted stent, it was recommended that a single additional bare Guidant MULTI-LINK VISION® stent be implanted as animal data only on single everolimus stent implantation were available at the onset of the study; these patients were a priori excluded from the per-treatment analysis but are part of the acute success population. IVUS was performed after angiographically optimal stent placement had been obtained and was repeated if additional post-dilatation was performed.

Intravenous boluses of heparin were administered according to local standard practice. Treatment with aspirin, at a minimum dose of 80 mg per day, was started at least 24 hours before the procedure and continued indefinitely. A loading dose of 300 mg of clopidogrel was administered 24 hours before the procedure, followed





by 75 mg daily for three months. Treatment with ticlopidine was permitted in case of clopidogrel hypersensitivity. Device success was defined as a final in-stent diameter stenosis of less than 50 percent by QCA using the assigned device. Clinical success was defined as the successful implantation of any device, with stenosis of less than 50 percent of the vessel diameter by QCA and no major cardiac events during the hospital stay.

## Follow-up

Patients were evaluated at 30 days and 6 months. Further evaluations will be performed at 9 months and 1 year, with annual evaluations out to 5 years. At outpatient visits, patients were asked specific questions about the interim development of angina according to the Canadian Cardiovascular Society classification of stable angina. They were also monitored for MACE. Angiographic and IVUS evaluations were performed at 6 months, and will be repeated at 1 year. Prior to performing a follow-up angiogram, the physician was required to record in the source documents whether a revascularization (if required) was clinically indicated – defined as the presence of ischaemic symptoms and/or a positive functional ischaemia study.

## Quantitative coronary angiography evaluation

Quantitative coronary angiography was performed using the CAAS II analysis system (Pie Medical BV, Maastricht, Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: computer-defined Minimal Luminal Diameter (MLD), reference diameter obtained by an interpolated method, and percentage diameter stenosis. Binary restenosis was defined in every segment as diameter stenosis $\geq 50\%$ at follow-up. Late loss was defined as the difference between MLD post-procedure and MLD at follow-up. Results are presented as matched pairs in the manuscript and as unmatched pairs in the Appendix. Unmatched pairs data is most commonly presented and utilises the mean QCA results of all projections obtained. Matched pairs data is more accurate as it compares the same views post-procedure and at follow-up and uses only QCA data of identical projections.

## Intravascular ultrasound analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased array intravascular ultrasound using automated pullback at 0.5 mm per second. The coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was examined. A computer-based contour detection program was used for automated 3-D reconstruction of the stented and adjacent segments. The lumen, stent boundaries and external elastic membrane (vessel boundaries) were detected using a minimum cost algorithm. The Stent Volume (SV) and Lumen Volume (LV) were calculated according to Simpson's rule. The intra-stent neointimal volume was calculated as the difference between SV and LV. The percentage obstruction of the stent volume was calculated as intra-stent neointimal volume/stent volume*100. Feasibility, reproducibility and inter- and intra-observer variability of

this system have been validated *in vitro* and *in vivo*. Incomplete apposition was defined as one or more stent struts separated from the vessel wall with evidence of blood speckles behind the strut on ultrasound, while late incomplete apposition was defined as incomplete apposition of the stent at follow-up which was not present post-procedure.

## Study endpoints

The primary angiographic endpoint was in-stent luminal late loss, as determined by quantitative angiography. Secondary endpoints (QCA and IVUS) at 6 months and 1 year included the in-stent and in-segment late loss, angiographic binary restenosis rate, percentage diameter stenosis; and in-stent percentage volume obstruction. In-stent was defined as within the margins of the stent while in-segment was defined as located either within the margins of the stent or 5 mm proximal or distal to the stent. Late loss was calculated as the difference between the follow-up and post-procedure minimum luminal diameter. Secondary clinical endpoints were a composite of major cardiac events, including cardiac death, Q-wave or non-Q-wave myocardial infarction, clinically driven surgical or percutaneous revascularization of the target lesion (MACE) or vessel (Target Vessel Failure) at 30 days, 6 months, 9 months, and annually up to 5 years after the index procedure; and acute device, procedure and clinical success. All deaths that could not be clearly attributed to another cause were considered cardiac deaths. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase-MB, in the absence of new Q waves on electrocardiography.
The endpoints were adjudicated by an independent clinical events committee. In addition, a data and safety monitoring board that was not affiliated with the study sponsor reviewed the data to identify any safety issues related to the conduct of the study.

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population which consisted of patients who had no bailout stenting and no major protocol deviations, as evaluated in a blinded manner. Acute success was analyzed on the entire patient population.
The sample size for the study was determined based on the primary endpoint of in-stent late loss at 180 days and on the following assumptions: a single comparison of active to uncoated; one-tailed t-test; unequal and unknown variances in the two groups being compared; $\alpha = 0.05$; true mean difference between the bare stent group and the treatment group of 0.48 mm. This assumption was made based on the results of the VISION Registry (mean late loss=0.83 mm)[7], SIRIUS trial (mean late loss=0.17 mm)[8] and TAXUS IV trial (mean late loss=0.39 mm)[9]. (Assume the true mean late loss for the treatment group is 0.35 mm, the difference between the bare stent group and treatment group is calculated as; 0.83 mm – 0.35 mm = 0.48 mm). The standard deviation was assumed to be 0.56 mm in the bare stent group and 0.38 mm in the treatment group (based on the results of the VISION Registry study and SIRIUS trial; approximately 20% rate of lost to follow-up or dropout; approximate-





ly 10% of patients with bailout stents. Given the above assumptions, 30 patients per arm (with the analysis of 22 evaluable patients per arm) will provide 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) would provide more than 96% power.

Binary variables were compared using Fisher's Exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon Rank-Sum test, except for the primary endpoint which was evaluated with a one sided t-test. Final 6-month results are presented in the manuscript, while the Appendix contains results that were available at the time that the 180-day report was prepared.

## Results
### Patient characteristics

Between December 2003 and April 2004, 28 patients were randomly assigned to receive the everolimus-eluting stent, and 32 were assigned to receive the bare stent. As defined in the protocol, all results (except acute success) are presented for the per-treatment population (27 patients in the everolimus group, Figure 1). In the everolimus group there was one bailout procedure, and in the bare stent group there were two bailout procedures and one major protocol deviation (the patient was on the heart transplant waiting list). With the exception of a significantly higher number of patients with hypertension requiring treatment in the everolimus group, the two groups were similar with respect to clinical variables examined (Table 1).

Table 1. Baseline characteristics of the per-treatment patient population and of each treatment group.*

| | Everolimus stent (n=27) | Bare stent (n=29) | All (n=56) |
|---|---|---|---|
| Age(yrs) | 64 ± 10 | 61 ± 9 | 63 ± 9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left anterior descending | 48 | 45 | 46 |
| Left circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC Lesion class (%)** | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference Vessel Diameter (mm ± SD) | 2.61 ± 0.40 | 2.71 ± 0.28 | 2.66 ± 0.34 |
| Lesion length (mm ± SD) | 10.1 ± 2.6 | 10.9 ± 3.3 | 10.5 ± 3.0 |

* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)

** AHA / ACC = American Heart Association / American College of Cardiology



FIGURE 1

Fig. 1: Flowchart of patients

## Procedural characteristics

The lesions in the two groups were treated similarly with the use of conventional techniques. Glycoprotein IIbIIIa inhibitors, used at the investigators' discretion, were administered to 7.4% of the patients in the everolimus group and 3.4% of those in the bare stent group. The two groups did not differ significantly with respect to the rate of device success (96.4% in the everolimus group and 93.8% in the bare stent group) or clinical success (96.4% in the everolimus group and 100% in the bare stent group).

## Quantitative coronary angiography analysis

Angiographic data at 6 months were available for 50 of the 56 analysable patients (89.3%). The mean reference diameter of the target vessel, the mean length of the lesion at baseline, the reference vessel diameter and mean MLD of the stented segment were similar in the two groups (Tables 1 and 2). At six months, with matched pairs analysis, the mean MLD of the stented segment was significantly greater in the everolimus group. The mean in-stent late loss, percentage of stenosis, and percentage of patients with 50 percent or more stenosis were 0.10 mm, 16%, and 0%, respectively, in the everolimus group, as compared with 0.87 mm, 39%, and 25.9%, respectively, in the bare stent group (p<0.001 for late loss and diameter stenosis, p=0.01 for restenosis). Figure 2 shows the cumulative frequency of stenosis immediately after the index procedure and at six months in each treatment group. Table 2 and Figure 3 show the results of sub-segmental quantitative angiographic analyses for matched pairs. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus group than in the bare stent group (p <0.01 for proximal and p=0.04 for distal). The late luminal loss in the stented segment was significantly less in the everolimus group than in the bare stent group (p ≤0.001).

## Intravascular ultrasound evaluation

At six months follow-up, intravascular ultrasound evaluation showed no significant differences between the two groups with respect to the volume of the stent or the vessel volume (Table 3). Significantly



FIGURE 2

Percent of patients vs Percent diameter stenosis

-o- Post Proc Bare Stent    -o- Post Proc Everolimus Stent
-o- Follow-up Bare Stent    -o- Follow-up Everolimus Stent

Fig. 2: Cumulative frequency of stenosis (in-stent) immediately after stenting and at six months



FIGURE 3

Late Loss (mm) vs Prox. Edge, In-Stent, Dist. Edge, In-Seg.

■ Bare Stent    ■ Everolimus Stent

Fig. 3: Comparison of in-segment / in-stent late loss

Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Matched Pairs).

| | Bare Stent (N=26) | Everolimus (N=26) | P value | Bare Stent (N=26) | Everolimus (N=26) | P value | Bare Stent (N=26) | Everolimus (N=26) | P value |
|---|---|---|---|---|---|---|---|---|---|
| **Reference Vessel Diameter (mm)** | | | | | | | | | |
| After procedure | 2.80±0.33 | 3.04±0.38 | 0.06* | 2.71±0.28 | 2.89±0.35 | 0.11* | 2.64±0.30 | 2.80±0.39 | 0.21* |
| At 6 months | 2.78±0.32 | 2.67±0.40 | 0.22* | 2.70±0.31 | 2.58±0.37 | 0.28* | 2.61±0.57 | 2.46±0.36 | 0.19* |
| **Minimal Luminal Diameter (mm)** | | | | | | | | | |
| After procedure | 2.56±0.44 | 2.61±0.45 | 0.79* | 2.38±0.25 | 2.45±0.31 | 0.59* | 2.23±0.41 | 2.26±0.45 | 0.77* |
| At 6 months | 2.45±0.46 | 2.19±0.49 | 0.04* | 2.28±0.33 | 1.58±0.41 | <0.001* | 2.18±0.38 | 2.00±0.45 | 0.21* |
| Late Loss (mm) | 0.11±0.15 | 0.42±0.39 | <0.01* | 0.10±0.21 | 0.87±0.37 | <0.001*** | 0.05±0.20 | 0.26±0.40 | 0.04* |
| **Diameter Stenosis (%DS)** | | | | | | | | | |
| After procedure | 9±11 | 14±9 | 0.07* | 12±8 | 15±6 | 0.05* | 16±10 | 20±10 | 0.16* |
| At 6 months | 12±12 | 17±17 | 0.26* | 15±8 | 39±14 | <0.001* | 15±10 | 19±14 | 0.82* |
| Binary Restenosis Rates | 6.3% | 3.7% | 1.00*† | 0.0% | 25.9% | 0.01** | 0.0% | 7.4% | 0.49** |

| Bare Stent (N=26) | Everolimus (N=26) | P value |
|---|---|---|
| 2.65±0.30 | 2.84±0.41 | 0.10* |
| 2.61±0.36 | 2.59±0.35 | 0.89* |
| 2.11±0.35 | 2.14±0.40 | 1.00* |
| 2.04±0.40 | 1.54±0.41 | <0.001* |
| 0.07±0.19 | 0.61±0.37 | <0.001* |
| 20±8 | 24±9 | 0.05* |
| 22±11 | 41±14 | <0.001* |
| 4.3% | 33.3% | 0.01** |

* two-sided Wilcoxon rank sum test ** two-sided Fisher's Exact test *** One-sided t-test † Fisher's Exact test



EURO PCRONLINE.COM



Table 3. IVUS measurements at 6 month follow-up.

| | Everolimus stent | Bare stent | p value |
|---|---|---|---|
| Vessel volume (mm³) | 281 ± 82 | 296 ± 73 | 0.64 |
| Stent volume (mm³) | 134 ± 28 | 139 ± 33 | 0.69 |
| In-stent neo-intimal volume (mm³) | 10 ± 13 | 38 ± 19 | <0.001 |
| Luminal volume (mm³) | 124 ± 32 | 100 ± 31 | 0.04 |
| In-stent volume obstruction (%)** | 8.0 ± 10.4 | 28.1 ± 14.0 | <0.001 |

* This final table contains an additional 13 patients not included in the 180-day report prepared for the sponsor. In 8 patients (4 in each group), an imputed stent length of 18mm was used due to non-continuous pullback. In a further 5 patients (all bare stent group) results were unavailable at the time of the 180-day report. (see Appendix)

** In-stent volume obstruction = 100*
(In-stent neo-intimal volume / Stent volume)

less neointimal hyperplasia was observed in the everolimus-stent group compared to the bare-stent group (10 ± 13 vs. 38 ± 19 mm³, p<0.001) and similarly, significantly less volume obstruction, (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). Figure 4 is a cumulative curve of percentage volume obstruction. No in-stent volume obstruction was detected in almost half of the patients in the everolimus-stent group, whereas in the bare stent group, some degree of obstruction by neointima was present in all patients (Figure 4). No evidence of an "edge effect," aneurysm formation, in-stent thrombosis, persistent dissection or late incomplete apposition were observed.



### FIGURE 4

*Fig. 4: Percentage in-stent volume obstruction versus cumulative frequency of patients. Values are expressed as mean ± standard deviation for each group.*

## Major adverse cardiac events

Major adverse cardiac events are listed in Table 4. There was one Q-wave myocardial infarction in the everolimus group in a patient who underwent additional revascularization for angina in a non-target vessel 18 days after the study procedure and suffered thrombosis of this non-study stent 12 days later. The everolimus stent was patent with no evidence of thrombus at the time of the thrombotic occlusion of the non study stent. One patient in the everolimus arm underwent a clinically driven target lesion revascularization at 3 weeks for symptomatic persistent dissection at the proximal edge left untreated at the time of the procedure. There were no clinically driven target revascularizations in the everolimus group for restenosis. There were six clinically driven target lesion revascularizations in the bare stent group, five were treated percutaneously for restenosis and the sixth by bypass surgery. No adverse effects were attributable to everolimus or the polymer coating of the stents.

Table 4. Hierarchical major adverse cardiac events at 180 days in per-treatment population*.

| | Everolimus stent | Bare stent |
|---|---|---|
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | | | | |
| Q-wave | 1‡ | 3.8 | 0 | 0 |
| Non-Q-wave | 0 | 0 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 1§ | 3.8 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 2 | 7.7 | 6 | 21.4 |
| Major adverse cardiac events | 2 | 7.7 | 6 | 21.4 |

* One patient in each group withdrew consent after treatment
** No statistical significance was detected between groups for all endpoints tested.
‡ Q-wave MI due to thrombosis of a non-study stent in a non-target vessel.
§ Clinically driven TLR for persistent dissection proximal to the stent 3 weeks after the index procedure.

## Discussion

The main finding of this randomized first-in-man study is that an everolimus-eluting stent coated with a durable polymer was associated with an in-stent angiographic late loss of 0.10 mm, significantly less than the corresponding bare cobalt chromium metal stent of 0.87 mm, which satisfied the primary endpoint of this trial and confirmed the efficacy of this system. Correspondingly, in-segment late loss was also significantly less in the everolimus-stent group.

Currently, two different drug-eluting systems (sirolimus and paclitaxel) are available. Although no published scientific comparative data is to date available, it appears that, from historical randomized trials, a difference of approximately 0.2 mm in-stent late loss exists between sirolimus and paclitaxel. Even if the impact of restenosis and MACE is currently unknown, some slight difference in restenosis rates and MACE can be expected. New devices should at least equal the incumbents in performance. This performance may be judged on late

EXHIBIT T

**DOCKET NO.:** CRDS-0066                                                **PATENT**
**Application No.:** Not yet assigned

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                                    Confirmation No.:
**Carol Wright, et al.**

Application No.: **not yet assigned**                    Group Art Unit:

Filing Date: **August 15, 2006**                         Examiner: **Not yet assigned**

For:    **Local Delivery of Rapamycin for Treatment of Proliferative Sequelae**
        **Associated with PTCA Procedures, Including Delivery Using a Modified Stent**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

**DECLARATION BY ATTORNEY IN SUPPORT OF PETITION TO MAKE SPECIAL**
**BECAUSE OF ACTUAL INFRINGEMENT (MPEP § 708.02)**

I, S. Maurice Valla, Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia PA, 19103, Registration No. 43,966, Telephone No. 215-564-3100, am the attorney of record for Applicants and make the following declarations.

1.      The instant application is directed to drug-eluting stents. Claims 1 to 5 are presently pending. Claim 1, the only independent claim, is directed to a metallic stent having a coating applied thereto. The coating comprises a mixture of a polymeric carrier and a therapeutic agent that is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation. The device provides a controlled release of the therapeutic agent

**DOCKET NO.:** CRDS-0066                                              **PATENT**
**Application No.:** Not yet assigned

over a period of several weeks.  Claim 2 recites that the therapeutic agent is a macrocyclic lactone analog of rapamycin, claim 3 recites that the polymeric carrier comprises a fluorinated polymer, and claim 4 recites a polymeric carrier that further comprises an acrylate-based polymer or copolymer.  Claim 5 is directed to a method for inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty that comprises implanting a metallic stent according to any one of claims 1 to 4 in the lumen of said coronary artery.

2.      Attached as exhibits hereto are several press releases issued by Guidant Corporation ("Guidant") describing its activities relating to drug eluting stents.  In a release dated January 30, 2006 (Exhibit 1), Guidant announced that it has received Conformité Européene (CE) Mark Approval for its XIENCE™ V Everolimus Eluting Coronary Stent System.  In the same press release, Guidant states that it "is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE™ V beginning in the second quarter of 2006."

3.      In a release dated October 19, 2005 (Exhibit 2), Guidant announced that inspection of its manufacturing facilities in Temecula, California had been successfully concluded as part of its submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe.   Guidant reported that its European Notified Body found no nonconformities and would recommend certification for Guidant's manufacturing facility for XIENCE™ V.

4.      Since Guidant's approved manufacturing facility for XIENCE™ V  is in Temecula, California, I conclude that the "ramping up manufacturing and building inventory to . . . support the European launch of XIENCE™ V" to which Guidant's January 30, 2006, release refers is being performed in the United States.  Thus, on the basis of these public statements by Guidant, I

**DOCKET NO.:** CRDS-0066                                        **PATENT**
**Application No.:** Not yet assigned

conclude that Guidant is "making" XIENCE™ V and building inventory in the United States to support launch of the product in Europe.


5.    Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).


6.    I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.


7.    Abbott's Fact Sheet attached hereto as Exhibit 4 further states that the XIENCE™ V product elutes everolimus from a MULTI-LINK VISION metallic stent. Everolimus is a macrocyclic lactone analog of rapamycin, bearing a stable 2-hydroxyethyl chain substitution at position 40 on the rapamycin structure (Exhibits 5, 6). In a press release dated March 15, 2006 (Exhibit 7), Guidant stated "everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation." Similarly, in a release dated November 15, 2005 (Exhibit 8), Guidant stated that "[t]he one year data from SPIRIT FIRST continued to demonstrate a preservation of the treatment effect of the XIENCE V Everolimus Eluting Coronary Stent System, with a highly statistically significant reduction of cell proliferation compared to the uncoated control." On the basis of the known structure of everolimus and Guidant's statements, I conclude that the XIENCE™ V product comprises a metallic stent and a macrocyclic lactone analog of rapamycin in an amount effective to inhibit neointimal proliferation.

**DOCKET NO.:** CRDS-0066                                        **PATENT**
**Application No.:** Not yet assigned

8.      An article published in EuroIntervention in 2005 (Exhibit 9) confirms the XIENCE™ V product comprises a stent bearing a coating that comprises a nonerodible (*i.e.*, nonabsorbable) polymer blended with everolimus (page 59, col. 2).  The coating is said to include a blend of acrylic and fluoro polymers, and the article further states that the stent is designed to release approximately 70% of the drug within 30 days after implantation (*Id.*).  On the basis of this information, I conclude that the XIENCE™ V product comprises a nonerodible polymeric coating comprising a fluropolymer and an acrylate-based polymer affixed to a metallic stent, and a macrocyclic triene analog of rapamycin incorporated into the coating.  I further concluded that the XIENCE™ V product provides a controlled release of the therapeutic agent over a period of several weeks, as recited in claims 1 to 4.


9.      The EuroIntervention article cited above (Exhibit 9) further confirms that the XIENCE™ V product is intended for use in a method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty (*see Id.*), as recited in claim 5 of the instant application.


10.     It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.


11.     I have a knowledge of the pertinent prior art by virtue of the prosecution histories of the parents of the instant application and other patents owned by the assignee of the instant application.  All such material art is provided to the Examiner as


☐     having been filed
☒     being filed

in a respective Information Disclosure Statement.

**DOCKET NO.:** CRDS-0066                                          **PATENT**
**Application No.:** Not yet assigned

12.    I declare further that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

                                        ___/S. Maurice Valla/_____
DATE: August 24, 2006                        S. Maurice Valla
                                        Registration No. 43,966


Woodcock Washburn LLP
One Liberty Place – 46th Floor
Philadelphia PA  19103
Telephone: (215) 568-3100
Facsimile:  (215) 568-3439

© 2005 WW

# EXHIBIT 1

**EXHIBIT 1**                     Page 1 of 2





# Guidant Receives European Approval for Drug Eluting Coronary Stent

## Company Achieves CE Mark Approval Ahead of Schedule; XIENCE V Launch Slated for Second Quarter

Indianapolis, Ind. and Brussels — January 30, 2006 — Guidant Corporation (NYSE: GDT) today announced that the company has received Conformité Européene (CE) Mark approval for the XIENCE™ V Everolimus Eluting Coronary Stent System. This regulatory certification allows Guidant to begin marketing the drug eluting stent in the 25 countries of the European Union. In addition, the CE Mark Approval is used to support market registrations in other regulated countries including those within Asia, Latin America and Eastern Europe.

"This early approval represents a significant milestone in Guidant's drug eluting stent program and demonstrates our ongoing commitment to advancing the field of cardiovascular therapy through innovative solutions," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "The development of XIENCE V represents years of hard work and dedication by our employees and by trial investigators. We look forward to bringing this next-generation therapy to physicians and patients."

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation.

"Completion of the CE Mark approval process for XIENCE V follows on the heels of impressive clinical results from the SPIRIT FIRST trial, which demonstrated the benefits of an everolimus drug eluting stent," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who served as the study's principal investigator. "With this approval, physicians in Europe will have an excellent treatment option for patients requiring a drug eluting stent."

Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE V beginning in the second quarter of 2006.

In November, Guidant announced completion of enrollment in only four months of SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-eluting coronary stent system for the treatment of coronary artery disease.

Guidant's 1,360-patient SPIRIT III global clinical trial is evaluating the XIENCE V Stent System in the United States and Japan. The randomized U.S. cohort, which will support U.S. Premarket Approval submission, has enrolled more than 70 percent of the required patients and is expected to complete enrollment later this quarter.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE V. The statements are based on assumptions about many important factors, including satisfactory enrollment and completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

[<< Back]

[Print this page]  [Close window]

# EXHIBIT 2

**EXHIBIT 2**                                                 Page 1 of 2





# Guidant Provides Update

Indianapolis, Ind. — October 19, 2005 — Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today responded to statements by Johnson & Johnson on its pending acquisition of the Company and provided an update on its two major businesses.

## Transaction Update

In response to Johnson & Johnson's comments yesterday, Ronald W. Dollens, president and CEO of Guidant Corporation, stated, "While neither company depends on this transaction for its continued future success, Guidant believes that the strategic rationale for combining the two companies is as strong today as when we entered into the Merger Agreement." Guidant anticipates that the pending transaction will receive FTC clearance in October. The Company does not expect to make any specific comments on the pending transaction until after FTC approval.

## Business Performance

"Guidant's third quarter results will reflect the temporary unavailability of the CONTAK RENEWAL 3 and 4 family of heart failure devices during the full month of July and part of August, partially offset by sequential growth of U.S. coronary stent revenue, and continuing sales growth of our emerging businesses," Dollens reported. "At the end of the quarter, data suggest our implantable defibrillator implant rate exceeded 80 percent of the pre-product notification level and is over 100 percent of the rate one year ago."

Dollens continued, "As previously announced, Guidant is launching several recently approved cardiac rhythm management systems during the fourth quarter, including the revolutionary Latitude Patient Management system. Physicians are expressing enthusiasm for the new wireless capability to monitor patients, improve their compliance, and monitor device status independent of patient effort." Dollens further observed, "Our drug eluting stent development program continues to make important progress toward European launch during the first half of next year. We are expanding manufacturing capacity, increasing productivity, and recently received FDA approval to expand clinical trial enrollment."

"While recent events and the publicity surrounding them will impact our short-term results, we believe that the fundamentals of our business and the markets that we serve remain strong and our outlook is positive," Dollens noted. "Our track record of success over the years has been driven in large part by the dedication of our people to the needs of patients and physicians who use our products. We continue to be committed to providing the highest quality products for patients who critically need them and we are confident that the value of the Company remains strong."

## Cardiac Rhythm Management Products Update

Consistent with an anticipated new product cycle, several significant new products were approved (cleared) by FDA during the third quarter. They include:

- VITALITY HE implantable defibrillator; Guidant's first high-energy product to offer the advanced functionality of the VITALITY family.

- CONTAK RENEWAL 3 RF cardiac resynchronization-defibrillator; this is Guidant's first wireless and wandless CRT-D and is designed to enhance the speed and convenience of patient care.

- ZOOM LATITUDE programmer; this next generation programmer is designed to interface with devices that include remote monitoring capability.

• LATITUDE Communicator and secure data storage system; these elements represent the final components of the Latitude Patient Management system.

Actions taken by the Company during the quarter reflect Guidant's commitment to provide more timely information to physicians and patients about our devices. Our products continue to demonstrate high performance and reliability, and tens of thousands of people are alive today and hundreds of thousands feel better as a result of Guidant's technologies. Guidant will continue to focus on meeting and exceeding the expectations of physicians, patients and the FDA.

## Drug Eluting Stent Progress

Guidant announced today that its drug eluting stent development program continues to demonstrate progress and the Company has enrolled more than 500 patients in the SPIRIT II and III clinical trials since June. SPIRIT III is a large-scale pivotal clinical trial evaluating XIENCE™ V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium rapid-exchange MULTI-LINK VISION® RX Coronary Stent System platform. Guidant plans to use the results of the SPIRIT III trial to obtain FDA approval for XIENCE V for the treatment of coronary artery disease. Results of the SPIRIT II study will provide additional clinical data to support the launch of XIENCE V in Europe and several countries outside the United States.

Earlier in the quarter, Guidant announced attainment of an enrollment milestone in the Company's exclusive license agreement with Novartis Pharma AG. Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies.

In addition, the Company plans to present one-year follow up data from SPIRIT I at the American Heart Association meeting in November 2005. SPIRIT I is a prospective, randomized, single-blind pilot study evaluating XIENCE V versus an uncoated MULTI-LINK VISION Coronary Stent System control in de novo (previously untreated) lesions.

During the quarter, the Company also announced that it successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the Company's submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant's manufacturing facility.

## Guidant Corporation

Guidant Corporation pioneers lifesaving technology, giving an opportunity for a better life today to millions of cardiac and vascular patients worldwide. The Company, driven by a strong entrepreneurial culture of more than 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information, visit www.guidant.com.

This release includes forward-looking statements that are based on assumptions about many important factors, including market trends and competition, particularly in connection with expanded indications and reimbursement for cardiac rhythm management products; satisfactory clinical and regulatory progress; progress with respect to the merger, including satisfaction of conditions to closing, including antitrust approvals; economic conditions, including exchange rates; litigation developments; and the factors listed on exhibit 99 to Guidant's most recent 10-Q. As such, they involve risks that could cause actual results to differ materially. The company does not undertake to update its forward-looking statements.



[ Print this page ]    [ Close window ]

# EXHIBIT 3

### ABBOTT COMPLETES ACQUISITION OF GUIDANT VASCULAR BUSINESS

*—COMBINATION OF ABBOTT'S AND GUIDANT'S VASCULAR ORGANIZATIONS CREATES LEADING VASCULAR DEVICES BUSINESS —*

Abbott Park, Illinois, April 21, 2006 — Abbott today announced it has completed the acquisition of Guidant's vascular business, which, combined with Abbott's current vascular business, creates one of the leading global vascular devices companies. This acquisition was made in connection with Boston Scientific's acquisition of Guidant Corporation.

"The acquisition of Guidant's vascular business builds on our broad-based business strategy to develop leading positions in attractive health care markets – shaping Abbott for greater balance and strengthening our business mix and breadth of pipeline opportunities," said Miles D. White, chairman and chief executive officer, Abbott.

"The combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as a state-of-the-art R&D organization, which is developing innovative technologies and devices such as the XIENCE™ V and ZoMaxx™ drug-eluting stents," White said. "Our newly expanded vascular organization has the tools and the talent to transform the way physicians treat vascular disease, impacting the lives of millions of patients around the world."

**Broad Vascular Devices Product Portfolio**
For the past several years, Abbott has built a competitive vascular business through acquisitions, licensing agreements, and internal scientific and commercial development. With the addition of Guidant's vascular business, Abbott offers physicians, catheterization labs and clinics a complete line of products and technologies for interventional procedures including: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. In addition, the combined business has a broad portfolio of intellectual property, including rapid exchange technology and stent designs, enabling the company to operate effectively in the competitive vascular devices market.

**Innovative Research and Development Programs**
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for treating vascular disease. With Guidant, Abbott now has two drug-eluting stents in development: ZoMaxx, a state-of-the-art stent coated with a proprietary immunosuppressant drug, zotarolimus, designed specifically to combat vessel re-narrowing; and XIENCE V, an everolimus-eluting stent on the MULTI-LINK VISION® cobalt chromium stent platform, which recently received approval in Europe. The combined organization also is leading the industry with a number of next-generation research programs including a stent that elutes two drugs targeted at difficult-to-treat patients such as diabetics, and a bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

**Guidant Vascular Sales and Employees**
The transaction provides Abbott with Guidant's vascular intervention and endovascular solutions business units, which had combined sales of more than $1 billion in 2005. These business units add nearly 6,000 employees worldwide to Abbott in three primary locations: Santa Clara, California; Temecula, California; and Clonmel, Ireland. The addition of Guidant's California-based employees boosts Abbott's presence in the state – currently the headquarters

of Abbott's diabetes care and vascular businesses – from more than 3,000 to more than 7,000 employees.

**Financial Details**
Abbott paid $4.1 billion in cash for Guidant's vascular business. In addition, Abbott will pay Boston Scientific milestone payments of $250 million at U.S. Food and Drug Administration approval of Guidant's drug-eluting stent, and an additional payment of $250 million upon a similar approval in Japan. Abbott also provided Boston Scientific with a five-year, $900 million interest-bearing loan. In addition, Abbott has purchased approximately 64 million shares of Boston Scientific stock for $1.4 billion, which represents less than 5 percent of the company.

Abbott expects that the Guidant transaction will be accretive to earnings per share in 2007 and beyond. Further information, including financial details, will be provided on the conference call scheduled for 8 a.m. Central time today (9 a.m. Eastern), as previously announced. A live webcast of the conference call will be accessible through Abbott's Investor Relations Web site at www.abbottinvestor.com. An archived edition of the call will be available after 11 a.m. Central time. Abbott also furnished an 8-K today regarding the Guidant transaction.

**About Abbott**
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company now employs 65,000 people and markets its products in more than 130 countries.

---

**Private Securities Litigation Reform Act of 1995 —**
**A Caution Concerning Forward-Looking Statements**
Some statements in this news release may be forward-looking statements for the purposes of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in the "Risk Factors" section and Exhibit 99.1 of our Securities and Exchange Commission Form 10-K for the period ended December 31, 2005, and are incorporated by reference. We undertake no obligation to release publicly any revisions to forward-looking statements as the result of subsequent events or developments.

---

Contact:

Media
Melissa Brotz          (847) 935-3456
Jonathon Hamilton      (847) 935-8646

Financial Community
John Thomas            (847) 938-2655
Tina Ventura           (847) 935-9390

---

Back to Top

Abbott Laboratories Press Releases (1098)

] Privacy Policy | Terms of Use |
Copyright © 1996, 2006 Abbott Laboratories. Abbott Park, Illinois, U.S.A.

# EXHIBIT 4



**EXHIBIT 4**

Abbott
A Promise for Life

# Abbott's Vascular Business
# Fact Sheet

*The combined Abbott and Guidant vascular business offers physicians, catheterization labs and clinics a complete line of products to treat patients with cardiac, vascular and biliary disease. Products and technologies for interventional procedures include: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. Bolstered by the acquisition of Guidant's vascular business in April 2006, Abbott began building its vascular presence with the 1999 acquisition of Perclose, a pioneer in vessel closure technologies. Over the next few years, Abbott strategically assembled a comprehensive vascular devices business through a series of acquisitions, licensing agreements and internal development.*

### Abbott's Vascular Business – At a Glance
| | |
|---|---|
| Worldwide headquarters: | San Francisco Bay Area |
| Web address: | www.abbottvascular.com |
| Primary businesses: | Coronary, Endovascular and Vessel Closure Devices |
| Employees: | 8,000 (including nearly 6,000 from Guidant) |
| Facilities: | More than 10 commercial, R&D and manufacturing facilities worldwide |

### Product Portfolio
Abbott offers comprehensive product lines throughout the world in three key areas of focus: coronary, endovascular and vessel closure devices. Key product lines and products include:

### Coronary Products:
With Abbott's long history in health care and the advanced medical devices developed by Abbott Vascular and Guidant, the company is uniquely positioned to bring physicians and their patients innovative products for the treatment of coronary artery disease.

**Drug-eluting Coronary Stents:** The *Xience V* stent, approved for sale in Europe, is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus.

**Bare Metal Coronary Stents:** Comprehensive line of bare metal stents designed for a variety of vessel sizes and clinical situations (*Multi-Link Vision* family). The *TriMaxx* bare metal stent is available outside the United States.

**Guide Wires:** Full lines of coronary guide wires to assist the interventional cardiologist in accessing treatment area (*Hi-Torque* and *Asahi PTCA*).

**Catheters:** A variety of balloon dilatation catheters and specialty catheters designed to restore blood flow to stenosed arteries (*Tornus* specialty catheter; *Mercury* balloons and *Jography* catheters; *Voyager*, *CrossSail*, *PowerSail* and *HighSail*).



**Endovascular Products:**
Abbott delivers an advanced portfolio of endovascular and biliary products to assist clinicians in a broad range of diagnostic and interventional procedures outside the coronary area (including carotid arteries, renal arteries and bile ducts).

Carotid Stents and Embolic Protection Devices: For the treatment of carotid artery disease, *RX Acculink* is an open-cell, self-expanding nitinol stent available on a rapid exchange delivery system. It is used in conjunction with *RX Accunet* embolic protection device, a polyurethane filter with a nitinol basket. *Xact* is a closed-cell, self-expanding stent used in conjunction with *Emboshield Embolic Protection System*, which features *Barewire*, a proprietary technology allowing for excellent stent placement.

Biliary stent systems: Broad lines of self-expanding and balloon expanding stents for a variety of applications (*RX Herculink, Omnilink* and *Jostent* balloon-expandable stent systems; and the *Absolute, Dynalink, Xceed* and *Xpert* self-expanding stent systems).

Peripheral Catheters and Guide wires: Full product lines of catheters and guide wires for various vessels and obstructions (*Agiltrac, Viatrac, Fox PTA*, and *Jocath* catheters; *Hi-Torque* guide wires).

**Vessel Closure Products:**
A pioneer in vessel closure technologies, Abbott offers products designed to facilitate faster, safer and more secure closure of the vascular access site following catheterizations.

Clip-based closure: The *StarClose Vascular Closure System* delivers a tiny circumferential flexible clip onto the surface of the femoral artery, mechanically closing the access site in the femoral artery securely in a matter of seconds following diagnostic catheterization procedures.

Suture-mediated closure: Minimally invasive vessel closure devices that utilize sutures and automate the surgical closure of femoral artery puncture sites following diagnostic or interventional procedures (*Perclose ProGlide, Perclose AT* and *Closer S*).

**Leading Vascular R&D Program**
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for vascular disease.

**Drug-eluting stents**
Abbott has two drug-eluting stents in development: *Xience V* and *ZoMaxx*.

- The *Xience V* stent is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus. *Xience V* recently received regulatory approval in Europe and is expected to be launched in the third quarter of 2006. The product is also currently an investigational device in the United States and Japan.

- The *ZoMaxx* stent elutes zotarolimus, a proprietary immunosuppressant drug, and utilizes the *TriMaxx* stent platform, formed from a unique tri-layer composite that allows for thin struts while maintaining optimal visibility via X-ray. *ZoMaxx* is currently in clinical trials in both the United States and internationally, with an expected European launch in 2006.



The company also has a number of next-generation drug-eluting stent programs in development, including:

- A second-generation stent that elutes two drugs (zotarolimus and dexamethasone) intended for difficult-to-treat patients, such as diabetics, where restenosis rates are high.
- A bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

## Carotid stent clinical trials:

Abbott is a leader in studying carotid stenting as a minimally invasive alternative to surgery for patients with carotid artery disease, a leading cause of stroke. The company is sponsoring/participating in three clinical trials designed to investigate the benefits of carotid stenting in patients who are at risk of stroke from carotid artery disease.

- ACT I is the first company-sponsored clinical trial to compare carotid artery stenting to carotid artery surgery in asymptomatic patients who normally would be referred for surgery. ACT I utilizes Abbott's *Xact* stent and *Emboshield* embolic protection device.
- CAPTURE 2 is a 10,000-patient post-approval study of high-risk patients using the *RX Acculink* stent and *RX Accunet* embolic protection device.
- Abbott is also participating in the CREST study comparing carotid artery stenting to carotid surgery in normal-risk, symptomatic and asymptomatic patients who normally would be referred for surgery. CREST is sponsored by the National Institute of Neurological Disorders and Stroke (NINDS), and the National Institutes of Health (NIH). CREST utilizes the *RX Acculink* stent and *RX Accunet* embolic protection device.

###

* Trademarks are shown in italics in the text of this fact sheet.



# EXHIBIT 5

**EXHIBIT 5**                                          Page 1 of 1

1: Clin Pharmacokinet. 2004;43(2):83-95.

Clinical pharmacokinetics of everolimus.

Kirchner GI, Meier-Wiedenbach I, Manns MP.

Department of Gastroenterology, Hepatology and Endocrinology, Zentrum Innere Medizin, Medizinische Hochschule Hannover, Hannover, Germany. Kirchner.Gabriele@MH-Hannover.de

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl chain substitution at position 40 on the sirolimus (rapamycin) structure. Everolimus, which has greater polarity than sirolimus, was developed in an attempt to improve the pharmacokinetic characteristics of sirolimus, particularly to increase its oral bioavailability. Everolimus has a mechanism of action similar to that of sirolimus. It blocks growth-driven transduction signals in the T-cell response to alloantigen and thus acts at a later stage than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and ciclosporin show synergism in immunosuppression both in vitro and in vivo and therefore the drugs are intended to be given in combination after solid organ transplantation. The synergistic effect allows a dosage reduction that decreases adverse effects. For the quantification of the pharmacokinetics of everolimus, nine different assays using high performance liquid chromatography coupled to an electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have been developed. Oral everolimus is absorbed rapidly, and reaches peak concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and steady-state peak and trough concentrations, and area under the concentration-time curve (AUC), are proportional to dosage. In adults, everolimus pharmacokinetic characteristics do not differ according to age, weight or sex, but bodyweight-adjusted dosages are necessary in children. The interindividual pharmacokinetic variability of everolimus can be explained by different activities of the drug efflux pump P-glycoprotein and of metabolism by cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system for everolimus biotransformation leads to drug-drug interactions with other drugs metabolised by this cytochrome system. In patients with hepatic impairment, the apparent clearance of everolimus is significantly lower than in healthy volunteers, and therefore the dosage of everolimus should be reduced by half in these patients. The advantage of everolimus seems to be its lower nephrotoxicity in comparison with the standard immunosuppressants ciclosporin and tacrolimus. Observed adverse effects with everolimus include hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections, thrombocytopenia and leucocytopenia. Because of the variable oral bioavailability and narrow therapeutic index of everolimus, blood concentration monitoring seems to be important. The excellent correlation between steady-state trough concentration and AUC makes the former a simple and reliable index for monitoring everolimus exposure. The target trough concentration of everolimus should range between 3 and 15 microg/L in combination therapy with ciclosporin (trough concentration 100-300 microg/L) and prednisone.

Publication Types:
    Review

PMID: 14748618 [PubMed - indexed for MEDLINE]

# EXHIBIT 6

EXHIBIT 6



# Everolimus – A Sirolimus Analog

| | Sirolimus® (Rapamycin) | Everolimus® |
|---|---|---|
| Formula | $C_{51}H_{79}NO_{13}$; MW: 914.2 | $C_{53}H_{83}NO_{14}$; MW: 958.25 |
| Original Indications | Acute Rejection – Kidney, Liver | Acute & Chronic Rejection – Heart, Kidney, Lung |
| Approvals | OUS & US | OUS; US approvable |

FKBP Binding domain

# EXHIBIT 7

EXHIBIT 7



Print this page

# Guidant Completes Enrollment in Randomized U.S. Portion of Drug Eluting Stent Pivotal Trial

## Large-Scale Trial Evaluating Safety and Efficacy of Next-Generation XIENCE™ V Coronary Stent System

Indianapolis, Ind. and Santa Clara, Calif. — March 15, 2006 — Guidant Corporation (NYSE: GDT) today announced that the company has completed enrollment of 1,002 patients in the randomized U.S. portion of its SPIRIT III drug eluting stent pivotal clinical trial. The randomized U.S. cohort will support Guidant's Premarket Approval submission to the U.S. Food and Drug Administration (FDA) for the company's XIENCE™ V Everolimus Eluting Coronary Stent System for the treatment of coronary artery disease.

SPIRIT III is an international clinical trial consisting of a 1,002-patient prospective, randomized, single-blind U.S. cohort evaluating the safety and efficacy of the XIENCE V Everolimus Eluting Coronary Stent System compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease, and four non-randomized trial arms. The trial is being conducted in the U.S. and Japan. XIENCE V, which utilizes Guidant's proven MULTI-LINK VISION® cobalt chromium stent platform, received CE Mark approval in January and will be launched in Europe in the second quarter of 2006.

"The completion of enrollment in the randomized U.S. portion of the SPIRIT III trial is a significant milestone for Guidant and demonstrates the commitment of our employees and trial investigators to advancing the science of drug eluting stents," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "We are very pleased with the progress this represents for this next-generation drug eluting stent in the U.S."

Gregg Stone, M.D., Professor of Medicine and Director of Cardiovascular Research & Education of Columbia University Medical Center in New York, and Campbell Rogers, M.D., Director of Cardiac Catheterization at Brigham and Women's Hospital, are co-principal investigators of the study. Dr. Shigeru Saito, Director of Cardiology and Catheterization Laboratories, Shonan Kamakura Hospital, is the principal investigator for the Japan arm of the trial.

"Based on the positive results of SPIRIT FIRST, Guidant's -olimus based XIENCE V Everolimus Eluting Coronary Stent System appears to hold great promise as a next-generation therapy for treating coronary artery disease," said Dr. Rogers. "We look forward to analyzing these data and sharing results of the trial early next year. We also look forward to continuing to examine how the XIENCE stent performs in diverse patient and lesion subsets in upcoming clinical studies."

"We are excited that the SPIRIT III clinical trial has completed enrollment so smoothly and rapidly," said Dr. Stone. "The potential of this highly deliverable XIENCE V Stent System represents a welcome option for physicians caring for patients with coronary artery disease."

In November, Guidant announced that SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V outside the U.S., had completed enrollment in only four months. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-Eluting Coronary Stent System for the treatment of coronary artery disease.

## About XIENCE V

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation. Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the

European launch of XIENCE V beginning in the second quarter of 2006.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE™ V. The statements are based on assumptions about many important factors, including completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

[ << Back ]

# EXHIBIT 8

**EXHIBIT 8**



Print this page

# Guidant Reports Excellent 12-Month Results from SPIRIT FIRST Everolimus Eluting Coronary Stent Clinical Trial

Results Demonstrate Sustained Benefit of the XIENCE V Everolimus Eluting Coronary Stent System

Indianapolis, Ind., and Dallas, Texas — November 16, 2005 — Guidant Corporation (NYSE: GDT) today announced 12-month adjudicated results from the company's SPIRIT FIRST clinical trial. SPIRIT FIRST is a prospective, randomized, single-blind trial evaluating Guidant's rapid-exchange XIENCE™ V Everolimus Eluting Coronary Stent System versus an uncoated MULTI-LINK VISION® Coronary Stent System control in de novo (previously untreated) lesions.

"The trial's impressive results demonstrate the sustained efficacy of the XIENCE V Everolimus Eluting Coronary Stent System," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who serves as the study's principal investigator. "The benefit of an everolimus drug eluting stent, with only one device-related MACE event and no thrombotic events, combined with the highly deliverable rapid-exchange VISION stent and stent delivery system, holds great promise for the treatment of patients with cardiovascular disease."

The one-year data from SPIRIT FIRST continued to demonstrate a preservation of the treatment effect of the XIENCE V Everolimus Eluting Coronary Stent System, with a highly statistically significant reduction of cell proliferation compared to the uncoated control. At one year, the XIENCE V arm demonstrated an angiographic in-stent late loss of 0.23 mm and an in-segment late loss of 0.13 mm, which were 72 percent and 78 percent less, respectively, than the values of the uncoated control (0.81 mm and 0.59 mm). The percent volume obstruction as determined by intravascular ultrasound at one year was 10.7 percent, which was 60 percent less than the control value (26.9 percent).

There were no acute or late stent thromboses reported through the one-year follow-up period. The rate of major adverse cardiac events (MACE) was 15.4 percent (4/26) at one year, compared with 21.4 percent (6/28) for the control. Three of the four MACE events in the treatment arm were not directly related to the XIENCE V Stent, resulting in a device-related MACE rate of 3.8 percent, compared with 21.4 percent for the control. Results were presented today at the American Heart Association Scientific Sessions in Dallas by Prof. Jan J. Piek, M.D. of the Academic Medical Center, Department of Cardiology, University of Amsterdam.

"Everolimus has clearly proven its effectiveness in reducing tissue proliferation in the coronary vessels following stent implantation. We are excited about combining this unique drug with the proven MULTI-LINK VISION, our most advanced coronary stent system, which is available on the rapid-exchange platform physicians prefer," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "We look forward to additional data on this exciting product coming from both SPIRIT II and SPIRIT III. SPIRIT II completed enrollment of 300 patients ahead of schedule last week, and enrollment is proceeding nicely in SPIRIT III as well, with more than 400 patients enrolled to date."

SPIRIT II and SPIRIT III are large-scale pivotal clinical trials evaluating the safety and efficacy of Guidant's drug eluting stent system for the treatment of coronary artery disease. These prospective, randomized, single-blind trials compare XIENCE V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium MULTI-LINK VISION Coronary Stent System platform, versus the TAXUS® Express 2™ Paclitaxel Eluting Coronary Stent System.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

[ <<Back ]

# EXHIBIT 9



**EXHIBIT 9**

# A randomized comparison of a durable polymer Everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial

Patrick W. Serruys, MD, PhD[1]; Andrew T. L. Ong, MBBS, FRACP[1]; Jan J. Piek, MD, PhD[2]; Franz-Josef Neumann, MD[3]; Willem J. van der Giessen, MD, PhD[1]; Marcus Wiemer, MD[4]; Andreas Zeiher, MD[5]; Eberhard Grube, MD[6]; Jürgen Haase, MD, PhD[7]; Leif Thuesen, MD[8]; Christian Hamm, MD[9]; Patricia C. Otto-Terlouw, MSc[10]

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herzzentrum, Bad Krozingen, Germany. 4. Herzzentrum, Bad Oeynhausen, Germany. 5. Uni. Klinikum Frankfurt, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik Bad Nauheim, Germany. 10. Cardialysis B.V., Rotterdam, The Netherlands.

Conflict of interest: All authors declare no conflict of interest.



## Abstract

*Background:* Everolimus is a sirolimus analogue with similar efficacy in animal models, and has been previously successfully tested in humans using an erodable polymer.

*Methods:* This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus eluting from a durable polymer on a cobalt chromium stent in patients with *de novo* native coronary artery lesions. Sixty patients were allocated to stent implantation with an everolimus-eluting stent (n=28) or an identical bare stent (n=32). Patients had either stable, unstable angina or silent ischaemia. Suitable lesions treated were single *de novo* native coronary lesions with 50-99% stenosis and could be covered by a 18 mm stent. The primary endpoint was in-stent late loss at 180 days, analysed on a per treatment basis. The major secondary endpoint was percent in-stent volume obstruction (%VO) as measured by intravascular ultrasound (IVUS) at 180 days. The clinical secondary endpoint was major adverse cardiac events (MACE) at 180 days.

*Results:* At 6 months, (matched pairs angiographic analysis), the in-stent late loss, percentage diameter stenosis and percentage of patients with binary restenosis were 0.10 mm, 16% and 0% respectively, in the everolimus arm (n=23), as compared with 0.87 mm, 39% and 25.9%, respectively in the bare stent arm (n=27, p<0.001 for late loss and diameter stenosis, p = 0.01 for restenosis). Significantly less neointimal hyperplasia was observed in the everolimus group compared to the bare stent group (10 ± 13 mm³ vs 38 ± 19 mm³, p<0.001) and similarly, less volume obstruction (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). A major adverse cardiac event occurred in 2 patients in the everolimus arm versus 5 in the bare stent arm.

*Conclusion:* Everolimus eluted from a durable polymer on a cobalt chromium stent effectively suppresses neointimal growth at 6 months compared to an identical bare stent.

Corresponding to: Professor P.W. S. Serruys, MD, PhD, FESC, FACC Thoraxcenter, Bd-406, Erasmus Medical Center, Dr. Molenaterplein 40, 3015 GD Rotterdam, The Netherlands, Telephone: +31-10-463.5260, Fax +31-10-436.9154, E-mail: p.w.j.c.serruys@erasmusmc.nl

Funding sources: This study was sponsored by Guidant Corporation.





## Introduction

Recent studies that have evaluated the local application of anti-proliferative drugs (sirolimus and paclitaxel) for the prevention of restenosis via a stent delivery system have shown that these therapies successfully inhibit the development of neointimal hyperplasia[1,2].

Everolimus is an effective anti-proliferative agent[3]. On a molecular level, everolimus forms a complex with the cytoplasmic protein FKBP12. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of protein synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of mammalian Target Of Rapamycin (mTOR), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with its function. Disabling mTOR explains the cell cycle arrest at the late G1 stage caused by everolimus and sirolimus.

The feasibility of using everolimus on a drug eluting stent was determined by the FUTURE I trial[4]. This trial utilized an S-stent and bioabsorbable polymer system (both Biosensors International, Singapore) and confirmed the safety of the everolimus-eluting stent at 6 and 12 months. At 6 months, a 7.7% Major Adverse Cardiac Event (MACE) rate was observed with no thrombosis and no late incomplete apposition. The efficacy was demonstrated by significant reduction of in-stent tissue proliferation at 6 months: both angiographic in-stent late loss and IVUS% neointimal volume were reduced by 87%. No angiographic in-stent binary restenosis was observed in the everolimus-eluting stent arm. The 12 month FUTURE I results showed sustained safety and efficacy with no new MACE events, no aneurysms, no late stent malapposition, and no thrombosis observed between 6 and 12 months. Minimal Lumen Area and Luminal Volume index were maintained up to 12 months and no in-stent binary restenosis was observed up to 12 months.

The SPIRIT First clinical trial represents the first clinical evaluation of the Guidant XIENCE™ V Everolimus Eluting Coronary Stent System (XIENCE™ V Everolimus Eluting CSS), to investigate the potential benefits of the local application of everolimus in a durable polymer in combination with a thin strut cobalt chromium stent.

## Methods

### Patient selection

This randomized single-blind trial was performed at 9 medical centers and enrolled patients from December 2003 to April 2004. It was approved by the ethics committee at each participating institution, and all patients gave written informed consent.

Patients were eligible for the study if they were aged above 18 years and had received a diagnosis of stable or unstable angina or silent ischaemia. Additional eligibility criteria were the presence of a single primary de novo coronary lesion that was 3.0 mm in diameter as assessed by on-line QCA, that could be covered by an 18 mm stent, a stenosis of between 50-99% of the luminal diameter, and a Thrombolysis In Myocardial Infarction (TIMI) flow grade of 1 or more. Patients were not eligible for enrollment if they had an evolving myocardial infarction, stenosis of an unprotected left main coro-

nary artery, an ostial location, located within 2 mm of a bifurcation, a lesion with moderate to heavy calcification, an angiographically visible thrombus within the target lesion, a left ventricular ejection fraction of less than 30%, were awaiting a heart transplant, or had a known hypersensitivity or contraindication to aspirin, heparin, clopidogrel, cobalt, chromium, nickel, tungsten, everolimus, acrylic and fluoro polymers or contrast sensitivity that could not be adequately pre-medicated.

## The Everolimus-eluting stent

The Guidant XIENCE™ V Everolimus Eluting CSS is comprised of the Guidant MULTI-LINK VISION® Stent and delivery system, and a drug eluting coating. The Guidant MULTI-LINK VISION® Stent is a balloon expandable stent, which consists of serpentine rings connected by links fabricated from a single piece of medical grade L-605 cobalt chromium alloy.

Everolimus is blended in a nonerodable polymer (this drug layer was coated over another nonerodable polymer primer layer). This coating includes of acrylic and fluoro polymers, both approved for use in blood contacting applications. This layer of everolimus-polymer matrix with a thickness of 5-6 microns is applied to the surface of the stent and is loaded with 100 micrograms of everolimus per square centimeter of stent surface area with no top coat polymer layer. The stent is designed to release approximately 70% of the drug within 30 days after implantation.

Everolimus (Certican®, Novartis Corporation) has been evaluated in clinical trials in the US and Europe for use as an immunosuppressant following cardiac and renal transplantation[5]. Everolimus has received market approval in the European Union.

## Study procedure

Following the confirmation of angiographic inclusion and exclusion criteria and prior to the procedure, patients were allocated through a telephone randomization system and assigned in a 1:1 ratio to either an everolimus eluting stent or bare metal stent. A single stent 3.0 mm in diameter, 18 mm long was used in the study.

Lesions were treated using standard interventional techniques with mandatory pre-dilatation and stent implantation at a pressure not exceeding the rated burst pressure. Due to packaging differences, physicians were not blinded to the device. Post-dilatation was allowed with a balloon shorter than the implanted stent. In the event of a dissection occurring at the edge of the implanted stent, it was recommended that a single additional bare Guidant MULTI-LINK VISION® stent be implanted as animal data only on single everolimus stent implantation were available at the onset of the study; these patients were a priori excluded from the per-treatment analysis but are part of the acute success population. IVUS was performed after angiographically optimal stent placement had been obtained and was repeated if additional post-dilatation was performed.

Intravenous boluses of heparin were administered according to local standard practice. Treatment with aspirin, at a minimum dose of 80 mg per day, was started at least 24 hours before the procedure and continued indefinitely. A loading dose of 300 mg of clopidogrel was administered 24 hours before the procedure, followed





by 75 mg daily for three months. Treatment with ticlopidine was permitted in case of clopidogrel hypersensitivity. Device success was defined as a final in-stent diameter stenosis of less than 50 percent by QCA using the assigned device. Clinical success was defined as the successful implantation of any device, with stenosis of less than 50 percent of the vessel diameter by QCA and no major cardiac events during the hospital stay.

## Follow-up

Patients were evaluated at 30 days and 6 months. Further evaluations will be performed at 9 months and 1 year, with annual evaluations out to 5 years. At outpatient visits, patients were asked specific questions about the interim development of angina according to the Canadian Cardiovascular Society classification of stable angina. They were also monitored for MACE. Angiographic and IVUS evaluations were performed at 6 months, and will be repeated at 1 year. Prior to performing a follow-up angiogram, the physician was required to record in the source documents whether a revascularization (if required) was clinically indicated — defined as the presence of ischaemic symptoms and/or a positive functional ischaemia study.

## Quantitative coronary angiography evaluation

Quantitative coronary angiography was performed using the CAAS II analysis system (Pie Medical BV, Maastricht, Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: computer-defined Minimal Luminal Diameter (MLD), reference diameter obtained by an interpolated method, and percentage diameter stenosis. Binary restenosis was defined in every segment as diameter stenosis ≥50% at follow-up. Late loss was defined as the difference between MLD post-procedure and MLD at follow-up. Results are presented as matched pairs in the manuscript and as unmatched pairs in the Appendix. Unmatched pairs data is most commonly presented and utilises the mean QCA results of all projections obtained. Matched pairs data is more accurate as it compares the same views post-procedure and at follow-up and uses only QCA data of identical projections.

## Intravascular ultrasound analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased array intravascular ultrasound using automated pullback at 0.5 mm per second. The coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was examined. A computer-based contour detection program was used for automated 3-D reconstruction of the stented and adjacent segments. The lumen, stent boundaries and external elastic membrane (vessel boundaries) were detected using a minimum cost algorithm. The Stent Volume (SV) and Lumen Volume (LV) were calculated according to Simpson's rule. The intra-stent neointimal volume was calculated as the difference between SV and LV. The percentage obstruction of the stent volume was calculated as intra-stent neointimal volume/stent volume*100. Feasibility, reproducibility and inter- and intra-observer variability of

this system have been validated *in vitro* and *in vivo*[8]. Incomplete apposition was defined as one or more stent struts separated from the vessel wall with evidence of blood speckles behind the strut on ultrasound, while late incomplete apposition was defined as incomplete apposition of the stent at follow-up which was not present post-procedure.

## Study endpoints

The primary angiographic endpoint was in-stent luminal late loss, as determined by quantitative angiography. Secondary endpoints (QCA and IVUS) at 6 months and 1 year included the in-stent and in-segment late loss, angiographic binary restenosis rate, percentage diameter stenosis; and in-stent percentage volume obstruction. In-stent was defined as within the margins of the stent while in-segment was defined as located either within the margins of the stent or 5 mm proximal or distal to the stent. Late loss was calculated as the difference between the follow-up and post-procedure minimum luminal diameter. Secondary clinical endpoints were a composite of major cardiac events, including cardiac death, Q-wave or non-Q-wave myocardial infarction, clinically driven surgical or percutaneous revascularization of the target lesion (MACE) or vessel (Target Vessel Failure) at 30 days, 6 months, 9 months, and annually up to 5 years after the index procedure; and acute device, procedure and clinical success. All deaths that could not be clearly attributed to another cause were considered cardiac deaths. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase-MB, in the absence of new Q waves on electrocardiography.

The endpoints were adjudicated by an independent clinical events committee. In addition, a data and safety monitoring board that was not affiliated with the study sponsor reviewed the data to identify any safety issues related to the conduct of the study.

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population which consisted of patients who had no bailout stenting and no major protocol deviations, as evaluated in a blinded manner. Acute success was analyzed on the entire patient population.

The sample size for the study was determined based on the primary endpoint of in-stent late loss at 180 days and on the following assumptions: a single comparison of active to uncoated; one-tailed t-test, unequal and unknown variances in the two groups being compared; α=0.05; true mean difference between the bare stent group and the treatment group of 0.48 mm. This assumption was made based on the results of the VISION Registry (mean late loss=0.83 mm[7], SIRIUS trial (mean late loss=0.17 mm)[8] and TAXUS IV trial (mean late loss=0.39 mm)[9]. (Assume the true mean late loss for the treatment group is 0.35 mm, the difference between the bare stent group and treatment group is calculated as; 0.83 mm – 0.35 mm = 0.48 mm). The standard deviation was assumed to be 0.56 mm in the bare stent group and 0.38 mm in the treatment group (based on the results of the VISION Registry study and SIRIUS trial; approximately 20% rate of lost to follow-up or dropout; approximate-





ly 10% of patients with bailout stents. Given the above assumptions, 30 patients per arm (with the analysis of 22 evaluable patients per arm) will provide 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) would provide more than 95% power.

Binary variables were compared using Fisher's Exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon Rank-Sum test, except for the primary endpoint which was evaluated with a one sided t-test. Final 6-month results are presented in the manuscript, while the Appendix contains results that were available at the time that the 180-day report was prepared.

## Results
### Patient characteristics

Between December 2003 and April 2004, 28 patients were randomly assigned to receive the everolimus-eluting stent, and 32 were assigned to receive the bare stent. As defined in the protocol, all results (except acute success) are presented for the per-treatment population (27 patients in the everolimus group, and 29 patients in the bare stent group, Figure 1). In the everolimus group there was one bailout procedure, and in the bare stent group there were two bailout procedures and one major protocol deviation (the patient was on the heart transplant waiting list). With the exception of a significantly higher number of patients with hypertension requiring treatment in the everolimus group, the two groups were similar with respect to clinical variables examined (Table 1).

**Table 1. Baseline characteristics of the per-treatment patient population and of each treatment group.\***

| | Everolimus (n=27) (65±SD) | Bare stent (n=29) (65±SD) | All patients (n=56) (65±SD) |
|---|---|---|---|
| Age (yrs) | 64 ± 10 | 61 ± 9 | 63 ± 9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left anterior descending | 48 | 45 | 46 |
| Left circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC Lesion Class (%)\*\* | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference Vessel Diameter (mm ± SD) | 2.61 ± 0.40 | 2.71 ± 0.28 | 2.66 ± 0.34 |
| Lesion length (mm ± SD) | 10.1 ± 2.6 | 10.9 ± 3.3 | 10.5 ± 3.0 |

\* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)

\*\* AHA / ACC = American Heart Association / American College of Cardiology

FIGURE 1



*Fig. 1: Flowchart of patients*



## Procedural characteristics

The lesions in the two groups were treated similarly with the use of conventional techniques. Glycoprotein IIb/IIIa inhibitors, used at the investigators' discretion, were administered to 7.4% of the patients in the everolimus group and 3.4% of those in the bare stent group. The two groups did not differ significantly with respect to the rate of device success (96.4% in the everolimus group and 93.8% in the bare stent group) or clinical success (96.4% in the everolimus group and 100% in the bare stent group).

## Quantitative coronary angiography analysis

Angiographic data at 6 months were available for 50 of the 56 analysable patients (89.3%). The mean reference diameter of the target vessel, the mean length of the lesion at baseline, the reference vessel diameter and mean MLD of the stented segment were similar in the two groups (Tables 1 and 2). At six months, with matched pairs analysis, the mean MLD of the stented segment was significantly greater in the everolimus group. The mean in-stent late loss, percentage of stenosis, and percentage of patients with 50 percent or more stenosis were 0.10 mm, 16%, and 0%, respectively, in the everolimus group, as compared with 0.87 mm, 39%, and 25.9%, respectively, in the bare stent group (p<0.001 for late loss and diameter stenosis, p=0.01 for restenosis). Figure 2 shows the cumulative frequency of stenosis immediately after the index procedure and at six months in each treatment group. Table 2 and Figure 3 show the results of sub-segmental quantitative angiographic analyses for matched pairs. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus group than in the bare stent group (p <0.01 for proximal and p=0.04 for distal). The late luminal loss in the stented segment was significantly less in the everolimus group than in the bare stent group (p ≤0.001).

## Intravascular ultrasound evaluation

At six months follow-up, intravascular ultrasound evaluation showed no significant differences between the two groups with respect to the volume of the stent or the vessel volume (Table 3). Significantly



Fig. 2: Cumulative frequency of stenosis (in-stent) immediately after stenting and at six months



Fig. 3: Comparison of in-segment / in-stent late loss

Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Matched Pairs).

| | Immediately after procedure | | | | | | At 6 months | | |
|---|---|---|---|---|---|---|---|---|---|
| **Reference Vessel Diameter (mm)** | | | | | | | | | |
| After procedure | 2.80±0.33 | 3.04±0.38 | 0.06ᵃ | 2.71±0.28 | 2.89±0.35 | 0.11ᵃ | 2.64±0.30 | 2.80±0.39 | 0.21ᵃ | 2.65±0.30 | 2.84±0.41 | 0.10ᵃ |
| At 6 months | 2.78±0.32 | 2.67±0.40 | 0.22ᵃ | 2.70±0.31 | 2.58±0.37 | 0.25ᵃ | 2.61±0.37 | 2.46±0.36 | 0.19ᵃ | 2.61±0.36 | 2.59±0.36 | 0.69ᵃ |
| **Minimal Luminal Diameter (mm)** | | | | | | | | | |
| After procedure | 2.56±0.44 | 2.61±0.45 | 0.79ᵃ | 2.38±0.25 | 2.45±0.31 | 0.50ᵃ | 2.23±0.41 | 2.26±0.43 | 0.77ᵃ | 2.11±0.35 | 2.14±0.40 | 1.00ᵇ |
| At 6 months | 2.45±0.46 | 2.19±0.49 | 0.04ᵃ | 2.28±0.33 | 1.58±0.41 | <0.001ᵃ | 2.18±0.38 | 2.00±0.45 | 0.21ᵃ | 2.04±0.40 | 1.54±0.41 | <0.001ᴬ |
| Late Loss (mm) | 0.11±0.15 | 0.42±0.39 | <0.01ᵃ | 0.10±0.21 | 0.87±0.37 | <0.001ᵃᵃ | 0.05±0.20 | 0.26±0.40 | 0.04ᵃ | 0.07±0.19 | 0.61±0.37 | <0.001ᵃ |
| **Diameter Stenosis (%DS)** | | | | | | | | | |
| After procedure | 9±11 | 14±9 | 0.07ᵃ | 12±8 | 15±6 | 0.05ᵃ | 16±10 | 20±10 | 0.16ᵇ | 20±8 | 24±9 | 0.05ᵃ |
| At 6 months | 12±12 | 17±17 | 0.26ᵃ | 15±8 | 39±14 | <0.001ᵃ | 15±10 | 19±14 | 0.82ᵃ | 22±11 | 41±14 | <0.001ᴬ |
| Binary Restenosis Rates | 4.3% | 3.7% | 1.00ᵃᵃ | 0.0% | 25.9% | 0.01ᵃᵃ | 0.0% | 7.4% | 0.49ᵃᵃ | 4.3% | 33.3% | 0.01ᵃᵃ |

ᵃ two-sided Wilcoxon rank sum test ᵃᵃ two-sided Fisher's Exact test ᵃᵃᵃ One-sided t-test ᵇ Fisher's Exact test





Table 3. IVUS measurements at 6 month follow-up.

| | Everolimus stent | Bare stent | p-value |
|---|---|---|---|
| Vessel volume (mm³) | 291 ± 82 | 296 ± 73 | 0.64 |
| Stent volume (mm³) | 134 ± 28 | 139 ± 33 | 0.69 |
| In-stent neo-intimal volume (mm³) | 10 ± 13 | 38 ± 19 | <0.001 |
| Luminal volume (mm³) | 124 ± 32 | 100 ± 31 | 0.04 |
| In-stent volume obstruction (%)** | 8.0 ± 10.4 | 28.1 ± 14.0 | <0.001 |

\* This final table contains an additional 13 patients not included in the 180-day report prepared for the sponsor. In 8 patients (4 in each group), an imputed stent length of 18mm was used due to non-continuous pullback. In a further 5 patients (all bare stent group) results were unavailable at the time of the 180-day report. (see Appendix)

\*\* In-stent volume obstruction = 100*
(In-stent neo-intimal volume / Stent volume)

less neointimal hyperplasia was observed in the everolimus-stent group compared to the bare-stent group (10 ± 13 vs. 38 ± 19 mm³, p<0.001) and similarly, significantly less volume obstruction, (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). Figure 4 is a cumulative curve of percentage volume obstruction. No in-stent volume obstruction was detected in almost half of the patients in the everolimus-stent group, whereas in the bare stent group, some degree of obstruction by neointima was present in all patients (Figure 4). No evidence of an "edge effect," aneurysm formation, in-stent thrombosis, persistent dissection or late incomplete apposition were observed.



FIGURE 4

Fig. 4: Percentage in-stent volume obstruction versus cumulative frequency of patients. Values are expressed as mean ± standard deviation for each group.

## Major adverse cardiac events

Major adverse cardiac events are listed in Table 4. There was one Q-wave myocardial infarction in the everolimus group in a patient who underwent additional revascularization for angina in a non-target vessel 18 days after the study procedure and suffered thrombosis of this non-study stent 12 days later. The everolimus stent was patent with no evidence of thrombus at the time of the thrombotic occlusion of the non study stent. One patient in the everolimus arm underwent a clinically driven target lesion revascularization at 3 weeks for symptomatic persistent dissection at the proximal edge left untreated at the time of the procedure. There were no clinically driven target revascularizations in the everolimus group for restenosis. There were six clinically driven target lesion revascularizations in the bare stent group, five were treated percutaneously for restenosis and the sixth by bypass surgery. No adverse effects were attributable to everolimus or the polymer coating of the stents.

Table 4. Hierarchical major adverse cardiac events at 180 days in per-treatment population*.

| | Everolimus stent | | Bare stent | |
|---|---|---|---|---|
| | n | % | n | % |
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | | | | |
| Q-wave | 1‡ | 3.8 | 0 | 0 |
| Non-Q-wave | 0 | 0 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 1§ | 3.8 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 2 | 7.7 | 6 | 21.4 |
| Major adverse cardiac events | 2 | 7.7 | 6 | 21.4 |

\* One patient in each group withdrew consent after treatment
\*\* No statistical significance was detected between groups for all endpoints tested.
‡ Q-wave MI due to thrombosis of a non-study stent in a non-target vessel.
§ Clinically driven TLR for persistent dissection proximal to the stent 3 weeks after the index procedure.

## Discussion

The main finding of this randomized first-in-man study is that an everolimus-eluting stent coated with a durable polymer was associated with an in-stent angiographic late loss of 0.10 mm, significantly less than the corresponding bare cobalt chromium metal stent of 0.87 mm, which satisfied the primary endpoint of this trial and confirmed the efficacy of this system. Correspondingly, in-segment late loss was also significantly less in the everolimus-stent group.

Currently, two different drug-eluting systems (sirolimus and paclitaxel) are available. Although no published scientific comparative data is to date available, it appears that, from historical randomized trials, a difference of approximately 0.2 mm in-stent late loss exists between sirolimus and paclitaxel. Even if the impact of restenosis and MACE is currently unknown, some slight difference in restenosis rates and MACE can be expected. New devices should at least equal the incumbents in performance. This performance may be judged on late

EXHIBIT U



DOCKET NO.: CRDS-0062 (CRD0931CIP)                           **PATENT**
Application No.: 10/829,074

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    Confirmation No.: **5950**
**Robert Falotico, et al.**

Application No.: **10/829,074**          Group Art Unit: **3743**

Filing Date: **April 21, 2004**         Examiner: **Not yet assigned**

For:  **Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular
Disease**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### DECLARATION BY ATTORNEY IN SUPPORT OF PETITION TO MAKE
### SPECIAL BECAUSE OF ACTUAL INFRINGEMENT (MPEP § 708.02)

I, S. Maurice Valla, Woodcock Washburn LLP, One Liberty Place, 46th Floor,
Philadelphia PA, 19103, Registration No. 43,966, Telephone No. 215-564-3100, am the
attorney of record for Applicants and make the following declarations.

1.      Claims 15 to 30 are presently pending. Each of the claims is directed to devices
comprising an intraluminal stent, a nonerodible polymeric coating affixed to the stent, and
rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the
coating; the devices provide an in-stent late loss in diameter at 12 months following
implantation in a human of less than about 0.5 mm, as measured by quantitative coronary
angiography. Claim 16 specifies an in-stent late loss in diameter of less than about 0.3 mm,
and claims 17 and 18 specify that the stent provides an in-stent diameter stenosis at 12
months following implantation in a human of less than about 22% or 15%, respectively, as

measured by quantitative coronary angiography. Claims 19 to 22 are similar to claims 15 to 18, but specify mean in-stent late loss and in-stent diameter stenosis values for in a human population. Claims 23 to 30 are directed to methods of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty, comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating. These methods provide in-stent late loss and/or in-stent diameter stenosis values as recited in claims 15 to 22.

2.     Attached as exhibits hereto are press releases issued by Guidant Corporation ("Guidant") describing certain of its activities relating to drug eluting stents. In a release dated January 30, 2006 (Exhibit 1), Guidant announced that it has received Conformité Européene (CE) Mark Approval for its XIENCE™ V Everolimus Eluting Coronary Stent System. In the same press release, Guidant states that it "is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE™ V beginning in the second quarter of 2006."

3.     In a release dated October 19, 2005 (Exhibit 2), Guidant announced that inspection of its manufacturing facilities in Temecula, California had been successfully concluded as part of its submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. Guidant reported that its European Notified Body found no nonconformities and would recommend certification for Guidant's manufacturing facility for XIENCE™ V.

4.     Since Guidant's approved manufacturing facility for XIENCE™ V is in Temecula, California, I conclude that the "ramping up manufacturing and building inventory to . . . support the European launch of XIENCE™ V" to which Guidant's January 30, 2006, release refers is being performed in the United States. Thus, on the basis of these public statements by Guidant, I conclude that Guidant is "making" XIENCE™ V and building inventory in the United States to support launch of the product in Europe.

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)                    **PATENT**
**Application No.:** 10/829,074

5.    Guidant's vascular business has recently been acquired by Abbott Laboratories
(Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the
third quarter of 2006 (Exhibit 4).

6.    I have made a rigid comparison of the XIENCE™ V product, as described in Guidant
press releases and other publicly available documents, with the claims of the instant
application. In my opinion, the XIENCE™ V product is unquestionably within the scope of
claims 15 to 30 on file in this application.

7.    Everolimus is a macrocyclic triene analog of rapamycin, bearing a stable 2-
hydroxyethyl chain substitution at position 40 on the rapamycin structure (Exhibits 5,6). An
article published in EuroIntervention in 2005 (Exhibit 7) confirms that everolimus binds with
FKBP12 (*see* page 59, col. 1), and that XIENCE™ V product comprises a stent bearing a
coating that comprises a nonerodible polymer blended with everolimus (*see* page 59, col. 2).
On the basis of this information, I conclude that the XIENCE™ V product comprises an
intraluminal stent, a nonerodible polymeric coating affixed to the stent, and rapamycin or a
macrocyclic triene analog thereof that binds FKBP12 incorporated into the coating, as recited
in claims 15 to 30 on file in this application.

8.    Another article published in EuroIntervention in 2005 (Exhibit 8) reports on one-year
results from Guidant's SPIRIT FIRST clinical trial, in which intravascular ultrasound and
quantitative angiographic analyses were performed one year following intraluminal
implantation of XIENCE™ V stents in the coronary arteries of human patients. The article
reports that mean in-stent late loss and diameter stenosis values were 0.24mm and 18%,
respectively (*see* abstract), which is within the limits recited in claims 15 to 30 on file in this
application.

9.    It is therefore my opinion that Guidant is making a product in the United States to
support the European launch that is unquestionably within the scope of claims 15 to 30 of the
instant application, and that a patent containing these claims could immediately be asserted
upon issue.

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)                    **PATENT**
**Application No.:** 10/829,074

10.    I have a knowledge of the pertinent prior art by virtue of the prosecution histories of the parents of the instant application and other patents owned by the assignee of the instant application. All such material art is provided to the Examiner as

&#9746;    having been filed

&#9746;    being filed

in a respective Information Disclosure Statement.

11.    I declare further that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Date:  August 7, 2006

S. Maurice Valla
Registration No. 43,966

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA  19103
Telephone: (215) 568-3100
Facsimile:  (215) 568-3439

© 2005 WW

**EXHIBIT 1**





# Guidant Receives European Approval for Drug Eluting Coronary Stent

## Company Achieves CE Mark Approval Ahead of Schedule; XIENCE V Launch Slated for Second Quarter

**Indianapolis, Ind. and Brussels — January 30, 2006** — Guidant Corporation (NYSE: GDT) today announced that the company has received Conformité Européene (CE) Mark approval for the XIENCE™ V Everolimus Eluting Coronary Stent System. This regulatory certification allows Guidant to begin marketing the drug eluting stent in the 25 countries of the European Union. In addition, the CE Mark Approval is used to support market registrations in other regulated countries including those within Asia, Latin America and Eastern Europe.

"This early approval represents a significant milestone in Guidant's drug eluting stent program and demonstrates our ongoing commitment to advancing the field of cardiovascular therapy through innovative solutions," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "The development of XIENCE V represents years of hard work and dedication by our employees and by trial investigators. We look forward to bringing this next-generation therapy to physicians and patients."

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation.

"Completion of the CE Mark approval process for XIENCE V follows on the heels of impressive clinical results from the SPIRIT FIRST trial, which demonstrated the benefits of an everolimus drug eluting stent," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who served as the study's principal investigator. "With this approval, physicians in Europe will have an excellent treatment option for patients requiring a drug eluting stent."

Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE V beginning in the second quarter of 2006.

In November, Guidant announced completion of enrollment in only four months of SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-eluting coronary stent system for the treatment of coronary artery disease.

Guidant's 1,380-patient SPIRIT III global clinical trial is evaluating the XIENCE V Stent System in the United States and Japan. The randomized U.S. cohort, which will support U.S. Premarket Approval submission, has enrolled more than 70 percent of the required patients and is expected to complete enrollment later this quarter.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE V. The statements are based on assumptions about many important factors, including satisfactory enrollment and completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

[ << Back ]

[ Print this page ]   [ Close window ]

**EXHIBIT 2**

Page 1 of 2





# Guidant Provides Update

**Indianapolis, Ind. — October 19, 2005 —** Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today responded to statements by Johnson & Johnson on its pending acquisition of the Company and provided an update on its two major businesses.

### Transaction Update

In response to Johnson & Johnson's comments yesterday, Ronald W. Dollens, president and CEO of Guidant Corporation, stated, "While neither company depends on this transaction for its continued future success, Guidant believes that the strategic rationale for combining the two companies is as strong today as when we entered into the Merger Agreement." Guidant anticipates that the pending transaction will receive FTC clearance in October. The Company does not expect to make any specific comments on the pending transaction until after FTC approval.

### Business Performance

"Guidant's third quarter results will reflect the temporary unavailability of the CONTAK RENEWAL 3 and 4 family of heart failure devices during the full month of July and part of August, partially offset by sequential growth of U.S. coronary stent revenue, and continuing sales growth of our emerging businesses," Dollens reported. "At the end of the quarter, data suggest our implantable defibrillator implant rate exceeded 80 percent of the pre-product notification level and is over 100 percent of the rate one year ago."

Dollens continued, "As previously announced, Guidant is launching several recently approved cardiac rhythm management systems during the fourth quarter, including the revolutionary Latitude Patient Management system. Physicians are expressing enthusiasm for the new wireless capability to monitor patients, improve their compliance, and monitor device status independent of patient effort." Dollens further observed, "Our drug eluting stent development program continues to make important progress toward European launch during the first half of next year. We are expanding manufacturing capacity, increasing productivity, and recently received FDA approval to expand clinical trial enrollment."

"While recent events and the publicity surrounding them will impact our short-term results, we believe that the fundamentals of our business and the markets that we serve remain strong and our outlook is positive," Dollens noted. "Our track record of success over the years has been driven in large part by the dedication of our people to the needs of patients and physicians who use our products. We continue to be committed to providing the highest quality products for patients who critically need them and we are confident that the value of the Company remains strong."

### Cardiac Rhythm Management Products Update

Consistent with an anticipated new product cycle, several significant new products were approved (cleared) by FDA during the third quarter. They include:

- VITALITY HE implantable defibrillator; Guidant's first high-energy product to offer the advanced functionality of the VITALITY family.

- CONTAK RENEWAL 3 RF cardiac resynchronization-defibrillator; this is Guidant's first wireless and wandless CRT-D and is designed to enhance the speed and convenience of patient care.

- ZOOM LATITUDE programmer; this next generation programmer is designed to interface with devices that include remote monitoring capability.

- LATITUDE Communicator and secure data storage system; these elements represent the final components of the Latitude Patient Management system.

Actions taken by the Company during the quarter reflect Guidant's commitment to provide more timely information to physicians and patients about our devices. Our products continue to demonstrate high performance and reliability, and tens of thousands of people are alive today and hundreds of thousands feel better as a result of Guidant's technologies. Guidant will continue to focus on meeting and exceeding the expectations of physicians, patients and the FDA.

## Drug Eluting Stent Progress

Guidant announced today that its drug eluting stent development program continues to demonstrate progress and the Company has enrolled more than 500 patients in the SPIRIT II and III clinical trials since June. SPIRIT III is a large-scale pivotal clinical trial evaluating XIENCE™ V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium rapid-exchange MULTI-LINK VISION® RX Coronary Stent System platform. Guidant plans to use the results of the SPIRIT III trial to obtain FDA approval for XIENCE V for the treatment of coronary artery disease. Results of the SPIRIT II study will provide additional clinical data to support the launch of XIENCE V in Europe and several countries outside the United States.

Earlier in the quarter, Guidant announced attainment of an enrollment milestone in the Company's exclusive license agreement with Novartis Pharma AG. Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies.

In addition, the Company plans to present one-year follow up data from SPIRIT I at the American Heart Association meeting in November 2005. SPIRIT I is a prospective, randomized, single-blind pilot study evaluating XIENCE V versus an uncoated MULTI-LINK VISION Coronary Stent System control in de novo (previously untreated) lesions.

During the quarter, the Company also announced that it successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the Company's submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant's manufacturing facility.

## Guidant Corporation

Guidant Corporation pioneers lifesaving technology, giving an opportunity for a better life today to millions of cardiac and vascular patients worldwide. The Company, driven by a strong entrepreneurial culture of more than 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information, visit www.guidant.com.

This release includes forward-looking statements that are based on assumptions about many important factors, including market trends and competition, particularly in connection with expanded indications and reimbursement for cardiac rhythm management products; satisfactory clinical and regulatory progress; progress with respect to the merger, including satisfaction of conditions to closing, including antitrust approvals; economic conditions, including exchange rates; litigation developments; and the factors listed on exhibit 99 to Guidant's most recent 10-Q. As such, they involve risks that could cause actual results to differ materially. The company does not undertake to update its forward-looking statements.



## ABBOTT COMPLETES ACQUISITION OF GUIDANT VASCULAR BUSINESS

### —COMBINATION OF ABBOTT'S AND GUIDANT'S VASCULAR ORGANIZATIONS CREATES LEADING VASCULAR DEVICES BUSINESS —

Abbott Park, Illinois, April 21, 2006 — Abbott today announced it has completed the acquisition of Guidant's vascular business, which, combined with Abbott's current vascular business, creates one of the leading global vascular devices companies. This acquisition was made in connection with Boston Scientific's acquisition of Guidant Corporation.

"The acquisition of Guidant's vascular business builds on our broad-based business strategy to develop leading positions in attractive health care markets – shaping Abbott for greater balance and strengthening our business mix and breadth of pipeline opportunities," said Miles D. White, chairman and chief executive officer, Abbott.

"The combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as a state-of-the-art R&D organization, which is developing innovative technologies and devices such as the XIENCE™ V and ZoMaxx™ drug-eluting stents," White said. "Our newly expanded vascular organization has the tools and the talent to transform the way physicians treat vascular disease, impacting the lives of millions of patients around the world."

### Broad Vascular Devices Product Portfolio

For the past several years, Abbott has built a competitive vascular business through acquisitions, licensing agreements, and internal scientific and commercial development. With the addition of Guidant's vascular business, Abbott offers physicians, catheterization labs and clinics a complete line of products and technologies for interventional procedures including: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. In addition, the combined business has a broad portfolio of intellectual property, including rapid exchange technology and stent designs, enabling the company to operate effectively in the competitive vascular devices market.

### Innovative Research and Development Programs

In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for treating vascular disease. With Guidant, Abbott now has two drug-eluting stents in development: ZoMaxx, a state-of-the-art stent coated with a proprietary immunosuppressant drug, zotarolimus, designed specifically to combat vessel re-narrowing; and XIENCE V, an everolimus-eluting stent on the MULTI-LINK VISION® cobalt chromium stent platform, which recently received approval in Europe. The combined organization also is leading the industry with a number of next-generation research programs including a stent that elutes two drugs targeted at difficult-to-treat patients such as diabetics, and a bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

### Guidant Vascular Sales and Employees

The transaction provides Abbott with Guidant's vascular intervention and endovascular solutions business units, which had combined sales of more than $1 billion in 2005. These business units add nearly 6,000 employees worldwide to Abbott in three primary locations: Santa Clara, California; Temecula, California; and Clonmel, Ireland. The addition of Guidant's California-based employees boosts Abbott's presence in the state – currently the headquarters

of Abbott's diabetes care and vascular businesses – from more than 3,000 to more than 7,000 employees.

**Financial Details**
Abbott paid $4.1 billion in cash for Guidant's vascular business. In addition, Abbott will pay Boston Scientific milestone payments of $250 million at U.S. Food and Drug Administration approval of Guidant's drug-eluting stent, and an additional payment of $250 million upon a similar approval in Japan. Abbott also provided Boston Scientific with a five-year, $900 million interest-bearing loan. In addition, Abbott has purchased approximately 64 million shares of Boston Scientific stock for $1.4 billion, which represents less than 5 percent of the company.

Abbott expects that the Guidant transaction will be accretive to earnings per share in 2007 and beyond. Further information, including financial details, will be provided on the conference call scheduled for 8 a.m. Central time today (9 a.m. Eastern), as previously announced. A live webcast of the conference call will be accessible through Abbott's Investor Relations Web site at www.abbottinvestor.com. An archived edition of the call will be available after 11 a.m. Central time. Abbott also furnished an 8-K today regarding the Guidant transaction.

**About Abbott**
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company now employs 65,000 people and markets its products in more than 130 countries.

---

**Private Securities Litigation Reform Act of 1995 —**
**A Caution Concerning Forward-Looking Statements**
Some statements in this news release may be forward-looking statements for the purposes of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in the "Risk Factors" section and Exhibit 99.1 of our Securities and Exchange Commission Form 10-K for the period ended December 31, 2005, and are incorporated by reference. We undertake no obligation to release publicly any revisions to forward-looking statements as the result of subsequent events or developments.

---

Contact:

Media
Melissa Brotz          (847) 935-3456
Jonathon Hamilton      (847) 935-8646

Financial Community
John Thomas            (847) 938-2655
Tina Ventura           (847) 935-9390

---

Back to Top

| Privacy Policy | Terms of Use |
Copyright © 1996, 2006 Abbott Laboratories. Abbott Park, Illinois, U.S.A.

**EXHIBIT 4**



# Abbott's Vascular Business
# Fact Sheet

*The combined Abbott and Guidant vascular business offers physicians, catheterization labs and clinics a complete line of products to treat patients with cardiac, vascular and biliary disease. Products and technologies for interventional procedures include: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. Bolstered by the acquisition of Guidant's vascular business in April 2006, Abbott began building its vascular presence with the 1999 acquisition of Perclose, a pioneer in vessel closure technologies. Over the next few years, Abbott strategically assembled a comprehensive vascular devices business through a series of acquisitions, licensing agreements and internal development.*

### Abbott's Vascular Business – At a Glance

| | |
|---|---|
| Worldwide headquarters: | San Francisco Bay Area |
| Web address: | www.abbottvascular.com |
| Primary businesses: | Coronary, Endovascular and Vessel Closure Devices |
| Employees: | 8,000 (including nearly 6,000 from Guidant) |
| Facilities: | More than 10 commercial, R&D and manufacturing facilities worldwide |

### Product Portfolio
Abbott offers comprehensive product lines throughout the world in three key areas of focus: coronary, endovascular and vessel closure devices. Key product lines and products include:

**Coronary Products:**
With Abbott's long history in health care and the advanced medical devices developed by Abbott Vascular and Guidant, the company is uniquely positioned to bring physicians and their patients innovative products for the treatment of coronary artery disease.

Drug-eluting Coronary Stents: The *Xience V* stent, approved for sale in Europe, is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus.

Bare Metal Coronary Stents: Comprehensive line of bare metal stents designed for a variety of vessel sizes and clinical situations (*Multi-Link Vision* family). The *TriMaxx* bare metal stent is available outside the United States.

Guide Wires: Full lines of coronary guide wires to assist the interventional cardiologist in accessing treatment area (*Hi-Torque* and *Asahi PTCA*).

Catheters: A variety of balloon dilatation catheters and specialty catheters designed to restore blood flow to stenosed arteries (*Tornus* specialty catheter; *Mercury* balloons and *Jography* catheters; *Voyager, CrossSail, PowerSail* and *HighSail*).



**Endovascular Products:**
Abbott delivers an advanced portfolio of endovascular and biliary products to assist clinicians in a broad range of diagnostic and interventional procedures outside the coronary area (including carotid arteries, renal arteries and bile ducts).

Carotid Stents and Embolic Protection Devices: For the treatment of carotid artery disease. *RX Acculink* is an open-cell, self-expanding nitinol stent available on a rapid exchange delivery system. It is used in conjunction with *RX Accunet* embolic protection device, a polyurethane filter with a nitinol basket. *Xact* is a closed-cell, self-expanding stent used in conjunction with *Emboshield Embolic Protection System*, which features *Barewire*, a proprietary technology allowing for excellent stent placement.

Biliary stent systems: Broad lines of self-expanding and balloon expanding stents for a variety of applications (*RX Herculink, Omnilink* and *Jostent* balloon-expandable stent systems; and the *Absolute, Dynalink, Xceed* and *Xpert* self-expanding stent systems).

Peripheral Catheters and Guide wires: Full product lines of catheters and guide wires for various vessels and obstructions (*Agiltrac, Viatrac, Fox PTA,* and *Jocath* catheters; *Hi-Torque* guide wires).

**Vessel Closure Products:**
A pioneer in vessel closure technologies, Abbott offers products designed to facilitate faster, safer and more secure closure of the vascular access site following catheterizations.

Clip-based closure: The *StarClose Vascular Closure System* delivers a tiny circumferential flexible clip onto the surface of the femoral artery, mechanically closing the access site in the femoral artery securely in a matter of seconds following diagnostic catheterization procedures.

Suture-mediated closure: Minimally invasive vessel closure devices that utilize sutures and automate the surgical closure of femoral artery puncture sites following diagnostic or interventional procedures (*Perclose ProGlide, Perclose AT* and *Closer S*).

Leading Vascular R&D Program
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for vascular disease.

**Drug-eluting stents**
Abbott has two drug-eluting stents in development: *Xience V* and *ZoMaxx*.
- The *Xience V* stent is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus. *Xience V* recently received regulatory approval in Europe and is expected to be launched in the third quarter of 2006. The product is also currently an investigational device in the United States and Japan.

- The *ZoMaxx* stent elutes zotarolimus, a proprietary immunosuppressant drug, and utilizes the *TriMaxx* stent platform, formed from a unique tri-layer composite that allows for thin struts while maintaining optimal visibility via X-ray. *ZoMaxx* is currently in clinical trials in both the United States and internationally, with an expected European launch in 2006.



The company also has a number of next-generation drug-eluting stent programs in development, including:

- A second-generation stent that elutes two drugs (zotarolimus and dexamethasone) intended for difficult-to-treat patients, such as diabetics, where restenosis rates are high.
- A bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

**Carotid stent clinical trials:**

Abbott is a leader in studying carotid stenting as a minimally invasive alternative to surgery for patients with carotid artery disease, a leading cause of stroke. The company is sponsoring/participating in three clinical trials designed to investigate the benefits of carotid stenting in patients who are at risk of stroke from carotid artery disease.

- ACT I is the first company-sponsored clinical trial to compare carotid artery stenting to carotid artery surgery in asymptomatic patients who normally would be referred for surgery. ACT I utilizes Abbott's *Xact* stent and *Emboshield* embolic protection device.
- CAPTURE 2 is a 10,000-patient post-approval study of high-risk patients using the *RX Acculink* stent and *RX Accunet* embolic protection device.
- Abbott is also participating in the CREST study comparing carotid artery stenting to carotid surgery in normal-risk, symptomatic and asymptomatic patients who normally would be referred for surgery. CREST is sponsored by the National Institute of Neurological Disorders and Stroke (NINDS), and the National Institutes of Health (NIH). CREST utilizes the *RX Acculink* stent and *RX Accunet* embolic protection device.

###

* Trademarks are shown in italics in the text of this fact sheet.



**EXHIBIT 5**

1: Clin Pharmacokinet. 2004;43(2):83-95.

Clinical pharmacokinetics of everolimus.

Kirchner GI, Meier-Wiedenbach I, Manns MP.

Department of Gastroenterology, Hepatology and Endocrinology, Zentrum Innere
Medizin, Medizinische Hochschule Hannover, Hannover, Germany.
Kirchner.Gabriele@MH-Hannover.de

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl
chain substitution at position 40 on the sirolimus (rapamycin) structure.
Everolimus, which has greater polarity than sirolimus, was developed in an
attempt to improve the pharmacokinetic characteristics of sirolimus,
particularly to increase its oral bioavailability. Everolimus has a mechanism of
action similar to that of sirolimus. It blocks growth-driven transduction
signals in the T-cell response to alloantigen and thus acts at a later stage
than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and
ciclosporin show synergism in immunosuppression both in vitro and in vivo and
therefore the drugs are intended to be given in combination after solid organ
transplantation. The synergistic effect allows a dosage reduction that decreases
adverse effects. For the quantification of the pharmacokinetics of everolimus,
nine different assays using high performance liquid chromatography coupled to an
electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have
been developed. Oral everolimus is absorbed rapidly, and reaches peak
concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and
steady-state peak and trough concentrations, and area under the
concentration-time curve (AUC), are proportional to dosage. In adults,
everolimus pharmacokinetic characteristics do not differ according to age,
weight or sex, but bodyweight-adjusted dosages are necessary in children. The
interindividual pharmacokinetic variability of everolimus can be explained by
different activities of the drug efflux pump P-glycoprotein and of metabolism by
cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system
for everolimus biotransformation leads to drug-drug interactions with other
drugs metabolised by this cytochrome system. In patients with hepatic
impairment, the apparent clearance of everolimus is significantly lower than in
healthy volunteers, and therefore the dosage of everolimus should be reduced by
half in these patients. The advantage of everolimus seems to be its lower
nephrotoxicity in comparison with the standard immunosuppressants ciclosporin
and tacrolimus. Observed adverse effects with everolimus include
hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections,
thrombocytopenia and leucocytopenia. Because of the variable oral
bioavailability and narrow therapeutic index of everolimus, blood concentration
monitoring seems to be important. The excellent correlation between steady-state
trough concentration and AUC makes the former a simple and reliable index for
monitoring everolimus exposure. The target trough concentration of everolimus
should range between 3 and 15 microg/L in combination therapy with ciclosporin
(trough concentration 100-300 microg/L) and prednisone.

Publication Types:
    Review

PMID: 14748618 [PubMed - indexed for MEDLINE]

**EXHIBIT 7**

# A randomized comparison of a durable polymer Everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial

Patrick W. Serruys, MD, PhD[1]; Andrew T. L. Ong, MBBS, FRACP[1]; Jan J. Piek, MD, PhD[2]; Franz-Josef Neumann, MD[3]; Willem J. van der Giessen, MD, PhD[1]; Marcus Wiemer, MD[4]; Andreas Zeiher, MD[5]; Eberhard Grube, MD[6]; Jürgen Haase, MD, PhD[7]; Leif Thuesen, MD[8]; Christian Hamm, MD[9]; Patricia C. Otto-Terlouw, MSc[10]

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herzzentrum, Bad Krozingen, Germany. 4. Herzzentrum, Bad Oeynhausen, Germany. 5. Uni. Klinikum Frankfurt, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik Bad Nauheim, Germany. 10. Cardialysis B.V., Rotterdam, The Netherlands.

Conflict of interest: All authors declare no conflict of interest.



## Abstract

*Background:* Everolimus is a sirolimus analogue with similar efficacy in animal models, and has been previously successfully tested in humans using an erodable polymer.

*Methods:* This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus eluting from a durable polymer on a cobalt chromium stent in patients with *de novo* native coronary artery lesions. Sixty patients were allocated to stent implantation with an everolimus-eluting stent (n=28) or an identical bare stent (n=32). Patients had either stable, unstable angina or silent ischaemia. Suitable lesions treated were single *de novo* native coronary lesions with 50-99% stenosis and could be covered by a 18 mm stent. The primary endpoint was in-stent late loss at 180 days, analysed on a per treatment basis. The major secondary endpoint was percent in-stent volume obstruction (%VO) as measured by intravascular ultrasound (IVUS) at 180 days. The clinical secondary endpoint was major adverse cardiac events (MACE) at 180 days.

*Results:* At 6 months, (matched pairs angiographic analysis), the in-stent late loss, percentage diameter stenosis and percentage of patients with binary restenosis were 0.10 mm, 16% and 0% respectively, in the everolimus arm (n=23), as compared with 0.87 mm, 39% and 25.9%, respectively in the bare stent arm (n=27, p<0.001 for late loss and diameter stenosis, p = 0.01 for restenosis). Significantly less neointimal hyperplasia was observed in the everolimus group compared to the bare stent group ($10 \pm 13$ mm$^3$ vs $38 \pm 19$ mm$^3$, p<0.001) and similarly, less volume obstruction ($8.0 \pm 10.4\%$ versus $28.1 \pm 14.0\%$, p<0.001). A major adverse cardiac event occurred in 2 patients in the everolimus arm versus 6 in the bare stent arm.

*Conclusion:* Everolimus eluted from a durable polymer on a cobalt chromium stent effectively suppresses neointimal growth at 6 months compared to an identical bare stent.

Corresponding to: Professor P.W. S. Serruys, MD, PhD, FESC, FACC Thoraxcenter, Bd-406, Erasmus Medical Center, Dr. Molewaterplein 40, 3015 GD Rotterdam, The Netherlands, Telephone: +31-10-463.5260, Fax: +31-10-435.9154, E-mail: p.w.j.c.serruys@erasmusmc.nl

Funding sources: This study was sponsored by Guidant Corporation.



## Introduction

Recent studies that have evaluated the local application of anti-proliferative drugs (sirolimus and paclitaxel) for the prevention of restenosis via a stent delivery system have shown that these therapies successfully inhibit the development of neointimal hyperplasia[1,2].

Everolimus is an effective anti-proliferative agent[3]. On a molecular level, everolimus forms a complex with the cytoplasmic protein FKBP12. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of protein synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of mammalian Target Of Rapamycin (mTOR), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with its function. Disabling mTOR explains the cell cycle arrest at the late G1 stage caused by everolimus and sirolimus.

The feasibility of using everolimus on a drug eluting stent was determined by the FUTURE I trial[4]. This trial utilized an S-stent and bioabsorbable polymer system (both Biosensors International, Singapore) and confirmed the safety of the everolimus-eluting stent at 6 and 12 months. At 6 months, a 7.7% Major Adverse Cardiac Event (MACE) rate was observed with no thrombosis and no late incomplete apposition. The efficacy was demonstrated by significant reduction of in-stent tissue proliferation at 6 months: both angiographic in-stent late loss and IVUS% neointimal volume were reduced by 87%. No angiographic in-stent binary restenosis was observed in the everolimus-eluting stent arm. The 12 month FUTURE I results showed sustained safety and efficacy with no new MACE events, no aneurysms, no late stent malapposition, and no thrombosis observed between 6 and 12 months. Minimal Lumen Area and Luminal Volume Index were maintained up to 12 months and no in-stent binary restenosis was observed up to 12 months.

The SPIRIT First clinical trial represents the first clinical evaluation of the Guidant XIENCE™ V Everolimus Eluting Coronary Stent System (XIENCE™ V Everolimus Eluting CSS), to investigate the potential benefits of the local application of everolimus in a durable polymer in combination with a thin strut cobalt chromium stent.

## Methods

### Patient selection

This randomized single-blind trial was performed at 9 medical centers and enrolled patients from December 2003 to April 2004. It was approved by the ethics committee at each participating institution, and all patients gave written informed consent.

Patients were eligible for the study if they were aged above 18 years and had received a diagnosis of stable or unstable angina or silent ischaemia. Additional eligibility criteria were the presence of a single primary de novo coronary lesion that was 3.0 mm in diameter as assessed by on-line QCA, that could be covered by an 18 mm stent, a stenosis of between 50-99% of the luminal diameter, and a Thrombolysis In Myocardial Infarction (TIMI) flow grade of 1 or more. Patients were not eligible for enrollment if they had an evolving myocardial infarction, stenosis of an unprotected left main coronary artery, an ostial location, located within 2 mm of a bifurcation, a lesion with moderate to heavy calcification, an angiographically visible thrombus within the target lesion, a left ventricular ejection fraction of less than 30%, were awaiting a heart transplant, or had a known hypersensitivity or contraindication to aspirin, heparin, clopidogrel, cobalt, chromium, nickel, tungsten, everolimus, acrylic and fluoro polymers or contrast sensitivity that could not be adequately pre-medicated.

## The Everolimus-eluting stent

The Guidant XIENCE™ V Everolimus Eluting CSS is comprised of the Guidant MULTI-LINK VISION® Stent and delivery system, and a drug eluting coating. The Guidant MULTI-LINK VISION® Stent is a balloon expandable stent, which consists of serpentine rings connected by links fabricated from a single piece of medical grade L-605 cobalt chromium alloy.

Everolimus is blended in a nonerodable polymer (this drug layer was coated over another nonerodable polymer primer layer). This coating includes of acrylic and fluoro polymers, both approved for use in blood contacting applications. This layer of everolimus-polymer matrix with a thickness of 5-6 microns is applied to the surface of the stent and is loaded with 100 micrograms of everolimus per square centimeter of stent surface area with no top coat polymer layer. The stent is designed to release approximately 70% of the drug within 30 days after implantation.

Everolimus (Certican®, Novartis Corporation) has been evaluated in clinical trials in the US and Europe for use as an immunosuppressant following cardiac and renal transplantation[5]. Everolimus has received market approval in the European Union.

## Study procedure

Following the confirmation of angiographic inclusion and exclusion criteria and prior to the procedure, patients were allocated through a telephone randomization service and assigned in a 1:1 ratio to either an everolimus eluting stent or bare metal stent. A single stent 3.0 mm in diameter, 18 mm long was used in the study.

Lesions were treated using standard interventional techniques with mandatory pre-dilatation and stent implantation at a pressure not exceeding the rated burst pressure. Due to packaging differences, physicians were not blinded to the device. Post-dilatation was allowed with a balloon shorter than the implanted stent. In the event of a dissection occurring at the edge of the implanted stent, it was recommended that a single additional bare Guidant MULTI-LINK VISION® stent be implanted as animal data only on single everolimus stent implantation were available at the onset of the study; these patients were a priori excluded from the per-treatment analysis but are part of the acute success population. IVUS was performed after angiographically optimal stent placement had been obtained and was repeated if additional post-dilatation was performed.

Intravenous boluses of heparin were administered according to local standard practice. Treatment with aspirin, at a minimum dose of 80 mg per day, was started at least 24 hours before the procedure and continued indefinitely. A loading dose of 300 mg of clopidogrel was administered 24 hours before the procedure, followed





by 75 mg daily for three months. Treatment with ticlopidine was permitted in case of clopidogrel hypersensitivity. Device success was defined as a final in-stent diameter stenosis of less than 50 percent by QCA using the assigned device. Clinical success was defined as the successful implantation of any device, with stenosis of less than 50 percent of the vessel diameter by QCA and no major cardiac events during the hospital stay.

## Follow-up

Patients were evaluated at 30 days and 6 months. Further evaluations will be performed at 9 months and 1 year, with annual evaluations out to 5 years. At outpatient visits, patients were asked specific questions about the interim development of angina according to the Canadian Cardiovascular Society classification of stable angina. They were also monitored for MACE. Angiographic and IVUS evaluations were performed at 6 months, and will be repeated at 1 year. Prior to performing a follow-up angiogram, the physician was required to record in the source documents whether a revascularization (if required) was clinically indicated – defined as the presence of ischaemic symptoms and/or a positive functional ischaemia study.

## Quantitative coronary angiography evaluation

Quantitative coronary angiography was performed using the CAAS II analysis system (Pie Medical BV, Maastricht, Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: computer-defined Minimal Luminal Diameter (MLD), reference diameter obtained by an interpolated method, and percentage diameter stenosis. Binary restenosis was included in every segment as diameter stenosis $\geq 50\%$ at follow-up. Late loss was defined as the difference/between MLD post-procedure and MLD at follow-up. Results are presented as matched pairs in the manuscript and as unmatched pairs in the Appendix. Unmatched pairs data is most commonly presented and utilises the mean QCA results of all projections obtained. Matched pairs data is more accurate as it compares the same views post-procedure and at follow-up and uses only QCA data of identical projections.

## Intravascular ultrasound analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased array intravascular ultrasound using automated pullback at 0.5 mm per second. The coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was examined. A computer-based contour detection program was used for automated 3-D reconstruction of the stented and adjacent segments. The lumen, stent boundaries and external elastic membrane (vessel boundaries) were detected using a minimum cost algorithm. The Stent Volume (SV) and Lumen Volume (LV) were calculated according to Simpson's rule. The intra-stent neointimal volume was calculated as the difference between SV and LV. The percentage obstruction of the stent volume was calculated as intra-stent neointimal volume/stent volume*100. Feasibility, reproducibility and inter- and intra-observer variability of

this system have been validated *in vitro* and *in vivo*. Incomplete apposition was defined as one or more stent struts separated from the vessel wall with evidence of blood speckles behind the strut on ultrasound, while late incomplete apposition was defined as incomplete apposition of the stent at follow-up which was not present post-procedure.

## Study endpoints

The primary angiographic endpoint was in-stent luminal late loss, as determined by quantitative angiography. Secondary endpoints (QCA and IVUS) at 6 months and 1 year included the in-stent and in-segment late loss, angiographic binary restenosis rate, percentage diameter stenosis; and in-stent percentage volume obstruction. In-stent was defined as within the margins of the stent while in-segment was defined as located either within the margins of the stent or 5 mm proximal or distal to the stent. Late loss was calculated as the difference between the follow-up and post-procedure minimum luminal diameter. Secondary clinical endpoints were a composite of major cardiac events, including cardiac death, Q-wave or non-Q-wave myocardial infarction, clinically driven surgical or percutaneous revascularization of the target lesion (MACE) or vessel (Target Vessel Failure) at 30 days, 6 months, 9 months, and annually up to 5 years after the index procedure; and acute device, procedure and clinical success. All deaths that could not be clearly attributed to another cause were considered cardiac deaths. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase-MB, in the absence of new Q waves on electrocardiography.

The endpoints were adjudicated by an independent clinical events committee. In addition, a data and safety monitoring board that was not affiliated with the study sponsor reviewed the data to identify any safety issues related to the conduct of the study.

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population which consisted of patients who had no bailout stenting and no major protocol deviations, as evaluated in a blinded manner. Acute success was analyzed on the entire patient population.

The sample size for the study was determined based on the primary endpoint of in-stent late loss at 180 days and on the following assumptions: a single comparison of active to uncoated; one-tailed t-test, unequal and unknown variances in the two groups being compared; $\alpha = 0.05$; true mean difference between the bare stent group and the treatment group of 0.48 mm. This assumption was made based on the results of the VISION Registry (mean late loss=0.83 mm)[7], SIRIUS trial (mean late loss=0.17 mm)[8] and TAXUS IV trial (mean late loss=0.39 mm)[9]. (Assume the true mean late loss for the treatment group is 0.35 mm, the difference between the bare stent group and treatment group is calculated as: 0.83 mm - 0.35 mm = 0.48 mm). The standard deviation was assumed to be 0.56 mm in the bare stent group and 0.38 mm in the treatment group (based on the results of the VISION Registry study and SIRIUS trial); approximately 20% rate of lost to follow-up or dropout; approximate-





ly 10% of patients with bailout stents. Given the above assumptions, 30 patients per arm (with the analysis of 22 evaluable patients per arm) will provide 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) would provide more than 96% power.

Binary variables were compared using Fisher's Exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon Rank-Sum test, except for the primary endpoint which was evaluated with a one sided *t*-test. Final 6-month results are presented in the manuscript, while the Appendix contains results that were available at the time that the 180-day report was prepared.

## Results

### Patient characteristics

Between December 2003 and April 2004, 28 patients were randomly assigned to receive the everolimus-eluting stent, and 32 were assigned to receive the bare stent. As defined in the protocol, all results (except acute success) are presented for the per-treatment population (27 patients in the everolimus group, and 29 patients in the bare stent group, Figure 1). In the everolimus group there was one bailout procedure, and in the bare stent group there were two bailout procedures and one major protocol deviation (the patient was on the heart transplant waiting list). With the exception of a significantly higher number of patients with hypertension requiring treatment in the everolimus group, the two groups were similar with respect to clinical variables examined (Table 1).

**Table 1. Baseline characteristics of the per-treatment patient population and of each treatment group.***

| | Everolimus stent (n=27) | Bare stent (n=29) | All patients (n=56) |
|---|---|---|---|
| Age(yrs) | 64 ± 10 | 61 ± 9 | 63 ± 9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left anterior descending | 48 | 45 | 46 |
| Left circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC Lesion Class (%)** | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference Vessel Diameter (mm ± SD) | 2.61 ± 0.40 | 2.71 ± 0.28 | 2.66 ± 0.34 |
| Lesion length (mm ± SD) | 10.1 ± 2.6 | 10.9 ± 3.3 | 10.5 ± 3.0 |

* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)
** AHA / ACC = American Heart Association / American College of Cardiology

## FIGURE 1



Fig. 1: Flowchart of patients

## Procedural characteristics

The lesions in the two groups were treated similarly with the use of conventional techniques. Glycoprotein IIb/IIIa inhibitors, used at the investigators' discretion, were administered to 7.4% of the patients in the everolimus group and 3.4% of those in the bare stent group. The two groups did not differ significantly with respect to the rate of device success (96.4% in the everolimus group and 93.8% in the bare stent group) or clinical success (96.4% in the everolimus group and 100% in the bare stent group).

## Quantitative coronary angiography analysis

Angiographic data at 6 months were available for 50 of the 56 analysable patients (89.3%). The mean reference diameter of the target vessel, the mean length of the lesion at baseline, the reference vessel diameter and mean MLD of the stented segment were similar in the two groups (Tables 1 and 2). At six months, with matched pairs analysis, the mean MLD of the stented segment was significantly greater in the everolimus group. The mean in-stent late loss, percentage of stenosis, and percentage of patients with 50 percent or more stenosis were 0.10 mm, 16%, and 0%, respectively, in the everolimus group, as compared with 0.87 mm, 39%, and 25.9%, respectively, in the bare stent group (p<0.001 for late loss and diameter stenosis, p=0.01 for restenosis). Figure 2 shows the cumulative frequency of stenosis immediately after the index procedure and at six months in each treatment group. Table 2 and Figure 3 show the results of sub-segmental quantitative angiographic analyses for matched pairs. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus group than in the bare stent group (p <0.01 for proximal and p=0.04 for distal). The late luminal loss in the stented segment was significantly less in the everolimus group than in the bare stent group (p ≤0.001).

## Intravascular ultrasound evaluation

At six months follow-up, intravascular ultrasound evaluation showed no significant differences between the two groups with respect to the volume of the stent or the vessel volume (Table 3). Significantly



FIGURE 2

-■- Post Proc Bare Stent      -○- Post Proc Everolimus Stent
-◆- Follow-up Bare Stent      -○- Follow-up Everolimus Stent

Fig. 2: Cumulative frequency of stenosis (in-stent) immediately after stenting and at six months



FIGURE 3

■ Bare Stent    ▨ Everolimus Stent

Fig. 3: Comparison of in-segment / in-stent late loss

Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Matched Pairs).

| | Proximal Edge | | | In-Stent | | | Distal Edge | | | In-Segment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bare (n=23) | Everolimus (n=23) | P-val | Bare (n=23) | Everolimus (n=23) | P-val | Bare (n=23) | Everolimus (n=23) | P-val | Bare (n=23) | Everolimus (n=23) | P-val |
| **Reference Vessel Diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.80 ± 0.33 | 3.04 ± 0.38 | 0.05* | 2.71 ± 0.28 | 2.89 ± 0.35 | 0.11* | 2.64 ± 0.30 | 2.80 ± 0.39 | 0.21* | 2.65 ± 0.30 | 2.84 ± 0.41 | 0.10* |
| At 6 months | 2.78 ± 0.32 | 2.67 ± 0.40 | 0.22* | 2.70 ± 0.31 | 2.58 ± 0.37 | 0.25* | 2.61 ± 0.37 | 2.46 ± 0.36 | 0.19* | 2.61 ± 0.36 | 2.59 ± 0.36 | 0.89* |
| **Minimal Luminal Diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.56 ± 0.44 | 2.61 ± 0.45 | 0.79* | 2.38 ± 0.25 | 2.45 ± 0.31 | 0.50* | 2.23 ± 0.41 | 2.26 ± 0.45 | 0.77* | 2.11 ± 0.35 | 2.14 ± 0.40 | 1.00* |
| At 6 months | 2.45 ± 0.46 | 2.19 ± 0.49 | 0.04* | 2.28 ± 0.33 | 1.58 ± 0.41 | <0.001* | 2.18 ± 0.38 | 2.00 ± 0.45 | 0.21* | 2.04 ± 0.40 | 1.54 ± 0.41 | <0.001* |
| Late Loss (mm) | 0.11 ± 0.15 | 0.42 ± 0.39 | <0.01* | 0.10 ± 0.21 | 0.87 ± 0.37 | <0.001*** | 0.05 ± 0.20 | 0.26 ± 0.40 | 0.04* | 0.07 ± 0.19 | 0.61 ± 0.37 | <0.001* |
| **Diameter Stenosis (%DS)** | | | | | | | | | | | | |
| After procedure | 9 ± 11 | 14 ± 9 | 0.07* | 12 ± 5 | 15 ± 6 | 0.05* | 16 ± 10 | 20 ± 10 | 0.16* | 20 ± 8 | 24 ± 9 | 0.05* |
| At 6 months | 12 ± 12 | 17 ± 17 | 0.26* | 16 ± 8 | 39 ± 14 | <0.001* | 16 ± 10 | 19 ± 14 | 0.82* | 22 ± 13 | 41 ± 14 | <0.001* |
| Binary Restenosis Rates | 4.3% | 3.7% | 1.00*† | 0.0% | 25.9% | 0.01*** | 0.0% | 7.4% | 0.49*† | 4.3% | 33.3% | 0.01*† |

* two-sided Wilcoxon rank sum test ** two-sided Fisher's Exact test *** One-sided t-test † Fisher's Exact test



Table 3. IVUS measurements at 6 month follow-up.

| | Everolimus (n = 26) | Bare-stent (n = 25) | p-value |
|---|---|---|---|
| Vessel volume (mm³) | 291 ± 82 | 296 ± 73 | 0.64 |
| Stent volume (mm³) | 134 ± 28 | 139 ± 33 | 0.69 |
| In-stent neo-intimal volume (mm³) | 10 ± 13 | 38 ± 19 | <0.001 |
| Luminal volume (mm³) | 124 ± 32 | 100 ± 31 | 0.04 |
| In-stent volume obstruction (%)** | 8.0 ± 10.4 | 28.1 ± 14.0 | <0.001 |

* This final table contains an additional 13 patients not included in the 180-day report prepared for the sponsor. In 8 patients (4 in each group), an imputed stent length of 18mm was used due to non-continuous pullback. In a further 5 patients (all bare stent group) results were unavailable at the time of the 180-day report. (see Appendix)

** In-stent volume obstruction = 100°
(In-stent neo-intimal volume / Stent volume)

less neointimal hyperplasia was observed in the everolimus-stent group compared to the bare-stent group (10 ± 13 vs. 38 ± 19 mm³, p<0.001) and similarly, significantly less volume obstruction, (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). Figure 4 is a cumulative curve of percentage volume obstruction. No in-stent volume obstruction was detected in almost half of the patients in the everolimus-stent group, whereas in the bare stent group, some degree of obstruction by neointima was present in all patients (Figure 4). No evidence of an "edge effect," aneurysm formation, in-stent thrombosis, persistent dissection or late incomplete apposition were observed.



FIGURE 4

*Fig. 4: Percentage in-stent volume obstruction versus cumulative frequency of patients. Values are expressed as mean ± standard deviation for each group.*

## Major adverse cardiac events

Major adverse cardiac events are listed in Table 4. There was one Q-wave myocardial infarction in the everolimus group in a patient who underwent additional revascularization for angina in a non-target vessel 18 days after the study procedure and suffered thrombosis of this non-study stent 12 days later. The everolimus stent was patent with no evidence of thrombus at the time of the thrombotic occlusion of the non study stent. One patient in the everolimus arm underwent a clinically driven target lesion revascularization at 3 weeks for symptomatic persistent dissection at the proximal edge left untreated at the time of the procedure. There were no clinically driven target revascularizations in the everolimus group for restenosis. There were six clinically driven target lesion revascularizations in the bare stent group, five were treated percutaneously for restenosis and the sixth by bypass surgery. No adverse effects were attributable to everolimus or the polymer coating of the stents.

Table 4. Hierarchical major adverse cardiac events at 180 days in per-treatment population*.

| | Everolimus-stent (n = 26) | | Bare-stent (n = 28) | |
|---|---|---|---|---|
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | | | | |
| Q-wave | 1‡ | 3.8 | 0 | 0 |
| Non-Q-wave | 0 | 0 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 1 § | 3.8 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 2 | 7.7 | 6 | 21.4 |
| Major adverse cardiac events | 2 | 7.7 | 6 | 21.4 |

* One patient in each group withdrew consent after treatment
** No statistical significance was detected between groups for all endpoints tested.
‡ Q-wave MI due to thrombosis of a non-study stent in a non-target vessel.
§ Clinically driven TLR for persistent dissection proximal to the stent 3 weeks after the index procedure.

## Discussion

The main finding of this randomized first-in-man study is that an everolimus-eluting stent coated with a durable polymer was associated with an in-stent angiographic late loss of 0.10 mm, significantly less than the corresponding bare cobalt chromium metal stent of 0.87 mm, which satisfied the primary endpoint of this trial and confirmed the efficacy of this system. Correspondingly, in-segment late loss was also significantly less in the everolimus-stent group.

Currently, two different drug-eluting systems (sirolimus and paclitaxel) are available. Although no published scientific comparative data is to date available, it appears that, from historical randomized trials, a difference of approximately 0.2 mm in-stent late loss exists between sirolimus and paclitaxel. Even if the impact of restenosis rates and MACE is currently unknown, some slight difference in restenosis rates and MACE can be expected. New devices should at least equal the incumbents in performance. This performance may be judged on late

loss, restenosis rate and / or the need for reintervention. With an in-stent late loss ranging from zero to 0.2 mm, it has been difficult to find a compound with the same efficacy, without resorting to the -limus family (Figure 5). With the sirolimus molecule being rather large and complex, it is therefore not surprising that major pharmaceutical companies have thoroughly explored its numerous analogues in order to develop a suitable competitor to sirolimus. The drug used in this study, everolimus, differs from sirolimus by a substitution of a hydrogen radical/side-branch with a methyl sidechain.

## FIGURE 5



*Fig. 5: Comparison of in-stent late loss from drug-eluting trials.*

The reason for developing new compounds is to improve on the side effects of the existing compounds such as delayed healing with re-endothelialization and fibrin[11], early[12] and late stent thrombosis[13]. The success of the device lies in its three components - the drug, the polymer properties and the stent. The use of a sirolimus ana-logue is not in itself a guarantee of success since some of them have intrinsically, a potency in inhibition of up to 100 times less (e.g. tacrolimus), and some other analogues with equal *in vitro* inhibitory effects nevertheless fail to equally inhibit neointimal growth *in vivo*, because their duration of elution was suspected to be too short. However it has already been demonstrated that everolimus in clinical trials using a bioerodable polymer with a slower elution profile than sirolimus is effective in reducing late loss to below 0.2 mm[4]. Therefore the remaining challenge was to establish whether everolimus eluted from a durable polymer was also efficient and is addressed in this report.

Although the 6-month results are promising, one year angiographic and IVUS follow-up results are awaited to confirm the long-term results of this study in light of recent findings regarding an increasing late loss seen with other devices over time.

At the time of the publication of RAVEL, it was argued that the restenosis rate of the bare stent was excessively high at 26%. Similarly, in the present trial the restenosis rate in the bare stent arm was 25.9%. Nevertheless, it must be emphasized that in both cases these restenosis rates correspond to the value predicted and derived from multivariate analyses including as determinant parameters vessel size, MLD post, incidence of LAD disease and diabetics. Of inter-

est, the late loss of the bare stent groups in RAVEL and this study were similar, corresponding to their restenosis rates. This is at variance with the VISION registry, and publications on stent strut thickness, but may be explained by the mismatch in stent size and reference diameter. This study was powered for late loss and not for clinical events, and it was not surprising that the 3 fold reduction in events failed to be statistically significant. At the time of trial design, safety studies with overlapping eluting-stents in animal models had not been complet-ed, requiring the use of bare stents for bailout. As a result of this confounder, these patients were *a priori* excluded from the per-treatment analysis. This study was however designed as a first in man trial with everolimus on an untested but durable polymer in combination with a cobalt chromium stent.

## Acknowledgements

The authors would like to acknowledge the invaluable assistance of Susan Veldhof, RN, Cecile Dorange, MSc, Sophie Henry, MSEE from Guidant Europe, Diegem, Belgium for the conduct and report-ing of this study.

## References

1. Morice MC, Serruys PW, Sousa JE, Fajadet J, Ban Hayashi E, Perin M, Colombo A, Schuler G, Barragan P, Guagliumi G, Molnar F, Falotico R. A ran-domized comparison of a sirolimus-eluting stent with a standard stent for coronary revascularization. *N Engl J Med*. 2002;346:1773-80.

2. Colombo A, Drzewiecki J, Banning A, Grube E, Hauptmann K, Silber S, Dudek D, Fort S, Schiele F, Zmudka K, Guagliumi G, Russell ME. Randomized study to assess the effectiveness of slow- and moderate-release polymer-based paclitaxel-eluting stents for coronary artery lesions. *Circulation*. 2003;108:788-94.

3. Farb A, John M, Acampado E, Kolodgie FD, Prescott MF, Virmani R. Oral everolimus inhibits in-stent neointimal growth. *Circulation*. 2002;106:2379-84.

4. Grube E, Sonoda S, Ikeno F, Honda Y, Kar S, Chan C, Gerckens U, Lansky AJ, Fitzgerald PJ. Six- and twelve-month results from first human experience using everolimus-eluting stents with bioabsorbable polymer. *Circulation*. 2004;109:2168-71.

5. Formica RN, Jr., Lorber KM, Friedman AL, Bia MJ, Lakkis F, Smith JD, Lorber MI. The evolving experience using everolimus in clinical transplantation. *Transplant Proc*. 2004;36:495S-499S.

6. Hamers R, Bruining N, Knook M, Sabate M, Roelandt J. A novel approach to quantitative analysis of intravascular Ultrasound Images. *Computers in Cardiology*. 2001;28:589-592.

7. Kereiakes DJ, Cox DA, Hermiller JB, Midei MG, Bachinsky WB, Nukta ED, Leon MB, Fink S, Marin L, Lansky AJ. Usefulness of a cobalt chromium coronary stent alloy. *Am J Cardiol*. 2003;92:463-6.

8. Moses JW, Leon MB, Popma JJ, Fitzgerald PJ, Holmes DR, O'Shaughnessy C, Caputo RP, Kereiakes DJ, Williams DO, Teirstein PS, Jaeger JL, Kuntz RE. Sirolimus-eluting stents versus standard stents in patients with stenosis in a native coronary artery. *N Engl J Med*. 2003;349:1315-23.

9. Stone GW, Ellis SG, Cox DA, Hermiller J, O'Shaughnessy C, Mann JT, Turco M, Caputo R, Bergin P, Greenberg J, Popma JJ, Russell ME. A polymer-based, paclitaxel-eluting stent in patients with coronary artery disease. *N Engl J Med*. 2004;350:221-31.

10. Leon MB, Bakhai A. Drug-eluting stents and glycoprotein IIb/IIIa inhibitors: combination therapy for the future. *Am Heart J*. 2003;146:S13-7.



11. Virmani R, Guagliumi G, Farb A, Musumeci G, Grieco N, Motta T, Mihalcsik L, Tespili M, Valsecchi O, Kolodgie FD. Localized hypersensitivity and late coronary thrombosis secondary to a sirolimus-eluting stent: should we be cautious? *Circulation.* 2004;109:701-5.

12. Ong AT, Hoye A, Aoki J, Van Mieghem CA, Rodriguez Granillo GA, Sonnenschien K, Regar E, Mc Fadden EP, Sianos G, van der Giessen WJ, de Jaegere PT, de Feyter PJ, van Domburg RT, Serruys PW. Thirty-Day Incidence and Six-Month Clinical Outcome of Thrombotic Stent Occlusion Following Bare Metal, Sirolimus or Paclitaxel Stent Implantation. *J Am Coll Cardiol.* 2005;45:947-953.

13. McFadden EP, Stabile E, Regar E, Cheneau E, Ong AT, Kinnaird T, Suddath WO, Weissman NJ, Torguson R, Kent KM, Pichard AD, Satler LF, Waksman R, Serruys PW. Late thrombosis in drug-eluting coronary stents after discontinuation of antiplatelet therapy. *Lancet.* 2004;364:1519-21.

14. Degertekin M, Serruys PW, Tanabe K, Lee CH, Sousa JE, Colombo A, Morice MC, Ligthart JM, de Feyter PJ. Long-term follow-up of incomplete stent apposition in patients who received sirolimus-eluting stent for *de novo* coronary lesions: an intravascular ultrasound analysis. *Circulation.* 2003;108:2747-50.

## Appendix

Sponsor: Guidant Corporation, Santa Clara, California, USA.

Principal Investigator: Patrick W. Serruys (The Netherlands).

Executive Committee: P.W. Serruys (Principal Investigator and Chairman, Rotterdam, The Netherlands); Gary Johnson (Vice President of Regulatory Affairs/Clinical Research, Guidant Corporation); Stan Fink (Director of Clinical Research USA, Guidant Corporation).

Data Safety Monitoring Board (DSMB) - J.G.P. Tijssen, Amsterdam, The Netherlands; F.W.A. Verheugt, Nijmegen, The Netherlands; W. Wijns, Aalst, Belgium.

Clinical Events Committee (CEC) - J. Vos, Amphia Ziekenhuis, Breda, The Netherlands; B.J.W.M. Rensing, Sint Antonius

Ziekenhuis, Nieuwegein, the Netherlands; C. Hanet, Clinique Universitaire de Saint-Luc, Brussels, Belgium.

Data management – Angiographic and IVUS core laboratories: Cardialysis BV, Rotterdam, The Netherlands; Data Coordination Centre and Site Monitoring: Guidant Europe, Diegem, Belgium.

The following investigators and institutions participated in the SPIRIT First trial:

Clinical sites: J.J. Piek, Academisch Medisch Centrum, Amsterdam, The Netherlands (18 patients); F.J. Neumann, Herzzentrum, Bad Krozingen, Germany (14 patients); P.W. Serruys, Thoraxcentre, Erasmus Medical Centre, Rotterdam, The Netherlands (5 patients); M. Wiemer, HZ Herzzentrum, Bad Oeynhausen, Germany (5 patients); A. Zeiher, Uni. Klinikum Frankfurt, Frankfurt, Germany (4 patients); E. Grube, Heart Center Siegburg, Siegburg, Germany (4 patients); J. Haase, Red Cross Hospital, Frankfurt, Germany (4 patients); L. Thuesen, Skejby Sygehus, Aarhus, Denmark (4 patients); C. Hamm, Kerckhoff Klinik, Bad Nauheim, Germany (2 patients).

**Table A2. Appendix: results of intra vascular ultra sound analysis as per 180-day progress report – Clinical investigation plan 02-350 The SPIRIT first clinical trial. Guidant Corporation, Data on file.**

| | Everolimus (n = 25) | Bare (n = 19) | |
|---|---|---|---|
| Vessel volume (mm³) | 299 ± 87 | 284 ± 77 | 0.76 |
| Stent volume (mm³) | 138 ± 30 | 139 ± 39 | 1.00 |
| In-stent neo-intimal volume (mm³) | 11.2 ± 14.0 | 41.4 ± 20.1 | <0.001 |
| Luminal volume (mm³) | 126 ± 35 | 98 ± 34 | 0.06 |
| In-stent volume obstruction (%) | 8.6 ± 10.7 | 29.0 ± 13.9 | <0.001 |

**Table A1. Appendix: results of sub-segmental quantitative coronary angiographic analysis (Unmatched Pairs) as per 180-day progress report – Clinical investigation plan 02-350 The SPIRIT first clinical trial. Guidant Corporation, Data on file.**

| | Maximum | | | In-stent | | | In-lesion | | | Segment analysis | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value |
| **Lumen diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.49 ± 0.44 | 2.57 ± 0.39 | 0.44* | 2.34 ± 0.26 | 2.42 ± 0.31 | 0.41* | 2.18 ± 0.44 | 2.25 ± 0.42 | 0.67* | 2.07 ± 0.37 | 2.14 ± 0.37 | 0.74* |
| At 6 months | 2.45 ± 0.46 | 2.19 ± 0.50 | 0.05* | 2.28 ± 0.33 | 1.58 ± 0.42 | <0.001* | 2.18 ± 0.38 | 1.99 ± 0.46 | 0.19* | 2.04 ± 0.40 | 1.53 ± 0.41 | <0.001* |
| Late loss (mm) | 0.10 ± 0.17 | 0.38 ± 0.38 | 0.01* | 0.10 ± 0.23 | 0.84 ± 0.36 | <0.001*** | 0.07 ± 0.20 | 0.26 ± 0.41 | 0.14* | 0.09 ± 0.20 | 0.60 ± 0.36 | <0.001* |
| **Diameter stenosis (%)** | | | | | | | | | | | | |
| After procedure | 10 ± 10 | 15 ± 9 | 0.13* | 12 ± 6 | 15 ± 6 | 0.02* | 17 ± 10 | 19 ± 9 | 0.39* | 21 ± 8 | 24 ± 8 | 0.14* |
| At 6 months | 12 ± 12 | 18 ± 17 | 0.21* | 16 ± 8 | 39 ± 14 | <0.001* | 16 ± 10 | 20 ± 14 | 0.67* | 22 ± 11 | 41 ± 14 | <0.001* |
| Binary restenosis rates | 4.3% | 3.8% | 1.00** | 0.0% | 26.9% | 0.01** | 0.0% | 7.7% | 0.49** | 4.3% | 34.6% | 0.01** |

* Two-sided Wilcoxon rank sum test ** Two-sided Fisher's Exact test *** One-sided t-test



## EuroIntervention

**EXHIBIT 8**

# One-year results of a durable polymer everolimus-eluting stent in *de novo* coronary narrowings (The SPIRIT FIRST Trial)

Keiichi Tsuchida[1], MD, PhD; Jan J. Piek[2], MD, PhD; Franz-Josef Neumann[3], MD; Willem J. van der Giessen[1], MD, PhD; Marcus Wiemer[4], MD; Andreas M. Zeiher[5], MD; Eberhard Grube[6], MD; Jürgen Haase[7], MD, PhD; Leif Thuesen[8], MD; Christian W. Hamm[9], MD; Susan Veldhof[10], RN; Cécile Dorange[10], MSc; Patrick W. Serruys[1]*, MD, PhD

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herz-zentrum Bad Krozingen, Bad Krozingen, Germany. 4. Herz- und Diabeteszentrum Nordrhein-Westfalen der Rhur-Universität Bochum, Bad Oeynhausen, Germany. 5. Klinikum de J. W. Goethe Univasität, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital Cardiology Center, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik, Bad Nauheim, Germany. 10. Guidant Corporation, Santa Clara, California, USA.

This study was sponsored by Guidant Corporation, Santa Clara, California, USA.
Ms. Veldhof and Ms. Dorange are employees of Guidant Corporation. The other authors declare no conflict of interests.
Presented in part at The Scientific Sessions of The American Heart Association, Dallas, Texas, 13 - 16 November, 2005.



KEYWORDS

## Abstract

**Aim:** Short-term results of durable polymer everolimus-eluting stents have shown significant improvements in clinical and angiographic outcomes. This report presents the 1-year clinical and angiographic data from the SPIRIT FIRST Trial.

**Methods and results:** This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus and a durable polymer on a cobalt chromium stent in patients with *de novo* native coronary artery lesions. Of the 60 patients enrolled, a total of 56 patients (27 everolimus arm and 29 bare stent arm) were qualified to per-treatment analyses at 1 year. Quantitative angiographic and intravascular ultrasound (IVUS) analyses were performed. Angiographic late loss, IVUS neointimal volume obstruction and major adverse cardiac events (MACE) at 1 year were assessed as the study endpoints. At 1 year, the in-stent late loss and diameter stenosis of patients were 0.24 mm and 18% in the everolimus arm (n=20), as compared with 0.84 mm and 37% in the bare stent arm (n=25, p < 0.001). Significantly less neointimal hyperplasia was observed in the everolimus arm compared to the bare stent arm (neointimal volume, 13±9 mm$^3$ vs. 37±17 mm$^3$, p < 0.001; volume obstruction, 10±7% vs. 28±12%, p < 0.001). The overall MACE rate was 15.4% in the everolimus arm and 21.4% in the bare stent arm.

**Conclusion:** The safety and efficacy of everolimus-eluting stent with a durable polymer observed at 6 months was sustained at 1 year.

*Corresponding author: Thoraxcenter, Ba 583, Erasmus Medical Center, Dr. Molewaterplein 40, 3015 GD Rotterdam, The Netherlands
E-mail: p.w.j.c.serruys@erasmusmc.nl

© Europa Edition 2005. All rights reserved.



## Introduction

To date percutaneous coronary intervention (PCI) using drug-eluting stents is considered the most secure treatment option for de novo single coronary artery disease. The two clinically available stents coated with an anti-proliferative drug, sirolimus or paclitaxel, have shown promising clinical and angiographic outcomes as proven in several randomized trials[1-3]. Beside these two drugs, the efficacy of newly developed antiproliferative drugs has been clinically investigated[4-9] and their potent effects in preventing restenosis have been reported[5-9].

Everolimus is a powerful anti-proliferative agent and has shown effect in preventing rejection in kidney and heart transplantation[10-12]. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of DNA synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of FRAP (FKBP-12-rapamycin associated protein, also called mTOR, mammalian Target Of Rapamycin), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with the function of FRAP.

The SPIRIT FIRST clinical trial represents the first evaluation of the everolimus-eluting stent which studied the potential benefits of the local application of everolimus in a durable polymer in combination with a stent with a thin strut design[5]. Compared to identical bare metal stents, everolimus-eluting stents have demonstrated effective suppression of neointimal growth at 6 months[5]. This paper presents the 1-year clinical and angiographic/intravascular ultrasound (IVUS) follow-up results from the experience with the durable polymer everolimus-eluting stent.

## Methods

### Study population

The SPIRIT FIRST clinical trial was a prospective, controlled, randomized, single-blinded, parallel 2-arm, multicentre clinical evaluation of a durable polymer everolimus-eluting stent (XIENCE™ V, Guidant, Santa Clara, CA, USA) in patients with de novo coronary artery lesions. Patient eligibility criteria, device description and study procedure were previously reported, along with 6-month clinical, angiographic and IVUS analyses[5]. Briefly, study patients had single de novo stenoses of < 18 mm lesion length, coverable by 1 study stent, > 50% diameter stenosis, and vessel reference diameter 3.0 mm as assessed by on-line quantitative coronary angiography (QCA). Patients were ineligible if they had any of the following: evolving myocardial infarction; stenosis of an unprotected left main coronary artery, an ostial location, or located within 2 mm of a bifurcation; a lesion with moderate to heavy calcification, or an angiographically visible thrombus; a left ventricular ejection fraction < 30%; were awaiting a heart transplant, or had a contraindication to aspirin, clopidogrel, heparin and any other drugs related to this study.

### Follow-up and study endpoint

Clinical evaluation was scheduled at 1, 6, and 12 months with annual evaluation up to 5 years. Angiographic and IVUS imaging was obtained at baseline, 6- and 12-month follow-up.

The primary endpoint was in-stent late loss at 6 months. The major secondary endpoint was percent (%) in-stent volume obstruction at 6 months based on IVUS analysis. Other secondary endpoints included the followings: a) in-stent late loss at 1 year; b) in-segment late loss at 6 months and 1 year including proximal and distal evaluations; c) in-stent% volume obstruction at 1 year; d) in-stent and in-segment% diameter stenosis at 6 months and 1 year; e) in-stent and in-segment angiographic binary restenosis (ABR) at 6 months and 1 year; f) persisting incomplete apposition, late incomplete apposition, aneurysm formation, thrombus, persisting dissection at 6 months and 1 year; g) major adverse cardiac events (MACE) rate in-hospital and at 1, 6, 9 months and annually up to 5 years. MACE is comprised of death, myocardial infarction (MI), or clinically driven target lesion revascularization (TLR); g) acute device, procedural and clinical success. All deaths that could not be clearly attributed to another cause were considered a cardiac death. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase MB, in the absence of new Q waves on the surface electrocardiogram.

## Quantitative Coronary Angiography evaluation

QCA was performed by means of the CAAS II analysis system (Pie Medical B.V., Maastricht, The Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: minimal luminal diameter (MLD), reference diameter, and% diameter stenosis. ABR was defined in every segment as diameter stenosis >50% at follow-up. Late loss was defined as the difference between MLD at post-procedure and MLD at follow-up.

## Intravascular Ultrasound Analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased-array IVUS using automated pullback at 0.5 mm per second. A coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was also examined. A computer-based contour detection program (Curad B.V., Wijk bij Duurstede, The Netherlands) was used for automated 3-D reconstruction of the stented and the peri-stent segments. The lumen, stent boundaries and external elastic membrane were detected using a minimum cost algorithm. The stent volume (SV) and lumen volume (LV) were calculated according to Simpson's rule. The in-stent neointimal volume was calculated as "SV-LV". The % obstruction of the stent volume was calculated as in-stent neointimal volume/stent volume _100. Feasibility, reproducibility and inter- and intra-observer variability of this system have been validated in vitro and in vivo[13].

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population. Acute success was analyzed on the safety population. The per-treatment evaluable population consisted of patients who had no bailout and no major protocol deviations. The data for each patient were reviewed in a blinded



manner to determine whether the patient should be included in this analysis population. Analyses based on the per-treatment evaluable population were as "treated". Patients were included in the treatment arm corresponding to the study stent actually received.

The overall sample size calculation for this trial was determined based on the primary endpoint of in-stent late loss at 6 months and on the following assumptions: a single comparison of active to control; one-tailed t-test, unequal and unknown variances in the 2 groups being compared; $\alpha = 0.05$; true mean difference between the control group and the treatment group is 0.48 mm. This assumption was made based on the results of VISION Registry (mean late loss = 0.83 mm)[14], SIRIUS trial (mean late loss = 0.17 mm)[2] and TAXUS IV trial (mean late loss = 0.39 mm)[15]. Assuming the true mean late loss for the treatment group was 0.35 mm, the difference between the control group and treatment group is calculated as: 0.83 mm – 0.35 mm = 0.48 mm. The standard deviation was assumed to be 0.56 mm in the control group and 0.38 mm in the treatment group (based on the results of VISION Registry study and SIRIUS trial with standard deviation for DES adjusted downward from 0.44 mm to 0.38 mm to take into account of 6-month angiography as opposed to 8-month angiography); approximately 20% rate of lost to follow-up or dropout; approximately 10% of patients with bailout stents; given the above assumptions, enrolling 30 patients per arm (analysis of 22 evaluable patients per arm) would have provided 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) provides more than 95% power. Binary variables were compared using Fisher's exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon's rank sum test. Time-to-event variables were compared with Kaplan-Meier analysis and the log rank statistic.

## Results

A total of 60 study patients were randomized and consecutively enrolled at 9 investigational sites between December 2003 and April 2004. The safety population is composed of these 60 patients. Of the 60 patients, 3 were excluded from the per-treatment population (1 from the everolimus arm and 2 from the bare stent arm) because of bailout stenting (2) and major protocol deviation (1 patient on a heart transplant waiting list from bare stent arm). Hence the per-treatment population includes 56 patients (27 everolimus arm and 29 control) as illustrated in the trial profile (Figure 1). The control arm and the everolimus arm shared similar demographic characteristics except for patients with hypertension which was significantly higher in the everolimus group than in control (Table 1). Procedural characteristics were explained previously[6].

## One-year quantitative coronary angiographic analysis (Table 2)

Nine patients did not have qualifying follow-up angiogram up to 1 year for the following reasons: a) patients withdrew from the clinical trial after the 30-day follow-up visit (1 patient in the everolimus



Figure 1. Flowchart of patients. QCA, quantitative coronary angiography; IVUS, intravascular ultrasound.

Table 1. Baseline characteristics of the per-treatment patient population and of each treatment group.*

| | Everolimus Stent (1) (n=27) | Uncoated Stent (1) (n=29) | All Patients (n=56) |
|---|---|---|---|
| Age (yrs) | 64±10 | 61±9 | 63±9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring Medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring Medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left Anterior Descending | 48 | 45 | 46 |
| Left Circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC# Lesion class (%) | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference vessel diameter (mm±SD) | 2.61±0.40 | 2.71±0.28 | 2.66±0.34 |
| Lesion length (mm±SD) | 10.1±2.6 | 10.9±3.3 | 10.5±3.0 |

* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)
# AHA / ACC = American Heart Association / American College of Cardiology.





Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Serial analysis)

| | Proximal Edge | | | In-Stent | | | Distal Edge | | | In-Segment Analysis | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value |
| **Reference vessel diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.81±0.36 | 2.98±0.33 | 0.27 | 2.74±0.29 | 2.80±0.32 | 0.61 | 2.70±0.31 | 2.71±0.32 | 0.95 | 2.69±0.33 | 2.74±0.34 | 0.81 |
| At 6 months | 2.79±0.34 | 2.64±0.43 | 0.10 | 2.74±0.31 | 2.57±0.39 | 0.12 | 2.66±0.37 | 2.44±0.38 | 0.06 | 2.65±0.36 | 2.58±0.38 | 0.50 |
| At 1 year | 2.75±0.34 | 2.64±0.39 | 0.29 | 2.65±0.32 | 2.52±0.38 | 0.22 | 2.59±0.39 | 2.40±0.39 | 0.12 | 2.59±0.37 | 2.53±0.38 | 0.62 |
| **Minimal luminal diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.56±0.44 | 2.60±0.43 | 0.93 | 2.40±0.25 | 2.42±0.26 | 0.91 | 2.29±0.38 | 2.20±0.45 | 0.54 | 2.15±0.32 | 2.11±0.37 | 0.56 |
| At 6 months | 2.47±0.49 | 2.15±0.51 | 0.04 | 2.28±0.33 | 1.53±0.40 | < 0.001 | 2.23±0.32 | 1.99±0.46 | 0.08 | 2.07±0.38 | 1.49±0.39 | < 0.001 |
| At 1 year | 2.44±0.47 | 2.12±0.48 | 0.03 | 2.16±0.37 | 1.58±0.44 | < 0.001 | 2.26±0.38 | 1.96±0.43 | 0.05 | 2.01±0.41 | 1.52±0.42 | < 0.001 |
| **Late loss (mm)** | | | | | | | | | | | | |
| At 6 months | 0.09±0.19 | 0.45±0.42 | <0.01 | 0.12±0.22 | 0.89±0.39 | < 0.001 | 0.06±0.21 | 0.21±0.41 | 0.10 | 0.08±0.20 | 0.62±0.39 | < 0.001 |
| At 1 year | 0.12±0.25 | 0.48±0.39 | < 0.001 | 0.24±0.27 | 0.84±0.45 | < 0.001 | 0.03±0.25 | 0.25±0.42 | 0.04 | 0.14±0.24 | 0.59±0.42 | < 0.001 |
| **Diameter stenosis (%DS)** | | | | | | | | | | | | |
| After procedure | 9±11 | 13±9 | 0.53 | 12±6 | 13±7 | 0.36 | 15±10 | 19±11 | 0.22 | 20±6 | 23±9 | 0.18 |
| At 6 months | 12±14 | 18±18 | 0.17 | 17±7 | 41±14 | < 0.001 | 16±8 | 19±14 | 0.95 | 22±11 | 42±13 | < 0.001 |
| At 1 year | 11±13 | 19±15 | 0.12 | 18±13 | 37±17 | < 0.001 | 13±8 | 18±14 | 0.24 | 22±15 | 40±16 | < 0.001 |

*Patients who underwent angiography at 6 months as well as 1 year.

arm and 1 in the control arm); b) patients refused (3 in the everolimus arm and 3 in the control arm); c) angiogram was not analyzable (1 in the everolimus arm). Serial angiographic follow-up data, which is reported in this paper, were available in 80.4% (45/56) of the per-treatment population, with 74.1% (20/27) in the everolimus arm and 86.2% (25/29) in the control arm (Table 2). The follow-up in-stent MLD was significantly larger in the everolimus arm than in the control arm and the preservation of MLD between 6 months and 1 year was observed (2.28±0.33 mm at 6 months; 2.16±0.37 mm at 1 year) The mean in-stent late loss and% diameter stenosis were 0.24 mm and 18%, respectively, in the everolimus-stent group, as compared with 0.84 mm and 37%, respectively, in the control arm (p < 0.001 for each comparison). Figure 2 shows the cumulative frequency of in-stent late loss immediately after the index procedure at 6 months and 1 year in each

treatment group. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus-stent group than in the control arm (p < 0.001 for proximal and ρ = 0.04 for distal). The in-segment late loss was significantly less in the everolimus arm than in the bare stent arm (p < 0.001).

## One-year intravascular ultrasound evaluation (Table 3)

In this 1-year report, data in patients who underwent IVUS at 6 months as well as 1 year were presented to identify the volumetric change in serial IVUS examination. Forty-one patients (18 in the everolimus arm; 23 in the control arm) out of 47 patients with 1-year angiography underwent a 1-year IVUS examination. In the remaining



Figure 2. Cumulative frequency of late loss (in-stent) immediately after stenting.

Table 3. Serial IVUS measurements at 1 year follow-up

| | | Everolimus-Stent | Uncoated Stent | P-value |
|---|---|---|---|---|
| Vessel volume (mm³) | 6 months | 296±90 | 291±74 | 0.89 |
| | 1 year | 286±80 | 290±72 | 0.82 |
| Stent volume (mm³) | 6 months | 137±31 | 138±31 | 0.94 |
| | 1 year | 133±27 | 137±32 | 0.79 |
| In-stent neo-intima volume (mm³) | 6 months | 9±12 | 39±20 | < 0.001 |
| | 1 year | 13±9 | 37±17 | < 0.001 |
| Luminal volume (mm³) | 6 months | 128±34 | 98±29 | 0.03 |
| | 1 year | 120±30 | 100±28 | 0.15 |
| In-stent volume obstruction (%)# | 6 months | 7±9 | 29±14 | < 0.001 |
| | 1 year | 10±7 | 28±12 | < 0.001 |

* Patients who underwent IVUS at 6 months as well as 1 year.
# In-stent volume obstruction=100*(In-stent neo-intima volume/Stent volume)

6 patients, IVUS was not available: 2 were not properly scheduled for IVUS, 2 inability to advance IVUS catheter distal to stent in the everolimus arm; 1 malfunction of IVUS, 1 inability to advance the IVUS catheter distal to the stent in the control arm. Of the 41 patients, 37 patients (16 in the everolimus arm; 21 in the control arm) had serial IVUS data. Everolimus-eluting stent was associated with a significantly reduced degree of in-stent neointimal hyperplasia as well as in-stent% volume obstruction compared to the bare metal stent ($13\pm9$ mm³ vs. $37\pm17$ mm³, p < 0.001; $10\pm7$% vs. $28\pm12$%, p < 0.001), reaching a 64% reduction of the in-stent volume obstruction (Table 3). There was no late acquired or persisting stent malapposion observed either at 6 months or at 1 year.

## Major adverse events and clinical outcomes

Table 4 provides results of MACE and target vessel failure for the time points of 1 year. Since the six months follow-up the 1-year results for the everolimus arm included 1 non-Q wave MI due to a spasm during the follow-up IVUS procedure and 2 additional TLRs by PCI. One of these patients had a delayed bailout (TLR) using a non-study drug eluting stent 21 days after the baseline procedure due to a dissection. In the control arm, 1 additional TLR by PCI was observed, this being the patient's 3rd TLR since the index procedure. The hierarchical MACE rate at 1 year was 15.4% for the everolimus arm and 21.4% for the bare stent arm (p=0.59). The MACE rate for the everolimus group increased from 7.7% (2/26) at 6 months to 15.4% (4/26) at 1 year. Three of the 4 overall MACE events in the everolimus group were non-study-device related events. One Q-wave MI was in a non-target vessel, one TLR was due to dissection during the procedure, and one non-Q-wave MI occurred during follow-up IVUS procedure. Total non-hierarchical clinically-driven TLR rates at 1 year were 7.7% in the everolimus arm and 21.4% in the control arm. No adverse effects related to everolimus or the durable polymer were noted. Kaplan-Meier survival estimates were performed for overall MACE (Figure 3). There was no stent thrombosis observed in both arms out to the 1-year time period.



Figure 3. Kaplan-Meier survival curve: MACE. Since the 6-month time point, 1 non-Q wave MI due to a dissection during the follow-up IVUS procedure and 1 clinically-driven additional target lesion revascularization by PCI were observed in everolimus arm. In the control arm, 1 clinically-driven additional target lesion revascularization by PCI was performed.

## Discussion

One-year clinical and angiographic follow-up from this trial demonstrates that the polymer-controlled release of everolimus from a coronary stent is safe and effective, with no late adverse effects. The superiority in efficacy, as measured by in-stent late loss, of everolimus-eluting stent as compared to bare stent was sustained at 1 year (71% reduction in late loss). The everolimus arm also maintained its superiority to the bare metal arm in the major secondary IVUS endpoint,% volume obstruction, at 1 year (64% reduction). In addition, the everolimus arm also continued to show significantly lower neointimal volume than the bare stent arm at 1 year (65% reduction).

The current strategy of local drug delivery using sirolimus and paclitaxel is the most promising approach to prevent restenosis, but, at the same time, the strategy has the potential liability for impairing endothelial recovery. Developing new compounds may improve on the potential side effects of the current drug-eluting stents, such as delayed healing with re-endothelialization[16] and fibrin[17], early[18] and late stent thrombosis[19]. In this trial, neither stent thrombosis nor other adverse effects related to the drug/durable polymer was observed out to the 1-year time point. On the other hand, an in vitro study has shown that sirolimus enhances tissue factor in human endothelial cell[20]. Effect of everolimus on endothelial cell and its similarity or difference compared to sirolimus will have to be investigated. The significant differences between sirolimus- and paclitaxel-eluting stents have recently been reported to likely exist with regard to angiographic as well as clinical outcomes[21,22]. "New comers" following these 2 pioneers could be competitors if they can, at least, demonstrate performance as effective as these 2 drug-eluting stents. Studies have suggested that angiographic assessment of late loss is associated with an increased restenosis rate[23,24] as well as a higher risk of TLR[25]. However, it still remains to be determined how to interpret the significance of the slight increase in late loss from 6 months (0.12 mm) to 1 year (0.24 mm) observed in this study stent. Moreover, delayed neointimal growth beyond the first 6 to 9 months has been reported in serial IVUS analyses in some trials

Table 4. Hierarchical Major Adverse Cardiac Events at 1 year in Per-Treatment Population

| Event | Everolimus Stent n = 26 | | Uncoated Stent n = 28 | |
|---|---|---|---|---|
| | n | % | n | % |
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | 2 | 7.6 | 0 | 0 |
| Q-wave | 1 | 3.8 | 0 | 0 |
| Non-Q-wave | 1 | 3.8 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 2 | 7.7 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 4 | 15.4 | 6 | 21.4 |
| Major adverse cardiac events | 4 | 15.4 | 6 | 21.4 |

EUROPCRONLINE.com



as documented in everolimus-eluting stent (in-stent volume obstruction, 7% at 6 months to 10% at 1 year), which may raise a concern about potential late catch-up phenomenon of DES[26]. Recent head-to-head comparative studies between sirolimus- and paclitaxel-eluting stent are still limited to short-term results[21,22,23,27-30]. Beneficial short-term outcomes do not necessarily translate in long-term efficacy. For example, late catch-up phenomenon has been experienced in vascular brachytherapy[31]. In this respect, the follow-up period of 1 year still seems relatively short to assess the durable safety and efficacy of one drug-eluting stent. However, neither sirolimus- nor paclitaxel-eluting stent have been associated with gradually increasing MACE over the years[32,33]. Therefore, we could expect a similar lasting treatment effect of this new eluting stent.

## Study limitation

This study with a small patient population provided only safety and efficacy data. Two larger single-blind, randomized controlled studies (The SPIRIT II and SPIRIT III) further evaluating this study stent compared to the paclitaxel-eluting stent for the treatment of coronary artery disease are under way.

## Conclusions

At 1 year, this trial demonstrated that the treatment effect observed at 6 months was sustained at 1 year for everolimus-eluting stent. The in-stent and in-segment late loss in the everolimus arm was reduced by 71% and 78% compared to those in the bare metal arm, respectively. These observations were consistent with IVUS measurements. The 1-year results showed a reduction of neointimal volume by 65% as compared to bare metal stent. A small increase in % volume obstruction in event-free patients was observed from 6 to 12 months, but is considered clinically insignificant. Both the angiographic and IVUS measurements showed that the patency of the target vessel treated with everolimus-eluting stent was maintained at 1 year.

## Acknowledgement

The authors are grateful to the invaluable assistance of Stan Fink and Danny Detlège (Guidant, Santa Clara and Guidant Europe) for their valued assistance in reporting this study.

## References

1. Morice MC, Serruys PW, Sousa JE, Fajadet J, Ban Hayashi E, Perin M, Colombo A, Schuler G, Barragan P, Guagliumi G, Molnar F, Falotico R. A randomized comparison of a sirolimus-eluting stent with a standard stent for coronary revascularization. N Engl J Med. 2002;346:1773-80.

2. Moses JW, Leon MB, Popma JJ, Fitzgerald PJ, Holmes DR, O'Shaughnessy C, Caputo RP, Kerelakes DJ, Williams DO, Teirstein PS, Jaeger JL, Kuntz RE. Sirolimus-eluting stents versus standard stents in patients with stenosis in a native coronary artery. N Engl J Med. 2003;349:1315-23.

3. Colombo A, Drzewiecki J, Banning A, Grube E, Hauptmann K, Silber S, Dudek D, Fort S, Schiele F, Zmudka K, Guagliumi G, Russell ME. Randomized study to assess the effectiveness of slow- and moderate-release polymer-based paclitaxel-eluting stents for coronary artery lesions. Circulation. 2003;108:788-94.

4. Serruys PW, Ormiston JA, Sianos G, Sousa JE, Grube E, den Heijer P, de Feyter P, Buszman P, Schomig A, Marco J, Polonski L, Thuesen L, Zeiher AM, Bett JH, Suttorp MJ, Glogar HD, Pitney M, Wilkins GT, Whitbourn R, Veldhof S, Miquel K, Johnson R, Coleman L, Virmani R. Actinomycin-eluting stent for coronary revascularization: a randomized feasibility and safety study: the ACTION trial. J Am Coll Cardiol. 2004;44:1363-7.

5. Serruys PW, Ong ATL, Piek JJ, Neumann FJ, van der Giessen WJ, Wiemer M, Zeiher A, Grube E, Haase J, Thuesen L, Hamm C, Otto-Terlouw PC. A randomized comparison of a durable polymer everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial. EuroIntervention. 2005;1:58-65.

6. Meredith IT, Ormiston J, Whitebourn R, Kay IP, Muller D, Bonan R, Popma JJ, Cutlip DE, Fitzgerald PJ, Prpic R, Kuntz RE. First-in-human study of the Endeavor ABT-57B-eluting phosphorylcholine-encapsulated stent system in de novo native coronary artery lesions: Endeavor I Trial. EuroIntervention. 2005;1:157-164.

7. Costa RA, Lansky AJ, Mintz GS, Mehran R, Tsuchiya Y, Negoita M, Gilutz Y, Nikolsky E, Fahy M, Pop R, Cristea E, Carlier S, Dangas G, Stone GW, Leon MB, Muller R, Techen G, Grube E. Angiographic results of the first human experience with everolimus-eluting stents for the treatment of coronary lesions (the FUTURE I trial). Am J Cardiol. 2005;95:113-6.

8. Storger H, Grube E, Hofmann M, Schwarz F, Haase J. Clinical experiences using everolimus-eluting stents in patients with coronary artery disease. J Interv Cardiol. 2004;17:387-90.

9. Grube E, Sonoda S, Ikeno F, Honda Y, Kar S, Chan C, Gerckens U, Lansky AJ, Fitzgerald PJ. Six- and twelve-month results from first human experience using everolimus-eluting stents with bioabsorbable polymer. Circulation. 2004;109:2168-71.

10. Schuler W, Sedrani R, Cottens S, Haberlin B, Schulz M, Schuurman HJ, Zenke G, Zenwes HG, Schreier MH. SDZ RAD, a new rapamycin derivative: pharmacological properties in vitro and in vivo. Transplantation. 1997;64:36-42.

11. Schuurman HJ, Cottens S, Fuchs S, Joergensen J, Meerloo T, Sedrani R, Tanner M, Zenke G, Schuler W. SDZ RAD, a new rapamycin derivative: synergism with cyclosporine. Transplantation. 1997;64:32-5.

12. Farb A, John M, Acampado E, Kolodgie FD, Prescott MF, Virmani R. Oral everolimus inhibits in-stent neointimal growth. Circulation. 2002;106:2379-84.

13. Hamers R, Bruining N, Knook M, Sabate M, Roelandt JRTC. A novel approach to quantitative analysis of intravascular ultrasound images. Computers in Cardiology. 2001;28:589-592.

14. Kerelakes DJ, Cox DA, Hermiller JB, Midei MG, Bachinsky WB, Nukta ED, Leon MB, Fink S, Marin L, Lansky AJ. Usefulness of a cobalt chromium coronary stent alloy. Am J Cardiol. 2003;92:463-6.

15. Stone GW, Ellis SG, Cox DA, Hermiller J, O'Shaughnessy C, Mann JT, Turco M, Caputo R, Bergin P, Greenberg J, Popma JJ, Russell ME. A polymer-based, paclitaxel-eluting stent in patients with coronary artery disease. N Engl J Med. 2004;350:221-31.

16. Finn AV, Kolodgie FD, Hamek J, Guerrero LJ, Acampado E, Tefera K, Skorija K, Weber DK, Gold HK, Virmani R. Differential response of delayed healing and persistent inflammation at sites of overlapping sirolimus- or paclitaxel-eluting stents. Circulation. 2005;112:270-8.

17. Virmani R, Guagliumi G, Farb A, Musumeci G, Grieco N, Motta T, Mihalcsik L, Tespili M, Valsecchi O, Kolodgie FD. Localized hypersensitivity and late coronary thrombosis secondary to a sirolimus-eluting stent: should we be cautious? Circulation. 2004;109:701-5.



18. Ong AT, Hoye A, Aoki J, Van Mieghem CA, Rodriguez Granillo GA, Sonnenschlen K, Regar E, Mc Fadden EP, Slanos G, van der Giessen WJ, de Jaegere PT, de Feyter PJ, van Domburg RT, Serruys PW. Thirty-Day Incidence and Six-Month Clinical Outcome of Thrombotic Stent Occlusion Following Bare Metal, Sirolimus or Paclitaxel Stent Implantation. *J Am Coll Cardiol.* 2005;45:947-953.

19. McFadden EP, Stabile E, Regar E, Cheneau E, Ong AT, Kinnaird T, Suddath WO, Weissman NJ, Torguson R, Kent KM, Pichard AD, Satler LF, Waksman R, Serruys PW. Late thrombosis in drug-eluting coronary stents after discontinuation of antiplatelet therapy. *Lancet.* 2004;364:1519-21.

20. Steffel J, Latini RA, Akhmedov A, Zimmermann D, Zimmerling P, Luscher TF, Tanner FC. Rapamycin, but not FK-506, increases endothelial tissue factor expression: implications for drug-eluting stent design. *Circulation.* 2005;112:2002-11.

21. Kastrati A, Mehilli J, von Beckerath N, Dibra A, Hausleiter J, Pache J, Schuhlen H, Schmitt C, Dirschinger J, Schomig A. Sirolimus-eluting stent or paclitaxel-eluting stent vs balloon angioplasty for prevention of recurrences in patients with coronary in-stent restenosis: a randomized controlled trial. *Jama.* 2005;293:165-71.

22. Windecker S, Remondino A, Eberli FR, Juni P, Raber L, Wenaweser P, Togni M, Billinger M, Tuller D, Seiler C, Roffi M, Corti R, Sutsch G, Maier W, Luscher T, Hess OM, Egger M, Meier B. Sirolimus-eluting and paclitaxel-eluting stents for coronary revascularization. *N Engl J Med.* 2005;353:653-62.

23. Mauri L, Orav EJ, O'Malley AJ, Moses JW, Leon MB, Holmes DR,Jr., Teirstein PS, Schofer J, Breithardt G, Cutlip DE, Kereiakes DJ, Shi C, Firth BG, Donohoe DJ, Kuntz RE. Relationship of late loss in lumen diameter to coronary restenosis in sirolimus-eluting stents. *Circulation.* 2005;111:321-7.

24. Mauri L, Orav EJ, Kuntz RE. Late loss in lumen diameter and binary restenosis for drug-eluting stent comparison. *Circulation.* 2005;111:3435-42.

25. Moliterno DJ. Healing Achilles–sirolimus versus paclitaxel. *N Engl J Med.* 2005;353:724-7.

25. Aoki J, Abizaid AC, Ong AT, Tsuchida K, Serruys PW. Serial assessment of tissue growth inside and outside the stent after implantation of drug-eluting stent in clinical trials. Does delayed neointimal growth exist? *EuroIntervention.* 2005;1. In press.

27. Dibra A, Kastrati A, Mehilli J, Pache J, Schuhlen H, von Beckerath N, Ulm K, Wessely R, Dirschinger J, Schomig A. Paclitaxel-eluting or sirolimus-eluting stents to prevent restenosis in diabetic patients. *N Engl J Med.* 2005;353:663-70.

28. Goy JJ, Stauffer JC, Siegenthaler M, Benoit A, Seydoux C. A prospective randomized comparison between paclitaxel and sirolimus stents in the real world of interventional cardiology: the TAXi trial. *J Am Coll Cardiol.* 2005;45:308-11.

29. Kaiser C, Brunner-La Rocca HP, Buser PT, Bonetti PO, Osswald S, Linka A, Bernheim A, Zutter A, Zellweger M, Grize L, Pfisterer ME. Incremental cost-effectiveness of drug-eluting stents compared with a third-generation bare-metal stent in a real-world setting: randomised Basel Stent Kosten Effektivitats Trial (BASKET). *Lancet.* 2005;366:921-9.

30. Kastrati A, Dibra A, Eberle S, Mehilli J, Suarez de Lezo J, Goy JJ, Ulm K, Schomig A. Sirolimus-eluting stents vs paclitaxel-eluting stents in patients with coronary artery disease: meta-analysis of randomized trials. *Jama.* 2005;294:819-25.

31. Grise MA, Massullo V, Jani S, Popma JJ, Russo RJ, Schatz RA, Guarneri EM, Steuterman S, Cloutier DA, Leon MB, Tripuraneni P, Teirstein PS. Five-year clinical follow-up after intracoronary radiation: results of a randomized clinical trial. *Circulation.* 2002;105:2737-40.

32. Fajadet J, Morice MC, Bode C, Barragan P, Serruys PW, Wijns W, Constantini CR, Guermonprez JL, Eltchaninoff H, Blanchard D, Bartorelli A, Laarman GJ, Perin M, Sousa JE, Schuler G, Molnar F, Guagliumi G, Colombo A, Ben Hayashi E, Wuifert E. Maintenance of long-term clinical benefit with sirolimus-eluting coronary stents: three-year results of the RAVEL trial. *Circulation.* 2005;111:1040-4.

33. Grube E, Silber S, Hauptmann KE, Buellesfeld L, Mueller R, Lim V, Gerckens U, Russell ME. Two-year-plus follow-up of a paclitaxel-eluting stent in *de novo* coronary narrowings (TAXUS I). *Am J Cardiol.* 2005;96:79-82.



EXHIBIT V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE LYNCH

06 CV 7685

|  |  |
|---|---|
| JOHNSON & JOHNSON, a New Jersey Corporation, | X : : : |
| Plaintiffs, | : : |
| - against - | : : |
| GUIDANT CORPORATION, an Indiana Corporation, BOSTON SCIENTIFIC CORPORATION, a Delaware Corporation, and ABBOTT LABORATORIES, an Illinois Corporation, | : : : : : |
| Defendants. | : X |

Civil Action No. ____

Complaint

RECEIVED
SEP 25 2006
U.S.D.C. S.D.N.Y.
CASHIERS

Johnson & Johnson ("J&J"), by its attorneys, Kramer Levin Naftalis & Frankel LLP, for its complaint against Guidant Corporation ("Guidant"), Boston Scientific Corporation ("Boston Scientific") and Abbott Laboratories ("Abbott"), alleges as follows:

## I.   Nature of the Action

1.    This action arises out of the highly publicized takeover battle between J&J and Boston Scientific to acquire Guidant. While Boston Scientific ultimately succeeded in its takeover bid for Guidant, it did so only because Guidant leaked confidential information to a third party, Abbott, for the purpose of arranging a prepackaged divestiture of significant Guidant businesses to Abbott. Based on these disclosures, which were in material breach of the terms of Guidant's merger agreement with J&J, Abbott agreed to enter into a divestiture and financing agreement with Boston Scientific, which allowed Boston Scientific to make an offer for Guidant that would not require a lengthy and uncertain antitrust review. This, in turn, allowed Guidant to accept Boston Scientific's offer as "superior" to J&J's offer and to terminate the agreement with

J&J. Thus, Guidant's breach of its agreement with J&J, and Boston Scientific's and Abbott's tortious interference with that agreement, deprived J&J of the benefit of the bargain of its merger with Guidant and caused it to suffer damages.

2.    In December 2004, J&J and Guidant entered into a merger agreement that provided that J&J would pay $25.4 billion to acquire Guidant, or $76 per Guidant share (the "Initial Merger Agreement"). Guidant's shareholders approved the merger. The price was subsequently changed to $21.5 billion, or $63.08 per share, as a result of various product recalls and legal problems that surfaced at Guidant. In this regard, the parties entered into an Amended and Restated Agreement and Plan of Merger dated November 14, 2005 (the "Merger Agreement").

3.    Like any large multi-national acquisition, the merger was subject to antitrust approval by U.S., European Union and other foreign regulators. Over the following ten months, J&J reached an agreement with domestic and foreign regulators which, among other things, would grant a non-exclusive license for certain patents to Abbott to facilitate antitrust approval for the merger with Guidant.

4.    Pending the closing of the merger, Guidant was prohibited under the express terms of the Merger Agreement from soliciting alternative offers and had limited ability to respond to an unsolicited bid from another party. Under the "No Solicitation" provision in the Merger Agreement — which was designed to prevent Guidant from using the Merger Agreement to solicit higher offers — Guidant was prohibited from providing confidential business information to any company, or its representatives, unless that company was making an unsolicited "Takeover Proposal" (i.e., a proposal to acquire 15% or more of Guidant) under

KL3251910L3

terms that were likely to result in a bid that constituted a "Superior Proposal" to the merger with J&J. Guidant also could not facilitate or cooperate with a Takeover Proposal other than through discussions with, and disclosures to, the person making such a Takeover Proposal. Under no circumstances could Guidant provide confidential business information to or discuss or negotiate with any third party that was not making a bona fide Takeover Proposal.

5.    In December 2005, just as the J&J/Guidant merger was about to close, Boston Scientific made a bid to acquire Guidant for $25 billion, or $72 per Guidant share. While nominally higher in price than the renegotiated deal with J&J, Boston Scientific's offer was fraught with uncertainty and timing issues that rendered its proposal patently inferior to the merger with J&J. For example, unlike J&J, which had spent much of the past year resolving potential antitrust issues by entering into a License Agreement with Abbott and a Consent Decree with the regulators, Boston Scientific had not even begun the pre-merger notification process, much less resolved its own antitrust issues, at the time of its announced bid.

6.    After receiving a Takeover Proposal from Boston Scientific, Guidant's management allowed Boston Scientific to perform limited due diligence. What Guidant did not disclose until after the fact, however, was that it simultaneously allowed Abbott — a third party with absolutely no right to receive any confidential information from Guidant under the No Solicitation provision and which had already agreed to facilitate J&J's bid — an even "deeper dive" into Guidant's confidential business information to determine whether Abbott would now be willing to enter into a pre-packaged divestiture agreement with Boston Scientific to clear any antitrust hurdles. In so doing, Guidant materially breached the No Solicitation provision of its Merger Agreement with J&J.

-3-

7.     Based on the information disclosed to it by Guidant, Abbott and Boston Scientific entered into an agreement to divest Guidant's entire vascular intervention ("VI") business and other assets and Boston Scientific then made a formal proposal to acquire Guidant for $72 per share. On January 25, 2006, after several counter-proposals from J&J and Boston Scientific, Guidant announced that it was terminating the Merger Agreement with J&J and entering into an acquisition agreement with Boston Scientific for $27 billion.

8.     Abbott would not have agreed to a pre-packaged divestiture without the confidential information it received in violation of the "No–Solicitation" provision of J&J's Merger Agreement with Guidant.   Without a pre-packaged divestiture agreement, Boston Scientific could not have made a proposal that would have been acceptable to Guidant's Board of Directors or shareholders, both because it would have been conditioned on reaching an agreement with Abbott or some other party to resolve antitrust issues and would have entailed a lengthy antitrust review, the outcome of which would have been uncertain.

9.     Guidant could have terminated its Merger Agreement with J&J and then provided information to Abbott, but would then have lost the ability to keep J&J bound to a deal if a transaction with Boston Scientific failed to materialize.  Guidant was also able to use its agreement with J&J to better its negotiating position with Boston Scientific.  By keeping J&J contractually bound while it facilitated what was ultimately declared a Superior Proposal from Boston Scientific, Guidant acted in bad faith and in violation of its contractual restrictions pending the closing of the Merger Agreement with J&J.

10.     Boston Scientific and Abbott were well aware that Guidant had entered into the Merger Agreement with J&J; indeed, Abbott had agreed to facilitate consummation of

-4-

that transaction before it began dealing with Boston Scientific behind J&J's back. By their actions, these defendants induced Guidant to breach that agreement by disclosing confidential information to Abbott with the goal of ensuring the success of Boston Scientific's Takeover Proposal.

11.    As a result of Guidant's willful and material breach, and the tortious interference by Boston Scientific and Abbott, J&J was deprived of the benefit of its merger agreement and suffered damages that it now seeks to recover through this action.

## II.    Jurisdiction and Venue

12.    The Court has diversity jurisdiction over the subject matter of this case, under 28 U.S.C. § 1332, because this case arises among citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

13.    The Court has jurisdiction over the parties, each of which is a corporation doing business in the State of New York, and jurisdiction to grant all the relief requested by J&J.

14.    Venue is proper in the Southern District of New York because one party, Guidant, is subject to and has consented to the jurisdiction of this Court and there is no other district in which this action may otherwise be brought.

## III.    The Parties

15.    J&J is a New Jersey corporation with its headquarters and principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Through its operating subsidiaries, J&J is a multi-national manufacturer and distributor of health care, surgical, biotechnology, and personal hygiene products, as well as a provider of related services

for the consumer, pharmaceutical, medical devices, and diagnostics markets. J&J has more than 230 operating companies, which employ approximately 116,000 people in 57 countries and sell products in the United States and around the world.

16.    Guidant is an Indiana corporation having a principal place of business at 11 Monument Circle, Indianapolis, Indiana.  It is now a wholly-owned subsidiary of Boston Scientific.  Guidant designs, develops, and markets cardiovascular medical products, including pacemakers and implantable defibrillators.

17.    Boston Scientific is a Delaware corporation having a principal place of business at One Boston Scientific Place, Natick, Massachusetts.  Boston Scientific develops, manufactures and markets a range of medical devices and procedures.

18.    Abbott is an Illinois corporation having a principal place of business at 100 Abbott Park Road, Abbott Park, Illinois.  Abbott develops, manufactures, and markets pharmaceutical and nutritional products, as well as surgical and diagnostic devices.

## IV.    Background Facts

(a)    J&J and Guidant Engage in Confidential Merger Discussions

19.    Among other products, J&J, through its subsidiary Cordis Corporation ("Cordis"), markets medical devices for the treatment of cardiovascular disorders, including a coronary stent known as the Cypher stent. A stent is a metallic device surgically inserted to keep arteries open after balloon angioplasty to clear blockages.  The Cypher stent provides a mechanical scaffold to keep the vessel open while a drug is slowly released from the stent to

prevent the build-up of new tissue that re-clogs the artery. Stents that work with drugs like this are known in the industry as drug-eluting stents ("DES").

20.    DES account for over 80% of the U.S. coronary stent market. Aside from Cordis, Boston Scientific is the only other company that markets DES in the U.S., with Cordis having approximately a 45% market share and Boston Scientific approximately a 55% market share. Guidant, Abbott and another company called Medtronic are all in the process of seeking, or undertaking the preparations necessary to seek, approval of the Food and Drug Administration to market DES in this country.

21.    During the fall 2004, J&J engaged in discussions with Guidant about the possibility of entering into a business transaction whereby J&J would acquire Guidant. The acquisition of Guidant represented an opportunity for J&J to expand its business into the cardiac rhythm management market for implantable pacemakers and defibrillators.

22.    On or about August 4, 2004, J&J and Guidant entered into a Confidentiality Agreement that provided that information exchanged between J&J and Guidant would be used solely for the purpose of exploring a possible negotiated business arrangement and not for any other business or competitive purpose.

(b)    J&J and Guidant Enter into a Merger Agreement

23.    On December 15, 2004, J&J and Guidant entered into the Initial Merger Agreement pursuant to which J&J agreed to pay $25.4 billion in cash and stock or $76 per share to acquire Guidant. The closing of the merger was conditioned on (i) approval of the deal by Guidant shareholders, (ii) approval for listing on the New York Stock Exchange of newly registered J&J stock for issuance to Guidant shareholders, (iii) regulatory approval of the

-7-

transaction, including any divestitures, from U.S. and European Commission antitrust authorities, and (iv) the accuracy of the representations and warranties set forth in the agreement.

24.    With Guidant's assistance, J&J prepared and filed with the Securities and Exchange Commission a Registration Statement on Form S-4 in connection with the issuance of J&J stock in the merger, as well as a Proxy Statement for the Merger that was included as a Prospectus.

25.    Guidant gave notice of, convened, and held a meeting of its shareholders solely for the purpose of obtaining shareholder approval of the merger. On or about April 27, 2005, Guidant shareholders approved the merger.

26.    J&J also sought the necessary antitrust clearance for the merger in the United States, Europe, and Canada. To this end, J&J filed a pre-merger notification under the Hart-Scott-Rodino Antitrust Act of 1976 with the Federal Trade Commission ("FTC") on January 18, 2005.

27.    In discussions with the FTC, the agency objected to the proposed transaction on the ground that a merger between one of two actual competitors in the DES market with one of the three potential competitors would lessen competition in that market. On August 12, 2005, J&J and Abbott entered into a License Agreement whereby J&J granted Abbott a non-exclusive license to certain patents in the DES field in the event the transaction was consummated in order to increase the likelihood that Abbott would successfully enter the DES market. After lengthy negotiations, and based in part on the agreement between J&J and Abbott, the FTC and J&J entered into a Consent Order on November 2, 2005 to resolve the FTC's antitrust concerns.

KL3:2519101.1

28.    In the meantime, numerous regulatory and legal problems surfaced involving Guidant products being recalled, lawsuits against Guidant being filed, and Guidant being investigated by the New York Attorney General. On October 18, 2005, J&J announced that the company was considering alternatives to its proposed acquisition of Guidant and on November 7, Guidant sued J&J claiming a breach of the Initial Merger Agreement. On November 14, Guidant accepted a revised offer of $21.5 billion, or $63.08 per Guidant share, the Merger Agreement was executed and the lawsuit was discontinued.

(c)    The Merger Agreement Contained Strict Limitations on Guidant's Ability to Solicit or Cooperate with Competing Bids, Designed to Protect the Benefit of J&J's Bargain

29.    Pursuant to the Merger Agreement, Guidant was prohibited from either (i) soliciting, initiating or knowingly encouraging, or taking any other action designed to, or which could reasonably be expected to, facilitate, any competing proposal to acquire Guidant or (ii) entering into, continuing or otherwise participating in any discussions or negotiations regarding, or furnishing to any person any information, or otherwise cooperating with any such proposal. These restrictions were designed to prevent Guidant from using the J&J offer as a means of obtaining higher bids for the company.

30.    In particular, Section 4.02 of the Merger Agreement, titled "No Solicitation," provided as follows:

> The Company [*i.e.*, Guidant] shall not, nor shall it authorize or permit any of its Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, "Representatives") retained by it or any of its Subsidiaries to, directly or indirectly through another person, *(i) solicit, initiate or knowingly encourage, or take any other action designed to, or which could reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise*

*participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any way with, any Takeover Proposal.* (Emphasis added).

31.    Section 4.02 of the Merger Agreement defined a "Takeover Proposal" as basically a bid for at least 15% of Guidant's assets or businesses:

> The term "Takeover Proposal" means any inquiry, proposal or offer from any person relating to, or that could reasonably be expected to lead to, any direct or indirect acquisition or purchase, in one transaction or a series of transactions, of assets (including equity securities of any Subsidiary of the Company) or businesses that constitute 15% or more of the revenues, net income or assets of the Company and its Subsidiaries, taken as a whole, or 15% or more of any class of equity securities of the Company, any tender offer or exchange offer that if consummated would result in any person beneficially owning 15% or more of any class of equity securities of the Company, or any merger, consolidation, business combination, recapitalization, liquidation, dissolution, joint venture, binding share exchange or similar transaction involving the Company or any of its Subsidiaries pursuant to which any person or the shareholders of any person would own 15% or more of any class of equity securities of the Company or of any resulting parent company of the Company, in each case other than the transactions contemplated by this Agreement.

32.    Notwithstanding these provisions, and in order to allow Guidant's directors to meet their fiduciary obligations to Guidant's shareholders, the Merger Agreement provided that if Guidant's Board of Directors, in consultation with outside legal counsel and a qualified financial advisor, determined that an unsolicited Takeover Proposal constituted or was reasonably likely to lead to a "Superior Proposal," as defined below, then, and only then, Guidant could (i) provide information to the "person making such Takeover Proposal (and its Representatives)," pursuant to an appropriate confidentiality agreement and as long as Guidant simultaneously provided (or already had provided) the information to J&J, and/or (ii) "participate in discussions or negotiations with the person making such Takeover Proposal (and its Representatives)."

33.    In this regard, Section 4.02 provided as follows:

> Notwithstanding the foregoing, at any time prior to obtaining the Shareholder Approval, in response to a bona fide written Takeover Proposal that the Board of Directors of the Company reasonably determines (after consultation with outside counsel and a financial advisor of nationally recognized reputation) constitutes or is reasonably likely to lead to a Superior Proposal, and which Takeover Proposal was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02(a), the Company may, subject to compliance with Section 4.02(c), (x) furnish information with respect to the Company and its Subsidiaries to the person making such Takeover Proposal (and its Representatives) pursuant to a customary confidentiality agreement not less restrictive to such person than the confidentiality provisions of the Confidentiality Agreement, *provided* that all such information has previously been provided to Parent or is provided to Parent prior to or substantially concurrent with the time it is provided to such person, and (y) participate in discussions or negotiations with the person making such Takeover Proposal (and its Representatives) regarding such Takeover Proposal.

34.    As further defined in Section 4.02, "Representatives" of a person making a Takeover Proposal included only that person's "Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative (collectively, 'Representatives')." Guidant was expressly prohibited from giving information to, or participating in discussions with, any other persons.

35.    Whether a Takeover Proposal constituted or likely would lead to a Superior Proposal was to be based not only on its financial terms, but also on whether it was "reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal." Thus, under Section 4.02:

> The term "Superior Proposal" means any bona fide offer made by a third party that if consummated would result in such person (or its shareholders) owning, directly or indirectly, more than 80% of

KL3:2519101.3

the shares of Company Common Stock then outstanding (or of the shares of the surviving entity in a merger or the direct or indirect parent of the surviving entity in a merger) or all or substantially all the assets of the Company, which the Board of Directors of the Company reasonably determines (after consultation with a financial advisor of nationally recognized reputation) to be (i) more favorable to the shareholders of the Company from a financial point of view than the Merger (taking into account all the terms and conditions of such proposal and this Agreement (including any changes to the financial terms of this Agreement proposed by Parent in response to such offer or otherwise)) and (ii) *reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal.* [Emphasis added]

36.     In sum, under the Merger Agreement, Guidant could not solicit any Takeover Proposal from another person. In the event that it received an unsolicited Takeover Proposal, which it determined upon consultation with its legal and financial advisors was or could become a Superior Proposal, Guidant could furnish information to, and conduct discussions with, only the person (or its Representatives) making such a Takeover Proposal.

37.     The Merger Agreement also provided that in the event Guidant's Board received a Superior Offer, Guidant was required to notify J&J of the terms of that offer and give J&J five business days to make a competing offer, which Guidant would be required to consider before it could terminate the Merger Agreement without a breach.

(d)     Boston Scientific Makes a Last-Minute Bid, and Guidant Breaches
        the Merger Agreement to Facilitate Turning It into a Superior Proposal

38.     On December 5, 2005, before the merger between J&J and Guidant had closed, Boston Scientific announced a bid for Guidant, offering $25 billion, or $72 per share. While nominally higher in price than the J&J deal, Boston Scientific's offer was contingent upon, among other things, receiving regulatory approval and was therefore subject to uncertainty and delay.

KL32519101.3

39.    On January 8, 2006, Boston Scientific submitted a formal proposal to acquire Guidant for $72 per share. As part of this formal offer, Boston Scientific also announced that it had entered into an agreement with Abbott to divest Guidant's VI and endovascular businesses to Abbott, as well as to share rights to Guidant's DES program, in order to facilitate prompt antitrust review and approval. Abbott also agreed to provide a $700 million loan to Boston Scientific.

40.    Based on statements made in a January 9, 2006 conference call with analysts to discuss the Boston Scientific proposal, it became clear that Guidant had cooperated with and facilitated Boston Scientific's Takeover Proposal by impermissibly providing confidential information to Abbott. This in turn enabled Boston Scientific to enter into the agreement with Abbott, which was critical to Boston Scientific's ability to have its offer declared by Guidant as a Superior Proposal and thereby have it accepted in lieu of the J&J transaction.

41.    On the conference call, Larry Best, Chief Financial Officer for Boston Scientific, emphasized the importance of the agreement with Abbott to Boston Scientific's Takeover Proposal. In Mr. Best's words, the Abbott agreement was "critically important not only for the quick completion of the Guidant acquisition but also for the business prospects of the combined company." Mr. Best explained: "As we said when we announced our initial proposal our intention was to divest Guidant's vascular intervention and endovascular business in an effort to obtain rapid antitrust approval for the Guidant acquisition. Therefore, we have executed a binding agreement with Abbott. Abbott will buy Guidant's VI and endovascular businesses when we complete this transaction with Guidant."

KL3:2519]0]3

42.     During the Q&A session at the end of the call, one analyst asked Boston Scientific's Chief Operating Officer, Paul LaViolette, whether Boston Scientific had "seen part of the [Guidant DES] data as a part of your due diligence and if not, is there some contingency that exists for Abbott should the [Guidant DES] data prove disappointing . . . ?"

43.     Electing to respond to this question himself, Mr. Best was quoted as saying:

> Let me explain the due diligence process. As you can imagine, Guidant, you know was very protective of their program in terms of our doing due diligence. *We had the opportunity to do a certain level of due diligence. Abbott had the opportunity to do a much deeper dive on due diligence.* My understanding from their due diligence is that they were very impressed with the data and what they found, and that is how they came up with the valuation and the decision to move forward. (Emphasis added).

44.     Thus, at some point in time between Boston Scientific's announcement of its bid for Guidant on December 5, 2005, and Boston Scientific's submission of a formal proposal on January 8, 2006, Guidant not only allowed Boston Scientific to conduct due diligence on it businesses but also disclosed even more confidential business information to Abbott — which had no independent right to receive any information and was prohibited from receiving any information under the Merger Agreement — about its VI and endovascular businesses.

45.     As a result of the "deeper dive" it was permitted into Guidant's confidential business information, Abbott was able to make a "decision to move forward" and agree to acquire the entire VI business and other assets that Boston Scientific needed to divest to expedite antitrust regulatory approval of its proposed acquisition of Guidant. Without these

KL3 2519101.3

agreements, Boston Scientific's Takeover Proposal would not have been viable, much less superior to J&J's.

(e)    Guidant's Impermissible Disclosures Constituted
       a Willful and Material Breach of the Merger Agreement

46.    Immediately upon learning that Guidant had divulged confidential business information to Abbott, in breach of the No Solicitation provision of the Merger Agreement, J&J's General Counsel raised the issue with Guidant's General Counsel. In a follow-up letter dated January 23, 2006, J&J's General Counsel wrote to Guidant noting the apparent breach of Section 4.02 of their Merger Agreement and demanding an explanation. In response, Guidant's General Counsel attempted to justify Guidant's actions by, among other things, claiming that "Boston Scientific brought Abbott into the transaction as part of Boston Scientific's 'Takeover Proposal'" and that Abbott was a "joint bidder" for Guidant along with Boston Scientific. The matter remained unresolved.

47.    Abbott was not a "joint-bidder" for Guidant. Abbott did not make a Takeover Proposal either on its own or in conjunction with Boston Scientific and, therefore, was not entitled to receive any confidential information from Guidant. Nor was Abbott a "Representative" of Boston Scientific, as that term is defined in Section 4.02 of the Merger Agreement. Rather, at all times Abbott was a third party divestiture candidate dealing at arms' length with Boston Scientific in negotiating the acquisition of certain businesses that would be divested in the event that Boston Scientific's Takeover Proposal was accepted.

48.    As Boston Scientific itself noted during the January 9 conference call, an executed agreement with Abbott was critically important both to rapid antitrust approval of a potential acquisition by Boston Scientific and to the perceived business prospects of the

K13:2519101:3

combined company. Just as J&J entered into a Licensing Agreement with Abbott in anticipation of closing its Merger Agreement with Guidant, Boston Scientific needed to enter into a much more extensive agreement with Abbott — divesting entire businesses — to ease antitrust approval of its own otherwise inferior proposal to acquire Guidant. By leaking confidential information to Abbott, a third-party divestiture candidate, Guidant, in violation of the No Solicitation restrictions in its Merger Agreement with J&J, thus knowingly and willfully facilitated Boston Scientific's Takeover Proposal becoming a Superior Proposal.

(f)    Guidant Deems Boston Scientific's Offer to be a "Superior Proposal"

49.    On January 10, 2006, Guidant's Board of Directors met to consider whether Boston Scientific's offer was a "Superior Proposal."

50.    Faced with the prospect of losing the transaction that it had pursued for more than a year, J&J chose to reconsider the amount it was willing to offer for Guidant. On January 11, J&J and Guidant announced a revised Merger Agreement, raising the price to $68.06 per Guidant share. On the next day, however, Boston Scientific improved its own offer to $73 per Guidant share. The following day, January 13, 2006, J&J and Guidant announced a further revision to their Merger Agreement, raising the acquisition price to $71 per share, but once again, on January 17, 2006, Boston Scientific raised its offer, this time to $80 per share.

51.    Later in the day on January 17, 2006, Guidant's Board announced that Boston's bid was deemed a "Superior Proposal" to the existing deal with J&J. On January 25, 2006, Guidant announced that it was terminating the Merger Agreement with J&J, as it was entitled to do upon determining that there was a Superior Proposal, and entering into an acquisition agreement with Boston Scientific for $27 billion. J&J ultimately received a $705

KL3:2519101.3

million "termination fee" under the terms of its Merger Agreement. However, as the Merger Agreement itself makes clear, "no such termination shall relieve any party hereto from any liability or damages resulting from the willful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement." (Merger Agreement at § 7.02).

52.    As a result of Guidant's willful and material breach of the No Solicitation provision of the Merger Agreement, which facilitated Boston Scientific's Takeover Proposal through the prohibited confidential disclosures to third-party divestiture candidate Abbott, J&J was wrongfully deprived of the full benefits of its bargain and suffered damages that it now seeks to recover.

V.    Claims for Relief

First Cause of Action
for Breach of Contract
(Against Defendant Guidant)

53.    J&J repeats and realleges the allegations of paragraphs 1 to 52.

54.    J&J entered into a valid, binding contract embodied in the Merger Agreement. A material term of the Merger Agreement was a "No Solicitation" clause, as set forth in Section 4.02 of the Merger Agreement. The No Solicitation clause was designed to protect the terms of the bargain that the parties struck, pending the closing of their transaction, while providing Guidant with the limited ability to receive and negotiate unsolicited alternative proposals.

KL3:2519101.3

55.    Assuming that Boston Scientific's December 5, 2005 bid could be viewed as reasonably likely to lead to a Superior Proposal, Guidant was only permitted to provide confidential information to Boston Scientific and its Representatives, as defined in the Merger Agreement.    Since Abbott was neither a person making a Takeover Proposal nor a Representative of Boston Scientific, but only a third-party divestiture candidate, permitting Abbott to take a "deeper dive" into Guidant's confidential information was a clear breach of the Merger Agreement.

56.    This breach went to the heart of J&J's bargain, facilitating a competing bid by providing confidential information to a person not entitled to receive such information under the No Solicitation clause.

57.    The breach was also material and harmed J&J.    Had Abbott not been provided with Guidant's confidential business information, Abbott would not have been able to enter into the divestiture agreement, which in turn facilitated and enabled Boston Scientific's Takeover Proposal to be viewed as a Superior Proposal.

58.    As a result of Guidant's willful and material breach, J&J was deprived of the benefit of its bargain under the Merger Agreement and suffered damages.

59.    J&J made reasonable and diligent attempts to mitigate its damages.

Second Cause of Action
for Breach of the Implied Duty of Good Faith and Fair Dealing
(Against Defendant Guidant)

60.    J&J repeats and realleges the allegations of paragraphs 1 to 52.

KL3 25 9101 3

61.    As a matter of common law, as well as the law of the State of Indiana, every contract imposes on the parties thereto an implied duty of good faith and fair dealing.

62.    Defendant Guidant breached the implied duty of good faith and fair dealing by negotiating and facilitating a competing Takeover Proposal from another party, Boston Scientific, during the time that it was party to a binding Merger Agreement with J&J, in violation of the Merger Agreement.

63.    Guidant could have terminated the Merger Agreement with J&J, paid the termination fee, and assumed the risk of being able to negotiate and enter into an alternative deal with Boston Scientific, subject to the uncertainty of being able to consummate a divestiture and the inevitable delay and uncertainty of antitrust regulatory review.    Instead, Guidant surreptitiously facilitated an alternative proposal with Boston Scientific, through the prohibited disclosure of confidential information to Abbott, a third party divestiture candidate.    Guidant thus used the Merger Agreement to negotiate a better offer in breach of its implied duty of good faith and fair dealing.

64.    As a result of Guidant's breach of the implied duty of good faith and fair dealing, J&J was deprived of the benefit of its bargain under the Merger Agreement and suffered damages.

Third Cause of Action
For Tortious Interference with Contract
(Against Defendants Boston Scientific and Abbott)

65.    J&J repeats and realleges herein the allegations of paragraphs 1 to 52.

KL3:2519191.3

66.    Boston Scientific and Abbott were aware that J&J had entered into a binding Merger Agreement with Guidant and were aware that the Merger Agreement prohibited the disclosure of confidential information to third parties.

67.    Boston Scientific and Abbott intentionally induced Guidant to breach the Merger Agreement with J&J by disclosing confidential business information to Abbott.

68.    Boston Scientific and Abbott thus knowingly, intentionally, and maliciously interfered with J&J's binding contract to acquire Guidant under the terms of the Merger Agreement that was on the verge of closing.

69.    Abbott emerged from its prohibited due diligence review with a clear picture of Guidant's businesses that enabled it to proceed expeditiously with a divestiture agreement, which in turn facilitated Boston Scientific's ability to make a "Superior Proposal" to Guidant.

70.    As a result of Guidant's breaches and Boston Scientific's and Abbott's tortious interference with J&J's Merger Agreement and prospective business opportunity, J&J was damaged.

<u>Prayer for Relief</u>

Wherefore, Plaintiff J&J respectfully requests the following relief:

(i)    that the Court find that Guidant willfully and materially breached the Merger Agreement with J&J;

KL3:2519101.3

(ii)     that the Court find that Guidant breached the implied obligation of good faith and fair dealing; and

(iii)    that the Court find that Boston Scientific and Abbott knowingly, intentionally and tortiously interfered with, and induced Guidant to breach, the Merger Agreement;

(iv)    that after making such determinations, the Court award Plaintiff appropriate legal damages (general and special), in an amount to be determined at trial, but in no event less than $5.5 billion; and

(v)     that the Court award such other necessary and proper relief, including, without limitation, attorneys' fees, interest, costs, as the Court may deem just and proper.

Dated:   New York, New York
         September 25, 2006

Kramer Levin Naftalis & Frankel LLP

By: _____

Harold P Weinberger (HW3240)
Timothy J. Helwick (TH5833)

1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9000

Attorneys for Plaintiff Johnson & Johnson

-21-

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and | ) | |
| ABBOTT CARDIOVASCULAR | ) | |
| SYSTEMS, INC., | ) | Civil Action No. 07-259-SLR |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| JOHNSON AND JOHNSON, INC. and | ) | |
| CORDIS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively "Abbott") bring this Supplemental and Amended Complaint against Defendants Johnson and Johnson, Inc. and Cordis Corporation (collectively "J&J"). This is an action for declaratory judgment and injunctive relief that United States Patent No. 7,217,286 entitled "LeadLocal Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Falotico '286 patent") isWright '7286 patent"), United States Patent No. 7,223,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '3286 patent"), United States Patent No. 7,229,473 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '473 patent"), and United States Patent No. 7,300,662 entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease" ("the Falotico '662 patent") are invalid and not infringed by

Abbott. The ~~Wright '7286 patent, the Wright '3286 patent, and the Wright '473 patent are attached as Exhibits A–C, respectively. The~~ Issue Notification for the Falotico '~~286~~662 patent ~~is~~and the Falotico '662 patent are attached as Exhibit A. ~~The Falotico '286 patent is attached as Exhibit B~~D. Abbott alleges as follows:

## THE PARTIES

1.    Abbott Laboratories is a corporation organized under the laws of the State of Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.    Abbott Cardiovascular Systems, Inc. ("ACS"), formerly Advanced Cardiovascular Systems, Inc., is a corporation organized under the laws of the State of California and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.    On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.    On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

## JURISDICTION AND VENUE

5.    This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.    This Court has personal jurisdiction, general and specific, over J&J.

8.      On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.      On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.     On information and belief, J&J regularly transacts business within this judicial district.

11.     On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

13.     J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.     The coronary stent industry is highly litigious.  J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.     On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc, et al.*, C.A. No. 97-550-SLR; *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 98-065-SLR).

16.     On three additional occasions within the last ten years, Cordis initiated patent infringement actions in this judicial district involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 98-197-SLR; *Cordis*

*Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR; and *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-027-SLR).

17.     In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS.   In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

18.     One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus.   ACS holds an exclusive patent license to use everolimus for drug eluting stents.   In clinical trials, everolimus has proven superior to other drugs.

19.     On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

**The ~~Patent~~Patents-in-Suit**

20.     United States Application No. 10/951,385 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '385 application ") was filed on September 28, 2004.

21.     The Wright '385 application is related to and claims priority to United States Patent Nos. 6,808,536 ("the Wright '536 patent") and 6,585,764 ("the Wright '764 patent").

22.     On information and belief, the subject matter claimed in the Wright '385 application is not patentably distinct from the subject matter claimed in at least the Wright '536 patent, the Wright '764 patent, the Wright '7286 patent, and the Wright '473 patent.

23.     The Wright '385 application issued on May 29, 2007 as United States Patent No. 7,223,286.

24. 20. United States Application No. 11/467,035 entitled "LeadLocal Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the "FaloticoWright '035 application") was filed on August 24, 2006.

25. 21. The FaloticoWright '035 application is related to and claims priority to United States Patent Nos. 6,808,536 ("the Wright '536 patent") and 6,585,764 (", the Wright '764 patent), and the Wright '3286 patent.

26. 22. On information and belief, the subject matter claimed in the FaloticoWright '035 application is not patentably distinct from subject matter claimed in at least the Wright '764 patent and, the Wright '536 patent, the Wright '3286 patent, and the Wright '473 patent.

27. 23. On information and belief, the Falotico '035 patentThe Wright '035 application issued on May 15, 2007 as United States Patent No. 7,217,286.

28. United States Application No. 11/466,983 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '983 application") was also filed on August 24, 2006.

29. The Wright '983 application is related to and claims priority to the Wright '536 patent, the Wright '764 patent, and the Wright '3286 patent.

30. On information and belief, the subject matter claimed in the Wright '983 application is not patentably distinct from the subject matter claimed in at least the Wright '536 patent, the Wright '764 patent, the Wright '3286 patent, and the Wright '7286 patent.

31. The Wright '983 application issued on June 12, 2007 as United States Patent No. 7,229,473.

32.    United States Application No. 10/829,074 entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease" (the "Falotico '074 application") was filed on April 21, 2004.

33.    On February 22, 2007 the United States Patent and Trademark Office issued a Final Action Office which in part rejected claims 15-22 and 31-36 for obviousness-type double patenting as being unpatentable over claims 1-6 of the Wright '536 patent. The February 22, 2007 Final Office Action is attached as Exhibit E.

34.    On information and belief, the Falotico '662 patent issued on November 27, 2007 as United States Patent No. 7,300,662.

**J&J's Public Threats To Sue For Patent Infringement By XIENCE V**

35.    24. On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

36.    25. On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch. On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and United States Patent No. 6,776,796 ("the Falotico '796 patent").

37.    26. On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

38.    27. For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant,"

attached as Exhibit CF ("the Prudential report"). In the Prudential report, parties are identified by their stock symbols: ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

39. 28. On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

40. 29. Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as . . . GDT's everolimus. The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.

\* \* \*

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI) business, including shared rights to GDT's promising everolimus-coated stent, Xience-V, to ABT. Although JNJ's patents have never been litigated, JNJ believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent. JNJ could pursue a preliminary injunction if ABT and BSX try to launch an everolimus-coated . . . stent. . . . According to JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

41. 30. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Prudential analysts.

42. 31. On January 23, 2006, A.G. Edwards & Sons, Inc. published a report titled "Healthcare Industry Note: The Game May Be Far From Over," attached as Exhibit DG ("the AG Edwards report").

43.    32. On information and belief, the AG Edwards report relied on information provided in pertinent part by J&J.

44.    33. Among other things, the AG Edwards report stated:

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over.

* * *

We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent.  We were only given two patent numbers (6776796 [the Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . . .

45.    34. On information and belief, the third patent referenced in J&J's threatening statements was the Wright '536 patent.

46.    35. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to AG Edwards analysts.

47.    36. On January 13, 2006, Citigroup published a report titled "An INTERESTing New Offer," attached as Exhibit EH ("the January 1313, 2006 Citigroup report").

48.    37. On information and belief, the January 13, 2006 Citigroup report relied on information provided in pertinent part by J&J.

49.    38. Among other things, the January 13, 2006 Citigroup report stated:

The [Wright and Falotico] patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.

50. 39. Citigroup published an additional report on March 23, 2006 titled "Deconstructing Xience," attached as Exhibit FI ("the March 23, 2006 Citigroup report"). In the March 23, 2006 Citigroup report, J&J is identified by its stock symbol JNJ.

51. 40. On information and belief, the March 23, 2006 Citigroup report relied on information provided in pertinent part by J&J.

52. 41. Among other things, the March 23, 2006 Citigroup report stated:

Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

53. 42. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Citigroup analysts.

54. 43. On January 30, 2006, Lehman Brothers published a report titled "BSX: The Risks – Part I," attached as Exhibit GJ ("the Lehman Brothers report"). In the Lehman Brothers report, parties are identified by their stock symbols: ABT for Abbott; GDT for Guidant; and JNJ for J&J.

55. 44. On information and belief, the Lehman Brothers report relied on information provided in pertinent part by J&J.

56. 45. Among other things, the Lehman Brothers report stated:

There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JNJNJ/Wyeth DES patents covering the "limus" family of drugs.

57. 46. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Lehman Brothers analysts.

58.    47. On March 14, 2006, ~~Merril~~Merrill Lynch published a report titled "More legal wrangling for J&J possible," attached as Exhibit ~~H~~K ("the ~~Merril~~Merrill Lynch report"). In the ~~Merril~~Merrill Lynch report, J&J is identified by its stock symbol JNJ.

59.    48. On information and belief, the ~~Merril~~Merrill Lynch report relied on information provided in pertinent part by J&J.

60.    49. Among other things, the ~~Merril~~Merrill Lynch report stated:

JNJ has two patents (Wright and Falotico) which appear to relate to the elution of characteristics of "olimus" compounds; JNJ's Cypher DES uses sirolimus, a member of the olimus family of drugs; other olimus drugs include Guidant's everolimus and Abbott/Medtronic's zotarolimus (ABT-578). The European launch of Guidant's Xience DES, which the company has targeted for Q2:06, could trigger possible legal activity since we understand U.S. patent law prohibits domestic manufacture of a product for sale outside the U.S. if there's been infringement of intellectual property.

61.    50. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to ~~Merril~~Merrill Lynch analysts.

62.    51. On information and belief, J&J broadcast threatening statements to other news outlets regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

63.    52. On January 23, 2006, the International Herald Tribune published an article headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit ~~I~~L ("the International Herald article").

64.   53. On information and belief, the International Herald article relied on information provided in pertinent part by J&J.

65.   54. Among other things, the International Herald article stated:

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G. Edwards.   Wald said he had been called by a Johnson & Johnson employee, whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

* * *

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design.  At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

* * *

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said. "J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

66.    55. On January 20, 2006, the Boston Globe published an article headlined "Suitors take Guidant fight to The Street," attached as Exhibit ~~J~~M ("the Boston Globe article").

67.    56. On information and belief, the Boston Globe article relied on information provided in pertinent part by J&J.

68.    57. Among other things, the Boston Globe article stated:

[J&J] has also raised ~~prospects~~the prospect that it could use patents and existing ties to Guidant to derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for Citigroup who is skeptical about Guidant's value to both companies.

69.    58. Also on January 20, 2006, Crain's Chicago Business published an article headlined "Abbott stock falls on concerns over success of Guidant bid," attached as Exhibit ~~K~~N ("the Crain's article").

70.    59. On information and belief, the Crain's article relied on information provided in pertinent part by J&J.

71.    60. Among other things, the Crain's article stated:

The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson, a competing bidder for Guidant, claims its patents would be violated if Abbott markets its own drug-eluting ~~stent~~stents or those made by Guidant.

72.  61. On January 21, 2006, Reuters published an article headlined "Abbott, Boston shares off on J&J patent threat," attached as Exhibit LO ("the Reuters article").

73.  62. On information and belief, the Reuters article relied on information provided in pertinent part by J&J.

74.  63. Among other things, the Reuters article stated:

One analyst, who asked not to be named, said J&J management was making rounds on Wall Street trying to fan fears about the Boston Scientific bid.

The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products.

75.  64. On January 24, 2006, Medical Device Daily published an article headlined "J&J offer rumors persist as Guidant has more ICD issues," attached as Exhibit MP ("the Medical Device Daily article").

76.  65. On information and belief, the Medical Device Daily article relied on information provided in pertinent part by J&J.

77.  66. Among other things, the Medical Device Daily article stated:

Fueling this speculation were rumors, some of which apparently were planted by J&J personnel as part of an organized campaign to undermine the Boston Scientific offer in the minds of analysts, that two of its patents may be infringed if an unnamed company tries to launch a drug-eluting stent coated withedwith a derivative of rapamycin.

78. 67. On January 26, 2006, The Wall Street Journal published an article headlineheadlined "Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant," attached as Exhibit NQ ("the Wall Street Journal article").

79. 68. On information and belief, the Wall Street Journal article relied on information provided in pertinent part by J&J.

80. 69. Among other things, the Wall Street Journal article stated that:

Another potential wrinkle arises in the intellectual-property rights surrounding stents ---- an area that's been the subject of extensive litigation in the industry. Citigroup analyst Matthew Dodds says J&J holds patents on methods of using "limus-type drugs on stents -- including the everolimus on Guidant's stent, as well as a drug on an Abbott stent.

81. 70. On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

82. 71. On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of patents in the Wright and/or Falotico families. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

83. 72. Abbott and others did become aware of J&J's threatening statements.

84. 73. For example, on January 20, 2006, Avram Goldstein of Bloomberg contacted Abbott regarding the Wright and Falotico patents in relation to the XIENCE V.

85. 74. On January 13, 2006, Bruce Nudell of Sanford C. Bernstein contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

86. ~~75.~~ Also on January 13, 2006, The Shaw Group contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

87. ~~76.~~ On January 20, 2006, Avram Goldstein of Bloomberg contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

88. ~~77.~~ Again on January 20, 2006, Barnaby Feder of the New York Times contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

89. ~~78.~~ On January 31, 2006, Steve Silva of Joele Frank contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

90. ~~79.~~ On March 23, 2006, Jennifer B. Pearlman of Burgundy Asset Management contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

91. On information and belief, in furtherance of its campaign to cast a cloud over the launch of the XIENCE V, J&J made threatening statements to Guidant.

92. On January 12, 2006, J&J contacted Guidant and informed Guidant that if Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with the Wright and Falotico patent families.

93. On January 13, 2006, J&J again contacted Guidant. J&J sent Guidant a document asserting that J&J's intellectual property portfolio included patents directed to everolimus when used on a stent, Abbott would not receive access to these patents in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using everolimus, including the XIENCE V, may infringe these patents.

94. ~~80.~~ On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

95.    81. On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

96.    82. In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

97.    83. The XIENCE V was subsequently launched in Europe.  On information and belief, J&J is aware that the XIENCE V has launched and is preparing to sue Abbott for infringement by the XIENCE V of patents in the Wright and/or Falotico families.

98.    84. On information and belief,Before Abbott filed the original complaint in this action on May 15, 2007, J&J has never withdrawnwithdrew or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the patents in the Wright and/or Falotico families.

85.    On information and belief, in furtherance of its campaign to cast a cloud over the launch of the XIENCE V, J&J made threatening statements to Guidant.

86.    On January 12, 2006, J&J contacted Guidant and informed Guidant that if Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with the Wright and Falotico patent families.

87.    On January 13, 2006, J&J again contacted Guidant.  J&J sent Guidant a document asserting that J&J's intellectual property portfolio included patents directed to Everolimus when used on a stent, Abbott would not receive access to these patent in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using Everolimus, including the XIENCE V, may infringe these patents.

99. ~~88.~~ On information and belief, by these statements J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

100. ~~89.~~ On information and belief, by these statements J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

101. ~~90.~~ On August ~~24,~~7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the First Petition") with the United States Patent and Trademark Office in the matter of ~~United States Application Serial No. 11/467,035 ("the Falotico '035~~the Wright '385 application"). On ~~information and belief, on May 15, 2007,~~May 29, 2007 the ~~Falotico '035~~Wright '385 application issued as ~~United States Patent No. 7,217,286.~~the Wright '3286 patent. A copy of the First Petition is attached as Exhibit ~~Q~~R.

102. ~~91.~~ In the First Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the ~~Falotico '035~~Wright '385 application as a patent. Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch ~~the~~ XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion,

17

the XIENCE™ V product is unquestionably within the scope of at least claims ~~1~~
~~to 5~~103 and 130 on file in this application.

\* \* \*

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims ~~1 to 5~~103 and 130 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

103. ~~92.~~ On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the ~~Falotico '286~~Wright '3286 patent.

104. ~~93.~~ On information and belief, J&J intended to create the apprehension in ~~Abbot~~Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the ~~Falotico '286 patent.~~Wright '3286 patent.

~~94.     On information and belief,~~

105. J&J ~~is~~was preparing to sue Abbott for infringement by the XIENCE V ~~of the Falotico '286 patent.~~upon the issuance of the Wright '3286 patent.

106. On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Second Petition") with the United States Patent and Trademark Office in the matter of the Wright '035 application. On May 15, 2007, the Wright '035 application issued as the Wright '7286 patent. A copy of the Petition is attached as Exhibit S.

107. In the Second Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '035 application as a patent. Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

\* \* \*

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.

\* \* \*

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

108.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '7286 patent.

109.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '7286 patent.

110.    J&J was preparing to sue Abbott for infringement by the XIENCE V upon the issuance of the Wright '7286 patent.

111.    On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Third Petition") with the United States Patent and Trademark Office in the

matter of the Wright '983 application. On June 12, 2007, the Wright '983 application issued as the Wright '473 patent. A copy of the Petition is attached as Exhibit T.

112. In the Third Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '983 application as a patent. Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.
>
> * * *
>
> It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

113. On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '473 patent.

114.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '473 patent.

115.    J&J was preparing to sue Abbott for infringement by the XIENCE V of the Wright '473 patent.

116.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Fourth Petition") with the United States Patent and Trademark Office in the matter of Falotico '074 application.  On information and belief, on November 27, 2007, the Falotico '074 application issued as the Falotico '662 patent.  A copy of the Fourth Petition is attached as Exhibit U.

117.    In the Fourth Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Falotico '074 application as a patent.  Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3).  Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

* * *

> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application.  In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 15 to 30 on file in this application.

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 15 to 30 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

118.   On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Falotico '662 patent.

119.   On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Falotico '662 patent.

120.   J&J is preparing to sue Abbott for infringement by the XIENCE V upon issuance of the Falotico '662 patent.

**J&J Has Recently Sued Abbott In An Attempt To Interfere With The XIENCE V Launch**

121.   95. On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York. Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant. The complaint seeks no less than $5.5 billion in damages. A copy of the complaint is attached as Exhibit PV.

122.   96. Although the events cited in the complaint occurred over eight months ago prior to the filing of J&J's complaint, J&J timed the lawsuit, on information and belief, in anticipation of the then imminent launch of the XIENCE V. Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the then imminent launch of the XIENCE V.

**The XIENCE V Launch**

123.    97. Abbott has manufactured and continues to manufacture, at its facilities in the United States, thousands of the XIENCE V.

124.    98. On information and belief, J&J created a substantial controversy between J&J and Abbott regarding the alleged infringement of the Wright '7286 patent, the Wright '3286 patent, the Wright '473 patent, and the Falotico '286662 patent by the XIENCE V.

125.    99. Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Wright '7286 patent, the Wright '3286 patent, the Wright '473 patent, and the Falotico '286662 patent by the XIENCE V.

## CLAIM I

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,217,286

126.    100. Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-99.125.

127.    The Wright '7286 patent issued on May 15, 2007.

128.    101. J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Falotico '286Wright '7286 patent by the XIENCE V.

129.    102. J&J has asserted rights under the Falotico '286Wright '7286 patent against the XIENCE V.

130.    103. J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Falotico '286Wright '7286 patent by the XIENCE V.

131.    104. On information and belief, the claims of the Falotico '286Wright '7286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

132.    ~~105.~~ The XIENCE V does not infringe any valid claim of the ~~Falotico '286~~ Wright '7286 patent.

133.    ~~106.~~ An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the ~~Falotico '286~~ Wright '7286 patent.

## CLAIM II

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,223,286

134.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-133.

135.    The Wright '3286 patent issued on May 29, 2007.

136.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '3286 patent by the XIENCE V.

137.    J&J has asserted rights under the Wright '3286 patent against the XIENCE V.

138.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '3286 patent by the XIENCE V.

139.    On information and belief, the claims of the Wright '3286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

140.    The XIENCE V does not infringe any valid claim of the Wright '3286 patent.

141.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '3286 patent.

## CLAIM III

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,229,473

142. Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-141.

143. The Wright '473 patent issued on June 12, 2007.

144. J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '473 patent by the XIENCE V.

145. J&J has asserted rights under the Wright '473 patent against the XIENCE V.

146. J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '473 patent by the XIENCE V.

147. On information and belief, the claims of the Wright '473 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

148. The XIENCE V does not infringe any valid claim of the Wright '473 patent.

149. An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '473 patent.

## CLAIM IV

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,300,662

150. Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-149.

151. On information and belief, the Falotico '662 patent issued on November 27, 2007.

152. J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Falotico '662 patent by the XIENCE V.

153. J&J has asserted rights under the Falotico '662 patent against the XIENCE V.

154.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Falotico '662 patent by the XIENCE V.

155.    On information and belief, the claims of the Falotico '662 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

156.    The XIENCE V does not infringe any valid claim of the Falotico '662 patent.

157.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Falotico '662 patent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 7,217,286 is invalid;

(b)    each and every claim of U.S. Patent No. 7,223,286 is invalid;

(c)    each and every claim of U.S. Patent No. 7,229,473 is invalid;

(d)    each and every claim of U.S. Patent No. 7,300,662 is invalid;

(e)    (b) Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,217,286;

(f)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,223,286;

(g)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,229,473;

(h)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,300,662;

(i) ~~(e)~~ Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S. Patent ~~No. 7,217,286~~ Nos. 7,217,286, 7,223,286, 7,229,473, and 7,300,662 against Plaintiffs, their suppliers, customers, distributors or users of their products;

(j) ~~(d)~~ Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by Plaintiffs in this action; and

(k) ~~(e)~~ Plaintiffs be granted such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT
LABORATORIES and ABBOTT
CARDIOVASCULAR SYSTEMS, INC.

Date: ~~May 15,~~ November 27, 2007

# EXHIBIT 3

**From:**   Leland Hansen
**Sent:**   Monday, November 19, 2007 3:51 PM
**To:**     Leland Hansen; 'rcass@Sidley.com'
**Subject:** RE: Abbott v. J&J

Russ:

To follow up on our phone conversation, I understand that Cordis will not stipulate to (or even discuss) any procedure to conserve the Court's and the parties' resources in dealing with the new Falotico patent.  Accordingly, we intend to file appropriate motions to supplement when the new patent issues.  We are disappointed that you will not consider less burdensome alternatives.

Leland

**From:** Leland Hansen
**Sent:** Monday, November 19, 2007 10:21 AM
**To:** 'rcass@Sidley.com'
**Subject:** Abbott v. J&J

Russ:

To follow up on my voicemail, we are aware that a new Falotico patent will issue on November 27.  I would like to discuss in an effort to minimize any additional burden on the court and the parties.  Please call when you are available.

Leland

**Leland G. Hansen**
McANDREWS, HELD & MALLOY, LTD.
500 WEST MADISON STREET, 34th FLOOR
CHICAGO, ILLINOIS 60661
312 775 8000 (T)
312 775 8013 (D)
312 775 8100 (F)
lhansen@mcandrews-ip.com
www.mcandrews-ip.com

# EXHIBIT 4



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/829,074 | 11/27/2007 | 7300662 | CRDS-0062 | 5950 |

45511        7590        11/07/2007
WOODCOCK WASHBURN LLP
CIRA CENTRE, 12TH FLOOR
2929 ARCH STREET
PHILADELPHIA, PA 19104-2891

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 503 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Robert Falotico, Belle Mead, NJ;
Gregory A. Kopia, Hillsborough, NJ;
Gerard H. Llanos, Stewartsville, NJ;

IR103 (Rev. 11/05)

# EXHIBIT 5



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/829,074 | 04/21/2004 | Robert Falotico | CRD0931CIP | 5950 |

| 45511          7590          02/22/2007 |
|---|
| WOODCOCK WASHBURN LLP |
| CIRA CENTRE, 12TH FLOOR |
| 2929 ARCH STREET |
| PHILADELPHIA, PA 19104-2891 |

| EXAMINER |
|---|
| KENNEDY, SHARON E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1615 | |

| SHORTENED STATUTORY PERIOD OF RESPONSE | MAIL DATE | DELIVERY MODE |
|---|---|---|
| 3 MONTHS | 02/22/2007 | PAPER |

Please find below and/or attached an Office communication concerning this application or proceeding.

If NO period for reply is specified above, the maximum statutory period will apply and will expire 6 MONTHS from the mailing date of this communication.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/829,074 | FALOTICO ET AL. |
| | Examiner | Art Unit | |
| | Sharon E. Kennedy | 1615 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>08 January 2007</u>.

2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>15-36</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>15-36</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 10/829,074                                    Page 2

Art Unit: 1615

## DETAILED ACTION

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

Claims 15-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 3-5, 7, 8, 13, 14, 16, 18, 19 of copending Application No. 10/431,059 with reference to view of Boston Scientific, "Measuring DES Efficacy," www.taxus-stent.com/usa/efficacy.html, pages 1-3, copyright 2006, hereinafter "Boston Scientific-2006". The claims of the '059 application recite a method of preventing lesion restenosis by using an implantable medical device having the compound rapamycin and the medical device. Applicant's claims are directed to a method of inhibiting neointimal proliferation resulting from transluminal coronary angioplasty comprising, e.g., using a stent having FKBP12,

Application/Control Number: 10/829,074                                    Page 3
Art Unit: 1615

rapamycin, etc, and the device. Applicant's claims further recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded much patentable weight since it is not an accurate measure of efficacy, and in view that the prior applied for claim already recites the rapamycin antiproliferative, the claims are provisionally rejected.

Applicant should take note that in this rejection, and in the following rejections, the Boston Scientific reference has a publication date of probably 2006, after the filing date of this application. However, this reference is being used to discuss the inherent scientific aspects of claiming an in stent late loss, and is not being used as prior art. It is being used as evidence to show that a characteristic not disclosed in the reference in inherent.

This is a <u>provisional</u> obviousness-type double patenting rejection.

Claims 15-22, 31-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claim 10 of copending Application No. 10/742,346 with reference to view of Boston Scientific-2006. The '346 application claim 10 recites an implantable medical device comprising the antiproliferative rapamycin. Applicant's claims are directed to a stent comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded much patentable weight since it is not an accurate measure of efficacy, and in view that the prior applied

Application/Control Number: 10/829,074

Art Unit: 1615

for claim already recites the rapamycin antiproliferative, the claims are provisionally rejected.

This is a _provisional_ obviousness-type double patenting rejection.

Claims 15-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-9 of copending Application No. 10/761,032 with reference to view of Boston Scientific-2006. The claims of the '032 application recite an implantable medical device and method comprising the rapamycin. Applicant's claims are directed to a stent comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded much patentable weight since it is not an accurate measure of efficacy, and in view that the prior applied for claims already recite the rapamycin antiproliferative, the claims are provisionally rejected.

This is a _provisional_ obviousness-type double patenting rejection.

Claims 15-36 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-23 of copending Application No. 10/796,397 with reference to view of Boston Scientific-2006. The claims of the '397 application recite an implantable medical device and method of use comprising rapamycin. Applicant's claims are directed to a stent and method of use comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of the drug in the medical device. Accordingly, in view that the in stent late loss limitation is not accorded

Application/Control Number: 10/829,074
Art Unit: 1615

much patentable weight since it is not an accurate measure of efficacy, and in view that

the prior applied for claim already recites rapamycin, the claims are provisionally

rejected.

This is a provisional obviousness-type double patenting rejection.

Claims 15-36 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-12 of U.S. Patent No. 6,776,796

in view of Boston Scientific-2006. The claims of the '796 patent are directed to a stent

and method including the therapeutic agent rapamycin. Applicant's claims 13-22 are

directed to a stent comprising, e.g., rapamycin and recite a specific in-stent late loss.

Boston Scientific explains that this terminology indicates, roughly at best, the efficacy of

the drug in the medical device. Accordingly, in view that the in stent late loss limitation

is not accorded much patentable weight since it is not an accurate measure of efficacy,

and in view that the prior patent claims already recite rapamycin, the claims are

rejected.

Claims 15-22, 31-36 are rejected on the ground of nonstatutory obviousness-type

double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 6,808,536 in

view of Boston Scientific-2006. The claims of the '536 patent are directed to a stent

including the therapeutic agent rapamycin. Applicant's claims 13-22 are directed to a

stent comprising, e.g., rapamycin and recite a specific in-stent late loss. Boston

Scientific explains that this terminology indicates, roughly at best, the efficacy of the

drug in the medical device. Accordingly, in view that the in stent late loss limitation is

not accorded much patentable weight since it is not an accurate measure of efficacy,

Application/Control Number: 10/829,074

Art Unit: 1615

and in view that the prior patent claims already recite rapamycin, the claims are

rejected.

## Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 15-30 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention. The claims require a specific in-stent late loss

efficacy, as claimed in the independent claims. Boston Scientific-2006, is cited to show

the inherent indefiniteness of this limitation. In-stent late loss, as shown in the article,

does not provide any useful information as to the efficacy of a stent delivery device.

See especially the second diagram in the reference, describing "CASE A" and "CASE

B". As shown, in-stent late loss has little meaning when describing the functionality of a

device as compared to in-segment late loss. Applicant may argue that this is irrelevant,

since the in-stent loss can be measured and quantified regardless of its usefulness as a

data point. However, the examiner takes the position that this characteristic places a

potential infringer in an untenable position since the data holds no real value. Although

applicant claims a specific numerical range, less than about 0.5 mm, the metes and

bounds of this range are indefinite because the standard for measuring the data is

unclear. See MPEP 2173.05(c), reproduced below for applicant's convenience.

### 2173.05(c)    Numerical Ranges and Amounts Limitations

Generally, the recitation of specific numerical ranges in a claim does not raise an issue of whether a claim is definite.

#### I. NARROW AND BROADER RANGES IN THE SAME CLAIM

Use of a narrow numerical range that falls within a broader range in the same claim may render the claim indefinite when the boundaries of the claim are not discernible. Description of examples and preferences is properly set forth in the specification rather than in a single claim. A narrower range or preferred embodiment may also be set forth in another independent claim or in a dependent claim. If stated in a single claim, examples and preferences lead to confusion over the intended scope of the claim. In those instances where it is not clear whether the claimed narrower range is a limitation, a rejection under 35 U.S.C. 112, second paragraph should be made. The Examiner should analyze whether the metes and bounds of the claim are clearly set forth. Examples of claim language which have been held to be indefinite are (A) "a temperature of between 45 and 78 degrees Celsius, preferably between 50 and 60 degrees Celsius"; and (B) "a predetermined quantity, for example, the maximum capacity."

While a single claim that includes both a broad and a narrower range may be indefinite, it is not improper under 35 U.S.C. 112, second paragraph, to present a dependent claim that sets forth a narrower range for an element than the range set forth in the claim from which it depends. For example, if claim 1 reads "A circuit ... wherein the resistance is 70-150 ohms." and claim 2 reads "The circuit of claim 1 wherein the resistance is 70-100 ohms.", then claim 2 should not be rejected as indefinite.

The claims are also indefinite in view of the language "rapamycin or a macrocyclic triene analog thereof". Applicant published specification paragraph [0040] states that "rapamycin used in this context includes rapamycin and all analogs, derivatives and congeners." There is also a broadening phrase set in the last line of applicant's published paragraph [0047]. It is unclear how these phrases affect the scope of the claims, accordingly, the claims are indefinite.

Application/Control Number: 10/829,074

Art Unit: 1615

## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.  Determining the scope and contents of the prior art.
2.  Ascertaining the differences between the prior art and the claims at issue.
3.  Resolving the level of ordinary skill in the pertinent art.
4.  Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 15-36 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Mitchell et al., US 5,288,711 in view of Kamath et al., US 6,335,029..

This application is a continuation in part of applicant's prior application, US Serial

No. 09/575,480. The claims of that application are under appeal. The file history of that

application is incorporated herein.

The claims of the present application differ from the '480 application by reciting

an in-stent late loss and requiring that the drug be rapamycin or a macrocyclic triene

analog thereof. Taxol (Paclitaxel) is not a macrocyclic triene.

Kamath, applied in the parent application, discloses the claimed invention except Kamath applies taxol instead of rapamycin as the drug delivered. In the '480 application, the examiner relied on applicant's disclosure on page 8, lines 25-27, which places taxol, vincristine and rapamycin in a Markush type grouping, which is an admission that the compounds have equivalent functionalities in stents. The present specification does not include this Markush grouping.

The examiner does not find this to be convincing evidence that applicant does not consider these drugs to be equivalents for the proposed use. The primary reference, Mitchell '711, has a publication date of 1994, and is cited to exemplify that the use of rapamycin in stents to prevent smooth muscle cell hyperplasia after balloon angioplasty has been well known for some time. However, Mitchell does not explicitly disclose the polymeric coatings claimed, merely stating (column 4, lines 5-7) that a "vascular stent can be impregnated with ... rapamycin." The secondary reference, Kamath, exemplifies that incorporating antiproliferative drugs in polymeric coatings on stents is rudimentary. Accordingly, it would have been obvious to a person of ordinary skill in the art at the time the invention was made to have use rapamycin in any stent having a polymeric coating, such as the Kamath stent, so that the rapamycin would be delivered to the intraluminal area of interest.

Regarding applicant's limitation directed to in-stent late loss, this numerical characteristic only vaguely, at best, defines the effectiveness of the stent. In view of the deficiencies in the definiteness of this embodiment (as explained in previous rejections), the in-stent late loss is considered to be within the scope of the ordinary artisan. In-

Application/Control Number: 10/829,074
Art Unit: 1615

stent late loss findings are dependent upon the amount of drug incorporated into the

stent, the release rate of the drug, the polymeric binding of the drug, the degree to

which the blood vessel was initially blocked or partially blocked, the degree to which the

artery was widened by the angioplasty, the health and age of the patient, and numerous

other factors.  All of these parameters are within the skill of the surgeon to control.

Accordingly, the specifically claimed in-stent late loss is obvious to one of ordinary skill

in the art.

Applicant has submitted new claims 31-36 directed to the drug dosage of

rapamycin/analog.  The examiner takes the position that  this is merely a recitation of a

"prescription-type" claim and does not set forth anything unusual or unexpected.  Citing

a particular range or dosage is merely akin to providing a dosage amount of any drug

for a patient in the absence of a showing of criticality.  It is simply up to the surgeon or

doctor to determine what dosage a patient needs and how long the drug should be

administered.  If a patient is in need of pain medication, it is a simple matter to decide

how much medicine should be provided and how long the patient should take the

medicine.  Every person who has ever suffered a migraine headache readily

understands this concept.  Similarly, it is well known that drug eluting stents are

designed according to patient need.  These are concepts which are merely observed

and learned by a surgeon during the ordinary course of patient examination.

Specifically with regard to Mitchell '711, this concept is explained therein.  As set

forth in column 7, lines 26+, Mitchell states, "The dosage requirements vary with the

particular compositions employed, the route of administration, the severity of the

symptoms presented and the particular subject being treated." There is nothing unusual about discovering a particular drug dosage in the absence of a showing of criticality.

## Response to Arguments

Applicant's arguments filed January 18, 2007 have been fully considered but they are not persuasive. Regarding the rejection under 35 U.S.C. 112, applicant presents several articles comparing the reliability of observations between in-stent late loss and in-segment late loss in predicting target lesion revascularization (TLR). The examiner's relied on reference and applicant's submitted references discuss different types of drug eluting stents. At a minimum, these references collectively show that these types of measurements are not universal, they must be carefully analyzed for each type of drug eluting stent, and are not a predictor of stent efficacy across the board. Accordingly, the examiner takes the position that these articles collectively affirm the examiner's rejection under 35 U.S.C. 112 in view that the outcome for predicting the TLR using in-stent LL or in-segment LL differed.

Further, the examiner takes the position that the Mauri '321 does not purport to prove the efficacy measuring in-stent versus in-segment LL. The thrust of the article is set forth in the "Conclusion" section of the Abstract. The point is to promote the use of transformation to improve the accuracy of predicting low binary restenosis rates. This has nothing to do with advocating one measuring data-collection technique over the other, but is relevant to the manner in which the data are "crunched" (log, square root, log normal, log-logistic, power), which is a statistical examination performed to provide

Application/Control Number: 10/829,074
Art Unit: 1615

useful information. A careful reading of the article will show that while in-stent LL was more effective in one single aspect, that pointed out by applicant, it was not statistically relevant in other stents.

Applicant has submitted new claims 31-36 which sets forth an amount of rapamycin/analog. These limitations, in combination with the description of late loss, yield useful information sufficient to place a potential infringer on notice. Accordingly, these claims are not rejected under 35 U.S.C. 112.

### Conclusion

Applicant did not address the obvious double patenting rejections in the previous response of January 8, 2007. Applicant must either argue the rejections or file the appropriate terminal disclaimers in response to this office action.

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. The patent to Kaplan, US 5,342,348, contains a statement similar to the Kamath patent, stating in column 2, lines 15-20 that it is well known for a drug delivery device to operate for weeks or months.

Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

Application/Control Number: 10/829,074                    Page 13

Art Unit: 1615

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action. In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

### Contact Information

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Sharon E. Kennedy whose telephone number is

571/272-4948. The examiner can normally be reached on Monday-Thursday.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Michael Woodward, can be reached on 571/272-8373.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system. Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).

Sharon E. Kennedy
Primary Examiner
Art Unit 1615